CRAIG H. MILLET, SBN 106027, CMillet@gibsondunn.com
MICHELE L. MARYOTT, SBN 191993, Mmaryott@gibsondunn.com
SOLMAZ KRAUS, SBN 223117, SKraus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, California 92612-4412
Telephone: (949) 451-3800
Facsimile: (949) 451-4220

Proposed Attorneys for
Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re | CASE NO. |
| FLEETWOOD ENTERPRISES, INC., et al., | Chapter 11 |
| Debtors | [Joint Administration Pending] |
| | **DECLARATION OF ANDREW M. GRIFFITHS IN SUPPORT OF FIRST DAY PLEADINGS** |
| | **Hearing:** <br> Date:        TBD <br> Time: <br> Place: <br> Judge:        Hon. |

I, Andrew M. Griffiths, declare and state as follows:

## I.
## FOUNDATION

1.      I am the Senior Vice President, Chief Financial Officer and Treasurer of Fleetwood Enterprises, Inc., (together with its affiliated debtors and non-debtor companies, "Fleetwood") and have held this position since September 8, 2008.  I joined Fleetwood Enterprises, Inc. in February 2004 as Vice President—Controller and was promoted in April 2006 to Senior Vice President—Chief Accounting Officer, a position I held until being promoted to my current position.

2.      In my capacity as Senior Vice President, Chief Financial Officer and Treasurer of Fleetwood Enterprises, Inc., I am familiar with the business operations of Fleetwood.  In my position, I am also required to and have become generally familiar with the manner in which Fleetwood's documents, books and records are prepared and maintained.  Fleetwood maintains records of all its transactions in the regular course of its business, and it is the regular course of business to create and maintain such records.

3.      I submit this Declaration in support of Fleetwood's petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Fleetwood's First Day Pleadings (as defined below).  I am authorized to submit this Declaration on behalf of Fleetwood.

4.      Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of Fleetwood's business operations and financial condition.  If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of the documents or opinion.

**II.**
**OVERVIEW OF THE BUSINESS AND STRUCTURE OF FLEETWOOD**

**A.      The Business of the Company Overall.**

5.      Fleetwood began as a California-based producer of manufactured housing in 1950.  In 1964, Fleetwood entered the recreational vehicle market with the purchase of a travel trailer manufacturer.  Today, through its subsidiaries and affiliates, Fleetwood is one of the nation's leading producers of manufactured housing and recreational vehicles.  Fleetwood operates its business through three divisions:  motor homes, housing and travel trailers.  Each division operates through separate subsidiaries, which employ the individuals who carry out those operations, from assembly line employees and plant managers to sales professionals and technical staff.  As of March 6, 2009, Fleetwood had approximately 3,700 people located in 19 manufacturing facilities in 11 states as well as its corporate headquarters located in Riverside, California.

Gibson, Dunn &
Crutcher LLP

2

6.      In its manufactured housing business, Fleetwood produces single and multi-section manufactured homes as well as multi-family residences and military barracks.  Fleetwood's high-quality, factory-built homes are designed to enable families to enjoy comfortable housing at affordable prices.  In its recreational vehicle business, Fleetwood has traditionally manufactured two types of recreational vehicles:  motor homes and travel trailers.

7.      Fleetwood's manufactured homes and recreational vehicles, as of March 6, 2009, were marketed through a network of more than 2,150 dealers in the United States and Canada which Fleetwood supports through competitive warranties and superior warranty service.  However, as explained below, Fleetwood is in the process of shutting down the travel trailer division.  Fleetwood also operates two supply companies (a fiberglass manufacturing operation and a lumber brokerage business) that provide components for the recreational vehicle and housing operations, while also generating outside sales.

**B.      Corporate Structure**

**Debtors**

8.      Debtor Fleetwood Enterprises, Inc. ("FEI") is a public company, incorporated in Delaware.  Although formerly traded on the New York Stock Exchange under the symbol "FLE," as of December 2008 its common stock is quoted on the over-the-counter markets (OTC Bulletin Board and Pink Sheets) under the trading symbol "FLTW."   FEI is the parent company of Debtors Fleetwood Holdings, Inc. ("FHI") and Fleetwood Retail Corp. ("FRC") as well as other non-debtor companies.  An organizational chart of the entities that constitute the business of Fleetwood is attached hereto as Exhibit A, which list both debtor and non-debtor entities as further described below.  The Debtor entities are listed on Exhibit A in bold type.

9.      The Debtors FHI and FRC are direct subsidiaries of FEI.  Other Debtors who are direct subsidiaries of FEI are as follows:

**Subsidiaries of FEI**

- Continental Lumber Products, Inc.

- Fleetwood Capital Trust

- Fleetwood Homes of Mississippi, Inc.

Gibson, Dunn &
Crutcher LLP

1    • Trendsetter Homes, Inc.

2    • Fleetwood International, Inc.

3    Debtors who are subsidiaries of FHI and FRC are as follows:

4    **Subsidiaries of FHI**

5    • Fleetwood General Partner of Texas, Inc.;

6    • Fleetwood Homes of Texas, L.P.[1]

7    • Fleetwood Homes Investment, Inc.

8    • Fleetwood Homes of Arizona, Inc.

9    • Fleetwood Homes of California, Inc.

10   • Fleetwood Homes of Florida, Inc.

11   • Fleetwood Homes of Georgia, Inc.

12   • Fleetwood Homes of Idaho, Inc.

13   • Fleetwood Homes of Indiana, Inc.

14   • Fleetwood Homes of Kentucky, Inc.

15   • Fleetwood Homes of North Carolina, Inc.

16   • Fleetwood Homes of Oregon, Inc.

17   • Fleetwood Homes of Pennsylvania, Inc.

18   • Fleetwood Homes of Tennessee, Inc.

19   • Fleetwood Homes of Virginia, Inc.

20   • Fleetwood Homes of Washington, Inc.

21   • Fleetwood Motor Homes of California, Inc.

22   • Fleetwood Motor Homes of Indiana, Inc.

23   • Fleetwood Motor Homes of Pennsylvania, Inc.

24   • Fleetwood Travel Trailers of California, Inc.

25   • Fleetwood Travel Trailers of Indiana, Inc.

26

27

28

[1]    Fleetwood Homes of Texas, L.P is affiliate of both Fleetwood General Partner of Texas, Inc. and Fleetwood Homes Investment, Inc., both of which are direct subsidiaries of FHI.

Gibson, Dunn &
Crutcher LLP

1      • Fleetwood Travel Trailers of Kentucky, Inc.

2      • Fleetwood Travel Trailers of Maryland, Inc.

3      • Fleetwood Travel Trailers of Ohio, Inc.

4      • Fleetwood Travel Trailers of Oregon, Inc.

5      • Fleetwood Travel Trailers of Texas, Inc.

6      • Gold Shield, Inc.

7      • Gold Shield of Indiana, Inc.

8      • Hauser Lake Lumber Operations, Inc.

9      **Subsidiaries of FRC**

10     • Fleetwood Home Centers of Nevada, Inc.

11     • Fleetwood Home Centers of Texas, Inc.

12     • Fleetwood Retail Corp. of California

13     • Fleetwood Retail Corp. of Illinois

14     • Fleetwood Retail Corp. of North Carolina

15     • Fleetwood Retail Corp. of Tennessee

16     • Fleetwood Retail Corp. of Virginia

17     • Fleetwood Retail Corp. of West Virginia

18     (The direct subsidiaries of FHI, other than Hauser Lake Lumber, along with Continental

19     Lumber Products, a subsidiary of FEI, are referred to as the "Operating Subsidiaries") (the Operating

20     Subsidiaries together with FEI, FHI and FRC and their subsidiaries are collectively referred to as the

21     "Debtors").

22     1.      **Non-Debtors**

23     10.     As shown on <u>Exhibit A</u>, the following direct and indirect subsidiaries and affiliates of

24     FEI have *not* filed chapter 11 petitions:

25     • Fleetwood Housing International, Inc.

26     • Fleetwood Travel Trailers of Virginia, Inc.

27     • Fleetwood Canada Ltd.

28     • Fleetwood De Mexico S.A. DE C.V.

