CRAIG H. MILLET, SBN 106027, CMillet@gibsondunn.com
SOLMAZ KRAUS, SBN 223117, SKraus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, California 92612-4412
Telephone: (949) 451-3800
Facsimile: (949) 451-4220

Attorneys for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>FLEETWOOD ENTERPRISES, INC., et al.,<br><br>            Debtors. | CASE NO. 09-14254-MJ<br><br>Chapter 11<br><br>[Jointly Administered]<br><br>**EXHIBIT A TO ORDER AUTHORIZING DEBTORS TO SELL PLANT 55-1 ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES**<br><br>**Hearing:**<br>Date:     August 12, 2009<br>Time:     1:30 p.m.<br>Place:    Courtroom 302<br>            3420 Twelfth Street<br>            Riverside, CA 92501<br>Judge:   Honorable Meredith A. Jury |

**ASSET PURCHASE AGREEMENT**

between

**FLEETWOOD HOMES OF INDIANA, INC., as Seller**

and

**ADVENTURE HOMES, LLC, as Purchaser**

**Dated as of July 7, 2009**

### ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of July 7, 2009, by and between Fleetwood Homes of Indiana, Inc., an Indiana corporation (the "Seller"), and Adventure Homes, LLC, an Indiana limited liability company (the "Purchaser"). Capitalized terms used are defined or cross-referenced in Section 9.1.

### Recitals

WHEREAS, on March 10, 2009 (the "Petition Date"), the Seller and certain of its Affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Central District of California, Riverside Division (the "Bankruptcy Court"). The Seller's bankruptcy case is being jointly administered with those of certain of its Affiliates under Case No. 09-14254-MJ (such case, together with all cases so jointly administered, being collectively referred to herein as the "Bankruptcy Case");

WHEREAS, the Seller was engaged in the business of manufacturing, marketing and selling manufactured homes (the "Seller's Business") at its Plant #55-1 at 1119 Fuller Drive in Garrett, Indiana (the "Plant");

WHEREAS, the Purchaser desires to purchase certain assets of the Seller and the Seller desires to sell such assets to the Purchaser, all on the terms and conditions set forth in this Agreement and in accordance with sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code;

WHEREAS, the Transferred Assets (as defined below) will be sold, subject to potential overbid, pursuant to an order of the Bankruptcy Court approving such sale under section 363 of the Bankruptcy Code; and

WHEREAS, the Seller desires to sell the Transferred Assets to further its reorganization efforts and to enable it to consummate a plan of reorganization in the Bankruptcy Case.

NOW, THEREFORE, in consideration of the foregoing and the representations and warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### Agreement

1.    Purchase and Sale

1.1    Assets to Be Transferred. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey and deliver (or cause to be sold, assigned, transferred, conveyed and delivered) to the Purchaser, and the Purchaser

shall purchase, assume and accept from the Seller, all of the Seller's right, title and interest in and to all of the Seller's properties, assets and rights, to the extent owned by Seller and specifically set forth below, other than the Excluded Assets (such rights, title and interests in and to such assets, properties and rights being collectively referred to herein as the "Transferred Assets"), in accordance with, and with all of the protections afforded by, sections 363 and 365 of the Bankruptcy Code:

      (a)    the real property listed on or described in Schedule 1.1(a), together in each case with the all right, title and interest in and to all structures, facilities or improvements located thereon and all easements, licenses, rights and appurtenances relating to the foregoing (the "Transferred Real Property");

      (b)    all equipment, machines, forklifts, trucks, vehicles, machinery and other tangible personal property: (1) (a) located at the Plant and (b) primarily used in the Seller's Business at the Plant; or (2) listed on or described in Schedule 1.1(b) (the "Tangible Personal Property");

      (c)    all of the Seller's material licenses, franchises, permits, variances, exemptions, orders, approvals and authorizations of Governmental Bodies, including any applications therefor, exclusively related to the Transferred Assets, to the extent effective and assignable or otherwise transferable at no cost to the Seller (the "Transferred Permits");

      (d)    subject to the terms of Section 5.12 of this Agreement, the inventory of all raw materials, building materials, and the homes for which manufacturing work is in process at the Plant as of the Closing (the "Unfinished Homes");

      (e)    all engineering, building, and construction designs, plans, specifications, drawings, records, and information including, without limitation, all such designs and plans approved by the U.S. Department of Housing and Urban Development ("HUD")and the Design Approval Primary Inspection Agencies ("DAPIA"), solely to the extent primarily used in the Seller's Business at the Plant (the "Engineering Plans");

      (f)    copies (in electronic and other forms designated in accordance with Section 1.7(h) of this Agreement) of all files, invoices, customers' and suppliers' lists and records (including mailing lists, email address lists, recipient lists, sales records, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers), other distribution lists, billing records, customer and supplier correspondence, and all books, ledgers, files, reports and operating records, in each case, to the extent (i) not prohibited by applicable Law, (ii) owned by and in the possession of Seller, and (iii) exclusively related to a Transferred Asset (collectively, the "Books and Records"); provided, however, "Books and Records" shall not include any: (A) privileged communications or information of any Seller (including any attorney work product); (B) non-public information primarily related to or prepared in connection with the Bankruptcy Case; (C) of Seller's minute books, stock books and Tax Returns; or (D) the Seller's books and records relating to the Excluded Assets; and

(g)     the open purchase orders for homes as of the Closing which are to be built at the Plant in the ordinary course of Seller's Business at the Plant and consistent with past practice (in each case, after the Petition Date).

1.2     Excluded Assets. The Seller is not selling, and the Purchaser is not purchasing, any assets other than the Transferred Assets, and without limiting the generality of the foregoing, the term "Transferred Assets" shall expressly exclude the following assets of the Seller (including all of the Seller's right, title and interest therein and thereto), all of which shall be retained by the Seller (collectively referred to as the "Excluded Assets"):

(a)     any asset of the Seller listed or described on Schedule 1.2(a); and

(b)     subject to the terms of Section 5.12 of this Agreement, any homes manufactured by Seller that are either (i) completed or substantially completed as of the Closing as determined by Seller's In-Plant Primary Inspection Agency for HUD in the ordinary course of Seller's Business at the Plant and consistent with past practice (in each case, after the Petition Date), or (ii) no longer located within the production line in the ordinary course of Seller's Business at the Plant and consistent with past practice (in each case, after the Petition Date) (collectively, the "Finished Homes").

1.3     Purchaser's Liabilities. After Closing, the Purchaser shall in due course pay, discharge, perform or otherwise fully satisfy the following Liabilities of the Purchaser arising out of, relating to or otherwise in respect of the Transferred Assets:

(a)     all Liabilities accruing, arising out of or relating to the ownership, use, operation or maintenance of the Transferred Assets after the Closing;

(b)     all Liabilities under the Transferred Permits arising out of actions or events following the Closing; and

(c)     all warranty obligations of the Seller relating to homes manufactured at the Plant after the Petition Date and any Liabilities arising from or related to such warranty obligations (collectively, the "Assumed Warranty Obligations").

1.4     Excluded Liabilities. Notwithstanding anything to the contrary contained in this Agreement, the parties hereto expressly acknowledge and agree that the Purchaser shall not assume or be liable or responsible for any Liability of the Seller, Seller's predecessors or Affiliates, other than the Liabilities described in Section 1.3, including, but not limited to (a) all expressed or implied warranties and product liability with respect to any homes or other goods, products or services provided and sold by Seller, (b) any and all Liabilities arising from or relating to any healthcare plan, health savings accounts and flexible spending accounts provided or administered by Seller for its employees, and any COBRA liabilities or obligations (including, without limitation, with respect to any Transferred Employees (as defined in Section 1.10 of this Agreement), (c) any and all Liabilities and obligations relating to any and all employee benefit plans of Seller, including, without limitation, any life insurance, disability, vacation, time off,

3

401k, and retirement plans of Seller, and (d) all other Liabilities set forth in Schedule 1.4 (such Liabilities being collectively referred to herein as the "Excluded Liabilities"), and Seller shall retain all such Excluded Liabilities.

    1.5    Purchase Price.

    (a)    Subject to the terms and conditions hereof, in full consideration for the sale and purchase of the Transferred Assets, at the Closing, the Purchaser shall pay One Million Seven Hundred Fifty Thousand Dollars ($1,750,000) minus Twenty Five Thousand Dollars ($25,000) for the for the assumption of the Assumed Warranty Obligations (the "Purchase Price") to the Seller as provided in Section 1.7(a).

