CRAIG H. MILLET, SBN 106027, CMillet@gibsondunn.com
SOLMAZ KRAUS, SBN 223117, SKraus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, California 92612-4412
Telephone: (949) 451-3800
Facsimile: (949) 451-4220

Attorneys for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>FLEETWOOD ENTERPRISES, INC., et al.,<br><br>Debtors. | CASE NO. 09-14254-MJ<br><br>Chapter 11<br><br>[Jointly Administered]<br><br>**STIPULATION EXTENDING THE DEBTORS' AUTHORIZATION TO USE CASH COLLATERAL TO EARLIER OF JANUARY 31, 2010 AND THE EFFECTIVE DATE OF A PLAN OF LIQUIDATION**<br><br>**Current Hearing:**<br>Date: September 2, 2009<br>Time: 1:30 p.m.<br>Place: Courtroom 302<br>Judge: Hon. Meredith Jury |

**I.**

**RECITALS**

A. On April 1, 2009 the Court entered an interim order in the above captioned Chapter 11 Cases ("Interim DIP Order") (all capitalized terms used herein but not otherwise defined shall have their respective meanings set forth in the Interim DIP Order) on the Debtors' motion seeking interim and final orders authorizing the Debtors' to enter into postpetition secured financing ("Motion for Approval of DIP Financing") entitled: "Interim Order (1) Authorizing Debtors to Obtain Postpetition

Secured Financing, (2) Authorizing the Use of Cash Collateral, (3) Granting Liens and Superpriority Claims, (4) Modifying the Automatic Stay, and (5) Setting Final Hearing."

B. The Final Hearing on the Interim DIP Order was set for April 21, 2009, which, on the motion of the Official Committee of Unsecured Creditors, was continued to April 29, 2009.

C. On April 29, 2009 the Debtors filed an emergency "Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral…" in which the Debtors withdrew their Motion for Approval of DIP Financing ("Cash Collateral Motion"). On the request of the Debtors, the Court set the hearing on the Cash Collateral Motion for April 29, 2009.

D. The parties have agreed to continue the hearing on the Cash Collateral Motion from time to time since April 29, 2009, and have entered into a series of stipulations and consent orders extending the Debtors' authorization to use Cash Collateral in accordance with the terms of the Interim DIP Order (as modified by such stipulations). Under the most recent stipulation and consent order, the hearing on the Cash Collateral Motion has been continued to September 2, 2009, and the Debtors' authorization to use Cash Collateral in accordance with the terms of the Interim DIP Order (as modified by such stipulation) has been extended to September 2, 2009.

E. The parties have agreed to extend the Debtors' authorization to use Cash Collateral on a final basis in accordance with the Order (as defined below) subject to the terms and conditions set forth in this Stipulation and the Interim DIP Order (as amended or modified herein).

F. In the interest of judicial economy, preventing expenses to the Debtors' estates, the agreements of the parties as stated on the record and as further discussed between them, and good cause appearing therefor, the parties agree as follows:

**STIPULATION RE USE OF CASH COLLATERAL AND CONTINUING HEARING**

1. Subject to entry of the order to be entered pursuant to this Stipulation entitled "Final Order Extending the Debtors' Authorization to Use Cash Collateral to earlier of January 31, 2010 and the Effective Date of a Plan of Liquidation" (the "Order"), the period during which the Debtors may use Cash Collateral as provided in (and subject to the limitations of) the Interim DIP Order is extended such that the day on which the Debtors' right to use Cash Collateral is to terminate (such date, the "Cash Use Termination Date") is extended up to and including the earlier to occur of (i)

5:00 p.m. PDT on January 31, 2010 and (ii) a Termination Date (as defined in the Interim DIP Order, as modified hereby).

