CONFIDENTIAL
Attorney-Client Privileged Document
COMMON INTEREST INFORMATION SUBJECT TO JOINT DEFENSE PRIVILEGE AND
CONFIDENTIALITY AGREEMENT

CRAIG H. MILLET, SBN 106027, CMillet@gibsondunn.com
KENNETH A. GLOWACKI JR., SBN 217762, KGlowacki@gibsondunn.com
SOLMAZ KRAUS, SBN 223117, SKraus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, California 92612-4412
Telephone: (949) 451-3800
Facsimile: (949) 451-4220

Attorneys for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re | CASE NO. 09-14254-MJ |
| FLEETWOOD ENTERPRISES, INC., et al., | Chapter 11 |
| Debtors. | [Jointly Administered] |
| | **DEBTORS' DISCLOSURE STATEMENT DESCRIBING JOINT PLAN OF LIQUIDATION OF FLEETWOOD ENTERPRISES, INC. AND ITS AFFILIATED DEBTORS AND THE OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS** |
| | **Hearing On Disclosure Statement:** |
| | Date:      April 14, 2010 |
| | Time:      2:30 p.m. |
| | Place:     Courtroom 301 |
| |              3420 Twelfth Street |
| |              Riverside, CA 92501 |
| | Judge:     Honorable Meredith A. Jury |

*****THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF LIQUIDATION DESCRIBED HEREIN.  ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF SUCH PLAN OF LIQUIDATION.  THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A BANKRUPTCY COURT DETERMINATION THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.*******

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT PLAN OF LIQUIDATION OF FLEETWOOD ENTERPRISES, INC. AND ITS AFFILIATED DEBTORS AND THE OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN AS SET FORTH IN THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF FLEETWOOD ENTERPRISES, INC. OR ANY OF THE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE

CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, FLEETWOOD ENTERPRISES, INC. OR ANY OF THE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.

## OVERVIEW OF THE CHAPTER 11 CASES, THE PLAN AND THE TREATMENT OF CLAIMS AND EQUITY INTERESTS THEREUNDER

This disclosure statement (the "Disclosure Statement") contains, among other things, descriptions and summaries of provisions of the Joint Plan of Liquidation of Fleetwood Enterprises, Inc. and its Affiliated Debtors (collectively, the "Debtors" or "Fleetwood") and the Official Committee of Creditors Holding Unsecured Claims (the "Creditors' Committee"), dated as of March 3, 2010 (the "Plan"). The Debtors and the Creditors' Committee are the proponents of the Plan (the "Plan Proponents").

*The following introduction and summary (the "Overview") is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. This Overview is intended solely as a summary of the background of the Debtors' Chapter 11 Cases and the distribution provisions of the Plan and is qualified in its entirety by the terms and provisions of the Plan.*

YOUR RIGHTS MAY BE AFFECTED BY PLAN CONFIRMATION. FOR A COMPLETE UNDERSTANDING OF THE PLAN AND HOW IT MAY AFFECT YOUR RIGHTS, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY.

All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. A copy of the Plan is annexed hereto as Appendix A.

### A.    Introductory Note

Fleetwood Enterprises, Inc. ("FEI") and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") on March 10, 2009 (the "Petition Date"),[1] thereby commencing these cases (the "Cases"). The Cases are pending before the United States Bankruptcy Court for the Central District of California, Riverside Division, before the Honorable Meredith Jury (the "Bankruptcy Court" or "Court"). The Cases are being jointly administered under Cases No. 09-14254-MJ. The Debtors are managing their affairs as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

### B.    General Structure of the Plan

The Plan is a liquidating plan. Pursuant to prior orders of the Bankruptcy Court, the Debtors have sold or will sell substantially all of their Assets. The Plan provides for the orderly liquidation of the remaining Assets of the Debtors and the distribution of the proceeds of the liquidation of the Debtors' Assets according to the priorities set forth in the Bankruptcy Code. To accomplish these liquidation and distribution goals, the Plan contemplates the creation of a Liquidating Trust to hold estate assets and the appointment of a Liquidating Trustee to administer such assets.

---

[1] For the reasons set forth below in section III.E., five additional Fleetwood retail debtors filed their chapter 11 petitions on July 29, 2009 and August 11, 2009. However, for purposes of this Disclosure Statement, the Petition Date is defined as March 10, 2009.

The Plan also provides for the substantive consolidation of all fifty (50) of the Debtors' estates. Following entry of the order approving the Plan (the "Confirmation Order"), on the Effective Date, (i) all Intercompany Claims by, between and among the Debtors shall be eliminated, (ii) all assets and liabilities of the Debtors shall be merged or treated as if they are one set of assets and liabilities, (iii) any obligation of a Debtor and all guarantees thereof by one or more of the other Debtors shall be deemed to be one obligation, (iv) the Equity Interests shall be cancelled, and (v) each Claim filed or to be filed against any Debtor shall be deemed a single Claim against, and a single obligation of, the consolidated Debtors.

**C.      Summary of Treatment of Claims and Equity Interests Under the Plan**

Under the Plan, Claims and Equity Interests are treated according to the priority rules set forth in the Bankruptcy Code. Under the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan. Allowed Administrative Claims are intended to be paid in full on or, as soon as reasonably practicable after, the Distribution Date of the Plan (or thereafter when they become allowed) or, for ordinary course Administrative Claims, when such Claims become due. Priority Tax Claims are intended to be paid in full in regular installment Cash payments, occurring not less frequently than quarterly over a period not exceeding five (5) years after the Petition Date.

A Claim is a Disputed Claim until it becomes an Allowed Claim. Only an Allowed Claim will receive a distribution under the Plan. The table below summarizes the classification and treatment of prepetition Claims and Equity Interests under the Plan. The table below also contains an estimate of the percentage recoveries that the Plan Proponents believe will ultimately be available to each Class of Claims. These estimates are based upon a number of assumptions, which may or may not prove to be accurate.

**Summary of Claims Against, and Equity Interests in, the Debtors**

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| N/A | Administrative Claims | $3.1 million | Full payment – one hundred cents on the dollar (100/100) upon the earlier of the Distribution Date immediately following the date the Claim becomes an Allowed Claim or the date that is ninety (90) days after the date on which such Claim becomes an Allowed Claim. |
| N/A | Priority Tax Claims | $1.0 million | Full payment – one hundred cents on the dollar (100/100) consistent with Bankruptcy Code section 1129(a)(9)(C). |

4

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 1 | Non-Tax Priority Claims | $7.2 million | Full payment – one hundred cents on the dollar (100/100).  Cash equal to the unpaid portion of the Allowed Non-Priority Claim or such other treatment as agreed upon between the Claim holder and the Liquidating Trustee upon the earlier of the Distribution Date immediately following the date that the Claim becomes an Allowed Claim or 90 days after the date when such claim becomes an Allowed Claim.<br><br>Estimated Projected Payment:  100%<br>**Unimpaired; Deemed to Accept** |
| 2 | Secured Credit Facility Claim | $1.7 million | Cash equal to 105% of the face amount as of the Effective Date of Outstanding Letters of Credit (as defined in the Interim DIP Order) issued on behalf of any or all of the Debtors by Bank of America, which shall be placed in a segregated account plus the other treatment as more fully set forth in Section IV.B.2 of the Plan.<br><br>Estimated Projected Payment:  100%<br>**Impaired; Entitled to Vote** |
| 3 | ISIS Claim | $23.2 million (approximately less further paydowns and credits applied prior to the Effective Date) | On the Effective Date, in full and final satisfaction of the Allowed ISIS Claim, the Debtors shall quitclaim Plant 47 securing the Allowed ISIS Claim to ISIS.  On the Effective Date, any Liens granted in favor of ISIS, whether existing as of the Petition Date or granted through the Chapter 11 Cases, shall be deemed released.<br><br>Estimated Projected Payment: 100%<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 4 | Miscellaneous Secured Claims | Unknown | At the election of the Liquidating Trustee, (i) Cash equal to the lesser of the unpaid portion of such Allowed Claim and the value of the Holder's Collateral securing the Miscellaneous Secured Claim as required pursuant to section 506(b) of the Bankruptcy Code; (ii) a return of the Holder's Collateral; or (iii) such other treatment as agreed to in writing upon the earlier of (a) the Distribution Date immediately following the date the Claim becomes an Allowed Claim or (b) the date that is ninety (90) days after the date on which such Claim becomes an Allowed Claim.<br><br>Estimated Projected Payment: 100%<br>**Unimpaired; Deemed to Accept** |
| 5 | 14% Notes Claims | $84.3 million | On the Effective Date, the Liens of the 14% Notes shall remain as valid Liens for Plan purposes only and the 14% Notes Claims shall be Allowed as a Secured Claim in the amount of $84,256,664. In full and final satisfaction of their Secured Allowed Claim, the 14% Notes Claims shall receive their Pro Rata share of 43.5% of the Net Distributable Proceeds, the Initial Net Distributable Proceeds of which shall be payable on the Effective Date, and the balance of which shall be distributable on each subsequent Distribution Date, as reasonably practicable after the Liquidating Trust acquires such Net Distributable Proceeds. *See* Section IV.B.5 in the Plan for further treatment.<br><br>Estimated Projected Payment: 23.9%<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 6 | General Unsecured Claims | $115 million to $195 million | Provided that all Allowed Administrative Claims, Priority Claims and Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Secured Claims have been placed in a segregated reserve, as set forth in the Plan and in the Liquidating Trust Agreement, and subject to the occurrence of the Effective Date, on, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date that is ninety (90) days after the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed General Unsecured Claim, Pro Rata with the Holders of Allowed Class 6 and Class 10 Claims, its share of the Initial Net Distributable Proceeds and, on each Periodic Distribution Date, each Holder of an Allowed General Unsecured Claim shall receive their Pro Rata share of the Periodic Net Distributable Proceeds.  In the aggregate, Allowed General Unsecured Claims shall receive 56.5% of the Net Distributable Proceeds available for distribution.<br><br>Estimated Projected Payment:  11.8% to 20.1%<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 7 | 6% Notes Claims | $161.173 million | Provided that all Allowed Administrative Claims, Priority Claims and Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Secured Claims have been placed in a segregated reserve, as set forth in the Plan and in the Liquidating Trust Agreement, and subject to the occurrence of the Effective Date, and subject to acceptance of the Plan by Class 7, Holders of 6% Notes Claims shall receive $2 million from the 56.5% of Net Distributable Proceeds allocable to the General Unsecured Claims. Concurrently with the final payment of Professional Fee Claims after the Effective Date and provided that Class 7 has voted to accept the Plan, the Holders of 6% Notes Claims shall be paid the fees and expenses payable to the indenture trustee and professionals of the 6% Notes Claims, subject to a review for reasonableness by the Creditors' Committee, but if at the time of such distribution, there are insufficient funds to make payment in full, then such fees shall be paid Pro Rata with other Professionals paid at such time.<br><br>Estimated Projected Payment:  1.2%<br>**Impaired; Entitled to Vote** |
| 8 | 5% Notes Claims | $1.069 million | Pursuant to the terms of the Noteholder Settlement, the parties agreed that the Holders of the 14% Notes Claims would pay for the Distribution to the Holders of 5% Notes Claims, if any, out of the 43.5% of the Net Distributable Proceeds allocable to the Allowed 14% Notes Claims.  However, the 14% Notes have evaluated the 5% Notes Claims and have determined that they are not entitled to a Distribution under the Plan.<br><br>Estimated Projected Payment:  0%<br>**Impaired; Deemed to Reject** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 9 | Convenience Claims | $5 million (approximate) | Holders of an Allowed Convenience Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Convenience Claim, 25% of their Allowed Claim as a final distribution.  Holders of Class 6 Claims in excess of $10,000 will be eligible to opt into this Class by reducing their claim to $10,000 by checking the "Opt-In to Convenience Class" box on their ballot.  Total distributions under this Class are anticipated to be limited to $1.25 million, subject to the Liquidating Trustee's discretion to increase this amount at the time of the Initial Distribution Date.  In the event that this Class has greater demand than funds allocated to this Class, then the Liquidating Trustee shall have the absolute discretion to select and remove certain of the opt-in members of this Class.  In no instance shall the Liquidating Trustee remove a non-opt-in Allowed Convenience Claim from this Class.<br><br>Estimated Projected Payment:  22.4%<br>**Impaired; Entitled to Vote** |
| 10 | Product Liability PI Claims | Unknown | Unless their Product Liability PI Claim has previously become an Allowed Claim, all Holders of Claims in Class 10 shall be required to participate in the Product Liability PI Claim Mediation Process attached to the Disclosure Statement as <u>Appendix E</u>.  As provided in the Product Liability PI Claim Mediation Process, if and when Allowed, Holders of Class 10 Claims shall receive a Pro Rata distribution of available insurance proceeds from Gibraltar policies covering Product Liability PI Claims upon the year in which the claim arose.  To the extent the allowed amount of any Class 10 Claim is not paid in full with insurance proceeds, then the unpaid deficiency amount shall receive the treatment provided for under Class 6 for Allowed General Unsecured Claims.<br><br>Estimated Projected Payment:  Unknown<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 11 | WARN Class Claims and Severance Class Claims | Unknown | If the WARN and Severance Class Settlement Agreement is approved: <br>• Class Members who do not Opt Out will receive the treatment afforded in the WARN and Severance Class Settlement. <br>• Class Members who Opt Out, who have filed claims and whose Claims are Allowed Claims, shall receive full payment of their Claims up to the cap set by Bankruptcy Code section 507 with any excess treated as an unsecured claim to share Pro Rata with Claims in Class 6. <br>If the WARN and Severance Class Settlement Agreement is *not* approved: <br>• The WARN Class Claim and Severance Class Claims shall continue to be litigated and class members whose Claims become Allowed Claims, shall receive full payment of their Claims up to the cap set by Bankruptcy Code section 507 with any excess treated as Claims in Class 6. <br><br>Estimated Projected Payment:  Unknown <br>**Impaired; Entitled to Vote.** |
| 12A | Lumbermen's Underwriting Alliance | Unknown | On the Effective Date, in full and final satisfaction of its Allowed Claim, the Holder of Allowed Claims in Class 12A shall be permitted to retain any proceeds of previously drawn letters of credit, as well as other Cash on hand, in exchange for waiver of any deficiency Claim. <br><br>Estimated Projected Payment:  Unknown <br>**Impaired; Entitled to Vote.** |
| 12B | Georgia Self Insurance Guaranty Trust Fund | Unknown | On the Effective Date, in full and final satisfaction of its Allowed Claim, the Holder of Allowed Claims in Class 12B shall be permitted to retain any proceeds of previously drawn letters of credit, as well as other Cash on hand, in exchange for waiver of any deficiency Claim. <br><br>Estimated Projected Payment:  Unknown <br>**Impaired; Entitled to Vote.** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 13A | Westchester Fire Insurance Company and ACE INA Insurance | Unknown | On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date that the Class 13A Claim becomes an Allowed Class 13A Claim, or (b) the date that is ninety (90) days after the date on which such Class 13A Claim becomes an Allowed Class 13A Claim, in full and final satisfaction, settlement and release of and in exchange for, such Allowed Secured Claim, the Holder of the Class 13A Claim shall be permitted to either (i) retain proceeds of letters of credit (drawn or undrawn), as well as other Cash on hand, equal to the lesser of the unpaid portion of such Allowed Class 13A Claim and the value of the Collateral securing such Claim, or (ii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment:  Unknown<br>**Unimpaired; Deemed to Accept** |
| 13B | Old Republic Insurance Co. | Unknown | On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date that the Class 13B Claim becomes an Allowed Class 13B Claim, or (b) the date that is ninety (90) days after the date on which such Class 13B Claim becomes an Allowed Class 13B Claim, in full and final satisfaction, settlement and release of and in exchange for, such Allowed Secured Claim, the Holder of the Class 13B Claim shall be permitted to either (i) retain proceeds of letters of credit (drawn or undrawn), as well as other Cash on hand, equal to the lesser of the unpaid portion of such Allowed Class 13B Claim and the value of the Collateral securing such Claim, or (ii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.  .<br><br>Estimated Projected Payment:  Unknown<br>**Unimpaired; Deemed to Accept** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 13C | National Union Fire Insurance Company of Pittsburgh, PA, et al. | Unknown | On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date that the Class 13C Claim becomes an Allowed Class 13C Claim, or (b) the date that is ninety (90) days after the date on which such Class 13C Claim becomes an Allowed Class 13C Claim, in full and final satisfaction, settlement and release of and in exchange for, such Allowed Secured Claim, the Holder of the Class 13C Claim shall be permitted to either (i) retain proceeds of letters of credit (drawn or undrawn), as well as other Cash on hand, equal to the lesser of the unpaid portion of such Allowed Class 13C Claim and the value of the Collateral securing such Claim, or (ii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment:  Unknown<br>**Unimpaired; Deemed to Accept** |
| 13D | Fidelity and Deposit Company of Maryland | Unknown | On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date that the Class 13D Claim becomes an Allowed Class 13D Claim, or (b) the date that is ninety (90) days after the date on which such Class 13D Claim becomes an Allowed Class 13D Claim, in full and final satisfaction, settlement and release of and in exchange for, such Allowed Secured Claim, the Holder of the Class 13D Claim shall be permitted to either (i) retain proceeds of letters of credit (drawn or undrawn), as well as other Cash on hand, equal to the lesser of the unpaid portion of such Allowed Class 13D Claim and the value of the Collateral securing such Claim, or (ii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment:  Unknown<br>**Unimpaired; Deemed to Accept** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 13E | Kemper Insurance Co., et al. | Unknown | On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date that the Class 13E Claim becomes an Allowed Class 13E Claim, or (b) the date that is ninety (90) days after the date on which such Class 13E Claim becomes an Allowed Class 13E Claim, in full and final satisfaction, settlement and release of and in exchange for, such Allowed Secured Claim, the Holder of the Class 13E Claim shall be permitted to either (i) retain proceeds of letters of credit (drawn or undrawn), as well as other Cash on hand, equal to the lesser of the unpaid portion of such Allowed Class 13E Claim and the value of the Collateral securing such Claim, or (ii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment:  Unknown<br>**Unimpaired; Deemed to Accept** |
| 14 | Intercompany Claims By and Between Debtors | Unknown | On the Effective Date, all Intercompany Claims by and between the Debtors shall be cancelled.<br><br>Estimated Projected Payment:  0%<br>**Impaired; Deemed to Reject** |
| 15 | Equity Interests | Unknown | On the Effective Date, all Equity Interests shall be cancelled.<br><br>Estimated Projected Payment:  0%<br>**Impaired; Deemed to Reject** |

**ALTHOUGH THE PLAN PROPONENTS HAVE DONE THEIR BEST TO ENSURE THE ACCURACY OF THE ESTIMATED CLAIM AMOUNTS AND THE ESTIMATED PERCENTAGE RECOVERIES SHOWN IN THE TABLE ABOVE, THE _ACTUAL_ CLAIM AMOUNTS AND PERCENTAGE RECOVERIES MAY VARY.**

The actual recoveries under the Plan will be dependent upon a variety of factors including, but not limited to, whether, and in what amount and with what priority, Contingent Claims against the Debtors become non-contingent, fixed and Allowed Claims; and whether, and to what extent, Disputed Claims are resolved in favor of the Debtors.  Accordingly, no representation can be nor is any representation being made with respect to whether each estimated percentage recovery shown in the table above will be realized by the Holder of an Allowed Claim in any particular Class.

**IN THE VIEW OF THE PLAN PROPONENTS, THE PLAN PROVIDES THE HOLDERS OF CLAIMS WITH THE BEST RECOVERY POSSIBLE. ACCORDINGLY, THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS AND STRONGLY RECOMMEND THAT ALL SUCH HOLDERS ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................... 1

   A.    Contents of the Disclosure Statement ................................................. 1

   B.    Purpose and Effect of Plan ................................................................... 1

II. DESCRIPTION OF THE DEBTORS' PRIOR BUSINESS, EVENTS THAT
PRECIPITATED THE FILING OF THESE CHAPTER 11 CASES .................................... 2

   A.    Overview of the Debtors and Their Prior Businesses ......................... 2

       1.    Fleetwood's Businesses ................................................. 2

       2.    Fleetwood's Corporate Structure .................................. 3

       3.    Manufactured Homes Business ..................................... 3

       4.    FRC's Business .............................................................. 4

       5.    Recreational Vehicles Business:  Motor Homes and Travel Trailers .............. 5

   B.    Fleetwood's Debt and Equity Structure ............................................... 6

       1.    Secured Bank Debt ......................................................... 6

       2.    5% Notes .......................................................................... 7

       3.    6% Notes .......................................................................... 7

       4.    The 5% Notes Put Right, The Exchange Offer and the Repurchase
Offer ................................................................................. 8

       5.    The New 14% Secured Notes .......................................... 8

       6.    Common Stock Issued in the Repurchase Offer in Exchange for 5%
Notes ............................................................................... 10

       7.    Remaining 5% Notes That Neither Tendered in the Exchange Offer nor
the Repurchase Offer ..................................................... 10

       8.    ISIS Lending Obligation ............................................... 10

       9.    The ISIS Replacement Liens ......................................... 10

       10.   Summary of Indebtedness ............................................. 11

       11.   FEI's Intercompany Claim Against the Subsidiary Debtors ........................... 12

       12.   Equity Interests in the Debtors ..................................... 12

   C.    Fleetwood's Business Downturn And Liquidity Crisis ....................... 12

i

**TABLE OF CONTENTS**
**[Continued]**

                                                                                              Page

D.    After Exploring Alternatives, Fleetwood Sought Relief Under Chapter 11 ............... 14

III. SIGNIFICANT EVENTS OCCURRING IN THESE CHAPTER 11 CASES .......................... 15

A.    Overview of Chapter 11 and the Plan Process ................................................. 15

B.    The Transition to Operations as Debtors in Possession ................................... 16

      1.    Cash Collateral Motion ....................................................................... 17

      2.    Joint Administration Motion ................................................................ 18

      3.    Cash Management Motion .................................................................... 18

      4.    Utilities Motion ................................................................................... 19

      5.    Employee Wages and Benefits Motion ................................................ 19

C.    Appointment of the Creditors' Committee ...................................................... 19

D.    Professionals Retained at the Expense of the Estates ...................................... 20

E.    Subsequent Chapter 11 Filing by Five Fleetwood Retail Corp. Entities ................. 21

F.    Fleetwood's Application to Have These Chapter 11 Cases Recognized as a
      Foreign Proceeding in Canada ....................................................................... 22

G.    The Bar Dates for Pre-Petition Claims ........................................................... 22

H.    Management Compensation ........................................................................... 23

I.    D&O Insurance .............................................................................................. 24

J.    Significant Asset Sales Occurring During the Bankruptcy Cases ........................ 24

      1.    Military Housing Assets ....................................................................... 24

      2.    RV Assets ........................................................................................... 25

      3.    Housing Assets ................................................................................... 26

      4.    Travel Trailer Inventory ....................................................................... 27

      5.    La Grande, Oregon Travel Trailer Manufacturing Plant ........................ 28

      6.    Mexicali Assets ................................................................................... 28

      7.    Miscellaneous Asset Sales ................................................................... 28

K.    Certain Environmental Matters ...................................................................... 31

      1.    Riverside District Attorney ................................................................... 31

**TABLE OF CONTENTS**
**[Continued]**

Page

2.   SCAQMD ..................................................................................... 32

L.   Litigation Commenced During these Chapter 11 Cases ....................... 32

1.   WARN and Severance Settlements ........................................... 33

2.   Pendency of First American Trust Company Adversary Proceeding ............ 33

3.   Schechter Litigation ................................................................. 34

M.   Deutsche Bank Litigation ................................................................. 34

N.   Plan Negotiations ............................................................................ 35

1.   Plan Exclusivity ....................................................................... 35

2.   Plan Negotiations .................................................................... 36

IV. DESCRIPTION OF ASSETS AND LIABILITIES  (INCLUDING CLAIMS) OF THE
DEBTORS .................................................................................................. 36

A.   Anticipated Assets of the Debtors as of the Effective Date ....................... 36

B.   Description of Liabilities ................................................................... 36

1.   Scheduled Liability ................................................................. 36

2.   Filed Claims Summary ............................................................ 37

V. INSURANCE CONSIDERATIONS:  PRODUCT LIABILITY PI CLAIMS, WORKERS'
COMPENSATION CLAIMS, AND FEMA CLAIMS ......................................... 37

A.   Gibraltar Insurance Company, Ltd. and Insurance Coverage Provided .................... 37

1.   General Overview .................................................................... 37

2.   Important Financial Information Regarding Gibraltar and Unknown
Factors That May Affect Insurance Coverage ............................ 38

B.   Product Liability PI Claims ............................................................... 39

1.   Product Liability Insurance Coverage Provided By Gibraltar to Debtors
and Availability for Product Liability PI Claims ......................... 39

C.   Product Liability PI Claims Mandatory Mediation Procedures .................. 40

D.   Workers' Compensation Claims .......................................................... 41

1.   Workers' Compensation Insurance ............................................ 41

2.   ACE INA and Westchester--Bonding ........................................ 44

3.   Debtors' Plan Regarding Undrawn Letters of Credit .................... 45

iii

**TABLE OF CONTENTS**
**[Continued]**

| | | | Page |
|---|---|---|---|
| | E. | FEMA Claims | 46 |
| VI. | SUMMARY OF THE PLAN OF LIQUIDATION | | 48 |
| | A. | Treatment of Claims and Equity Interests | 48 |
| | | 1. Unclassified Claims | 48 |
| | | 2. Claims | 49 |
| | B. | Acceptance or Rejection of the Plan by Claim Holders | 62 |
| | | 1. Impaired Classes of Claims Entitled to Vote | 62 |
| | | 2. Acceptance by an Impaired Class | 63 |
| | | 3. Presumed Acceptances by Unimpaired Classes | 63 |
| | | 4. Classes Deemed to Reject Plan | 63 |
| | | 5. Summary of Classes Voting on the Plan | 63 |
| | | 6. Confirmation Pursuant to Bankruptcy Code Section 1129(b) | 63 |
| | C. | Substantive Consolidation of All of the Debtors' Estates | 64 |
| | | 1. The Plan Proponents Can Satisfy the Single Entity Test | 65 |
| | | 2. The Plan Proponents Can Satisfy the Hopeless Entanglement Test | 65 |
| | | 3. The Effect of Substantive Consolidation Under the Plan | 66 |
| | D. | Employee Related Provisions | 67 |
| | | 1. Employees | 67 |
| | | 2. KEIP Payments | 67 |
| | | 3. Benefit Plans | 67 |
| | E. | The Liquidating Trust | 67 |
| | | 1. Establishment of Liquidating Trust | 67 |
| | | 2. Trust Distributions | 67 |
| | | 3. Duration of Trust | 68 |
| | | 4. Liquidation of Causes of Action | 68 |
| | | 5. Liquidating Trustee | 68 |
| | | 6. Federal Income Taxation of Liquidating Trust | 71 |

**TABLE OF CONTENTS**
**[Continued]**

Page

F.    Release of Liens ................................................................................. 71

G.    Exemption from Certain Transfer Taxes ............................................ 71

H.    Preservation of Causes of Action; Settlement of Causes of Action ........................... 72

    1.    Preservation of Causes of Action ............................................. 72

    2.    Settlement of Causes of Action ................................................ 72

I.    Provisions Governing Distributions ................................................... 72

    1.    Special Provision Regarding Unimpaired Claims ....................... 72

    2.    Allowed Claims ...................................................................... 73

    3.    Distributions for Claims Allowed as of the Effective Date ............ 73

    4.    Liquidating Trustee as Disbursing Agent ................................. 73

    5.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ............................................ 73

