# Exhibit A

CRAIG H. MILLET, SBN 106027, CMillet@gibsondunn.com
KENNETH A. GLOWACKI JR., SBN 217762, KGlowacki@gibsondunn.com
SOLMAZ KRAUS, SBN 223117, SKraus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, California 92612-4412
Telephone: (949) 451-3800
Facsimile: (949) 451-4220

Attorneys for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re | CASE NO. 09-14254-MJ |
| FLEETWOOD ENTERPRISES, INC., et al., | Chapter 11 |
| Debtors. | [Jointly Administered] |
| | **DEBTORS' FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED JOINT PLAN OF LIQUIDATION OF FLEETWOOD ENTERPRISES, INC. AND ITS AFFILIATED DEBTORS AND THE OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS DATED APRIL 12, 2010** |

**Hearing On Disclosure Statement:**
Date:    April 14, 2010
Time:    2:30 p.m.
Place:   Courtroom 301
         3420 Twelfth Street
         Riverside, CA 92501

Judge:   Honorable Meredith A. Jury

*****THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE FIRST AMENDED PLAN OF LIQUIDATION DESCRIBED HEREIN.  ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF SUCH PLAN OF LIQUIDATION.  THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A BANKRUPTCY COURT DETERMINATION THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.*****

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED JOINT PLAN OF LIQUIDATION OF FLEETWOOD ENTERPRISES, INC. AND ITS AFFILIATED DEBTORS AND THE OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN AS SET FORTH IN THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF FLEETWOOD ENTERPRISES, INC. OR ANY OF THE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE

CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, FLEETWOOD ENTERPRISES, INC. OR ANY OF THE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.

### OVERVIEW OF THE CHAPTER 11 CASES, THE PLAN AND THE TREATMENT OF CLAIMS AND EQUITY INTERESTS THEREUNDER

This first amended disclosure statement (the "Disclosure Statement") contains, among other things, descriptions and summaries of provisions of the First Amended Joint Plan of Liquidation of Fleetwood Enterprises, Inc. and its Affiliated Debtors (collectively, the "Debtors" or "Fleetwood") and the Official Committee of Creditors Holding Unsecured Claims (the "Creditors' Committee"), dated as of April 12, 2010 (the "Plan"). The Debtors and the Creditors' Committee are the proponents of the Plan (the "Plan Proponents").

*The following introduction and summary (the "Overview") is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. This Overview is intended solely as a summary of the background of the Debtors' Chapter 11 Cases and the distribution provisions of the Plan and is qualified in its entirety by the terms and provisions of the Plan.*

YOUR RIGHTS MAY BE AFFECTED BY PLAN CONFIRMATION. FOR A COMPLETE UNDERSTANDING OF THE PLAN AND HOW IT MAY AFFECT YOUR RIGHTS, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY.

All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. A copy of the Plan is annexed hereto as Appendix A.

A.    **Introductory Note**

Fleetwood Enterprises, Inc. ("FEI") and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") on March 10, 2009 (the "Petition Date"),[1] thereby commencing these cases (the "Cases"). The Cases are pending before the United States Bankruptcy Court for the Central District of California, Riverside Division, before the Honorable Meredith Jury (the "Bankruptcy Court" or "Court"). The Cases are being jointly administered under Cases No. 09-14254-MJ. The Debtors are managing their affairs as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

B.    **General Structure of the Plan**

The Plan is a liquidating plan. Pursuant to prior orders of the Bankruptcy Court, the Debtors have sold or will sell substantially all of their Assets. The Plan provides for the orderly liquidation of the remaining Assets of the Debtors and the distribution of the proceeds of the liquidation of the Debtors' Assets according to the priorities set forth in the Bankruptcy Code. To accomplish these liquidation and distribution goals, the Plan contemplates the creation of a Liquidating Trust to hold estate assets and the appointment of a Liquidating Trustee to administer such assets.

---

[1]  For the reasons set forth below in section III.E., five additional Fleetwood retail debtors filed their chapter 11 petitions on July 29, 2009 and August 11, 2009. However, for purposes of this Disclosure Statement, the Petition Date is defined as March 10, 2009.

The Plan also provides for the substantive consolidation of all fifty (50) of the Debtors' estates. Following entry of the order approving the Plan (the "Confirmation Order"), on the Effective Date, (i) all Intercompany Claims by, between and among the Debtors shall be eliminated, (ii) all assets and liabilities of the Debtors shall be merged or treated as if they are one set of assets and liabilities, (iii) any obligation of a Debtor and all guarantees thereof by one or more of the other Debtors shall be deemed to be one obligation, (iv) the Equity Interests shall be cancelled, and (v) each Claim filed or to be filed against any Debtor shall be deemed a single Claim against, and a single obligation of, the consolidated Debtors.

**C.    Summary of Treatment of Claims and Equity Interests Under the Plan**

Under the Plan, Claims and Equity Interests are treated according to the priority rules set forth in the Bankruptcy Code. Under the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan. Allowed Administrative Claims are intended to be paid in full on or, as soon as reasonably practicable after, the Distribution Date of the Plan (or thereafter when they become allowed) or, for ordinary course Administrative Claims, when such Claims become due. Priority Tax Claims are intended to be paid in full in regular installment Cash payments, occurring not less frequently than quarterly over a period not exceeding five (5) years after the Petition Date.

A Claim is a Disputed Claim until it becomes an Allowed Claim. Only an Allowed Claim will receive a distribution under the Plan. The table below summarizes the classification and treatment of prepetition Claims and Equity Interests under the Plan. The table below also contains an estimate of the percentage recoveries that the Plan Proponents believe will ultimately be available to each Class of Claims. These estimates are based upon a number of assumptions, which may or may not prove to be accurate.

**Summary of Claims Against, and Equity Interests in, the Debtors**

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| N/A | Administrative Claims | $3.1 million | Full payment – one hundred cents on the dollar (100/100) upon the earlier of the Distribution Date immediately following the date the Claim becomes an Allowed Claim or the date that is ninety (90) days after the date on which such Claim becomes an Allowed Claim. |
| N/A | Priority Tax Claims | $1.0 million | Full payment – one hundred cents on the dollar (100/100) consistent with Bankruptcy Code section 1129(a)(9)(C). |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 1 | Non-Tax Priority Claims | $7.2 million | Full payment – one hundred cents on the dollar (100/100). Cash equal to the unpaid portion of the Allowed Non-Priority Claim or such other treatment as agreed upon between the Claim holder and the Liquidating Trustee upon the earlier of the Distribution Date immediately following the date that the Claim becomes an Allowed Claim or 90 days after the date when such claim becomes an Allowed Claim.<br><br>Estimated Projected Payment: 100%<br>**Unimpaired; Deemed to Accept** |
| 2 | Secured Credit Facility Claim | $1.7 million | Cash equal to 105% of the face amount as of the Effective Date of Outstanding Letters of Credit (as defined in the Interim DIP Order) issued on behalf of any or all of the Debtors by Bank of America, which shall be placed in a segregated account, plus the other treatment as more fully set forth in Section IV.B.2 of the Plan.<br><br>Estimated Projected Payment: 100%<br>**Impaired; Entitled to Vote** |
| 3 | ISIS Claim | $17.8 million | On or as soon as reasonably practicable after the Effective Date, the Allowed ISIS Claim shall be cured and reinstated within the meaning of section 1124 of the Bankruptcy Code.<br><br>Estimated Projected Payment: 100%<br>**Unimpaired; Not Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 4 | Miscellaneous Secured Claims | Unknown | At the election of the Liquidating Trustee, (i) Cash equal to the lesser of the unpaid portion of such Allowed Claim and the value of the Holder's Collateral securing the Miscellaneous Secured Claim as required pursuant to section 506(b) of the Bankruptcy Code; (ii) a return of the Holder's Collateral; or (iii) such other treatment as agreed to in writing upon the earlier of (a) the Distribution Date immediately following the date the Claim becomes an Allowed Claim or (b) the date that is ninety (90) days after the date on which such Claim becomes an Allowed Claim.<br><br>Estimated Projected Payment: 100%<br>**Unimpaired; Deemed to Accept** |
| 5 | 14% Notes Claims | $84.3 million | On the Effective Date, the Liens of the 14% Notes shall remain as valid Liens for Plan purposes only and the 14% Notes Claims shall be Allowed as a Secured Claim in the amount of $84,256,664. In full and final satisfaction of their Secured Allowed Claim, the 14% Notes Claims shall receive their Pro Rata share of 43.5% of the Net Distributable Proceeds, net of the fees and expenses payable to DB and Whippoorwill and the distribution to Class 8, the Initial Net Distributable Proceeds of which shall be payable on the Effective Date, and the balance of which shall be distributable on each subsequent Distribution Date, as reasonably practicable after the Liquidating Trust acquires such Net Distributable Proceeds. *See* Section IV.B.5 in the Plan for further treatment.<br><br>Estimated Projected Payment: 21%<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 6 | General Unsecured Claims | $115 million to $195 million | Provided that all Allowed Administrative Claims, Priority Claims and Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Secured Claims have been placed in a segregated reserve, as set forth in the Plan and in the Liquidating Trust Agreement, and subject to the occurrence of the Effective Date, on, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date that is ninety (90) days after the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed General Unsecured Claim, Pro Rata with the Holders of Allowed Class 6 and Class 10 Claims, its share of the Initial Net Distributable Proceeds and, on each Periodic Distribution Date, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Periodic Net Distributable Proceeds. In the aggregate, including any distributions herein to Classes 7, 10 (to the extent of any deficiency), 11 (to the extent of any deficiency), Allowed General Unsecured Claims shall receive 56.5% of the Net Distributable Proceeds available for distribution.<br><br>Estimated Projected Payment: 10.3% to 17.4%<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 7 | 6% Notes Claims | $161.173 million | Provided that all Allowed Administrative Claims, Priority Claims and Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Secured Claims have been placed in a segregated reserve, as set forth in the Plan and in the Liquidating Trust Agreement, and subject to the occurrence of the Effective Date, and subject to acceptance of the Plan by Class 7, Holders of 6% Notes Claims shall receive $2 million from the 56.5% Net Distributable Proceeds allocable to the General Unsecured Claims, which amount shall be paid at the time Distributions are made to General Unsecured Creditors pursuant to the Plan or as the Liquidating Trustee shall determine in its sole and absolute discretion. Concurrently with the final payment of Professional Fee Claims for the Debtors and the Creditors' Committee after the Effective Date and provided that Class 7 has voted to accept the Plan, the professional fees and expenses of the indenture trustee of the 6% Notes and the trustee's professionals shall be paid to such applicable indenture trustee or professional, subject to a review for reasonableness by the Creditors' Committee, out of the 56.5% of the Net Distributable Proceeds allocable to the Allowed General Unsecured Claims, but if at the time of such distribution, there are insufficient funds to make payment in full, then such fees shall be paid Pro Rata with other professionals paid at such time. <br><br>Estimated Projected Payment:  1.2% <br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 8 | 5% Notes Claims | $1.069 million | Pursuant to the terms of the Noteholder Settlement among the Creditors' Committee and the Holders of a majority of the 14% Notes, the parties agreed that the Holders of the 14% Notes Claims would pay for the Distribution to the Holders of the 5% Notes Claims, if any, out of the 43.5% of the Net Distributable Proceeds allocable to the Allowed 14% Notes Claims. ~~Plan~~ Pursuant to negotiations between the Holders of a majority of the 14% Notes and Law Debenture Trust Company of New York, as indenture trustee for the 5% Notes (the "5% Indenture Trustee"), provided that Class 8 does not vote to reject the Plan and the 5% Indenture Trustee does not object to the Plan or Disclosure Statement, Holders of the Allowed 14% Notes Claims will allocate to Holders of Allowed 5% Notes Claims a total of $75,000 from the 43.5% of Net Distributable Proceeds allocated to the Allowed 14% Notes Claims. The $75,000 distribution to Holders of Allowed 5% Notes Claims shall include all fees and expenses of the 5% Indenture Trustee and shall be subject to the exercise by such 5% Indenture Trustee of any contractual right of priority or charging lien under the 5% Notes indenture for payment of its fees and expenses. Distributions to Holders of Class 8 Claims shall be made pro rata and contemporaneously with the first distribution to the Holders of Class 5 Claims, other than payments for fees and expenses of DB and Whippoorwill.<br><br>Estimated Projected Payment: 6.8%<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 9 | Convenience Claims | $5 million (approximate) | Holders of an Allowed Convenience Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Convenience Claim, 25% of their Allowed Claim as a final distribution.  Holders of Class 6 Claims in excess of $10,000 will be eligible to opt into this Class by reducing their claim to $10,000 by checking the "Opt-In to Convenience Class" box on their ballot.  Total distributions under this Class are anticipated to be limited to $1.25 million, subject to the Liquidating Trustee's discretion to increase this amount at the time of the Initial Distribution Date.  In the event that this Class has greater demand than funds allocated to this Class, then the Liquidating Trustee shall have the absolute discretion to select and remove certain of the opt-in members of this Class.  In no instance shall the Liquidating Trustee remove a non-opt-in Allowed Convenience Claim from this Class.<br><br>Estimated Projected Payment:  22.4%<br>**Impaired; Entitled to Vote** |
| 10 | Product Liability PI Claims | Unknown | Unless their Product Liability PI Claim has previously become an Allowed Claim, all Holders of Claims in Class 10 shall be required to participate in the Product Liability PI Claim Mediation Process attached to the Disclosure Statement as <u>Appendix E</u>.  As provided in the Product Liability PI Claim Mediation Process, if and when Allowed, Holders of Class 10 Claims shall receive a Pro Rata distribution of available insurance proceeds from Gibraltar policies covering Product Liability PI Claims upon the year in which the claim arose.  To the extent the allowed amount of any Class 10 Claim is not paid in full with insurance proceeds, then the unpaid deficiency amount shall receive the treatment provided for under Class 6 for Allowed General Unsecured Claims.<br><br>Estimated Projected Payment:  Unknown<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 11 | WARN Class Claims and Severance Class Claims | Unknown | If the WARN and Severance Class Settlement Agreement is approved: <br>• Class Members who do not Opt Out will receive the treatment afforded in the WARN and Severance Class Settlement. <br>• Class Members who Opt Out, who have filed claims and whose Claims are Allowed Claims, shall receive full payment of their Claims up to the cap set by Bankruptcy Code section 507 with any excess treated as an unsecured claim to share Pro Rata with Claims in Class 6. <br>If the WARN and Severance Class Settlement Agreement is *not* approved: <br>• The WARN Class Claim and Severance Class Claims shall continue to be litigated and class members whose Claims become Allowed Claims, shall receive full payment of their Claims up to the cap set by Bankruptcy Code section 507 with any excess treated as Claims in Class 6. <br><br>Estimated Projected Payment:  Unknown <br>**Impaired; Entitled to Vote.** |
| 12A | Lumbermen's Underwriting Alliance | Unknown | On the Effective Date, in full and final satisfaction of its Allowed Claim, the Holder of Allowed Claims in Class 12A shall be permitted to retain any proceeds of previously drawn letters of credit, as well as other Cash on hand, in exchange for waiver of any deficiency Claim. <br><br>Estimated Projected Payment:  Unknown <br>**Impaired; Entitled to Vote.** |
| 12B | Georgia Self Insurance Guaranty Trust Fund | Unknown | On the Effective Date, in full and final satisfaction of its Allowed Claim, the Holder of Allowed Claims in Class 12B shall be permitted to retain any proceeds of previously drawn letters of credit, as well as other Cash on hand, in exchange for waiver of any deficiency Claim. <br><br>Estimated Projected Payment:  Unknown <br>**Impaired; Entitled to Vote.** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 13A | Westchester Fire Insurance Company and ACE INA Insurance | Unknown | Upon a Claim in Class 13A becoming an Allowed Claim, the Holder of a Class 13A Claim shall be permitted to either: (i) to the extent the Allowed Claim is *less than* the amount of the Collateral held by Holder, retain the Collateral up to the amount of such Allowed Claim and any excess shall be returned to the Liquidating Trustee; (ii) to the extent the Allowed Claim *exceeds* the amount of the Collateral held by Holder, retain the Collateral and the amount by which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General Unsecured Claim in Class 6; or (iii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>The Holder of the Class 13A Claim shall have an Allowed Claim as further set forth herein.<br><br>Estimated Projected Payment:  Unknown<br>**Unimpaired; Deemed to Accept** |
| 13B | Old Republic Insurance Co. | Unknown | Upon a Claim in Class 13B becoming an Allowed Claim, the Holder of a Class 13B Claim shall be permitted to either:  (i) to the extent the Allowed Claim is *less than* the amount of the Collateral held by Holder, retain the Collateral up to the amount of such Allowed Claim and any excess shall be returned to the Liquidating Trustee; (ii) to the extent the Allowed Claim *exceeds* the amount of the Collateral held by Holder, retain the Collateral and the amount by which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General Unsecured Claim in Class 6; or (iii)  accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment:  Unknown<br>**Unimpaired; Deemed to Accept** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 13C | National Union Fire Insurance Company of Pittsburgh, PA, et al. | Unknown | Upon a Claim in Class 13C becoming an Allowed Claim, the Holder of a Class 13C Claim shall be permitted to either: (i) to the extent the Allowed Claim is *less than* the amount of the Collateral held by Holder, retain the Collateral up to the amount of such Allowed Claim and any excess shall be returned to the Liquidating Trustee; (ii) to the extent the Allowed Claim *exceeds* the amount of the Collateral held by Holder, retain the Collateral and the amount by which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General Unsecured Claim in Class 6; or (iii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment: Unknown<br>**Unimpaired; Deemed to Accept** |
| 13D | Fidelity and Deposit Company of Maryland | Unknown | Upon a Claim in Class 13D becoming an Allowed Claim, the Holder of a Class 13D Claim shall be permitted to either: (i) to the extent the Allowed Claim is *less than* the amount of the Collateral held by Holder, retain the Collateral up to the amount of such Allowed Claim and any excess shall be returned to the Liquidating Trustee; (ii) to the extent the Allowed Claim *exceeds* the amount of the Collateral held by Holder, retain the Collateral and the amount by which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General Unsecured Claim in Class 6; or (iii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment: Unknown<br>**Unimpaired; Deemed to Accept** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 13E | Kemper Insurance Co., et al. | Unknown | Upon a Claim in Class 13E becoming an Allowed Claim, the Holder of a Class 13E Claim shall be permitted to either: (i) to the extent the Allowed Claim is *less than* the amount of the Collateral held by Holder, retain the Collateral up to the amount of such Allowed Claim and any excess shall be returned to the Liquidating Trustee; (ii) to the extent the Allowed Claim *exceeds* the amount of the Collateral held by Holder, retain the Collateral and the amount by which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General Unsecured Claim in Class 6; or (iii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment: Unknown<br>**Unimpaired; Deemed to Accept** |
| 14 | Intercompany Claims By and Between Debtors | Unknown | On the Effective Date, all Intercompany Claims by and between the Debtors shall be cancelled.<br><br>Estimated Projected Payment: 0%<br>**Impaired; Deemed to Reject** |
| 15 | Equity Interests | Unknown | On the Effective Date, all Equity Interests shall be cancelled.<br><br>Estimated Projected Payment: 0%<br>**Impaired; Deemed to Reject** |