Gibson, Dunn &
Crutcher LLP

1       • Fleetwood Retail Corp. of Alabama

2       • Fleetwood Retail Corp. of Arizona

3       • Fleetwood Retail Corp. of Arkansas

4       • Fleetwood Retail Corp. of Colorado

5       • Fleetwood Retail Corp. of Florida

6       • Fleetwood Retail Corp. of Georgia

7       • Fleetwood Retail Corp. of Idaho

8       • Fleetwood Retail Corp. of Kansas

9       • Fleetwood Retail Corp. of Kentucky

10      • Fleetwood Retail Corp. of Louisiana

11      • Fleetwood Retail Corp. of Mississippi

12      • Fleetwood Retail Corporation of Missouri

13      • Fleetwood Retail Corp. of New Mexico

14      • Fleetwood Retail Corp. of Ohio

15      • Fleetwood Retail Corp. of Oklahoma

16      • Fleetwood Retail Corp. of Oregon

17      • Fleetwood Retail Corp. of South Carolina

18      • Fleetwood Retail Corp. of Washington

19      • Fleetwood Financial Services, Inc.

20      • Fleetwood Holidays, Inc.

21      • Fleetwood Homes of Oklahoma, Inc.

22      • Fleetwood Travel Trailers of Nebraska, Inc.

23      • Gibraltar Insurance Company, Ltd.

24      • GSF Installation Co.

25      • Fleetwood Retail Investment Corp.

26      • Expression Homes Corp.

27      • Fleetwood Vacation Club, Inc.

28      • FVC Management Co. Inc.

- HomeOne Credit Corp.

- Home Sentry Insurance Agency, Inc.

- National Home Shield Insurance Agency, Inc. of Alabama

11.     The majority of the non-debtors, which include the subsidiaries of FRC, as well as Fleetwood Retail Investment Corp., Expression Homes Corp., HomeOne Credit Corp. and its subsidiaries, were formerly involved in Fleetwood's manufactured housing retail and financing business.  Fleetwood sold the manufactured housing retail operations and its entire loan portfolio in 2005.  In connection with that sale, Fleetwood assigned leases for numerous retail locations to the buyers, but remains liable for remaining lease terms in the event of default by the assignees.  The non-debtor subsidiaries of FRC are those which are not presently involved in any litigation arising from the sale of the manufactured housing retail operations.  Gibraltar Insurance Company, Ltd., ("Gibraltar") is an entity established in 1977 under the laws of Bermuda which provides, primarily, coverage for product liability claims involving Fleetwood's products.

12.     The remaining non-debtors, Fleetwood Housing International, Fleetwood Financial Services, Fleetwood Vacation Club, Inc. (including its wholly owned subsidiary, FVC Management Co., Inc.), Fleetwood Holidays, Inc., Fleetwood Homes of Oklahoma, Inc., Fleetwood Travel Trailers of Nebraska, Inc., and GSF Installation Co., are all inactive and have no assets, employees or liabilities.

## C.    Manufactured Homes Business.

13.     In 2007, Fleetwood was the second-largest producer of manufactured homes in the United States in terms of retail units shipped.  A manufactured home is a single-family house that is constructed in a factory using assembly-line techniques in accordance with the Federal Department of Housing and Urban Development ("HUD") construction and safety standards.  Fleetwood distributes its manufactured housing products through a network of approximately 1,450 dealers in 46 states. The cost of a quality manufactured home runs about one-third that of an on-site constructed home, in each case excluding land.  Off-site production eliminates the use of multiple contractors, greatly reduces the affect of adverse weather, and also greatly reduces the time required for construction because every component arrives at the assembly point ready to use.  Manufactured homes are

Gibson, Dunn &
Crutcher LLP

trucked in sections to the pre-prepared site, where they are assembled in a matter of days, instead of the normal site-built construction times that can stretch into weeks and months.

14.    Fleetwood also builds modular housing units for the United States Military and has, in the past, completed multi-family modular housing projects.  Modular homes differ from typical manufactured homes primarily because they comply with state and local building codes.

15.    The manufactured housing industry grew significantly from 1991 to 1998, fueled in part by liberal credit standards, availability of financing and low interest rates.  After 1998, the industry started to steadily decline due to tighter credit practices and relatively high interest rates.  In addition, some lenders have discontinued the practice of extending loans to manufactured housing buyers and more than half of the retail lenders available in the year 2000 have existed the business, leaving an insufficient volume of financing.  In more recent times, the manufactured housing industry has also been competing with excessive inventories of site-built homes which have yet to clear the market.

16.    Despite market pressure, Fleetwood has continued to see strength in the manufactured housing business and particularly in military housing.

**D.    Recreational Vehicles Business:  Motor Homes and Travel Trailers.**

17.    Historically, Fleetwood has been one of the nation's leaders in producing recreational vehicles and distributes its recreational vehicle products – motor homes and travel trailers – through a dealer network of nearly 700 independent dealers in 49 states and Canada.  A motor home is a motorized unit that can be used as a temporary dwelling.  In many cases a motor home is used for extended travel and is often considered a second home.  Travel trailers are designed to be towed by another vehicle, and are similar to motor homes in use and features.

**Motor Homes**

18.    Within the motor home business, Fleetwood primarily competes in the Class A and Class C categories.  The Company's Class A units range in length from 30 to 45 feet and sell for an average retail price of $160,000.  The Company's Class C units range in length from 23 to 31 feet and sell for an average retail price of $67,000.  Fleetwood is the largest manufacturer of Class A motor homes in the United States, the 3rd largest manufacturer of Class C motor homes and the 2nd

Gibson, Dunn & Crutcher LLP

largest motor home manufacturer overall.  Fleetwood markets its Class A and Class C motor homes through 23 different brand names which vary based on size and price point.

**Travel Trailers**

19.      Fleetwood has lost substantial market share in the travel trailer business over the past several years due to aggressive competition from well-capitalized industry peers.  The continuing decline in Fleetwood's travel trailer business accounted for a loss of approximately $69 million last year alone.  Although Fleetwood responded to competitive pressures by improving its product lineup, current market conditions have proven too severe to enable a timely recovery.  Because of the continuing losses, Fleetwood has decided to withdraw from the travel trailer business and apply its resources to businesses that are more viable in the near term.

20.      On March 9, 2009, Fleetwood caused notices to be delivered to its travel trailer dealers notifying them that it was terminating their respective travel trailer dealer agreements, effective immediately.  As Fleetwood advised the dealers, Fleetwood intends to honor and fulfill orders previously submitted by the dealers for travel trailer products to the extent possible given existing inventory and work-in-process.  On or about March 10, 2009, Fleetwood will terminate approximately 600 employees associated with the travel trailer business, including employees at two manufacturing plants in Oregon and one manufacturing plant in Ohio, as well as employees who work in the travel trailer division from Fleetwood's corporate headquarters.  The remaining employees in the travel trailer division, approximately 80 of them, will continue to assist with the orderly closure of the operations, which Fleetwood expects will take approximately 30-45 days.  This orderly closure will include completing remaining work-in-process to the extent possible, and removing equipment and transporting equipment that can be used in other manufacturing facilities to those facilities.

Gibson, Dunn &
Crutcher LLP

9

# III.
## DEBT STRUCTURE OF FLEETWOOD

A.      **Secured Bank Debt.**

21.      FHI and the Operating Subsidiaries (collectively, the "Borrowers") are parties to a secured credit facility with a syndicate of lenders[2] led by Bank of America, N.A., as administrative agent (as amended and restated, the "Secured Credit Facility").  The borrowings under the Secured Credit Facility are used for working capital and general corporate purposes.  The Secured Credit Facility provides for a revolving credit facility, and has been amended several times to reset financial requirements that could have resulted in past defaults.

22.      The obligations of the Borrowers under the Secured Credit Facility are guaranteed by FEI, Fleetwood Canada Ltd. and Fleetwood International Inc. (collectively, the "Secured Credit Facility Guarantors").  Except for a certain amount of real property, the Secured Credit Facility is secured by a pledge of the majority of the assets of each of the Debtors, including accounts receivable, cash, inventory and real property owned by certain of the Operating Subsidiaries.  The Borrowers' borrowing capacity under the Secured Credit Facility is governed by the amount of a borrowing base, calculated based on inventory and accounts receivable and a real estate sub-facility.

23.      As of the March 6, 2009, the maximum availability under the Secured Credit Facility was approximately $135 million and there was approximately $61.7 million in borrowings outstanding.  As of the Petition Date, no amount was outstanding on the revolving credit facility itself and the total amount outstanding on the Secured Credit Facility consisted of approximately $61.7 million in letters of credit issued to support performance bonds issued to insure the Debtors' performance of certain manufactured housing contracts, to support workers' compensation obligations and in favor of certain states to support the Debtors' self-insured workers' compensation obligations.

---

[2]  Wells Fargo Foothill, Inc., fka Foothill Capital Corporation; Textron Financial Corporation; PNC Bank, National Association; Wachovia Capital Finance Corporation (Western); and Bank of America, N.A.