    (b)    On or prior to the second (2nd) Business Day after the entry of the Bidding Procedures Order, Purchaser shall also deliver a good faith deposit to Seller of One Hundred Thousand Dollars ($100,000) (the "Deposit"), which shall be held by Seller to secure Purchaser's obligations under this Agreement and shall be released in accordance with the Bidding Procedures Order and this Agreement. At Closing, such Deposit may be used by Purchaser as a credit towards payment of the Purchase Price.

    1.6    Closing. Subject to the terms and conditions of this Agreement and the Sale Approval Order, the sale and purchase of the Transferred Assets shall take place at a closing (the "Closing") to be held at a time and place mutually agreeable to the parties hereto. The Closing shall occur on August 14, 2009 after the satisfaction or waiver of all conditions to the obligations of the parties hereto set forth in Sections 6 and 7 (other than those conditions which by their nature can only be satisfied at the Closing), or other date as the parties hereto may agree to in writing (the day on which the Closing takes place being the "Closing Date").

    1.7    Closing Deliveries by the Seller. At the Closing, unless otherwise waived in writing by the Purchaser, the Seller shall deliver or cause to be delivered to the Purchaser:

    (a)    a duly executed Bill of Sale substantially in the form of Exhibit A hereto;

    (b)    a duly executed Seller's Certificate pursuant to Section 6.1;

    (c)    a receipt for the payment of the Purchase Price;

    (d)    such other duly executed bills of sale, motor vehicle titles, assignments and other instruments of assignment, transfer or conveyance, in form and substance reasonably satisfactory to the Purchaser, as the parties hereto may otherwise deem reasonable or necessary to evidence and effect the sale, assignment, transfer, and conveyance of the Transferred Assets to the Purchaser;

    (e)    an ALTA title insurance policy issued by First American Title Insurance Company, at Seller's expense, dated as of Closing, committing to insure the title to Seller's Transferred Real Property, free and clear of all encumbrances, except Permitted Encumbrances;

(f)    a certificate of Seller's good standing;

(g)    Seller's limited warranty deed (or equivalent deed) to the Transferred Real Property; and

(h)    the Books and Records and Engineering Plans on such forms and formats of computer disks and other electronic forms or formats as Purchaser shall reasonably designate at least fifteen (15) Business Days prior to Closing.

1.8    <u>Closing Deliveries by the Purchaser</u>.  At the Closing, unless otherwise waived in writing by the Seller, the Purchaser shall deliver or cause to be delivered to the Seller:

(a)    an amount equal to the Purchase Price by wire transfer of immediately available funds to account (or accounts) designated by the Seller prior to Closing; and

(b)    a duly executed Purchaser's Certificate pursuant to <u>Section 7.1</u>.

1.9    <u>Allocation of Proceeds</u>.  The Purchaser shall provide the Seller with a reasonable Purchase Price allocation on or before the Closing.

1.10    <u>Offers of Employment</u>.  Purchaser makes no commitment concerning the hiring of any percentage and/or number of Seller's current workforce at the Plant.  Although Purchaser retains and preserves the option and opportunity to look elsewhere, Purchaser commits to interview and permit the hourly employees of Seller who are actively employed by Seller at the Plant on the Closing Date to make application for employment.  It is understood that the initial terms and conditions of employment included in any offers of employment need not match current terms and conditions, but will be established at the sole discretion of the Purchaser.  Each employee who is first offered by Purchaser and then accepts such new employment terms and conditions after the Closing Date shall be referred to as a "<u>Transferred Employee</u>."

1.11    <u>Assignment and Assumption of the Assumed Contracts</u>.  Without limiting <u>Section 1.3</u>, (a) as of the Closing, the Seller shall not assume pursuant to Section 365(a) of the Bankruptcy Code and shall not assign to the Purchaser pursuant to Sections 363(b), (f) and (m) and Section 365(f) of the Bankruptcy Code any Contracts that may be assumed pursuant to the Sale Approval Order, and (b) the Purchaser shall not assume nor be obligated to pay, discharge, perform or satisfy any of the obligations of Seller pursuant to section 365 of the Bankruptcy Code.

2.    "AS IS, WHERE IS" Sale.

2.1    "AS IS, WHERE IS" SALE.  THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT AFFORDS THE PURCHASER THE FULL AND COMPLETE OPPORTUNITY TO MAKE SUCH INVESTIGATIONS AND INSPECTIONS OF THE TRANSFERRED ASSETS, THE SELLER'S RECORDS WITH RESPECT TO THE TRANSFERRED ASSETS AND MATTERS RELATED THERETO AS THE PURCHASER

AND ITS REPRESENTATIVES REASONABLY DESIRE, AND THE PURCHASER HAS ENTERED INTO THIS AGREEMENT INTENDING TO RELY ON THE BASIS OF ITS OWN INVESTIGATION OF THE LEGAL STATUS AND CONDITION, TITLE AND PHYSICAL CONDITION OF THE TRANSFERRED ASSETS, INCLUDING SUBSURFACE CONDITIONS OF THE TRANSFERRED REAL PROPERTY EXCEPT AS PROVIDED IN THIS AGREEMENT. THE PURCHASER FURTHER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT (I) EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE SELLER DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSFERRED ASSETS (OR ANY RELATED MATTERS), (II) THE TRANSFERRED ASSETS ARE SOLD TO THE PURCHASER IN AN "AS IS, WHERE IS, WITH ALL FAULTS" CONDITION AS OF THE CLOSING DATE, AND (III) THE PURCHASER ASSUMES THE RISK THAT ADVERSE LEGAL AND/OR PHYSICAL CONDITIONS MAY NOT HAVE BEEN REVEALED BY ITS INVESTIGATION. IN PARTICULAR, BUT WITHOUT LIMITATION, THE PURCHASER MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE SUBSURFACE CONDITION OR CONDITIONS OF THE TRANSFERRED REAL PROPERTY RELATED TO HAZARDOUS SUBSTANCES (AS DEFINED BELOW), COMPLIANCE WITH APPLICABLE STATUTES, LAWS, CODES, ORDINANCES, REGULATIONS OR REQUIREMENTS RELATING TO LEASING, OCCUPANCY, ZONING, SUBDIVISION, PLANNING, BUILDING, FIRE, SAFETY, HEALTH OR ENVIRONMENTAL MATTERS, COMPLIANCE WITH COVENANTS, CONDITIONS AND RESTRICTIONS (WHETHER OR NOT OF RECORD), OTHER LOCAL, MUNICIPAL, REGIONAL, STATE OR FEDERAL REQUIREMENTS, OR OTHER STATUTES, LAWS, CODES, ORDINANCES, REGULATIONS OR REQUIREMENTS. AS USED HEREIN, THE TERM "HAZARDOUS SUBSTANCES" SHALL MEAN ANY SUBSTANCE WHICH IS LISTED IN THE UNITED STATES DEPARTMENT OF TRANSPORTATION TABLE (49 C.F.R. 172.01) OR BY THE ENVIRONMENTAL PROTECTION AGENCY AS A HAZARDOUS SUBSTANCE (40 C.F.R., PART 302). TO THE EXTENT REQUIRED TO BE OPERATIVE, THE DISCLAIMERS OF WARRANTIES CONTAINED HEREIN ARE "CONSPICUOUS" DISCLAIMERS FOR PURPOSES OF ANY APPLICABLE LAW, RULE, REGULATION OR ORDER.

2.2    Release. The Purchaser shall rely upon the Purchaser's own inspection of the Property in determining the Property's physical condition. The Purchaser waives the Purchaser's right to recover from the Seller or any of its Affiliates, and releases Seller and its Affiliates from any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, foreseen or unforeseen, which may arise from or be related to (i) the physical condition of the Transferred Assets; and (ii) laws applicable thereto, and all regulations, rulings and orders relating thereto, including, without limitation, federal, state or local statutory or common law, ordinance or regulation pertaining to the existence or release of Hazardous Substances from or at the Transferred Real Property or the environmental condition of the Transferred Real Property, including, but not limited to, claims arising under the Comprehensive Environmental Response Compensation Liability Act ("CERCLA"), 42 U.S.C.

Section 9601 et seq.; and (iii) any other state of facts which exists with respect to the Transferred Assets.