2. Except as otherwise set forth herein, all provisions of the Interim DIP Order and the DIP Credit Agreement shall remain in full force and effect and be binding on the Prepetition Agent, the Prepetition Credit Facility Lenders, the Postpetition Agent and the DIP Lenders (as such terms are defined in the Interim DIP Order) (collectively, the "Secured Parties"), the Debtors and all other parties as provided therein. In furtherance, and not in limitation, of the foregoing, the Debtors acknowledge and agree (and the Order shall provide) that (i) each of the Postpetition Liens and Superpriority Claims granted to the Secured Parties in or under the Interim DIP Order, including without limitation, the Postpetition Liens and Superpriority Claims described in sections 9(a), (b), (c) and (d) of the Interim DIP Order, remains in full force and effect (and no obligation, payment, transfer or grant of security interest under the Interim DIP Order (as modified hereby) shall be stayed, restrained, voidable or recoverable or subject to any defense, reduction, setoff, recoupment or counterclaim), (ii) the waivers and releases benefiting the Secured Parties granted under the Interim DIP Order, including, without limitation, under section 19 thereof, remain in full force and effect, and (iii) the time period set forth in section 19(b) of the Interim DIP Order has expired for parties other than the Debtor to challenge the extent, validity, priority, perfection and enforceability of the Prepetition Credit Agreement Obligations and the Prepetition Credit Facility Liens or to file a complaint seeking to invalidate, subordinate or otherwise challenge any of the Prepetition Credit Facility Obligations or Prepetition Credit Facility Liens, and thus the Secured Parties are entitled to the protections, rights and releases set forth in section 19(c) of the Interim DIP Order.

3. Section 20 of the Interim DIP Order shall be amended by deleting in their entirety subclauses (a) through (g) thereof as well as the last paragraph of such section and inserting in lieu thereof the following:

"(a) this Court terminates the Debtors' authorization to use the Cash Collateral;

(b) the Debtors breach any of their obligations under the Stipulation Extending the Debtors Authorization to Use Cash Collateral to Earlier of January 31, 2010, and the Effective Date

of a Plan of Liquidation (the "Stipulation"), the order approving the Stipulation (the "Stipulated Order") or the Interim DIP Order (as amended by the Stipulation and the Stipulated Order);

  (c) the dismissal of any Chapter 11 Case or the conversion of any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal or conversion of any Chapter 11 Case;

  (d) the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Debtor;

  (e) the dissolution of any Debtor;

  (f) except to the extent that the Postpetition Agent has agreed in writing in its sole discretion, (1) any stay, vacatur, reversal, modification or other amendment in any respect of the Stipulated Order or the Interim DIP Order (except to the extent amended herein), (2) the filing of a motion or other pleading by any Debtor seeking the entry of any order providing for any such stay, vacatur, reversal, modification or other amendment with respect to the Stipulated Order or the Interim DIP Order or challenging any of the Postpetition Liens, or (3) the filing of a motion for reconsideration by any Debtor with respect to the Stipulated Order or the Interim DIP Order;

  (g) the bringing of a motion or taking of any action by any Debtor in any Chapter 11 Case to use Cash Collateral without the prior written consent of the Secured Parties;

  (h) the effective date of a confirmed plan of reorganization or liquidation in the Chapter 11 Cases;

  (i) the Debtors file a plan of reorganization or liquidation that (i) does not provides for payment in full of all Postpetition Obligations then outstanding, cash collateralization of any Letters of Credit then outstanding in an amount equal to 105% of the face amount of such Letters of Credit, and treatment of any unliquidated or contingent claims of the Secured Parties, including, without limitation, any claims for indemnification that any of them might have or assert, from the Segregated Cash Collateral Account in the first instance and the Debtors' other Postpetition Blocked Accounts and other Postpetition Collateral in the second instance, all in a manner acceptable to the

Postpetition Agent in its reasonable discretion or (ii) is not otherwise acceptable to the Secured Parties in their sole discretion;

(j) the bringing of a motion or the taking of any action by any Debtor to grant any lien or security interest that is senior to or pari passu with any of the Postpetition Liens;

(k) any person or entity, including, without limitation, the Debtors or the Creditors' Committee, files a motion or takes any other action to use, control or take possession of any cash or other assets held in the Segregated Cash Collateral Account (as defined in the Stipulation) other than in accordance with the terms of the Stipulation;

(l) the Debtors shall fail to maintain the Required Amount in the Segregated Cash Collateral Account or, to the extent necessary, deposit funds into the Segregated Cash Collateral Account in an amount necessary to ensure that the Required Amount is maintained in the Segregated Cash Collateral Account and such failure remains uncured for more than two (2) Business Days; or

(m) the entry of an order by the Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a lien or security interest on any Postpetition Collateral, which would have a material adverse effect on (i) any Debtor or its financial condition, business, prospects or assets or (ii) any Secured Party under the Stipulation, the Stipulated Order, the DIP Credit Agreement or the Interim DIP Order (as amended by the Stipulated Order)."