    6.    Prepayment ........................................................................... 74

    7.    Means of Cash Payment ......................................................... 74

    8.    Interest on Claims .................................................................. 74

    9.    Withholding and Reporting Requirements ................................ 74

    10.    Setoffs ................................................................................. 75

    11.    Procedure for Treating and Resolving Disputed, Contingent and/or Unliquidated Claims ............................................ 76

    12.    Distribution Record Date ........................................................ 76

J.    Treatment Of Executory Contracts And Unexpired Leases ................. 76

    1.    Rejected Contracts And Leases ............................................... 76

    2.    Bar to Rejection Damages ....................................................... 77

    3.    Assumed and Assigned Contracts and Leases .......................... 77

K.    Confirmation And Consummation Of The Plan ................................. 77

    1.    Conditions Precedent to Confirmation and Effective Date ............ 77

    2.    Waiver of Conditions .............................................................. 77

    3.    Consequences of Non-Occurrence of Effective Date ................... 77

**TABLE OF CONTENTS**
**[Continued]**

                                                                                    Page

       4.      Substantial Consummation ................................................ 78

   L.    Allowance And Payment Of Certain Administrative Claims ................................... 78

       1.      Professional Fee Claims................................................ 78

       2.      Substantial Contribution Compensation and Expenses Bar Date .................. 78

       3.      Other Administrative Claims ........................................... 79

   M.   Effect Of Plan Confirmation ................................................ 79

       1.      Binding Effect ....................................................... 79

       2.      Discharge of the Debtors................................................ 79

       3.      Releases by the Debtors ................................................ 79

       4.      Release By Holders of Claims and Equity Interests ........................... 81

       5.      Injunction .......................................................... 82

       6.      Term of Bankruptcy Injunction or Stays................................... 83

       7.      Exculpation and Limitation of Liability................................... 83

VII. CERTAIN FACTORS TO BE CONSIDERED ................................................ 84

   A.    General Considerations ................................................ 84

   B.    Certain Bankruptcy Considerations ................................................ 84

   C.    Administrative and Priority Claims ................................................ 85

VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.................. 85

   A.    Certain Tax Consequences of the Plan ................................................ 88

       1.      Treatment of Transfers to and Distributions by the Liquidating Trust .......... 88

       2.      Allocation of Plan Distributions Between Principal and Interest ................. 92

       3.      Withholding, Backup Withholding, and Information Reporting .................. 92

   B.    Importance of Obtaining Professional Tax Assistance ............................... 94

IX. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS .......................... 94

   A.    Feasibility of the Plan.................................................. 94

   B.    Acceptance of the Plan................................................ 95

   C.    Best Interests Test ................................................ 95

vi

**TABLE OF CONTENTS**
**[Continued]**

| | | Page |
|---|---|---|
| D. | Liquidation Analysis | 96 |
| E. | Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Plan | 97 |
| F. | Confirmation Without Acceptance of All Impaired Classes:  The "Cramdown" Alternative | 97 |
| X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | 98 |
| A. | Alternative Plan(s) of Liquidation | 99 |
| B. | Liquidation under Chapter 7 | 99 |
| C. | Dismissal of the Chapter 11 Cases | 99 |
| XI. PLAN VOTING INSTRUCTIONS AND PROCEDURES | | 100 |
| A. | Notice to Holders of Claims and Equity Interests | 100 |
| B. | Holders of Claims Entitled to Vote | 101 |
| C. | Solicitation Package | 103 |
| D. | Voting Procedures, Ballots and Voting Deadline | 103 |
| E. | Confirmation Hearing and Deadline for Objections to Confirmation | 104 |
| F. | Internet Access to Bankruptcy Court Documents | 105 |
| XII. RECOMMENDATION AND CONCLUSION | | 105 |

# APPENDICES

A.    Joint Plan of Liquidation

B.    Organizational Chart

C.    Liquidation Analysis

D.    Litigation Commenced During These Chapter 11 Cases

E.    Mediation Procedures for Product Liability PI Claims

**DISCLOSURE STATEMENT DESCRIBING THE JOINT PLAN OF LIQUIDATION OF
FLEETWOOD ENTERPRISES, INC., ITS AFFILIATED DEBTORS, AND ITS OFFICIAL
COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS**

**I.
<u>INTRODUCTION</u>**

The Debtors submit this Disclosure Statement pursuant to Bankruptcy Code section 1125, for use in the solicitation of votes on the Plan.  A copy of the Plan is annexed as <u>Appendix A</u> to this Disclosure Statement.

**A.      Contents of the Disclosure Statement**

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, the past, current and anticipated liquidation of the Debtors' Assets, and the winding down of the Debtors' business operations.  This Disclosure Statement also describes various terms and provisions of the Plan, the substantive consolidation of all fifty (50) of the Debtors' estates, certain effects of Plan Confirmation, treatment of Creditors' Claims against the estates, and the manner in which Distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the foregoing "Overview" and the Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

**B.      Purpose and Effect of Plan**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders.  If reorganization is not feasible, Chapter 11 also allows a debtor to formulate and consummate a plan of liquidation, which sets forth the process for the orderly satisfaction of claims against and interests in a debtor pursuant to the priority rules of the Bankruptcy Code.

1

Confirmation of a plan of liquidation by a bankruptcy court makes the plan binding upon the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired (*i.e.*, will receive less than 100% of its Allowed Claim) under the plan, (ii) has accepted the plan, or (iii) receives or retains any property under the plan.

In these Chapter 11 Cases, the Plan provides for the distribution of the proceeds from the liquidation of all Assets of the Debtors to various Creditors as set forth under the Plan, and for the winding-down of the Debtors' corporate affairs.  Under the Plan, Claims against, and Equity Interests in, the Debtors are divided into Classes according to their relative seniority and other criteria as required under the Bankruptcy Code.  If the Plan is confirmed by the Bankruptcy Court and ultimately consummated, the Claims and Equity Interests of the various Classes will be treated in accordance with the provisions in the Plan established for each Class.  On the Distribution Dates, a liquidating trust formed under the Plan will make Distributions to certain Classes of Claims (to the extent that such Claims have been Allowed) as provided in the Plan.

A summary of the Classes of Claims and Equity Interests, as well as their treatment under the Plan, is included in the Overview above.  A more detailed description of the Classes of Claims against the Debtors created under the Plan, the treatment of those Classes under the Plan, and the property to be distributed under the Plan are described in Section VI below.

**II.**
**DESCRIPTION OF THE DEBTORS' PRIOR BUSINESS, EVENTS THAT PRECIPITATED THE FILING OF THESE CHAPTER 11 CASES**

**A.    Overview of the Debtors and Their Prior Businesses**

  **1.    *Fleetwood's Businesses***

Fleetwood began as a California-based producer of manufactured housing in 1950.  In 1964, Fleetwood entered the recreational vehicle market with the purchase of a travel trailer manufacturer.  Prior to the Petition Date, through its subsidiaries and affiliates, Fleetwood was one of the nation's leading producers of manufactured housing and recreational vehicles.  Fleetwood operated its business through three divisions:  motor homes, housing and travel trailers.  Each division operated through separate subsidiaries, which employed the individuals who carried out those operations, from assembly line employees and plant managers to sales professionals and technical staff.  As of the

2

Petition Date, Fleetwood had approximately 3,700 people located in 19 manufacturing facilities in 11 states as well as its corporate headquarters located in Riverside, California.

In its manufactured housing business, Fleetwood produced single and multi-section manufactured homes as well as multi-family residences and military barracks.  Fleetwood's high-quality, factory-built homes were designed to enable families to enjoy comfortable housing at affordable prices.  In its recreational vehicle business, Fleetwood manufactured two types of recreational vehicles:  motor homes and travel trailers.  Due to lackluster sales, Fleetwood shut down its travel trailer division immediately prior to the Petition Date.

As of the Petition Date, Fleetwood's manufactured homes and recreational vehicles were marketed through a network of more than 2,050 dealer locations in the United States and Canada which Fleetwood supported through competitive warranties and superior warranty service. Fleetwood also operated two supply companies (a fiberglass manufacturing operation and a lumber brokerage business) that provided components for the recreational vehicle and housing operations, while also generating outside sales.

### 2.    *Fleetwood's Corporate Structure*

FEI is a public company, incorporated in Delaware.  Although formerly traded on the New York Stock Exchange under the symbol "FLE," as of December 2008 FEI's common stock was quoted on the over-the-counter markets (OTC Bulletin Board and Pink Sheets) under the trading symbol "FLTW."  FEI is the parent company of Debtors Fleetwood Holdings, Inc. ("FHI") and Fleetwood Retail Corp. ("FRC") as well as other non-debtor companies.  An organizational chart of both the debtor and non-debtor entities that constitute the businesses of Fleetwood, as well as a short description thereof, is attached hereto as Appendix B.

### 3.    *Manufactured Homes Business*

In fiscal 2008, Fleetwood was the second largest producer of manufactured homes[2] in the United States in terms of retail units shipped.  Fleetwood distributed its manufactured housing products through a network of approximately 1,450 dealers in 46 states.

---

[2]  A manufactured home is a single-family house that is constructed in a factory using assembly-line techniques in accordance with the Federal Department of Housing and Urban Development

Fleetwood also built modular housing units for the United States Military.  Modular homes differ from typical manufactured homes primarily because they comply with state and local building codes.

The manufactured housing industry grew significantly from 1991 to 1998, fueled in part by liberal credit standards, availability of financing and low interest rates.  After 1998, the industry started to steadily decline due to tighter credit practices and relatively high interest rates.  Some lenders stopped extending loans to manufactured housing buyers altogether.  In fact, by 2000, more than half of the retail lenders had exited the business, leaving an insufficient volume of financing for manufactured home purchases.  More recently, after the bursting of the housing bubble in 2006-2007, the manufactured housing industry had to compete with excessive inventories of site-built homes at drastically reduced prices.

### 4.    *FRC's Business*

Fleetwood entered the retail business beginning in the late 1990's through acquisitions of independent retail dealers and by developing new retail locations.  Fleetwood also established a financial services subsidiary, HomeOne Credit Corp. ("HomeOne"), to provide finance and insurance products to customers of FRC as part of a vertically integrated retail strategy.  FEI's manufactured housing business operated a large number of retail outlets through its FRC subsidiaries.  As the retail market for manufactured housing continued to slow and losses increased, FRC operations were downsized to better match market demand.  In March 2005, with the retail business still sustaining losses, Fleetwood announced its intention to exit the manufactured housing retail and financial services businesses to focus more on core manufacturing activities.  These FRC businesses were designated as discontinued operations and were subsequently sold to competitor Clayton Homes during the second quarter of fiscal 2006.

---

[Footnote continued from previous page]
  ("HUD") construction and safety standards.  The cost of a quality manufactured home runs about one-third that of an on-site constructed home, in each case excluding land.  Off-site production eliminates the use of multiple contractors, greatly reduces the affect of adverse weather, and also greatly reduces the time required for construction because every component arrives at the assembly point ready to use.  Manufactured homes are trucked in sections to the pre-prepared site, where they are assembled in a matter of days, instead of the normal site-built construction times that can stretch into weeks and months.

### 5. *Recreational Vehicles Business:  Motor Homes and Travel Trailers*

Prior to the Petition Date, Fleetwood was one of the nation's leading producers of recreational vehicle products– motor homes and travel trailers – which it distributed through a network of approximately 600 independent dealers in 48 states and Canada.

### (a)    Motor Homes

A motor home is a motorized unit that can be used as a temporary dwelling.  In many cases a motor home is used for extended travel and is often considered a second home.  Within the motor home business, Fleetwood primarily competed in the Class A and Class C categories.  The Company's Class A units ranged in length from 30 to 45 feet and sold for an average retail price of $160,000.  The Company's Class C units ranged in length from 23 to 31 feet and sold for an average retail price of $67,000.  Prior to the Petition Date, Fleetwood was the largest manufacturer of Class A motor homes in the United States, the 3rd largest manufacturer of Class C motor homes, and the 2nd largest motor home manufacturer overall.  As of the Petition Date, Fleetwood marketed its Class A and Class C motor homes through 21 different brand names which varied based on size and price point.

### (b)    Travel Trailers

Travel trailers are designed to be towed by another vehicle, and are similar to motor homes in use and features.  Fleetwood was in the travel trailer business for approximately 44 years during which time Fleetwood sold more than 1 million trailers.  In many of those years the Fleetwood branded travel trailers dominated the top 10 travel trailer brands sold at retail and became "household" names throughout the RV community in the United States and Canada.

In the years leading up to the Petition Date, Fleetwood lost substantial market share in the travel trailer business due to aggressive competition from well-capitalized industry peers.  The continuing decline in Fleetwood's travel trailer business accounted for a loss of approximately $86 million in the last two years of operations.  Although Fleetwood responded to competitive pressures by improving its product lineup, market conditions proved too severe to enable recovery.  Because of the continuing losses, Fleetwood withdrew from the travel trailer business prior to the Petition Date.  Specifically, on the day before the Petition Date, Fleetwood caused notices to be delivered to its

travel trailer dealers notifying them that it was terminating their respective travel trailer dealer agreements, effective immediately.  To the extent possible Fleetwood honored and fulfilled orders previously submitted by the dealers for travel trailer products with then-existing inventory and work-in-process.  Also at or about that time, Fleetwood terminated its approximately 600 employees associated with the travel trailer business, including employees at two manufacturing plants in Oregon and one manufacturing plant in Ohio, as well as employees who worked in the travel trailer division from Fleetwood's corporate headquarters.  Approximately 80 employees of the travel trailer division stayed on to assist with the orderly wind-down of the travel trailer operations.

**B.    Fleetwood's Debt and Equity Structure**

**1.    *Secured Bank Debt***

FHI and the Operating Subsidiaries[3] (collectively, the "Borrowers") are parties to a secured credit facility with a syndicate of lenders[4] led by Bank of America, N.A. ("BofA"), as administrative agent (as amended and restated, the "Secured Credit Facility").  The borrowings under the Secured Credit Facility were used for working capital and general corporate purposes.  The Secured Credit Facility is a revolving credit facility that was amended several times prior to the Petition Date.

The obligations of the Borrowers under the Secured Credit Facility are guaranteed by FEI, Fleetwood Canada Ltd. and Fleetwood International Inc. (collectively, the "Secured Credit Facility Guarantors").  Except for a certain amount of real property, the Secured Credit Facility is secured by a pledge of the majority of the assets of each of the Debtors, including accounts receivable, cash, inventory and real property owned by certain of the Operating Subsidiaries.  The Borrowers' borrowing capacity under the Secured Credit Facility was governed by the amount of a borrowing base, calculated based on inventory and accounts receivable and a real estate sub-facility.

---

[3]  As set forth in <u>Appendix B</u>, the direct subsidiaries of FHI, other than Hauser Lake Lumber, along with Continental Lumber Products, a subsidiary of FEI, are referred to as the ("Operating Subsidiaries").

[4]  Wells Fargo Foothill, Inc., fka Foothill Capital Corporation; Textron Financial Corporation; PNC Bank, National Association; Wachovia Capital Finance Corporation (Western); and Bank of America, N.A.

As of March 6, 2009, the maximum availability under the Secured Credit Facility was approximately $135 million and there was approximately $61.7 million in borrowings outstanding. As of January 31, 2010, there were no amounts outstanding on the revolving credit facility itself, but the total amount outstanding on the Secured Credit Facility was approximately $16.6 million consisting of letters of credit issued to support performance bonds issued to insure the Debtors' performance of certain manufactured housing contracts, to support workers' compensation obligations, and in favor of certain states to support the Debtors' self-insured workers' compensation obligations.

### 2.    *5% Notes*

In December 2003, FEI issued $100 million in aggregate principal amount of its 5% Convertible Senior Subordinated Debentures due 2023 (the "5% Notes"). The 5% Notes are unsecured obligations of FEI. Holders of the 5% Notes had the right to require FEI to repurchase their 5% Notes, in whole or in part, on December 15, 2008 (the "2008 Put Right," discussed further below), and, prior to the Petition Date, current holders of the 5% Notes had similar rights on December 15, 2013 and December 15, 2018. The repurchase price was to be 100% of the principal amount of the 5% Notes plus accrued and unpaid interest. The Law Debenture Trust Company of New York is the indenture trustee as to the 5% Notes.

### 3.    *6% Notes*

In 1998, Debtor Fleetwood Capital Trust ("FCT"), a subsidiary of FEI, completed a $287.5 million private placement of 5,750,000 shares of its preferred securities. FCT then transferred the proceeds of the private placement to FEI in exchange for FEI's issuance to FCT of $296.4 million in FEI's 6% Convertible Subordinated Debentures due 2028 (the "6% Notes"). The Bank of New York is the indenture trustee as to the 6% Notes. The 6% Notes are unsecured obligations of FEI and represent the sole asset of FCT. FEI guaranteed the obligations of FCT to its preferred shareholders.

As of the Petition Date, approximately $151.25 million in aggregate principal amount of FEI's 6% Notes were outstanding. Also, as of the Petition Date, approximately 3,025,000 shares of convertible trust preferred securities of FCT were issued and outstanding.

7

### 4.    *The 5% Notes Put Right, The Exchange Offer and the Repurchase Offer*

The indenture controlling the 5% Notes permitted FEI, at its option, to elect to pay the

repurchase price for the 2008 Put Right in cash, in its common stock, or with a combination of cash

and common stock.  In the summer of 2008, FEI projected that it would not have enough liquid cash

to satisfy the 2008 Put Right if all outstanding 5% Notes were tendered and also concluded that it

may not have enough authorized shares of its common stock to issue in lieu of cash in satisfaction of

the 2008 Put Right (as the number of shares to be issued was based on the market price of FEI's

common stock over the 20 trading days preceding December 15, 2008).  Any inability of FEI to

satisfy its obligation to repurchase 5% Notes from holders who exercised their 2008 Put Right would

be a default under the indenture governing the 5% Notes.  Accordingly, FEI commenced two separate

"exchange offers."

Pursuant to a form S-4 filed with the SEC on October 30, 2008, as amended, FEI commenced

an exchange offer (the "Exchange Offer") pursuant to which it offered to exchange its outstanding

5% Notes for new 14% Senior Secured Notes due 2011 (the "14% Notes") with more favorable

terms, including the pledge of security.

Pursuant to a separate form S-4 filed with the SEC on November 6, 2008, as amended, FEI

commenced a second simultaneous exchange offer (the "Repurchase Offer") to allow those 5% Notes

who, instead of accepting the Exchange Offer, wished to exercise their 2008 Put Right (as provided

in the indenture governing the 5% Notes) to require FEI to repurchase their 5% Notes in exchange for

common stock of FEI.

### 5.    *The New 14% Secured Notes*

Those Creditors holding approximately 79% of the outstanding 5% Notes accepted the

Exchange Offer, and on December 12, 2008, FEI issued (a) approximately $81.4 million in aggregate

principal amount of the new 14% Notes due 2011[5], and (b) approximately 11.1 million shares of its

---

[5]   Immediately prior to the Petition Date, approximately $81.4 million in aggregate principal amount of the 14% Notes remained outstanding, the beneficial owners of which included the following:  Whippoorwill Associates, Inc. ($34,407,000); Credit Suisse (USA) Securities ($10,300,000); Wolverine Asset Management, L.L.C. ($14,111,000); Brigade Capital Management, LLC ($9,985,000); Barclays Capital ($3,979,000); Putnam Investment Management, L.L.C. ($3,325,000); JP Morgan Securities Inc. ($1,637,000); Argent Capital

common stock in exchange for approximately $79.1 million in aggregate principal amount of its 5%

Notes tendered in the Exchange Offer.

As security for the obligations of FEI under the 14% Notes, certain of the Operating

Subsidiaries pledged their real property to Deutsche Bank ("DB") as indenture trustee for the benefit

of the holders of the 14% Notes as evidenced (a) by first-priority mortgages liens on previously

unencumbered real property, and (b) by second priority mortgages or deeds of trust on 18 parcels of

real property which had previously been pledged as collateral to secure the Secured Credit Facility.

The pledged property consisted largely of the manufacturing facilities owned and operated by the

Operating Subsidiaries that produced recreational vehicles and housed the manufactured housing

supply operations.

FEI's obligations under the 14% Notes are guaranteed jointly and severally by FHI and the

Operating Subsidiaries, which are also Borrowers under the Secured Credit Facility.  The 14% Note

guarantees are unsecured obligations of the Operating Subsidiaries and are subordinated to the

obligations of the Operating Subsidiaries under the Secured Credit Facility.

During the course of the Chapter 11 Cases, certain of the collateral supporting the liens for the

14% Notes have been sold.  As a result, DB, as indenture trustee for the 14% Notes, has been given

replacement liens, all subject to further order of the Bankruptcy Court and all defenses of the Debtors

with respect to the validity and extent of the liens.  In connection with the sale of the Debtors' motor

home division, (described in more detail in Section III.J below), DB has been given a first lien on an

$8.1 million segregated reserve and a second lien in a cash collateral account up to $11.2 million.  In

connection with the sale of the Debtors' manufactured housing division, (as described in more detail

in Section III.J below), DB has been given a first lien on a $2.135 million segregated reserve and a

second lien in a cash collateral account up to $10.727 million.[6]

_____

[Footnote continued from previous page]
Management, LLC ($500,000); Clutterbuck Capital Management, LLC ($103,000); GAMCO
Investors, Inc. ($100,000); White Peaks Asset Management ($75,000); and Alpine Fund LLP
($77,000).

[6]  The Creditors' Committee has commenced an action to avoid the issuance of the 14% Notes as a
fraudulent transfer, as well as the issuance of the guarantees and the security interests granted in
connection with the 14% Notes, as set forth in more detail in section III.M below.

**6.**     *Common Stock Issued in the Repurchase Offer in Exchange for 5% Notes*

Instead of electing to participate in the Exchange Offer, on December 15, 2008, the holders of approximately $19.9 million in aggregate principal amount of the 5% Notes accepted the Repurchase Offer and thereby exercised their right (as provided in the indenture governing the 5% Notes) to require FEI to repurchase their Debentures in exchange for common stock of FEI.  The amount of stock issued was based on a formula using the volume weighted average price of FEI stock over a 20 day trading period.

On December 16, 2008, FEI issued approximately 121.8 million shares of its common stock in exchange for approximately $19.9 million in aggregate principal amount of 5% Notes tendered in the Repurchase Offer.

**7.**     *Remaining 5% Notes That Neither Tendered in the Exchange Offer nor the Repurchase Offer*

Immediately prior to the Petition Date, approximately $1.069 million in aggregate principal amount of the 5% Notes remained outstanding and consisted of 5% Notes holders who neither tendered their 5% Notes in the Exchange Offer nor in the Repurchase Offer.[7]  Based upon the Indenture, the 5% Notes remain senior to the 6% Notes in right of payment.

**8.**     *ISIS Lending Obligation*

On or about August 22, 2008, Debtors Fleetwood Motor Homes of California, Inc. and Fleetwood Homes of California, Inc., each executed a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing in which they pledged each of their real property located in Riverside, California as security for a loan in the principal amount of $27.25 million made by Isis Lending, LLC ("ISIS") to Debtors Fleetwood Motor Homes of California, Inc. and Fleetwood Homes of California, Inc. (the "ISIS Loan").  The obligations under the ISIS Loan are guaranteed by FEI.

**9.**     *The ISIS Replacement Liens*

As of the Petition Date, the Debtors had $27.25 million of principal senior borrowings with ISIS collateralized by first liens on the real estate at Plant 47 (a motor home facility located in

---

[7]  $1,025,000 and $44,000 in principal amount of 5% Notes were beneficially held by Lehman Brothers Inc. (Lehman Brothers Convertible Securities Trading) and Pension Benefit Guaranty Corporation, respectively, as of such date.

Riverside, California) and Plant 17 (a housing facility in Woodland, California) and second liens on certain personal property at those locations.

On August 17, 2009, the Debtors sold its manufactured housing division (including Plant 17 and all machinery, trade fixtures and equipment located therein) to FH Holding, Inc. By an Order entered on August 14, 2009 [Docket No. 1102], $4,000,000 of the cash proceeds was paid to ISIS on account of the first priority security interest of ISIS on Plant 17 assets.

In conjunction with the sale of the Debtors' motor home division to AIP on July 17, 2009, ISIS received replacement liens on an idle manufactured housing facility in Alma, Georgia (Plant 75-1) and an idle motor home facility in Elysburg, Pennsylvania (Plant 71-1) as well as replacement liens on (i) certain machinery and equipment located therein and (ii) the Debtors' cash collateral account (up to a maximum recovery of $10.2 million) (the " ISIS Replacement Liens"). The ISIS Replacement Liens, which are junior in priority to BofA's liens, were provided to replace the various personal property liens related to Plant 47 where the underlying assets (mostly motor home inventory) were either consumed or sold postpetition. The order approving the ISIS Replacement Lien on Plant 75-1 and 71-1 was entered on July 2, 2009 [Docket 852] and the order approving the ISIS Replacement Lien on the cash collateral account was entered on August 6, 2009 [Docket 1056]. Currently, there is approximately $25.2 million outstanding to ISIS.

**10.** *Summary of Indebtedness*

As of the date of the filing of this Disclosure Statement, the approximate aggregate non-contingent obligations of the Debtors were as follows:

- Secured Credit Facility: $2.7 million in outstanding letters of credit
- 14% Secured Notes: $84.3 million
- 5% Notes: $1.069 million
- 6% Notes: $161.173 million
- ISIS Loan: $25.2 million

The Debtors also have trade debt owing to various service and goods providers, in addition to other amounts due and owing, as set forth in more detail in the claims discussion at Section IV herein.

1      **11.**    *FEI's Intercompany Claim Against the Subsidiary Debtors*

2          Based on the Form 10-Q filed by Fleetwood Enterprises, Inc. with the Securities and

3      Exchange Commission for the quarterly period ended January 25, 2009, FEI is owed $39.981 million

4      from the Subsidiary Debtors who guaranteed the Secured Credit Facility as an intercompany

5      receivable as reflected on the Condensed Consolidating Balance Sheet as of March 10, 2009

6      (Unaudited).

7      **12.**    *Equity Interests in the Debtors*

8          As of the Petition Date, FHI had issued and outstanding 250 shares of common stock, all of

9      which is held by FEI.  There are no other equity interests in FHI.

10         Similarly, FEI has authorized 300,000,000 shares of common stock, with a par value $0.01

11     per share, and 10,000,000 shares of preferred stock, with a par value $1.00 per share.  In total, as of

12     the Petition Date, FEI had issued and outstanding approximately 209,229,954 shares of common

13     stock and 0 shares of preferred stock.  To FEI's knowledge based on public filings, approximately

14     one-third of the FEI common stock was held by approximately a half-dozen institutions.  As of the

15     Petition Date, the Debtors' executive officers and directors collectively held less than 1% of the FEI

16     common stock, and there were outstanding options with respect to a total of approximately

17     5,362,739 shares of FEI's common stock that had been granted.  In addition, holders of an aggregate

18     of approximately $151,250,000 in stated liquidation amount of 6% Notes had the right to convert

19     their securities into an aggregate of 3,104,467 shares of FEI common stock, subject to adjustment;

20     and holders of an aggregate of approximately $1,100,000 principal amount of 5% Notes had the right

21     to convert their securities into a maximum of approximately 100,000 shares of FEI common stock.