**ALTHOUGH THE PLAN PROPONENTS HAVE DONE THEIR BEST TO ENSURE THE ACCURACY OF THE ESTIMATED CLAIM AMOUNTS AND THE ESTIMATED PERCENTAGE RECOVERIES SHOWN IN THE TABLE ABOVE, THE *ACTUAL* CLAIM AMOUNTS AND PERCENTAGE RECOVERIES MAY VARY.**

The actual recoveries under the Plan will be dependent upon a variety of factors including, but not limited to, whether, and in what amount and with what priority, Contingent Claims against the Debtors become non-contingent, fixed and Allowed Claims; and whether, and to what extent, Disputed Claims are resolved in favor of the Debtors. Accordingly, no representation can be nor is any representation being made with respect to whether each estimated percentage recovery shown in the table above will be realized by the Holder of an Allowed Claim in any particular Class.

**IN THE VIEW OF THE PLAN PROPONENTS, THE PLAN PROVIDES THE HOLDERS OF CLAIMS WITH THE BEST RECOVERY POSSIBLE. ACCORDINGLY, THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF**

**SUCH HOLDERS AND STRONGLY RECOMMEND THAT ALL SUCH HOLDERS ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................ 2

    A.    Contents of the Disclosure Statement .......................................... 2

    B.    Purpose and Effect of Plan .......................................................... 2

II. DESCRIPTION OF THE DEBTORS' PRIOR BUSINESS, EVENTS THAT
PRECIPITATED THE FILING OF THESE CHAPTER 11 CASES ................... 3

    A.    Overview of the Debtors and Their Prior Businesses ................... 3

        1.    Fleetwood's Businesses ................................................ 3

        2.    Fleetwood's Corporate Structure ................................. 4

        3.    Manufactured Homes Business ..................................... 4

        4.    FRC's Business ............................................................ 5

        5.    Recreational Vehicles Business:  Motor Homes and Travel Trailers .............. 6

    B.    Fleetwood's Debt and Equity Structure ....................................... 7

        1.    Prepetition Secured Bank Debt ..................................... 7

        2.    5% Notes ...................................................................... 8

        3.    6% Notes ...................................................................... 8

        4.    The 5% Notes Put Right, The Exchange Offer and the Repurchase
Offer .............................................................................. 9

        5.    The New 14% Secured Notes ........................................ 9

        6.    Common Stock Issued in the Repurchase Offer in Exchange for 5%
Notes ............................................................................ 11

        7.    Remaining 5% Notes That Neither Tendered in the Exchange Offer nor
the Repurchase Offer .................................................... 11

        8.    ISIS Lending Obligation ............................................... 11

        9.    The ISIS Replacement Liens ......................................... 12

        10.    Summary of Indebtedness ............................................. 12

        11.    FEI's Intercompany Claim Against the Subsidiary Debtors .......................... 13

        12.    Equity Interests in the Debtors ..................................... 13

    C.    Fleetwood's Business Downturn And Liquidity Crisis ............................... 14

**TABLE OF CONTENTS**
**[Continued]**

|  |  |  | Page |
|---|---|---|---|
| | D. | After Exploring Alternatives, Fleetwood Sought Relief Under Chapter 11 | 16 |
| III. SIGNIFICANT EVENTS OCCURRING IN THESE CHAPTER 11 CASES | | | 17 |
| | A. | Overview of Chapter 11 and the Plan Process | 17 |
| | B. | The Transition to Operations as Debtors in Possession | 18 |
| | | 1. Cash Collateral Motion | 18 |
| | | 2. Joint Administration Motion | 19 |
| | | 3. Cash Management Motion | 20 |
| | | 4. Utilities Motion | 20 |
| | | 5. Employee Wages and Benefits Motion | 21 |
| | C. | Appointment of the Creditors' Committee | 21 |
| | D. | Professionals Retained at the Expense of the Estates | 21 |
| | E. | Subsequent Chapter 11 Filing by Five Fleetwood Retail Corp. Entities | 22 |
| | F. | Fleetwood's Application to Have These Chapter 11 Cases Recognized as a Foreign Proceeding in Canada | 23 |
| | G. | The Bar Dates for Pre-Petition Claims | 24 |
| | H. | Management Compensation | 24 |
| | I. | D&O Insurance | 25 |
| | J. | Significant Asset Sales Occurring During the Bankruptcy Cases | 26 |
| | | 1. Military Housing Assets | 27 |
| | | 2. RV Assets | 28 |
| | | 3. Housing Assets | 29 |
| | | 4. Travel Trailer Inventory | 30 |
| | | 5. La Grande, Oregon Travel Trailer Manufacturing Plant | 31 |
| | | 6. Mexicali Assets | 31 |
| | | 7. Miscellaneous Asset Sales | 32 |
| | K. | Certain Environmental Matters | 34 |
| | | 1. Riverside District Attorney | 34 |

TABLE OF CONTENTS
[Continued]

|   |   |   | Page |
|---|---|---|------|
|   | 2. | SCAQMD | 35 |
| L. |   | Litigation Commenced During these Chapter 11 Cases | 36 |
|   | 1. | WARN and Severance Settlements | 36 |
|   | 2. | Pendency of First American Trust Company Adversary Proceeding | 37 |
|   | 3. | Schechter Litigation | 40 |
|   | 4. | The Browder Class Action | 40 |
| M. |   | Deutsche Bank Litigation | 42 |
| N. |   | Plan Negotiations | 43 |
|   | 1. | Plan Exclusivity | 43 |
|   | 2. | Plan Negotiations | 43 |
| IV. DESCRIPTION OF ASSETS AND LIABILITIES  (INCLUDING CLAIMS) OF THE DEBTORS | | | 44 |
| A. |   | Anticipated Assets of the Debtors as of the Effective Date | 44 |
| B. |   | Description of Liabilities | 44 |
|   | 1. | Scheduled Liability | 44 |
|   | 2. | Filed Claims Summary | 45 |
| V. INSURANCE CONSIDERATIONS:  product liability PI CLAIMS, WORKERS' COMPENSATION CLAIMS, AND FEMA CLAIMS | | | 45 |
| A. |   | Gibraltar Insurance Company, Ltd. and Insurance Coverage Provided | 45 |
|   | 1. | General Overview | 45 |
|   | 2. | Important Financial Information Regarding Gibraltar and Unknown Factors That May Affect Insurance Coverage | 46 |
| B. |   | Product Liability PI Claims | 47 |
|   | 1. | Product Liability Insurance Coverage Provided By Gibraltar to Debtors and Availability for Product Liability PI Claims | 47 |
| C. |   | Product Liability PI Claims Mandatory Mediation Procedures | 48 |
| D. |   | Workers' Compensation Claims | 49 |
|   | 1. | Workers' Compensation Insurance | 49 |
|   | 2. | ACE INA and Westchester--Bonding | 54 |

|  |  |  | Page |
|---|---|---|---|
|  | 3. | Debtors' Plan Regarding Undrawn Letters of Credit | 54 |
| E. |  | FEMA Claims | 57 |
| **VI. SUMMARY OF THE FIRST AMENDED PLAN OF LIQUIDATION** |  |  | 58 |
| A. |  | Treatment of Claims and Equity Interests | 59 |
|  | 1. | Unclassified Claims | 59 |
|  | 2. | Claims | 60 |
| B. |  | Acceptance or Rejection of the Plan by Claim Holders | 79 |
|  | 1. | Impaired Classes of Claims Entitled to Vote | 79 |
|  | 2. | Acceptance by an Impaired Class | 79 |
|  | 3. | Presumed Acceptances by Unimpaired Classes | 80 |
|  | 4. | Classes Deemed to Reject Plan | 80 |
|  | 5. | Summary of Classes Voting on the Plan | 80 |
|  | 6. | Confirmation Pursuant to Bankruptcy Code Section 1129(b) | 80 |
| C. |  | Substantive Consolidation of All of the Debtors' Estates | 80 |
|  | 2. | The Plan Proponents Can Satisfy the Single Entity Test | 81 |
|  | 3. | The Plan Proponents Can Satisfy the Hopeless Entanglement Test | 82 |
|  | 4. | The Effect of Substantive Consolidation Under the Plan | 83 |
| D. |  | Employee Related Provisions | 83 |
|  | 1. | Employees | 83 |
|  | 2. | KEIP Payments | 84 |
|  | 3. | Benefit Plans | 84 |
| E. |  | The Liquidating Trust | 84 |
|  | 1. | Establishment of Liquidating Trust | 84 |
|  | 2. | Trust Distributions | 84 |
|  | 3. | Duration of Trust | 84 |
|  | 4. | Liquidation of Causes of Action | 85 |
|  | 5. | Liquidating Trustee | 85 |

iv

|   |   |   | Page |
|---|---|---|------|
| | 6. | Federal Income Taxation of Liquidating Trust | 87 |
| F. | | Release of Liens | 88 |
| G. | | Exemption from Certain Transfer Taxes | 88 |
| H. | | Preservation of Causes of Action; Settlement of Causes of Action | 88 |
| | 1. | Preservation of Causes of Action | 88 |
| | 2. | Settlement of Causes of Action | 89 |
| I. | | Provisions Governing Distributions | 89 |
| | 1. | Special Provision Regarding Unimpaired Claims | 89 |
| | 2. | Allowed Claims | 89 |
| | 3. | Distributions for Claims Allowed as of the Effective Date | 90 |
| | 4. | Liquidating Trustee as Disbursing Agent | 90 |
| | 5. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 90 |
| | 6. | Prepayment | 91 |
| | 7. | Means of Cash Payment | 91 |
| | 8. | Interest on Claims | 91 |
| | 9. | Withholding and Reporting Requirements | 91 |
| | 10. | Setoffs | 92 |
| | 11. | Procedure for Treating and Resolving Disputed, Contingent and/or Unliquidated Claims | 92 |
| | 12. | Distribution Record Date | 93 |
| J. | | Treatment Of Executory Contracts And Unexpired Leases | 93 |
| | 1. | Rejected Contracts And Leases | 93 |
| | 2. | Bar to Rejection Damages | 93 |
| | 3. | Assumed and Assigned Contracts and Leases | 94 |
| K. | | Confirmation And Consummation Of The Plan | 94 |
| | 1. | Conditions Precedent to Confirmation and Effective Date | 94 |
| | 2. | Waiver of Conditions | 94 |

Page

3.    Consequences of Non-Occurrence of Effective Date .................................. 94

4.    Substantial Consummation .......................................................................... 95

L.    Allowance And Payment Of Certain Administrative Claims ................................ 95

1.    Professional Fee Claims .............................................................................. 95

2.    Substantial Contribution Compensation and Expenses Bar Date ................. 95

3.    Other Administrative Claims ....................................................................... 96

M.    Effect Of Plan Confirmation ............................................................................... 96

1.    Binding Effect ............................................................................................. 96

2.    Discharge of the Debtors.............................................................................. 96

3.    Releases by the Debtors ............................................................................... 96

4.    Release By Holders of Claims and Equity Interests ..................................... 98

5.    Injunction .................................................................................................... 99

6.    Term of Bankruptcy Injunction or Stays...................................................... 101

7.    Exculpation and Limitation of Liability....................................................... 101

8.    Discharge of DB under the 14% Indenture ................................................... 102

VII. CERTAIN FACTORS TO BE CONSIDERED ............................................................ 102

A.    General Considerations ........................................................................................ 102

B.    Certain Bankruptcy Considerations ..................................................................... 102

C.    Administrative and Priority Claims ..................................................................... 103

VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............. 104

A.    Certain Tax Consequences of the Plan ................................................................ 106

1.    Treatment of Transfers to and Distributions by the Liquidating Trust ......... 106

2.    Allocation of Plan Distributions Between Principal and Interest ................. 110

3.    Withholding, Backup Withholding, and Information Reporting ................... 110

B.    Importance of Obtaining Professional Tax Assistance ........................................ 112

IX. FEASIBILITY OF THE PLAN, BEST INTERESTS OF CREDITORS, and analysis of
recovery to creditors............................................................................................. 112

**TABLE OF CONTENTS**
**[Continued]**

|  |  |  | Page |
|---|---|---|---|
| A. | Feasibility of the Plan | | 112 |
| B. | Acceptance of the Plan | | 113 |
| C. | Best Interests Test | | 113 |
| D. | Liquidation Analysis | | 114 |
| E. | Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Plan | | 115 |
| F. | Confirmation Without Acceptance of All Impaired Classes:  The "Cramdown" Alternative | | 115 |
| G. | Significant Changes to Financial Assets of the Debtors as of Conversion Date | | 117 |
| X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | | 118 |
| A. | Alternative Plan(s) of Liquidation | | 119 |
| B. | Liquidation under Chapter 7 | | 119 |
| C. | Dismissal of the Chapter 11 Cases | | 119 |
| XI. PLAN VOTING INSTRUCTIONS AND PROCEDURES | | | 120 |
| A. | Notice to Holders of Claims and Equity Interests | | 120 |
| B. | Holders of Claims Entitled to Vote | | 121 |
| C. | Solicitation Package | | 123 |
| D. | Voting Procedures, Ballots and Voting Deadline | | 123 |
| E. | Confirmation Hearing and Deadline for Objections to Confirmation | | 124 |
| F. | Internet Access to Bankruptcy Court Documents | | 124 |
| XII. RECOMMENDATION AND CONCLUSION | | | 125 |

# APPENDICES

A.    First Amended Joint Plan of Liquidation

B.    Organizational Chart

C.    Liquidation Analysis

D.    Litigation Commenced During These Chapter 11 Cases

E.    Mediation Procedures for Product Liability PI Claims

F.    Balance Sheet Comparison

G.    Case-To-Date Income Statement

H.    Wind Down Cost Summary

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING THE FIRST AMENDED
JOINT PLAN OF LIQUIDATION OF FLEETWOOD ENTERPRISES, INC., ITS
AFFILIATED DEBTORS, AND ITS OFFICIAL COMMITTEE OF CREDITORS HOLDING
UNSECURED CLAIMS**

## I.
## INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to Bankruptcy Code section 1125, for use in the solicitation of votes on the Plan. A copy of the Plan is annexed as <u>Appendix A</u> to this Disclosure Statement.