Gibson, Dunn & Crutcher LLP

**B.    5% Unsecured Debentures**

24.    In December 2003, FEI issued $100 million in aggregate principal amount of its 5% Convertible Senior Subordinated Debentures due 2023 (the "5% Debentures").  The 5% Debentures are unsecured obligations of FEI.  Holders of the 5% Debentures had the right to require FEI to repurchase their 5% Debentures, in whole or in part, on December 15, 2008 (the "2008 Put Right" discussed further below), and current holders of the 5% Debentures have similar rights on December 15, 2013 and December 15, 2018.  The repurchase price is 100% of the principal amount of the 5% Debentures plus accrued and unpaid interest.  Bank of New York is the indenture trustee as to the 5% Debentures.

**C.    6% Debentures.**

25.    In 1998, Debtor Fleetwood Capital Trust ("FCT"), a subsidiary of FEI, completed a $287.5 million private placement of 5,750,000 shares of its preferred securities.  FCT then transferred the proceeds of private placement to FEI in exchange for FEI's issuance to FCT of $296.4 million in FEI's 6% Convertible Subordinated Debentures due 2028 (the "6% Debentures").  Bank of New York is the indenture trustee as to the 6% Debentures.  The 6% Debentures are unsecured obligations of FEI and represent the sole asset of FCT.   FEI has guaranteed the obligations of FCT to its preferred shareholders.

26.    As of the Petition Date, approximately $151.25 million in aggregate principal amount of FEI's 6% Debentures remain outstanding.  The 6% Debentures are junior to the 5% Debentures in right of payment.  Also, as of the Petition Date approximately 3,025,000 shares of convertible trust preferred securities of FCT were issued and outstanding.

**D.    The 5% Debenture Put Right, The Exchange Offer and the Repurchase Offer**

27.    The indenture controlling the 5% Debentures permitted FEI, at its option, to elect to pay the repurchase price for the 2008 Put Right in cash, in its common stock, or with a combination of cash and common stock.  In the Summer of 2008, FEI projected that it would not have enough liquid cash to satisfy the 2008 Put Right if all outstanding 5% Debentures were tendered and also concluded that it may not have enough authorized shares of its common stock to issue in lieu of cash in satisfaction of the 2008 Put Right (as the number of shares to be issued was based on the market

Gibson, Dunn &
Crutcher LLP

price of FEI's common stock over the 20 trading days preceding December 15, 2008). If FEI were unable to satisfy its obligation to repurchase 5% Debentures from holders who exercised their 2008 Repurchase Right, then FEI would be in default under the indenture governing the 5% Debentures. In response, FEI commenced two separate "exchange offers."

28.    Pursuant to a form S-4 filed with the SEC on October 30, 2008, as amended, FEI commenced an exchange offer (the "Exchange Offer") pursuant to which it offered to exchange its outstanding 5% Debentures for new 14% Notes with more favorable terms, including the pledge of security.

29.    Pursuant to a separate form S-4 filed with the SEC on November 6, 2008, as amended, FEI commenced a second simultaneous exchange offer (the "Repurchase Offer"), to allow those 5% Debentures who, instead of accepting the Exchange Offer, wished to exercise their 2008 Repurchase Right (as provided in the indenture governing the 5% Debentures) to require FEI to repurchase their 5% Debentures in exchange for common stock of FEI.

**E.    The New 14% Secured Notes**

30.    Those holding approximately 79% of the outstanding 5% Debentures accepted the Exchange Offer, and on December 12, 2008, FEI issued (a) approximately $81.4 million in aggregate principal amount of the new 14% Senior Secured Notes due 2011 (the "14% Notes")[3] and (b) approximately 11.1 million shares of its common stock in exchange for approximately $79.1 million in aggregate principal amount of its 5% Debentures tendered in the Exchange Offer.

31.    As security for the obligations of FEI under the 14% Notes, certain of the Operating Subsidiaries pledged their real property to Deutsche Bank as indenture trustee for the benefit of the holders of the 14% Notes as evidenced (a) by first-priority mortgages liens on previously

---

[3]    As of March 6, 2009, approximately $81.4 million in aggregate principal amount of the 14% Notes remained outstanding, the beneficial owners of which include the following: Whippoorwill Associates, Inc. ($34,407,000); Credit Suisse (USA) Securities ($10,300,000); Wolverine Asset Management, L.L.C. ($14,111,000); Brigade Capital Management, LLC ($9,985,000); Barclays Capital ($3,979,000); Putnam Investment Management, L.L.C. ($3,325,000); JP Morgan Securities Inc. ($1,637,000); Argent Capital Management, LLC ($500,000); Clutterbuck Capital Management, LLC ($103,000); GAMCO Investors, Inc. ($100,000); White Peaks Asset Management ($75,000); and Alpine Fund LLP ($77,000).

Gibson, Dunn & Crutcher LLP

unencumbered real property, and (b) by second priority mortgages or deeds of trust on 18 real properties which had previously been pledged as collateral to secure the Secured Credit Facility.  The pledged property consisted largely of the manufacturing facilities owned and operated by the Operating Subsidiaries that produce recreational vehicles and the manufactured housing supply operations.

32.    FEI's obligations under the 14% Notes are unconditionally guaranteed jointly and severally by FHI and the Operating Subsidiaries who are also the borrowers under the Secured credit Facility.  The 14% Note Guarantees are unsecured obligations of the Operating Subsidiaries and are subordinated to the obligations of the Operating Subsidiaries under the Secured Credit Facility.

33.    The 14% Notes (i) rank equally in right of payment with all existing and any future unsecured debt of FEI and junior to all existing and future secured debt of FEI to the extent of the value of the liens securing such obligations, (ii) are senior in right of payment to the 5% Debentures and the 6% Debentures and (iii) are subordinated to all liabilities and preferred stock of each subsidiary of FEI that did not guarantee FEI's obligations under the 14% Note.

F.    **Common Stock Issued in the Repurchase Offer in Exchange for 5% Debentures.**

34.    Instead of electing to participate in the Exchange Offer, on December 15, 2008, the holders of approximately $19.8 million in aggregate principal amount of the 5% Debentures accepted the Repurchase Offer and thereby exercised their right (as provided in the indenture governing the 5% Debentures) to require FEI to repurchase their Debentures in exchange for common stock of FEI. The amount of stock to be issued was based on a formula using the volume weighted average price of FEI stock over a 20 day trading period.

35.    On December 16, 2008, FEI issued approximately 121.8 million shares of its common stock in exchange for approximately $19.8 million in aggregate principal amount of 5% Debentures tendered in the Repurchase Offer.

G.    **Remaining 5% Debentures That Neither Tendered in the Exchange Offer nor the Repurchase Offer.**

36.    As of March 6, 2009, approximately $1.069 million in aggregate principal amount of the 5% Debentures remained outstanding  consisting of 5% Debentures holders who neither tendered

Gibson, Dunn &
Crutcher LLP

13

their 5% Debentures in the Exchange Offer nor in the Repurchase Offer.[4]  The 5% Debentures

remain senior to the 6% Debentures in right of payment.

**H.    ISIS Lending Obligation**

37.    On or about August 22, 2008, Debtors Fleetwood Motor Homes of California, Inc. and

Fleetwood Homes of California, Inc., each executed a Deed of Trust, Assignment of Rents, Security

Agreement and Fixture Filing in which they pledged each of their real property located in Riverside,

California as security for a loan in the principal amount of $27.25 million made by Isis Lending, LCC

to Debtors Fleetwood Motor Homes of California, Inc. and Fleetwood Homes of California, Inc.

("Isis Loan").   The obligations under the Isis Loan are guaranteed by FEI.

**I.    Life Insurance Obligations**

38.    Under that certain Split Dollar Agreement (the "Split Dollar Agreement"), dated as of

August 10, 1992, between FEI and John C. Crean (the policy "Owner"), FEI agreed to pay a portion

of the premiums on a life insurance policy on the Owner and his spouse with a face amount of

$40,000,000. To secure the repayment to FEI of the amount of the premiums paid by it, Owner

assigned to FEI, among other things, the right to receive loans against the policy, to the extent of the

aggregate premiums paid by FEI, and the right to receive a portion of the proceeds from the policy

upon the death of the insured or surrender of the policy.  Within sixty days after termination of the

Split Dollar Agreement, Owner has the option to obtain a release of the collateral assignment by

repaying to FEI certain net premiums and costs of funds. If Owner does not exercise such option,

Owner must the transfer his interest in the policy to FEI or FEI may enforce its rights under the

collateral assignment of the policy.