3.    Representations and Warranties of the Seller. the Seller represents and warrants to the Purchaser as follows:

3.1    Due Incorporation and Authority. The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana and has all necessary corporate power and authority to own, lease and operate the Transferred Assets. Subject to the entry of the Sale Approval Order, (a) the Seller has all requisite corporate power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby and (b) the execution and delivery by the Seller of this Agreement, the performance by the Seller of its respective obligations hereunder and the consummation by the Seller of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of the Seller. This Agreement has been duly executed and delivered by the Seller, and, upon entry of the Sale Approval Order (assuming the due authorization, execution and delivery hereof by the Purchaser and satisfaction of all conditions to the Closing), this Agreement will constitute the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except to the extent enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting creditors rights generally or by general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

3.2    Real Property. Schedule 1.1(a) lists or describes the Transferred Real Property owned by the Seller. Upon the entry of the Sale Approval Order, at the Closing, the Seller shall have fee title to the Transferred Real Property, which shall be transferred to the Purchaser free and clear of all Encumbrances (including liens in favor of Bank of America and Deutsche Bank), other than Permitted Encumbrances.

3.3    Title to Tangible Personal Property. Upon the entry of the Sale Approval Order, at the Closing, the Seller shall have good and marketable title to the Tangible Personal Property, which shall be transferred to the Purchaser free and clear of all Encumbrances (including liens in favor of Bank of America), other than Permitted Encumbrances.

3.4    No Defaults. The Seller is not (i) in violation of any provision of its governing documents, or (ii) in default or violation of any term, condition or provision of (A) any order of a Governmental Body applicable to it, or (B) any material contract or governmental authorization to which the Seller is a party, which in any of the cases set forth in clauses (i) and (ii) above would materially and adversely affect its ability to consummate the transactions contemplated by this Agreement.

3.5    No Brokers or Finders. Except for Greenhill & Co., whose compensation shall be the sole responsibility of Seller, the Seller has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of the Seller, any liability for brokerage or finders' fees or agents' commissions or similar charges in

7

connection with the execution and performance of the transactions contemplated by this Agreement.

4.    <u>Representations and Warranties of the Purchaser</u>.  The Purchaser represents and warrants to the Seller as follows:

    4.1    <u>Due Incorporation and Authority</u>.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Indiana, and has all necessary company power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  The Purchaser has all requisite company power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.  The execution and delivery by the Purchaser of this Agreement, the performance by the Purchaser of its obligations hereunder and the consummation by the Purchaser of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of the Purchaser.  This Agreement has been duly executed and delivered by the Purchaser, and, assuming the due authorization, execution and delivery hereof by the Seller, this Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except to the extent enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting creditors rights generally or by general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

    4.2    <u>No Conflicts</u>.  The execution and delivery by the Purchaser of this Agreement, the consummation of the transactions contemplated hereby, and the performance by the Purchaser of this Agreement in accordance with its terms will not:

        (a)    violate the certificate of incorporation or by-laws (or comparable instruments) of the Purchaser; or

        (b)    violate any Law to which the Purchaser or its assets are bound or subject.

    4.3    <u>Litigation</u>.  There are no Claims pending or, to the knowledge of the Purchaser, threatened against the Purchaser before any Governmental Body that would prevent or materially delay the consummation by the Purchaser of the transactions contemplated by this Agreement.

    4.4    <u>Purchaser's Financial Capability</u>.  The Purchaser has available under its current credit facilities, or otherwise, the funds necessary to consummate the transactions contemplated by this Agreement, including payment of the Purchase Price.

    4.5    <u>No Brokers or Finders</u>.  The Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of the Purchaser, any liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and performance of the transactions contemplated by this Agreement.

8

4.6     Acknowledgement of "AS IS, WHERE IS" Sale. The Purchaser represents, warrants and acknowledges that, except as set forth in this Agreement:  (a) the Purchaser is purchasing the Transferred Assets on an "as is, where is, with all faults" basis based solely on the Purchaser's own investigation of the Transferred Assets and (b) neither the Seller nor any of its Representatives has made any representations and warranties or guarantees, express, implied or statutory, written or oral, with respect to the Transferred Assets (or any part thereof), the financial performance of the Transferred Assets, or the physical condition of the Transferred Assets.

5.     Covenants and Agreements.

5.1     Retention of Transferred Assets. Except as otherwise provided in this Agreement, between the date hereof and the Closing Date, the Seller shall not sell, transfer, encumber or otherwise dispose of any Transferred Assets or any interest therein, other than immaterial dispositions with the prior consent of Purchaser and Finished Homes sold or disposed of in the ordinary course of Seller's Business at the Plant (after the Petition Date).

5.2     Confidentiality. All Confidential Information obtained by the Purchaser, either by the observations and examinations of its Representative or as disclosed to the Purchaser by the Seller, shall remain confidential.  If the transaction contemplated herein fails to close for any reason, the Purchaser shall deliver to the Seller, at no cost to the Seller, all such Confidential Information and the Purchaser shall make no further distribution or disclosures of any such Confidential Information.

5.3     Expenses. Except as otherwise specifically provided herein, the Purchaser and the Seller shall bear their respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of their Representatives.

5.4     Access to Information. From the date hereof until the Closing, upon written reasonable notice, the Seller shall, subject to Seller's approval (not to be unreasonably withheld), (i) afford the Representatives of the Purchaser reasonable access, during normal business hours, to the Transferred Assets, and (ii) furnish to the Representatives of the Purchaser such additional information regarding the Transferred Assets as the Purchaser may from time to time reasonably request.

5.5     Regulatory and Other Authorizations.

(a)     Each of the parties hereto shall use its commercially reasonable efforts to (i) take, or cause to be taken, all appropriate action, and do, or cause to be done all things necessary, proper or advisable under any Law or otherwise to consummate the Closing, (ii) obtain any authorizations or orders required to be obtained or made in connection with the Closing, and (iii) make all filings and give any notice, and thereafter make any other submissions either required or reasonably deemed appropriate by the parties hereto, with respect to this Agreement and the transactions contemplated hereby.

5.6    Further Action. Each of the parties hereto shall execute such documents and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and give effect to the transactions contemplated hereby.

5.7    Bankruptcy Court Approval.

(a)    On or before the fifth (5th) Business Day after the execution of this Agreement, the Seller shall file (or shall have filed) a motion with the Bankruptcy Court seeking entry of an order of the Bankruptcy Court regarding the transactions contemplated by this Agreement, establishing notice and service requirements to creditors and parties in interest with respect thereto, approving the Break-Up Fee and the Expense Reimbursement, and approving the bidding procedures governing the sale of the Transferred Assets contemplated by this Agreement (such order being referred to herein as the "Bidding Procedures Order"),

(b)    On or before the fifth (5th) Business Day after the entry of the Bidding Procedures Order, the Seller shall file (or shall have filed) a motion with the Bankruptcy Court seeking entry of an order of the Bankruptcy Court approving the sale of the Transferred Assets pursuant to this Agreement (the "Sale Approval Order").

(c)    The Bidding Procedures Order. The Bidding Procedures Order shall be substantially in the form (with such changes thereto as the Purchaser shall approve, which approval shall not be unreasonably withheld, conditioned or delayed) of Exhibit B hereto.

(d)    The Sale Approval Order. The Sale Approval Order shall be substantially in the form of Exhibit C hereto (with such changes thereto as the Seller and the Purchaser shall mutually approve, which approval shall not be unreasonably withheld, conditioned or delayed).

5.8    Books and Records. If, in order to properly prepare documents required to be filed with Governmental Bodies or its financial statements, it is necessary that either party hereto or any successors thereto be furnished with additional information relating to the Transferred Assets, and such information is in the possession of the other party hereto or any successor thereto or any of their respective Affiliates, such party agrees to use commercially reasonable efforts to furnish or cause to be furnished such information to such other party, at the reasonable cost and expense of the party being furnished such information.

5.9    Tax Matters.

(a)    Sales, Use and Other Transfer Taxes. The Seller shall be responsible for paying all unpaid real and personal property taxes assessed prior to the Closing Date with respect to the Transferred Assets including, without limitation, all 2008 and 2009 taxes and assessments for the period prior to the Closing which are not due until after the Closing in 2009 and 2010, and the Purchaser shall be responsible for paying all real and personal property taxes assessed after the Closing Date with respect to the Transferred Assets for the period after the Closing. The Purchaser shall provide the Seller with resale exemption certificates as is appropriate. The Purchaser shall be responsible for any Indiana excise, sales, value added, use, registration, stamp,

franchise, transfer and similar Taxes incurred in connection with the transactions contemplated by this Agreement and which are not otherwise exempt pursuant to the applicable sections of the Bankruptcy Code. The Seller shall be responsible for all income, profit and similar Taxes incurred or imposed with respect to the sale of the Transferred Assets by the Seller. The parties hereto agree to cooperate in the filing of all necessary documentation and all Tax Returns with respect to all such Taxes, including any available pre-sale filing procedure. At Closing, if there are any unpaid taxes or utilities assessed or charged to the Plant and/or the Transferred Assets prior to the Closing, then the escrow agent designated by First American Title Insurance Company shall be authorized to pay such taxes or utilities using the proceeds due to Seller pursuant to this Agreement.