4. Without prejudice to and with a full reservation of rights by all parties, the Secured Parties shall forbear, up to and including the Cash Use Termination Date, from exercising any rights and remedies on account of any default under the Interim DIP Order or the DIP Credit Agreement that occurred on or prior to the date of the Order and any Default under the DIP Credit Agreement that occurs on or prior to the Cash Use Termination Date with respect to any failure on the part of the Borrowers on or prior to the dates separately disclosed to and agreed by the Postpetition Agent to have achieved certain benchmarks separately disclosed to and agreed by the Postpetition Agent (as further set forth in Section 9.1(xviii) of the DIP Credit Agreement).

5. The Interim DIP Order is amended to provide (and the Order shall provide) that an amount equal to the Required Amount (as defined below) shall be maintained at all times in the

existing cash collateral account at the Postpetition Agent described in paragraph 6 of the Interim DIP Order and such account shall for all purposes in the Chapter 11 Cases be deemed to be a segregated account under the sole control and dominion of the Agent and subject to the restrictions and requirements set forth herein (the "Segregated Cash Collateral Account").  The Segregated Cash Collateral Account and all cash and other assets from time to time contained therein shall collateralize, pursuant to the Postpetition Liens, the Letters of Credit outstanding under the DIP Credit Agreement and the other Postpetition Obligations owed to the Secured Parties; provided that notwithstanding paragraph 9(a) of the Interim DIP Order or any other provision therein or any provision of this Stipulation, the Order or the DIP Credit Agreement to the contrary, such Postpetition Liens in the Segregated Cash Collateral Account and all cash or other assets from time to time contained therein shall not be subject to the Carve-Out.   Immediately upon entry of the Order and from time to time thereafter the amount (the "Required Amount") required to be maintained at all times in the Segregated Cash Collateral Account will be an amount equal to (a) 105% multiplied by the amount of outstanding Borrowings (initially, 105% multiplied by $34.7 million in face amount of outstanding Letters of Credit) less (b) an amount equal to "Real Estate Availability" (which will initially be set at $4.0 million, but will decrease as set forth below).  Except as expressly set forth in paragraphs 6 and 12 below, none of the Debtors, their estates or (i) any of their successors (including, without, limitation any trustee appointed in any of the Chapter 11 Cases or any trustee appointed in any successor case brought under Chapter 7 of the Bankruptcy Code) or (ii) any person or entity purporting to act for or on behalf of the Debtors or their estates or purporting to be a beneficiary of the Debtors or their estates (each the persons and entities described in these clauses (i) and (ii) are referred to herein individually as an "Affected Person" and collectively as the "Affected Persons") shall have any right to or interest in the Segregated Cash Collateral Account or any cash or other assets contained in the Segregated Cash Collateral Account, and the Debtors, for themselves, their estates, the Affected Persons, and the agents and representatives of any of the foregoing, hereby waive and disclaim any rights that they might have or assert to or interests that they might have or assert in the Segregated Cash Collateral Account and any and all cash or other assets held in the Segregated Cash Collateral Account other than as expressly set forth in paragraph 6 and 12 below.

In furtherance, and not in limitation, of the foregoing, none of the Debtors, their estates or any Affected Person shall have any right whatsoever, whether pursuant to 11 U.S.C. § 363 or otherwise, to use (or seek the use of) the funds placed in the Segregated Cash Collateral Account (other than to the extent released in accordance with the provisions described in paragraph 13 below).