22         Under the Plan, ***all*** existing Equity Interests, including stock, in the Debtors will be cancelled.

23     **C.    Fleetwood's Business Downturn And Liquidity Crisis**

24         Fleetwood reported a net loss in every fiscal year since 2001.  Fleetwood's failure to generate

25     sufficient cash from operations reduced its liquidity and expenditures on capital improvements,

26     machinery, equipment and research and development, ultimately negatively affecting sales and

27     earnings.  In particular, Fleetwood's operating results were negatively impacted by:

28         •      a general weakness in both the manufactured housing and the recreational vehicle
                  markets, initially caused by turmoil in the mortgage industry that later spread to the

broader financial markets and economy, depressed real estate prices and stringent home equity lending, that resulted in a reduced ability, particularly for recreational vehicle buyers, to borrow all or part of the purchase price against their home equity;

- the fallout in the subprime mortgage sector that resulted in depressed prices and an increased number of foreclosures of site-built homes, which reduced demand for manufactured housing; and

- a decline in the availability and a rise in the cost of wholesale and retail financing for both manufactured housing and recreational vehicles, among other market factors.

Fleetwood repeatedly assessed its business plan and took a number of steps to cut costs, restructure its business operations, and address the cash short falls from operations to improve liquidity.  Specifically, Fleetwood:

- consolidated operations where possible, including management teams at adjacent plants;

- divested or closed certain non-core businesses that were unprofitable, including the folding trailers business, the manufactured housing retail business and several supply businesses; and

- closed two motor home plants and 13 manufactured housing plants and intermittently idled others in order to better match capacity with customer demand among other things.[8]

Despite these attempts, given the ongoing credit constrictions, economic decline and weakness in both the recreational vehicle and manufacturing housing markets, the measures taken by Fleetwood were ineffective.  Accordingly,  Fleetwood looked for other strategic alternatives.

After completing the Exchange Offer in the fourth calendar quarter of 2008, Fleetwood's management (with the help of its banks, advisors and professionals) critically analyzed business operations and continued further cost-cutting measures.  However, Fleetwood's liquidity continued to decline.

Under an amendment to the Secured Credit Facility dated November 26, 2008, Fleetwood was subject to a springing financial performance covenant.  The covenant only applied if either (a)

---

[8]  The Debtors have not undertaken any post-petition efforts to determine whether and to what extent the sale of properties may constitute a fraudulent transfer and/or otherwise give rise to a claim or cause of action in favor of the Debtors and their Estates.  By and through the Plan, the Debtors (on behalf of themselves and their Estates) shall, and do hereby, reserve any and all rights to investigate and, if appropriate, prosecute any and all such claims.

average daily liquidity, defined as bank cash, cash equivalents, and unused borrowing capacity, fell

below a prescribed minimum level of $45 million in any calendar month, or (b) liquidity fell below

$25 million on any single day.  Under the amended Secured Credit Facility, Fleetwood was also

subject to a new separate covenant under which liquidity could not fall below $25 million on any

three consecutive business days.  As a result of a significant decline in Fleetwood's liquidity due to

reduced cash flow from operations, Fleetwood was in danger of breaching one or both of the

covenants under the amended Secured Credit Facility.

A breach of the foregoing covenants would have resulted in a default under the Secured

Credit Facility, as well as a cross-default in Fleetwood's 14% Notes and Fleetwood's capital lease

obligations.  In the event of such a default, Fleetwood was not certain that its lenders would have

refrained from enforcing any remedies otherwise available to them or that they would have granted

Fleetwood any further waivers or amended the covenants.  The more likely scenario was that

Fleetwood's default would have resulted in the lenders declaring all amounts outstanding to be

immediately due and payable.  The lenders would have then proceeded against Fleetwood's assets,

and any proceeds realized upon the sale of assets would have been used first to satisfy all amounts

outstanding under the Secured Credit Facility and, thereafter, any of Fleetwood's other liabilities,

including liabilities relating to Fleetwood's 14% Notes, 5% Notes and 6% Notes.

**D.    After Exploring Alternatives, Fleetwood Sought Relief Under Chapter 11**

Fleetwood, with the help of its counsel and its advisers, including FTI Consulting, Inc. and

Greenhill & Co., LLC, considered several possible alternatives to bankruptcy during 2008.

Fleetwood explored the possibility of selling off certain of its assets as well as other ways to generate

liquidity.  In connection with this strategic analysis, Fleetwood concluded that it would not be able to

entice a buyer unless it could sell its assets free and clear of liens, claims, and encumbrances.

Fleetwood also concluded that any new debt or equity investments would be unlikely unless it could

restructure its existing debt.  Fleetwood also explored and engaged in negotiations for a merger with a

strategic partner.  However, despite its efforts, Fleetwood was unable to effectuate such a transaction.

During the time it was considering strategic alternatives, and as referenced above, Fleetwood

decided to shut down the unprofitable travel trailer division to reduce overall operating costs and

stem further operating losses associated with that business segment.  Fleetwood realized that shutting down the travel trailer division posed potentially significant liabilities associated with repurchase obligations that arose under the dealer agreements and certain state laws resulting from dealer terminations.[9]  Fleetwood ultimately concluded that a bankruptcy would allow it to best deal with the repurchase claims that arose from the termination of its travel trailer dealers.

Because Fleetwood's options to continue as a going concern had all but run out, Fleetwood determined that it was in the best interests of its creditors to preserve its ability to avoid the Exchange Offer in which the 14% Notes were issued and in which the Operating Subsidiaries guaranteed the 14% Notes and pledged their real property as collateral to secure the 14% Notes.  Fleetwood concluded that it was only able to preserve its ability to set aside the Exchange Offer through a bankruptcy proceeding.  Moreover, Fleetwood believed that it needed additional liquidity while it pursued strategic alternatives which it could only obtain through debtor in possession or DIP lending approved under the Bankruptcy Code.  As a result, Fleetwood filed for chapter 11 protection on the Petition Date.

## III.
## SIGNIFICANT EVENTS OCCURRING IN THESE CHAPTER 11 CASES

### A.    Overview of Chapter 11 and the Plan Process

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor in possession attempts to reorganize its business for the benefit of itself, its creditors, and other parties in interest, or, in the alternative, attempts to use chapter 11 to effectuate an orderly liquidation of its assets.

The commencement of a chapter 11 case creates an estate consisting of all of the debtor's legal and equitable interests in property as of the date that the petition is filed.  Bankruptcy Code sections 1107 and 1108 provide that a debtor may continue to operate its business and remain in

---

[9] Specifically, the agreements between the travel trailer dealers and the subsidiaries of FHI that operated in the travel trailer segment imposed a repurchase obligation on those subsidiaries in the event of termination.  In certain states, the dealer agreements were either augmented or superseded by dealer and franchise laws that imposed liability upon the manufacturer for the termination of the dealers or franchisees.

15

possession of its property as a "debtor in possession," unless the bankruptcy court orders the appointment of a trustee.

The filing of a voluntary petition under chapter 11 also operates as an automatic stay of, among other things, all attempts to collect on prepetition claims from a debtor or otherwise interfere with a debtor's property or business.  In a chapter 11 case, unless otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect through the effective date of a confirmed chapter 11 plan.  The formulation of a chapter 11 plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying the claims against and interests in the debtor.

In these Chapter 11 Cases, following the Petition Date, the Debtors remained in possession of their property and operated their businesses as debtors in possession.  The Debtors successfully divested the majority of their Assets and defended against numerous creditor actions for relief from the automatic stay, which, together, maximized the Assets available for distribution under the Plan. To that end, the Debtors and Creditors' Committee believe that they have proposed a Plan that provides for a liquidation of the balance of the Debtors' Assets and the equitable distribution thereof to creditors.

**B.      The Transition to Operations as Debtors in Possession**

During the early days of the Cases, the Debtors filed a number of emergency motions designed primarily to enable the Debtors to make a seamless transition into chapter 11 without significantly impacting operations, and to facilitate the Debtors' compliance with the requirements of chapter 11 ("First Day Motions").  The Debtors filed numerous First Day Motions, including the following noteworthy motions:

- Motion for Joint Administration of Cases ("Joint Administration Motion");

- Motion to Maintain Present Cash Management System and Investment Policies ("Cash Management Motion");

- Motion for Approval to Use Cash Collateral ("Cash Collateral Motion");

- Motion to Establish Adequate Assurance of Performance for Utilities ("Utilities Motion"); and

16

- Motion to Pay Prepetition Employee Wages and Benefits ("Employee Wages and Benefits Motion").

The foregoing First Day Motions are summarized below.

   1. *Cash Collateral Motion*

As of the Petition Date, certain of the Debtors had $62 million in borrowings outstanding under a pre-petition Secured Credit Facility with a syndicated group of lenders led by BofA, as agent. In the Cash Collateral Motion, the Debtors requested authorization to use the lenders' cash collateral (*i.e.*, cash, negotiable instruments, securities, deposit accounts, or cash equivalents in which the Debtors and the lenders have an interest) to fund their postpetition operations, pay their employees, maximize value, and pursue reorganization under chapter 11.  The Debtors and BofA were able to finalize the terms of an Interim Order allowing for the Debtors' use of cash collateral to allow the Debtors to access their cash and operate their business pending further negotiations with the lenders. An Interim Order granting the Cash Collateral Motion was entered on March 13, 2009 [Docket No. 42], and was later superseded by the Interim Order (1) Authorizing Debtors to Obtain Postpetition Secured Financing, (2) Authorizing the Use of Cash Collateral, (3) Granting Liens and Superpriority Claims, (4) Modifying the Automatic Stay and (5) Setting Final Hearing (the "Interim DIP Order"), entered on April 1, 2009 [Docket No. 183].

On April 29, 2009, the Debtors filed an emergency "Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral…" [Docket No. 383] in which the Debtors withdrew their Motion for Approval of DIP Financing ("Renewed Cash Collateral Motion") based on the Debtors' budget improvements and accelerated asset sales.

The Debtors and the lenders agreed to continue the hearing on the Renewed Cash Collateral Motion from time to time, and entered into a series of stipulations and consent orders extending the Debtors' authorization to use cash collateral in accordance with the terms of the Interim DIP Order (as modified by such stipulations).  On September 10, 2009, the "Final Order Extending the Debtors' Authorization to Use Cash Collateral to Earlier of January 31, 2010 and the Effective Date of a Plan of Liquidation" [Docket No. 1255] was entered.  Then, on February 2, 2010, the Court entered the "Order Extending the Debtors' Authorization To Use Cash Collateral To Earlier Of February 8, 2010

And The Effective Date Of A Plan Of Liquidation" [Docket No. 1779].  Finally, on February 10, 2010, the Court entered the "Order Extending the Debtors' Authorization To Use Cash Collateral To Earlier Of April 30, 2010 And The Effective Date Of A Plan Of Liquidation" [Docket No. 1808].  This last order extended the Debtors' authorization to use cash collateral on a final basis.

As of January 31, 2010, approximately $16.6 million in undrawn letters of credit remain outstanding.  These have been reduced since the Petition Date by $45.1 million, where $16.4 million were cancelled or removed without cost to the Debtors and $28.7 million were drawn upon and paid with cash from the Debtors' bank accounts.  The planned resolution of the remaining letters of credit is discussed below in Section V.

### 2.    *Joint Administration Motion*

The Debtors requested joint administration of these chapter 11 cases to ease the overall burden of administering 50 related bankruptcy cases and based the consolidated manner in which the Debtors manage cash, their debt structure, and the sheer number of entities involved.  As discussed in the motion, joint administration reduced (i) the number of documents prepared, filed, and served in connection with these chapter 11 cases, (ii) the administrative burden of coordinating these cases, and (iii) the monitoring burden that the cases would impose on the Court, the Clerk of the Court, the Office of the United States Trustee, and all parties in interest.  The Order granting the Joint Administration Motion was entered on March 11, 2009 [Docket No. 19].[10]

### 3.    *Cash Management Motion*

The Debtors filed a Cash Management Motion for court approval to maintain the Debtors' centralized cash management system (the "Cash Management System"), which was designed to efficiently collect, transfer, consolidate and disburse funds generated by the Debtors' numerous affiliates through the Debtors' operations.

The Debtors also requested authorization to maintain their existing policies and practices for deposits and investments of excess funds within the Cash Management System, to continue to pay

---

[10]  The five Fleetwood retail Debtors discussed in section III.E. that filed their chapter 11 petitions on July 29, 2009 and August 11, 2009, filed their motion seeking joint administration with these Cases on August 13, 2009 [Docket No. 1092].  It was approved by order of this Court on August 19, 2009 [Docket No. 1118].

1  bank fees and charges in the ordinary course of business, and to continue their intercompany

2  transactions and transfers.  The Final Order granting the Cash Management Motion was entered on

3  April 1, 2009 [Docket No. 175].

4  **4.  *Utilities Motion***

5  In order to avoid any interruption in the provision of utility services by certain utility

6  companies, the Debtors filed the Utilities Motion which sought approval of the creation of a $450,000

7  utility deposit account from which the utility companies could draw if the Debtors neglected to make

8  postpetition payments thereto.  The Debtors also requested that the Court prohibit the utility

9  companies from altering, refusing, or discontinuing services on account of any outstanding

10  prepetition invoices.  The Order granting the Utilities Motion and establishing a utility deposit

11  account minimum of $450,000, was entered on March 18, 2009 [Docket No. 71].  Subsequently, on

12  July 21, 2009, the Court entered an order granting the Debtors' motion to reduce the utility deposit

13  account minimum to $200,000 upon the entry of an order approving the sale of the Debtors' RV

14  Assets (defined below) [Docket No. 972].

15  **5.  *Employee Wages and Benefits Motion***

16  The Employee Wages and Benefits Motion requested the entry of an order (a) authorizing the

17  Debtors to pay certain prepetition (i) reimbursable expenses, and (ii) health plan claims, insurance

18  premiums and other administrative fees, (b) authorizing the Debtors to make deductions from

19  employees' paychecks, and (c) authorizing and directing banks and other financial institutions to

20  honor all checks and electronic payment requests made by the Debtors related to the foregoing.  FEI

21  and other Debtors with employees also sought permission to pay $418,800 in prepetition obligations

22  related to employee wages and benefits.  The Order granting the Employee Wages and Benefits

23  Motion was entered on March 26, 2009 [Docket No. 129].

24  **C.  Appointment of the Creditors' Committee**

25  Shortly after the Petition Date, on March 19, 2009 [Docket No. 73], the U.S. Trustee

26  appointed the Creditors' Committee in these Chapter 11 Cases.  The following table lists the current

27  members of the Creditors' Committee and their representatives.

28

19

| Member | Representative |
|---|---|
| The Bank of New York | J. Chris Matthews |
| Giant RV | Peter Kravitz |
| Mike Thompson's RV Super Stores | Frank DeGelas |
| Arbutus RV & Marine | Craig Little |
| McGovern's RV Centre | Dwain McGovern |
| Affordable RV | Chris Bugg |
| Auto Gallery | Thomas Glen |
| Boundary RV & Marine | Warren Lux |
| Esco Industries, Inc. | Wink Hallmark |

**D.    Professionals Retained at the Expense of the Estates**

During the Cases, the Bankruptcy Court has approved the employment of the following professionals:

- Gibson, Dunn & Crutcher LLP as Debtors' General Insolvency Counsel

- FTI Consulting, LLC as Debtors' Financial Advisors/Restructuring Professionals

- Pachulski Stang Ziehl & Jones LLP as Counsel to the Creditors' Committee

- Grant Thornton LLP as the Creditors' Committee's Financial Advisors and Accountants

- XRoads Solutions Group, LLC as the Creditors' Committee's Financial Advisors and Consultants

- FocalPoint Securities, LLC as the Creditors' Committee's Investment Banker

- Ballenger, Cleveland & Issa LLC as the Creditors' Committee's Expert Witness in connection with the Application for an Order Approving the Employment of Greenhill & Co., LLC as the Debtors' Investment Banker

- Abernathy MacGregor Group as Debtors' Corporate Communications Consultant

- Kurtzman Carson Consultants LLC ("KCC") as Debtors' Claims and Noticing Agent

- Julander, Brown & Bollard LLP as Debtors' Special Counsel in an adversary action filed against DB

- Greenhill & Co., LLC as the Debtors' Investment Banker

On May 13, 2009, the Bankruptcy Court entered an order approving interim fee procedures for professionals seeking compensation from the Estates [Docket No. 552].  With the exception of KCC, whose compensation is subject to different procedures, subject to the Debtors' cash availability, professionals are eligible to receive payment of 80% of their monthly fees and 100% of their monthly expenses provided that no objection is timely filed and served with respect to such professionals' monthly fee statements.  Such professionals have the opportunity to request and obtain payment of the "hold back" amounts at an interim or a final fee application hearing.  The first interim fee application hearing is currently scheduled for March 31, 2010.

In addition, on May 14, 2009, this Court entered an order approving the employment of professionals that the Debtors use in the ordinary course of business [Docket No. 571].

**E.    Subsequent Chapter 11 Filing by Five Fleetwood Retail Corp. Entities**

Approximately four months into these Chapter 11 Cases of the first forty-five (45) Debtors, five (5) additional Fleetwood entities filed for bankruptcy protection.  On July 29, 2009, Fleetwood Retail Corp. of Arizona filed a voluntary bankruptcy petition.  Fleetwood Retail Corp. of Arizona's emergency filing was necessary to stay the landlord's attempts to terminate its prepaid lease, based on the landlord's allegations that the bankruptcy filing of the lease guarantor, FEI, created an actionable default under the lease.  The bankruptcy filing reflects Fleetwood Retail Corp. of Arizona's efforts to preserve the lease because FEI had already ***paid the lease in full in advance for the entire term***.  Ultimately, Fleetwood Retail Corp. of Arizona and its landlord consensually resolved their disputes in a Court-approved settlement that returned $85,000 to the estate plus released Fleetwood Retail Corp. of Arizona from its obligations to pay property taxes and make premises repair, among others [Docket No. 1717].

The filing of the other four retail Debtors, namely Fleetwood Retail Corp. of Arkansas, Fleetwood Retail Corp. of Florida, Fleetwood Retail Corp. of Georgia, and Fleetwood Retail Corp. of South Carolina, followed on August 11, 2009, to stay similar attempts by the landlords under their leases to take action against these Debtors' prepaid leasehold interests.  Pursuant to an order of this Court on August 19, 2009 [Docket No. 1118], the bankruptcy estates of these five additional Fleetwood entities are being jointly administered with the Estates of the other Debtors.

21

**F.    Fleetwood's Application to Have These Chapter 11 Cases Recognized as a Foreign Proceeding in Canada**

In or about July 2009, certain of the Debtors with exposure to Canada filed an Application with the Court of Queen's Bench of Alberta, Judicial District of Calgary, pursuant to s.18.6 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"), for: (a) an order and declaration that these Chapter 11 Cases be recognized as a "foreign proceeding" for the purposes of s.18.6(1) of the CCAA; and (b) an order recognizing the automatic stay in these Chapter 11 Cases and granting a parallel stay of proceedings in Canada with respect to the Debtors (the "Foreign Proceeding Application").  Although, none of the Debtors have operations or are registered to do business in Canada, the Debtors have accounts receivable and other assets in Canada, and are parties to litigation there.  The Foreign Proceeding Application was ultimately granted by the Canadian court, which issued a "Recognition Order" on August 7, 2009.

Recognition of these Chapter 11 Cases in Canada was necessary to obtain appropriate relief (particularly, a stay of proceedings) in order to prevent actions which could otherwise: (i) interfere with the ability of the Debtors to liquidate their assets; (ii) violate the automatic stay; and (iii) interfere with the operations of the Debtors and particularly, their ability to collect valuable accounts receivable owing from Canadian counterparties.  As with all other interests, rights and Assets of the Debtors in these Chapter 11 Cases, any and all rights of the Debtors and their Estates with respect to the Recognition Order and the Canadian foreign proceeding shall vest in the Liquidating Trust and Liquidating Trustee, and the Debtors/Liquidating Trustee expressly reserve and retain any and all rights and interests attendant thereto.

**G.    The Bar Dates for Pre-Petition Claims**

On July 6, 2009, the Court approved the Debtors' motion requesting the establishment of a general bar date in these Chapter 11 Cases for the Primary Filers and entered its *Order Setting Final Bar Dates to File Proofs of Claim and Approving Related Noticing Procedures* [Docket No. 875] (the "Bar Date Order").  Pursuant to the Bar Date Order, August 28, 2009 (the "General Bar Date") was fixed as the last date on which non-governmental creditors of the Primary Filers could file a proof of claim against the Debtors' Estates on account of a prepetition Claim.  The Bar Date Order also

established additional bar dates for the prepetition Claims of governmental units and Claims arising from the Primary Filers' rejection of an executory contract or unexpired lease.

The bar date for filing section 503(b)(9) claims for all Debtors (the "503(b)(9) Bar Date") was fixed separately as October 5, 2009.

The General Bar Date for the Secondary Filers and Tertiary Filers was January 4, 2010, with the governmental bar date being the later of January 4, 2010 or a date that is 180 days after the order for relief was entered in the applicable Secondary or Tertiary Filer's case.  Thus, for Secondary Filer, FRC Arizona, the governmental bar date was January 25, 2010 (180 days after FRC Arizona filed its petition, on July 29, 2009) and for the Tertiary Filers, the governmental bar date is February 8, 2010 (180 days after the filing of their petitions, on August 11, 2009).

A more extensive discussion of the Claims received by the General Bar Date is set forth below in Section IV.B.

**H.      Management Compensation**

Prior to the Petition Date, the Debtors' management received several different types of compensation, including, but not limited to, salaries, discretionary bonuses, performance bonuses, benefits, life insurance, and 401(k) contributions.  However, after the Petition Date, the Debtors' management continued to receive their respective salaries, which remained substantially the same, and also their benefits and life insurance, but all bonuses and contributions to their 401(k) were eliminated.  Recognizing this loss of compensation, and in an effort to incentivize its management and retain its key employees, the Debtors sought to implement an incentive bonus and severance plan.  After extensive negotiations between the Debtors and the Committee, the Debtors finalized a plan, which the Court approved on July 17, 2009, by the *Order Approving the Debtors' Payment of Incentive Bonuses and Severance Payments to Key Employees* [Docket No. 956] (the "KEIP Order").

Under the incentive program, certain executives were to be eligible for bonuses tied to the achievement of specific Plan confirmation performance deadlines and Asset disposition objectives.  Although the Plan-related milestones are not expected to be met, because of their extraordinary work efforts and contributions to these Chapter 11 Cases, the Plan Proponents have sought and received authority for the Debtors and/or the Liquidating Trustee (depending upon whether paid pre or post

23

1  Effective Date) to pay the discretionary bonus component to four eligible employees, Andrew

2  Griffiths, Leonard J. McGill, Michael Shearin, and James Smith (the "KEIP Employees") up to the

3  maximum amount they would have been entitled to receive under the incentive program.  *See*

4  Modified and Amended KEIP Plan Order [Docket No. 1846].

5  **I.    D&O Insurance**

6          The Debtors currently have multiple layers of directors and officers ("D&O") liability

7  insurance coverage in place, up to $50 million.  The Debtors also have an additional "Side A Only"

8  policy, which provides another $10 million in coverage.  The Debtors shall continue their D&O

9  policies through the Effective Date of the Plan.  Furthermore, the Debtors shall purchase a "tail"

10  D&O liability policy covering directors and officers (who will no longer be employed by the Debtors

11  or Estates) that will continue to provide coverage for claims made ***after*** the end of the current policy

12  period based on claims that may have arisen prior to or during the current policy period.

13  **J.    Significant Asset Sales Occurring During the Bankruptcy Cases**

14          During the cases, the Debtors have sold significant asset groups comprising operating

15  business divisions as well as other Assets.

16          **1.    *Military Housing Assets***

17          On May 28, 2009, the Debtors sold certain assets related to their military housing business

18  (the "Military Housing Assets") to CMH Manufacturing, Inc. ("CMH") free and clear of all liens,

19  claims and interests (except as expressly agreed) for the aggregate purchase price of $4,500,000 in

20  cash, plus (i) CMH's agreement to relieve the Debtors of approximately $4,000,000 of the Debtor's

21  bonding obligations relating to certain work in progress that CMH will complete, and (ii) CMH's

22  agreement to assume the Debtors' warranty obligations with respect to completed military housing

23  projects, pursuant to the Asset Purchase Agreement dated May 22, 2009 (the "Military Housing

24  APA").[11]  The Military Housing Assets consist of real property, buildings, equipment, intellectual

25  ───────────────

26  [11] *See* Military Housing APA, attached as <u>Exhibit A</u> to the Notice of Emergency Motion and
     Emergency Motion of Debtors for an Order (I) Authorizing and Approving the Sale of Military

27  Housing Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (II) Granting
     Related Relief; Memorandum of Points and Authorities in Support Thereof [Docket No. 618] for

28  further details.

1    property, and other assets used in and associated with the construction of modular military housing

2    by the Debtors at their two manufacturing plants in Belton, Texas.  The order approving the sale of

3    the Military Housing Assets was entered on May 27, 2009 [Docket No. 653].  The Debtors received

4    $4.5 million in cash proceeds from this sale of the Military Housing Assets.

5         **2.    *RV Assets***

6         On July 17, 2009, the Debtors sold substantially all of their assets related to their recreational

7    vehicle business (the "RV Assets") to Fleetwood RV, Inc. and Goldshield Fiberglass, Inc., affiliates

8    of American Industrial Partners L.P. (collectively, "AIP") free and clear of all liens, claims and

9    interests (except as expressly agreed).  The RV Assets consist of real property, buildings, equipment,

10   inventory, intellectual property, contracts and leases, permits, information technology systems,

11   software and other assets used in and associated with the manufacturing, marketing and sale of

12   recreational vehicles by the Debtors, together with substantially all of the assets of the Debtors'

13   fiberglass supply business.  Notably, the Debtors' California and Pennsylvania RV manufacturing

14   facilities were not included in this sale.

15        The aggregate purchase price for the RV Assets was $53,000,000, less certain Assumed

16   Liabilities (as defined in the RV APA) and other purchase price adjustments, pursuant to the terms

17   and conditions of the Asset Purchase Agreement dated as of May 29, 2009 (the "RV APA").[12]  The

18   net proceeds received after taking in account the adjustments and Assumed Liabilities was $33.6

19   million.  The order approving the sale of the RV Assets was entered on July 2, 2009 [Docket No.

20   853], and an amendment thereto, which provided for approximately $2 million of sale proceeds to be

21   transferred to a separate transition services escrow account, was entered on August 6, 2009 [Docket

22   No. 1056].  An additional $2.5 million of the purchase price was also segregated pending the

23   resolution of the final working capital adjustments.  AIP and the Debtors are currently in the process

24   of determining the scope of the dispute to be arbitrated regarding how much, if any, of the purchase

25

26   [12]  *See* RV APA, attached as <u>Exhibit A</u> to the Notice of Motion and Motion of Debtors for an Order
         (I) Authorizing and Approving the Sale of RV Assets Free and Clear of Liens, Claims, Interests
27       and Encumbrances; (II) Authorizing and Approving Assumption and Assignment of Contracts
         and Leases; and (III) Granting Related Relief; Memorandum of Points and Authorities in Support
28       Thereof [Docket No. 667], for further details.