**A.      Contents of the Disclosure Statement**

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, the past, current and anticipated liquidation of the Debtors' Assets, and the winding down of the Debtors' business operations. This Disclosure Statement also describes various terms and provisions of the Plan, the substantive consolidation of all fifty (50) of the Debtors' estates, certain effects of Plan Confirmation, treatment of Creditors' Claims against the estates, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the foregoing "Overview" and the Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

**B.      Purpose and Effect of Plan**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. If reorganization is not feasible, Chapter 11 also allows a debtor to formulate and consummate a plan of liquidation, which sets forth the process for the orderly satisfaction of claims against and interests in a debtor pursuant to the priority rules of the Bankruptcy Code.

1    Confirmation of a plan of liquidation by a bankruptcy court makes the plan binding upon the

2    debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest

3    holder (i) is impaired (*i.e.*, will receive less than 100% of its Allowed Claim) under the plan, (ii) has

4    accepted the plan, or (iii) receives or retains any property under the plan.

5    In these Chapter 11 Cases, the Plan provides for the distribution of the proceeds from the

6    liquidation of all Assets of the Debtors to various Creditors as set forth under the Plan, and for the

7    winding-down of the Debtors' corporate affairs. Under the Plan, Claims against, and Equity Interests

8    in, the Debtors are divided into Classes according to their relative seniority and other criteria as

9    required under the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court and

10    ultimately consummated, the Claims and Equity Interests of the various Classes will be treated in

11    accordance with the provisions in the Plan established for each Class. On the Distribution Dates, a

12    liquidating trust formed under the Plan will make Distributions to certain Classes of Claims (to the

13    extent that such Claims have been Allowed) as provided in the Plan.

14    A summary of the Classes of Claims and Equity Interests, as well as their treatment under the

15    Plan, is included in the Overview above. A more detailed description of the Classes of Claims

16    against the Debtors created under the Plan, the treatment of those Classes under the Plan, and the

17    property to be distributed under the Plan are described in Section VI below.

18

**II.
DESCRIPTION OF THE DEBTORS' PRIOR BUSINESS, EVENTS THAT
PRECIPITATED THE FILING OF THESE CHAPTER 11 CASES**

19

20    **A.    Overview of the Debtors and Their Prior Businesses**

21        **1.    *Fleetwood's Businesses***

22    Fleetwood began as a California-based producer of manufactured housing in 1950. In 1964,

23    Fleetwood entered the recreational vehicle market with the purchase of a travel trailer manufacturer.

24    Prior to the Petition Date, through its subsidiaries and affiliates, Fleetwood was one of the nation's

25    leading producers of manufactured housing and recreational vehicles. Fleetwood operated its

26    business through three divisions: motor homes, housing and travel trailers. Each division operated

27    through separate subsidiaries, which employed the individuals who carried out those operations, from

28    assembly line employees and plant managers to sales professionals and technical staff. As of the

1    Petition Date, Fleetwood had approximately 3,700 people located in 19 manufacturing facilities in 11

2    states as well as its corporate headquarters located in Riverside, California.

3          In its manufactured housing business, Fleetwood produced single and multi-section

4    manufactured homes as well as multi-family residences and military barracks.  Fleetwood's high-

5    quality, factory-built homes were designed to enable families to enjoy comfortable housing at

6    affordable prices.  In its recreational vehicle business, Fleetwood manufactured two types of

7    recreational vehicles:  motor homes and travel trailers.  Due to lackluster sales, Fleetwood shut down

8    its travel trailer division immediately prior to the Petition Date.

9          As of the Petition Date, Fleetwood's manufactured homes and recreational vehicles were

10    marketed through a network of more than 2,050 dealer locations in the United States and Canada

11    which Fleetwood supported through competitive warranties and superior warranty service.

12    Fleetwood also operated two supply companies (a fiberglass manufacturing operation and a lumber

13    brokerage business) that provided components for the recreational vehicle and housing operations,

14    while also generating outside sales.

15          **2.    *Fleetwood's Corporate Structure***

16          FEI is a public company, incorporated in Delaware.  Although formerly traded on the New

17    York Stock Exchange under the symbol "FLE," as of December 2008 FEI's common stock was

18    quoted on the over-the-counter markets (OTC Bulletin Board and Pink Sheets) under the trading

19    symbol "FLTW."  FEI is the parent company of Debtors Fleetwood Holdings, Inc. ("FHI") and

20    Fleetwood Retail Corp. ("FRC") as well as other non-debtor companies.  An organizational chart of

21    both the debtor and non-debtor entities that constitute the businesses of Fleetwood, as well as a short

22    description thereof, is attached hereto as Appendix B.

23          **3.    *Manufactured Homes Business***

24          In fiscal 2008, Fleetwood was the second largest producer of manufactured homes[2] in the

25    United States in terms of retail units shipped.  Fleetwood distributed its manufactured housing

26    products through a network of approximately 1,450 dealers in 46 states.

27    _____

28    [2]  A manufactured home is a single-family house that is constructed in a factory using assembly-line
      techniques in accordance with the Federal Department of Housing and Urban Development

1  Fleetwood also built modular housing units for the United States Military.  Modular homes

2  differ from typical manufactured homes primarily because they comply with state and local building

3  codes.

4  The manufactured housing industry grew significantly from 1991 to 1998, fueled in part by

5  liberal credit standards, availability of financing and low interest rates.  After 1998, the industry

6  started to steadily decline due to tighter credit practices and relatively high interest rates.  Some

7  lenders stopped extending loans to manufactured housing buyers altogether.  In fact, by 2000, more

8  than half of the retail lenders had exited the business, leaving an insufficient volume of financing for

9  manufactured home purchases.  More recently, after the bursting of the housing bubble in 2006-2007,

10  the manufactured housing industry had to compete with excessive inventories of site-built homes at

11  drastically reduced prices.

12  **4.    *FRC's Business***

13  Fleetwood entered the retail business beginning in the late 1990's through acquisitions of

14  independent retail dealers and by developing new retail locations.  Fleetwood also established a

15  financial services subsidiary, HomeOne Credit Corp. ("HomeOne"), to provide finance and insurance

16  products to customers of FRC as part of a vertically integrated retail strategy.  FEI's manufactured

17  housing business operated a large number of retail outlets through its FRC subsidiaries.  As the retail

18  market for manufactured housing continued to slow and losses increased, FRC operations were

19  downsized to better match market demand.  In March 2005, with the retail business still sustaining

20  losses, Fleetwood announced its intention to exit the manufactured housing retail and financial

21  services businesses to focus more on core manufacturing activities.  These FRC businesses were

22  designated as discontinued operations and were subsequently sold to competitor Clayton Homes

23  during the second quarter of fiscal 2006.

24  [Footnote continued from previous page]
   ("HUD") construction and safety standards.  The cost of a quality manufactured home runs about
25  one-third that of an on-site constructed home, in each case excluding land.  Off-site production
   eliminates the use of multiple contractors, greatly reduces the affect of adverse weather, and also
26  greatly reduces the time required for construction because every component arrives at the
   assembly point ready to use.  Manufactured homes are trucked in sections to the pre-prepared site,
27  where they are assembled in a matter of days, instead of the normal site-built construction times
   that can stretch into weeks and months.
28

1    **5.**    *Recreational Vehicles Business: Motor Homes and Travel Trailers*

2    Prior to the Petition Date, Fleetwood was one of the nation's leading producers of recreational

3    vehicle products– motor homes and travel trailers – which it distributed through a network of

4    approximately 600 independent dealers in 48 states and Canada.

5    (a)    Motor Homes

6    A motor home is a motorized unit that can be used as a temporary dwelling. In many cases a

7    motor home is used for extended travel and is often considered a second home. Within the motor

8    home business, Fleetwood primarily competed in the Class A and Class C categories. The

9    Company's Class A units ranged in length from 30 to 45 feet and sold for an average retail price of

10    $160,000. The Company's Class C units ranged in length from 23 to 31 feet and sold for an average

11    retail price of $67,000. Prior to the Petition Date, Fleetwood was the largest manufacturer of Class A

12    motor homes in the United States, the 3rd largest manufacturer of Class C motor homes, and the 2nd

13    largest motor home manufacturer overall. As of the Petition Date, Fleetwood marketed its Class A

14    and Class C motor homes through 21 different brand names which varied based on size and price

15    point.

16    (b)    Travel Trailers

17    Travel trailers are designed to be towed by another vehicle, and are similar to motor homes in

18    use and features. Fleetwood was in the travel trailer business for approximately 44 years during

19    which time Fleetwood sold more than 1 million trailers. In many of those years the Fleetwood

20    branded travel trailers dominated the top 10 travel trailer brands sold at retail and became

21    "household" names throughout the RV community in the United States and Canada.

22    In the years leading up to the Petition Date, Fleetwood lost substantial market share in the

23    travel trailer business due to aggressive competition from well-capitalized industry peers. The

24    continuing decline in Fleetwood's travel trailer business accounted for a loss of approximately $86

25    million in the last two years of operations. Although Fleetwood responded to competitive pressures

26    by improving its product lineup, market conditions proved too severe to enable recovery. Because of

27    the continuing losses, Fleetwood withdrew from the travel trailer business prior to the Petition Date.

28    Specifically, on the day before the Petition Date, Fleetwood caused notices to be delivered to its

travel trailer dealers notifying them that it was terminating their respective travel trailer dealer agreements, effective immediately. To the extent possible Fleetwood honored and fulfilled orders previously submitted by the dealers for travel trailer products with then-existing inventory and work-in-process. Also at or about that time, Fleetwood terminated its approximately 600 employees associated with the travel trailer business, including employees at two manufacturing plants in Oregon and one manufacturing plant in Ohio, as well as employees who worked in the travel trailer division from Fleetwood's corporate headquarters. Approximately 80 employees of the travel trailer division stayed on to assist with the orderly wind-down of the travel trailer operations.

**B.      Fleetwood's Debt and Equity Structure**

      **1.      *Prepetition Secured Bank Debt***

      FHI and the Operating Subsidiaries[3] (collectively, the "Borrowers") are parties to a prepetition secured credit facility (the "Prepetition Secured Credit Facility") with a syndicate of lenders[4] (collectively, the "Lenders"). Bank of America, N.A. ("BofA"), is the administrative agent under the Prepetition Secured Credit Facility. Prior to the Petition Date, the borrowings under the Prepetition Secured Credit Facility were used for working capital and general corporate purposes. In addition, the Debtors obtained letters of credit under the Prepetition Secured Credit Facility to support performance bonds issued to insure the Debtors' performance of certain manufactured housing contracts, to support workers' compensation obligations, and in favor of certain states to support the Debtors' self-insured workers' compensation obligations. The Prepetition Secured Credit Facility was amended, and amended and restated, several times prior to the Petition Date.

      The obligations of the Borrowers under the Prepetition Secured Credit Facility were guaranteed by FEI, Fleetwood Canada Ltd. and Fleetwood International Inc. (collectively, the "Secured Credit Facility Guarantors"). As of the Petition Date, the Prepetition Secured Credit

---

[3] As set forth in <u>Appendix B</u>, the direct subsidiaries of FHI, other than Hauser Lake Lumber, along with Continental Lumber Products, a subsidiary of FEI, are referred to as the ("Operating Subsidiaries").

[4] Wells Fargo Foothill, Inc., fka Foothill Capital Corporation; Textron Financial Corporation; PNC Bank, National Association; Wachovia Capital Finance Corporation (Western); and Bank of America, N.A.

Facility was secured by a pledge of the majority of the assets of each of the Debtors, including accounts receivable, cash, inventory and certain real property owned by certain of the Operating Subsidiaries. The Borrowers' borrowing capacity under the Prepetition Secured Credit Facility was governed by a borrowing base which was based on the Borrowers' inventory and accounts receivable as well as a real estate sub-facility.

As of March 6, 2009, the maximum availability under the Prepetition Secured Credit Facility was approximately $135 million and there was approximately $61.7 million outstanding under the Prepetition Secured Credit Facility, which represented the Borrowers' reimbursement obligations for issued and outstanding letters of credit. The Lenders assert that all of the Debtors' obligations under the Prepetition Secured Credit Facility were rolled up into the Secured Credit Facility (as defined below) pursuant to the terms of the Interim DIP Order (as defined below) and the Final Cash Collateral Orders (as defined below).

**2.    *5% Notes***

In December 2003, FEI issued $100 million in aggregate principal amount of its 5% Convertible Senior Subordinated Debentures due 2023 (the "5% Notes"). The 5% Notes are unsecured obligations of FEI. Holders of the 5% Notes had the right to require FEI to repurchase their 5% Notes, in whole or in part, on December 15, 2008 (the "2008 Put Right," discussed further below), and, prior to the Petition Date, current holders of the 5% Notes had similar rights on December 15, 2013 and December 15, 2018. The repurchase price was to be 100% of the principal amount of the 5% Notes plus accrued and unpaid interest. The Law Debenture Trust Company of New York is the indenture trustee as to the 5% Notes.

**3.    *6% Notes***

In 1998, Debtor Fleetwood Capital Trust ("FCT"), a subsidiary of FEI, completed a $287.5 million private placement of 5,750,000 shares of its preferred securities. FCT then transferred the proceeds of the private placement to FEI in exchange for FEI's issuance to FCT of $296.4 million in FEI's 6% Convertible Subordinated Debentures due 2028 (the "6% Notes"). The Bank of New York is the indenture trustee as to the 6% Notes. The 6% Notes are unsecured obligations of FEI and represent the sole asset of FCT. FEI guaranteed the obligations of FCT to its preferred shareholders.

8

As of the Petition Date, approximately $151.25 million in aggregate principal amount of FEI's 6% Notes were outstanding.  Also, as of the Petition Date, approximately 3,025,000 shares of convertible trust preferred securities of FCT were issued and outstanding.

### 4.    *The 5% Notes Put Right, The Exchange Offer and the Repurchase Offer*

The indenture controlling the 5% Notes permitted FEI, at its option, to elect to pay the repurchase price for the 2008 Put Right in cash, in its common stock, or with a combination of cash and common stock.  In the summer of 2008, FEI projected that it would not have enough liquid cash to satisfy the 2008 Put Right if all outstanding 5% Notes were tendered and also concluded that it may not have enough authorized shares of its common stock to issue in lieu of cash in satisfaction of the 2008 Put Right (as the number of shares to be issued was based on the market price of FEI's common stock over the 20 trading days preceding December 15, 2008).  Any inability of FEI to satisfy its obligation to repurchase 5% Notes from holders who exercised their 2008 Put Right would be a default under the indenture governing the 5% Notes.  Accordingly, FEI commenced two separate "exchange offers."

Pursuant to a form S-4 filed with the SEC on October 30, 2008, as amended, FEI commenced an exchange offer (the "Exchange Offer") pursuant to which it offered to exchange its outstanding 5% Notes for new 14% Senior Secured Notes due 2011 (the "14% Notes") with more favorable terms, including the pledge of security.