39.    FEI borrowed against its rights in the policy.  As of March 6, 2009, the aggregate

principal amount outstanding under such borrowings is $22,422,069, consisting of an 8.00% loan

made by The Prudential Insurance Company of America in a principal amount of $7,622,275, a

5.75% loan made by John Hancock Life Insurance Company in a principal amount of $11,287,482

---

[4]    $1,025,000 and $44,000 in principal amount of 5% Debentures were beneficially held by
Lehman Brothers Inc. (Lehman Brothers Convertible Securities Trading) and Pension Benefit
Guaranty Corporation, respectively, as of such date.

Gibson, Dunn &
Crutcher LLP

and a 6.50% loan made by Security Life/Midwestern United Life Insurance Company in an amount of $3,512,312.

40.    FEI sponsors a non-qualified Deferred Compensation Plan ("DCP") benefit plan for "highly-compensated" managers.  The DCP was designed to allow managers to defer a portion of their incentive compensation (pre-tax) to future years.  FEI accrues a liability for these benefits which is informally funded with the purchase of Corporate Owned Life Insurance ("COLI") policies on the lives of several management employees.  This investment is held by a trustee in a "Rabbi Trust" which protects the benefits against a change of control, a change of heart on the part of FEI or a lack of assets to pay the benefits.  Under the trust arrangement, these assets cannot be accessed by FEI, except for the payment of benefits, or, in the case of bankruptcy, the trust is required to surrender them to FEI and any remaining benefits are paid to the participants as unsecured creditors.

41.    FEI borrows against the COLI policies.  As of the March 6, 2009, the interest on such borrowings is 3.5% per annum and the aggregate principal amount outstanding is $61,730,571.

**J.    Summary of Indebtedness:**

42.    As of March 6, 2009, the approximate aggregate non-contingent obligations of the Debtors was as follows:

- Secured Credit Facility: $135 million
- 14% Secured Notes: $81.4 million
- 6% Debentures: $151.25 million
- 5% Debentures: $1.1 million
- Isis Loan:  $27.25 million
- The total number of outstanding shares of common stock of FEI was approximately 209.2 million
- Prudential Loan: $7.6 million
- John Hancock Loan:  $11.2 million
- Security Life/Midwestern United Loan:  $3.5 million
- COLI Loan:  $61.7 million

Gibson, Dunn &
Crutcher LLP

43.      In addition to the above, Debtor FEI has outstanding unsecured indebtedness owed to its subsidiary Gibraltar of approximately $500,000, which may be offset by future dividends available to FEI from Gibraltar under Bermuda law.

44.      Aside from the outstanding obligations summarized above, as of March 6, 2009 the Debtors had approximately $4,683,455.97 in trade debt owed by 22 filing entities to approximately 1,212 creditors, not including contingent claims potentially held by former travel trailer dealers based on the termination of their dealer agreements.

**IV.**
**LITIGATION**

45.      As of December 8, 2008, the Debtors collectively were parties to a total of 289 different lawsuits pending in federal and state courts in 31 U.S. states and in two Canadian provinces. The claims at issue in these actions include breach of warranty, product liability, personal injury, property damage and labor/employment matters.  All lawsuits pending against the Debtors are automatically stayed upon commencement of the Debtors' bankruptcy cases pursuant to section 362 of the Bankruptcy Code.

**V.**
**FLEETWOOD'S BUSINESS DOWNTURN AND LIQUIDITY CRISIS**

46.      Fleetwood has reported a net loss in each fiscal year since 2001.  A failure to generate sufficient cash from operations has reduced Fleetwood's liquidity and caused it to reduce its expenditures on capital improvements, machinery, equipment and research and development, ultimately having a negative effect on sales and earnings.  Fleetwood's operating results have been negatively impacted by:

- a general weakness in both the manufactured housing and the recreational vehicle markets, initially caused by turmoil in the mortgage industry that later spread to the broader financial markets and economy;

- depressed real estate prices and stringent home equity lending, resulting in a reduced ability, particularly for recreational vehicle buyers, to borrow all or part of the purchase price against their home equity;

Gibson, Dunn &
Crutcher LLP

16

- the fallout in the subprime mortgage sector resulting in depressed prices and an increased number of foreclosures of site-built homes, reducing demand for manufactured housing;

- a decline in the availability and a rise in the cost of wholesale and retail financing for both manufactured housing and recreational vehicles;

- restrictive lending standards in the manufactured housing market by the remaining retail lenders;

- relatively high interest rates and stricter lending standards for manufactured homes as opposed to site-built homes;

- high and volatile fuel prices and speculation about potential fuel shortages contributing to consumers' reluctance to purchase recreational vehicles;

- cyclical and seasonal nature of both the manufactured housing and recreational vehicle industries—demand generally declines during the winter season, while sales and profits in both industries are generally highest during the spring and summer months;

- increasing costs of component parts and commodities;

- resistance by property owners to the adoption of zoning ordinances permitting the location of manufactured homes in residential areas;

- excessive retail inventory levels in the manufactured housing and recreational vehicle industries;

- competition with resellers of repossessed manufactured homes; and

- declining stock price (for example, the price per share of FEI's common stock declined from $1.70 on September 5, 2008 to $.08 on March 6, 2009).

47.    As a result, Fleetwood has been involved in a constant assessment of its business plan and since 2005 has taken a number of steps to cut costs, to restructure its business operations, and to address the cash short falls from operations in order to improve its liquidity, such as:

- focusing on high-value, innovative products;

- being more selective as to which market segments Fleetwood pursues in order to optimize its competitiveness and profitability;

Gibson, Dunn &
Crutcher LLP

17

- implementing more cost-effective operations/reducing fixed costs, including reducing the number of corporate officers from 24 to 7;

- consolidating operations where possible, including consolidating management teams at adjacent plants;

- adding new distribution points;

- establishing a new modular division under subsidiary Trendsetter Homes, Inc. (modular homes constitute a segment of the housing industry that are built to local or regional building codes but are produced in a factory setting);

- divesting or closing certain non-core businesses that were unprofitable, including the folding trailers business, the manufactured housing retail business and several supply businesses; and

- closing 2 motor home plants and 13 manufactured housing plants and intermittently idling others in order to better match capacity with customer demand.

48.    However, given the ongoing credit constrictions, economic decline and weakness in both the recreational vehicle and manufacturing housing markets, the measures taken by Fleetwood have not been effective to turn the tide.  Accordingly,  Fleetwood has continued to look for alternatives.

49.    Since completing the Exchange Offer, Fleetwood's management has continued to work with its banks, advisors and professionals to analyze its business operations, has taken steps to further cut costs, has commenced the shutdown of the unprofitable travel trailer division and has continued to analyze if Fleetwood's operations can be returned to profitability within a reasonable time.  However, Fleetwood's many analyses show liquidity continuing to decline and profitability failing to materialize for some time.

50.    Under an amendment to the Secured Credit Facility, Fleetwood continues to be subject to a springing financial performance covenant. The covenant only applies if either (a) average daily liquidity, defined as bank cash, cash equivalents, and unused borrowing capacity, falls below a prescribed minimum level of $45 million in any calendar month, or (b) liquidity falls below $25 million on any single day. Under the amended Secured Credit Facility, Fleetwood is also subject to a

new separate covenant under which liquidity cannot fall below $25 million on any three consecutive business days.  As a result of a significant decline in Fleetwood's liquidity due to reduced cash flow from operations, Fleetwood's analyses showed that it was in danger of breaching one or both of the covenants under the amended Secured Credit Facility in the foreseeable future.

51.    A breach of the covenant could result in a default under the Secured Credit Facility, as well as a cross-default in Fleetwood's 14% Notes and Fleetwood's capital lease obligations.  In the event of a default under the Secured Credit Facility and 14% Notes, Fleetwood could not be certain that its lenders would refrain from enforcing any remedies otherwise available to them or that they would grant Fleetwood any further waivers or amend the covenants.

52.    Given its significant decline in liquidity, in the event of a default Fleetwood would be unable to repay all outstanding balances in the event the lenders declare all amounts outstanding to be immediately due and payable.  The lenders could then proceed against Fleetwood's assets, and any proceeds realized upon the sale of assets would be used first to satisfy all amounts outstanding under the Secured Credit Facility and, thereafter, any of Fleetwood's other liabilities, including liabilities relating to Fleetwood's 14% Notes, 5% Debentures and 6% Debentures.

## VI.
## AFTER EXPLORING ALTERNATIVES, FLEETWOOD DETERMINED TO SEEK RELIEF UNDER CHAPTER 11

53.    As result of declining conditions, Fleetwood began to look at alternatives to maximize the value of its business for the benefit of all of its creditors and shareholders outside of continuing its historical business operations.  Working with its counsel and its advisers, including FTI Consulting, Inc. and Greenhill & Co., LLC, Fleetwood began to explore the possibility of selling certain of its assets and other ways to bring in new investment to the company.