(b)    Cooperation. The parties hereto shall cooperate with each other and with each other's respective Representatives, including accounting firms and legal counsel, in connection with the preparation or audit of any Tax Return(s) and any Tax claim or litigation in respect of the Transferred Assets that include whole or partial taxable periods, activities, operations or events on or prior to the Closing Date, which cooperation shall include making available employees, if any, for the purpose of providing testimony and advice, or original documents, or either of them.

(c)    Bulk Sales Law. The Purchaser hereby waives compliance by the Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Transferred Assets to the Purchaser.

5.10    Notification of Certain Matters. Until the Closing, each party hereto shall promptly notify the other party in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Section 6 or 7 of this Agreement becoming incapable of being satisfied.

5.11    Use of Names. The Seller is not conveying ownership rights or granting the Purchaser or any Affiliate of the Purchaser a license to use any of the trade names, trademarks, service marks, logos or domain names of the Seller or any of its Affiliates (including the name "Fleetwood" or any trade name, trademark, service mark, logo or domain name incorporating the name "Fleetwood") and, after the Closing, the Purchaser shall not use, or permit any Affiliate of the Purchaser to use, in any manner the names or marks of the Seller or any Affiliate of the Seller or any word that is similar in sound or appearance to such names or marks. In the event the Purchaser or any Affiliate of the Purchaser violates any of its obligations under this Section 5.11, the Seller may proceed against it in law or in equity for such damages or other relief as a court may deem appropriate. The Purchaser acknowledges that a violation of this Section 5.11 may cause the Seller and its Affiliates irreparable harm which may not be adequately compensated for by money damages. The Purchaser therefore agrees that in the event of any actual or threatened violation of this Section 5.11, the Seller shall be entitled, in addition to other remedies that it may have, to a temporary restraining order and to preliminary and final injunctive relief against the Purchaser or such Affiliate of the Purchaser to prevent any violations of this Section 5.11. The

Purchaser may use the Seller's drawings and engineering plans that are Transferred Assets in Purchaser's Business to the extent that such use is in compliance with this Section 5.11.

5.12    Ordering of Materials. Purchaser hereby acknowledges and agrees that Walter Comer is an representative of Purchaser and a current employee of Seller. Purchaser hereby covenants and agrees that, prior to the Closing, it shall cause Walter Comer (in his capacity as an employee of Seller) to continue to manage and conduct the Seller's Business at the Plant in the ordinary course and consistent with past practice (in each case, after the Petition Date), including with respect to (i) managing assets, (ii) preserving goodwill, (iii) operating the production line, and (iv) ordering and purchasing supplies, raw materials and building materials used at the Plant. For the avoidance of doubt, any purchase of supplies, raw materials and building materials prior to the Closing over $5,000 shall not be deemed to be in the ordinary course of Seller's Business at the Plant and consistent with past practice (in each case, after the Petition Date) and shall be subject to approval, which shall not be unreasonably withheld, by an individual to be designated by Fleetwood Enterprises, Inc. Seller hereby covenants and agrees that, prior to Closing, Seller shall continue to fund and approve, as appropriate, the operation of the Seller's Business at the Plant in the ordinary course and consistent with past practice (in each case, after the Petition Date), including with respect to (i) managing assets, (ii) preserving goodwill, (iii) operating the production line, and (iv) ordering and purchasing supplies, raw materials and building materials used at the Plant (in quantities sufficient as of Closing to complete all homes under construction in the production line at the Plant as of the Closing pursuant to open purchase orders).

5.13    Seller Termination Right. The Seller and Purchaser acknowledge and agree that (i) the Sellers' investment banker, Greenhill & Company LLC, has been marketing for sale the assets comprising the Seller's Business conducted by the Seller and its Affiliates (the "Housing Group Assets"), which may include the Transferred Assets, and (ii) the Seller shall have (beginning on the date hereof and expiring on the first (1st) Business Day after the deadline for submitting over bids for the Transferred Assets pursuant to the Bidding Procedures Order) the right to terminate this Agreement in the event that Seller, in its sole discretion, desires to proceed with a sale of the Housing Group Assets that includes a material portion of the Transferred Assets, taken as a whole, subject to the terms of Section 8.2 of this Agreement (the "Seller Termination Right"). The Seller and Purchaser further agree that in the event Seller exercises the Seller Termination Right, Seller may (a) withdraw its motion or motions seeking entry of the Bidding Procedures Order and/or the Sale Approval Order and (b) vacate any related hearing.

6.    Conditions Precedent to the Obligation of the Purchaser to Close. The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing Date of each of the following conditions, any one or more of which (to the extent permitted by applicable Law) may be waived, in whole or in part, by the Purchaser:

6.1    Representations and Warranties; Covenants. The representations and warranties of the Seller contained in this Agreement shall be true and correct both as of the date of this Agreement and as of the Closing, other than such representations and warranties that are made as

12

of a specified date, which representations and warranties shall be true and correct as of such date, except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" (including the term "material") set forth therein) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or delay the Closing of the transactions contemplated by this Agreement (except where such failure to be true and correct has been or will be cured or remedied pursuant to the Sale Approval Order). The covenants and agreements contained in this Agreement to be complied with by the Seller at or before the Closing shall have been complied with in all material respects (except for such covenants and agreements in Section 5.12, which shall have been fully complied with). The Purchaser shall have received a certificate of the Seller (the "Seller's Certificate") to such effect signed by a duly authorized officer thereof.

6.2    No Order. No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions and which is not satisfied or resolved or preempted by the Sale Approval Order.

6.3    Bankruptcy Filing. The Bankruptcy Case shall not have been dismissed or converted to a proceeding under chapter 7 of the Bankruptcy Code and no trustee or examiner shall have been appointed.

6.4    Closing Documents. The Seller shall have delivered to the Purchaser on the Closing Date the documents required to be delivered pursuant to Section 1.6.

6.5    Sale Approval Order. The Bankruptcy Court shall have entered the Sale Approval Order and such Sale Approval Order shall have become a Final Order on or before August 28, 2009.

6.6    Other Conditions. All conditions of this Agreement not otherwise listed in this Section 6 shall have been satisfied or waived in writing, signed by the party whose obligation is conditioned.

7.    Conditions Precedent to the Obligation of the Seller to Close. The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing Date of each of the following conditions, any one or more of which (to the extent permitted by applicable Law) may be waived, in whole or in part, by the Seller:

7.1    Representations and Warranties; Covenants. The representations and warranties of the Purchaser contained in this Agreement shall be true and correct both as of the date of this Agreement and as of the Closing, other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct as of such date, except where the failure to be so true and correct (without giving effect to any limitation or

qualification as to "materiality" (including the terms "material") set forth therein) would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Purchaser or prevent or delay the Closing. The covenants and agreements contained in this Agreement to be complied with by the Purchaser at or before the Closing shall have been complied with in all material respects (except for such covenants and agreements in Section 5.12, which shall have been fully complied with). The Seller shall have received a certificate of the Purchaser (the "Purchaser's Certificate") to such effect signed by a duly authorized officer thereof.

7.2    No Order.  No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions and which is not satisfied or resolved or preempted by the Sale Approval Order.

7.3    Sale Approval Order.  The Bankruptcy Court shall have entered the Sale Approval Order, and the Sale Approval Order shall have become a Final Order.

7.4    Closing Documents.  The Purchaser shall have delivered to the Seller on the Closing Date the documents and payments required to be delivered by it pursuant to Section 1.7.

7.5    Other Conditions.  All conditions of this Agreement not otherwise listed in this Section 7 shall have been satisfied or waived in writing, signed by the party whose obligation is conditioned.