6. The following liens and security interests shall remain attached to the Segregated Cash Collateral Account and any and all other funds in the Segregated Cash Collateral Account, with the priorities set forth below; *provided* that nothing contained herein shall be deemed to be a finding or determination as to the validity or enforceability of any lien or security interest (other than the Postpetition Liens), and all such liens and security interests (other than the Postpetition Liens) shall be subject to the rights, claims, defenses and objections, if any, the Debtors may possess with respect thereto:

    a. The Secured Parties shall have a first-priority lien (in the form of a Postpetition Lien) on and security interest in the Segregated Cash Collateral Account and any and all other funds in the Segregated Cash Collateral Account;

    b. Each of the Prepetition 14% Notes Trustee and ISIS Lending LLC, as lender under the Prepetition Mortgage Loan (in such capacity, "ISIS") shall have a second-priority lien and security interest in the Segregated Cash Collateral Account and any and all other funds in the Segregated Cash Collateral Account to the extent (and subject to the limitations) set forth in the "Order (I) Authorizing and Approving the Sale of RV Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing and Approving Assumption and Assignment of Contracts and Leases; and (III) Granting Related Relief" entered by the Court on July 2, 2009 and the "Order (I) Authorizing and Approving the Sale of Housing Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing and Approving Assumption and Assignment of Contracts and Leases; and (III) Granting Related Relief" entered by the Court on August 14, 2009 (such orders, collectively, the "Specified Prior Court Orders").

    c. The second-priority liens and security interests of the Prepetition 14% Notes Trustee and ISIS as to the Segregated Cash Collateral Account and any and all other funds in

Gibson, Dunn & Crutcher LLP

7

the Segregated Cash Collateral Account shall be pari passu with each other, but shall be junior to the liens and security interests of the Secured Parties. In furtherance of the foregoing, until the Secured Parties are Paid in Full, neither the Prepetition 14% Notes Trustee nor ISIS shall be permitted to exercise any rights or remedies that it (or anyone on whose behalf it is purporting to act) might have or assert as a secured creditor solely on account of the second-priority liens and security interests described in this paragraph 6 without the prior written consent of Postpetition Agent. Without limiting the scope of the previous sentence, until the Secured Parties are Paid in Full, the liens and security interests of the Prepetition 14% Notes Trustee and ISIS on and in the Segregated Cash Collateral Account and any and all other funds in the Segregated Cash Collateral Account described in this paragraph 6 shall not give either of them any right to object to any use by the Debtors of the cash collateral of the Secured Parties. Once the Secured Parties have been Paid in Full, both ISIS and the Prepetition 14% Notes Trustee shall be free to exercise their rights and remedies with respect to their liens on the Segregated Cash Collateral Account, and the Debtors will no longer be able to use the funds therein without either their consent or the further order of the Court.

d. As used in this paragraph 6, the term "Paid in Full" shall have the meaning given to it in that certain Intercreditor Agreement, dated as of December 12, 2008, among Fleetwood Enterprises, Inc., certain of its affiliates, Postpetition Agent and the Prepetition 14% Notes Trustee.

7. To the extent that the amount of cash on deposit in the Segregated Cash Collateral Account does not equal or exceed the Required Amount at any time (due to the incurrence of additional outstanding Borrowings or the decrease in Real Estate Availability or otherwise), the Debtors shall immediately transfer (and Postpetition Agent shall be authorized by the Court to so transfer on the Debtors' behalf) funds from any other account of the Debtors to the Segregated Cash Collateral Account, and such funds once deposited into the Segregated Cash Collateral Account shall be subject to all of the restrictions set forth herein.

8. As defined herein, the term "Real Estate Availability" means the amount of Real Estate (from the pool of Real Estate collateral over which the Secured Parties have a first priority

Gibson, Dunn & Crutcher LLP

Postpetition Lien and in respect of which all required deliverables have been obtained in order to treat such Real Estate as Eligible Real Estate for purposes of the DIP Credit Agreement) that may support the outstanding Borrowings alongside the Cash Collateral maintained or deposited in the Segregated Cash Collateral Account, which amount shall initially be set at $4.0 million. The Real Estate Availability will decrease (until such time as the Real Estate Availability equals $0.00) from time to time immediately upon the occurrence of the following events:

  a. Upon the expiration or termination of any Letter of Credit, by an amount equal to the excess of the face amount of the released Letter of Credit over the amount of cash required to pay any Reimbursement Obligations related to the expiration or termination of such Letter of Credit;