1    price must be returned to AIP as a purchase price adjustment.  In an attempt to establish the scope of

2    arbitral issues to submit to the arbitrator, the Debtors sought and obtained (over AIP's objection) an

3    Order Determining Issues Subject to ADR [Docket No. 1649] (the "ADR Order") on December 16,

4    2009.  AIP appealed the ADR Order to the District Court for the Central District of California and

5    sought a stay pending appeal from the Bankruptcy Court, which was denied on January 21, 2010

6    [Docket No. 1771].  AIP's appeal of the ADR Order is currently pending before the District Court

7    and, unless AIP attempts to stall the arbitration, the arbitration should proceed shortly.

8    Additionally, $8.2 million of the sale proceeds were set aside in a segregated reserve (the "RV

9    Assets Segregated Reserve") for the benefit of DB, as indenture trustee for the 14% Notes, on

10    account of the disputed first lien on certain of the RV Assets asserted by DB.  With the Creditors'

11    Committee and DB resolving all of their disputes in a global settlement, if the Plan is confirmed, this

12    portion of the sale proceeds will be removed from the reserve and placed into the Debtors' other cash

13    accounts.  The remainder of the proceeds, approximately $20.4 million, was placed into the Debtors'

14    other cash accounts.

15    ### 3.  *Housing Assets*

16    On August 17, 2009, the Debtors sold the majority of their assets related to their

17    manufactured housing business (the "Housing Assets") to FH, Holding, Inc. free and clear of all

18    liens, claims and interests (except as expressly agreed) for the aggregate purchase price of

19    $26,150,000 in cash, plus the sum of the current assets of the Debtors included in the Housing Assets,

20    less the sum of the current liabilities of the Debtors assumed by FH Holding, Inc. and other purchase

21    price adjustments, pursuant to the terms and conditions of the Asset Purchase Agreement dated as of

22    July 21, 2009 (the "Housing APA").[13]  After giving effect to the purchase price adjustments, the net

23    purchase price paid by FH Holding, Inc. to the Debtors was approximately $25.6 million, including

24    $1 million deposited into a segregated account to secure FH Holding, Inc.'s right to potential post-

25

26    [13]  *See* form of Housing APA, attached as <u>Exhibit A</u> to the Notice of Motion and Motion of Debtors
for an Order (I) Authorizing and Approving the Sale of Housing Assets Free and Clear of Liens,
Claims, Interests and Encumbrances; (II) Authorizing and Approving Assumption and
27    Assignment of Contracts and Leases; and (III) Granting Related Relief; Memorandum of Points
and Authorities in Support Thereof [Docket No. 949], for further details.
28

closing purchase price adjustments based on final determination of net working capital.[14]  Of the sale proceeds, $4 million was used to pay down ISIS on account of their first priority liens asserted in Plant 17.  An additional $2.135 million was set aside in a segregated account (the "Housing Assets Segregated Reserve") for the benefit of DB, as indenture trustee for the 14% Notes, on account of the disputed first lien asserted by DB on certain Housing Assets.  With the Creditors' Committee and DB having resolved all of their disputes in a global settlement, if the Plan is confirmed, this portion of the sale proceeds will be removed from the reserve and placed into the Debtors' other cash accounts. The remainder of the sale proceeds, approximately $18.436 million, was placed in the Debtors' other cash accounts.

The Housing Assets consist of substantially all of the operating real property, buildings, equipment, inventory, intellectual property, contracts and leases, permits, and other assets used in and associated with the production, marketing and sale of the manufactured housing by the Debtors.  The order approving the sale of the Housing Assets was entered on August 14, 2009 [Docket No. 1102]. As discussed below, one operating manufactured housing plant (Plant 55-1) located in Garrett, Indiana was not included in this transaction and was sold to a separate purchaser.  In addition, two other operating plants were not included in the Housing Assets, but were shut down and idled at approximately the same time as the sale of the Housing Assets

### 4.  *Travel Trailer Inventory*

The Debtors sold 154 finished travel trailer units (the "Travel Trailer Inventory") to Lazy Days RV Center, Inc. ("Lazy Days") free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate cash price of $2,250,968 pursuant to an undated Asset Purchase Agreement (the "Travel Trailer Inventory APA").[15]  The order approving the sale of the Travel Trailer Inventory was entered on April 15, 2009 [Docket No. 293].

---

[14]  This $1 million amount has since been released to the Debtors.

[15]  *See* Travel Trailer Inventory APA, attached as <u>Exhibit C</u> to the Notice of Motion and Motion of Debtors for Authorization to Sell Travel Trailer Inventory Free and Clear of Liens, Claims, Interests and Encumbrances; Memorandum of Points and Authorities in Support Thereof [Docket No. 199], for further details.

### 5.    *La Grande, Oregon Travel Trailer Manufacturing Plant*

On May 15, 2009,  the Debtors sold certain assets related to their La Grande Oregon travel trailer manufacturing plant, comprising approximately 40.59 acres and approximately 103,710 square feet of industrial office space and storage, all machinery, tools and equipment located thereon (the "Plant 24 Assets"), to Northwood Real Estate, LLC and Northwood Operations, Inc., free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $2,050,000 pursuant to the Asset Purchase Agreement dated as of May 13, 2009 (the "La Grande APA").[16]  The order approving the sale of the Plant 24 Assets was entered on May 14, 2009 [Docket No. 563].

### 6.    *Mexicali Assets*

On or around May 15, 2009, the Debtors sold certain assets related to their travel trailer manufacturing facility in Mexico and all of the shares of capital stock of Fleetwood de Mexico S.A. de C.V. (collectively, the "Mexicali Assets") to Krystal Enterprises, LLC free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price $150,000 pursuant to the Asset Purchase Agreement dated as of April 30, 2009 ("Mexicali APA") and the Stock Purchase Agreements dated as of May 1, 2009 ("Mexicali SPAs").[17]  The order approving the sale of the Mexicali Assets was entered on May 13, 2009 [Docket No. 554].

### 7.    *Miscellaneous Asset Sales*

(a)    Non-Core Asset Sales

On August 6, 2009, an order approving procedures to sell certain non-core assets (the "Non-Core Asset Sale Procedures") was entered by this Court [Docket No. 1053].  As of the date hereof, the Debtors have sold the following non-core assets pursuant to the Non-Core Asset Sale Procedures.

---

[16]  *See* form of La Grande APA, attached as Exhibit A to the to Order Authorizing Debtors to Sell Assets Related to La Grande, Oregon Manufacturing Plant Free and Clear of Liens, Claims, Interests and Encumbrances [Docket No. 563], for further details.

[17]  *See* Mexicali SPAs and Mexicali APA, attached as Exhibits B-1 and B-2 and Exhibit C, respectively, to the Notice of Motion and Motion of Debtors for Authorization to Sell Mexicali Assets Free and Clear of Liens, Claims, Interests and Encumbrances; Memorandum of Points and Authorities [Docket No. 401], for further details.

(i)      Manufactured Housing Plant 35-2:  Pearson, Georgia

On October 28, 2009, the Debtors sold certain assets related to their manufactured housing plant number 35-2 located in Pearson, Georgia, comprising approximately 16.08 acres of land and approximately 98,404 square feet of industrial office space and storage, and all machinery, tools and equipment located thereon, to L&M Bag & Supply Co., Inc. free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $400,000 pursuant to the Asset Purchase Agreement dated as of October 7, 2009.

(ii)      Manufactured Housing Plant 34-2:  Willacoochie, Georgia

On November 5, 2009, the Debtors sold certain assets related to their manufactured housing plant number 34-2 located in Willacoochie, Georgia, comprising approximately 33.19 acres of land and approximately 123,968 square feet of industrial office space and storage, and all machinery, tools and equipment located thereon, to Larry Booth free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $862,500 pursuant to the Asset Purchase Agreement dated as of October 13, 2009.

(iii)      Manufactured Housing Plant 55-2:  Garrett, Indiana

On November 24, 2009, the Debtors sold certain assets related to their manufactured housing plant number 55-2 located in Garrett, Indiana, comprising approximately 20.35 acres of land and approximately 118,546 square feet of industrial office space and storage, and all machinery, tools, raw materials and equipment located thereon, to Walter G. Fuller, LLC free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $850,000 pursuant to the Asset Purchase Agreement dated as of November 2, 2009.

(iv)      Manufactured Housing Plant 26-2:  Westmoreland, Tennessee

On December 1, 2009, the Debtors sold certain assets related to their manufactured housing plant number 26-2 located in Westmoreland, Tennessee, comprising approximately 20.60 acres of land and approximately 127,117 square feet of industrial office space and storage, and all machinery, tools and equipment located thereon, to the Industrial Development Board of the Town of Westmoreland free and clear of all liens, claims and interests (except as expressly agreed) for the

aggregate purchase price of $350,000 pursuant to the Asset Purchase Agreement dated as of October 28, 2009.

(v)    Travel Trailer Trademarks

On February 1, 2010, the Debtors sold certain trademark and intellectual property assets related to their shuttered travel trailer business to Heartland Recreational Vehicles, LLC, free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $306,000 pursuant to the Asset Purchase Agreement dated as of January 22, 2010.

(b)    <u>La Grande, Oregon Raw Materials and Inventory</u>

The Debtors sold certain raw materials and inventory located in La Grande, Oregon to Outdoors RV Manufacturing, Inc. ("Outdoors RV") for the aggregate cash price of $200,000 pursuant to an undated Asset Purchase Agreement.[18]  The inventory was sold to Outdoors RV on an "as is, where is" basis, free and clear of all liens, claims, interests and encumbrances.  The order approving the sale of the inventory to Outdoors RV was entered on June 25, 2009 [Docket No. 812].

(c)    <u>Manufactured Housing Plant 55-1:  Garrett, Indiana</u>

The Debtors sold certain assets related to their manufactured housing plant number 55-1 located in Garrett, Indiana, comprising approximately 22.16 acres of land and approximately 140,890 square feet of industrial office space and storage, and all machinery, tools and equipment located thereon (the "Plant 55-1 Assets"), to Adventure Homes, LLC free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $1,725,000 pursuant to the Asset Purchase Agreement dated as of July 7, 2009.  The order approving the sale of the Plant 55-1 Assets was entered on August 14, 2009 [Docket No. 1100].

(d)    <u>Travel Trailer Plants 23-1 and 23-2:  Pendleton Oregon</u>

The Debtors sold certain assets related to their travel trailer manufacturing plant located at 4640 NW McKennon Road and 4640 NW Bartsch Road, Pendleton, Oregon, consisting of two manufacturing plants (Plant 23-1 and Plant 23-2) with approximately 203,153 square feet of

---

[18] *See* the form Asset Purchase Agreement, attached as <u>Exhibit B</u> to the Notice of Motion and Motion of Debtors for Authorization to Sell Raw Materials and Inventory Free and Clear of Liens, Claims, Interests and Encumbrances; Memorandum of Points and Authorities in Support Thereof [Docket No. 718], for further details

1   industrial warehouse space sitting on approximately 21.24 acres of land, and all machinery, tools, raw

2   materials or other personal property located therein (the "Plant 23 Assets"), to Keystone RV

3   Company for the purchase price of $4,200,000.00, pursuant to the terms of the Asset Purchase

4   Agreement date September 30, 2009.  The order approving the sale of the Plant 23 Assets was

5   entered on November 9, 2009 [Docket No. 1510].

6   **K.    Certain Environmental Matters**

7           **1.    *Riverside District Attorney***

8           On September 10, 2008, the Office of the District Attorney for the County of Riverside

9   ("Riverside DA") informed FEI that it would be subject to prosecution for alleged violations of the

10  California Hazardous Waste Control Act and related regulations at the Fleetwood 3200 Myers Street

11  facility in Riverside, California.  Counsel for FEI met with the Riverside DA on October 6, 2008, to

12  discuss the alleged violations and subsequently submitted a settlement offer thereto on November 13,

13  2008.  The parties engaged in negotiations and agreed in principle to a settlement on February 17,

14  2009, whereby FEI would pay $30,000 as civil penalties and reimburse the Riverside County Waste

15  Management Department for costs of $1,234.14 incurred in connection with the alleged violations.

16          After further negotiations, the Riverside DA was willing to settle the alleged violations in

17  exchange for an allowed unsecured non-priority claim in the amount of $31,234.14.  However, the

18  parties never executed the stipulation and, on August 11, 2009, the Riverside DA filed a lawsuit

19  against FEI in the Superior Court of California, County of Riverside, for negligent violations of

20  hazardous waste disposal laws, illegal transportation of hazardous waste, and violations of unfair

21  competition laws.

22          On September 10, 2009, FEI answered the Riverside DA's complaint and asserted affirmative

23  defenses contending that, among other things, the Superior Court lacked jurisdiction to consider the

24  relief requested by the Riverside DA and that the complaint was void as a violation of the automatic

25  stay.  Subsequently, on September 21, 2009, the Riverside DA filed a demurrer to FEI's answer and

26  contended that FEI's affirmative defenses challenging the Superior Court's jurisdiction did not state

27  defenses upon which relief could be granted.  On November 4, 2009, before FEI's opposition to the

28

1 demurrer was due, FEI removed the Superior Court action to the Bankruptcy Court. *See generally*

2 Adversary No. 09-01539.

3        On January 7, 2010, the Riverside DA and FEI entered into a Stipulation for Settlement,

4 whereby FEI agreed that the Riverside DA would have an allowed unsecured non-priority claim

5 against FEI in the amount of $31,234.14, without the need to file a proof of claim or take further

6 action against FEI in its bankruptcy case. *See* Adversary No. 09-01539, Docket No. 6 (Jan. 7, 2010).

7 In exchange, the Riverside DA agreed to waive all claims against FEI or the other Debtors on account

8 of the hazardous waste incident.  On January 13, 2010, FEI filed a motion under Federal Bankruptcy

9 Rule 9019 seeking approval of the settlement (the "Riverside DA 9019 Motion") [Docket No. 1741],

10 which was approved by the Court on February 9, 2010 [Docket No. 1806].

11     **2.**   ***SCAQMD***

12        Prior to the Petition Date, the South Coast Air Quality Management District through the

13 Office of the District Prosecutor ("SCAQMD") issued FEI a Notice of Violation

14 P-53805 ("NOV") dated August 26, 2008, concerning spray booth operations at the Fleetwood 5300

15 Via Ricardo facility in Riverside, California.  The NOV includes five separate alleged violations of

16 District Rule 3002 in connection with FEI's spray booth and an additional alleged violation for a late

17 filing of a Clean Air Act semi-annual Title V report.  On February 6, 2009, the SCAQMD requested

18 that FEI provide in writing any information that it would like the SCAQMD to consider in assessing

19 any penalties in connection with NOV P-53805.  On March 6, 2009, FEI responded to the

20 SCAQMD's request.  On April 10, 2009, the SCAQMD provided FEI with a proposed settlement of

21 $50,000 for the five spray booth violations and $1,500 for the late filing of the Clean Air Act Title V

22 report.  After further negotiations, SCAQMD agreed to settle the alleged violations in exchange for

23 an allowed unsecured non-priority claim in the amount of $51,500 against FEI.  The parties entered

24 into a stipulation regarding the settlement, which was ultimately approved by the Court on October

25 22, 2009 [Docket No. 1442].

26 **L.**    **Litigation Commenced During these Chapter 11 Cases**

27        Since the Petition Date, approximately nineteen (19) adversary proceedings have been filed

28 that relate to the Debtors' Chapter 11 Cases.  These adversary proceedings include avoidance actions,

breach of contract actions, breach of warranty actions, injunction actions to extend the automatic stay, and Worker Adjustment and Retraining Notification ("WARN") Act actions. The adversary proceedings commenced during these Chapter 11 Cases are summarized on <u>Appendix D</u> attached hereto, along with the status of each.

**1.      *WARN and Severance Settlements***

Almost immediately after the Petition Date, multiple class action adversary proceedings listed in <u>Appendix D</u> (*e.g.*, *Myers*, *Justice* and *Doud*) were filed against Fleetwood alleging violations under the WARN Act and California Labor Code §§ 1400 et seq. On September 15, 2009, Judge Jury entered an order consolidating the *Myers*, *Justice* and *Doud* WARN Act cases into one proceeding (the *Doud* adversary proceeding- Case No. 6:09-ap-01114-MJ) wherein the plaintiffs filed a consolidated complaint.

Similarly, on August 28, 2009, *Curtis Jay Howe* filed a class action adversary complaint against Fleetwood (*see* <u>Appendix D</u>) alleging breach of contract and violations of ERISA relating to FEI's alleged prepetition severance plan.

In December 2009, the parties to the *Doud* consolidated WARN Act class action and *Howe* severance class action adversary proceedings reached global settlements. The parties will document the settlements and file the required motions for approval under Bankruptcy Rules 7023 and 9019 shortly.

**2.      *Pendency of First American Trust Company Adversary Proceeding***

In 1992, Fleetwood's Board of Directors authorized the Company to enter into a Split-Dollar Agreement with First American Trust Company as trustee of a trust (commonly referred to as the Century Trust) established by John C. Crean, its founder, and at that time its CEO and a primary shareholder, and his wife, for the benefit of the Crean family. The agreement provided for Fleetwood's purchase, for the trust, of three split-dollar life insurance policies with an aggregate death benefit of $40 million on the lives of Mr. and Mrs. Crean. The terms of the split-dollar agreement required Fleetwood to make premium payments until the policies became self-sustaining, which was estimated based upon actuarial projections to be 15 years.

On or about August 26, 2009, the trustee of the Century Trust commenced an adversary proceeding (Adv. Proc. No. 6:09-ap-01415-MJ) by filing a complaint against Fleetwood, BofA, Wells Fargo Foothill, Inc., Textron Financial Corp., PNC Bank, N.A., Wachovia Capital Finance Corp., Lyle Larkin, Elden Smith, James Smith and Larry Mace in this Court asserting that Fleetwood breached its contractual obligations and fiduciary duties by failing to pay the 2007 and 2008 premiums due under the under the policies for those years, misappropriating funds, and overborrowing against the policies. Fleetwood (i) believes it has good defenses to the Century Trust's claims and that the Estates may be entitled to a recovery under the policies, and (ii) will continue to defend the above-referenced adversary proceeding.

### 3. *Schechter Litigation*

On September 1, 2009, Robert Alan Schechter filed a putative class action lawsuit (the "Schechter Action") on behalf of purchasers of FEI common stock between December 6, 2007 and March 10, 2009 against FEI officers Elden L. Smith and Boyd R. Plowman in the United States District Court for the Central District of California (Case No. EDCV 09-01653 MJG (OPx)). The Complaint in the Schechter Action asserts claims for violation of section 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. The Debtors are informed that Mr. Smith and Mr. Plowman deny the allegations of the complaint filed in the Schechter Action and intend to vigorously defend it. A policy or policies of D&O liability insurance provides coverage for the claims asserted in the Schechter Action and the costs of defense. The Debtors do not anticipate that their estates will incur any cost or liability as a result of the Schechter Action.

### M. Deutsche Bank Litigation

On May 27, 2009, the Debtors commenced the adversary proceeding against DB and the Holders of the 14% Notes to avoid the Exchange Offer. The complaint that commenced the adversary proceeding, entitled *Fleetwood Enterprises, Inc. et al. v. Deutsche Bank Trust Company Americas, as Trustee and Collateral Agent, et. al.*, Adv. No. 09-1258-MJ (the "DB Litigation"), alleged causes of action for avoidance of preferential transfers, avoidance of fraudulent transfers, recovery of avoidable transfers, and disallowance of defendant's proofs of claim. On October 21, 2009, after receiving Court approval to substitute plaintiffs, the Creditors' Committee served and

filed its First Amended Complaint (the "Amended Complaint") on behalf of the Debtors.  In the

Amended Complaint, the Creditors' Committee brought claims under bankruptcy and state law to (i)

avoid the security interests and guarantees provided by the Operating Subsidiaries granted in

connection with the Exchange Offer, (ii) preserve liens for the estates, and (iii) avoid the 14% Notes.

In late 2009, the parties stipulated to a stay of the DB Litigation through February 2010,

during which time the parties negotiated a settlement in principal of the DB Litigation.  The

settlement–in-principle with DB and the Holders of 14% Notes includes the allowance of the 14%

Note Claims and an agreement as to the treatment thereof under the Plan for Class 7.  The parties are

in the process of seeking approval of the settlement of the DB Litigation.

**N.     Plan Negotiations**

**1.     *Plan Exclusivity***

The Debtors sought and received extensions of their exclusive periods under section 1121(d)

three times in these Chapter 11 Cases.  On June 5, 2009, the Debtors filed a motion for entry of an

order extending the exclusive periods by 90 days within which only they could file a chapter 11 plan

and solicit acceptances thereof [Docket No. 706].  On July 2, 2009, the Court entered an order

approving the motion [Docket No. 851].  Thereafter on October 1, 2009, the Debtors filed a motion

seeking an additional 90 day extension of the exclusive periods [Docket No. 1332].  On October 30,

2009, the Court entered an order extending the dates within which only the Debtors could file a

chapter 11 plan and solicit acceptances thereof to January 5, 2010 and March 8, 2010, respectively

[Docket No. 1467].  Finally, on December 10, 2009, the Debtors filed a third motion seeking an

additional 90 day extension of the exclusive periods [Docket No. 1633].  On January 8, 2010, the

Court entered an order extending the dates within which only the Debtors could file a chapter 11 plan

and solicit acceptances thereof to April 5, 2010 and June 6, 2010, respectively [Docket No. 1715].

Given that the Plan is a liquidating plan, the Plan is being propounded jointly by the Debtors

and the Creditors' Committee.

### 2.    *Plan Negotiations*

There have been extensive discussions spanning several months with the key constituents for a consensual plan, including the largest holder of the 14% Notes, the indenture trustee for the 6% Notes, and the Creditors' Committee.

Beginning in the summer of 2009, the Creditors' Committee proposed the current plan structure and held an in-person meeting in September 2009 amongst the key constituents.  Thereafter, several rounds of offers and counteroffers ensued, resulting in the final Plan.

The Plan embodies a settlement in principle with the majority Holders of 14% Notes and 6% Notes that, in the aggregate, asserted in excess of $233 million of claims against the Debtors (the "Noteholder Settlement").  The Noteholder Settlement resolves the DB Litigation, *i.e.*, the Creditor Committee's pending avoidance action against DB, the Holders of 14% Notes and 6% Notes, in a manner that is in the best interests of the Estates and will provide a far greater recovery to general unsecured creditors than protracted litigation against the 14% Notes.

**IV.**
**DESCRIPTION OF ASSETS AND LIABILITIES**
**(INCLUDING CLAIMS) OF THE DEBTORS**

**A.    Anticipated Assets of the Debtors as of the Effective Date**

As of the anticipated Effective Date of the Plan, the Debtors will have liquidated a majority of their assets, and therefore, expect that their most valuable remaining assets will include: (1) cash on hand, (2) miscellaneous real property, (3) intellectual property assets, (4) litigation/avoidance actions, (5) rights in certain life insurance policies, and (6) accounts receivable.  As discussed in greater detail in the Plan, the Plan Proponents estimate that the Net Distributable Proceeds for Holders of Allowed General Unsecured Claims (Class 6) against the Debtors will range from approximately 11% to 18.6%.

**B.    Description of Liabilities**

### 1.    *Scheduled Liability*

The Debtors filed their Schedules on May 11, 2009 and subsequently amended them on July 1, 2009.  The Debtors' Amended Schedules listed $339,507,603 in total Claims as of the Petition Date, classified into the following priorities:  (i) Secured Claims in the amount of $135,938,000, (ii)

Priority Claims in the amount of $2,016,632.66, and (iii) Unsecured Claims in the amount of $201,552,970.76. The Secured Claims amount in the Schedules includes a duplicate claim (ISIS's $27,250,000 Claim) that was reported in both FEI's and FHI's Schedules.

      **2.**    *Filed Claims Summary*

To date, there have been over 14,000 Proofs of Claim filed against the Debtors totaling over $2.6 billion, and additional claims continue to be filed. The following chart summarizes the Claims filed against the Debtors on a consolidated basis as of the General Bar Date.

$ in Millions

| | Secured | Admin | Priority | Unsecured | Total | Count |
|---|---|---|---|---|---|---|
| **Filed Claims** | $ 212.3 | $ 7.2 | $ 22.8 | $ 2,421.4 | $ 2,663.7 | 14,230 |

Based on preliminary analysis, the Plan Proponents estimate that there are as many as $1.35 billion duplicate Proofs of Claims filed, which Claims will be deemed eliminated as a result of substantive consolidation if the Plan is confirmed. Further, because the Plan provides for the settlement of certain large claim holding classes, such as the WARN Class Claims and the Severance Class Claims, the Plan Proponents expect further Claim reductions of over $766 million. In addition, the Plan Proponents have also performed preliminary analysis on approximately $7 million of Proofs of Claim filed that either match exactly the claim amount as scheduled or were filed after the General Bar Date. The Plan Proponents have been and continue to evaluate these Proofs of Claim.

**V.**
**INSURANCE CONSIDERATIONS:  PRODUCT LIABILITY PI CLAIMS,**
**WORKERS' COMPENSATION CLAIMS, AND FEMA CLAIMS**

**A.**    **Gibraltar Insurance Company, Ltd. and Insurance Coverage Provided**

      **1.**    *General Overview*

Gibraltar Insurance Company, Ltd. ("Gibraltar") is a wholly-owned subsidiary of FEI formed under the laws of Bermuda. Since 1977, Gibraltar has provided products liability insurance coverage as to personal injury claims asserted against Fleetwood's recreational vehicle and manufactured housing businesses. In each of the years 2000 through 2008, Gibraltar provided a "Product/Completed Operations Liability" policy (the "Gibraltar Policy") to insure Fleetwood as to products liability claims on an "occurrence" basis, meaning the coverage is provided as to claims based on when the claim occurred.

Additionally, Gibraltar has provided "excess insurance" as to Fleetwood's self-insured workers' compensation programs to the extent any single claim exceeds $200,000 per occurrence, but up to a maximum limit of $600,000 per claim in self insured programs and $1 million in programs utilizing outside insured programs.

### 2. *Important Financial Information Regarding Gibraltar and Unknown Factors That May Affect Insurance Coverage*

As of January 31, 2010, Gibraltar had approximately $24.5 million of assets, consisting of approximately $2.1 million in cash, $20.6 million in high quality commercial paper and an additional $0.7 million owed to Gibraltar from third party insurers and other miscellaneous assets. Gibraltar is audited annually and files annual reports with the Bermuda Monetary Authority in Bermuda. Based on its last annual report filed in August of 2008, Gibraltar was in compliance with the Bermuda law as to solvency requirements. Gibraltar sought and received an extension to file its 2009 report due to the need to first deal with various events in the Debtors' bankruptcy cases. The 2009 report has now been filed. The Debtors are uncertain of any potential value that Gibraltar may have, which value is dependent upon several unknown factors as described herein.

With respect to the Gibraltar Policies, for Policy Years 2000 and 2001, Gibraltar should have no additional exposure provided its reinsurance proceeds are collected when due. As of January 31, 2010, the total remaining coverage available under the outstanding Gibraltar Policies was approximately $29,399,483. While Gibraltar believes that it will not have to do so, because it will pay claims in an orderly fashion, if Gibraltar were compelled to liquidate and to tender policy proceeds up to the maximum policy limits for products liability coverage for each policy year, Gibraltar would have insufficient assets to pay cash up to full policy limits for all policy years to date.