Pursuant to a separate form S-4 filed with the SEC on November 6, 2008, as amended, FEI commenced a second simultaneous exchange offer (the "Repurchase Offer") to allow those 5% Notes who, instead of accepting the Exchange Offer, wished to exercise their 2008 Put Right (as provided in the indenture governing the 5% Notes) to require FEI to repurchase their 5% Notes in exchange for common stock of FEI.

### 5.    *The New 14% Secured Notes*

Those Creditors holding approximately 79% of the outstanding 5% Notes accepted the Exchange Offer, and on December 12, 2008, FEI issued (a) approximately $81.4 million in aggregate

1  principal amount of the new 14% Notes due 2011[5], and (b) approximately 11.1 million shares of its

2  common stock in exchange for approximately $79.1 million in aggregate principal amount of its 5%

3  Notes tendered in the Exchange Offer.

4      As security for the obligations of FEI under the 14% Notes, certain of the Operating

5  Subsidiaries pledged their real property to Deutsche Bank Trust Company Americas ("DB") as

6  indenture trustee for the benefit of the holders of the 14% Notes as evidenced (a) by first-priority

7  mortgages liens on previously unencumbered real property, and (b) by second priority mortgages or

8  deeds of trust on 18 parcels of real property which had previously been pledged as collateral to secure

9  the Prepetition Secured Credit Facility.  The pledged property consisted largely of the manufacturing

10 facilities owned and operated by the Operating Subsidiaries that produced recreational vehicles and

11 housed the manufactured housing supply operations.

12      FEI's obligations under the 14% Notes are guaranteed jointly and severally by FHI and the

13 Operating Subsidiaries, which are also Borrowers under the Secured Credit Facility.  The 14% Note

14 guarantees are unsecured obligations of the Operating Subsidiaries and are subordinated to the

15 obligations of the Operating Subsidiaries under the Secured Credit Facility.

16      During the course of the Chapter 11 Cases, certain of the collateral supporting the liens for the

17 14% Notes have been sold.  As a result, DB, as indenture trustee for the 14% Notes, has been given

18 replacement liens, all subject to further order of the Bankruptcy Court and all defenses of the Debtors

19 with respect to the validity and extent of the liens.  In connection with the sale of the Debtors' motor

20 home division, (described in more detail in Section III.J below), DB has been given a first lien on an

21 $8.1 million segregated reserve and a second lien in a cash collateral account up to $11.2 million.  In

22 connection with the sale of the Debtors' manufactured housing division, (as described in more detail

---

[5]  Immediately prior to the Petition Date, approximately $81.4 million in aggregate principal
amount of the 14% Notes remained outstanding, the beneficial owners of which included the
following:  Whippoorwill Associates, Inc. ($34,407,000); Credit Suisse (USA) Securities
($10,300,000); Wolverine Asset Management, L.L.C. ($14,111,000); Brigade Capital
Management, LLC ($9,985,000); Barclays Capital ($3,979,000); Putnam Investment
Management, L.L.C. ($3,325,000); JP Morgan Securities Inc. ($1,637,000); Argent Capital
Management, LLC ($500,000); Clutterbuck Capital Management, LLC ($103,000); GAMCO
Investors, Inc. ($100,000); White Peaks Asset Management ($75,000); and Alpine Fund LLP
($77,000).

in Section III.J below), DB has been given a first lien on a $2.135 million segregated reserve and a second lien in a cash collateral account up to $10.727 million.[6]

### 6. *Common Stock Issued in the Repurchase Offer in Exchange for 5% Notes*

Instead of electing to participate in the Exchange Offer, on December 15, 2008, the holders of approximately $19.9 million in aggregate principal amount of the 5% Notes accepted the Repurchase Offer and thereby exercised their right (as provided in the indenture governing the 5% Notes) to require FEI to repurchase their Debentures in exchange for common stock of FEI. The amount of stock issued was based on a formula using the volume weighted average price of FEI stock over a 20 day trading period.

On December 16, 2008, FEI issued approximately 121.8 million shares of its common stock in exchange for approximately $19.9 million in aggregate principal amount of 5% Notes tendered in the Repurchase Offer.

### 7. *Remaining 5% Notes That Neither Tendered in the Exchange Offer nor the Repurchase Offer*

Immediately prior to the Petition Date, approximately $1.069 million in aggregate principal amount of the 5% Notes remained outstanding and consisted of 5% Notes holders who neither tendered their 5% Notes in the Exchange Offer nor in the Repurchase Offer.[7] Based upon the Indenture, the 5% Notes remain senior to the 6% Notes in right of payment.

### 8. *ISIS Lending Obligation*

On or about August 22, 2008, Debtors Fleetwood Motor Homes of California, Inc. and Fleetwood Homes of California, Inc., each executed a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing in which they pledged each of their real property and certain personal property located in Riverside, California and Woodland, California as security for a loan in the principal amount of $27.25 million made by Isis Lending, LLC ("ISIS") to Debtors Fleetwood Motor

---

[6] The Creditors' Committee has commenced an action to avoid the issuance of the 14% Notes as a fraudulent transfer, as well as the issuance of the guarantees and the security interests granted in connection with the 14% Notes, as set forth in more detail in section III.M below.

[7] $1,025,000 and $44,000 in principal amount of 5% Notes were beneficially held by Lehman Brothers Inc. (Lehman Brothers Convertible Securities Trading) and Pension Benefit Guaranty Corporation, respectively, as of such date.

Homes of California, Inc. and Fleetwood Homes of California, Inc. (the "ISIS Loan"). The obligations under the ISIS Loan are guaranteed by FEI.

### 9.    *The ISIS Replacement Liens*

As of the Petition Date, the Debtors had $27.25 million of principal senior borrowings with ISIS collateralized by first liens on the real estate at Plant 47 (a motor home facility located in Riverside, California) and Plant 17 (a housing facility in Woodland, California) and second liens on certain personal property at those locations.

On August 17, 2009, the Debtors sold its manufactured housing division (including Plant 17 and all machinery, trade fixtures and equipment located therein) to FH Holding, Inc. By an Order entered on August 14, 2009 [Docket No. 1102], $4,000,000 of the cash proceeds was paid to ISIS on account of the first priority security interest of ISIS on Plant 17 assets.

In conjunction with the sale of the Debtors' motor home division to AIP on July 17, 2009, ISIS received replacement liens on an idle manufactured housing facility in Alma, Georgia (Plant 75-1) and an idle motor home facility in Elysburg, Pennsylvania (Plant 71-1) as well as replacement liens on (i) certain machinery and equipment located therein and (ii) the Debtors' cash collateral account and Remaining Proceeds (as that term is defined in the RV Asset Sale Order [Docket No. 853])up to a maximum recovery of $10.2 million (the " ISIS Replacement Liens"). The ISIS Replacement Liens, which are junior in priority to BofA's liens, were provided to replace the various personal property liens related to Plant 47 where the underlying assets (mostly motor home inventory) were either consumed or sold postpetition. The order approving the ISIS Replacement Lien on Plant 75-1 and 71-1 was entered on July 2, 2009 [Docket 852] and the order approving the ISIS Replacement Lien on the cash collateral account was entered on August 6, 2009 [Docket 1056]. Currently, there is approximately $25.2 million outstanding to ISIS.

### 10.    *Summary of Indebtedness*

As of the date of the filing of this Disclosure Statement, the approximate aggregate non-contingent obligations of the Debtors were as follows:

- Secured Credit Facility: $1.7 million in outstanding letters of credit plus certain fees and expenses and contingent indemnification claims

- 14% Secured Notes: $84.3 million
- 5% Notes: $1.069 million
- 6% Notes: $161.173 million
- ISIS Loan: $17.8 million

The Debtors also have trade debt owing to various service and goods providers, in addition to other amounts due and owing, as set forth in more detail in the claims discussion at Section IV herein.

### 11.    *FEI's Intercompany Claim Against the Subsidiary Debtors*

Based on the Form 10-Q filed by Fleetwood Enterprises, Inc. with the Securities and Exchange Commission for the quarterly period ended January 25, 2009, FEI is owed $39.981 million from the Subsidiary Debtors who guaranteed the Prepetition Secured Credit Facility as an intercompany receivable as reflected on the Condensed Consolidating Balance Sheet as of March 10, 2009 (Unaudited).

### 12.    *Equity Interests in the Debtors*

As of the Petition Date, FHI had issued and outstanding 250 shares of common stock, all of which is held by FEI. There are no other equity interests in FHI.

Similarly, FEI has authorized 300,000,000 shares of common stock, with a par value $0.01 per share, and 10,000,000 shares of preferred stock, with a par value $1.00 per share. In total, as of the Petition Date, FEI had issued and outstanding approximately 209,229,954 shares of common stock and 0 shares of preferred stock. To FEI's knowledge based on public filings, approximately one-third of the FEI common stock was held by approximately a half-dozen institutions. As of the Petition Date, the Debtors' executive officers and directors collectively held less than 1% of the FEI common stock, and there were outstanding options with respect to a total of approximately 5,362,739 shares of FEI's common stock that had been granted. In addition, holders of an aggregate of approximately $151,250,000 in stated liquidation amount of 6% Notes had the right to convert their securities into an aggregate of 3,104,467 shares of FEI common stock, subject to adjustment; and holders of an aggregate of approximately $1,100,000 principal amount of 5% Notes had the right to convert their securities into a maximum of approximately 100,000 shares of FEI common stock.

1    Under the Plan, *all* existing Equity Interests, including stock, in the Debtors will be cancelled.

2    **C.    Fleetwood's Business Downturn And Liquidity Crisis**

3    Fleetwood reported a net loss in every fiscal year since 2001.  Fleetwood's failure to generate

4    sufficient cash from operations reduced its liquidity and expenditures on capital improvements,

5    machinery, equipment and research and development, ultimately negatively affecting sales and

6    earnings.  In particular, Fleetwood's operating results were negatively impacted by:

7    •    a general weakness in both the manufactured housing and the recreational vehicle
     markets, initially caused by turmoil in the mortgage industry that later spread to the
8         broader financial markets and economy, depressed real estate prices and stringent
          home equity lending, that resulted in a reduced ability, particularly for recreational
9         vehicle buyers, to borrow all or part of the purchase price against their home equity;

10   •    the fallout in the subprime mortgage sector that resulted in depressed prices and an
          increased number of foreclosures of site-built homes, which reduced demand for
11        manufactured housing; and

12   •    a decline in the availability and a rise in the cost of wholesale and retail financing for
          both manufactured housing and recreational vehicles, among other market factors.
13

14   Fleetwood repeatedly assessed its business plan and took a number of steps to cut costs,

15   restructure its business operations, and address the cash short falls from operations to improve

16   liquidity.  Specifically, Fleetwood:

17   •    consolidated operations where possible, including management teams at adjacent
          plants;
18
     •    divested or closed certain non-core businesses that were unprofitable, including the
19        folding trailers business, the manufactured housing retail business and several supply
          businesses; and
20
     •    closed two motor home plants and 13 manufactured housing plants and intermittently
21        idled others in order to better match capacity with customer demand among other
          things.[8]
22

23

24

25

---

26   [8] The Debtors have not undertaken any post-petition efforts to determine whether and to what
     extent the sale of properties may constitute a fraudulent transfer and/or otherwise give rise to a
27   claim or cause of action in favor of the Debtors and their Estates.  By and through the Plan, the
     Debtors (on behalf of themselves and their Estates) shall, and do hereby, reserve any and all
28   rights to investigate and, if appropriate, prosecute any and all such claims.

1    Despite these attempts, given the ongoing credit constrictions, economic decline and weakness in

2    both the recreational vehicle and manufacturing housing markets, the measures taken by Fleetwood

3    were ineffective.  Accordingly,  Fleetwood looked for other strategic alternatives.

4          After completing the Exchange Offer in the fourth calendar quarter of 2008, Fleetwood's

5    management (with the help of its advisors and professionals) critically analyzed business operations

6    and continued further cost-cutting measures.  However, Fleetwood's liquidity continued to decline.

7          Under an amendment to the Prepetition Secured Credit Facility, Fleetwood was subject to a

8    springing financial performance covenant.  The covenant only applied if either (a) average daily

9    liquidity, defined as bank cash, cash equivalents, and unused borrowing capacity, fell below a

10    prescribed minimum level of $45 million in any calendar month, or (b) liquidity fell below $25

11    million on any single day.  Under the amended Prepetition Secured Credit Facility, Fleetwood was

12    also subject to a new separate covenant under which liquidity could not fall below $25 million on any

13    three consecutive business days.  As a result of a significant decline in Fleetwood's liquidity due to

14    reduced cash flow from operations, Fleetwood was in danger of breaching one or both of the

15    covenants under the amended Prepetition Secured Credit Facility.

16          A breach of the foregoing covenants would have resulted in a default under the Prepetition

17    Secured Credit Facility, as well as a cross-default in Fleetwood's 14% Notes and Fleetwood's capital

18    lease obligations.  In the event of such a default, Fleetwood was not certain that its lenders would

19    have refrained from enforcing any remedies otherwise available to them or that they would have

20    granted Fleetwood any further waivers or amended the covenants.  Fleetwood believed that the more

21    likely scenario was that Fleetwood's default would have resulted in the lenders declaring all amounts

22    outstanding to be immediately due and payable.  The lenders might have then proceeded against

23    Fleetwood's assets, and any proceeds realized upon the sale of assets would have been used first to

24    satisfy all amounts outstanding under the Prepetition Secured Credit Facility and, thereafter, any of

25    Fleetwood's other liabilities, including liabilities relating to Fleetwood's 14% Notes, 5% Notes and

26    6% Notes.

27

28

**D.    After Exploring Alternatives, Fleetwood Sought Relief Under Chapter 11**

Fleetwood, with the help of its counsel and its advisers, including FTI Consulting, Inc. and Greenhill & Co., LLC, considered several possible alternatives to bankruptcy during 2008. Fleetwood explored the possibility of selling off certain of its assets as well as other ways to generate liquidity. In connection with this strategic analysis, Fleetwood concluded that it would not be able to entice a buyer unless it could sell its assets free and clear of liens, claims, and encumbrances. Fleetwood also concluded that any new debt or equity investments would be unlikely unless it could restructure its existing debt. Fleetwood also explored and engaged in negotiations for a merger with a strategic partner. However, despite its efforts, Fleetwood was unable to effectuate such a transaction.

During the time it was considering strategic alternatives, and as referenced above, Fleetwood decided to shut down the unprofitable travel trailer division to reduce overall operating costs and stem further operating losses associated with that business segment. Fleetwood realized that shutting down the travel trailer division posed potentially significant liabilities associated with repurchase obligations that arose under the dealer agreements and certain state laws resulting from dealer terminations.[9] Fleetwood ultimately concluded that a bankruptcy would allow it to best deal with the repurchase claims that arose from the termination of its travel trailer dealers.

Because Fleetwood's options to continue as a going concern had all but run out, Fleetwood determined that it was in the best interests of its creditors to preserve its ability to avoid the Exchange Offer in which the 14% Notes were issued and in which the Operating Subsidiaries guaranteed the 14% Notes and pledged certain of their real property as collateral to secure the 14% Notes. Fleetwood concluded that it was only able to preserve its ability to set aside the Exchange Offer through a bankruptcy proceeding. Moreover, Fleetwood believed that it needed additional liquidity while it pursued strategic alternatives which it could only obtain through debtor in possession or DIP

---

[9] Specifically, the agreements between the travel trailer dealers and the subsidiaries of FHI that operated in the travel trailer segment imposed a repurchase obligation on those subsidiaries in the event of termination. In certain states, the dealer agreements were either augmented or superseded by dealer and franchise laws that imposed liability upon the manufacturer for the termination of the dealers or franchisees.

1    lending approved under the Bankruptcy Code.  As a result, Fleetwood filed for chapter 11 protection

2    on the Petition Date.

### III.
### SIGNIFICANT EVENTS OCCURRING IN THESE CHAPTER 11 CASES

5    **A.**     **Overview of Chapter 11 and the Plan Process**

6          Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under

7    chapter 11, a debtor in possession attempts to reorganize its business for the benefit of itself, its

8    creditors, and other parties in interest, or, in the alternative, attempts to use chapter 11 to effectuate an

9    orderly liquidation of its assets.