54.    In connection with this strategic analysis, Fleetwood concluded that it would not be able to entice a buyer unless it could insure the buyer that it could acquire assets free and clear of liens and claims.  Fleetwood also concluded that any new debt or equity investments would be unlikely unless it could restructure its existing debt, given the current amount of outstanding debt owed to the 14% Notes, the 5% Debentures, the 6% Debentures and ISIS Lending, LLC.

Gibson, Dunn &
Crutcher LLP

55.     In addition, Fleetwood concluded that shutting down the unprofitable travel trailer division would reduce overall operating costs and stem further operating losses associated with that business segment.  However, a travel trailer shutdown could give rise to significant liabilities in connection with repurchase obligations arising under the dealer agreements and certain state laws resulting from dealer terminations.  Specifically, the agreements between the travel trailer dealers and the subsidiaries of FHI operating in the travel trailer segment impose a repurchase obligation on those subsidiaries in the event of termination.  In certain states, the dealer agreements are either augmented or superseded by dealer and franchise laws that impose liability upon the manufacturer for the termination of the dealers or franchisees.  Fleetwood determined that a bankruptcy would allow it to better deal with the repurchase claims that would arise from the termination of its travel trailer dealers.

56.     Because its extensive projections of business operations did not yield a plan that showed positive cash flow in the foreseeable future, Fleetwood also determined that it was in the best interests of Fleetwood and its creditors to preserve Fleetwood's ability to avoid the Exchange Offer in which the 14% Notes were issued and in which the Operating Subsidiaries guaranteed the 14% Notes and pledged their real property as collateral to secure the 14% Notes.  Fleetwood concluded that it could only preserve its ability to set aside the Exchange Offer through a bankruptcy proceeding.

57.     Fleetwood also concluded that it would need additional liquidity while it pursued strategic alternatives which it could only obtain through additional lending approved under the bankruptcy code.

## VII.
### FLEETWOOD INTENDS TO FOCUS ON MAXIMIZING THE VALUE OF ITS BUSINESSES THROUGH  POTENTIAL SALES AS A GOING CONCERN

58.     Fleetwood intends to focus its reorganization efforts on restructuring its secured debt structure and strengthening its core operations so that it can maximize the value of its business as a going concern.  Fleetwood is exploring the potential sale of one or more of its divisions and/or other business combinations intended to realize the maximum value of the business.

59.     As discussed above, Fleetwood announced on March 9, 2009, its plan to shut down the travel trailer division.  Fleetwood will cease purchasing materials for these operations and use

existing inventory and work-in-process to complete orders placed prior to March 6, 2009; it will not accept any new orders for travel trailers. The majority of the employees associated with the travel trailer business segment will be terminated on March 10, 2009, with approximately 80 employees remaining to complete existing orders and wind down the business. Fleetwood anticipates that the travel trailer business will be wound down within 30-45 days.

60. Fleetwood will also explore consolidation of its facilities relating to its motor home and housing businesses as well as it Riverside headquarters. Consolidation is dependent upon Fleetwood's ongoing analysis of the efficiency that would be gained from plant consolidation as compared to any pricing advantage that may be realized due to lower shipping costs in the Southwestern region and its impact on working capital. As part of this, Fleetwood is also considering the closure of an additional manufactured housing plant in southern Georgia.

61. The bankruptcy filing also preserved certain avoidance powers available under the bankruptcy code that will allow Fleetwood to asses the Exchange Offer and the transactions related thereto, and determine if Fleetwood should take actions within the bankruptcy case to avoid it..

## VIII.

## SUPPORT OF FIRST DAY MOTIONS

**A.** **Motion for Joint Administration**

62. Fleetwood's businesses are conducted through multiple entities, most of which are Debtors in these cases. The organizational chart attached hereto as <u>Exhibit</u> <u>A</u> shows all of Fleetwood's subsidiaries, and separately identifies each of the Debtor subsidiaries. All of the Debtors are affiliates of one another because each Debtor either directly or indirectly wholly owns, or is wholly owned by, another Debtor or Debtors.

63. Several of the debtor entities work in concert to form the Debtors' manufactured housing and RV divisions. Although many of the Debtors have different creditors, certain Debtors have guaranteed the obligations of the others and/or secured the performance of the obligations of other Debtors with the pledge of property. In some instances, multiple debtors were parties to the same transaction or multiple related transactions. I believe that each of the matters to be addressed in these bankruptcy cases will involve all or a substantial portion of the Debtor entities. I also expect

Gibson, Dunn &
Crutcher LLP

that these chapter 11 cases will proceed on the same timetable and that no Debtor will be prepared to submit a plan of reorganization ahead of any other.

64.    The Debtors engage in intercompany transfers on an accounting basis  in the ordinary course of operating the Debtors' business since all cash is managed through the accounts of FEI.  The debtors are in the process of reconciling intercompany accounting, but at this point I am unaware of any material issues giving rise to a conflict between several Debtor estates.

**B.    Motion to Maintain Present Cash Management System.**

65.    The Debtors' business requires the collection, payment and transfer of funds through numerous bank accounts.  All of the Debtors' domestic bank accounts are maintained at Bank of America, N.A., which is on the list of approved depositories (the "Approved Bank List") of the Office of the U. S. Trustee for the Central District of California (Region 16) (the "U.S. Trustee") below amounts insured by the United States (through FDIC or FSLIC).[5]  In the ordinary course of business and prior to the Petition Date , the Debtors have maintained a centralized cash management system (the "Cash Management System") similar to those utilized by other large corporate enterprises.  The present Cash Management System, developed over the Debtors' 59 years in business, is designed to efficiently collect, transfer, consolidate and disburse funds generated by the Debtors' several affiliates through the Debtors' operations and to accurately record such collections, transfers and disbursements as they are made.

66.    The Cash Management System involves the following bank accounts (together, the "Bank Accounts"), which are also described and listed in the chart describing the Cash Management System attached hereto as Exhibit A and the list of domestic accounts attached hereto as Exhibit B:

**Cash Management System**

i.    ***Blocked Account.***  The Debtors maintain a single bank account which collects all receipts received by the Debtors and is subject to a control agreement with the Prepetition Agent (the "Blocked Receipts Account").  This bank account, maintained at Bank of America,

---

[5]    The Debtors also fund a foreign account in Canada for payroll obligations to Canadian employees, and one in Mexico to support minor operations there.

collects direct wires, as well as checks received by the Debtors, which are deposited only into this account. Receipts collected in this account are first applied to any outstanding Secured Credit Facility loan balance pursuant to the Secured Credit Agreement, before the funds are made available for the Debtors' general business use. None of the other bank accounts maintained by the Debtors are used to collect receipts in the ordinary course of business.

ii.   ***Main Accounts*.**  The Debtors maintain two primary operating bank accounts, one for Fleetwood Holdings, Inc. ("FHI Main Account") and one for Fleetwood Enterprises, Inc. ("FEI Main Account"). These accounts (collectively, the "Main Accounts") are both held at Bank of America and are used to facilitate the payment of the Debtors' expenses, either directly or through the Debtors' other bank accounts. Specifically, the FHI Main Account funds: (a) the FHI Master Funding Account for Controlled Disbursements (the "FHI Master Funding Account") and (b) the FHI Wage and Disbursement Account (the "FHI Wage Account") that funds manual payroll for FHI employees. The FHI Master Funding Account also funds 40 controlled local payable disbursement accounts held by the Debtors' other entities (the "Local Disbursement Accounts"). The FEI Main Account funds the (a) FEI Disbursement Account (together with the FHI Master Funding Account, the "Corporate Disbursement Accounts"), (b) the FEI Wage and Disbursement Account that funds manual payroll for FEI employees (together with the FHI Wage Account, the "Wage Accounts"), (c) certain foreign bank accounts at Banamex in Mexico (the "Foreign Accounts") that fund minor payroll and other expenses there, and (d) a newly created blocked account that holds cash collateral to support the Debtors' company card program (the "Blocked Collateral Account"). The FHI Main Account receives any receipts in excess of any outstanding Secured Credit Facility balance that is collected from the Blocked Account, any borrowings made under the Secured Credit Facility, as well as any proceeds from the redemption of investments from the Debtors' investment account maintained on behalf of FHI  (the "FHI Investment Account"). To the extent needed, funds are transferred between the Main Accounts to ensure funds are available for that day's disbursements. The FEI Main Account receives proceeds from the redemption of investments from the Debtors' investment account maintained on behalf of FEI (the "FEI Investment Account") and transfers from the FHI Main Account. The Debtors typically maintain a daily cash balance of approximately $50,000-$100,000 in each Main Account, and any excess cash balance is then invested in the Investment Accounts.