8.    Termination of Agreement.

8.1    Termination Prior to Closing.  Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, at any time prior to the Closing (the "Termination Date"), upon notice by the terminating party to the other party:

(a)    by the mutual written consent of the Seller and the Purchaser;

(b)    by either the Seller or the Purchaser if the Closing shall not have occurred prior to August 29, 2009; provided, however, that the right to terminate this Agreement under this Section 8.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur prior to such date;

(c)    (i) by the Seller, if the Purchaser breaches or fails to perform in any respect any of its representations and warranties or covenants contained in this Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in Section 7, (B) cannot be or has not been cured within ten (10) Business Days following delivery

14

of written notice of such breach or failure to perform, and (C) has not been waived by the Seller; or (ii) by the Purchaser, if the Seller breaches or fails to perform in any respect any of its representations and warranties or covenants contained in this Agreement and such breach or failure to perform (X) would give rise to the failure of a condition set forth in Section 6, (Y) cannot be or has not been cured within ten (10) Business Days following delivery of written notice of such breach or failure to perform, and (Z) has not been waived by the Purchaser.

(d) (i) by the Seller, if any of the conditions set forth in Section 7 shall have become incapable of fulfillment prior to the Termination Date, or (ii) by the Purchaser, if any of the conditions set forth in Section 6 shall have become incapable of fulfillment prior to the Termination Date; provided, however, that the right to terminate this Agreement pursuant to this Section 8.1(d) shall not be available if the failure of the party so requesting termination to fulfill any obligation under this Agreement shall have been through fault, breach of covenant or breach of representation or warranty by the party seeking termination, which has caused the failure of such condition to be satisfied on or prior to the Termination Date.

(e) by either the Seller or the Purchaser, if the Bankruptcy Court approves a sale, transfer or other disposition by the Seller of all or substantially all of the Transferred Assets to a Person (or group of Persons) other than the Purchaser (a "Competing Transaction");

(f) by the Purchaser, (provided that the Purchaser is not then in material breach of any provision of this Agreement), if any of the following shall occur:

(i) the Bankruptcy Case is dismissed or converted to one or more proceedings under chapter 7 of the Bankruptcy Code, a trustee or examiner is appointed for the Seller, or the automatic stay under section 362 of the Bankruptcy Code is lifted as to any material Transferred Asset; or

(ii) the Sale Approval Order is not entered by the Bankruptcy Court or does not become a Final Order.

(g) by Seller, pursuant to the Seller Termination Right.

(h) by Seller or Purchaser, if the other party fails to fully comply with its covenants and agreements in Section 5.12.

8.2    Break-up Fee; Expense Reimbursement

(a) In the event that this Agreement is terminated under Section 8.1(e), and provided that the Purchaser is not in material breach of any provision of this Agreement prior to such termination, the Seller shall pay to the Purchaser, in cash, the Deposit plus the amount of $52,500, less the amount of the Expense Reimbursement (the "Break-Up Fee") not later than seven (7) Business Days after the closing of a Competing Transaction.

(b) In the event that this Agreement is terminated under Sections 8.1(c)(ii), 8.1(g), or 8.1(h), and provided that the Purchaser is not in material breach of any provision of this

Agreement prior to such termination, the Seller shall reimburse the Purchaser for reasonable, documented out-of-pocket expenses actually incurred by the Purchaser in connection with this Agreement and the transactions contemplated hereby (including, without limitation, printing, computer hardware and software purchases and expenditures, and engineering fees for HUD and DAPIA certifications), the amount of which shall not in the aggregate exceed $52,500 (the "Expense Reimbursement"), not later than seven (7) Business Days after the closing of the Competing Transaction.  The Expense Reimbursement and Break-Up Fee shall both be treated as a super-priority administrative expense with priority over administrative expenses of the kind specified in Sections 503(b) and 507(a) of the Bankruptcy Code, *provided*, *however*, that such super-priority administrative expense shall be junior in all respects to any other super-priority administrative expense or claim approved by the Bankruptcy Court (on an interim basis, or otherwise) prior to the date of termination of this Agreement triggering the Expense Reimbursement and/or Break-up Fee.

(c)    In the event this Agreement is terminated for any reason other than an uncured breach or failure to perform by Purchaser as contemplated by Section 8.1(c), the Deposit shall be returned and paid to Purchaser by Seller no later than seven (7) Business Days after such termination.

(d)    In the event that this Agreement is terminated by the Purchaser, return and refund of the Deposit and the payment of the Break-Up Fee and the Expense Reimbursement (if applicable, in accordance with this Section 8.2 and the Bidding Procedures Order) shall be the Purchaser's sole and exclusive remedy against the Seller (whether in contract or tort, under statute, rule, Law or otherwise), in full satisfaction of all of the Seller's obligations hereunder, except in the case of fraud or intentional misconduct.

(e)    In the event that this Agreement is terminated by the Seller (except pursuant to Section 8.1(g)), the forfeiture and retention of the Deposit shall be the Seller's sole and exclusive remedy against the Purchaser (whether in contract or tort, under statute, rule, Law or otherwise), in full satisfaction of all of the Purchaser's obligations hereunder, except in the case of fraud or intentional misconduct.

8.3    Survival After Termination.  If this Agreement is terminated pursuant to Section 8.1 and the transactions contemplated hereby are not consummated, or if the Bankruptcy Court does not approve this Agreement, this Agreement shall become null and void and have no further force or effect except that any such termination shall be without prejudice to the rights of any party on account of the non-satisfaction of the conditions set forth in Sections 6 and 7 resulting from the breach or violation, involving fraud or intentional misconduct, of the representations and warranties, covenants or agreements of another party under this Agreement.  Notwithstanding anything in this Agreement to the contrary, the provisions of Sections 5.2, Section 8.2, this Section 8.3 and Section 9 shall survive any termination of this Agreement.

9.    Miscellaneous.

9.1    Certain Definitions.

(a)    As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.

"Bill of Sale" means Bills of Sale substantially in the form of Exhibit A hereto to be executed by the Seller on the Closing Date.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks located in California are authorized or obligated to close.

"Claim" means a suit, claim, action, proceeding, inquiry, investigation, litigation, legal proceeding, demand, charge, complaint, arbitration, indictment, information, or grand jury subpoena, in each case, filed with or made by a Governmental Body.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means all information regarding a party's business or affairs, including business concepts, processes, methods, trade secrets, systems, know-how, devices, formulas, product specifications, marketing methods, prices, customer lists, supplier lists, methods of operation or other information, whether in oral, written or electronic form, that is either: (i) designated as confidential; (ii) is of a nature such that a reasonable person would know that it is confidential; or (iii) is disclosed under circumstances such that a reasonable person would know it is confidential. Notwithstanding the foregoing, the following information shall not be considered Confidential Information: (A) information that is or becomes publicly available through no fault of the party obligated to keep it confidential (or such party's Affiliates or Representatives); (B) information with regard to the other party that was rightfully known by a party prior to commencement of discussions regarding the subject matter of this Agreement, as evidenced by documentation; (C) information that was independently developed by a party without use of the Confidential Information, as evidenced by documentation; and (D) information rightfully disclosed to a party by a third party without continuing restrictions on its use or disclosure.

"Contract" means any written agreement, arrangement, understanding, purchase order, lease or instrument or other contractual or similar arrangement or commitment.

"Encumbrances" means all Liens, claims, conditional sales agreements, rights of first refusal or options.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction as to which: (i) no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed; (ii) the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) if an appeal has been timely filed no stay pending an appeal is in effect and the time for requesting a stay pending appeal shall have expired; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"Governmental Body" means a domestic or foreign national, federal, state, provincial, or local governmental, regulatory or administrative authority, department, agency, commission, court, tribunal, arbitral body or self-regulated entity.

"Law" means any federal, state or local statute, law, rule, regulation, order, writ, ordinance, judgment, governmental directive, injunction, decree or other requirement of any Governmental Body.

"Liabilities" means any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), claim, deficiency, guaranty or endorsement of or by any Person (other than endorsements of notes, bills, checks and drafts presented for collection or deposit in the ordinary course of business) of any type, whether accrued, absolute or contingent, liquidated or unliquidated, choate or inchoate, matured or unmatured, or otherwise. Without limiting the foregoing, the term "Liabilities" includes and refers to all liabilities and obligations for or with respect to Taxes, including liabilities for Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of any applicable Law), as a transferee or successor, by contract, or otherwise.

"Lien" means any security interest, mortgage, pledge, lien, encumbrance, charge or claim (as defined in Section 101(5) of the Bankruptcy Code).