  b. Upon receipt by any Debtor of Modified Net Proceeds of any disposition, liquidity source or other source of cash, in each case not in the ordinary course and not set forth in the Approved DIP Budget referred to in paragraph 16 below for the period commencing on the date hereof and ending on the Cash Use Termination Date, by the amount the proceeds from such asset sale exceed proceeds projected for such asset sale in the Approved DIP Budget (to the extent and upon such proceeds being available to the Debtors);

  c. Upon the occurrence of a Maximum Real Estate Trigger Event (as defined below), by an amount equal to an amount necessary such that the Maximum Real Estate Trigger Event is cured; and

  d. On October 1, 2009, by an amount such that Real Estate Availability does not exceed $3 .0 million, on November 2, 2009, by an amount such that Real Estate Availability does not exceed $2 .0 million, and on December, 1 2009, by an amount such that Real Estate Availability does not exceed $0.0 million.

9. At no point shall Real Estate Availability exceed 10% of the aggregate appraised market values (limited to a twelve (12) month marketing timeframe) of Real Estate Subfacility Assets subject to a Mortgage (as defined in the DIP Credit Agreement) and over which the Secured Parties shall have a first priority Postpetition Lien. In the event of an occurrence of such a Maximum Real Estate Trigger Event, the Real Estate Availability shall decrease as and to the extent set forth above.

Gibson, Dunn & Crutcher LLP

9

10.     Notwithstanding anything herein or in the Interim DIP Order (including, without limitation, paragraph 4 thereof) to the contrary, the definition of "Maximum Amount" as used in the DIP Credit Agreement shall mean thirty-four million six hundred ninety-five thousand sixteen and 30/100 Dollars ($34,695,016.30); provided that the Maximum Amount shall be permanently reduced, on any applicable date, by an amount equal to the aggregate reduction, from and after the date hereof, of the aggregate face amount of all outstanding Letters of Credit, and the DIP Credit Agreement and the Interim DIP Order shall be deemed to be amended accordingly.

11.     Notwithstanding anything herein or in the Interim DIP Order (including, without limitation, paragraph 4 thereof) to the contrary, the definition of "Unused Letter of Credit Subfacility" as used in the DIP Credit Agreement shall mean an amount equal to thirty-four million six hundred ninety-five thousand sixteen and 30/100 Dollars ($34,695,016.30) <u>minus</u> the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit <u>plus</u>, without duplication, (b) the aggregate unpaid reimbursement obligations with respect to all Letters of Credit; provided that the Unused Letter of Credit Subfacility shall be permanently reduced, on any applicable date, by an amount equal to the aggregate reduction, from and after the date hereof, of the aggregate face amount of all outstanding Letters of Credit, and the DIP Credit Agreement and the Interim DIP Order shall be deemed to be amended accordingly. In no event shall any Letters of Credit, including, without limitation, any "evergreen" Letters of Credit, be extended or renewed without the express written consent of each Secured Party.

12.     Postpetition Agent, on behalf of itself and on behalf of the Secured Parties, shall be granted sole dominion and control over the Segregated Cash Collateral Account. Funds in the Segregated Cash Collateral Account may be applied by the Postpetition Agent (i) to outstanding Borrowings (as defined in the DIP Credit Agreement) (including to facilitate the Debtors' obligations to immediately pay Reimbursement Obligations that arise in respect of non-extended evergreen Letters of Credit and otherwise) and (ii) to payment of costs, fees and/or expenses of the Secured Parties (including costs, fees and/or expenses of its counsel) to the extent provided for in the DIP Credit Agreement (as modified hereby) and to the extent copies of any invoices, statements, receipts or other documents evidencing in reasonable detail such costs, fees and/or expenses have been