Further, as discussed in Section V.E below, based on the recent settlement in principle reached in the FEMA class action cases, it is assumed that Gibraltar will have no insurance obligations arising out of the FEMA formaldehyde claims. Pursuant to the proposed settlement, the Debtors' separate "Pollution Legal Liability Select Policy" issued by American International Specialty Lines Insurance Company, an affiliate of AIG (the "AISLIC Policy"), will pay the entire settlement amount, which is significantly less than the $10 million AISLIC Policy limit. It is also

38

assumed that, as stated above, Gibraltar's reinsurers comply with their obligations, any gap in coverage is financially immaterial to Gibraltar, there are no material expenditures of defense costs upon claims reaching the excess layer of coverage (as referenced above), and Gibraltar maintains sufficient funds to continue to operate and administer to its insurance obligations. Finally, Gibraltar's financial worth is also affected by the workers' compensation insurance it provided Debtors.

Gibraltar has exposure on open workers' compensation claims dating back to as early as 1982 for which it provides excess coverage and against which Gibraltar has established reserves of $3,432,954. It is assumed that the Debtors' workers' compensation insurance obligations, including those of Gibraltar's are satisfied within expected limits.

Until Claims covered under the Gibraltar Policies are liquidated and the total amount to be paid on account of covered claims is determined, it is not possible to determine if Gibraltar will have any residual value or if sufficient proceeds will exist to pay claims as to any particular policy year.

*Therefore, the Plan does not represent or assure that Gibraltar will have the financial ability to pay out the full remaining amount of coverage attributable to any policy year on account of the liquidated amount of allowed claims.*

**B.    Product Liability PI Claims**

**1.    *Product Liability Insurance Coverage Provided By Gibraltar to Debtors and Availability for Product Liability PI Claims***

The Schedules attached to <u>Appendix E</u> hereto set forth the coverage provided under the Gibraltar Policies (and excess carriers) for each Policy Year 2000 through 2008. The maximum amount of aggregate liability coverage, or "policy limit," provided under the Gibraltar Policies was $7.5 million per year for Policy Years 2000 through 2003 or $5 million per year for Policy Years 2004 through 2008.[19] As of January 31, 2010, remaining coverage available under the outstanding Gibraltar Policies for product liability was approximately $27,399,483 against total Case Reserves of $13,811,807.

---

[19]  The Gibraltar Policies run from November 1 in one year until November 1 of the next year (the "Policy Year").

For Policy Years 2000 through 2008, the Debtors also purchased "excess" insurance, which is intended to provide coverage after the primary layer of coverage is exhausted. For Policy Years 2000 through 2003, the amount of excess coverage was $92.5 million in each year. For these Policy Years, the excess layer of coverage would cover the indemnification of claims (but not costs of defense, investigation, etc.) once the $7.5 million primary layer of Gibraltar insurance had been exhausted. However, for Policy Years 2004 through 2008, while the excess layer of insurance provided coverage of the indemnification of claims (but not defense costs, investigation, etc) after the primary layer of $5.0 million of Gibraltar insurance had been exhausted, it is only to the extent that any single claim exceeded $5.0 million. Finally even if these excess layers of coverage are reached, the Debtors would have the responsibility to pay defense costs after the Gibraltar Policies are exhausted, although each claim in excess of $5 million would be insured by the excess carriers. Upon the exhaustion of the Gibraltar Policies, an excess carrier may determine it shall pay the cost of further defending a claim where it may lead to exposure under excess coverage, but it is under no contractual obligation to do so.

## C.    Product Liability PI Claims Mandatory Mediation Procedures

As of the Petition Date, over 129 Product Liability PI Claims had been asserted against the Debtors or their insurers. The Bankruptcy Court does not have jurisdiction to liquidate Product Liability PI Claims pursuant to 28 U.S.C. § 157(b)(5). Accordingly, the Plan provides that **all Holders of Product Liability PI Claims ("PI Claimants") must first complete the mandatory mediation process described in Appendix E hereto before seeking a trial before the District Court**. If the mediation successfully resolves the Product Liability PI Claim, to the extent the liquidated amount of any Allowed Product Liability PI Claim is not paid in full from the remaining proceeds of a Gibraltar Policy and/or excess insurance if coverage is available as to the allowed Product Liability PI Claim within a given policy year, and if a PI Claimant has not agreed to waive any deficiency claim against the Estate, **then the amount of the Allowed Product Liability PI Claim that is not paid from Gibraltar proceeds or excess insurance coverage shall be an Allowed General Unsecured Claim in Class 6 which shall be treated as provided in the Plan.** However, if the mediation is unsuccessful, then such Holders of Product Liability PI Claims shall be

allowed to proceed to trial before the United States District Court for the Central District of California or any other venue as appropriate.

*__Important Notes:__*

*The Plan Proponents do not make any representations as to the financial condition of Gibraltar, that the mediation procedures will guarantee the solvency of Gibraltar, the financial ability of Gibraltar to pay out the full remaining coverage attributable to any policy year or that sufficient coverage remains to pay any Allowed Product Liability PI Claim in full.*

*The full remaining proceeds in any policy year are not being tendered to pay Product Liability PI Claims in that year. The liquidated amount of any Product Liability PI Claim will be based on the merits of the Product Liability PI Claim itself. There is no assurance or representation that the full amount of the remaining proceeds in a given Policy Year will be used to pay liquidated Allowed Product Liability PI Claims that occurred within that Policy Year. The aggregate amount of Allowed Product Liability PI Claims within a particular Policy Year may exceed proceeds available.*

*Neither the Plan nor the mediation procedures represent or assure that Gibraltar will remain solvent, as determined under Bermuda law, or otherwise have the financial ability to pay out the full remaining coverage attributable to any policy or policy year.*

**D.    Workers' Compensation Claims**

    **1.    *Workers' Compensation Insurance***

        (a)    Workers' Compensation Program Overview

Throughout its history, the Debtors have used a combination of insurance provided by outside insurers and self-insured programs to provide workers' compensation coverage in the states in which it has employees. Typically a third party administrator is used to manage claims which are paid by the company. The programs used have varied over time and also varied by state. The insured programs often cover multiple states and involve the typical issuance of policies of insurance for which the Debtors pay a premium. To participate in a state sponsored self insurance program, each Debtor had to qualify in each state covered by the program, which required in part that the Debtors provided letters of credit ("LCs") as collateral to insure payment of the claims to be covered. As of

the Petition Date, the Debtors had caused 11 LCs to be posted in the total aggregate amount of $31,797,540 as security for their workers' compensation obligations.

In addition to the participation in insured and self insured programs, the Debtors' wholly owned subsidiary Gibraltar Insurance Company Limited (described above) provides excess coverage on larger claims to the extent a single claim exceeds $200,000 up to a maximum of $600,000 per claim for self-insured states and $1,000,000 for insured states.

As of January 31, 2010, the total Case Reserves for all pending workers' compensation claims were $4,743,450. It is typical for the ultimate amounts paid on account of claims to exceed the Case Reserve for that claim because: (i) Case Reserves are based on the assumption that the facts and circumstances as to the claim will remain static (despite them often being dynamic); and (ii) Case Reserves often do not factor in the prospect and cost of lifetime medical care, which may exist in some situations.

The details are discussed below regarding the Debtors' workers' compensation insurance obligations and liabilities in connection with their insurance program. In some cases, the LCs posted will provide more than sufficient funds to satisfy the insurance obligations, and the insurers will be over-secured. When that situation arises, Debtors are trying to reach agreement with the insurers to refund amounts not necessary to pay claims. The outcome of such negotiations are not known and may provide additional cash for distribution by the Liquidating Trust. On the other hand, in some cases, the LCs posted will be insufficient to cover the workers' compensation liabilities, and it is unclear what liability, if any, the Debtors could or would have. The uncertainties discussed above can affect the Plan and their financial impact is unknown and cannot be predicted at this time. They also could impact Gibraltar financial situation in either a positive or negative way.

(b)      Insurance Coverage Provided By Third Party Insurers

For the past six years, Chartis Insurance (formerly AIG) has covered the Debtors workers' compensation exposure in the states in which the Debtors did business, but did not participate in the state sponsored self insurance program. Prior to the April 30, 2009 renewal, the Chartis policies had a deductible amount or "retention" of $1.0 million per claim for which the Debtors were responsible before Chartis paid any part of the claim. However, the retention was reduced to $250,000 per claim

as part of the April 30, 2009 renewal.  As of January 31, 2010, twenty six (26) open claims were pending with Case Reserves of $654,419.  The obligations of the Debtors as to the coverage provided by Chartis is secured by an LC held thereby of $4.3 million.

Prior to the coverage provided by Chartis, during the 1980's and 1990's, Kemper Insurance covered the Debtors' workers' compensation claims liability.  As of January 31, 2010, twenty (20) open claims remained with Case Reserves of $2,199,965.  Kemper holds collateral of an LC in the amount of $1,070,000 and cash deposits of $1,428,604 (for a combined amount of $2,498,604).  Kemper policies had a deductible amount or "retention" of $1.0 million per claim for which the Debtors were responsible before Kemper paid any part of the claim.  The Debtors' obligations to pay claims is currently funded from the cash deposit held by Kemper.  The Debtors are currently in the process of completing a "buyout" transaction that will require payment of the outstanding retrospective invoice in exchange for full release of the $1.07 million letter of credit.

Prior to the coverage provided by Kemper, during the 1970's and 1980's Lumbermen's Underwriting Alliance ("LUA") covered the Debtors' workers' compensation liability.  As of December 1, 2009, six (6) open claims remained with Case Reserves of $266,732.  LUA holds collateral of an LC in the amount of $100,000 and cash deposits of $86,774 (for combined amount of $186,774).  LUA policies had a deductible amount or "retention" of $100,000 per claim for which the Debtors were responsible before LUA paid any part of the claim.  LUA drew down on the letter of credit they held on December 4, 2009.  As of January 31, 2010, no open claims remained with LUA.

(c)    Self Insurance Programs

The chart below sets forth the financial situation regarding the Debtors' workers' compensation insurance in states with self insurance programs.

**Chart Reflecting Self-Insured Workers' Compensation Programs by State[20]**

| State | Case Reserve | | Letter of Credit (LC) | |
|---|---|---|---|---|
| | *3/31/2009* | *1/31/2010* | *3/31/2009* | *1/31/2010* |
| | $6,232,412 | $0 | | |
| California and Georgia | $872,413 | $0 | $13,800,000 | $0 |

---

[20]  All programs self-insured except where noted.

43

| | | | |
|---|---|---|---|
| Pennsylvania | $502,177 | $420,357 | $7,600,000 | $6,600,000 |
| North Carolina | $298,726 | $190,753 | $636,000 | $636,000 |
| Washington | $259,792 | $175,154 | $678,000 | $0 |
| Maryland | $287,221 | $358,348 | $950,000 | $950,000 |
| Oregon | $590,765 | $0 | $859,000 | $0 |
| Indiana | $161,189 | $24,362 | $1,800,000 | $0 |
| Pennsylvania, Florida and Georgia | $393,830 | $330,003 | $1,008,000 | $0 |
| Florida[21] | | | $100,000 | $0 |
| | $792,069 | $638,353 | $277,000 | $0 |

Outside of bankruptcy, workers' compensation claims can take an extensive period of time to resolve because the permanent disability rating of an injured employee may not be determinable until after lengthy monitoring of the injury by medical experts. In some cases, claims may be open for decades before they can be resolved and closed. The Debtors are thus analyzing potential ways in which to liquidate these claims, including whether to negotiate "loss transfer portfolios," pursuant to which the Debtor employers would transfer specified workers' compensation liabilities to an insurer in exchange for a premium, reach settlements with the insurers who issued surety bonds in support of self-insured obligations as to the maximum amount of the Debtor employers' liability as to those obligations, and/or default on certain workers' compensation obligations and allow the beneficiaries of LCs supporting those obligations to draw thereon. Under the Plan, the handling of these claims will be transferred to the Liquidating Trustee.

## 2. *ACE INA and Westchester--Bonding*

ACE INA ("ACE") is the primary provider of surety bonds for FEI and its subsidiaries. Fleetwood surety bond exposure consists of financial guarantee, license, appellate, supply and workers' compensation bonds. As of January 31, 2010, there were five bonds "in force" with a combined exposure of $7,428,000. The five bonds consist of two workers' compensation bonds

---

[21] Not self-insured; insured by Old Republic as part of the compliance with the states' self insurance programs.

issued to the states of Indiana and Washington in the amounts of $800,000 and $678,000,

respectively (discussed immediately above), and three bonds issued for military modular housing

manufacturing.  FEI's military bond exposure consists of three "in force" bonds consisting of one

price and performance bond issued by ACE in principal for the Warrior Group in the amount of

$1,250,000 which is supported by FEI collateral, and two supply bonds issued in principal for FEI in

the amounts of $3,500,000 and $1,200,000 which are supported by FEI collateral.  These bonds have

gone through a series of declinations as build-out of the project has been completed.  All other

historical bonds have been cancelled as of September 30, 2009.

### 3. *Debtors' Plan Regarding Undrawn Letters of Credit*

As discussed above, as of the Petition Date, certain of the Debtors had undrawn letters of

credit of $62 million to support a variety of bonding obligations of the Debtors, including self-insured

workers' compensation programs, construction bonds for the Debtor's military housing business,

license and permit obligations and legal bonds.  As of January 31, 2010, approximately $16.6 million

of letters of credit remained outstanding, which have been reduced since the Petition Date by $45.1

million.  In February 2010, the Debtors filed for returns and received $2,080,000 in cash collateral

from ACE for various manufacturing license bonds that have passed their tail period.  The Debtors

have also completed a loss portfolio transfer with the State of Pennsylvania which released the

remaining $6.6 million letter of credit.

A summary of the remaining exposure as of January 31, 2010, is as follows:

| Type | No. of Beneficiaries | Amount |
|---|---|---|
| Workers' compensation | 8 | $13,558,576 |
| Military project surety bonds | 1 | $3,017,440 |
| **Total** | **9** | **$16,576,016**[22] |

---

[22] After January 31, 2010, the Debtors completed a loss portfolio transfer with the State of
Pennsylvania which released the remaining $6.6 million letter of credit, reducing the total amount
of outstanding letters of credit to approximately $10 million.

In the case of workers' compensation bonds, the Debtors believe that the amount of the outstanding bonds exceeds the ultimate amount of expected claims. Since the tail period to resolve underlying workers' compensation claims can be extensive, sometimes over decades, the Debtors will seek to resolve these issues by reaching settlements with individual states or beneficiaries. If the Debtors are unable to do so, the Debtors or the Liquidating Trustee will seek orders of the need to estimate the values of these claims pursuant to section 502(c) of the Bankruptcy Code.[23]

The exposure on the supply and price and performance bonds for constructions projects by the Debtors' military housing business (prior to its sale in May 2009) are expected to mature and expire in the ordinary course and are unlikely to attract any claims. The Debtors will seek to agree upon an acceptable release timeframe from these obligations from the surety providers to ensure a timely return of the cash collateral used to support these obligations, which is expected to be released in 2010.

**E.    FEMA Claims**

In the aftermath of Hurricanes Katrina and Rita, which struck the Gulf Coast in August and September 2005, the Federal Emergency Management Agency ("FEMA") provided over 140,000 emergency housing units ("EHU's"), in the form of both manufactured housing and travel trailers, for use as temporary housing for those left homeless. In response to FEMA's call for housing units, FEI sold approximately 10,500 travel trailers and 3,100 manufactured housing units to an approved government contractor, Morgan Building & Spas, which in turn sold those units to FEMA.

Since May 2006, numerous plaintiffs have filed suit, alleging that they suffered personal injuries from exposure to excessive levels of formaldehyde emitted from certain wood products used in the construction of the EHU's provided by FEMA. Certain of the Debtors are defendants in the resulting litigation, which, in the aggregate, comprised approximately 2,300 actions, complaints or claims brought on behalf of over 10,000 claimants against numerous defendants, largely manufacturers, as well as FEMA and a number of government contractors (the "FEMA Litigation").

---

[23] For some of the bonds it may be possible to effect a loss portfolio transfer to an insurance company that would assume responsibility for all claims against the bonds in exchange for an acceptable premium payable by the Debtors. The Debtors need to perform further due diligence on this possibility.

The FEMA Litigation is now pending before the United States District Court for the Eastern District of Louisiana (the "MDL Court") as a proceeding consolidated pursuant the rules for multidistrict litigation, entitled *In Re: FEMA Trailer Formaldehyde Product Liability Litigation*, United States District Court for the Eastern District of Louisiana, New Orleans Division, MDL No. 1873, Section N(4). The FEMA Litigation was originally filed as a series of class actions; however, on December 29, 2008, the MDL Court denied plaintiffs' motion for class certification. Following this ruling, the Eastern District of Louisiana retained jurisdiction over the individual actions.

Up to the Petition Date, additional plaintiffs continued to serve Fleetwood with similar suits in different state and federal courts, which were then transferred to the FEMA Litigation. Apparently unaware of the bankruptcy proceedings, some additional suits have been filed postpetition. Under the rules established by the MDL Judge, newly filed actions are reviewed by the MDL Defense Liaison Committee for facial or other patent deficiencies and, if they are determined to state a claim that is properly part of the FEMA Litigation, then the individual actions are consolidated into the FEMA Litigation, but are then stayed pending further proceedings as ordered by the MDL Judge.

Fleetwood entities are named as defendant in 25 of the actions that have been consolidated into the FEMA Litigation. Over 7,500 timely proofs of claim have been filed in these Chapter 11 Cases based on the FEMA Litigation, which represents approximately 96% of all litigation-based proofs of claim filed.

The claims in the FEMA Litigation as covered under a "Pollution Legal Liability Select Policy" issued by American International Specialty Lines Insurance Company—an affiliate of AIG (the "AISLIC Policy"). Coverage under the AISLIC Policy is limited to $10 million per incident and in the aggregate. The FEMA Litigation claims are not covered under the Gibraltar Policies.

Subject to bankruptcy Court approval, as of the date of the filing of the Disclosure Statement, the Debtors have reached an agreement in principal to fully and finally resolve all of the FEMA Litigation claims. The confidential settlement amount will be funded exclusively under the AISLIC Policy. Neither the Debtors nor Gibraltar will need to contribute to the settlement.

# VI.
## SUMMARY OF THE PLAN OF LIQUIDATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY INTEREST HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

**A.      Treatment of Claims and Equity Interests**

**1.      *Unclassified Claims***

In accordance with Bankruptcy Code section 1123(a)(1) of the Bankruptcy Code, certain Claims have not been classified, and the respective treatment of such Unclassified Claims is set forth immediately below.

(a)      Administrative Claims

Except as otherwise provided herein, and subject to the requirements of the Plan, on, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date an Administrative Claim becomes an Allowed Administrative Claim or (b) the date that is ninety (90) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim against the Debtors shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements

48

relating thereto (i) prior to the Effective Date, by the Debtors and (ii) subsequent to the Effective Date, by the Liquidating Trustee.

Administrative Claimholders will be paid in full on account of their Claims and are not entitled to vote on the Plan.

(b)    <u>Priority Tax Claims</u>

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Distribution Date, a Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (i) regular installment Cash payments, occurring not less frequently than quarterly over a period not exceeding five (5) years after the Petition Date, in an aggregate principal amount equal to the unpaid portion of such Allowed Priority Tax Claim, plus interest on the unpaid portion thereof at the Case Interest Rate from the Effective Date through the date of payment thereof or (ii) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; <u>provided</u>, <u>however</u>, that the Liquidating Trustee shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance of any Allowed Priority Tax Claim, in full at any time on or after the Effective Date without premium or penalty.

Priority Tax Claimholders will be paid in full on account of their Claims and are not entitled to vote on the Plan.

**2.    *Claims***

(a)    <u>Class 1: Non-Tax Priority Claims</u>

On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim or (b) the date that is ninety (90) days after the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, a Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Non-Tax Priority Claim, (i) Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim or (ii) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing.  Any deficiency claim over and above the limits set forth

under section 507 of the Bankruptcy Code for priority claims shall be treated as a Class 6 General Unsecured Claim.

Class 1 is conclusively presumed to have accepted the Plan and, therefore, Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

(b)      Class 2: Allowed Secured Credit Facility Claims

On the Effective Date, Holders of Allowed Secured Credit Facility Claims shall receive:

A.      Payment in full of all Postpetition Obligations (as defined in the Interim DIP Order) then outstanding (including, without limitation, all costs, fees and/or expenses of the Secured Parties payable by the Debtors in accordance with the Interim DIP Order, the DIP Credit Agreement and the Final Cash Collateral Order (in each case modified by the Extension Order) which have been invoiced to the Debtors and which are neither contested nor disputed by either the Debtors or the Creditors' Committee.

B.      Cash equal to 105% of the face amount as of the Effective Date of Outstanding Letters of Credit (as defined in the Interim DIP Order) to be held as collateral for Outstanding Letters of Credit.

C.      Cash in the amount of $200,000 shall be held as Collateral for any further costs, fees and/or expenses of the Secured Parties incurred on or prior to the Effective Date and payable by the Debtors in accordance with the Interim DIP Order, the DIP Credit Agreement and the Final Cash Collateral Order (in each case modified by the Extension Order) ("Future Costs") that are either disputed or unpaid.  The amount of collateral held on account of Future Costs shall be reduced and released to the Liquidating Trust to the extent Future Costs are undisputed and paid such that the amount to remain as collateral shall then equal Future Costs that are disputed and/or remain unpaid.

D.      Cash in the amount of $2,500,000 shall be held as Collateral for any unliquidated or contingent claims of the Secured Parties, including, without limitation, any claims for indemnification that any of them might have asserted or may assert ("BofA Indemnification Claims").

The aggregated of the amounts in paragraphs B, C & D above shall be known as the BofA Cash Collateral Amount.

50

On the Effective Date, the BofA Cash Collateral Amount shall be placed in a segregated account at BofA in the name of the Liquidating Trustee (the "BofA Cash Collateral Account").  The BofA Cash Collateral Amount shall be free and clear of all existing Liens as to any party other than the Prepetition Agent, the Prepetition Credit Facility Lenders, the Postpetition Agent and the DIP Lenders (as such terms are defined in the Interim DIP Order) (collectively, the "Secured Parties"), which shall have a fully perfected first priority lien on all amounts in the BofA Cash Collateral Account necessary to secure the obligations of all of the Debtors and the Liquidating Trustee to the Secured Parties with respect to any and all Outstanding Letters of Credit, the Future Costs, the Disputed Costs (as defined below), and any BofA Indemnification Claims.

Except as otherwise agreed to by the Secured Parties and the Liquidating Trustee, or as ordered by the Bankruptcy Court, from and after the Effective Date, the BofA Cash Collateral Amount required to be maintained at all times in the BofA Cash Collateral Account shall be an amount equal to:

(a) 105% multiplied by the face amount as of such date of all Outstanding Letters of Credit remaining outstanding plus,

(b) the amount set forth in paragraph C above to secure the Future Costs plus,

(c) an amount equal to all costs, fees and/or expenses of the Secured Parties (including costs, fees and/or expenses of its counsel) disputed by the Debtors, the Creditors' Committee or the Liquidating Trustee and not reimbursed by the Debtors in accordance with the Interim DIP Order, the DIP Credit Agreement and the Final Cash Collateral Order (in each case to the extent modified by the Extension Order) within 10 days of  receipt by the Debtors of any applicable invoices, statements, receipts or other documents (the "Disputed Costs"), plus

(d) the amount set forth in paragraph D above to secure the BofA Indemnification Claims.

The BofA Cash Collateral Amount in the BofA Cash Collateral Account shall be reduced from time to time and the funds released to the Liquidating Trustee, either by agreement of the Liquidating Trustee and the Secured Parties or by Final Order of the Bankruptcy Court or such other court of competent jurisdiction (including any appellate court), in the event of the reduction of the amount of Outstanding Letters of Credit, the resolution or other disposition of the underlying Claims

51

giving rise to the BofA Indemnification Claims, other circumstances on which the Secured Parties and the Liquidating Trustee may mutually agree or for any other reason as set forth in a Final Order of the Bankruptcy Court or such other court of competent jurisdiction (including any appellate court).

The collateralization of the Future Costs, the Disputed Costs, or the BofA Indemnification Claims shall not be deemed to be an admission by the Debtors or the Liquidating Trustee that any of the Disputed Costs or BofA Indemnification Claims are valid and proper Claims against the Debtors or the Liquidating Trustee either in the amount collateralized or in any other amount and the Liquidating Trust reserves the right to seek an Order of the Bankruptcy Court (which Order shall be subject to any appeal rights of any party) as to the Secured Parties' entitlement to the Disputed Costs and/or BofA Indemnification Claims.  Any dispute asserted as to fees and cost owed to or previously paid to the Secured Parties, including any dispute under submission to the Court, is preserved for the benefit of the Debtors or the Liquidating Trust, as applicable.

Except for the Liens and rights provided herein (including without limitation, the right to reimbursement of costs, fees and/or expenses of the Secured Parties payable by the Debtors in accordance with the Interim DIP Order, the DIP Credit Agreement and the Final Cash Collateral Order (in each case modified by the Extension Order) and all BofA Indemnification Claims), all rights held by the Secured Parties under the DIP Credit Agreement, Interim DIP Order, Final Cash Collateral Order and the Extension Order (including Liens granted prior to the Effective Date) shall be terminated upon the Effective Date.

The foregoing treatment shall be in full and complete satisfaction of any and all Claims that Bank of America has or may have against the Debtors and with respect to any such Claims, and recourse shall be limited as set forth above.

Class 2 is Impaired and is entitled to vote on the Plan.

(c)    Class 3: Allowed ISIS Claim

On the Effective Date, in full and final satisfaction of the Allowed ISIS Claim, the Debtors shall quitclaim Plant 47 securing the Allowed ISIS Claim to ISIS.  On the Effective Date, any Liens granted in favor of ISIS by the Debtors, whether existing as of the Petition Date or granted through these Chapter 11 Cases, shall be deemed released and extinguished.

52

Class 3 is Impaired and is entitled to vote on the Plan.

(d)     Class 4: Miscellaneous Secured Claims

On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim or (b) the date that is ninety (90) days after the date on which such Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, a Holder of an Allowed Miscellaneous Secured Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for, such Allowed Miscellaneous Secured Claim, at the election of the Liquidating Trustee, (i) Cash equal to the lesser of the unpaid portion of such Allowed Miscellaneous Secured Claim and the value of the Holder's Collateral securing the Miscellaneous Secured Claim as required pursuant to section 506(b) of the Bankruptcy Code, (ii) a return of the Holder's Collateral securing the Miscellaneous Secured Claim, or (iii) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing.  Any Holder of a Miscellaneous Secured Claim shall retain its Lien in the Collateral or the proceeds of the Collateral (to the extent that such Collateral is sold by the Debtors or the Liquidating Trustee free and clear of such Lien) to the same extent and with the same priority as such Lien held as of the Petition Date until such time as (a) the Holder of such Miscellaneous Secured Claim (i) has been paid Cash equal to the value of its Allowed Miscellaneous Secured Claim, (ii) has received a return of the Collateral securing the Miscellaneous Secured Claim or (iii) has been afforded such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; or (b) such purported Lien has been determined by an order of the Bankruptcy Court to be invalid or otherwise avoidable.

Class 4 is conclusively presumed to have accepted the Plan and, therefore, Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan.