10        The commencement of a chapter 11 case creates an estate consisting of all of the debtor's

11    legal and equitable interests in property as of the date that the petition is filed.  Bankruptcy Code

12    sections 1107 and 1108 provide that a debtor may continue to operate its business and remain in

13    possession of its property as a "debtor in possession," unless the bankruptcy court orders the

14    appointment of a trustee.

15        The filing of a voluntary petition under chapter 11 also operates as an automatic stay of,

16    among other things, all attempts to collect on prepetition claims from a debtor or otherwise interfere

17    with a debtor's property or business.  In a chapter 11 case, unless otherwise ordered by the

18    bankruptcy court, the automatic stay remains in full force and effect through the effective date of a

19    confirmed chapter 11 plan.  The formulation of a chapter 11 plan is the principal objective of a

20    chapter 11 case.  A plan sets forth the means for satisfying the claims against and interests in the

21    debtor.

22        In these Chapter 11 Cases, following the Petition Date, the Debtors remained in possession of

23    their property and operated their businesses as debtors in possession.  The Debtors successfully

24    divested the majority of their Assets and defended against numerous creditor actions for relief from

25    the automatic stay, which, together, maximized the Assets available for distribution under the Plan.

26    To that end, the Debtors and Creditors' Committee believe that they have proposed a Plan that

27    provides for a liquidation of the balance of the Debtors' Assets and the equitable distribution thereof

28    to creditors.

**B.     The Transition to Operations as Debtors in Possession**

During the early days of the Cases, the Debtors filed a number of emergency motions designed primarily to enable the Debtors to make a seamless transition into chapter 11 without significantly impacting operations, and to facilitate the Debtors' compliance with the requirements of chapter 11 ("First Day Motions").  The Debtors filed numerous First Day Motions, including the following noteworthy motions:

- Motion for Joint Administration of Cases ("Joint Administration Motion");
- Motion to Maintain Present Cash Management System and Investment Policies ("Cash Management Motion");
- Motion for Approval to Use Cash Collateral ("Cash Collateral Motion");
- Motion to Establish Adequate Assurance of Performance for Utilities ("Utilities Motion"); and
- Motion to Pay Prepetition Employee Wages and Benefits ("Employee Wages and Benefits Motion").

The foregoing First Day Motions are summarized below.

### 1.     *Cash Collateral Motion*

On the Petition Date, the Debtors filed a motion seeking authorization to use the Lenders' cash collateral (*i.e.*, cash, negotiable instruments, securities, deposit accounts, or cash equivalents in which the Debtors and the lenders have an interest) to fund their postpetition operations, pay their employees, maximize value, and pursue reorganization under chapter 11.  The Debtors and BofA negotiated the terms of a consensual interim order, entered by the Bankruptcy Court on March 13, 2009 [Docket No. 42], permitting the Debtors to use the Lenders' cash collateral on a temporary basis while the Debtors and the Lenders negotiated the terms of a debtor-in-possession financing facility or the long-term use of cash collateral.

The Debtors thereafter negotiated a debtor-in-possession financing facility (the "Secured Credit Facility") with the Lenders, and the Bankruptcy Court entered an interim order approving the Secured Credit Facility on April 1, 2009 [Docket No. 183] (the "Interim DIP Order").  The Lenders assert that, pursuant to the Interim DIP Order, the Prepetition Secured Credit Facility was rolled up into and became part of the Secured Credit Facility.  In late April 2009, the Debtors determined that

1    they no longer needed post-petition financing due to budget improvements and accelerated assets

2    sales.  On April 29, 2009, the Debtors withdrew their motion seeking final approval of the Secured

3    Credit Facility and filed an emergency motion (the "Renewed Cash Collateral Motion") seeking the

4    continued use of the Lenders' cash collateral [Docket No. 383].

5         The Debtors and the Lenders agreed to continue the hearing on the Renewed Cash Collateral

6    Motion from time to time, and entered into a series of stipulations and consent orders extending the

7    Debtors' authorization to use cash collateral in accordance with the terms of the Interim DIP Order

8    (as modified by such stipulations).  On September 10, 2009, the Bankruptcy Court entered the "Final

9    Order Extending the Debtors' Authorization to Use Cash Collateral to Earlier of January 31, 2010

10   and the Effective Date of a Plan of Liquidation" [Docket No. 1255].  On February 2, 2010, the

11   Bankruptcy Court entered the "Order Extending the Debtors' Authorization To Use Cash Collateral

12   To Earlier Of February 8, 2010 And The Effective Date Of A Plan Of Liquidation" [Docket No.

13   1779], and on February 10, 2010, the Court entered the "Order Extending the Debtors' Authorization

14   To Use Cash Collateral To Earlier Of April 30, 2010 And The Effective Date Of A Plan Of

15   Liquidation" [Docket No. 1808] (collectively, the "Final Cash Collateral Order").

16        As of January 31, 2010, approximately $16.6 million in undrawn letters of credit remain

17   outstanding.  The total amount of outstanding letters of credit has been reduced since the Petition

18   Date by approximately $45.1 million.  Of this amount, letters of credit totaling approximately $16.4

19   million were cancelled or terminated without cost to the Debtors, and approximately $28.7 million in

20   letters of credit were drawn upon.  The planned resolution of the remaining letters of credit is

21   discussed below in Section V.

22        **2.    *Joint Administration Motion***

23        The Debtors requested joint administration of these chapter 11 cases to ease the overall

24   burden of administering 50 related bankruptcy cases and based the consolidated manner in which the

25   Debtors manage cash, their debt structure, and the sheer number of entities involved.  As discussed in

26   the motion, joint administration reduced (i) the number of documents prepared, filed, and served in

27   connection with these chapter 11 cases, (ii) the administrative burden of coordinating these cases, and

28   (iii) the monitoring burden that the cases would impose on the Court, the Clerk of the Court, the

19

1  Office of the United States Trustee, and all parties in interest.  The Order granting the Joint

2  Administration Motion was entered on March 11, 2009 [Docket No. 19].[10]

3       **3.     *Cash Management Motion***

4       The Debtors filed a Cash Management Motion for court approval to maintain the Debtors'

5  centralized cash management system (the "Cash Management System"), which was designed to

6  efficiently collect, transfer, consolidate and disburse funds generated by the Debtors' numerous

7  affiliates through the Debtors' operations.

8       The Debtors also requested authorization to maintain their existing policies and practices for

9  deposits and investments of excess funds within the Cash Management System, to continue to pay

10  bank fees and charges in the ordinary course of business, and to continue their intercompany

11  transactions and transfers.  The Final Order granting the Cash Management Motion was entered on

12  April 1, 2009 [Docket No. 175].

13       **4.     *Utilities Motion***

14       In order to avoid any interruption in the provision of utility services by certain utility

15  companies, the Debtors filed the Utilities Motion which sought approval of the creation of a $450,000

16  utility deposit account from which the utility companies could draw if the Debtors neglected to make

17  postpetition payments thereto.  The Debtors also requested that the Court prohibit the utility

18  companies from altering, refusing, or discontinuing services on account of any outstanding

19  prepetition invoices.  The Order granting the Utilities Motion and establishing a utility deposit

20  account minimum of $450,000, was entered on March 18, 2009 [Docket No. 71].  Subsequently, on

21  July 21, 2009, the Court entered an order granting the Debtors' motion to reduce the utility deposit

22  account minimum to $200,000 upon the entry of an order approving the sale of the Debtors' RV

23  Assets (defined below) [Docket No. 972].

24

25

26  ─────────────

27  [10]  The five Fleetwood retail Debtors discussed in section III.E. that filed their chapter 11 petitions
on July 29, 2009 and August 11, 2009, filed their motion seeking joint administration with these
Cases on August 13, 2009 [Docket No. 1092].  It was approved by order of this Court on August

28  19, 2009 [Docket No. 1118].

### 5.    *Employee Wages and Benefits Motion*

The Employee Wages and Benefits Motion requested the entry of an order (a) authorizing the Debtors to pay certain prepetition (i) reimbursable expenses, and (ii) health plan claims, insurance premiums and other administrative fees, (b) authorizing the Debtors to make deductions from employees' paychecks, and (c) authorizing and directing banks and other financial institutions to honor all checks and electronic payment requests made by the Debtors related to the foregoing.  FEI and other Debtors with employees also sought permission to pay $418,800 in prepetition obligations related to employee wages and benefits.  The Order granting the Employee Wages and Benefits Motion was entered on March 26, 2009 [Docket No. 129].

### C.    Appointment of the Creditors' Committee

Shortly after the Petition Date, on March 19, 2009 [Docket No. 73], the U.S. Trustee appointed the Creditors' Committee in these Chapter 11 Cases.  The following table lists the current members of the Creditors' Committee and their representatives.

| Member | Representative |
| --- | --- |
| The Bank of New York | J. Chris Matthews |
| Giant RV | Peter Kravitz |
| Mike Thompson's RV Super Stores | Frank DeGelas |
| Arbutus RV & Marine | Craig Little |
| McGovern's RV Centre | Dwain McGovern |
| Affordable RV | Chris Bugg |
| Auto Gallery | Thomas Glen |
| Boundary RV & Marine | Warren Lux |
| Esco Industries, Inc. | Wink Hallmark |

### D.    Professionals Retained at the Expense of the Estates

During the Cases, the Bankruptcy Court has approved the employment of the following professionals:

- Gibson, Dunn & Crutcher LLP as Debtors' General Insolvency Counsel

21

- FTI Consulting, LLC as Debtors' Financial Advisors/Restructuring Professionals

- Pachulski Stang Ziehl & Jones LLP as Counsel to the Creditors' Committee

- Grant Thornton LLP as the Creditors' Committee's Financial Advisors and Accountants

- XRoads Solutions Group, LLC as the Creditors' Committee's Financial Advisors and Consultants

- FocalPoint Securities, LLC as the Creditors' Committee's Investment Banker

- Ballenger, Cleveland & Issa LLC as the Creditors' Committee's Expert Witness in connection with the Application for an Order Approving the Employment of Greenhill & Co., LLC as the Debtors' Investment Banker

- Abernathy MacGregor Group as Debtors' Corporate Communications Consultant

- Kurtzman Carson Consultants LLC ("KCC") as Debtors' Claims and Noticing Agent

- Julander, Brown & Bollard LLP as Debtors' Special Counsel in an adversary action filed against DB

- Greenhill & Co., LLC as the Debtors' Investment Banker

On May 13, 2009, the Bankruptcy Court entered an order approving interim fee procedures for professionals seeking compensation from the Estates [Docket No. 552].  With the exception of KCC, whose compensation is subject to different procedures, subject to the Debtors' cash availability, professionals are eligible to receive payment of 80% of their monthly fees and 100% of their monthly expenses provided that no objection is timely filed and served with respect to such professionals' monthly fee statements.  Such professionals have the opportunity to request and obtain payment of the "hold back" amounts at an interim or a final fee application hearing.  The first interim fee application hearing was held on March 31, 2010.

In addition, on May 14, 2009, this Court entered an order approving the employment of professionals that the Debtors use in the ordinary course of business [Docket No. 571].

**E.    Subsequent Chapter 11 Filing by Five Fleetwood Retail Corp. Entities**

Approximately four months into these Chapter 11 Cases of the first forty-five (45) Debtors, five (5) additional Fleetwood entities filed for bankruptcy protection.  On July 29, 2009, Fleetwood Retail Corp. of Arizona filed a voluntary bankruptcy petition.  Fleetwood Retail Corp. of Arizona's emergency filing was necessary to stay the landlord's attempts to terminate its prepaid lease, based

1  on the landlord's allegations that the bankruptcy filing of the lease guarantor, FEI, created an

2  actionable default under the lease.  The bankruptcy filing reflects Fleetwood Retail Corp. of

3  Arizona's efforts to preserve the lease because FEI had already *paid the lease in full in advance for*

4  *the entire term*.  Ultimately, Fleetwood Retail Corp. of Arizona and its landlord consensually

5  resolved their disputes in a Court-approved settlement that returned $85,000 to the estate plus

6  released Fleetwood Retail Corp. of Arizona from its obligations to pay property taxes and make

7  premises repair, among others [Docket No. 1717].

8        The filing of the other four retail Debtors, namely Fleetwood Retail Corp. of Arkansas,

9  Fleetwood Retail Corp. of Florida, Fleetwood Retail Corp. of Georgia, and Fleetwood Retail Corp. of

10  South Carolina, followed on August 11, 2009, to stay similar attempts by the landlords under their

11  leases to take action against these Debtors' prepaid leasehold interests.  Pursuant to an order of this

12  Court on August 19, 2009 [Docket No. 1118], the bankruptcy estates of these five additional

13  Fleetwood entities are being jointly administered with the Estates of the other Debtors.

14  **F.    Fleetwood's Application to Have These Chapter 11 Cases Recognized as a Foreign
        Proceeding in Canada**

15        In or about July 2009, certain of the Debtors with exposure to Canada filed an Application

16  with the Court of Queen's Bench of Alberta, Judicial District of Calgary, pursuant to s.18.6 of the

17  *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"), for: (a) an

18  order and declaration that these Chapter 11 Cases be recognized as a "foreign proceeding" for the

19  purposes of s.18.6(1) of the CCAA; and (b) an order recognizing the automatic stay in these Chapter

20  11 Cases and granting a parallel stay of proceedings in Canada with respect to the Debtors (the

21  "Foreign Proceeding Application").  Although, none of the Debtors have operations or are registered

22  to do business in Canada, the Debtors have accounts receivable and other assets in Canada, and are

23  parties to litigation there.  The Foreign Proceeding Application was ultimately granted by the

24  Canadian court, which issued a "Recognition Order" on August 7, 2009.

25        Recognition of these Chapter 11 Cases in Canada was necessary to obtain appropriate relief

26  (particularly, a stay of proceedings) in order to prevent actions which could otherwise: (i) interfere

27  with the ability of the Debtors to liquidate their assets; (ii) violate the automatic stay; and (iii)

28  interfere with the operations of the Debtors and particularly, their ability to collect valuable accounts

receivable owing from Canadian counterparties. As with all other interests, rights and Assets of the Debtors in these Chapter 11 Cases, any and all rights of the Debtors and their Estates with respect to the Recognition Order and the Canadian foreign proceeding shall vest in the Liquidating Trust and Liquidating Trustee, and the Debtors/Liquidating Trustee expressly reserve and retain any and all rights and interests attendant thereto.

### G.    The Bar Dates for Pre-Petition Claims

On July 6, 2009, the Court approved the Debtors' motion requesting the establishment of a general bar date in these Chapter 11 Cases for the Primary Filers and entered its *Order Setting Final Bar Dates to File Proofs of Claim and Approving Related Noticing Procedures* [Docket No. 875] (the "Bar Date Order"). Pursuant to the Bar Date Order, August 28, 2009 (the "General Bar Date") was fixed as the last date on which non-governmental creditors of the Primary Filers could file a proof of claim against the Debtors' Estates on account of a prepetition Claim. The Bar Date Order also established additional bar dates for the prepetition Claims of governmental units and Claims arising from the Primary Filers' rejection of an executory contract or unexpired lease.

The bar date for filing section 503(b)(9) claims for all Debtors (the "503(b)(9) Bar Date") was fixed separately as October 5, 2009.

The General Bar Date for the Secondary Filers and Tertiary Filers was January 4, 2010, with the governmental bar date being the later of January 4, 2010 or a date that is 180 days after the order for relief was entered in the applicable Secondary or Tertiary Filer's case. Thus, for Secondary Filer, FRC Arizona, the governmental bar date was January 25, 2010 (180 days after FRC Arizona filed its petition, on July 29, 2009) and for the Tertiary Filers, the governmental bar date is February 8, 2010 (180 days after the filing of their petitions, on August 11, 2009).

A more extensive discussion of the Claims received by the General Bar Date is set forth below in Section IV.B.