iii.   ***Corporate Disbursement Accounts*.**  The two Corporate Disbursement Accounts (FHI Master Funding Account and FEI Disbursement Account) are both held at Bank of America and are funded by the Main Accounts. The Corporate Disbursement Accounts are used to satisfy

Gibson, Dunn & Crutcher LLP

checks presented to Bank of America that day for amounts owed by Fleetwood Holdings, Inc. and Fleetwood Enterprises, Inc. to various payees. In the ordinary course of operations, the Main Accounts fund the Corporate Disbursement Accounts with only the amount of money necessary to satisfy the obligations due that day. As a result, the Corporate Disbursement Accounts are left with a zero balance at the end of each day.

iv.    ***FHI Main Funding Account.***  The FHI Main Funding Account, which is held at Bank of America, is used to fund payments for invoices owed by the Debtors' other entities. The Master Funding Account is funded by the FHI Main Account daily, in an amount that is equal to the payments presented to Bank of America that day. As a result, the Master Funding Account is left with a zero balance at the end of each day.

v.    ***Local Disbursement Accounts***.  The Debtors maintain 40 controlled Local Disbursement Accounts which are specific to the Debtors' operating entities. All of the Local Disbursement Accounts are held at Bank of America. On a daily basis, the Local Disbursement Accounts are funded by the FHI Master Funding Account, in an amount equal to the checks presented to Bank of America that day for payment by the other Debtor entities. As a result, the Local Disbursement Accounts are left with zero balances at the end of each day.

vi.    ***Foreign Accounts***.  In addition to the Blocked Receipts Account, the Main Accounts, the Corporate Disbursement Accounts, the Wage Accounts, the Blocked Collateral Account and the Local Disbursement Accounts which are all maintained at Bank of America, an affiliate of the Debtors maintains two bank accounts with Banamex in Mexico (the "Foreign Accounts").[6] FEI funds the Foreign Accounts from the FEI Main Account with manual transfers as needed in an amount no greater than $50,000 per month. The Foreign Accounts also have relatively little activity because the plant in Mexico has closed and only two employees remain. The two Foreign Accounts with Banamex consist of a U.S. dollar and a Mexican peso account. Manual transfers are

---

[6]    As noted above Gibraltar is a subsidiary of Debtor FEI and is not a debtor in these chapter 11 cases. Gibraltar also maintains two accounts with the Bank of Bermuda and an account at Concord Investment Management. These are separate, stand-alone accounts that are not part of the Debtors' cash management system. Cash is transferred from Gibraltar to FEI on a monthly basis for excess insurance reimbursements and product liability defense case expenses. In addition, FEI wires Gibraltar premium payments on a quarterly basis for the Company's self-insured product liability and workers compensation plan.

Gibson, Dunn &
Crutcher LLP

made to only the U.S. dollar account at Banamex from the FEI Main Account.[7]

vii.    ***Investment Accounts.***  To the extent that the Debtors have funds in their Main Accounts that are in excess of the sum of payments due from those accounts that day and their desired remaining cash balance at the end of that day, the Debtors will transfer the excess funds to its two Investment Accounts (one for Fleetwood Holdings, Inc. and the other for Fleetwood Enterprises, Inc.), which are both managed by Banc of America Securities LLC ("Banc of America Securities"). These funds were recently transferred to two accounts at Banc of America Securities that are subject to control agreements with the Prepetition Agent.  These funds are invested in Columbia Cash Reserves Institutional Class offered by Banc of America Securities.  To the extent the Debtors require additional cash to fund their operations that is in excess of the cash balances in their Main Accounts and is in excess of the loan availability under their Secured Credit Facility, the Debtors may redeem investments held in the Investment Accounts the same day without penalty.

**1.    Maintaining the Cash Management System and the Bank Accounts is Critical to the Debtors.**

67.    The daily use of the complex Cash Management System, the Bank Accounts and the system for Intercompany Transactions described below constitutes the Debtors' ordinary business practices, which the Debtors view as essential.  The Cash Management System provides significant benefit to the Debtors' operations, including the ability (i) to efficiently control corporate funds, (ii) to ensure the maximum availability of funds when necessary, (iii) to reduce borrowing costs and administrative expenses by facilitating the movement of funds, and (iv) to develop timely and accurate account balance information.

68.    The Debtors seek authority to continue their Cash Management System and maintain their current Bank Accounts, as this will facilitate the necessary cash transfers among the various Bank Accounts and related transactions, and will greatly simplify the tracking of interbank and intrabank disbursements and other administrative aspects of the Debtors' operations during the pendency of these chapter 11 cases.  The Debtors intend to continue to maintain records of all

---

[7]    Until recently. a wholly-owned subsidiary of the Debtors maintained four bank accounts with the Canadian Imperial Bank of Commerce in Canada to fund payroll and wage related expenses for four employees there.  These accounts were closed as of March 9, 2009.

Gibson, Dunn & Crutcher LLP

1    transfers within the Cash Management System, so that all transfers and transactions will be properly

2    documented and accurate balances will be maintained.

3        69.    Based upon their sophisticated accounting procedures already in place, and with the

4    assistance of their professionals, the Debtors are able to distinguish between pre- and postpetition

5    obligations and payments without closing the Bank Accounts and opening new ones.  The Debtors

6    have been working with Bank of America to ensure that no checks or payments issued prior to the

7    Petition Date will be honored after the Petition Date.  In this regard, all banks with which the Debtors

8    maintain the Bank Accounts have been advised not to honor checks issued prior to the Petition Date,

9    except as otherwise expressly permitted by an order of the Court and directed by the Debtors.

10   Moreover, in accordance with the requirements of the U.S. Trustee, the Debtors are in the process of

11   closing their books and opening "new" books and records for the postpetition period.  These

12   procedures will ensure that the protections sought by the U.S. Trustee's requirements for opening all

13   new debtor-in-possession bank accounts will be provided to the Debtors' estates and creditors without

14   requiring seriously damaging disruptions to their systems and operations.

15       70.    In addition, the Debtors are current on all their priority tax obligations and have strict

16   systems in place to make sure that these claims are satisfied on a timely basis.  Altering the Bank

17   Account structure would interrupt these systems, thereby significantly disrupting the Debtors'

18   business operations and jeopardizing the Debtors' prompt and timely payment of payroll, employee

19   taxes and other priority tax obligations.  The protection of prompt and accurate payments to

20   employees is especially important to the Debtors.  The Debtors' systems provide the protections

21   sought by the Requirements – ensuring payment of employees and taxes – without requiring the

22   creation of new accounts and payment procedures.

23       71.    Requiring each of the Debtors to close the existing accounts and thus terminate the

24   existing Cash Management System would significantly hinder the Debtors' ability to collect and

25   disburse funds in the ordinary course of business.  Such disruption would undermine the Debtors'

26   ability to make a smooth transition into chapter 11, by slowing payments to employees, tax

27   authorities, important vendors, and other critical business partners, with no discernible benefit.  This

28   requirement would force the Debtors to recreate completely a new cash management system, which

Gibson, Dunn &
Crutcher LLP

would mean that their finance, accounting and bookkeeping employees must focus immediately on opening new accounts, implementing new procedures, and redirecting receipts and disbursements to the neglect of their daily responsibilities and additional demands imposed by the bankruptcy filing. Many of the Debtors' Bank Accounts are subject to control agreements with the Prepetition Agent. Closing these accounts would require consents and involvement from the Prepetition Agent and further result in delays and administrative costs to the estates.  Preserving a "business as usual" atmosphere instead and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the existing cash management system will better facilitate the stabilization of the Debtors' business operations.

### 2.    Description of Intercompany Transactions.

72.    Prior to the Petition Date, in the ordinary course of their business, the Debtors engaged in intercompany transactions and transfers (collectively, the "Intercompany Transactions").  In general, there are three types of Intercompany Transfers that the Debtors enter into in the normal course of their operations.

> i.   the sale and transfer of goods between business entities;
> ii.  payments made by FHI on behalf of its subsidiaries; and
> iii. fees charged by FEI to its subsidiaries for management services performed on their behalf.