"Material Adverse Effect" means any material adverse effect on the operating condition of the Transferred Assets, taken as a whole, except any such effect resulting from (i) changes in global, national or regional political conditions (including the outbreak of war or acts of terrorism) or in general economic, business, regulatory, political or market conditions or in national or global financial markets, (ii) any actions required under this Agreement to obtain any approval or authorization of the Bankruptcy Court or under any applicable Law, (iii) changes in any applicable Law or applicable accounting regulations or principles or interpretations thereof, (iv) the announcement or pendency of this Agreement and the transactions contemplated hereby, including the initiation of litigation by any Person with respect to this Agreement, (v) any action taken by the Seller which is required or permitted by or resulting from or arising in connection with this Agreement, (vi) changes in commercial real property values in the state and

county where any Transferred Real Property is located, (vii) any actions taken (or omitted to be taken) at the request of the Purchaser or (viii) the Bankruptcy Case.

"Permitted Encumbrances" means: (i) Liens for Taxes and assessments not yet payable which are paid in full by Seller (or for which Purchaser is given a credit against the Purchase Price) at Closing; (ii) inchoate mechanics' Liens for work in progress which are subsequently paid in full by Seller; (iii) materialmen's, mechanics', carriers', workmen's and repairmen's Liens arising in the ordinary course and not past due and payable or the payment of which is being contested in good faith by appropriate proceedings, provided that any such Liens are fully satisfied by Seller at its expense following such proceedings; (iv) Liens that will be released at or prior to the Closing; (v) (A) easements, rights-of-way, servitudes, permits, licenses, surface leases, ground leases to utilities, municipal agreements, railway siding agreements and other rights, all as reflected in the official records of the jurisdictions where any real property is located, (B) conditions, covenants or other restrictions reflected in the official records of the jurisdictions where any real property is located, and (C) easements for streets, alleys, highways, telephone lines, gas pipelines, power lines, railways and other easements and rights-of-way on, over or in respect of any real property, all as reflected in the official records of the jurisdictions where any real property is located; in each case with respect to clauses (i) through (v) above, individually or in the aggregate, that do not or would not reasonably be expected to materially and adversely affect the current use or value of the property subject thereto or the operations of the Seller as it is currently conducted, and (vi) Liens related to purchase money security interests entered into in the ordinary course of the Seller's Business at the Plant after the date of this Agreement.

"Person" means any individual, corporation, partnership, limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Representative" means, with respect to a particular Person, any director, officer, manager, partner, member, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants, financiers and financial advisors.

"Tax" or "Taxes" means all taxes, charges, fees, imposts, levies or other assessments, including all net income, franchise, profits, gross receipts, capital, sales, use, ad valorem, value added, transfer, transfer gains, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real or personal property, and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest and any penalties, fines, additions to tax or additional amounts thereon, imposed by any taxing authority (federal, state, local or foreign) and shall include any transferee liability in respect of Taxes.

19

"Tax Returns" means all returns, declarations, reports, forms, estimates, information returns and statements required to be filed in respect of any Taxes or to be supplied to a taxing authority in connection with any Taxes.

(b)    The following capitalized terms are defined in the following Sections of this Agreement:

| Definition | Location |
|---|---|
| Agreement | Preamble |
| Assumed Warranty Obligations | 1.3(c) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bidding Procedures Order | 5.7(a) |
| Books and Records | 1.1(f) |
| Break-Up Fee | 8.2(a) |
| Closing | 1.6 |
| Closing Date | 1.6 |
| Competing Transaction | 8.1(e) |
| DAPIA | 1.1(e) |
| Deposit | 1.5(b) |
| Engineering Plans | 1.1(e) |
| Excluded Assets | 1.2 |
| Excluded Liabilities | 1.4 |
| Expense Reimbursement | 7.2(b) |
| Finished Homes | 1.2(b) |
| Hazardous Substance | 2.1 |

| Definition | Location |
|---|---|
| HUD | 1.1(e) |
| Petition Date | Recitals |
| Plant | Recitals |
| Purchase Price | 1.5(a) |
| Purchaser | Preamble |
| Purchaser's Certificate | 7.1 |
| Sale Approval Order | 5.7(b) |
| Seller | Preamble |
| Seller's Business | Recitals |
| Seller's Certificate | 6.1 |
| Tangible Personal Property | 1.1(b) |
| Termination Date | 8.1 |
| Transferred Assets | 1.1 |
| Transferred Employee | 1.10 |
| Transferred Permits | 1.1(c) |
| Transferred Real Property | 1.1(a) |
| Unfinished Homes | 1.1(d) |

9.2    Consent to Jurisdiction; Service of Process.

(a)    The Purchaser and the Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating hereto except in the Bankruptcy Court).

(b)    Any and all service of process and any other notice in any Claim shall be effective against any party if given personally or by registered or certified mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage prepaid, mailed to

such party as herein provided.  Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction.

   (c) EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

   9.3 Notices.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) on the day of delivery if delivered in person, (b) on the day of delivery if delivered by facsimile upon confirmation of receipt (provided that if delivery is completed after the close of business, then the next Business Day), (c) on the first (1st) Business Day following the date of dispatch if delivered using a next-day service by a nationally recognized express courier service, or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated by notice given in accordance with this Section 9.3 by the party to receive such notice:

   (a) if to the Purchaser, to:

    Adventure Homes, LLC
    217 East Railroad Street, PO Box 299
    Garrett, IN 46738
    Attention: Walter G. Fuller
    Facsimile: (260) 357-5900

    with a copy to:
    Burt, Blee, Dixon, Sutton & Bloom, LLP
    200 East Main Street, Suite 1000
    Fort Wayne, IN 46802
    Attention: Robert E. Doelling, Jr., Esq.
    Facsimile: (260) 422-7932

   (b) if to the Seller, to:

    Fleetwood Enterprises, Inc.
    3125 Myers Street
    Riverside, California 92503
    Attention:  General Counsel
    Facsimile:  (951) 351-3776

with a copy to:

Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, California 92612
Attention: Craig Millet, Esq.
Facsimile: (949) 475-4651

9.4    Entire Agreement. This Agreement (including the Exhibits and Schedules hereto) and any other ancillary agreements executed in connection with the consummation of the transactions contemplated hereby, contain the entire agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements, written or oral, with respect thereto.

9.5    Amendments. This Agreement may be amended, superseded, canceled, renewed or extended only by a written instrument signed by the Purchaser and the Seller.

9.6    Waiver. Each party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other party hereto, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered pursuant hereto, (c) waive compliance with any of the agreements of the other party contained herein, or (d) waive satisfaction of any condition to its obligations hereunder. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege. All remedies, rights, undertakings, obligations, and agreements contained herein shall be cumulative and not mutually exclusive.

9.7    Nonsurvival of Representations, Warranties and Covenants. The respective representations and warranties and covenants of the Seller and the Purchaser contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided, that this Section shall not limit any covenant or agreement of the parties hereto that by its terms requires performance after the Closing.

9.8    Governing Law. This Agreement and all Claims with respect thereto shall be governed by and construed in accordance with the federal bankruptcy law, to the extent applicable, and, where state law is implicated, the laws of the State of Indiana without regard to any conflict of laws rules thereof that might indicate the application of the laws of any other jurisdiction.

9.9    Binding Effect; Assignment. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns; provided, that this Agreement (and the rights, agreements and obligations hereunder) is not assignable by any party without the prior written consent of the other party, which shall not be

unreasonably withheld or delayed. In addition to the consent required under this clause, (i) any such assignor shall remain bound by its agreements and obligations under this Agreement and (ii) the assignee or assignees shall agree in writing to be bound by all of the agreements and obligations of the assignor under this Agreement.

9.10    Interpretation; Headings. All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require. All terms defined in this Agreement in their singular or plural forms have correlative meanings when used herein in their plural or singular forms, respectively. Unless otherwise expressly provided, the words "include," "includes" and "including" do not limit the preceding words or terms and shall be deemed to be followed by the words "without limitation." All references herein to Sections shall be deemed references to such parts of this Agreement, unless the context shall otherwise require. The Section headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. The parties hereto acknowledge and agree that (a) each party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision, (b) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement, and (c) the terms and provisions of this Agreement shall be construed fairly as to all parties hereto, regardless of which party was generally responsible for the preparation of this Agreement.

9.11    Severability of Provisions. If any provision or any portion of any provision of this Agreement shall be held invalid or unenforceable, the remaining portion of such provision and the remaining provisions of this Agreement shall not be affected thereby. If the application of any provision or any portion of any provision of this Agreement to any Person or circumstance shall be held invalid or unenforceable, the application of such provision or portion of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby.

9.12    Counterparts. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all, of the parties hereto.

9.13    No Third Party Beneficiaries. No provision of this Agreement is intended to, or shall, confer any third party beneficiary or other rights or remedies upon any Person other than the parties hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SELLER

FLEETWOOD HOMES OF INDIANA, INC.