Gibson, Dunn & Crutcher LLP

10

provided to the Debtors and counsel for the Committee, in each case, without further approval of this court; provided that, in the case of clause (ii) only, each of the Debtors and counsel for the Committee shall have ten (10) days from receipt of such invoices, statements, receipts or other documents to send written notice to Postpetition Agent that it objects to the deduction and payment thereof in full or in part, in which case the disputed portion of such costs, fees and/or expenses shall not be deducted from the Segregated Cash Collateral Account pending approval of this Court. Notwithstanding anything contained in this paragraph 12 or otherwise, the Postpetition Agent shall promptly release funds, deposits and proceeds thereof from such Segregated Cash Collateral Account on request of the Debtors, solely only upon the termination of outstanding Letters of Credit (either to pay the reimbursement obligations ("Reimbursement Obligations") payable in accordance with Section 1.4(e) of the DIP Credit Agreement in the event that a Letter of Credit is drawn, or to return amounts in excess of the Required Amount to the Debtors' other Postpetition Blocked Accounts at the Postpetition Agent specified by the Postpetition Agent and over which the Postpetition Agent shall continue to exercise sole dominion and control as further set forth in the Interim DIP Order); <u>provided</u> that funds shall be returned from the Segregated Cash Collateral Account to the Debtors' other Postpetition Blocked Accounts (as defined in the Interim DIP Order) <u>only</u> to the extent that the amount in the Segregated Cash Collateral Account after giving effect to such release is more than an amount equal to (a) 105% multiplied by the amount of outstanding Borrowings (including outstanding Letters of Credit) less (b) the lesser of $1.0 million and the Real Estate Availability then in effect. Cash Collateral released to the Debtors' other Postpetition Blocked Accounts will remain subject to the Postpetition Liens and may be utilized only in accordance with the Interim DIP Order as modified hereby.

13. Notwithstanding anything in the Interim DIP Order or the DIP Credit Agreement to the contrary, the Postpetition Agent shall promptly release funds, investments deposits and proceeds from the Debtors' other Postpetition Blocked Accounts (other than the Segregated Cash Collateral Account and any other account set aside for further determination as to the relative rights of the secured parties therein pursuant to the Specified Prior Court Orders on request of the Debtors), in all cases, (x) in amounts not to exceed the disbursements set forth in the Approved DIP Budget for the

Gibson, Dunn & Crutcher LLP

applicable Measurement Period (as defined in the DIP Credit Agreement) (plus any excess in cash expenditures that would be permitted without violating the budget covenant set forth in Section 7.22(b) of the DIP Credit Agreement (for the avoidance of doubt, it being understood and agreed that the presence of any "basket" or "carve-out" set forth in any negative covenant contained in <u>Section 7</u> of the DIP Credit Agreement shall not be, and shall not be deemed to be, an approval or acceptance by the Postpetition Agent or any Lender of any Line Item (as defined in the DIP Credit Agreement) in any Approved DIP Budget, or portion thereof, related to cash expenditures of the type described in such "basket" or "carve-out," which shall remain subject to the approval rights of the Postpetition Agent and the Required Lenders (as defined in the DIP Credit Agreement) with respect to each Approved DIP Budget, as set forth herein)) and (y) solely to the extent that the amount of funds in the Segregated Cash Collateral Account exceeds the Required Amount.

14. Notwithstanding anything herein or in the Interim DIP Order to the contrary, the DIP Credit Agreement shall be amended by deleting clause (j) of Section 13.7 of the DIP Credit Agreement and inserting in lieu thereof "and (j) expenses of each Lender or each such Lender's own outside counsel, capped at each such Lender's Pro Rata Share of one-hundred thousand Dollars ($100,000)." Notwithstanding anything herein or in the Interim DIP Order to the contrary, the Debtors shall be authorized to pay such amounts pursuant to the terms of the DIP Credit Agreement (as so amended).

15. Notwithstanding anything herein or in the Interim DIP Order to the contrary, (a) the covenants set forth in Section 7.22(a) and Section 7.22(b) of the DIP Credit Agreement shall only be applicable for any Measurement Period to the extent that actual net cash flow (as reflected in the line item in the Approved DIP Budget labeled "Net Cash Flow") in the cumulative period from August 30, 2009 through the end of such Measurement Period is less than the amount in the Approved DIP Budget for the same period; and (b) the covenant set forth in Section 7.22(b)(i) shall only be applicable for any Measurement Period for a given Line Item to the extent that cash expenditures under such Line Item for the cumulative period from August 30, 2009 through the end of such Measurement Period are greater than the amount in the Approved DIP Budget for such Line Item for the same period.