(e)     Class 5: 14% Notes Claims

On the Effective Date, the Liens of the 14% Notes held as of the Petition Date shall remain as valid Liens for purposes of the Plan only and the 14% Notes Claims shall be Allowed as a Secured Claim in the amount of $84,256,664.  In full and final satisfaction of their Secured Allowed Claim,

the 14% Notes Claims shall receive their Pro Rata share of 43.5% of the Net Distributable Proceeds,

less:  (a) fees and expenses payable and paid to DB (both for its services and those of its agents) (the

"DB Fees"); (b) any amounts payable and paid to Whippoorwill for fees and expenses incurred by its

professionals (collectively, the "Whippoorwill Fees"), pursuant to a Substantial Contribution Claim;

and (c) any funds distributed to the Holders of the 5% Notes.  The Creditors' Committee will support

Whippoorwill's Substantial Contribution Claim, provided any recovery thereon is paid in accordance

with the previous sentence.  The 43.5% of Net Distributable Proceeds payable to the 14% Notes

Claims shall be paid (x) on the Effective Date with respect to the Initial Net Distributable Proceeds;

and (y) on each subsequent Distribution Date as reasonably practicable after the Liquidation Trust

acquires such Net Distributable Proceeds with respect to the balance.

Without recourse, representation, or warranty and solely for purposes of enforcing the

percentage allocation of Net Distributable Proceeds, on the Effective Date, the 14% Notes shall be

deemed to assign to the Liquidating Trustee that portion of their intercreditor rights necessary to

preclude the Holders of the 5% Notes from exercising a payover demand against distribution to the

Holders of 6% Notes.  On the Effective Date, provided that Class 5 votes to accept the Plan, the 14%

Notes shall be deemed to release any intercreditor rights or payover demands that they have against

the Holders of 6% Notes.  For the avoidance of doubt, any rights or Liens granted to the 14% Notes

prior to the Effective Date will be extinguished on the Effective Date in exchange for the treatment

afforded to the 14% Notes Claims hereunder.

All of the DB Fees shall be paid concurrently with the final payment of Professional Fee

Claims, but if at the time of such distribution, there are insufficient funds to make a payment in full,

then DB shall be entitled to its Pro Rata portion of the DB Fees distributed at such time relative to the

total fees and expenses paid to all Professionals, which amount shall be deducted from the 43.5% Net

Distributable Proceeds allocated to the 14% Notes Claims.  Similarly, all of the Whippoorwill Fees

shall be paid concurrently with the final payment of Professional Fee Claims (but if at the time of

such Distribution, there are insufficient funds to make a payment in full, then Whippoorwill shall be

entitled to its Pro Rata portion relative to the total fees and expenses paid to all Professionals of the

Whippoorwill Fees distributed at such time), provided that such Whippoorwill Fees have been

approved by allowance of the Substantial Contribution Claim, and such amount shall be deducted from the 43.5% Net Distributable Proceeds allocated to the 14% Notes Claims.

Upon the Effective Date, the DB Litigation shall be deemed dismissed with respect to all parties, with prejudice, and confirmation of this Plan shall constitute a final and binding resolution of all issues raised, or that could be raised, in connection with the DB Litigation.

Class 5 is Impaired and is entitled to vote on the Plan.

(f)    Class 6: General Unsecured Claims

Provided that all Allowed Administrative Claims, Priority Claims and Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Secured Claims have been placed in a segregated reserve, as set forth in the Plan and in the Liquidating Trust Agreement, and subject to the occurrence of the Effective Date, on, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date that is ninety (90) days after the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed General Unsecured Claim, its Pro Rata share of the Initial Net Distributable Proceeds, if any, and, on each Periodic Distribution Date, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Periodic Net Distributable Proceeds, not to exceed in the aggregate receive 56.5% of the total Net Distributable Proceeds.

Class 6 is Impaired and is entitled to vote on the Plan.

(g)    Class 7: 6% Notes Claims

Provided that all Allowed Administrative Claims, Priority Claims and Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Secured Claims have been placed in a segregated reserve, as set forth in the Plan and in the Liquidating Trust Agreement, and subject to the occurrence of the Effective Date, and subject to acceptance of the Plan by Class 7, Holders of 6% Notes Claims shall receive $2 million from the 56.5% Net Distributable Proceeds allocable to the General Unsecured Claims, which amount shall be

1  paid at the time Distributions are made to General Unsecured Creditors pursuant to the Plan or as the

2  Liquidating Trustee shall determine in its sole and absolute discretion.  Concurrently with the final

3  payment of Professional Fee Claims for the Debtors and the Creditors' Committee after the Effective

4  Date and provided that Class 7 has voted to accept the Plan, the Professional fees and expenses of the

5  indenture trustee of the 6% Notes and the trustee's professionals shall be paid to such applicable

6  indenture trustee or professional, subject to a review for reasonableness by the Creditors' Committee,

7  out of the 56.5% of the Net Distributable Proceeds allocable to the Allowed General Unsecured

8  Claims, but if at the time of such distribution, there are insufficient funds to make payment in full,

9  then such fees shall be paid Pro Rata with other professionals paid at such time.

10     Class 7 is Impaired and is entitled to vote on the Plan.

11          (h)     Class 8: 5% Notes Claims

12     Pursuant to the terms of the Noteholder Settlement, the parties agreed that the Holders of the

13  14% Notes Claims would pay for the distribution to the Holders of 5% Notes Claims, if any, out of

14  the 43.5% of the Net Distributable Proceeds allocable to the Allowed 14% Notes Claims.  However,

15  the 14% Notes have evaluated the 5% Notes Claims and have determined that they are not entitled to

16  a Distribution under the Plan.

17     Class 8 is Impaired, will not receive or retain any property or interest in property on account

18  of such Claims, is deemed to have rejected the Plan and, therefore, Holders of Class 8 Claims are not

19  entitled to vote to accept or reject the Plan.

20          (i)     Class 9: Convenience Claims

21     On, or as soon as reasonably practicable after, the Initial Distribution Date, each Holder of an

22  Allowed Convenience Claim shall receive, in full and final satisfaction, settlement and release of and

23  in exchange for such Convenience Claim, 25% of its Allowed Claim as a final distribution.  Holders

24  of Class 6 Claims in excess of $10,000 will be eligible to opt into this Class by reducing their claim

25  to $10,000 by checking the "Opt-In to Convenience Class" box on their ballot.  Total distributions

26  under this Class shall be paid out of the 56.5% of the Net Distributable Proceeds allocable to the

27  Allowed General Unsecured Claims, and are anticipated to be limited to $1.25 million, subject to the

28  Liquidating Trustee's discretion to increase this amount at the time of the Initial Distribution Date.  In

the event that this class has greater demand than funds allocated to this Class, then the Liquidating Trustee shall have the absolute discretion to select and remove certain of the opt-in members of this class.  In no instance shall the Liquidating Trustee remove a non-opt-in Allowed Convenience Claim from this Class.

Class 9 is Impaired and is entitled to vote on the Plan.

(j)      Class 10: Product Liability PI Claims

Unless their Product Liability PI Claim has previously become an Allowed Claim, all Holders of Claims in Class 10 shall be required to participate in the Product Liability PI Claim Mediation Process attached hereto as Appendix E.  As provided in the Product Liability PI Claim Mediation Process, if and when Allowed, Holders of Class 10 Claims shall receive a Pro Rata distribution of available insurance proceeds from Gibraltar policies covering Product Liability PI Claims upon the year in which the Claim arose.  Once all mediations as to Product Liability PI Claims in a given policy year have been liquidated, the Liquidating Trustee may, in its discretion, begin the distribution of Gibraltar policy proceeds for that year without regard to whether the Product Liability PI Claims in any other policy year have been liquidated or allowed, or he may wait until Product Liability PI Claims in other policy years, or all policy years have been liquidated, before making distributions of Gibraltar policy proceeds.  To the extent the allowed amount of any Class 10 Claim is not paid in full with insurance proceeds, then the unpaid deficiency amount shall receive the treatment provided for under Class 6 for Allowed General Unsecured Claims, and any Distributions thereto shall be paid out of the 56.5% of the Net Distributable Proceeds allocable to the Allowed General Unsecured Claims.

Class 10 is Impaired and is entitled to vote on the Plan

(k)      Class 11: WARN Class Claims and Severance Class Claims

The WARN and Severance Class Settlement Agreement shall be presented to the Bankruptcy Court for approval pursuant to Rule 9019 of the Bankruptcy Rules and as a class settlement under Rule 23 of the Federal Rules of Civil Procedure and notice of the WARN and Severance Class Settlement Agreement shall be given to all WARN Class Members and/or Severance Class Members as required under Rule 23 and the Order of the Bankruptcy Court.  If the WARN and Severance Class Settlement Agreement is approved, any WARN Class Member or Severance Class Member may

affirmatively elect not to accept the treatment ("Opt Out") afforded to the WARN Class Members and Severance Class Members in the WARN and Severance Class Settlement Agreement by following the procedures in the notice of the WARN and Severance Class Settlement Agreement.

*If the WARN and Severance Class Settlement Agreement is approved by the Bankruptcy Court*:

A.    On the effective date of the WARN and Severance Class Settlement Agreement or the Effective Date of the Plan, whichever is later, any WARN Class Member or Severance Class Member who has *not* affirmatively elected to Opt Out shall receive, in full satisfaction of their Claims, the treatment provided in the WARN and Severance Class Settlement Agreement.

B.    As to any WARN Class Member or Severance Class Member who affirmatively elects to Opt Out, if and when their WARN Class Claim or Severance Class Claim becomes an Allowed Claim, then they shall be afforded the treatment of a Non-Tax Priority Claim in Class 1 subject to the limitations of section 507(a)(4) and (5) of the Bankruptcy Code with any amount of their WARN Class Claim or Severance Class Claim in excess of the limitations of section 507(a)(4) and (5) of the Bankruptcy Code treated as a General Unsecured Claim in Class 6 and any Distribution under Class 6 shall be paid out of the 56.5% Net Distributable Proceeds allocable to the Allowed General Unsecured Claims.

C.    Any WARN Class Member or Severance Class Member who Opts Out of the treatment afforded in the WARN and Severance Class Settlement Agreement shall have the same rights and obligations as he or she would have had if the WARN Action and/or the Severance Action had never been filed and the WARN and Severance Class Settlement Agreement had never been executed.

*If the Settlement Agreement is not approved by the Bankruptcy Court:*

The WARN Class Claims and Severance Class Claims will continue to be litigated before the Bankruptcy Court.  If and when the Claim of any WARN Class Member or any Severance Class Member becomes an Allowed Claim, the Claim of the WARN Class Member or Severance Class Member shall be afforded the treatment of a Non-Tax Priority Claim in Class 1 subject to the limitations of section 507(a)(4) and (5) of the Bankruptcy Code with any amount in excess of the

limitations of section 507(a)(4) and (5) of the Bankruptcy Code treated as a General Unsecured Claim in Class 6 with any Distribution under Class 6 to be paid out of the 56.5% of Net Distributable Proceeds allocable to the Allowed General Unsecured Claims.

The Class 11 Claims of WARN Class Members and Severance Class Members are impaired and are entitled to vote on the Plan.

(l)    Class 12

Each Claimant in Class 12 is or was the beneficiary of an LC issued by the Debtors' Secured Parties pursuant to the Secured Credit Facility and which comprises the Allowed Secured Credit Facility Claims.  Upon the Effective Date, each Claim in Classes 12A and 12B shall be deemed an Allowed Claim and each holder of an Allowed Claim in Class 12 shall receive the treatment described below in full and final satisfaction of its Claim and in exchange for waiver of any deficiency claims.  Each Claim in Class 12A and Class 12B is Impaired and is entitled to vote on the Plan.

(i)    Class 12A: Lumbermen's Underwriting Alliance

LUA insured the workers' compensation liability of the Debtors in the states of Arizona, Idaho, Tennessee, Virginia, Texas, Florida, Maryland and Kentucky between November 1, 1981 and February 1, 1999.  The Debtors' liability to LUA was secured by LC No. 3040443 in the amount of $100,000 which LUA drew on or about December 4, 2009.  LUA was also holding Cash deposits of $86,774.   On the Effective Date, in full and final satisfaction of LUA's Allowed Claim, LUA shall retain the approximately $186,000 in LC proceeds as well as other Cash on hand.

(ii)    Class 12B:  Georgia Self Insurance Guaranty Trust Fund

The Debtors' workers' compensation liability in the state of Georgia, was secured by LC No. 3040445 in the amount of $1,230,000.  The Georgia Self Insurers Guaranty Trust Fund ("Georgia"), drew on LC No. 3140445 on July 23, 2009 and it now holds $1,230,000 in Cash.  On the Effective Date, in full and final satisfaction of the Allowed Claim of the Georgia, Georgia shall retain the proceeds of LC No. 3040445 in the amount $1,230,000, as well as other Cash on hand.

(m)    <u>Class 13</u>

Each Claimant in Class 13 is or was the beneficiary of an LC issued by the Debtors' Secured Parties pursuant to the Secured Credit Facility and which comprises the Allowed Secured Credit Facility Claims.  On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a Class 13 Claim becomes an Allowed Class 13 Claim or (b) the date that is ninety (90) days after the date on which such Class 13 Secured Claim becomes an Allowed Class 13 Claim, a Holder of an Allowed Class 13 Claim shall be allowed to retain, in full and final satisfaction, settlement and release of and in exchange for, such Allowed Class 13 Claim, at the election of the Liquidating Trustee, (i) proceeds of letters of credit (drawn or undrawn), as well as other Cash on hand, equal to the lesser of the unpaid portion of such Allowed Class 13 Claim and the value of the Holder's Collateral securing the Class 13 Claim or (ii) such other amounts as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing.

Each Holder of a Class 13 Claim shall retain its Collateral or the proceeds of the Collateral to the same extent and with the same priority held as of the Petition Date until such time as (a) the Holder of such Allowed Class 13 Claim (i) is allowed to retain letter of credit proceeds and/or other Cash equal to the value of its Allowed Class 13 Claim, (ii) has been afforded such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; or (b) such purported Claim has been determined by an order of the Bankruptcy Court to be invalid or otherwise avoidable.

Each Holder of a Claim in Class 13 is conclusively presumed to have accepted the Plan and, therefore, each Holder of a Class 13 Claim is not entitled to vote to accept or reject the Plan.

(i)    Class 13A:  Westchester Fire Insurance Company and ACE INA Insurance

Westchester Fire Insurance Company and ACE issued construction bonds with respect to the Debtors' military housing business and bonds supporting the Debtors' self insured workers' compensation liability in Washington and Indiana all of which were secured by LC No. 3051853.  On or about December 29, 2009, ACE drew on LC. No. 3051853 in its entirety.  As of January 31, 2010, ACE held $13,897,702.50 in Cash as security for the Claims of ACE against the Debtors.

(ii)      Class 13B:  Old Republic Insurance Co.

On behalf of Gibraltar, Old Republic Insurance Co. ("Old Republic") provided workers' compensation coverage to the Debtors in Alabama and Georgia and the reimbursement obligations of the Debtors and Gibraltar to Old Republic were secured by LC No. 3040444 in the amount of $1.08 million.  On November 27, 2009, Old Republic drew on LC No. 3040444 and it now holds $1.08 million in Cash.

(iii)      Class 13C:  National Union Fire Insurance Company of Pittsburgh, PA, et al.

The Debtors' workers' compensation liability in the states of Arizona, Idaho, Tennessee, Virginia, Florida, Maryland and Kentucky from April 1, 2003 to the present was covered by National Union Fire Insurance Company of Pittsburgh, PA, American Home Assurance Company, American International Specialty Lines Insurance Company of the State of Pennsylvania, Commerce and Industry Insurance Company, AIU Insurance Company, Birmingham Fire Insurance Company of the State of Pennsylvania, Illinois National Insurance Company, American International South Insurance Company, National Union Fire Insurance Company of Louisiana, American International Pacific Insurance Company, Granit State Insurance Company, New Hampshire Insurance Company, Lexington Insurance Company, Landmark Insurance Company, Starr Excess Liability Insurance Company Ltd. ("National Union").  The Debtors' reimbursement obligations to National Union are secured by LC No. 3056166 in the amount of $4,302,210, which expires on March 31, 2010.

(iv)      Class 13D: Fidelity and Deposit Company of Maryland

Fidelity and Deposit Company of Maryland ("Fidelity") issued a surety bond with respect to the Debtors' contract to supply manufactured housing to the U.S. Department of Defense for Fort Sill.  The Surety Bond is secured by LC No. 3092431 in the amount of $3,017,440, which expires on March 11, 2010.  Morgan Buildings and Spas, Inc. ("Morgan Spa") has made claims against the Debtors, which the Debtors deny, and which are now being litigated in Texas along with the Debtors' claims against Morgan Spa.  If Morgan Spa prevails, it will be entitled to payment under the surety bond and Fidelity will then be entitled to indemnification from the proceeds of LC No. 3092431.

1         (v)     Class 13E:  Kemper Insurance Co., et al.

2       Lumbermen's Mutual Casualty Company, American Motorists Insurance Company,

3 American Manufacturers Mutual Insurance Company and American Protection Insurance Company

4 and Kemper Insurance Co. ("Kemper") insured the workers' compensation liability of the Debtors in

5 the states of Arizona, Idaho, Tennessee, Virginia, Texas, Florida, Maryland and Kentucky between

6 February 1, 1996 and April 1, 2003.  The Debtors' liability to Kemper is secured by LC No. 3040130

7 in the remaining amount of $1,070,000 plus Cash of approximately $1.428 million held by Kemper

8 from prior draws on letters of credit..

9         (n)     <u>Class 14: Intercompany Claims</u>

10       In connection with, to the extent of and as a result of, the substantive consolidation of the

11 Debtors' Estates in these Chapter 11 Cases, on the Confirmation Date or such other date as may be

12 set by an order of the Bankruptcy Court, but subject to the occurrence of the Effective Date, all

13 Intercompany Claims by and between the Debtors shall be deemed eliminated, cancelled and/or

14 extinguished and the Holders of Class 14 Claims shall not be entitled to, and shall not receive or

15 retain any property or interest in property on account of such Claims.

16         (o)     <u>Class 15:  Equity Interests</u>

17       On the Effective Date, all Equity Interests in the Debtors shall be cancelled and each Holder

18 thereof shall not be entitled to, and shall not receive or retain any property or interest in property on

19 account of, such Equity Interests.  For the sake of clarity, the equity interests in ***non***-Debtors that are

20 affiliated with one or more of the Debtors (*e.g.*, Gibraltar) will ***not*** be cancelled, but, to the extent

21 owned or controlled by the Debtors, shall be transferred to the Liquidating Trust as Estate property.

22       Class 15 is deemed to have rejected the Plan and, therefore, Holders of Equity Interests are

23 not entitled to vote to accept or reject the Plan.

24 **B.**     **Acceptance or Rejection of the Plan by Claim Holders**

25      **1.**    ***Impaired Classes of Claims Entitled to Vote***

26       The votes of Holders of Claims and Equity Interests in Impaired Classes who receive or retain

27 property on account of their Claims or Equity Interests and who are entitled to vote under the

28 Solicitation Procedures Order will be solicited for acceptance or rejection of the Plan.

**2.** *Acceptance by an Impaired Class*

In accordance with Bankruptcy Code section 1126(c) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims of such Class that are entitled to vote and have timely and properly voted to accept or reject the Plan.

**3.** *Presumed Acceptances by Unimpaired Classes*

Classes 1, 4 and 13 are Unimpaired by the Plan.  Under Bankruptcy Code section 1126(f), such Claimholders are conclusively presumed to accept the Plan, and the votes of such Claimholders will not be solicited.

**4.** *Classes Deemed to Reject Plan*

Claimholders in Classes 8 and 14, and Equity Interest Holders in Class 15, are not entitled to receive or retain any property under the Plan.  Under Bankruptcy Code section 1126(g), Holders of Claims and Equity Interests in these Classes are deemed to reject the Plan, and the votes of such Claimholders or Equity Interest Holders will not be solicited.

**5.** *Summary of Classes Voting on the Plan*

The votes of Holders of Claims in Classes 2, 3, 5, 6, 7, 9, 10, 11 and 12 whose Claims are not the subject of an objection and whose Claims are not listed in the Debtors' Schedules as contingent, unliquidated, or disputed, will be temporarily allowed for voting purposes as set forth in the Solicitation Procedures Order and will be solicited with respect to the Plan.

**6.** *Confirmation Pursuant to Bankruptcy Code Section 1129(b)*

To the extent necessary, the Plan Proponents will seek confirmation of the Plan from the Court by employing the "cramdown" procedures set forth in section 1129(b) of the Bankruptcy Code. The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Exhibit or schedule, including to amend or modify the Plan or such Exhibits or schedules to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

**C.      Substantive Consolidation of All of the Debtors' Estates**

"Substantive consolidation" is the merging of the assets and liabilities of two or more related debtors into a single pool to pay creditors.  Substantive consolidation simplifies the process of how creditor claims are resolved by making available all of the assets of the consolidated debtors to each of the consolidated debtors' creditors.  The goal of substantive consolidation is to accomplish fairness to all creditors.  The common effects of substantive consolidation are:  (1) the combining of the assets of multiple debtors as if they belonged to one single, consolidated entity; (2) the treatment of multiple claims against multiple debtors as one claim asserted against one common entity; (3) the satisfaction of the liabilities of multiple debtors from one common asset pool; (4) the elimination of intercompany claims by and among the substantively consolidated debtor entities; and (5) the combining of the creditors of multiple debtors into a single class of creditors for voting and distribution purposes under a plan of reorganization or liquidation.

The Ninth Circuit has determined that substantive consolidation is appropriate when *either*:

    (i)      creditors dealt with the debtor entities as a single economic unit and did not rely on their separate identities in extending credit (the "Single Entity Test"); or

    (ii)      the affairs of the debtors are so entangled that consolidation will benefit all creditors (the "Hopeless Entanglement Test").

*Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 766 (9th Cir. 2000).  Because the test is framed in the disjunctive (*i.e.*, using "or" instead of "and"), substantive consolidation is appropriate under this test if just one of the two requirements is satisfied.  Proponents of substantive consolidation bear the burden of proof.

In connection with the Plan, the Plan Proponents seek a substantive consolidation of the assets and liabilities of all of the Debtors.  Although only one of the two elements must be met to establish substantive consolidation, the Plan Proponents believe that they can satisfy both the Hopeless Entanglement Test and the Single Entity Test.

### 1.      *The Plan Proponents Can Satisfy the Single Entity Test*

Creditors relied upon the combined creditworthiness of the Debtors in extending loans thereto as well as the Debtors' various cross-guarantees and cross-collateralization of assets for security.  For example, FHI and the Operating Subsidiaries are the combined Borrowers under the Secured Credit Facility, which is secured by a pledge of the majority of the assets of each of FHI and the Operating Subsidiaries, including real property owned thereby.  FEI guaranteed FHI's and the Operating Subsidiaries' obligations under the Secured Credit Facility.  In return, FHI and the Operating Subsidiaries guaranteed FEI's obligations under the 14% Notes for FEI.  The 14% Notes are also secured by the assets of FHI and the Operating Subsidiaries.

Additionally, two of the Operating Subsidiaries, Fleetwood Motor Homes of California, Inc. and Fleetwood Homes of California, Inc., borrowed approximately $27.25 million from ISIS, which was secured by each of their real property located in Riverside, CA.  FEI guaranteed FHI's and the Operating Subsidiaries' obligations under the ISIS loan.  Because the foregoing shows a single "operating" enterprise funded by loans secured by cross collateralization, the Plan Proponents submit that creditors relied upon the creditworthiness of ***all*** the Debtors in making loans to the operating enterprise.  As such, the Debtors' estates should be consolidated under the Single Entity Test.

### 2.      *The Plan Proponents Can Satisfy the Hopeless Entanglement Test*

Disentangling the affairs of the Debtors would likely be burdensome and could adversely affect creditor distributions.  The Debtors repeatedly engaged in intercompany lending, shared raw materials, shared personnel, entered into cross-guaranties, and participated in cross-collateralization with their assets.  Moreover, despite the fact that each of the Debtors are independent legal entities with their own facilities, employees, and local management, the Debtors generally operated as a single enterprise with a central payment system and central cash management system.

The Debtors' central payment system illustrates the extent of entanglement between the Debtors.  The Debtors adopted a centralized vendor payment system whereby trade payable balances owed by individual Operating Subsidiaries are paid directly by FHI on behalf of the Operating Subsidiaries.  Rather than have each Operating Subsidiary remit multiple payments for amounts owed to the same vendor, the Debtors' central payment system consolidated amounts owed across the

1    Operating Subs to the same vendor into a single payment made to that vendor from FHI.

2    Consolidating payments at FHI also provided greater centralized control over disbursements.

3      The Debtors' inability to disentangle its affairs without affecting creditor dispositions is also

4    evidenced by the Debtors' centralized cash management system.  On the operations level, the system

5    was designed to centralize cash flow from FEI's intake (*i.e.*, blocked) account to FHI's main account,

6    which directly funds the Operating Subsidiaries' activities through 40 individual disbursement

7    accounts.  FHI's main account is physically linked with both FEI's main account and the accounts of

8    the Operating Subsidiaries, and provides them with the funds needed to continue operations.

9      As further evidence of the Debtors' entanglement, FEI files consolidated financial statements

10    with the SEC (*see* 10-K and 10-Q's) and lists its Debtor subsidiaries as "the RV Group" and "the

11    Housing Group," which intimates that these "groups" are captive divisions of FEI, not independent

12    entities.  FEI and its subsidiaries also share overhead, management, accounting, and other related

13    expenses.  FEI owns (either directly or indirectly) all or a majority of the stock of each of the Debtors

14    and the Debtors share common directors and officers.  As demonstrated by the foregoing, the Debtors

15    operated and were regarded as a consolidated enterprise.  Indeed, disentangling their affairs is simply

16    not possible and, even if it was, would cost more than the value of the Estates' remaining assets.

17    Accordingly, the consolidation of the Debtors' Estates is proper under the Hopeless Entanglement

18    Test.

19      **3.**  ***The Effect of Substantive Consolidation Under the Plan***

20      The Plan contemplates and is predicated upon entry of an order substantially consolidating the

21    Debtors' Estates.  On the Effective Date, the Plan provides that (i) all Intercompany Claims by,

22    between and among the Debtors shall be eliminated, (ii) all assets and liabilities of the Debtors shall

23    be merged, (iii) any obligation of a Debtor and all guarantees thereof by one or more of the other

24    Debtors shall be deemed to be one obligation, (iv) the Equity Interests in the Debtors shall be

25    cancelled, and (v) each Claim filed or to be filed against any Debtor shall be deemed a single Claim

26    against and a single obligation of the Debtors.  Finally, on the Effective Date, in accordance with the

27    terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based

28

upon guarantees of collection, payment, or performance made by the Debtors as to the obligations of another Debtor shall be released and of no further force and effect.

**D.      Employee Related Provisions**

      **1.      *Employees***

All of the Debtors' employees shall be terminated as of the Effective Date and converted to independent contractors upon execution by the employee of an independent contractor agreement with the Liquidating Trust.

      **2.      *KEIP Payments***

Depending upon the timing of the KEIP Payments, both the Debtors (pre-Effective Date) and the Liquidating Trustee (post-Effective Date) shall be permitted to pay to the KEIP Employees the KEIP Payments up to the maximum incentive payment set forth in the KEIP Order and Modified and Amended KEIP Plan Order.

      **3.      *Benefit Plans***

To the extent not terminated previously, all of the benefit plans for the benefit of the Debtors' employees shall be cancelled effective as of the Effective Date.

**E.      The Liquidating Trust**

      **1.      *Establishment of Liquidating Trust***

The Liquidating Trust shall be established and shall become effective on the Effective Date. All Distributions to the Holders of Allowed Claims shall be from the Liquidating Trust.  The Liquidating Trust shall hold and administer the Assets of the Debtors and their Estates, including but not limited to the Causes of Action for liquidation and distribution in accordance with the Plan unless otherwise settled or released by Order of the Bankruptcy Court prior to the Effective Date, and the Net Proceeds thereof (collectively, the "Liquidating Trust Assets").