### H.    Management Compensation

Prior to the Petition Date, the Debtors' management received several different types of compensation, including, but not limited to, salaries, discretionary bonuses, performance bonuses, benefits, life insurance, and 401(k) contributions. However, after the Petition Date, the Debtors'

24

1  management continued to receive their respective salaries, which remained substantially the same,

2  and also their benefits and life insurance, but all bonuses and contributions to their 401(k) were

3  eliminated.  Recognizing this loss of compensation, and in an effort to incentivize its management

4  and retain its key employees, the Debtors sought to implement an incentive bonus and severance

5  plan.  After extensive negotiations between the Debtors and the Committee, the Debtors finalized a

6  plan, which the Court approved on July 17, 2009, by the *Order Approving the Debtors' Payment of*

7  *Incentive Bonuses and Severance Payments to Key Employees* [Docket No. 956] (the "KEIP Order").

8       Under the incentive program, certain executives were to be eligible for bonuses tied to the

9  achievement of specific Plan confirmation performance deadlines and Asset disposition objectives.

10  Although the Plan-related milestones are not expected to be met, because of their extraordinary work

11  efforts and contributions to these Chapter 11 Cases, the Plan Proponents have sought and received

12  authority for the Debtors and/or the Liquidating Trustee (depending upon whether paid pre or post

13  Effective Date) to pay the discretionary bonus component to four eligible employees, Andrew

14  Griffiths, Leonard J. McGill, Michael Shearin, and James Smith (the "KEIP Employees") up to the

15  maximum amount they would have been entitled to receive under the incentive program.  *See*

16  Modified and Amended KEIP Plan Order [Docket No. 1846].

17       As for costs, the total payments allowed under the KEIP Order would have been $1,445,177

18  ($873,669 for incentive participants plus $571,508 for severance participants).  However, under the

19  Modified and Amended KEIP Plan Order, the costs of the incentive payments dropped significantly.

20  The maximum cost of the program is now $1,055,564.  This is $389,613 *less* than the potential

21  liability approved by the Court under the KEIP Order.

22  **I.    D&O Insurance**

23       The Debtors currently have multiple layers of directors and officers ("D&O") liability

24  insurance coverage in place, up to $50 million.  The Debtors also have an additional "Side A Only"

25  policy, which provides another $10 million in coverage.  The Debtors shall continue their D&O

26  policies through the Effective Date of the Plan.  Furthermore, the Debtors shall purchase a "tail"

27  D&O liability policy covering directors and officers (who will no longer be employed by the Debtors

28

or Estates) that will continue to provide coverage for claims made *after* the end of the current policy period based on claims that may have arisen prior to or during the current policy period.

## J.    Significant Asset Sales Occurring During the Bankruptcy Cases

During the cases, the Debtors have sold significant asset groups comprising operating business divisions as well as other Assets summarized as follows and detailed below.

Significant Asset Sales During the Bankruptcy Cases

| Date | Asset | Purchaser | Consideration |
|------|-------|-----------|---------------|
| 5/28/2009 | Military Housing Assets | CMH Manufacturing, Inc. | Aggregate purchase price included cash of $4.5M, relieve bonding obligations of $4.0M, and assumption of warranty obligations. |
| 7/17/2009 | RV Assets | Fleetwood RV, Inc. and Goldshield Fiberglass, Inc., affiliates of American Industrial Partners L.P. | Aggregate purchase price included cash of $53.0M less certain Assumed Liabilities and other purchase price adjustments. |
| 8/17/2009 | Housing Assets | FH Holdings, Inc. | Aggregate purchase price included cash of $26.2M, plus the sum of the current assets, less the sum of current liabilities and other purchase price adjustments. |
| 4/15/2009 | Travel Trailer Inventory | Lazy Days RV Center | Aggregate cash price of $2.3M. |
| 5/15/2009 | La Grande, Oregan Travel Trailer Manufacturing Plant | Northwood Real Estate, LLC and Northwood Operations, Inc. | Aggregate purchase price of $2.1M. |
| 5/15/2009 | Mexicali Assets | Krystal Enterprises, LLC | Aggregate purchase price $150K. |
| 10/28/2009 | Manufactured Housing Plant 35-2: Pearson, Georgia | L&M Bag & Supply Co. | Aggregate purchase price of $400K. |

| 11/5/2009 | Manufactured Housing Plant 34-2: Willacoochie, Georgia | Larry Booth | Aggregate purchase price of $863K. |
| 11/24/2009 | Manufactured Housing Plant 55-2: Garrett, Indiana | Walter G. Fuller, LLC | Aggregate purchase price of $850K. |
| 12/1/2009 | Manufactured Housing Plant 26-2: Westmoreland, Tennessee | Industrial Development Board of the Town of Westmoreland | Aggregate purchase price of $350K. |
| 2/1/2010 | Travel Trailer Trademarks | Heartland Recreational Vehicles, LLC | Aggregate purchase price of $306K. |
| 7/25/2009 | La Grande, Oregon Raw Materials and Inventory | Outdoors RV Manufacturing, Inc. | Aggregate cash price of $200K. |
| 8/14/2009 | Manufactured Housing Plant 55-1: Garrett, Indiana | Adventure Homes, LLC | Aggregate purchase price of $1.7M. |
| 11/9/2009 | Travel Trailer Plants 23-1 and 23-2: Pendleton, Oregon | Keystone RV Company | Aggregate purchase price of $4.2M. |
| Total <1> | | | Aggregate purchase price of $97.1M |

<1> - A significant portion of the aggregate purchase price contained herein included assumed liabilities and other purchase price adjustments as discussed in the sections immediately below.

## 1. *Military Housing Assets*

On May 28, 2009, the Debtors sold certain assets related to their military housing business (the "Military Housing Assets") to CMH Manufacturing, Inc. ("CMH") free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $4,500,000 in cash, plus (i) CMH's agreement to relieve the Debtors of approximately $4,000,000 of the Debtor's bonding obligations relating to certain work in progress that CMH will complete, and (ii) CMH's

agreement to assume the Debtors' warranty obligations with respect to completed military housing projects, pursuant to the Asset Purchase Agreement dated May 22, 2009 (the "Military Housing APA").[11]  The Military Housing Assets consist of real property, buildings, equipment, intellectual property, and other assets used in and associated with the construction of modular military housing by the Debtors at their two manufacturing plants in Belton, Texas.  The order approving the sale of the Military Housing Assets was entered on May 27, 2009 [Docket No. 653].  The Debtors received $4.5 million in cash proceeds from this sale of the Military Housing Assets.

### 2.  *RV Assets*

On July 17, 2009, the Debtors sold substantially all of their assets related to their recreational vehicle business (the "RV Assets") to Fleetwood RV, Inc. and Goldshield Fiberglass, Inc., affiliates of American Industrial Partners L.P. (collectively, "AIP") free and clear of all liens, claims and interests (except as expressly agreed).  The RV Assets consist of real property, buildings, equipment, inventory, intellectual property, contracts and leases, permits, information technology systems, software and other assets used in and associated with the manufacturing, marketing and sale of recreational vehicles by the Debtors, together with substantially all of the assets of the Debtors' fiberglass supply business.  Notably, the Debtors' California and Pennsylvania RV manufacturing facilities were not included in this sale.

The aggregate purchase price for the RV Assets was $53,000,000, less certain Assumed Liabilities (as defined in the RV APA) and other purchase price adjustments, pursuant to the terms and conditions of the Asset Purchase Agreement dated as of May 29, 2009 (the "RV APA").[12]  The net proceeds received after taking in account the adjustments and Assumed Liabilities was $33.6

---

[11] *See* Military Housing APA, attached as <u>Exhibit A</u> to the Notice of Emergency Motion and Emergency Motion of Debtors for an Order (I) Authorizing and Approving the Sale of Military Housing Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (II) Granting Related Relief; Memorandum of Points and Authorities in Support Thereof [Docket No. 618] for further details.

[12] *See* RV APA, attached as <u>Exhibit A</u> to the Notice of Motion and Motion of Debtors for an Order (I) Authorizing and Approving the Sale of RV Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing and Approving Assumption and Assignment of Contracts and Leases; and (III) Granting Related Relief; Memorandum of Points and Authorities in Support Thereof [Docket No. 667], for further details.

million.  The order approving the sale of the RV Assets was entered on July 2, 2009 [Docket No.

853], and an amendment thereto, which provided for approximately $2 million of sale proceeds to be

transferred to a separate transition services escrow account, was entered on August 6, 2009 [Docket

No. 1056].  An additional $2.5 million of the purchase price was also segregated pending the

resolution of the final working capital adjustments.  AIP and the Debtors are currently in the process

of determining the scope of the dispute to be arbitrated regarding how much, if any, of the purchase

price must be returned to AIP as a purchase price adjustment.  In an attempt to establish the scope of

arbitral issues to submit to the arbitrator, the Debtors sought and obtained (over AIP's objection) an

Order Determining Issues Subject to ADR [Docket No. 1649] (the "ADR Order") on December 16,

2009.  AIP appealed the ADR Order to the District Court for the Central District of California and

sought a stay pending appeal from the Bankruptcy Court, which was denied on January 21, 2010

[Docket No. 1771].  AIP's appeal of the ADR Order is currently pending before the District Court

and, since AIP's request for a stay pending appeal was denied, the arbitration will proceed.

Additionally, $8.2 million of the sale proceeds were set aside in a segregated reserve (the "RV

Assets Segregated Reserve") for the benefit of DB, as indenture trustee for the 14% Notes, on

account of the disputed first lien on certain of the RV Assets asserted by DB.  With the Creditors'

Committee and DB resolving all of their disputes in a global settlement, if the Plan is confirmed, this

portion of the sale proceeds will be removed from the reserve and placed into the Debtors' other cash

accounts.  The remainder of the proceeds, approximately $20.4 million, was placed into the Debtors'

other cash accounts.

### 3.   *Housing Assets*

On August 17, 2009, the Debtors sold the majority of their assets related to their

manufactured housing business (the "Housing Assets") to FH, Holding, Inc. free and clear of all

liens, claims and interests (except as expressly agreed) for the aggregate purchase price of

$26,150,000 in cash, plus the sum of the current assets of the Debtors included in the Housing Assets,

less the sum of the current liabilities of the Debtors assumed by FH Holding, Inc. and other purchase

price adjustments, pursuant to the terms and conditions of the Asset Purchase Agreement dated as of

1    July 21, 2009 (the "Housing APA").[13]  After giving effect to the purchase price adjustments, the net

2    purchase price paid by FH Holding, Inc. to the Debtors was approximately $25.6 million, including

3    $1 million deposited into a segregated account to secure FH Holding, Inc.'s right to potential post-

4    closing purchase price adjustments based on final determination of net working capital.[14]  Of the sale

5    proceeds, $4 million was used to pay down ISIS on account of their first priority liens asserted in

6    Plant 17.  An additional $2.135 million was set aside in a segregated account (the "Housing Assets

7    Segregated Reserve") for the benefit of DB, as indenture trustee for the 14% Notes, on account of the

8    disputed first lien asserted by DB on certain Housing Assets.  With the Creditors' Committee and DB

9    having resolved all of their disputes in a global settlement, if the Plan is confirmed, this portion of the

10   sale proceeds will be removed from the reserve and placed into the Debtors' other cash accounts.

11   The remainder of the sale proceeds, approximately $18.436 million, was placed in the Debtors' other

12   cash accounts.

13        The Housing Assets consist of substantially all of the operating real property, buildings,

14   equipment, inventory, intellectual property, contracts and leases, permits, and other assets used in and

15   associated with the production, marketing and sale of the manufactured housing by the Debtors.  The

16   order approving the sale of the Housing Assets was entered on August 14, 2009 [Docket No. 1102].

17   As discussed below, one operating manufactured housing plant (Plant 55-1) located in Garrett,

18   Indiana was not included in this transaction and was sold to a separate purchaser.  In addition, two

19   other operating plants were not included in the Housing Assets, but were shut down and idled at

20   approximately the same time as the sale of the Housing Assets

21        4.    *Travel Trailer Inventory*

22        The Debtors sold 154 finished travel trailer units (the "Travel Trailer Inventory") to Lazy

23   Days RV Center, Inc. ("Lazy Days") free and clear of all liens, claims and interests (except as

24

---

25   [13]  *See* form of Housing APA, attached as <u>Exhibit A</u> to the Notice of Motion and Motion of Debtors
      for an Order (I) Authorizing and Approving the Sale of Housing Assets Free and Clear of Liens,
26    Claims, Interests and Encumbrances; (II) Authorizing and Approving Assumption and
      Assignment of Contracts and Leases; and (III) Granting Related Relief; Memorandum of Points
27    and Authorities in Support Thereof [Docket No. 949], for further details.

28   [14]  This $1 million amount has since been released to the Debtors.

1   expressly agreed) for the aggregate cash price of $2,250,968 pursuant to an undated Asset Purchase

2   Agreement (the "Travel Trailer Inventory APA").[15]  The order approving the sale of the Travel

3   Trailer Inventory was entered on April 15, 2009 [Docket No. 293].

### 5.    *La Grande, Oregon Travel Trailer Manufacturing Plant*

5        On May 15, 2009,  the Debtors sold certain assets related to their La Grande Oregon travel

6   trailer manufacturing plant, comprising approximately 40.59 acres and approximately 103,710 square

7   feet of industrial office space and storage, all machinery, tools and equipment located thereon (the

8   "Plant 24 Assets"), to Northwood Real Estate, LLC and Northwood Operations, Inc., free and clear

9   of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of

10  $2,050,000 pursuant to the Asset Purchase Agreement dated as of May 13, 2009 (the "La Grande

11  APA").[16]  The order approving the sale of the Plant 24 Assets was entered on May 14, 2009 [Docket

12  No. 563].

### 6.    *Mexicali Assets*

14       On or around May 15, 2009, the Debtors sold certain assets related to their travel trailer

15  manufacturing facility in Mexico and all of the shares of capital stock of Fleetwood de Mexico S.A.

16  de C.V. (collectively, the "Mexicali Assets") to Krystal Enterprises, LLC free and clear of all liens,

17  claims and interests (except as expressly agreed) for the aggregate purchase price $150,000 pursuant

18  to the Asset Purchase Agreement dated as of April 30, 2009 ("Mexicali APA") and the Stock

19  Purchase Agreements dated as of May 1, 2009 ("Mexicali SPAs").[17]  The order approving the sale of

20  the Mexicali Assets was entered on May 13, 2009 [Docket No. 554].

---

[15] *See* Travel Trailer Inventory APA, attached as <u>Exhibit C</u> to the Notice of Motion and Motion of Debtors for Authorization to Sell Travel Trailer Inventory Free and Clear of Liens, Claims, Interests and Encumbrances; Memorandum of Points and Authorities in Support Thereof [Docket No. 199], for further details.

[16] *See* form of La Grande APA, attached as <u>Exhibit A</u> to the to Order Authorizing Debtors to Sell Assets Related to La Grande, Oregon Manufacturing Plant Free and Clear of Liens, Claims, Interests and Encumbrances [Docket No. 563], for further details.

[17] *See* Mexicali SPAs and Mexicali APA, attached as <u>Exhibits B-1</u> and <u>B-2</u> and <u>Exhibit C</u>, respectively, to the Notice of Motion and Motion of Debtors for Authorization to Sell Mexicali Assets Free and Clear of Liens, Claims, Interests and Encumbrances; Memorandum of Points and Authorities [Docket No. 401], for further details.

7. *Miscellaneous Asset Sales*

(a)    Non-Core Asset Sales

On August 6, 2009, an order approving procedures to sell certain non-core assets (the "Non-Core Asset Sale Procedures") was entered by this Court [Docket No. 1053]. As of the date hereof, the Debtors have sold the following non-core assets pursuant to the Non-Core Asset Sale Procedures.

(i)    Manufactured Housing Plant 35-2:  Pearson, Georgia

On October 28, 2009, the Debtors sold certain assets related to their manufactured housing plant number 35-2 located in Pearson, Georgia, comprising approximately 16.08 acres of land and approximately 98,404 square feet of industrial office space and storage, and all machinery, tools and equipment located thereon, to L&M Bag & Supply Co., Inc. free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $400,000 pursuant to the Asset Purchase Agreement dated as of October 7, 2009.