#### a.    The Sale and Transfer of Goods Between Business Entities.

73.    In an effort to reduce external costs and to secure dependable sources of materials and components needed for the manufacture of their products, the Debtors created two vertically integrated divisions, RV Supply and Continental Lumber Products, Inc. ("Continental Lumber").  The primary purpose of these entities is to sell processed materials to its affiliated companies.[8]  RV Supply provides needed raw materials, such as fiberglass paneling, electrical components to the Debtors' motor home and travel trailer production entities.  Similarly, Continental Lumber supplies

---

[8]    Third party sales for the second quarter ended October 26, 2008 for RV Supply totaled $5.0 million (or 66% of total sales), while external sales for Continental Lumber totaled $78K (or 1% of total sales).

Gibson, Dunn & Crutcher LLP

the Debtors' housing production entities with needed raw materials, such as, lumber, other

manufactured wood components.

74.    These intercompany sales result in the creation of intercompany receivables on RV

Supply's and Continental Lumber's books, and intercompany payables on the purchasing affiliates'

books.  Cash payments are then made between these Debtors to satisfy these intercompany balances

in the ordinary course of business.

75.    In addition to the above normal course intercompany sales, the Debtors' operating

divisions may also, from time to time, enter into intercompany transfers of raw materials amongst

each other in order to minimize the cost associated with maintaining excess or obsolete inventory at

the individual divisions.  In addition to raw material transfers, personnel assigned to the Debtors'

operating divisions may sometimes render services on behalf of another division.  Sharing personnel

between the divisions allows the Debtors to reduce payroll costs while providing at the same time

consistent levels of service and quality between divisions.  In instances where raw materials are

transferred to, or services are rendered for, another division, an intercompany payable will be created

on the receiving affiliate's books and an intercompany receivable will be created on the books of the

affiliate providing the raw materials or services.  Unlike the intercompany sales related to RV Supply

and Continental Lumber described above, cash payments are not made between the Debtors' affiliates

to satisfy intercompany balances resulting from intercompany transfers of raw materials or services.

Instead, these balances are netted against each other at the end of each month.

> b.    **Payments made by Fleetwood Enterprises, Inc. on Behalf of its
> Subsidiaries**

76.    The Debtors centralize many of their payments using a centralized vendor payment

system ("Central Pay") whereby trade payable balances owed by individual manufacturing entities

("Plants") are paid directly by Fleetwood Holdings, Inc. on behalf of those Plants.  The Debtors have

several vendors that provide raw materials and services to more than one Plant.  Rather than have

each plant remit multiple payments for amounts owed to the same vendor each week, Central Pay is

used to consolidate amounts owed across the Plants to the same vendor into a single payment made to

that vendor from the Central Pay Account at Fleetwood Holdings, Inc.  As a result of these practices,

Gibson, Dunn &
Crutcher LLP

the Debtors save not only postage and fees from reduced check and wire payments, but also save on the administrative costs required to process multiple payments each week.  Consolidating payments at Fleetwood Holdings, Inc. also provides the Debtors with greater centralized control over disbursements.  Due to these benefits, over half of the Debtors' trade invoices paid in the second quarter of this year were paid through Central Pay.[9]

77.     When a Central Pay payment is made, an intercompany receivable is created on Fleetwood Holdings, Inc.'s books and an intercompany payable is created on the books for those Plants on behalf of which the payment was made.  No cash payment is made between the Debtors to satisfy these intercompany balances, rather, the balances are netted upon consolidation at the end of every month.

### c.    Fees Charged by Fleetwood Enterprises, Inc. to its Subsidiaries for Management Services

78.     Fleetwood Enterprises, Inc. pays for services that directly or indirectly benefit its subsidiaries, which include the cost of senior management.  In order to more accurately reflect the proportionate cost of these services at the individual Debtor entities, the Debtors enter into Intercompany Transactions to allocate these expenses ("Management Service Fees") among the different Debtor entities.  The allocation of Management Service Fees allows the Debtors to more accurately reflect the operating costs of each of its entities as if they were operated as separate and distinct businesses, which assists the Debtors in assessing profitability and managing their businesses at the subsidiary level.

79.     Management Service Fees owed by each entity are pre-determined at the beginning of each fiscal year based on the budgeted sales for that year for that entity, as a percentage of total consolidated sales.  On a monthly basis, each of Fleetwood Enterprises, Inc.'s subsidiaries accrue their estimated share of Management Service Fees and at the end of each quarter, the accrual is reconciled with the actual service costs Fleetwood Enterprises, Inc. expended during the quarter.

---

[9]     In the second quarter ended October 26, 2008, $39 million, or 56% of total trade payments were paid through Central Pay.  Vendor payments not made through Central Pay typically represent payments to smaller suppliers or vendors that supply just one or a few Plants.

Gibson, Dunn &
Crutcher LLP

Intercompany receivables are created on Fleetwood Enterprises, Inc.'s books for these Management

Service Fees, while corresponding intercompany payables are created at the subsidiary level.  Cash is

not exchanged to satisfy these intercompany balances.  These balances instead are netted against each

other at month end consolidation.

80.    The three types of Intercompany Transactions described above not only benefit the

Debtors by reducing costs and alleviating unnecessary administrative burden, but also enhance

profitability assessment, provide the Debtors with greater control over disbursements, and ensure the

continued supply and operation of the Debtors' business.

### 3.    Importance of Additional Time to Order Preprinted Checks and Forms

81.    Given the size and complexity of the Debtors' operations, the Debtors also seek an

extension of time to comply with the U.S. Trustee requirements for checks and forms to reflect their

status as Debtors in Possession.  Numerous checks and other business forms are used by the Debtors

in the ordinary course of their businesses.  The Debtors' payables system is largely decentralized with

payments made from their 40 different local disbursement accounts on a plant by plant basis.  This

decentralized payables system and the complex and varied nature of the Debtors' business operations

make it especially difficult for the Debtors to immediately change their checks and forms to reflect

their status as "Debtors in Possession."  Because they routinely deal with a large number of vendors,

changing business forms immediately as of the petition date would put additional demands on the

Debtors' payables management and staff at a time when they are struggling with the repercussions of

the commencement of these cases, including the Debtors' responsibility to ensure that no outstanding

prepetition invoices to vendors are paid.

82.    It is reasonable to expect a significant delay before such newly ordered checks and

forms are received, thereby further hindering the Debtors' business operations.  Requiring the

immediate use of new checks for all postpetition payables will increase the administrative burdens on

employees, result in additional expense to their estates and threaten to disrupt operations.  It is thus

essential that the Debtors be authorized to continue using their existing pre-printed checks and

business forms until the current stock of these checks and forms is depleted.

Gibson, Dunn &
Crutcher LLP

**4.      Importance of Maintaining Investment Policies and Practices.**

83.      Prior to the petition date, in the ordinary course of their business, the Debtors developed policies and practices for deposits and investments ("Prepetition Practices") of excess funds within the Cash Management System as permitted under the Debtors' Secured Credit Facility.

84.      In particular, under the Prepetition Practices, excess funds of the Debtors within the Cash Management System are either: (a) invested in Columbia Cash Reserves Institutional Class, a closed end money management fund, offered by Banc of America Securities or (b) maintained in accounts at Bank of America, which appears on the Approved Bank List below amounts insured by the United States (through FDIC or FSLIC). Columbia Cash Reserves Institutional Class (inception date: 11/18/2005) is a money market fund offered by Banc of America Securities that seeks current income, consistent with capital preservation and maintenance of a high degree of liquidity.

85.      In consultation with the professionals the Debtors propose to retain, the Debtors have determined that it is in the best interests of the estate to maintain their excess cash in income-producing investments to the fullest extent possible because they will best preserve principal, maintain liquidity, and diversify investment risk while still maximizing earnings on invested funds. The Debtors expect that investments will be primarily short term in nature, because of the need for liquidity in the operation of the Debtors' business.

86.      The Debtors also expect that the yield on investments under the Prepetition Practices will be greater than if the Debtors were restricted to direct investments in government securities as required by section 345. If the Debtors were limited to investing directly in government securities or bonded investments, considerations of liquidity would limit their investments to very short-term securities that would produce a lower return on such investments. The Debtors believe that such investment of funds nevertheless would be safe and prudent and will yield the maximum reasonable net return on the funds invested, taking into account the safety of the investment. The Debtors propose, therefore, to continue their Prepetition Practices during these chapter 11 cases.