By: _____

Name: _____

Title: _____

PURCHASER

ADVENTURE HOMES, LLC

By: _____

Name:

Title:

SIGNATURE PAGE
TO
ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SELLER

FLEETWOOD HOMES OF INDIANA, INC.

By: _____
    Name:
    Title:


PURCHASER

ADVENTURE HOMES, LLC


By: _____
    Name:  Walter Fuller
    Title:  Manager

SIGNATURE PAGE
TO
ASSET PURCHASE AGREEMENT

Schedule 1.1(a) Transferred Real Property

Legal Description of Plant # 55-1

Part of the West half of the Northeast Quarter of Section 35, Township 34 North, Range 12 East, DeKalb County, Indiana, more particularly described as follows:

Beginning at a point on the East line of the West half of the Northeast Quarter of Section 35, Township 34 North, Range 12 East, DeKalb County, Indiana, said point being 938.9 feet South of the Northeast corner of the West half of the Northeast Quarter of Section 35, Township 34 North, Range 12 East, thence South along the East line of the West half of the Northeast Quarter of Section 35, Township 34 North, Range 12 East, a distance of 608.35 feet; thence West with a deflection angle to the right of 90 degrees 18 minutes a distance of 949.78 feet thence North with a deflection angle to the right of 89 degrees 26 minutes 40 seconds a distance of 608.36 feet; thence East with a deflection angle to the right of 90 degrees 23 Minutes 20 seconds a distance of 950.73 feet to the point of beginning, containing 13.27 acres.

ALSO:

A Part of the West Half of the Northeast Quarter of Section 35, Township 34 North, Range 12 East, Keyser Civil Township, DeKalb County, Indiana, being more fully described as follows:

Commencing at the Northeast corner of said West Half of the Northeast Quarter, Section 35; thence south 00 degrees 12 minutes 20 seconds West 2071.25 feet to a pin on the North line of a proposed 60 foot Roadway line; thence North 89 degrees 36 minutes 37 seconds West along said North Roadway line, a distance of 215.0 feet to a pin set at the Point of Beginning; thence continuing along said North Roadway line, North 89 degrees 36 minutes 37 seconds West 729.75 feet to a pin set on the East line of a utilities easement described in Deed Record 199 page 570; thence North 00 degrees 00 minutes East along said easement East line, a distance of 530.0 feet to an iron pin found; thence South 89 degrees 36 minutes 37 seconds East 731.65 feet to an iron pin set; thence South 00 degrees 12 minutes 20 seconds West 530.0 feet back to the Point of Beginning; containing 8.89 acres, more or less.

<u>Schedule 1.1(b) Tangible Personal Property</u>

(See attached.)

Schedule 1.1(b)

R5712430

Fleetwood Enterprises, Inc.
Depreciation Expense Report

6/16/2009    14:22:55
Page -    1
As of Date    5/24/2009

| Asset Object | Asset Number | Unit Number | Description | En St | Loc | Start Depr | Life Mos | Cost | Accumulated Depreciation | Year to Date | Depreciation Exp Quarter to Date | Current | Net Book Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1811 | 1550001 | 1550001 | LAND LAND PURCHASE FROM PLT #7 | | 1 | 4/15/1994 | | 25,812.15 | | | | | 25,812.15 |
| 1811 | 1550002 | 1550002 | LAND LAND | | 1 | 5/15/1994 | | 131,670.20 | | | | | 131,670.20 |
| | 1:1 | | | | | | | 157,482.35 | | | | | 157,482.35 |

R5712430

Fleetwood Enterprises, Inc.
Depreciation Expense Report

5/16/2009    14:22:55
Page :    2
As of Date    5/24/2009

| Asset Object | Asset Number | Unit Number | Description | Eq St | Loc | Start Depr | Life Mos | Cost | Accumulated Depreciation | Year to Date | Depreciation Exp Quarter to Date | Current | Net Book Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1812 | 13713 | 255000701 | LAND IMPRV MISC LAND IMPRV | | 1 | 1/15/1995 | 111 | 22.66 | 22.66 | | | | |
| 1812 | 13714 | 255001101 | LAND IMPRV ADD'L CNCRT WRK & M | | 1 | 1/15/1995 | 111 | 303.15 | 303.15 | | | | |
| 1812 | 2550007 | 2550007 | LAND IMPRV MISC LAND IMPRV | | 1 | 5/15/1994 | 119 | 6,430.35 | 6,430.35 | | | | |
| 1812 | 2550008 | 2550008 | LAND IMPRV ASPHALT WORK | | 1 | 5/15/1994 | 119 | 36,000.00 | 36,000.00 | | | | |
| 1812 | 2550009 | 2550009 | LAND IMPRV STORM DRAINAGE | | 1 | 5/15/1994 | 119 | 67,000.00 | 67,000.00 | | | | |
| 1812 | 2550010 | 2550010 | LAND IMPRV FENCING | | 1 | 5/15/1994 | 119 | 30,000.00 | 30,000.00 | | | | |
| 1812 | 2550011 | 2550011 | LAND IMPRV CONCRETE WORK | | 1 | 5/15/1994 | 119 | 330,769.85 | 330,769.85 | | | | |
| 1812 | 2550012 | 2550012 | LAND IMPRV COMPACTOR PAD | | 1 | 5/15/1994 | 119 | 31,650.00 | 31,650.00 | | | | |
| 1812 | 2550013 | 2550013 | LAND IMPRV FENCING | | 1 | 5/15/1994 | 120 | 6,035.00 | 6,035.00 | | | | |
| 1812 | 2550014 | 2550014 | LAND IMPRV PARKING LOT STRIPIN | | 1 | 5/16/1994 | 120 | 1,210.31 | 1,210.31 | | | | |
| 1812 | 2550015 | 2550015 | LAND IMPRV SITE WORK-ENGINEERI | | 1 | 5/15/1994 | 120 | 6,340.00 | 6,340.00 | | | | |
| 1812 | 2550016 | 2550016 | LAND IMPRV GUARDPOSTS | | 1 | 5/15/1966 | 111 | 4,807.00 | 4,807.00 | | | | |
| 1812 | 2550017 | 2550017 | LAND IMPRV TRENCH DRAIN | | 1 | 1/15/1995 | 111 | 5,768.00 | 5,768.00 | | | | |
| 1812 | | | | | | | | 526,326.31 | 526,326.31 | | | | |

R5712430

Fleetwood Enterprises, Inc.
Depreciation Expense Report

6/16/2009    14:22:55
Page    3
As of Date    5/24/2009

| Asset Object | Asset Number | Unit Number | Description | Eq St | Loc | Start Depr | Life Mos | Cost | Accumulated Depreciation | Year to Date | Depreciation Exp Quarter to Date | Current | Net Book Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1813 | 13715 | 355000101 | BLDG&IMPRV HVAC | | 1 | 5/15/1994 | 479 | 119,460.00 | 44,891.02 | 249.40 | 249.40 | 249.40 | 74,568.98 |
| 1813 | 13716 | 355000102 | BLDG&IMPRV ELECTRICAL | | 1 | 5/15/1994 | 479 | 187,798.29 | 70,571.38 | 392.06 | 392.06 | 392.06 | 117,226.91 |
| 1813 | 13717 | 355000104 | BLDG&IMPRV ADDITIONAL COSTS | | 1 | 5/15/1994 | 479 | 9,237.08 | 3,471.13 | 19.28 | 19.28 | 19.28 | 5,765.95 |
| 1813 | 13718 | 355000105 | BLDG&IMPRV DUST COLLECTION SYS | | 1 | 5/15/1994 | 479 | 81,220.00 | 30,521.08 | 169.56 | 169.56 | 169.56 | 50,698.92 |
| 1813 | 13719 | 355000106 | BLDG&IMPRV OVERHEAD AIR LINES | | 1 | 5/15/1994 | 476 | 59,056.69 | 22,192.49 | 123.29 | 123.29 | 123.29 | 36,864.20 |
| 1813 | 13720 | 355000107 | DUST COLLECTION SYSTEM ADD-ON | | 1 | 3/15/1998 | 433 | 2,011.93 | 622.63 | 4.64 | 4.64 | 4.64 | 1,389.30 |
| 1813 | 13721 | 355000108 | BLDG&IMPRV ADDITIONAL COST | | 1 | 5/15/1994 | 479 | 557,475.92 | 209,489.90 | 1,163.83 | 1,163.83 | 1,163.83 | 347,986.02 |
| 1813 | 13722 | 355000109 | BLDG&IMPRV ADDL COSTS - NEW PL | | 1 | 1/15/1995 | 471 | 160,053.75 | 58,448.51 | 339.83 | 339.83 | 339.83 | 101,605.24 |
| 1813 | 13723 | 355000110 | BLDG&IMPRV EXTND ELEC TO NEW L | | 1 | 1/15/1995 | 471 | 1,761.75 | 643.36 | 3.74 | 3.74 | 3.74 | 1,118.39 |
| 1813 | 13724 | 355000111 | BLDG&IMPRV ADDL ELECTRICAL COS | | 1 | 1/15/1995 | 471 | 93,007.91 | 33,964.87 | 197.47 | 197.47 | 197.47 | 59,043.24 |
| 1813 | 13725 | 355000112 | BLDG&IMPRV ADDL COSTS-HUBBELL | | 1 | 1/15/1996 | 471 | 2,806.09 | 1,024.73 | 5.96 | 5.96 | 5.96 | 1,781.36 |
| 1813 | 13726 | 355000113 | BLDG&IMPRV 60X200 WAREHOUSE | | 1 | 1/16/1995 | 300 | 194,727.00 | 111,643.48 | 649.09 | 649.09 | 649.09 | 83,083.52 |
| 1813 | 13727 | 355000114 | BLDG&IMPRV ELECTRICAL - 60X200 | | 1 | 1/15/1995 | 300 | 4,040.61 | 2,316.82 | 13.48 | 13.48 | 13.48 | 1,723.39 |
| 1813 | 13728 | 355000116 | BLDG&IMPRV (4)STRIP DOORS 18X1 | | 1 | 11/15/1994 | 473 | 4,384.77 | 1,613.00 | 9.27 | 9.27 | 9.27 | 2,771.77 |
| 1813 | 13729 | 355000117 | BLDG&IMPRV STRIP DOOR 18X16FX | | 1 | 11/16/1994 | 473 | 960.00 | 353.15 | 2.02 | 2.02 | 2.02 | 606.85 |
| 1813 | 13730 | 355000118 | BLDG&IMPRV PARTITIONS AND DOOR | | 1 | 5/15/1994 | 60 | 840.52 | 840.52 | | | | |
| 1813 | 13731 | 355000119 | DOOR #14 REPLACED | | 1 | 12/15/1997 | 437 | 5,812.00 | 1,822.07 | 13.30 | 13.30 | 13.30 | 3,989.93 |
| 1813 | 13732 | 355000202 | BLDG&IMPRV ADD COSTS-RELC CHAS | | 1 | 1/15/1996 | 471 | 2,447.60 | 893.82 | 5.20 | 5.20 | 5.20 | 1,553.78 |
| 1813 | 13733 | 355000203 | BLDG&IMPRV PIT MODIFICATION | | 1 | 1/15/1995 | 471 | 4,000.00 | 1,460.72 | 8.49 | 8.49 | 8.49 | 2,539.28 |
| 1813 | 13734 | 355000204 | BLDG&IMPRV PIT MODIFICATION | | 1 | 1/15/1995 | 471 | 3,386.33 | 1,236.62 | 7.18 | 7.18 | 7.18 | 2,149.71 |
| 1813 | 13735 | 355000205 | BLDG&IMPRV PIT MODIFICAT | | 1 | 4/15/1995 | 468 | 2,076.82 | 749.97 | 4.45 | 4.45 | 4.45 | 1,326.85 |
| 1813 | 13741 | 355003301 | REP.COMPRESS.1 INDOOR COIL- 2 L | | 1 | 8/25/2005 | 480 | 4,270.00 | 400.32 | 8.80 | 8.80 | 8.80 | 3,869.68 |
| 1813 | 13736 | 355000206 | CHASSIS FLOOR MATING PIT | | 1 | 7/15/1996 | 453 | 121,966.66 | 41,463.26 | 269.25 | 269.25 | 269.25 | 80,503.38 |
| 1813 | 13737 | 355000601 | BLDG&IMPRV EAST DORMER MEZZ | | 1 | 8/16/1994 | 476 | 4,463.12 | 1,659.61 | 9.38 | 9.38 | 9.38 | 2,803.51 |
| 1813 | 13738 | 355000902 | BLDG&IMPRV DORMER MEZZ | | 1 | 11/15/1994 | 473 | 26,557.83 | 9,769.69 | 56.15 | 56.15 | 56.15 | 16,788.14 |
| 1813 | 13739 | 355002701 | BLDG&IMPRV ADDL FIRE PROTECT | | 1 | 3/15/1995 | 469 | 3,170.00 | 1,149.04 | 6.76 | 6.76 | 6.76 | 2,020.96 |
| 1813 | 13740 | 355003001 | BLDG&IMPRV ROOF BEAM LIFT DEVI | | 1 | 4/15/1995 | 468 | 8,340.00 | 3,011.87 | 17.82 | 17.82 | 17.82 | 5,328.33 |
| 1813 | 3550001 | 3550001 | BLDG&IMPRV MAIN BUILDING | | 1 | 5/15/1994 | 479 | 2,387,847.43 | 897,237.03 | 4,984.65 | 4,984.65 | 4,984.65 | 1,490,410.40 |
| 1813 | 3550002 | 3550002 | BLDG&IMPRV RELOCATE CHASSIS LF | | 1 | 5/15/1994 | 479 | 46,504.40 | 17,475.56 | 97.09 | 97.09 | 97.09 | 29,028.84 |
| 1813 | 3550005 | 3550005 | BLDG&IMPRV GLUE LINES | | 1 | 5/15/1994 | 479 | 5,316.95 | 1,998.02 | 11.10 | 11.10 | 11.10 | 3,316.93 |
| 1813 | 3550007 | 3550007 | BLDG&IMPRV FOAM SEAL ROOM | | 1 | 5/15/1994 | 479 | 2,922.65 | 1,098.28 | 6.10 | 6.10 | 6.10 | 1,824.37 |
| 1813 | 3550008 | 3550008 | BLDG&IMPRV SECURITY SYSTEM | | 1 | 5/15/1994 | 479 | 4,516.25 | 1,697.13 | 9.43 | 9.43 | 9.43 | 2,819.12 |
| 1813 | 3550009 | 3550009 | BLDG&IMPRV MEZZANINES | | 1 | 5/15/1994 | 479 | 93,885.93 | 35,280.72 | 196.00 | 196.00 | 196.00 | 58,605.21 |
| 1813 | 3550010 | 3550010 | BLDG&IMPRV OVERHEAD STEEL OHS | | 1 | 5/15/1994 | 479 | 42,474.21 | 15,961.08 | 88.67 | 88.67 | 88.67 | 26,513.13 |
| 1813 | 3550011 | 3550011 | BLDG&IMPRV ACCOUSTIC TO TOPSET | | 1 | 5/15/1994 | 479 | 1,192.81 | 448.24 | 2.50 | 2.50 | 2.50 | 744.57 |
| 1813 | 3550013 | 3550013 | BLDG&IMPRV DORMERS-OHS | | 1 | 5/15/1994 | 479 | 2,240.31 | 841.87 | 4.68 | 4.68 | 4.68 | 1,398.44 |
| 1813 | 3550014 | 3550014 | BLDG&IMPRV END WALLS-OHS | | 1 | 5/15/1994 | 479 | 2,063.49 | 775.43 | 4.32 | 4.32 | 4.32 | 1,288.06 |
| 1813 | 3550015 | 3550015 | BLDG&IMPRV SHINGLES-OHS | | 1 | 5/15/1994 | 479 | 4,586.84 | 1,723.56 | 9.58 | 9.58 | 9.58 | 2,863.18 |
| 1813 | 3550016 | 3550016 | BLDG&IMPRV SHINGLES-OHS | | 1 | 5/15/1994 | 479 | 2,021.55 | 759.66 | 4.22 | 4.22 | 4.22 | 1,261.89 |
| 1813 | 3550017 | 3550017 | BLDG&IMPRV TOPS DECKING-OHS | | 1 | 5/15/1994 | 479 | 1,474.49 | 554.09 | 3.08 | 3.08 | 3.08 | 920.40 |
| 1813 | 3550018 | 3550018 | BLDG&IMPRV TOP SET-OHS | | 1 | 5/15/1994 | 479 | 9,497.67 | 3,569.06 | 19.82 | 19.82 | 19.82 | 5,928.61 |