16. Attached hereto as Exhibit A is a rolling 13-week budget setting forth all projected cash receipts and cash disbursements (by line item) on a weekly basis for the time period set forth therein. Such budget shall constitute the current Approved DIP Budget prepared by the Debtors and approved by the Postpetition Agent and the Required Lenders, and shall be updated weekly in accordance with the terms of the DIP Credit Agreement.

17. Notwithstanding the provisions of this Stipulation, but subject to the last sentence of this paragraph 17, nothing herein shall be deemed a waiver of the right of the Committee, whether acting on its own behalf or on behalf of the estates, to seek recovery of the $2.4 million commitment fee paid to the Secured Parties (the "Commitment Fee Issue"); provided, further that (i) each of the Debtors shall be deemed to have waived and released any such right or claim on its own behalf (but not on behalf of its estate); (ii) except to the extent set forth herein, nothing herein shall render any of the provisions of the Interim DIP Order final (and in particular any provisions of the Interim DIP Order relating to the Commitment Fee Issue), it being the intent of the parties that the Commitment Fee Issue be reserved for future proceedings; (iii) the Debtors', their estates', or the Committee's agreement not to contest the other provisions of the Interim DIP Order, including, among other things, the granting of Postpetition Liens or superpriority administrative claims to the Secured Parties, shall not be deemed an admission or acknowledgment by the Debtors, their estates, or the Committee that the provisions of the Interim DIP Order are or were final for purposes of the Commitment Fee Issue; and (iv) the Secured Parties' agreement to modify any of the provisions of the Interim DIP Order, whether under this Stipulation, the Order or any other stipulation or consensual order, or forbearance from enforcing any rights thereunder or under the DIP Credit Agreement shall not be deemed an admission or acknowledgment by any of the Secured Parties that the provisions of the Interim DIP Order are or were not final or binding for purposes of the Commitment Fee Issue. The Secured Parties, the Debtors and the Committee acknowledge and agree that nothing contained in this Stipulation or the Order shall constitute a finding of fact or conclusion of law by the Court or an admission by any party as to the Commitment Fee Issue, and nothing contained herein shall be relied upon by any party to assert or argue that any of the provisions of this Stipulation or the Order shall constitute, whether expressly or implicitly, any such admission, finding

of fact or conclusion of law.  Notwithstanding the other provisions of this paragraph 17, however, unless the Committee has filed a pleading or pleadings with the Court commencing an action or other proceeding to adjudicate the Commitment Fee Issue, or seeking leave of the Court to commence such an action or proceeding, on or before 4 p.m. PT on October 9, 2009, or such later date as may be agreed to in writing by the Postpetition Agent, then (i) the Committee, the Debtors, the estates and all other persons or entities (other than any of the Secured Parties) shall be deemed to have irrevocably waived and released any and all rights and claims that it or they might have or assert as to the Commitment Fee Issue and (ii) the provisions of the Interim DIP Order relating in any way to the Commitment Fee Issue shall be deemed to be final, non-appealable and subject to no further challenge, dispute, claim or right, including any right or claim to seek the reimbursement or recovery of the commitment fee or any other fees that are subject of or relate to the Commitment Fee Issue or damages or penalties on account thereof, by any person or entity (other than any of the Secured Parties).

Dated: September 10, 2009

LATHAM & WATKINS LLP
GREGORY O. LUNT

By: /s/ Gregory O. Lunt
Gregory O. Lunt
Attorneys for Bank of America, N.A., as Postpetition Agent for the Secured Parties

Dated: September 10, 2009

CRAIG H. MILLET
SOLMAZ KRAUS
GIBSON, DUNN & CRUTCHER LLP

By: /s/ Craig H. Millet
Craig H. Millet
Attorneys for Debtors and Debtors in Possession

100726530_1.DOC

**EXHIBIT A**

**Consolidated**
**Extended Cash Flow Forecast**

| Date | 08/23/09 | 08/30/09 | 09/06/09 | 09/13/09 | 09/20/09 | 09/27/09 | 10/04/09 | 10/11/09 | 10/18/09 | 10/25/09 | 11/01/09 | 11/08/09 | 11/15/09 | 11/22/09 | 11/29/09 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Budget/Actual | Actual | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget |
| **CASH FLOW** | | | | | | | | | | | | | | | | |
| **GROSS SALES** | | | | | | | | | | | | | | | | |
| GROSS SALES/BILLINGS | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **RECEIPTS** | | | | | | | | | | | | | | | | |
| A   RECEIPTS | 1,482,053 | (354,678) | (28,106) | (127,498) | - | - | - | - | 139,901 | - | - | - | 53,573 | - | - | 1,165,245 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | | |
| B   Incentives and Discounts | | | | | | | | | | | | | | | | |
| Incentives | - | - | 750,000 | 100,000 | 450,000 | 100,000 | 100,000 | - | - | - | - | - | - | - | - | 1,500,000 |
| C   Purchases | | | | | | | | | | | | | | | | |
| Materials | 115,664 | 250,000 | 50,000 | 50,000 | 50,000 | 50,000 | - | - | - | - | - | - | - | - | - | 565,664 |
| D   Payroll and Benefits | | | | | | | | | | | | | | | | |
| Total Payroll and Benefits | 1,013,941 | 917,955 | 446,414 | 851,021 | 514,449 | 505,746 | 348,269 | 786,194 | 289,317 | 295,837 | 471,942 | 279,817 | 610,159 | 279,317 | 422,679 | 8,033,054 |
| E   Operating Expenditures | | | | | | | | | | | | | | | | |
| Operating Expenditures | 435,835 | 798,771 | 387,710 | 116,825 | 304,021 | 105,001 | 304,663 | 82,375 | 82,375 | 1,050,687 | 1,325,610 | 327,664 | 82,375 | 140,554 | 167,722 | 5,712,189 |
| F   Non-Recurring Expenses | | | | | | | | | | | | | | | | |
| Non-Recurring Expenses | - | 156,284 | 2,390,978 | 1,168,422 | 40,000 | 1,493,300 | 40,000 | 40,000 | 40,000 | 1,068,300 | 40,000 | 40,000 | 40,000 | 40,000 | 2,711,117 | 9,308,401 |
| G   Warranty and Service Expense | | | | | | | | | | | | | | | | |
| Warranty and Service Expense | 42,499 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 42,499 |
| H   Debt Service | | | | | | | | | | | | | | | | |
| Debt Service | 59,120 | - | 250,082 | - | - | - | 183,367 | - | - | 75,000 | 165,264 | - | - | - | - | 732,833 |
| I   Other (Income) and Expense | | | | | | | | | | | | | | | | |
| Other (Income) - and Expense | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **DISBURSEMENTS** | 1,667,058 | 2,123,009 | 4,275,184 | 2,286,268 | 1,358,470 | 2,254,047 | 976,299 | 908,569 | 411,692 | 2,489,824 | 2,002,816 | 647,481 | 732,534 | 459,871 | 3,301,517 | 25,894,639 |
| **NET CASH FLOW** | (185,006) | (2,477,687) | (4,303,290) | (2,413,766) | (1,358,470) | (2,254,047) | (976,299) | (908,569) | (271,790) | (2,489,824) | (2,002,816) | (647,481) | (678,961) | (459,871) | (3,301,517) | (24,729,394) |
| Receipts from Asset Sales | 22,251,706 | (4,000,000) | - | - | - | - | - | - | (2,400,000) | 2,000,000 | 1,500,000 | - | - | - | - | 19,351,706 |
| LC Reduction/ Cash Collateralization to Agent | - | - | - | - | - | - | - | - | (3,100,000) | - | - | - | - | - | - | (3,100,000) |
| **NET CASH FLOW - Incl. Asset Sales** | 22,066,701 | (6,477,687) | (4,303,290) | (2,413,766) | (1,358,470) | (2,254,047) | (976,299) | (908,569) | (5,771,790) | (489,824) | (502,816) | (647,481) | (678,961) | (459,871) | (3,301,517) | (8,477,688) |
| MEMO:  Accrued Prof. Fees (net of retainers) | 3,532,469 | 3,892,969 | 2,987,242 | 3,231,867 | 3,476,492 | 2,559,117 | 2,723,917 | 2,888,717 | 3,053,517 | 2,429,817 | 2,594,617 | 2,755,554 | 2,897,179 | 3,058,117 | 765,125 | 765,125 |

Draft - Subject to Change