      **2.      *Trust Distributions***

The Liquidating Trustee shall liquidate all Assets of the Debtors and the Estates (including, without limitation, all Causes of Action) and distribute the Net Proceeds of such liquidation from the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.

### 3. *Duration of Trust*

The Liquidating Trust shall have an initial term of five (5) years; <u>provided</u>, <u>however</u>, that, if warranted by the facts and circumstances, and subject to the approval of the Bankruptcy Court with jurisdiction over the case, upon a finding that an extension of the term of the Liquidating Trust is necessary to accomplish the liquidating purpose of the Trust, the term of the Liquidating Trust may be extended for a finite term and/or terminated as more fully described in the Plan.  As soon as practicable after the Final Trust Distribution Date, the Liquidating Trustee shall seek entry of a Final Order closing these Chapter 11 Cases pursuant to Bankruptcy Code section 350.

### 4. *Liquidation of Causes of Action*

Notwithstanding any other term or provision of the Plan, the Debtors shall have, prior to the Effective Date, and the Liquidating Trustee shall have, on and after the Effective Date, sole authority and responsibility for investigating, analyzing, commencing, prosecuting, litigating, compromising, collecting, and otherwise administering the Causes of Action pursuant to the terms of the Plan and Liquidating Trust Agreement.  Further, the Liquidation Trust Oversight Committee shall set thresholds for approval with respect to the initiation of prosecution of any Avoidance Actions in its sole discretion.

### 5. *Liquidating Trustee*

(a) <u>Appointment</u>

The appointment of the Liquidating Trustee shall be effective as of the Effective Date. Successor Liquidating Trustee(s) shall be appointed as set forth in the Liquidating Trust Agreement.

(b) <u>Term</u>

Unless the Liquidating Trustee resigns or dies earlier, the Liquidating Trustee's term shall expire upon termination of the Liquidating Trust pursuant to the Plan and/or the Liquidating Trust Agreement.

(c) <u>Powers and Duties</u>

The Liquidating Trustee shall have the rights and powers set forth in the Liquidating Trust Agreement including, but not limited to, the powers of a debtor-in-possession under Bankruptcy Code sections 1107 and 1108.  The Liquidating Trustee shall be governed in all things by the terms of

the Liquidating Trust Agreement and the Plan.  The Liquidating Trustee shall administer the Liquidating Trust, and its assets, and make Distributions from the proceeds of the Liquidating Trust in accordance with the Plan.  In addition, the Liquidating Trustee shall, in accordance with the terms of the Plan, take all actions necessary to wind down the affairs of the Debtors consistent with the Plan and applicable non-bankruptcy law.

(d)     <u>Fees and Expenses</u>

Except as otherwise provided in the Plan, compensation of the Liquidating Trustee and the costs and expenses of the Liquidating Trustee and the Liquidating Trust (including, without limitation, professional fees and expenses) shall be paid from the Liquidating Trust.  The Liquidating Trustee shall pay, without further order, notice, or application to the Bankruptcy Court, the reasonable fees and expenses of the Liquidating Trust Professionals, as necessary to discharge the Liquidating Trustee's duties under the Plan and the Liquidating Trust Agreement.  Prior to the Effective Date, the Liquidating Trustee shall be entitled to payment of reasonable fees and expenses incurred in an amount to be agreed to by the Plan Proponents and approved by the Bankruptcy Court in the Confirmation Order.  After the Effective Date, the Liquidating Trustee shall be entitled to payment at a rate of $25,000 for the first six months, $20,000 for the next twelve months, and $10,000 per month thereafter.

(e)     <u>Retention of Professionals and Compensation Procedure</u>

On and after the Effective Date, subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee may engage such professionals and experts, including a financial advisor (after discussing with Whippoorwill), as may be deemed necessary and appropriate by the Liquidating Trustee to assist the Liquidating Trustee in carrying out the provisions of the Plan and the Liquidating Trust Agreement, including, but not limited to, professionals retained prior to the Effective Date by either the Debtors or the Creditors' Committee.

(f)     <u>Liquidating Trustee as Successor</u>

Pursuant to Bankruptcy Code section 1123(b), the Liquidating Trustee shall be the successor to the Debtors for all purposes.

(g)    Compromising Claims

Pursuant to the Plan and the Liquidating Trust Agreement, as of the Effective Date, the Liquidating Trustee is authorized to approve compromises of the Causes of Action and all Claims, Disputed Claims, and Liens and to execute necessary documents, including Lien releases and stipulations of settlement or release, without notice to any party and without further order of the Bankruptcy Court, except as otherwise provided in the Liquidating Trust Agreement and pursuant to the threshold amounts for approval as may be set by the Liquidation Trust Oversight Committee.

(h)    Investment Powers

The powers of the Liquidating Trustee to invest any Cash that is held by the Liquidating Trust, other than those powers reasonably necessary to maintain the value of the assets and to further the Liquidating Trust's liquidating purposes, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, such as treasury bills.

(i)    Distributions

The Liquidating Trustee is required to distribute at least annually to beneficiary Claimholders qualifying for Distributions from the Liquidating Trust under the Plan the Liquidating Trust's net income and all Net Proceeds from the sale of assets by the Liquidating Trust, except that the Liquidating Trust may retain an amount of Net Proceeds or net income reasonably necessary to maintain the value of its assets or to meet Claims and contingent liabilities (including Disputed Claims).  The Liquidating Trustee shall make continuing efforts to dispose of the Liquidating Trust's Assets, make timely Distributions, and not unduly prolong the duration of the Liquidating Trust.

(j)    Vesting of Assets

On the Effective Date, all property treated by the Plan, any minutes, and general corporate records of Debtors, and any books and records relating to the foregoing not otherwise treated by the Plan, shall automatically vest in the Liquidating Trust free and clear of all Liens, Claims, encumbrances, and other interests and shall thereafter be administered, liquidated by sale, collection, recovery, or other disposition and distributed by the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement and the Plan without further action of the Debtors.

70

**6.**    *Federal Income Taxation of Liquidating Trust*

For federal income tax purposes, the Debtors, the Liquidating Trust, the Liquidating Trustee and the beneficiary Claimholders shall treat the Liquidating Trust as a liquidating trust within the meaning of Treasury Income Tax Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124.  For federal income tax purposes, the transfer of assets to the Liquidating Trust under the Plan is treated as a deemed transfer to the beneficiary Claimholders in satisfaction of their Claims followed by a deemed transfer of the assets by the beneficiary Claimholders to the Liquidating Trust.  For federal income tax purposes, the beneficiary Claimholders will be deemed to be the grantors and owners of the Liquidating Trust and its assets.  For federal income tax purposes, the Liquidating Trust will be taxed as a grantor trust within the meaning of IRC sections 671-677 (a non-taxable pass-through tax entity) owned by the beneficiary Claimholders.  The Liquidating Trust will file federal income tax returns as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 and report, but not pay tax on the Liquidating Trust's tax items of income, gain, loss deductions and credits ("Tax Items").  The beneficiary Claimholders will report on their federal income tax returns and pay any federal income tax liability attributable to such Liquidating Trust's Tax Items.  The Debtors, Liquidating Trust and the beneficiary Claimholders will use consistent valuations of the assets transferred to the Liquidating Trust for all federal income tax purposes, such valuations to be determined jointly by the Debtors and the Liquidating Trustee.

**F.    Release of Liens**

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, or other agreement created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens, or other security interests against the property of the Estates shall be released.

**G.    Exemption from Certain Transfer Taxes**

Pursuant to Bankruptcy Code section 1146(c), any transfers from any of the Debtors to the Liquidating Trust or to any other Person pursuant to the Plan in the United States shall not be subject to any stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment

71

and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## H.    Preservation of Causes of Action; Settlement of Causes of Action

### 1.    *Preservation of Causes of Action*

In accordance with section 1123(b)(3) of the Bankruptcy Code or any corresponding provision of similar federal or state laws, on and after the Effective Date, (a) the Liquidating Trustee shall be deemed to be a representative of the Debtors as the party in interest in these Chapter 11 Cases and any adversary proceeding in these Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal as to which any of the Debtors is a party and (b) the Liquidating Trustee shall retain all of the Causes of Action of the Debtors and their Estates, a nonexclusive list of which is set forth on Exhibit D annexed to the Plan, and other similar claims arising under applicable state laws, including, without limitation, Avoidance Actions, if any, and all other causes of action of a trustee and debtor in possession under the Bankruptcy Code.  The failure of the Plan Proponents to list a claim, right, cause of action, suit or proceeding on Exhibit D shall not constitute a waiver or release by the Debtors or their Estates of such claim, right of action, suit or proceeding.

### 2.    *Settlement of Causes of Action*

Subject to the terms of the Liquidating Trust Agreement, at any time after the Confirmation Date but before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors may settle some or all of the Causes of Action with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.  After the Effective Date, the Liquidating Trustee, in accordance with the terms of the Plan and the Liquidating Trust Agreement, will determine whether to bring, settle, release, compromise, enforce or abandon such rights (or decline to do any of the foregoing) in accordance with the Plan.

## I.    Provisions Governing Distributions

### 1.    *Special Provision Regarding Unimpaired Claims*

Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Bankruptcy Court, or any document or agreement enforceable pursuant to the terms of the Plan, nothing shall affect the rights and defenses, both legal and equitable, of the Debtors and the

Liquidating Trustee with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

### 2. *Allowed Claims*

Except as set forth in the Plan, the Liquidating Trustee shall only make Distributions to Holders of Allowed Claims.  No Holder of a Disputed Claim will receive any Distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim.

### 3. *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Distribution Date by the Liquidating Trustee.  Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to the terms and conditions of the Plan.

### 4. *Liquidating Trustee as Disbursing Agent*

The Liquidating Trustee shall make all Distributions required under the Plan, subject to the terms and provisions of the Plan and the Liquidating Trust Agreement.

### 5. *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

(a)    Delivery of Distributions in General

Distributions shall be made from the Liquidating Trust in accordance with the terms of the Plan and the Liquidating Trust Agreement.  In making Distributions under the Plan, the Liquidating Trustee may rely upon the accuracy of the claims register maintained by the Claims Agent in these Chapter 11 Cases, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

(b)    Undeliverable and Unclaimed Distributions

If the Distribution to any Holder of an Allowed Claim is returned to the Liquidating Trustee as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  Amounts in respect of undeliverable Distributions made by the Liquidating Trustee shall be returned to the

Liquidating Trustee until such Distributions are claimed.  The Liquidating Trustee shall, with respect to Cash, maintain in the Liquidating Trust Cash on account of undeliverable and unclaimed Distributions until such time as a Distribution becomes deliverable, is claimed or is forfeited as set forth in Section VII.E of the Plan.

### 6.    *Prepayment*

Except as otherwise provided in the Plan or the Confirmation Order, the Debtors or the Liquidating Trustee, as the case may be, shall have the right to prepay in their discretion, without penalty, all or any portion of an Allowed Administrative Claim, Allowed Priority Tax Claim, Allowed Miscellaneous Secured Claim or Allowed Non-Tax Priority Claim, at any time.

### 7.    *Means of Cash Payment*

Cash payments made pursuant to the Plan shall be in U.S. Dollars and shall be made, on and after the Effective Date, at the option and in the sole discretion of the Liquidating Trustee by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Liquidating Trustee.  In the case of foreign creditors, Cash payments may be made, at the option of the Liquidating Trustee, in such funds and by such means as are necessary or customary in a particular jurisdiction.

### 8.    *Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Claimholder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

### 9.    *Withholding and Reporting Requirements*

In connection with the Plan and all Distributions under the Plan, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding, payment, and reporting requirements.  The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or

74

appropriate to comply with such withholding, payment, and reporting requirements.  All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution.

**10.**    *Setoffs*

(a)    <u>By a Debtor</u>

Except as otherwise provided in the Plan, the Debtors, prior to the Effective Date, and the Liquidating Trustee, on and after the Effective Date, may, pursuant to Bankruptcy Code section 553 or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtors may have against the Holder of such Claim without seeking relief from the Bankruptcy Court; <u>provided, however</u>, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Liquidating Trust or the Liquidating Trustee of any such Claim that the Debtors may have against such Holder.

(b)    <u>By Non-Debtors</u>

Unless otherwise stipulated in writing by the Debtors (before the Effective Date) or by the Liquidating Trustee (after the Effective Date), any party against whom a claim or counterclaim is asserted by the Estates (an "Estate Claim") must assert any setoff rights, right of subrogation, or recoupment of any kind against such Estate Claim at the time it answers such Estate Claim, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred; provided, however that nothing herein shall limit the assertion of such right of setoff, subrogation or recoupment via an amended or supplemental pleading to the extent required by Rule 15 of the Federal Rules of Civil Procedure and/or Rule 7015 of the Federal Rules of Bankruptcy Procedure.

**11.**   ***Procedure for Treating and Resolving Disputed, Contingent and/or Unliquidated Claims***

The procedures for treating and resolving disputed, contingent and/or unliquidated claims are enumerated in Section VII.K. of the Plan.

**12.**   ***Distribution Record Date***

The Liquidating Trustee will have no obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all Plan purposes to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, as stated on the official claims register.

**J.**   **Treatment Of Executory Contracts And Unexpired Leases**

**1.**   ***Rejected Contracts And Leases.***

Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document, the Confirmation Order shall constitute an order under Bankruptcy Code section 365 rejecting all prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, (d) is identified in Exhibit C to the Plan as an executory contract or unexpired lease of the Debtors to be assumed; provided, however, that the Plan Proponents may amend such Exhibit C at any time prior to the Confirmation Date; provided further however, that listing such an agreement on such Exhibit shall not constitute an admission by a Debtor that such agreement is an executory contract  or unexpired lease or that any Debtor has any liability thereunder, or (e) is identified in Exhibit E to the Plan as an IT agreement that will ***not*** be rejected by the Plan, but will continue for up to 200 days after the Effective Date, and if not assumed by the expiration thereof, will be deemed to be automatically rejected without a further order of the Court (with creditors having 30 days after notice of rejection to file rejection damage claims, if any).

### 2.    *Bar to Rejection Damages*

If the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the Liquidating Trust, or their respective successors or properties unless a Proof of Claim is filed and served on the Liquidating Trust and counsel for the Liquidating Trustee within thirty (30) days after service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court.

### 3.    *Assumed and Assigned Contracts and Leases*

Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document entered into after the Petition Date or in connection with the Plan, the Confirmation Order shall constitute an order under Bankruptcy Code section 365 assuming, as of the Effective Date, those agreements listed on <u>Exhibit C</u> to the Plan; <u>provided, however</u>, that the Plan Proponents may amend such Exhibit at any time prior to the Confirmation Date; <u>provided further, however</u>, that listing an agreement on such Exhibit shall not constitute an admission by a Debtor that such agreement is an executory contract or unexpired lease or that any Debtor has any liability thereunder.

## K.    Confirmation And Consummation Of The Plan

### 1.    *Conditions Precedent to Confirmation and Effective Date*

The conditions precedent to the occurrence of Confirmation and the Effective Date that must either be satisfied or waived in writing are enumerated in Section IX.A and IX.B of the Plan.

### 2.    *Waiver of Conditions*

Each of the conditions set forth in Section IX.A and IX.B of the Plan may be waived in whole or in part by the Plan Proponents.  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such condition to be satisfied.

### 3.    *Consequences of Non-Occurrence of Effective Date*

In the event that the Effective Date does not timely occur, the Plan Proponents reserve all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated,

that the Plan be null and void in all respects, and/or that any settlement of Claims provided for in the Plan be null and void.

### 4.    *Substantial Consummation*

Substantial consummation of the Plan, as defined in Bankruptcy Code section 1101(2), shall not be deemed to have occurred unless and until all Allowed Administrative Claims, Priority Claims and Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Miscellaneous Secured Claims have been placed in a segregated reserve.

### L.    **Allowance And Payment Of Certain Administrative Claims**

#### 1.    *Professional Fee Claims*

##### (a)    Final Fee Applications

The Final Fee Applications must be filed no later than forty-five (45) days after the Effective Date.  Objections, if any, to Final Fee Applications of such Professionals must be filed and served on the Liquidating Trustee and its respective counsel, the requesting Professional and the Office of the U.S. Trustee no later than ninety (90) days from the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

##### (b)    Employment of Professionals after the Effective Date

Except as otherwise provided for in the Liquidating Trust Agreement, from and after the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 or any order previously entered by the Bankruptcy Court in seeking retention or compensation for services rendered or expenses incurred after such date shall terminate.

#### 2.    *Substantial Contribution Compensation and Expenses Bar Date*

Any Person who wishes to make a Substantial Contribution Claim based on facts or circumstances arising after the Petition Date, must file an application with the clerk of the Court, on or before the Administrative Claims Bar Date, and serve such application on counsel for the Plan Proponents and as otherwise required by the Court and the Bankruptcy Code on or before the Administrative Claims Bar Date, or be forever barred from seeking such compensation or expense

reimbursement.  Objections, if any, to the Substantial Contribution Claim must be filed no later than the Administrative Claims Objection Deadline, unless otherwise extended by Order of the Court.

### 3.    *Other Administrative Claims*

All other requests for payment of an Administrative Claim arising after the Petition Date up to and through the Effective Date, other than Professional Fee Claims, must be filed with the Court and served on counsel for the Plan Proponents no later than the Administrative Claims Bar Date.  Unless the Liquidating Trustee or any other party in interest objects to an Administrative Claim by the Administrative Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Liquidating Trustee or any other party in interest objects to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

## M.    **Effect Of Plan Confirmation**

### 1.    *Binding Effect*

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Equity Interests, and their respective successors and assigns, including, but not limited to, the Liquidating Trust and the Liquidating Trustee.

### 2.    *Discharge of the Debtors*

Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation will not discharge Claims against the Debtors; provided, however, that no Claimholder or Equity Interest Holder may, on account of such Claim or Equity Interest, seek or receive any payment or other Distribution from, or seek recourse against, any Debtor, the Liquidating Trust, the Liquidating Trustee, and/or their respective successors, assigns and/or property, except as expressly provided in the Plan.

### 3.    *Releases by the Debtors*

(a)    Professionals and Creditors' Committee

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors (in their individual capacities and as debtors and debtors in possession) will be deemed to release forever, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of

the Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other

agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the

ordinary course of business) whether liquidated or unliquidated, fixed or contingent, matured or

unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law,

equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other

occurrences taking place on or after the Petition Date through and including the Effective Date in

connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the negotiation and

filing of the Plan, the Disclosure Statement or any prior plans of reorganization, the filing of the

Chapter 11 Cases, the pursuit of confirmation of the Plan or any prior plans of reorganization, the

consummation of the Plan, the administration of the Plan, or the property to be liquidated and/or

distributed under the Plan, and that could have been asserted by or on behalf of the Debtors or their

Estates, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter

ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, in

any such case, against the Released Parties, *except* Avoidance Actions or objections to Proofs of

Claims filed by any Released Parties.

(b)        <u>Debtor Released Parties</u>

Pursuant to section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, the

Debtors, in their individual capacity and as debtors-in possession, for and on behalf of their Estates,

shall release and forever unconditionally release all the Debtors' present or former, officers, directors,

employees, attorneys, financial advisors, representatives or agents ("Debtor Released Parties") for

and from any and all Claims or rights contingent or existing as of the Effective Date in any manner

arising from, based on or relating to, in whole or in part, the Debtors, the subject matter of, or the

transactions or events giving rise to, any Claim or interest that is treated in the Plan, the business or

contractual arrangements between any Debtor or any Debtor Released Party, the restructuring of

Claims and interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence or event in

any manner related to any such Claims, interest, or the Chapter 11 Case, *except* for Avoidance

Actions or objections to Proof of Claims filed by any of the Debtor Released Parties.

No provision of the Plan or of the Confirmation Order, including without limitation, any release or exculpation provision, shall modify, release or otherwise limit the liability of any person not specifically released hereunder, including without limitation, any person that is a co-obligor or joint tortfeasor of a Debtor Released Party or that otherwise is liable under theories of vicarious or other derivative liability.

After the Effective Date, the Liquidating Trustee and the Liquidating Trust shall be bound, to the same extent the Debtor is bound, by all of the releases set forth above.

### 4.  *Release By Holders of Claims and Equity Interests*

On the Effective Date (a) each Person that votes to accept the Plan or any Person who fails to vote on the Plan, and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Equity Interests, in consideration for the obligations of the Liquidating Trust and the Liquidating Trustee under the Plan and the Cash and other consideration to be delivered in connection with the Plan and the Liquidating Trust, each entity (other than a Debtor) that has held, holds or may hold a Claim or Equity Interest, as applicable, (each, a "Release Obligor") shall have conclusively, absolutely, unconditionally, irrevocably and forever, released each Debtor Released Party from any Claim or Cause of Action (except Avoidance Actions) existing as of the Effective Date arising from, based on or relating to, in whole or in part, the subject matter of, or the transaction or event giving rise to, the Claim or Equity Interest of such Release Obligor, and any act, omission, occurrence or event in any manner related to such subject matter, transaction or obligation and any act, omission, occurrence, representation or failure to act that occurred prior to the Petition Date, including the decision to file and the preparation and filing the Chapter 11 cases and the timing of the commencement of the Chapter 11 Cases.

Notwithstanding the foregoing, however, this section shall not release any Debtor Released Party from any Claims or Causes of Action existing as of the Effective Date, based on (i) the Internal Revenue Code or other domestic state, city or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city or municipality, (iii) any criminal laws of the United States or any domestic state, city or municipality, (iv) Sections 1104-1109 and 1342(d) of the Employee

1  Retirement Income Security Act of 1974, as amended, (v) any Claim previously asserted or

2  hereinafter asserted that is covered by an existing policy of insurance, (vi) any Claim or Cause of

3  Action expressly reserved in the Plan or (vii) a Debtor Released Party's acts of gross negligence or

4  willful misconduct.

5      **5.**    *Injunction*

6      Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other

7  things, that **FROM AND AFTER THE EFFECTIVE DATE ALL PERSONS WHO HAVE**

8  **HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN THE**

9  **DEBTORS ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE**

10  **FOLLOWING ACTIONS AGAINST THE ESTATE(S), THE LIQUIDATING TRUST, THE**

11  **LIQUIDATING TRUSTEE, GIBRALTAR, OR ANY OF THEIR PROPERTY ON ACCOUNT**

12  **OF ANY SUCH CLAIMS OR EQUITY INTERESTS:  (A) COMMENCING OR**

13  **CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER**

14  **PROCEEDING; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN**

15  **ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER; (C) CREATING,**

16  **PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (D) ASSERTING A**

17  **SETOFF, RIGHT OF SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY**

18  **DEBT, LIABILITY, OR OBLIGATION DUE TO THE DEBTORS; (E) COMMENCING OR**

19  **CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER**

20  **PROCEEDING (INCLUDING, WITHOUT LIMITATION, ANY "DIRECT ACTION"**

21  **UNDER THE LAWS OF ANY STATE) TO OBTAIN OR CLAIM ENTITLEMENT TO THE**

22  **PROCEEDS OF ANY POLICY OF INSURANCE ISSUED BY GIBRALTAR WHICH**

23  **COVER CLAIMS AGAINST THE DEBTORS OR TO DETERMINE IF A CLAIM IS**

24  **COVERED BY ONE OR MORE POLICIES OF INSURANCE ISSUED BY GIBRALTAR;**

25  **AND (F) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY**

26  **ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE**

27  **PROVISIONS OF THE PLAN; <u>PROVIDED, HOWEVER</u>, THAT NOTHING CONTAINED**

28  **HEREIN SHALL PRECLUDE SUCH PERSONS FROM EXERCISING THEIR RIGHTS**

1   **PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN OR THE**

2   **CONFIRMATION ORDER.**

3         **6.**     *Term of Bankruptcy Injunction or Stays*

4       All injunctions or stays provided for in these Chapter 11 Cases under Bankruptcy Code

5   section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force

6   and effect until the Effective Date.  Upon the Effective Date, the immediately foregoing injunction

7   shall apply.

8         **7.**     *Exculpation and Limitation of Liability*

9         Except as otherwise specifically provided in the Plan, the Debtors, the Liquidating

10  Trustee, the Liquidating Trust, the Creditors' Committee, the members of the Creditors' Committee,

11  solely in their capacity as such, and any of the foregoing parties' respective present or former

12  members, officers, directors, employees, advisors, attorneys, representatives, financial advisors,

13  investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur

14  any claim, action, proceeding, cause of action, Avoidance Action, suit, account, controversy,

15  agreement, promise, right to legal remedies, right to equitable remedies, right to payment, or Claim

16  (as defined in Bankruptcy Code section 101(5)), whether known, unknown, reduced to judgment, not

17  reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

18  undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively, in law,

19  equity, or otherwise to one another or to any Claimholder or Equity Interest Holder, or any other

20  party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or

21  affiliates, or any of their successors or assigns, for any act or omission originating or occurring on or

22  after the Petition Date through and including the Effective Date in connection with, relating to, or

23  arising out of the Debtors, the Chapter 11 Cases, the negotiation and filing of the Plan, the Disclosure

24  Statement or any prior plans of reorganization, the filing of the Chapter 11 Cases, the pursuit of

25  confirmation of the Plan or any prior plans of reorganization, the consummation of the Plan, the

26  administration of the Plan, or the property to be liquidated and/or distributed under the Plan except

27  for their willful misconduct or gross negligence as determined by a Final Order of a court of

28  competent jurisdiction, and in all respects shall be entitled to rely reasonably upon the advice of

counsel with respect to their duties and responsibilities under the Plan; <u>provided, however</u>, that the foregoing shall not be deemed to exculpate or release any of the parties from Avoidance Actions or objections to Proofs of Claims that the Debtors may hold against such parties.

**VII.**
**<u>CERTAIN FACTORS TO BE CONSIDERED</u>**

The Holders of Claims against any of the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

**A.    General Considerations**

The Plan sets forth the means for satisfying the Claims against each of the Debtors.  Certain Claims and Equity Interests receive no Distributions pursuant to the Plan.

**B.    Certain Bankruptcy Considerations**

Even if all Impaired Classes vote in favor of the Plan and, with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan.  Bankruptcy Code section 1129 requires, among other things, a showing that the value of Distributions to dissenting Holders of Claims and Equity Interests may not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Plan Proponents believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  *See* <u>Appendix C</u> annexed hereto for a Liquidation Analysis of the Debtors.

The Plan provides for certain conditions that must be fulfilled prior to Confirmation of the Plan and the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be met (or waived) or that the other conditions to Confirmation, if any, will be satisfied.  If a chapter 7 liquidation were to occur, there is a substantial risk that the value of the Debtors' Estates would be substantially eroded to the detriment of all stakeholders.

**C.     Administrative and Priority Claims**

As discussed elsewhere in this Disclosure Statement, the Plan provides that additional Distributions under the Plan (in excess of any Distributions made during these Chapter 11 Cases) to Holders of General Unsecured Claims are entirely dependent on whether there will be net Cash remaining after payment in full or reserving for the payments in full of all Allowed Administrative, Priority Tax, Secured, and Non-Tax Priority Claims, and all other costs and expenses of the wind-down of the Debtors' Estates ("Net Distributable Proceeds").

While the Plan Proponents currently estimate that there will be Net Distributable Proceeds, all Allowed Administrative, Priority Tax, Secured, and Non-Tax Priority Claims have not yet been resolved or fixed in amount, and all costs and expenses of completing the wind-down of the Estates cannot be estimated with certainty.  As a result, the actual allowed amounts of all such Claims could turn out to be substantially higher than the estimate made by the Plan Proponents herein, and there can be no assurance that there will be any Net Distributable Proceeds.

Additionally, as the number and amount of Priority Tax Claims and Administrative Claims are presently unknown to the Debtors, it is possible that, if the actual number and amount of Priority Tax Claims and Administrative Claims exceeds the Debtors' estimates, the Debtors may not obtain enough Cash to satisfy all Priority Tax Claims and Administrative Claims in full.  Accordingly, should Priority Tax Claims and Administrative Claims exceed the amount of Cash held by the Debtors and Holders of such Priority Tax Claims and Administrative Claims refuse to consent to less than payment in full, the Bankruptcy Court may deny Confirmation of the Plan.  As set forth elsewhere in the Plan and the Disclosure Statement, the Debtors reserve their right to seek to dismiss or convert one or more of these Chapter 11 Cases.

**VIII.**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtors, the Liquidating Trust and certain Holders that are entitled to vote to accept or reject the Plan.  This discussion is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations

promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof, and all of which are subject to change, possibly with retroactive effect.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types of Holders subject to special treatment under the Tax Code (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and U.S. persons that have a functional currency other than the U.S. Dollar). This discussion assumes that Holders hold their Claims as capital assets for U.S. federal income tax purposes (generally, property held for investment). This discussion does not address any aspects of state, local or non-U.S. taxation or U.S. federal taxation other than income taxation. Furthermore, this discussion generally does not address the U.S. federal income tax consequences to Holders that are Unimpaired under the Plan or Holders that are not entitled to receive or retain any property under the Plan.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of

the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; (xi) whether the Claim, and any instrument received in exchange therefor, is considered a "security" for U.S. federal income tax purposes; and (xii) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. There can be no assurance that the Internal Revenue Service ("IRS") will not take a contrary view with respect to one or more of the issues discussed below. No ruling has been or will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE TAX CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**A.    Certain Tax Consequences of the Plan**

　　**1.    *Treatment of Transfers to and Distributions by the Liquidating Trust***

　　　　(a)    <u>Treatment of Holders of Interests in the Liquidating Trust</u>

For U.S. federal income tax purposes, all parties must treat the transfer of Assets to the Liquidating Trust as (i) a transfer of the Assets to the beneficiaries of the Liquidating Trust followed by (ii) a transfer of the Assets by such beneficiaries to the Liquidating Trust, with the beneficiaries being treated as the grantors and owners of the Liquidating Trust.  Each Holder that is a beneficiary of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim.  The amount realized for this purpose should generally equal the fair market value of the Assets deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim.  A Holder that is deemed to receive Assets under the Plan in respect of its Claim should generally have a tax basis in such Assets in an amount equal to the fair market value of such Assets on the date of receipt.

As each Holder's share of the Assets may change depending upon the resolution of Disputed Claims, Holders may be prevented from recognizing all of their loss in connection with the consummation of the Plan until all Disputed Claims have been resolved for U.S. federal income tax purposes.

The Liquidating Trustee and the beneficiaries of the Liquidating Trust are required to value the Assets consistently and to use such valuations for all U.S. federal income tax purposes.  The Liquidating Trust Agreement will provide for (i) consistent valuation of the Assets by the Liquidating Trustee and the beneficiaries of the Liquidating Trust, (ii) the Liquidating Trust to determine the fair market value of the Assets, and (iii) the Liquidating Trust to send such determination to each beneficiary of the Liquidating Trust.

(b)    Tax Treatment of Liquidating Trust

(i)    General

As described in Section VI.F.6 of the Plan, and except as otherwise described below, the parties believe and intend to take the position that, for U.S. federal income tax purposes, the Liquidating Trust is a grantor trust.

A grantor trust is treated as a pass-through entity for U.S. federal income tax purposes. Accordingly, in general, no tax should be imposed on the deemed transfer of Assets by a Holder to the Liquidating Trust.  In addition, no tax should be imposed on the Liquidating Trust on the deemed receipt of such Assets or on income earned or gain recognized by the Liquidating Trust with respect to those Assets.  Instead, the beneficiaries of the Liquidating Trust will be taxed on their respective allocable shares of such net income or gain in each taxable year of the Liquidating Trust, and will be responsible for paying the taxes associated with such income or gain whether or not they received any Distributions from the Liquidating Trust in such taxable year.

There can be no assurance that the IRS will agree with the classification of the Liquidating Trust or any reserves within the Liquidating Trust, as a grantor trust or part of a grantor trust, respectively.  A different classification could result in a different income tax treatment of the Liquidating Trust or a reserve within the Liquidating Trust.  Such treatment could include, but is not limited to, the imposition of an entity-level tax on either the Liquidating Trust or a reserve within the Liquidating Trust.  Such a tax, if imposed, could result in a material reduction in the amount that would otherwise be available for distribution to Holders.

(ii)    Reserves that may be Established by the Liquidating Trustee

A portion of the Assets transferred to the Liquidating Trust will be attributable to Disputed Claims.  The tax treatment of such transfers of Assets generally will be the same as the tax treatment of transfers of Assets with respect to Allowed Claims.  The Liquidating Trustee, however, may create one or more reserve accounts for the Assets held on account of Disputed Claims.  Under the Tax Code, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax.  Although the U.S. Treasury Department has issued certain Treasury regulations addressing the tax treatment of such funds, the U.S. Treasury Department has not issued Treasury

89

regulations to address the tax treatment of such funds in a bankruptcy context.  Accordingly, the proper tax treatment of such funds, and the extent to which a reserve established by the Liquidating Trustee would be treated as such a fund, is uncertain.  Depending on the facts and the relevant law, such funds may be treated as grantor trusts to debtors, grantor trusts to claimholders, or as trusts subject to an entity-level tax.  Except as described below, the Debtors intend to treat the Assets held in any reserve established by the Liquidating Trustee on account of Disputed Claims as having been transferred to the Liquidating Trust by the Holders of such Disputed Claims, and the Holders of the Disputed Claims as grantors and owners of the Liquidating Trust.

Under the Plan, the Liquidating Trust may be allowed, for federal income tax purposes, to treat an account, trust, fund or reserve that holds assets to satisfy the Disputed Claims as a Disputed Ownership Fund ("DOF") taxable under IRC section 468B and Treasury Income Tax Regulation section 1.468B-9.  If the Liquidating Trustee were to file an election to treat a reserve as a DOF, then the DOF would be treated as a separate taxable entity for U.S. federal income tax purposes, and would be required to file tax returns and pay any tax due on income earned or gain recognized that was attributable to the Assets held in the reserve with respect to which the DOF election was made.  Any tax liability of the DOF would reduce the distributions to certain Holders.  For purposes of determining the DOF's federal income tax liability, a DOF would not be required to report as income transfers of assets to the DOF, but would be required to include in income all income received or accrued from assets transferred to the DOF.  The DOF would not be allowed a tax deduction for a distribution of Assets or of the net after-tax income earned by the DOF to a Holder.  The initial tax basis of assets transferred to a DOF would be the fair market value of the assets determined on the date of transfer to the DOF, and the DOF's holding period would begin on the date of the transfer.

No assurance can be given that the IRS would accept a DOF election made by the Liquidating Trustee with respect to a reserve.  If the IRS were to successfully reject a DOF election, the reserve with respect to which the DOF election was made would be subject to the rules applicable to reserve accounts described above.

90

(c)     Tax Treatment of the Debtors

(i)     Recognition of Gain or Loss

The Debtors will recognize gain or loss equal to the difference between the fair market value of the Assets and the adjusted tax basis of such Assets at the time the Assets are transferred to the Liquidating Trust.  The Debtors anticipate that any net gain resulting from the transfer of Assets may be offset by the tax attributes available to the Debtors, such as net operating losses, capital loss carry-forwards and other deductions from, or offsets to, income.  The Debtors may, however, have some alternative minimum tax liability as a result of the transfer of the Assets.  Any such tax will be paid by the Debtors or the Liquidating Trust to the IRS.

The foregoing conclusions are based on, among other things, the Debtors' assumptions concerning the fair market value of the Assets and the nature and magnitude of their respective tax attributes.  Although the Debtors believe such assumptions are correct and appropriate, the IRS may challenge one or more of those assumptions, and if the IRS were to prevail in any such challenge, the Debtors' Estates could be subject to a tax liability that might be allowed as an Administrative Claim.  Such an Allowed Administrative Claim would reduce the funds available to administrative and other Creditors.

(ii)     Cancellation of Debt Income

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("COD") income recognized during the taxable year.  COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property transferred by the debtor in satisfaction of such discharged indebtedness (including stock).  COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

The Tax Code permits a debtor in bankruptcy to exclude its COD income from gross income if the discharge occurs in a title 11 case.  Thus, although the Debtors will realize COD income as a result of the satisfaction of Claims, the Debtors may not be required to recognize any of that COD income.

91

(d)    Treatment of Holders of Equity Interests

In accordance with the Plan, Holders of Equity Interests will not receive any recovery under the Plan.  A Holder of an Equity Interest will generally recognize a loss in an amount equal to such Holder's adjusted tax basis in the Equity Interest.  Capital losses are subject to various limitations under the Tax Code.

### 2.    *Allocation of Plan Distributions Between Principal and Interest*

Distributions under the Plan with respect to any Claim that is composed of indebtedness and accrued but unpaid interest on such indebtedness will, to the extent permitted by applicable law, be allocated for U.S. federal income tax purposes first to the principal amount of the Claim and second, to the extent the distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.  A Holder will generally recognize a loss to the extent that any accrued interest, including original issue discount ("OID"), was previously included in income and is not paid in full.  Current U.S. federal income tax law is unclear on this point, and no assurance can be given that the IRS will not challenge the Debtors' position.  Holders of Claims are urged to consult their own tax advisors regarding the particular U.S. federal income tax consequences to them of the treatment of accrued but unpaid interest, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

If, contrary to the intended position, such a distribution were treated as allocated first to accrued but unpaid interest, a Holder would realize ordinary income with respect to such distribution in an amount equal to the accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder would otherwise realize a loss as a result of the Plan.  A Holder should also recognize ordinary income (but not in excess of the amount of gain recognized, as described above) to the extent a distribution is received in exchange for market discount not previously taken into account under the Holder's method of accounting.

### 3.    *Withholding, Backup Withholding, and Information Reporting*

In connection with the Plan and all Distributions under the Plan, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions

under the Plan shall be subject to any such withholding, payment, and reporting requirements.  The

Liquidating Trustee shall be authorized to take any and all actions that may be necessary or

appropriate to comply with such withholding, payment, and reporting requirements.  All amounts

properly withheld from Distributions to a Holder as required by applicable law and paid over to the

applicable taxing authority for the account of such Holder shall be treated as part of the Distributions

to such Holder.  All persons holding Claims shall be required to provide any information necessary to

effect information reporting and withholding of such taxes.  For example, with respect to any

employee-related withholding, if the Debtors are obligated by law to withhold amounts from

Distributions to a present or former employee to satisfy such present or former employee's tax and

other payroll obligations, the Liquidating Trustee may withhold a portion of the Distributions

allocated to the Holder of an Allowed Claim that is a present or former employee, whether or not

such Distributions are in the form of Cash, in such amount as is determined necessary to satisfy such

Holder's tax and other payroll obligations with respect to the Distributions.

Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is

to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the

satisfaction and payment of any tax obligations imposed by any governmental unit, including income,

withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall

be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made

arrangements satisfactory to the Liquidating Trustee for the payment and satisfaction of such

withholding tax obligations or such tax obligation that would be imposed upon the Liquidating

Trustee in connection with such Distribution.  Any property to be distributed pursuant to the Plan

shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution

pursuant to Section VII.E.2. of the Plan.

Moreover, under certain circumstances, Holders may be subject to "backup withholding" with

respect to payments made pursuant to the Plan, unless such Holder either (i) comes within certain

exempt categories (which generally include corporations) and, when required, demonstrates this fact,

or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury

that the Holder is a U.S. person, that its taxpayer identification number is correct and that it is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds.  Each Holder is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**B.    Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**IX.**
**FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS**

**A.    Feasibility of the Plan**

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or reorganization is proposed in the Plan.  *See* 11 U.S.C. § 1129(a)(11).  The Plan provides for the

liquidation of the Debtors' Assets and the Distribution of the proceeds to Holders of Allowed Claims.
The Plan Proponents believe that the Cash on hand and the proceeds from the Assets will be
sufficient to pay all Administrative and Priority Claims that become Allowed, based upon the Plan
Proponents' estimates.  Accordingly, the Plan Proponents believe that the Plan is feasible

**B.      Acceptance of the Plan**

As a condition to confirmation of any plan, the Bankruptcy Code requires that each class of
impaired claims vote to accept that plan, unless the plan satisfies the best interests test, as set forth
below.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims
as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in
number of claims in that class, but for that purpose counts only those who actually vote to accept or
to reject a plan.  Thus, Impaired Classes under the Plan will have voted to accept such Plan only if
two-thirds (2/3) in amount and a majority in number actually voting in each Class cast their Ballots in
favor of acceptance.  Holders of Claims who fail to vote for the Plan are not counted as either
accepting or rejecting that Plan.

**C.      Best Interests Test**

As noted above, even if a plan is accepted by the holders of each class of claims and interests,
the Bankruptcy Code requires a bankruptcy court to determine that such plan is in the best interests of
all holders of claims or interests that are impaired by that plan and that have not accepted that plan.
The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a bankruptcy
court to find either that all members of an impaired class of claims or interests have accepted the plan
or that the plan will provide a member who has not accepted the plan with a recovery of property of a
value, as of the effective date of the plan, that is not less than the amount that such holder would
recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests
if the debtors were liquidated under chapter 7, a bankruptcy court must first determine the aggregate
dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to
chapter 7 cases under the Bankruptcy Code.  Because, here, the Plan is a liquidating plan, the

"liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.  However, the Plan Proponents believe that in a chapter 7 liquidation, there would be *additional* costs and expenses that the Estates would incur.  Such costs would include the compensation of a trustee, as well as compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in these Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases, litigation costs, and Claims arising from the operations of the Debtors during the pendency of these Chapter 11 Cases.  As such, there is no reason to believe that Creditors of the Debtors would receive more in a chapter 7 liquidation than they would receive under the Plan.

**D.        Liquidation Analysis**

In order to determine the amount of hypothetical chapter 7 liquidation value available to Creditors, the Plan Proponents have prepared a liquidation analysis, a copy of which is annexed hereto as <u>Appendix C</u> (the "Liquidation Analysis").  The Plan Proponents believe that such Liquidation Analysis demonstrates that in a chapter 7 liquidation, Holders of certain Claims against the Debtors, including General Unsecured Claimholders, would receive less of a recovery as compared to the recovery under the Plan.

Notwithstanding the foregoing, the Plan Proponents believe that the Liquidation Analysis with respect to the Debtors is inherently speculative.  The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that will be available after completion of a chapter 7 wind-down.  Claims estimates are based solely upon the Plan Proponents' review of any Claims filed (a review that is ongoing) and the Debtors' books and records.  No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis.

The Plan Proponents reserve the right under the Plan to revoke or withdraw the Plan at any time prior to Confirmation.  If the Plan is withdrawn, the Plan Proponents reserve the right to request that these Chapter 11 Case be converted to one under chapter 7, although as set forth above and in

this section, the Plan Proponents believe that Creditors will receive a higher recovery through the Plan than through chapter 7.

**E.      Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Plan**

It is impossible for the Plan Proponents to determine with any specificity the value each Creditor will receive as a percentage of its Allowed Claim.  This difficulty in estimating the value of recoveries is due to, among other things, the inherent uncertainty in estimating the amount of Administrative Claims, Priority Tax Claims, Miscellaneous Secured Claims, and Non-Tax Priority Claims that will ultimately become Allowed, as well as, to a lesser degree, the ultimate amount of Allowed Claims in any Impaired Class.

Notwithstanding the difficulty in quantifying recoveries to Holders of Allowed Claims with precision, the Plan Proponents believe that the Liquidation Analysis and proposed recoveries to each Class of Impaired Claims under the Plan imply a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation.  Accordingly, the Plan Proponents believe that the "best interests" test of Bankruptcy Code section 1129 is satisfied.

**F.      Confirmation Without Acceptance of All Impaired Classes:  The "Cramdown" Alternative**

Under the Plan, Classes 11 and 12 are deemed to have rejected the Plan.  In view of the deemed rejection by such Holders, the Plan Proponents will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Specifically, Bankruptcy Code section 1129(b) provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  A bankruptcy court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan.  11 U.S.C. § 1129(b)(1).

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.  Moreover, a plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property

that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.  11 U.S.C. § 1129(b)(2)(B).

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain any property at all on account of such junior interest under the plan.  11 U.S.C. § 1129(b)(2)(C).

For example, if a class of unsecured claims rejects a plan under which a junior class (*e.g.*, a class of interest holders) will receive or retain any property under the plan, the plan cannot be confirmed (with certain possible exceptions not relevant to the plan) unless the plan provides that the class of unsecured creditors receives value equal to the allowed amount of the claims in that class. This is not the case under the Plan in these Chapter 11 Cases.  Contrary to the foregoing example, because neither Class 11 nor Class 12 will receive any Distribution under the Plan, and there is no class that is junior to Class 12, the Plan Proponents submit that the Plan is fair and equitable as to such Classes of Holders.  Moreover, the Plan does not discriminate unfairly because the Plan treats all Holders within these Classes equally with respect to other classes of equal rank.

## X.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

As discussed immediately above, the Plan Proponents believe that the Plan affords Holders of Claims the potential for a better realization on the Debtors' Assets than a chapter 7 liquidation, and, therefore, is in the best interests of such Holders.

If, however, the requisite acceptances of voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative plan or plans of liquidation, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**A.      Alternative Plan(s) of Liquidation**

If the requisite acceptances are not received or if the Plan is not confirmed, the Plan Proponents or any other party in interest could attempt to formulate and propose a different plan or plans of liquidation.

With respect to an alternative liquidation plan, the Plan Proponents have explored various other alternatives in connection with the extensive negotiation process involved in the formulation and development of the Plan.  The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

**B.      Liquidation under Chapter 7**

If no Plan is confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to complete the liquidation of the Debtors' assets for Distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Equity Interests in the Debtors.

The Plan Proponents believe that in a liquidation under chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a diminution in the value of the Debtors' Estates. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority.  In such a case, the proceeds of the liquidation would be distributed by the chapter 7 trustee in accordance with chapter 7.  The Plan Proponents believe that such a result would reduce Distributions to all Holders of General Unsecured Claims compared to those under the Plan, because of additional administrative expenses for the chapter 7 trustee and professionals retained by it.  *See* Appendix C.

**C.      Dismissal of the Chapter 11 Cases**

If no Plan is confirmed, the Debtors or other parties in interest may seek dismissal of these Chapter 11 Cases pursuant to Bankruptcy Code section 1112.  Without limitation, dismissal of these

99

Chapter 11 Cases would terminate the automatic stay and might allow certain Creditors to foreclose on their Liens on substantially all of the Debtors' remaining assets.  Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' remaining assets, would lower the return to Creditors and would reduce any return to Holders of Claims other than Miscellaneous Secured Claims.

## XI.
## PLAN VOTING INSTRUCTIONS AND PROCEDURES

**A.    Notice to Holders of Claims and Equity Interests**

This Disclosure Statement will be made available to Holders of Claims that are entitled to vote on the Plan.  A discussion and listing of those Holders of Claims that are entitled to vote on the Plan and those Holders of Claims that are not entitled to vote on the Plan is provided herein.  The primary purpose of this Disclosure Statement is to provide adequate information to enable such Claimholders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court has been asked to approve this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable such Claimholders to make an informed judgment with respect to acceptance or rejection of the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT (WHEN SUCH APPROVAL IS OBTAINED) DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

WHEN AND IF CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, WHETHER OR NOT SUCH HOLDERS ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT HOLDERS RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS, YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT CAREFULLY.  IN PARTICULAR, ALL HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS

DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR

ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  This Disclosure Statement

contains important information about the Plan, the Debtors' businesses and operations, considerations

pertinent to acceptance or rejection of the Plan and developments concerning these Chapter 11 Cases.

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN**

**CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO**

**SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS**

**DISCLOSURE STATEMENT, AND NO PERSON HAS BEEN AUTHORIZED TO**

**DISTRIBUTE ANY INFORMATION OR MAKE ANY STATEMENTS CONCERNING THE**

**DEBTORS OTHER THAN THE INFORMATION CONTAINED HEREIN.**

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT

IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES AND

ASSUMPTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE

RESULTS.  Except as otherwise specifically and expressly stated herein, this Disclosure Statement

does not reflect any events that may occur subsequent to the date hereof and that may have a material

impact on the information contained in this Disclosure Statement.  The Debtors do not anticipate that

any amendments or supplements to this Disclosure Statement will be distributed to reflect such

occurrences.  Accordingly, the delivery of this Disclosure Statement shall not under any circumstance

imply that the information herein is correct or complete as of any time *subsequent* to the date hereof.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED

BY A CERTIFIED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN

ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**B.**      **Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity

interests in classes of claims or equity interests that are impaired *and* that are in a class that will

receive a distribution under a proposed chapter 11 plan are entitled to vote to accept or reject a

proposed chapter 11 plan.  Classes of claims in which the holders of claims are unimpaired under a

chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject

the plan.  Classes of claims or interests that receive no distribution on account of their claims or interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitled the holder thereof, or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In addition, a holder of an impaired claim or interest which is entitled to receive or retain property under a plan may vote to accept or to reject a plan only if the claim or interest is "allowed" for purposes of voting, which means generally that no party in interest has objected to such claim or interest or, if no proof of claim was filed, that such claim or interest has not been scheduled by the Debtor as contingent, unliquidated or disputed.

Accordingly, the Holder of a Claim against a Debtor that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (i) the Plan provides a Distribution in respect of such Claim, (ii) (a) the Claim has been scheduled by the Debtors (and such claim is not scheduled at zero or as disputed, contingent or unliquidated) or (b) the Claimholder has filed a Proof of Claim on or before the bar date applicable to such Holder, pursuant to Bankruptcy Code sections 502(a) and 1126(a) and Bankruptcy Rules 3003 and 3018, and (iii) (a) no objection to the Claim has been timely filed or any timely objection been withdrawn, dismissed or denied by Final Order, or (b) pursuant to Bankruptcy Rule 3018(a), upon application of the Holder of the Claim with respect to which there has been an objection, the Bankruptcy Court temporarily allows the Claim in an amount that the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan, all as further set forth in the motion for a Solicitation Procedures Order.

Under the Plan, Classes 1, 4 and 13 are Unimpaired and are conclusively presumed under Bankruptcy Code section 1126(f) to have accepted the Plan, and their votes to accept or to reject the Plan will not be solicited.  Classes 2, 3, 5, 6, 7, 9, 10, 11, and 12 are Impaired under the Plan and are entitled to vote on the Plan, subject to the limitations set forth above.  Classes 8, 14 and 15 are

Impaired under the Plan and will not receive or retain any Distribution or property under the Plan on account of their Claims or Equity Interests and, therefore, are deemed under Bankruptcy Code section 1126(g) to have rejected the Plan and are not entitled to vote to accept or reject the Plan.  Pursuant to Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

**C.      Solicitation Package**

Unless ordered otherwise by the Bankruptcy Court, accompanying this Disclosure Statement are copies of (1) the Plan; (2) the notice of the confirmation hearing and related matters, setting forth (i) the time fixed for returning Ballots to accept or reject the Plan, (ii) the time fixed for filing objections to confirmation of the Plan, (iii) the date and time of the hearing on confirmation, and (iv) the website address where the Plan and this Disclosure Statement (among other Plan related documents) can be downloaded for free (the "Confirmation Hearing Notice"); (3) if you are the Holder of Claim(s) entitled to vote on the Plan, one or more Ballots to be used by you in voting to accept or reject the Plan; (4) the order approving this Disclosure Statement (the "Disclosure Statement Order"); and (5) a plan support letter authored by the Plan Proponents (the "Plan Support Letter").

The Solicitation Package contains hard copies of the Confirmation Hearing Notice, Ballot and Plan Support Letter, and CD-Rom copies of the Plan, Disclosure Statement, and Disclosure Statement Order.

The Confirmation Hearing Notice sets forth in detail, among other things, procedures governing voting deadlines and objection deadlines with respect to the Plan and confirmation of the Plan.  The Confirmation Hearing Notice and the instructions attached to the Ballot should be read in connection with this section of the Disclosure Statement.

**D.      Voting Procedures, Ballots and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used for each separate Class of Claims.  After carefully reviewing the Plan, this Disclosure Statement and the detailed instructions

accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot.  Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you.  You must complete and sign your original Ballot (copies will not be accepted) and return it to the Voting Agent by the Voting Deadline as follows:

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u> NO LATER THAN  **May 19, 2010 AT 5:00 P.M. (PACIFIC TIME)** (THE "VOTING DEADLINE") BY GRANT THORNTON, LLP (THE "VOTING AGENT").

DO NOT RETURN ANY STOCK CERTIFICATES OR DEBT INSTRUMENTS WITH YOUR BALLOT.

If you have any questions about (i) the procedure for voting your Claim or with respect to the materials that you have received or (ii) the amount of your Claim, please contact the Voting Agent at the address listed on your Ballot.

*Alternatively, if you wish to obtain a copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please visit: <u>http://www.kccllc.net/fleetwood</u> to download free copies.*

**E.    Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Bankruptcy Code section 1128 and Bankruptcy Rule 3017(c), the Confirmation Hearing date and the date by which objections to Confirmation must be filed are set forth in the Confirmation Hearing Notice.  The Confirmation Hearing will be held before the Honorable Meredith A. Jury, United States Bankruptcy Judge for the Central District of California, in the Bankruptcy Court, 3420 Twelfth Street, Courtroom 301, Riverside, CA 92501-3819.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

1    **F.**    **Internet Access to Bankruptcy Court Documents**

2         Bankruptcy Court documents filed in these Chapter 11 Cases as well as the Bankruptcy

3  Court's calendar and other administrative matters may be found, downloaded and printed from the

4  Bankruptcy Court's website found at http://www.caeb.uscourts.gov through an account obtained from

5  Pacer Service Center by dialing 1-800-676-6856 (from the United States) or (210) 301-6440 (from

6  outside the United States).   Free copies can be found, downloaded and printed from

7  http://www.kccllc.net/fleetwood.

8                                     **XII.**

9                  **RECOMMENDATION AND CONCLUSION**

10        For all of the reasons set forth in this Disclosure Statement, the Plan Proponents believe that

11 confirmation and consummation of the Plan is preferable to all other alternatives.   Consequently, the

12 Plan Proponents urge all Holders of Claims in Impaired Classes to vote to ACCEPT the Plan, and to

13 complete and return their Ballots so that they will be RECEIVED by the Voting Agent on or before

14 5:00 p.m. (Pacific Time) on May 19, 2010.

15 DATED:  March 3, 2010              Respectfully submitted,

16                              **FLEETWOOD ENTERPRISES, INC. AND ITS**
**AFFILIATED DEBTORS AND DEBTORS IN**
17                              **POSSESSION IN THE CHAPTER 11 CASES**

18

19                            By: _____

20                            Name:  Andrew Griffiths
                           Title:   Chief Financial Officer

21

22 100775090_1.DOC

23

24

25

26

27

28

105