(ii)    Manufactured Housing Plant 34-2:  Willacoochie, Georgia

On November 5, 2009, the Debtors sold certain assets related to their manufactured housing plant number 34-2 located in Willacoochie, Georgia, comprising approximately 33.19 acres of land and approximately 123,968 square feet of industrial office space and storage, and all machinery, tools and equipment located thereon, to Larry Booth free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $862,500 pursuant to the Asset Purchase Agreement dated as of October 13, 2009.

(iii)    Manufactured Housing Plant 55-2:  Garrett, Indiana

On November 24, 2009, the Debtors sold certain assets related to their manufactured housing plant number 55-2 located in Garrett, Indiana, comprising approximately 20.35 acres of land and approximately 118,546 square feet of industrial office space and storage, and all machinery, tools, raw materials and equipment located thereon, to Walter G. Fuller, LLC free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $850,000 pursuant to the Asset Purchase Agreement dated as of November 2, 2009.

(iv)    Manufactured Housing Plant 26-2:  Westmoreland, Tennessee

On December 1, 2009, the Debtors sold certain assets related to their manufactured housing plant number 26-2 located in Westmoreland, Tennessee, comprising approximately 20.60 acres of land and approximately 127,117 square feet of industrial office space and storage, and all machinery, tools and equipment located thereon, to the Industrial Development Board of the Town of Westmoreland free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $350,000 pursuant to the Asset Purchase Agreement dated as of October 28, 2009.

(v)    Travel Trailer Trademarks

On February 1, 2010, the Debtors sold certain trademark and intellectual property assets related to their shuttered travel trailer business to Heartland Recreational Vehicles, LLC, free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $306,000 pursuant to the Asset Purchase Agreement dated as of January 22, 2010.

(b)    La Grande, Oregon Raw Materials and Inventory

The Debtors sold certain raw materials and inventory located in La Grande, Oregon to Outdoors RV Manufacturing, Inc. ("Outdoors RV") for the aggregate cash price of $200,000 pursuant to an undated Asset Purchase Agreement.[18]  The inventory was sold to Outdoors RV on an "as is, where is" basis, free and clear of all liens, claims, interests and encumbrances.  The order approving the sale of the inventory to Outdoors RV was entered on June 25, 2009 [Docket No. 812].

(c)    Manufactured Housing Plant 55-1:  Garrett, Indiana

The Debtors sold certain assets related to their manufactured housing plant number 55-1 located in Garrett, Indiana, comprising approximately 22.16 acres of land and approximately 140,890 square feet of industrial office space and storage, and all machinery, tools and equipment located thereon (the "Plant 55-1 Assets"), to Adventure Homes, LLC free and clear of all liens, claims and interests (except as expressly agreed) for the aggregate purchase price of $1,725,000 pursuant to the

---

[18] *See* the form Asset Purchase Agreement, attached as Exhibit B to the Notice of Motion and Motion of Debtors for Authorization to Sell Raw Materials and Inventory Free and Clear of Liens, Claims, Interests and Encumbrances; Memorandum of Points and Authorities in Support Thereof [Docket No. 718], for further details

1   Asset Purchase Agreement dated as of July 7, 2009. The order approving the sale of the Plant 55-1

2   Assets was entered on August 14, 2009 [Docket No. 1100].

3                    (d)    Travel Trailer Plants 23-1 and 23-2: Pendleton Oregon

4           The Debtors sold certain assets related to their travel trailer manufacturing plant located at

5   4640 NW McKennon Road and 4640 NW Bartsch Road, Pendleton, Oregon, consisting of two

6   manufacturing plants (Plant 23-1 and Plant 23-2) with approximately 203,153 square feet of

7   industrial warehouse space sitting on approximately 21.24 acres of land, and all machinery, tools, raw

8   materials or other personal property located therein (the "Plant 23 Assets"), to Keystone RV

9   Company for the purchase price of $4,200,000.00, pursuant to the terms of the Asset Purchase

10  Agreement date September 30, 2009. The order approving the sale of the Plant 23 Assets was

11  entered on November 9, 2009 [Docket No. 1510].

12                   (e)    Bingham and Kummer Split Dollar Settlements

13          The Debtors were parties to certain split dollar life insurance policies with Paul Bingham and

14  Glen Kummer. The Debtors have surrendered these policies pursuant to a settlement agreement,

15  which this Court approved on March 31, 2010 [Docket No. 1987]. Although not technically an asset

16  sale, Fleetwood's surrender of the policies returned approximately $3.8 million to the Debtors'

17  estates.

18  **K.     Certain Environmental Matters**

19          **1.     *Riverside District Attorney***

20          On September 10, 2008, the Office of the District Attorney for the County of Riverside

21  ("Riverside DA") informed FEI that it would be subject to prosecution for alleged violations of the

22  California Hazardous Waste Control Act and related regulations at the Fleetwood 3200 Myers Street

23  facility in Riverside, California. Counsel for FEI met with the Riverside DA on October 6, 2008, to

24  discuss the alleged violations and subsequently submitted a settlement offer thereto on November 13,

25  2008. The parties engaged in negotiations and agreed in principle to a settlement on February 17,

26  2009, whereby FEI would pay $30,000 as civil penalties and reimburse the Riverside County Waste

27  Management Department for costs of $1,234.14 incurred in connection with the alleged violations.

28

1    After further negotiations, the Riverside DA was willing to settle the alleged violations in

2    exchange for an allowed unsecured non-priority claim in the amount of $31,234.14. However, the

3    parties never executed the stipulation and, on August 11, 2009, the Riverside DA filed a lawsuit

4    against FEI in the Superior Court of California, County of Riverside, for negligent violations of

5    hazardous waste disposal laws, illegal transportation of hazardous waste, and violations of unfair

6    competition laws.

7    On September 10, 2009, FEI answered the Riverside DA's complaint and asserted affirmative

8    defenses contending that, among other things, the Superior Court lacked jurisdiction to consider the

9    relief requested by the Riverside DA and that the complaint was void as a violation of the automatic

10   stay. Subsequently, on September 21, 2009, the Riverside DA filed a demurrer to FEI's answer and

11   contended that FEI's affirmative defenses challenging the Superior Court's jurisdiction did not state

12   defenses upon which relief could be granted. On November 4, 2009, before FEI's opposition to the

13   demurrer was due, FEI removed the Superior Court action to the Bankruptcy Court. *See generally*

14   Adversary No. 09-01539.

15   On January 7, 2010, the Riverside DA and FEI entered into a Stipulation for Settlement,

16   whereby FEI agreed that the Riverside DA would have an allowed unsecured non-priority claim

17   against FEI in the amount of $31,234.14, without the need to file a proof of claim or take further

18   action against FEI in its bankruptcy case. *See* Adversary No. 09-01539, Docket No. 6 (Jan. 7, 2010).

19   In exchange, the Riverside DA agreed to waive all claims against FEI or the other Debtors on account

20   of the hazardous waste incident. On January 13, 2010, FEI filed a motion under Federal Bankruptcy

21   Rule 9019 seeking approval of the settlement (the "Riverside DA 9019 Motion") [Docket No. 1741],

22   which was approved by the Court on February 9, 2010 [Docket No. 1806]. The Bankruptcy Court's

23   approval of the Riverside DA 9019 Motion by entry of a final order approving the settlement fully

24   and finally resolved any and all issues between Fleetwood and the Riverside DA.

25   **2.    *SCAQMD***

26   Prior to the Petition Date, the South Coast Air Quality Management District through the

27   Office of the District Prosecutor ("SCAQMD") issued FEI a Notice of Violation

28   P-53805 ("NOV") dated August 26, 2008, concerning spray booth operations at the Fleetwood 5300

1    Via Ricardo facility in Riverside, California. The NOV includes five separate alleged violations of

2    District Rule 3002 in connection with FEI's spray booth and an additional alleged violation for a late

3    filing of a Clean Air Act semi-annual Title V report. On February 6, 2009, the SCAQMD requested

4    that FEI provide in writing any information that it would like the SCAQMD to consider in assessing

5    any penalties in connection with NOV P-53805. On March 6, 2009, FEI responded to the

6    SCAQMD's request. On April 10, 2009, the SCAQMD provided FEI with a proposed settlement of

7    $50,000 for the five spray booth violations and $1,500 for the late filing of the Clean Air Act Title V

8    report. After further negotiations, SCAQMD agreed to settle the alleged violations in exchange for

9    an allowed unsecured non-priority claim in the amount of $51,500 against FEI. The parties entered

10   into a stipulation regarding the settlement, which was ultimately approved by the Court on October

11   22, 2009 [Docket No. 1442].

12   **L.    Litigation Commenced During these Chapter 11 Cases**

13         Since the Petition Date, approximately nineteen (19) adversary proceedings have been filed

14   that relate to the Debtors' Chapter 11 Cases. These adversary proceedings include avoidance actions,

15   breach of contract actions, breach of warranty actions, injunction actions to extend the automatic stay,

16   and Worker Adjustment and Retraining Notification ("WARN") Act actions. The adversary

17   proceedings commenced during these Chapter 11 Cases are summarized on <u>Appendix D</u> attached

18   hereto, along with the status of each. None of the claims for relief alleged against the Debtors in

19   these adversary proceedings are covered by insurance policies of the Debtors. As discussed below,

20   only Product Liability PI Claims *may* be covered by insurance.

21         **1.    *WARN and Severance Settlements***

22         Almost immediately after the Petition Date, multiple class action adversary proceedings listed

23   in <u>Appendix D</u> (*e.g.*, *Myers*, *Justice* and *Doud*) were filed against Fleetwood alleging violations under

24   the WARN Act and California Labor Code §§ 1400 et seq. On September 15, 2009, Judge Jury

25   entered an order consolidating the *Myers*, *Justice* and *Doud* WARN Act cases into one proceeding

26   (the *Doud* adversary proceeding- Case No. 6:09-ap-01114-MJ) wherein the plaintiffs filed a

27   consolidated complaint.

28

1    Similarly, on August 28, 2009, *Curtis Jay Howe* filed a class action adversary complaint

2 against Fleetwood (*see* Appendix D) alleging breach of contract and violations of ERISA relating to

3 FEI's alleged prepetition severance plan.

4    In December 2009, the parties to the *Doud* consolidated WARN Act class action and *Howe*

5 severance class action adversary proceedings reached global settlements.  The parties will document

6 the settlements and file the required motions for approval under Bankruptcy Rules 7023 and 9019

7 shortly.

8         **2.    *Pendency of First American Trust Company Adversary Proceeding***

9    In 1992, Fleetwood's Board of Directors authorized the Company to enter into a Split-Dollar

10 Agreement with First American Trust Company as trustee of a trust (commonly referred to as the

11 Century Trust) established by John C. Crean, Fleetwood's founder and at that time its CEO and a

12 primary shareholder, and his wife for the benefit of the Crean family.  The Split-Dollar Agreement

13 provided for Fleetwood's purchase for the Century Trust of three split-dollar life insurance policies

14 with an aggregate death benefit of $40 million on the lives of Mr. and Mrs. Crean.  The policy

15 premiums were to be split between the Century Trust and Fleetwood—Fleetwood was to pay the full

16 premium and the Century Trust was to pay its share (based on the IRS value of the current death

17 benefit to the insureds) to Fleetwood.   The parties agreed and understood that Fleetwood would

18 make its share of the premium payments until the policies became self-sustaining, which was

19 estimated based upon actuarial projections to be 15 years.

20    On the death of the survivor of Mr. Crean and his wife, Fleetwood was to be reimbursed for

21 the premiums that it had paid plus a defined rate of return from the death benefit paid under the

22 policies.  *Id.* at 4.  Any premium payments made by the Century Trust to Fleetwood would be used to

23 reduce the amounts that would ultimately be repaid to Fleetwood.  In addition, the amount due to

24 Fleetwood was to be reduced by any borrowings that it might make against the policies.

25    Under the terms of the Split-Dollar Agreement, Fleetwood was also required by applicable tax

26 law to furnish a statement of the amount of income that would have to be reported for federal and

27 state income tax purposes (by Mr. Crean while he was alive and by the Century Trust after his death)

28 as a result of the value of the insurance protection provided by Fleetwood.  Obj., Ex. 1 at 3.  Notably,

1    that amount would always be equal to the value of the portion of the total premium that the Century

2    Trust was required to pay to Fleetwood. *Id.* at 2. If the Century Trust made the required premium

3    payment to Fleetwood, then there would be no reportable income. As further security for the

4    repayment of the amounts advanced by Fleetwood as premiums for the Split-Dollar Policies, the

5    parties also entered into a Collateral Assignment Agreement, which among other things provided that

6    Fleetwood had the unfettered "right to make and receive loans against the [Split-Dollar] Policy . . . to

7    the extent of the aggregate premiums paid by [Fleetwood]."

8           John Crean died in 2007 and Donna Crean is 81 years of age.

9           In December of 2008, Fleetwood borrowed $9,822,069 on the Policies as permitted by the

10   Collateral Assignment Agreement. In determining what amounts it could borrow against the Split-

11   Dollar Policies under the Collateral Assignment Agreement, Fleetwood relied on the calculations

12   provided by the Century Trust's insurance broker TRC Financial.

13          On or about August 26, 2009, First American as the trustee of the Century Trust commenced

14   an adversary proceeding (Adv. Proc. No. 6:09-ap-01415-MJ) ("Adversary Action") by filing a

15   complaint against Fleetwood, Bank of America, Wells Fargo Foothill, Inc., Textron Financial Corp.,

16   PNC Bank, N.A., Wachovia Capital Finance Corp. (collectively the "Bank Defendants"), Lyle

17   Larkin, Elden Smith, James Smith and Larry Mace (collectively the "Individual Defendants") in the

18   Bankruptcy Court in which First American alleged that (a) Fleetwood has been fully repaid for all

19   premiums Fleetwood paid, plus "costs of funds," such that there is nothing presently owing to

20   Fleetwood under the Split-Dollar Agreement; (b) Fleetwood has been reimbursed and/or borrowed

21   more than it paid in premiums and owes money back to the Century Trust for that overpayment;

22   (c) Fleetwood has breached its obligations under the Split Dollar Agreement and Collateral

23   Assignment Agreement by, among other things, failing to pay premiums due under the Policies,

24   borrowing from the Insurers who issued the Policies without First American's knowledge or consent

25   and purportedly securing repayment of said loans (as well as interest accruing on said loans) with the

26   Policies; (d) Fleetwood has breached its obligations under the Split-Dollar Agreement, the Collateral

27   Assignment Agreement and its loan agreements with the Insurers by failing to pay interest on loans

28   secured by the Policies as such interest accrues; and (e) the value of the death benefits payable under

1   the Policies has been and is being depleted because the Insurers are purporting to offset interest on

2   Fleetwood's loans against the Policies due to Fleetwood's failure to pay said interest.

3            Fleetwood denies First American's allegations and further contends among other things that,

4   under the terms of the Split-Dollar Agreement, Fleetwood is or will be owed anywhere from $2.0

5   million to $3.7 million, net of loans and interest, as of December 31, 2009 for premiums paid plus the

6   "cost of funds return." Fleetwood further asserts that First American has no standing to pursue the

7   claims it has asserted in the Adversary Action against the Individual Defendants and the Bank

8   Defendants.

9            Fleetwood is obligated to indemnify its officers and directors to the fullest extent allowed by

10  Delaware law and all its directors and officers have filed contingent claims for indemnification

11  generally.  Fleetwood has no separate agreement to indemnify the Individual Defendants as to the

12  claims in the First American Action.  D&O Policies may cover claims asserted against the

13  Individuals Defendants and Fleetwood's D&O carrier Chubb Group of Insurance Companies has

14  accepted the defense of the individual defendants subject to a reservation of rights.  Typically, D&O

15  insurance does not cover avoidance claims.

16           The D&O Polices do not provide coverage for any claims asserted by First American against

17  Fleetwood.  If the Claims of First American become an Allowed Claim, there will be no proceeds of

18  insurance available to satisfy such Allowed Claim.  If and when any claim of First American against

19  Fleetwood becomes an Allowed Claim, such Claim will be treated as a General Unsecured Claim in

20  Class 6.

21           The Bank Defendants are Fleetwood's Senior Secured Lenders under its Prepetition Secured

22  Credit Facility.  The Bank Defendants claim that Fleetwood is obligated to indemnify them for any

23  costs, attorney's fees, loss or liability that they incur as a result of the claims asserted by First

24  American based on the terms of the Secured Credit Facility, the DIP Credit Agreement and Interim

25  DIP Order.

26           Nothing in the releases set forth at Section III.L.2 of this Disclosure Statement and Section XI

27  of the Plan shall release or enjoin any claim that First American has asserted in the Adversary Action

28  against Fleetwood, the Individual Defendants, the Bank Defendants or any party added as a defendant

1    by a Final Order of the Court entered prior to the Confirmation of the Plan. BofA and the Lenders

2    have asserted that they have indemnification claims under the Secured Credit Facility on account of

3    this litigation.

4         **3.    *Schechter Litigation***

5         On September 1, 2009, Robert Alan Schechter filed a putative class action lawsuit (the

6    "Schechter Action") on behalf of purchasers of FEI common stock between December 6, 2007 and

7    March 10, 2009 against FEI officers Elden L. Smith and Boyd R. Plowman in the United States

8    District Court for the Central District of California (Case No. EDCV 09-01653 MJG (OPx)). The

9    Complaint in the Schechter Action asserts claims for violation of section 10(b) and 20(a) of the

10   Securities Exchange Act of 1934 and Rule 10b-5. The Debtors are informed that Mr. Smith and Mr.

11   Plowman deny the allegations of the complaint filed in the Schechter Action and intend to vigorously

12   defend it. A policy or policies of D&O liability insurance provides coverage for the claims asserted

13   in the Schechter Action and the costs of defense. The Debtors do not anticipate that their estates will

14   incur any cost or liability as a result of the Schechter Action.

15        **4.    *The Browder Class Action***

16        On May 3, 2008, plaintiffs, Jesse Browder, Mary White, Otha Townsend, Vera and Robert

17   Burns, Tamicca Stantley, and Mary Goodwin (the "Browder Plaintiffs"), filed their Second Amended

18   Complaint in an action in the United States District Court for the Central District of California, (Case

19   No. EDCV 07 -0 1180-SGL) on behalf of a class of over 150,000 persons who purchased Fleetwood

20   manufactured homes. The Browder Plaintiffs' complaint alleges violations of California Business

21   and Professions Code Section 17500, violations of California Business and Professions Code section

22   17200, violations of the Consumers Legal Remedies Act, Cal. Civ. Code section 1750 et seq., Breach

23   of Express Warranty, Breach of Contract, Suppression, and Common Law Unjust Enrichment. In

24   essence, the Browder Plaintiffs allege that the members of the class purchased manufactured homes

25   with insufficient insulation.

26        The Browder Plaintiffs allege that Fleetwood's uniform methodology of calculating the R-

27   value of insulation to be installed in the roof cavities of Fleetwood's manufactured homes, and the

28   instructions for installing such insulation provided to its manufacturing facilities, resulted in the

1  insulation in roof cavities of the class members' homes having a lower R-value than Fleetwood

2  represented prior to or during sale.  The Browder Plaintiffs claim that this led to personal property

3  damages including diminished value of the homes, the cost to install adequate insulation, and

4  increased cooling and heating costs for each class member.  However, the Browder Plaintiffs do not

5  claim personal injury damage as a result of the insufficient insulation.

6       On September 4, 2008, the United States District Court entered an order certifying a class

7  defined as:

8       "All persons in the United States who, at any time since January 1, 1999, purchased a
        home manufactured by Fleetwood Enterprises, Inc., or any of its wholly owned
9       subsidiaries, which contained blown insulation in the attic in which the R-Value of
        that insulation is less that [sic] what was represented by Fleetwood Enterprises, Inc."
10      ("Plaintiff Class").

11  Each of the Browder Plaintiffs has filed a proof of claim ("Browder Claims") on behalf of themselves

12  and on behalf of the members of the Plaintiff Class.  Fleetwood denies the allegations of the Browder

13  Plaintiffs' complaint and the Browder Claims.  The Plan Proponents believe that the Browder Claims

14  are without merit and that the Browder Plaintiffs and the class members are not entitled to any

15  damages, Allowed Claims or other recovery of any kind.  Except for costs incurred by the

16  Liquidating Trust to object to the class claims of the Browder Plaintiffs and to litigate as necessary

17  the claim objections before the Bankruptcy Court, the Plan Proponents do not believe there will be

18  any significant negative impact on Distributions to creditors.  The Browder Plaintiffs dispute these

19  conclusions.

20       The Plan Proponents and/or Fleetwood believe that the Browder Claims are not covered by

21  any policy of insurance issued in favor of Fleetwood.  The Browder Plaintiffs dispute this contention.

22  Notwithstanding the foregoing, the Plan does not release or discharge any claims that the Browder

23  Plaintiffs may have against any policy of insurance issued in favor of Fleetwood, to the extent any

24  such claim exists.  Nothing in the Plan or in the Confirmation Order shall preclude Plaintiffs and the

25  Plaintiff Class from pursuing their claims to the extent of available insurance coverage and proceeds.

26  The Browder Claims of the Plaintiff Class asserted against the Debtors, solely to the extent of

27  available insurance, are preserved and not discharged by the Plan.  However, to the extent the

28  Browder Plaintiffs assert that they are entitled to any recovery on account of any policy of insurance

41

1  issued by Gibraltar Insurance Co. Ltd, then any action to establish coverage, to assert a claim against

2  Gibraltar Insurance Co. Ltd or to obtain any other recovery from Gibraltar must be brought before the

3  Bankruptcy Court.

4        If and when the Browder Claims of the Plaintiff Class members become Allowed Claims, and

5  to the extent not covered by insurance, then such Allowed Claims shall be treated as General

6  Unsecured Claims in Class 6.  To the extent any portion of the Browder Claims is covered by the

7  proceeds of insurance, any deficit will be treated as a General Unsecured Claim in Class 6.

8        As provided in Section VI.E.5(j) hereof and the Liquidating Trust Agreement, from and after

9  the Effective Date, all of the Debtors' Assets not otherwise treated by the Plan, shall be transferred to

10  and vest in the Liquidating Trust which shall preserve and maintain all of the Debtors' documents,

11  files, books, records, electronic data (including but not limited to, emails and email server back-up

12  tapes) (collectively, the "Documents").  The Liquidating Trust shall not destroy, abandon or

13  otherwise render the Documents unavailable except upon entry of an Order by a court of competent

14  jurisdiction on notice to parties in interest, including the Browder Plaintiffs, and an opportunity to be

15  heard.

16  **M.    Deutsche Bank Litigation**

17        On May 27, 2009, the Debtors commenced the adversary proceeding against DB and the

18  Holders of the 14% Notes to avoid the Exchange Offer.  The complaint that commenced the

19  adversary proceeding, entitled *Fleetwood Enterprises, Inc. et al. v. Deutsche Bank Trust Company*

20  *Americas, as Trustee and Collateral Agent, et. al.*, Adv. No. 09-1258-MJ (the "DB Litigation"),

21  alleged causes of action for avoidance of preferential transfers, avoidance of fraudulent transfers,

22  recovery of avoidable transfers, and disallowance of defendant's proofs of claim.  On October 21,

23  2009, after receiving Court approval to substitute plaintiffs, the Creditors' Committee served and

24  filed its First Amended Complaint (the "Amended Complaint") on behalf of the Debtors.  In the

25  Amended Complaint, the Creditors' Committee brought claims under bankruptcy and state law to (i)

26  avoid the security interests and guarantees provided by the Operating Subsidiaries granted in

27  connection with the Exchange Offer, (ii) preserve liens for the estates, and (iii) avoid the 14% Notes.

28

1      In late 2009, the parties stipulated to a stay of the DB Litigation through February 2010,

2  during which time the Creditors' Committee and the holders of a majority of the 14% Notes

3  negotiated a settlement in principle of the DB Litigation.  The settlement-in-principle includes the

4  allowance of the 14% Note Claims and an agreement as to the treatment thereof under the Plan.

5  Confirmation of the Plan will constitute approval of the settlement of the DB Litigation in accordance

6  with the terms set forth in the Plan.

7  **N.      Plan Negotiations**

8           **1.     *Plan Exclusivity***

9      The Debtors sought and received extensions of their exclusive periods under section 1121(d)

10  three times in these Chapter 11 Cases.  On June 5, 2009, the Debtors filed a motion for entry of an

11  order extending the exclusive periods by 90 days within which only they could file a chapter 11 plan

12  and solicit acceptances thereof [Docket No. 706].  On July 2, 2009, the Court entered an order

13  approving the motion [Docket No. 851].  Thereafter on October 1, 2009, the Debtors filed a motion

14  seeking an additional 90 day extension of the exclusive periods [Docket No. 1332].  On October 30,

15  2009, the Court entered an order extending the dates within which only the Debtors could file a

16  chapter 11 plan and solicit acceptances thereof to January 5, 2010 and March 8, 2010, respectively

17  [Docket No. 1467].  Finally, on December 10, 2009, the Debtors filed a third motion seeking an

18  additional 90 day extension of the exclusive periods [Docket No. 1633].  On January 8, 2010, the

19  Court entered an order extending the dates within which only the Debtors could file a chapter 11 plan

20  and solicit acceptances thereof to April 5, 2010 and June 6, 2010, respectively [Docket No. 1715].

21      Given that the Plan is a liquidating plan, the Plan is being propounded jointly by the Debtors

22  and the Creditors' Committee.

23           **2.     *Plan Negotiations***

24      There have been extensive discussions spanning several months with the key constituents for

25  a consensual plan, including the largest holder of the 14% Notes, the indenture trustee for the 6%

26  Notes, and the Creditors' Committee.

27

28

Beginning in the summer of 2009, the Creditors' Committee proposed the current plan structure and held an in-person meeting in September 2009 amongst the key constituents. Thereafter, several rounds of offers and counteroffers ensued, resulting in the final Plan.

The Plan embodies a settlement in principle with the majority Holders of 14% Notes and 6% Notes that, in the aggregate, asserted in excess of $233 million of claims against the Debtors (the "Noteholder Settlement"). The Noteholder Settlement resolves the DB Litigation, *i.e.*, the Creditor Committee's pending avoidance action against DB, the Holders of 14% Notes and 6% Notes, in a manner that is in the best interests of the Estates and will provide a far greater recovery to general unsecured creditors than protracted litigation against the 14% Notes.

# IV.
## DESCRIPTION OF ASSETS AND LIABILITIES (INCLUDING CLAIMS) OF THE DEBTORS

### A.    Anticipated Assets of the Debtors as of the Effective Date

As of the anticipated Effective Date of the Plan, the Debtors will have liquidated a majority of their assets, and therefore, expect that their most valuable remaining assets will include: (1) cash on hand, (2) miscellaneous real property, (3) intellectual property assets, (4) litigation/avoidance actions, and (5) accounts receivable. As discussed in greater detail in the Plan, the Plan Proponents estimate that the Net Distributable Proceeds for Holders of Allowed General Unsecured Claims (Class 6) against the Debtors will range from approximately 10.3% to 17.4%. Financial analysis and projections regarding the Debtors' Cash, Assets and liabilities are appended hereto as <u>Appendices C, F and G</u>.

### B.    Description of Liabilities

#### 1.    *Scheduled Liability*

The Debtors filed their Schedules on May 11, 2009 and subsequently amended them on July 1, 2009. The Debtors' Amended Schedules listed $339,507,603 in total Claims as of the Petition Date, classified into the following priorities: (i) Secured Claims in the amount of $135,938,000, (ii) Priority Claims in the amount of $2,016,632.66, and (iii) Unsecured Claims in the amount of $201,552,970.76. The Secured Claims amount in the Schedules includes a duplicate claim (ISIS's $27,250,000 Claim) that was reported in both FEI's and FHI's Schedules.

### 2.    *Filed Claims Summary*

To date, there have been over 14,000 Proofs of Claim filed against the Debtors totaling over $2.6 billion, and additional claims continue to be filed. The following chart summarizes the Claims filed against the Debtors on a consolidated basis as of the General Bar Date.

$ in Millions

|  | Secured | Admin | Priority | Unsecured | Total | Count |
|---|---|---|---|---|---|---|
| **Filed Claims** | $ 212.3 | $ 7.2 | $ 22.8 | $ 2,421.4 | $ 2,663.7 | 14,230 |

Based on preliminary analysis, the Plan Proponents estimate that there are as many as $1.35 billion duplicate Proofs of Claims filed, which Claims will be deemed eliminated as a result of substantive consolidation if the Plan is confirmed. Further, because the Plan provides for the settlement of certain large claim holding classes, such as the WARN Class Claims and the Severance Class Claims, the Plan Proponents expect further Claim reductions of over $766 million. In addition, the Plan Proponents have also performed preliminary analysis on approximately $7 million of Proofs of Claim filed that either match exactly the claim amount as scheduled or were filed after the General Bar Date. The Plan Proponents have been and continue to evaluate these Proofs of Claim.

# V.
# INSURANCE CONSIDERATIONS:  PRODUCT LIABILITY PI CLAIMS, WORKERS' COMPENSATION CLAIMS, AND FEMA CLAIMS

A.    **Gibraltar Insurance Company, Ltd. and Insurance Coverage Provided**

### 1.    *General Overview*

Gibraltar Insurance Company, Ltd. ("Gibraltar") is a wholly-owned subsidiary of FEI formed under the laws of Bermuda. Since 1977, Gibraltar has provided products liability insurance coverage as to personal injury claims asserted against Fleetwood's recreational vehicle and manufactured housing businesses. In each of the years 2000 through 2008, Gibraltar provided a "Product/Completed Operations Liability" policy (the "Gibraltar Policy") to insure Fleetwood as to products liability claims on an "occurrence" basis, meaning the coverage is provided as to claims based on when the claim occurred.

Additionally, Gibraltar has provided "excess insurance" as to Fleetwood's self-insured workers' compensation programs to the extent any single claim exceeds $200,000 per occurrence, but

1  up to a maximum limit of $600,000 per claim in self insured programs and $1 million in programs

2  utilizing outside insured programs.

3      **2.    *Important Financial Information Regarding Gibraltar and Unknown Factors That
        May Affect Insurance Coverage***

4          As of January 31, 2010, Gibraltar had approximately $24.5 million of assets, consisting of

5  approximately $2.1 million in cash, $20.6 million in high quality commercial paper and an additional

6  $0.7 million owed to Gibraltar from third party insurers and other miscellaneous assets.  Gibraltar is

7  audited annually and files annual reports with the Bermuda Monetary Authority in Bermuda.  Based

8  on its last annual report filed in August of 2008, Gibraltar was in compliance with the Bermuda law

9  as to solvency requirements.  Gibraltar sought and received an extension to file its 2009 report due to

10  the need to first deal with various events in the Debtors' bankruptcy cases.  The 2009 report has now

11  been filed.  The Debtors are uncertain of any potential value that Gibraltar may have, which value is

12  dependent upon several unknown factors as described herein.

13          With respect to the Gibraltar Policies, for Policy Years 2000 and 2001, Gibraltar should have

14  no additional exposure provided its reinsurance proceeds are collected when due.  As of January 31,

15  2010, the total remaining coverage available under the outstanding Gibraltar Policies was

16  approximately $29,399,483.  While Gibraltar believes that it will not have to do so, because it will

17  pay claims in an orderly fashion, if Gibraltar were compelled to liquidate and to tender policy

18  proceeds up to the maximum policy limits for products liability coverage for each policy year,

19  Gibraltar would have insufficient assets to pay cash up to full policy limits for all policy years to date.

20          Further, as discussed in Section V.E below, based on the recent settlement in principle

21  reached in the FEMA class action cases, it is assumed that Gibraltar will have no insurance

22  obligations arising out of the FEMA formaldehyde claims.  Pursuant to the proposed settlement, the

23  Debtors' separate "Pollution Legal Liability Select Policy" issued by American International

24  Specialty Lines Insurance Company, an affiliate of AIG (the "AISLIC Policy"), will pay the entire

25  settlement amount, which is significantly less than the $10 million AISLIC Policy limit.  It is also

26  assumed that, as stated above, Gibraltar's reinsurers comply with their obligations, any gap in

27  coverage is financially immaterial to Gibraltar, there are no material expenditures of defense costs

28