Gibson, Dunn &
Crutcher LLP

**5.    Importance of Ability to Pay Bank Fees and Charges in Ordinary Course of Business.**

87.    The continued payment of bank fees and charges in the ordinary course of business will likewise minimize the disruption of the Cash Management System, eliminate the need for any administrative holds imposed on the Debtors' Bank Accounts and allow the Debtors to focus on other operational issues in order to promote a smooth transition to operating under chapter 11.  Any type of administrative hold, freeze or block on the Bank Accounts or reduction in the Debtors' ability to automatically move funds among the Bank Accounts will effectively shut down the Debtors' operations.  Thus the Debtors also request that the Court prohibit the Banks at which the Bank Accounts are located from imposing any administrative freeze or hold on the Bank Accounts..  To preserve business as usual and avoid a destructive cessation in operations, the banks must be required to allow the Debtors to continue in all respects to use their Bank Accounts and the Cash Management System in the ordinary course of business according to practices prior to the Petition Date.

**C.    Motion for Approval of Use of Cash Collateral**

88.    The Debtors' businesses require working capital to fund payroll and payroll taxes and to pay normal operating expenses.  Without the ability to fund their ongoing operations, the Debtors' estates and creditors will be immediately and irreparably harmed because the Debtors would be required to shutdown its entire business.  This lead to consequences from which the Debtors' would never recover and would render almost impossible the chances of a favorable conclusion to these chapter 11 cases will be in substantial jeopardy.

89.    A shutdown for even a short time would probably result in parties to whom BofA has issued letters of credit drawing on those instruments.  In turn, BofA and the Secured Lenders would be forced to pursue their remedies against the collateral pledged by Debtors to obtain the letters of credit.  Certainly, the Secured lenders would have no further appetite to negotiate debtor in possession financing.  Even if alternate financing could be found, future government housing contracts would cease.

90.    In order to address working capital needs, to avoid the negative outcome outlined above  and to fund the Debtors business plans in these chapter 11 cases, the Debtors require the use

of the Cash Collateral.  The use of the Cash Collateral will provide the Debtors with the necessary capital with which to operate their business, pay their employees, maximize value, and pursue reorganization under chapter 11.  The ability of the Debtors to finance their operations, to preserve and maintain the value of their assets and maximize a return for all creditors requires the availability of working capital.

91.    Prior to the petition date, I and others on behalf of the Debtors and professionals representing the Debtors  engaged in extensive discussions with the BofA as Agent on behalf of the Secured  Lenders to explore have financing options including debtor in possession financing.  The Debtors professionals have also engaged in discussions with other parties as well who have indicated an interest in either providing debtor in possession financing or in participating in a financing.

92.    Although significant progress has been made, as of the filing of the petitions, the parties were not able to complete their negotiations and document an agreement.  Negotiations are ongoing and the Debtor are hopeful an agreement will soon be reached.  In the meantime, BofA and the Debtors were able to finalize the terms of an Interim Order allowing for the Debtors' use of cash collateral to allow the Debtors to access their cash and operate their business pending further negotiations with the Secured Lenders.

**D.      Motion to Establish Adequate Assurance of Performance as to Utilities**

93.    The Debtors maintain many manufacturing operations at complex plants and facilities, which depend on the constant and reliable provision of utility services.  Should companies providing utility services ("Utility Companies") refuse or discontinue service, even for a brief period of time, the Debtors' business operations would be severely disrupted.

94.    Other than current the utility bills not yet due and owing as of the petition date, which the Debtors will not be able to pay as a result of the commencement of these chapter 11 cases, the Debtors historically have paid their undisputed utility bills in full when due.

95.    Prior to the petition date, the Debtors paid approximately $875,000 per month in the aggregate to the Utility Providers on account of Utility Services.  Based on budget analysis performed in preparation for their chapter 11 cases and in connection with cash collateral and post-

Gibson, Dunn &
Crutcher LLP

1  petition financing negotiations, the Fleetwood's management believes that they have or will have

2  sufficient availability of funds with which to pay all postpetition charges for utility services.

3  **E.     Retention of Kurtzman Carson Consultants LLC as Claims Agent**

4       96.     The Debtors seek authority to retain Kurtzman Carson Consultants LLC ("KCC") as

5  their noticing agent and claims processor based on the terms and conditions set forth in that certain

6  KCC Services Agreement, dated February 20, 2009 (the "KCC Agreement").  I have reviewed the

7  KCC Agreement filed with the Debtors' motion seeking Court approval of KCC's retention.

8       97.     Given the nature of the Debtors business and the number of creditors involved,

9  Fleetwood management expects there to be thousands of claims.  Given Fleetwood's limiting staffing

10  and the cost benefit of having claims administration and notice matters handled by someone other

11  than counsel, I and Fleetwood management believe it would be in the best interest of the estate to

12  utilize the services of an experienced claims processor such as KCC.

13       98.     I and Fleetwood management consulted with their legal and financial advisors and

14  determined that based on the size, scope, and geography of the case, KCC was the appropriate choice.

15  Given prior relationships from other matters, the Debtors' advisors were also able to secure a discount

16  resulting in extremely competitive pricing from KCC for these services.

17       99.     KCC has been retained in large and complex cases filed in this Court as well as other

18  courts across the country.  I and the Debtors management believe, in our business judgment, that

19  KCC has the necessary experience and expertise to render the necessary services in a professional

20  and efficient manner in accordance with the Bankruptcy Rules and Local Bankruptcy Rules.  The

21  Debtors believe that the proposed compensation to KCC is fair and reasonable.

22  **F.     Motion For Authorization to Pay Common Carrier Claims and Other Critical
23          Prepetition Claims (Lien Claimants)**

24       100.     The Debtors rely on "common carriers " who transport their products, supplies and

25  materials by truck, railroad, barge, pipeline, or other similar means (the "Common Carriers"), and

26  also businesses that store the products or supplies in warehouses or otherwise (the "Warehousemen").

27  The Common Carriers, which include both large national carriers and small local carriers, for the

28  most part, transport finished products such as recreational vehicles and manufactured homes from the

Gibson, Dunn &
Crutcher LLP

1   Debtors' plants to the Debtors' dealers and retail customers.  The Warehousemen include storage

2   facilities that hold rail car and truck load quantities of wood product.  The Warehouseman often

3   times, at the request of the Debtors, cut to size some of the lumber and then ship it to the Debtors'

4   plants in smaller quantities.  The Debtors compensate the Warehousemen for unloading the wood into

5   their storage facility, storing the wood, cutting the wood (if requested by the Debtors to do so),

6   loading the wood back onto their trucks, and ultimately delivering the wood to the Debtors.  The

7   Debtors only utilize the Warehouseman when it is more cost efficient than buying small quantities of

8   wood from other lumber wholesalers.

9        101.    The ability of the Debtors to continue their operations on a going-forward basis will

10   depend largely upon uninterrupted, continued access to the products and supplies transported by the

11   Common Carriers and stored by the Warehousemen.  At this critical stage, an interruption to access

12   of such products and supplies will have a severely prejudicial, if not detrimental, effect on the efforts

13   of the Debtors to rehabilitate and reorganize, and would significantly impair the value of the Debtors'

14   estates.

15        102.    In efforts to cut costs, Debtors are operating with limited or virtually no inventory of

16   materials and supplies and no inventory finished products.  Debtors relay on materials and supplies

17   arriving when needed and products being delivered promptly upon completion.  Any delay in the

18   timely delivery of products and supplies, and any damage caused to the products and supplies by

19   improper storage conditions, will severely harm the Debtors' operations

20        103.    The harm and economic disadvantage that would stem from the failure to pay the

21   Critical Prepetition Claims is grossly disproportionate to the amount of the Critical Prepetition

22   Claims that would have to be paid to ensure an uninterrupted supply of the Debtors' products and

23   supplies and proper storage of same.

24   **G.**    **Motion for Approval of the Payment of Prepetition Employee Wages and Benefits**

25        104.    I am familiar with the Motion for Entry of an Order (a) Authorizing the Debtors to pay

26   certain prepetition (i) reimbursable expenses, and (ii) health plan claims, insurance premiums and

27   other administrative fees, (b) authorizing the debtors to make deductions from employees' paychecks,

28   and (c) authorizing and directing banks and other financial institutions to honor all checks and

Gibson, Dunn &
Crutcher LLP

1  electronic payment requests made by the debtors related to the foregoing, by which FEI and other

2  Debtors with employees seek permission to pay $418,800 in obligations related to employee wages

3  and benefits, which have accrued prepetition, but have not been paid.  Payment of these prepetition

4  employee-related claims will not render the Debtors' estate administratively insolvent.

Gibson, Dunn &
Crutcher LLP

1

2

# IX.
## CONCLUSION

3
   I declare under penalty of perjury under the laws of the United States of America that the

4
foregoing is true and correct.

5
   Executed this 10th day of March, 2009 at Riverside, California.

6

7
                                      /s/ Andrew M. Griffiths

8
100606338_2.DOC                        Andrew M. Griffiths

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP