1  upon claims reaching the excess layer of coverage (as referenced above), and Gibraltar maintains

2  sufficient funds to continue to operate and administer to its insurance obligations. Finally, Gibraltar's

3  financial worth is also affected by the workers' compensation insurance it provided Debtors.

4        Gibraltar has exposure on open workers' compensation claims dating back to as early as 1982

5  for which it provides excess coverage and against which Gibraltar has established reserves of

6  $3,432,954. It is assumed that the Debtors' workers' compensation insurance obligations, including

7  those of Gibraltar's are satisfied within expected limits.

8        Until Claims covered under the Gibraltar Policies are liquidated and the total amount to be

9  paid on account of covered claims is determined, it is not possible to determine if Gibraltar will have

10  any residual value or if sufficient proceeds will exist to pay claims as to any particular policy year.

11        *Therefore, the Plan does not represent or assure that Gibraltar will have the financial ability*

12  *to pay out the full remaining amount of coverage attributable to any policy year on account of the*

13  *liquidated amount of allowed claims.*

14  **B.**      **Product Liability PI Claims**

15      **1.**    ***Product Liability Insurance Coverage Provided By Gibraltar to Debtors and***

16            ***Availability for Product Liability PI Claims***

17        The Schedules attached to <u>Appendix E</u> hereto set forth the coverage provided under the

18  Gibraltar Policies (and excess carriers) for each Policy Year 2000 through 2008. The maximum

19  amount of aggregate liability coverage, or "policy limit," provided under the Gibraltar Policies was

20  $7.5 million per year for Policy Years 2000 through 2003 or $5 million per year for Policy Years

21  2004 through 2008.[19] As of January 31, 2010, remaining coverage available under the outstanding

22  Gibraltar Policies for product liability was approximately $27,399,483 against total Case Reserves of

23  $13,811,807.

24        For Policy Years 2000 through 2008, the Debtors also purchased "excess" insurance, which is

25  intended to provide coverage after the primary layer of coverage is exhausted. For Policy Years 2000

26  through 2003, the amount of excess coverage was $92.5 million in each year. For these Policy Years,

27  ───────────────

[19]  The Gibraltar Policies run from November 1 in one year until November 1 of the next year (the

28  "Policy Year").

1    the excess layer of coverage would cover the indemnification of claims (but not costs of defense,

2    investigation, etc.) once the $7.5 million primary layer of Gibraltar insurance had been exhausted.

3    However, for Policy Years 2004 through 2008, while the excess layer of insurance provided coverage

4    of the indemnification of claims (but not defense costs, investigation, etc) after the primary layer of

5    $5.0 million of Gibraltar insurance had been exhausted, it is only to the extent that any single claim

6    exceeded $5.0 million. Finally even if these excess layers of coverage are reached, the Debtors

7    would have the responsibility to pay defense costs after the Gibraltar Policies are exhausted, although

8    each claim in excess of $5 million would be insured by the excess carriers. Upon the exhaustion of

9    the Gibraltar Policies, an excess carrier may determine it shall pay the cost of further defending a

10    claim where it may lead to exposure under excess coverage, but it is under no contractual obligation

11    to do so.

12    **C.    Product Liability PI Claims Mandatory Mediation Procedures**

13    As of the Petition Date, over 129 Product Liability PI Claims had been asserted against the

14    Debtors or their insurers. The Bankruptcy Court does not have jurisdiction to liquidate Product

15    Liability PI Claims pursuant to 28 U.S.C. § 157(b)(5). Accordingly, the Plan provides that **all**

16    **Holders of Product Liability PI Claims ("PI Claimants") must first complete the mandatory**

17    **mediation process described in <u>Appendix E</u> hereto before seeking a trial before the District**

18    **Court**. If the mediation successfully resolves the Product Liability PI Claim, to the extent the

19    liquidated amount of any Allowed Product Liability PI Claim is not paid in full from the remaining

20    proceeds of a Gibraltar Policy and/or excess insurance if coverage is available as to the allowed

21    Product Liability PI Claim within a given policy year, and if a PI Claimant has not agreed to waive

22    any deficiency claim against the Estate, **then the amount of the Allowed Product Liability PI**

23    **Claim that is not paid from Gibraltar proceeds or excess insurance coverage shall be an**

24    **Allowed General Unsecured Claim in Class 6 which shall be treated as provided in the Plan.**

25    However, if the mediation is unsuccessful, then such Holders of Product Liability PI Claims shall be

26    allowed to proceed to trial before the United States District Court for the Central District of

27    California or any other venue as appropriate.

28    ***Important Notes:***

*The Plan Proponents do not make any representations as to the financial condition of Gibraltar, that the mediation procedures will guarantee the solvency of Gibraltar, the financial ability of Gibraltar to pay out the full remaining coverage attributable to any policy year or that sufficient coverage remains to pay any Allowed Product Liability PI Claim in full.*

*The full remaining proceeds in any policy year are not being tendered to pay Product Liability PI Claims in that year. The liquidated amount of any Product Liability PI Claim will be based on the merits of the Product Liability PI Claim itself. There is no assurance or representation that the full amount of the remaining proceeds in a given Policy Year will be used to pay liquidated Allowed Product Liability PI Claims that occurred within that Policy Year. The aggregate amount of Allowed Product Liability PI Claims within a particular Policy Year may exceed proceeds available.*

*Neither the Plan nor the mediation procedures represent or assure that Gibraltar will remain solvent, as determined under Bermuda law, or otherwise have the financial ability to pay out the full remaining coverage attributable to any policy or policy year.*

**D.    Workers' Compensation Claims**

    **1.    *Workers' Compensation Insurance***

        (a)   Workers' Compensation Program Overview

Throughout its history, the Debtors have used a combination of insurance provided by outside insurers and self-insured programs to provide workers' compensation coverage in the states in which it has employees. Typically a third party administrator is used to manage claims which are paid by the company. The programs used have varied over time and also varied by state. The insured programs often cover multiple states and involve the typical issuance of policies of insurance for which the Debtors pay a premium. To participate in a state sponsored self insurance program, each Debtor had to qualify in each state covered by the program, which required in part that the Debtors provided letters of credit ("LCs") as collateral to insure payment of the claims to be covered. As of the Petition Date, the Debtors had caused 11 LCs to be posted in the total aggregate amount of $31,797,540 as security for their workers' compensation obligations.

In addition to the participation in insured and self insured programs, the Debtors' wholly owned subsidiary Gibraltar Insurance Company Limited (described above) provides excess coverage on larger claims to the extent a single claim exceeds $200,000 up to a maximum of $600,000 per claim for self-insured states and $1,000,000 for insured states.

As of January 31, 2010, the total Case Reserves for all pending workers' compensation claims were $4,743,450. It is typical for the ultimate amounts paid on account of claims to exceed the Case Reserve for that claim because: (i) Case Reserves are based on the assumption that the facts and circumstances as to the claim will remain static (despite them often being dynamic); and (ii) Case Reserves often do not factor in the prospect and cost of lifetime medical care, which may exist in some situations.

The details are discussed below regarding the Debtors' workers' compensation insurance obligations and liabilities in connection with their insurance program. In some cases, the LCs posted will provide more than sufficient funds to satisfy the insurance obligations, and the insurers will be over-secured. When that situation arises, Debtors are trying to reach agreement with the insurers to refund amounts not necessary to pay claims. The outcome of such negotiations are not known and may provide additional cash for distribution by the Liquidating Trust. On the other hand, in some cases, the LCs posted will be insufficient to cover the workers' compensation liabilities, and it is unclear what liability, if any, the Debtors could or would have. The uncertainties discussed above can affect the Plan and their financial impact is unknown and cannot be predicted at this time. They also could impact Gibraltar financial situation in either a positive or negative way.

(b)    Insurance Coverage Provided By Third Party Insurers

For the past six years, Chartis Insurance (formerly AIG) has covered the Debtors workers' compensation exposure in the states in which the Debtors did business, but did not participate in the state sponsored self insurance program. Prior to the April 30, 2009 renewal, the Chartis policies had a deductible amount or "retention" of $1.0 million per claim for which the Debtors were responsible before Chartis paid any part of the claim. However, the retention was reduced to $250,000 per claim as part of the April 30, 2009 renewal. As of January 31, 2010, twenty six (26) open claims were

pending with Case Reserves of $654,419. The obligations of the Debtors as to the coverage provided

by Chartis is secured by an LC held thereby of $4.3 million.

Prior to the coverage provided by Chartis, during the 1980's and 1990's, Kemper Insurance

covered the Debtors' workers' compensation claims liability. As of January 31, 2010, twenty (20)

open claims remained with Case Reserves of $2,199,965. Kemper holds collateral of an LC in the

amount of $1,070,000 and cash deposits of $1,428,604 (for a combined amount of $2,498,604).

Kemper policies had a deductible amount or "retention" of $1.0 million per claim for which the

Debtors were responsible before Kemper paid any part of the claim. The Debtors' obligations to pay

claims is currently funded from the cash deposit held by Kemper. The Debtors are currently in the

process of completing a "buyout" transaction that will require payment of the outstanding

retrospective invoice in exchange for full release of the $1.07 million letter of credit.

Prior to the coverage provided by Kemper, during the 1970's and 1980's Lumbermen's

Underwriting Alliance ("LUA") covered the Debtors' workers' compensation liability. As of

December 1, 2009, six (6) open claims remained with Case Reserves of $266,732. LUA holds

collateral of an LC in the amount of $100,000 and cash deposits of $86,774 (for combined amount of

$186,774). LUA policies had a deductible amount or "retention" of $100,000 per claim for which the

Debtors were responsible before LUA paid any part of the claim. LUA drew down on the letter of

credit they held on December 4, 2009. As of January 31, 2010, no open claims remained with LUA.

        (c)    <u>Self Insurance Programs</u>

The chart below sets forth the financial situation regarding the Debtors' workers'

compensation insurance in states with self insurance programs.

**Chart Reflecting Self-Insured Workers' Compensation Programs by State[20]**

| State | Case Reserve | | Letter of Credit (LC) | |
|---|---|---|---|---|
| | *3/31/2009* | *1/31/2010* | *3/31/2009* | *1/31/2010* |
| | $6,232,412 | $0 | | |
| California and Georgia | $872,413 | $0 | $13,800,000 | $0 |
| Pennsylvania | $502,177 | $420,357 | $7,600,000 | $6,600,000 |

---

[20] All programs self-insured.

| | | | | |
|---|---|---|---|---|
| North Carolina | $298,726 | $190,753 | $636,000 | $636,000 |
| Washington | $259,792 | $175,154 | $678,000 | $0 |
| Maryland | $287,221 | $358,348 | $950,000 | $950,000 |
| Oregon | $590,765 | $0 | $859,000 | $0 |
| Indiana | $161,189 | $24,362 | $1,800,000 | $0 |
| Pennsylvania, Florida and Georgia | $ $1,185,899 | $ 968,356 | $1,008,000 $100,000 | $0 $0 |

Outside of bankruptcy, workers' compensation claims can take an extensive period of time to resolve because the permanent disability rating of an injured employee may not be determinable until after lengthy monitoring of the injury by medical experts. In some cases, claims may be open for decades before they can be resolved and closed. The Debtors are thus analyzing potential ways in which to liquidate these claims, including whether to negotiate "loss transfer portfolios," pursuant to which the Debtor employers would transfer specified workers' compensation liabilities to an insurer in exchange for a premium, reach settlements with the insurers who issued surety bonds in support of self-insured obligations as to the maximum amount of the Debtor employers' liability as to those obligations, and/or default on certain workers' compensation obligations and allow the beneficiaries of LCs supporting those obligations to draw thereon. The Debtors recently completed a loss portfolio transfer with the State of Pennsylvania that resulted in a release of approximately $6.6 million (gross) of its LC to the Estates. Under the Plan, the handling of these claims will be transferred to the Liquidating Trustee.

    (d)    LC's Held By States/Insurance Companies That Did Not File A Proof of Claim

In connection with Fleetwood's self insurance programs, certain of the LC's reflected in the chart above, or the proceeds thereof, are held by states or insurance companies that did not file a proof of claim in these Chapter 11 Cases. As such, these LC holders, which are described below, are not classified as creditors in the Plan; however, they are listed on Fleetwood's "retained claims" schedule (Exhibit D to the Plan) to preserve Fleetwood's right to recover any excess Collateral not used to satisfy workers' compensation claims.

(i)      Travelers Casualty and Surety Company

To insure payment of the Debtors workers' compensation liability in the states of Oregon and Florida, Travelers Casualty and Surety Company of America and Travelers Casualty and Surety Company and Farmington Casualty Company and Travelers Casualty and Surety Company of Illinois and Travelers Casualty and Surety Company of Canada ("Travelers") issued self insured workers' compensation surety bonds to Florida and Oregon which were originally secured by LC No 3040446 issued to Travelers in the amount of $859,000. Travelers drew the full amount of LC No. 3040446 on December 23, 2009.

(ii)      State of California Self-Insurance Plans

The Debtors' workers' compensation liability in California was secured by LC No. 3040932 in the amount of $11,563,964 held by the Department of Industrial Relations of the State of California ("California"). On August 6, 2009, California drew the full amount of LC No. 3040932 and now holds the Cash proceeds of $11,563,964.

(iii)      Maryland Workers' Compensation Commission

The Debtors' workers' compensation liability in the state of Maryland is secured by LC No. 3058109 in the amount of $950,000 held by the Maryland Workers' Compensation Commission which expires on August 18, 2010.

(iv)      North Carolina Department of Insurance

The Debtors' workers' compensation liability in the state of North Carolina is secured by LC No. 3094413 in the amount $636,366.30 held by the North Carolina Department of Insurance which expires on July 11, 2010.

(v)      Continental Casualty Company and/or CNA Claims Plus

The Debtors' workers' compensation liability in the states of Alabama and Georgia is covered by Continental Casualty Company and/or CNA Claims Plus which are the beneficiary of LC No. 3059909 in the amount of $4,000. Prior to October 31 2009, Continental Casualty Company and/or CNA Claims Plus drew on LC No. 3059909 and now holds $4,000 in Cash.

### 2.    *ACE INA and Westchester--Bonding*

ACE INA ("ACE") is the primary provider of surety bonds for FEI and its subsidiaries. Fleetwood surety bond exposure consists of financial guarantee, license, appellate, supply and workers' compensation bonds. As of January 31, 2010, there were five bonds "in force" with a combined exposure of $7,428,000. The five bonds consist of two workers' compensation bonds issued to the states of Indiana and Washington in the amounts of $800,000 and $678,000, respectively (discussed immediately above), and three bonds issued for military modular housing manufacturing. FEI's military bond exposure consists of three "in force" bonds consisting of one price and performance bond issued by ACE in principal for the Warrior Group in the amount of $1,250,000 which is supported by FEI collateral, and two supply bonds issued in principal for FEI in the amounts of $3,500,000 and $1,200,000 which are supported by FEI collateral. These bonds have gone through a series of declinations as build-out of the project has been completed. All other historical bonds have been cancelled as of September 30, 2009. As of April 1, 2010, ACE continues to hold cash in the amount of $11,783,000 as security for contingent liabilities as to existing and previously fully decremented bonds as well as claims to expenses and fees. The Debtors are in discussion with ACE and hope to agree to a collateral release schedule as to remaining and previously fully decremented bonds.

### 3.    *Debtors' Plan Regarding Undrawn Letters of Credit*

As discussed above, as of the Petition Date, certain of the Debtors had undrawn letters of credit of $61.7 million to support a variety of bonding obligations of the Debtors, including self-insured workers' compensation programs, construction bonds for the Debtor's military housing business, license and permit obligations and legal bonds. When drawn, the proceeds of these letters of credit were applied to compensate workers who were injured while working at Fleetwood and pay construction related obligations in the event payment was not otherwise made. As of January 31, 2010, approximately $16.6 million of letters of credit remained outstanding, which have been reduced since the Petition Date by $45.2 million. The $45.2 million reduction was comprised of a drawdown of $28.7 million and release of $16.5 million in letters of credit. A summary of the letter of credit reductions from the Petition Date through January 31, 2010 is shown below.

($ in Thousands)

| L/C No. | Beneficiary | Petition Date L/C Balance Outstanding | Drawn or Paid | Released | 1/31/2010 L/C Balance Outstanding |
|---|---|---|---|---|---|
| 3040130 | Kemper Insurance Co., et al. | $    1,070 | $        - | $        - | $    1,070 |
| 3040443 | Lumbermen's Underwriting Alliance | 100 | (100) | - | - |
| 3040444 | Old Republic Insurance Co. | 1,008 | (1,008) | - | - |
| 3040445 | Georgia Self Insurance Guaranty Trust Fund | 1,230 | (1,230) | - | - |
| 3040446 | Travelers Casualty and Surety Company of America | 859 | (859) | - | - |
| 3040932 | State of California Self-Insurance Plans | 11,564 | (11,564) | - | - |
| 3051853 | Westchester Fire Insurance Company and ACE INA Insurance | 29,350 | (13,898) | (15,452) | - |
| 3054529 | State of California Self-Insurance Division | 7,600 | - | (1,000) | 6,600 |
| 3056166 | National Union Fire Insurance Company of Pittsburgh, PA, et al. | 4,302 | - | - | 4,302 |
| 3058109 | Maryland Workers' Compensation Commission | 950 | - | - | 950 |
| 3059909 | Continental Casualty Company and/or CNA Claims Plus, Inc. | 4 | (4) | - | - |
| 3092431 | Fidelity and Deposit Company of Maryland | 3,017 | - | - | 3,017 |
| 3094413 | North Carolina Department of Insurance | 636 | - | - | 636 |
| Total | | $   61,691 | $   (28,663) | $   (16,452) | $   16,576 |

A summary of the remaining exposure as of January 31, 2010, is as follows:

| Type | No. of Beneficiaries | Amount |
|---|---|---|

| Workers' compensation | 8 | $13,558,576 |
| Military project surety bonds | 1 | $3,017,440 |
| **Total** | **9** | **$16,576,016**[21] |

In February 2010, the Debtors received the return of $2,080,000 in cash collateral from ACE for various manufacturing license bonds that have passed the post release holding period imposed by ACE. The Debtors have also completed a $6,600,000 loss portfolio transfer with the State of Pennsylvania. After claims reconciliation, the cost to the Estates for the transfer was $2,235,033.97, thereby providing a net return to the Estates of $4,364,966.03.

In the case of workers' compensation bonds, the Debtors believe that the amount of the outstanding bonds exceeds the ultimate amount of expected claims. Since the holding period to resolve underlying workers' compensation claims can be extensive, sometimes over decades, the Debtors will seek to resolve these issues by reaching settlements with individual states or beneficiaries. If the Debtors are unable to do so, the Debtors or the Liquidating Trustee will seek orders of the need to estimate the values of these claims pursuant to section 502(c) of the Bankruptcy Code.[22]

The exposure on the supply and price and performance bonds for constructions projects by the Debtors' military housing business (prior to its sale in May 2009) are expected to mature and expire in the ordinary course and are unlikely to attract any claims. The Debtors will seek to agree upon an acceptable release timeframe from these obligations from the surety providers to ensure a timely return of the cash collateral used to support these obligations, which is expected to be released in 2010.

---

[21] After January 31, 2010, the Debtors completed a loss portfolio transfer with the State of Pennsylvania which released the remaining $6.6 million letter of credit, reducing the total amount of outstanding letters of credit to approximately $10 million.

[22] For some of the bonds it may be possible to effect a loss portfolio transfer to an insurance company that would assume responsibility for all claims against the bonds in exchange for an acceptable premium payable by the Debtors. The Debtors need to perform further due diligence on this possibility.

E.    **FEMA Claims**

In the aftermath of Hurricanes Katrina and Rita, which struck the Gulf Coast in August and September 2005, the Federal Emergency Management Agency ("FEMA") provided over 140,000 emergency housing units ("EHU's"), in the form of both manufactured housing and travel trailers, for use as temporary housing for those left homeless.  In response to FEMA's call for housing units, FEI sold approximately 10,500 travel trailers and 3,100 manufactured housing units to an approved government contractor, Morgan Building & Spas, which in turn sold those units to FEMA.

Since May 2006, numerous plaintiffs have filed suit, alleging that they suffered personal injuries from exposure to excessive levels of formaldehyde emitted from certain wood products used in the construction of the EHU's provided by FEMA.  Certain of the Debtors are defendants in the resulting litigation, which, in the aggregate, comprised approximately 2,300 actions, complaints or claims brought on behalf of over 10,000 claimants against numerous defendants, largely manufacturers, as well as FEMA and a number of government contractors (the "FEMA Litigation").  The FEMA Litigation is now pending before the United States District Court for the Eastern District of Louisiana (the "MDL Court") as a proceeding consolidated pursuant the rules for multidistrict litigation, entitled *In Re: FEMA Trailer Formaldehyde Product Liability Litigation*, United States District Court for the Eastern District of Louisiana, New Orleans Division, MDL No. 1873, Section N(4).  The FEMA Litigation was originally filed as a series of class actions; however, on December 29, 2008, the MDL Court denied plaintiffs' motion for class certification.  Following this ruling, the Eastern District of Louisiana retained jurisdiction over the individual actions.

Up to the Petition Date, additional plaintiffs continued to serve Fleetwood with similar suits in different state and federal courts, which were then transferred to the FEMA Litigation.  Apparently unaware of the bankruptcy proceedings, some additional suits have been filed postpetition.  Under the rules established by the MDL Judge, newly filed actions are reviewed by the MDL Defense Liaison Committee for facial or other patent deficiencies and, if they are determined to state a claim that is properly part of the FEMA Litigation, then the individual actions are consolidated into the FEMA Litigation, but are then stayed pending further proceedings as ordered by the MDL Judge.

1    Fleetwood entities are named as defendant in 25 of the actions that have been consolidated

2    into the FEMA Litigation.  Over 12,000 timely proofs of claim have been filed in these Chapter 11

3    Cases based on the FEMA Litigation, which represents approximately 96% of all litigation-based

4    proofs of claim filed.

5    The claims in the FEMA Litigation as covered under a "Pollution Legal Liability Select

6    Policy" issued by American International Specialty Lines Insurance Company—an affiliate of AIG

7    (the "AISLIC Policy").  Coverage under the AISLIC Policy is limited to $10 million per incident and

8    in the aggregate.  The FEMA Litigation claims are not covered under the Gibraltar Policies.

9    The Debtors have reached an agreement to fully and finally resolve all of the FEMA

10   Litigation claims, and on March 11, 2010, the Bankruptcy Court approved said settlement [Docket

11   No. 1918].  The confidential settlement amount will be funded exclusively under the AISLIC Policy.

12   Neither the Debtors nor Gibraltar will need to contribute to the settlement.  Additionally, as part of

13   the settlement, any and all proofs of claim relating to the FEMA Litigation filed against any Debtor in

14   these Chapter 11 Cases have been disallowed with prejudice.  For the avoidance of doubt, none of the

15   holders of FEMA Litigation claims that have been disallowed will be eligible to vote on the Plan *nor*

16   will they receive any solicitation or related materials.

17   
### VI.
### SUMMARY OF THE FIRST AMENDED PLAN OF LIQUIDATION

18   

19   THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION,

20   TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS

21   ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE

22   STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

23   THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL

24   CONTROL THE TREATMENT OF CREDITORS AND EQUITY INTEREST HOLDERS UNDER

25   THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF

26   CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

27   

28

## A.    Treatment of Claims and Equity Interests

### 1.    *Unclassified Claims*

In accordance with Bankruptcy Code section 1123(a)(1) of the Bankruptcy Code, certain Claims have not been classified, and the respective treatment of such Unclassified Claims is set forth immediately below.

(a)    Administrative Claims

Except as otherwise provided herein, and subject to the requirements of the Plan, on, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date an Administrative Claim becomes an Allowed Administrative Claim or (b) the date that is ninety (90) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim against the Debtors shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto (i) prior to the Effective Date, by the Debtors and (ii) subsequent to the Effective Date, by the Liquidating Trustee.

Administrative Claimholders will be paid in full on account of their Claims and are not entitled to vote on the Plan.

(b)    Priority Tax Claims

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Distribution Date, a Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (i) regular installment Cash payments, occurring not less frequently than quarterly over a period not exceeding five (5) years after the Petition Date, in an aggregate principal amount equal to the unpaid portion of such Allowed Priority Tax Claim, plus interest on the unpaid portion thereof at the Case

1  Interest Rate from the Effective Date through the date of payment thereof or (ii) such other treatment

2  as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in

3  writing; provided, however, that the Liquidating Trustee shall have the right to pay any Allowed

4  Priority Tax Claim, or any remaining balance of any Allowed Priority Tax Claim, in full at any time

5  on or after the Effective Date without premium or penalty.

6  Priority Tax Claimholders will be paid in full on account of their Claims and are not entitled

7  to vote on the Plan.

8  **2.    *Claims***

9  (a)    Class 1: Non-Tax Priority Claims

10  On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date

11  immediately following the date a Non-Tax Priority Claim becomes an Allowed Non-Tax Priority

12  Claim or (b) the date that is ninety (90) days after the date on which such Non-Tax Priority Claim

13  becomes an Allowed Non-Tax Priority Claim, a Holder of an Allowed Non-Tax Priority Claim shall

14  receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed

15  Non-Tax Priority Claim, (i) Cash equal to the unpaid portion of such Allowed Non-Tax Priority

16  Claim or (ii) such other treatment as to which such Holder and the Debtors and/or the Liquidating

17  Trustee shall have agreed upon in writing.  Any deficiency claim over and above the limits set forth

18  under section 507 of the Bankruptcy Code for priority claims shall be treated as a Class 6 General

19  Unsecured Claim.

20  Class 1 is conclusively presumed to have accepted the Plan and, therefore, Holders of Class 1

21  Claims are not entitled to vote to accept or reject the Plan.

22  (b)    Class 2: Allowed Secured Credit Facility Claims

23  The Secured Credit Facility Claims shall be Allowed Claims, except for amounts at issue in

24  the Turnover Motion (which shall become Allowed Claims to the extent the Turnover Motion is

25  denied pursuant to a Final Order of the Bankruptcy Court or other court of competent jurisdiction

26  (including any appellate court)), the Disputed Costs, any disputed Future Costs, any disputed post-

27  Effective Date costs and any BofA Indemnification Claims (as defined below) that are contingent,

28

unliquidated or disputed as of the Effective Date. On the Effective Date, Holders of Secured Credit Facility Claims shall receive the following treatment:

A.    Payment in full of all Postpetition Obligations (as defined in the Interim DIP Order) then outstanding (including, without limitation, all costs, fees and/or expenses of the Secured Parties (including, without limitation, costs, fees, and/or expenses of their counsel) other than the Disputed Costs, the Future Costs and any BofA Indemnification Claims that are contingent, unliquidated or disputed as of the Effective Date) and that are payable by the Debtors in accordance with the Interim DIP Order, the Secured Credit Facility and the Final Cash Collateral Order (in each case modified by the Extension Order); provided that the payment of any amount pursuant to this subsection A shall not constitute a waiver or release of any claim, defense, right or remedy that any Person might have or assert in connection with the Turnover Motion.

B.    Cash equal to 105% of the face amount as of the Effective Date of Outstanding Letters of Credit (as defined in the Interim DIP Order) to be held as collateral for Outstanding Letters of Credit. After the Effective Date, BofA, for and on behalf of the Secured Parties, shall be entitled to one (1) Business Days' notice to the Liquidating Trustee, and without the need for any further notice to or approval of any Person, including without limitation the Debtors, the Liquidating Trustee or the Bankruptcy Court, to apply the cash collateral described in the preceding sentence to reimburse the Secured Parties for any Outstanding Letters of Credit that are drawn.

In addition, BofA, for and on behalf of the Secured Parties, shall be entitled, without the need for any further notice to or approval of any Person, including without limitation, the Debtors, the Liquidating Trustee, or the Bankruptcy Court, except as set forth in clause (iv) of this sentence, to apply the cash collateral described in the first paragraph of this subsection B to pay any documented costs, fees and/or expenses (including, without limitation, the costs, fees and/or expenses of their counsel) related to, incurred in connection with or arising from the Outstanding Letters of Credit that are (i) incurred on or after the Effective Date, (ii) are or would be payable by the Debtors in accordance with the Interim DIP Order, the Secured Credit Facility and the Final Cash Collateral Order (in each case modified by the Extension Order), (iii) are not BofA Indemnification Claims (as defined below) and (iv) are not disputed in writing by the Liquidating Trustee within ten (10)

1   Business Days after submission by BofA of applicable invoices, statements, receipts or other

2   documents supporting such costs, fees and/or expenses, or, to the extent disputed by the Liquidating

3   Trustee within such ten (10) Business Day period, are either approved by a Final Order of the

4   Bankruptcy Court or other court of competent jurisdiction (including any appellate court) or are no

5   longer disputed by the Liquidating Trustee (as reflected in a written notice from the Liquidating

6   Trustee).

7          The amount of cash collateral held pursuant to this subsection B shall be reduced and released

8   from time to time by BofA to the Liquidating Trust to the extent that it exceeds 105% of the face

9   amount of Outstanding Letters of Credit that remain outstanding at such time plus the amount of any

10  fees, costs and/or expenses that are being disputed by the Liquidating Trustee pursuant to the

11  preceding sentence.

12          C.      Cash in the amount of $100,000 to be held as Collateral for any further costs,

13  fees and/or expenses of the Secured Parties (including, without limitation, costs, fees, and/or

14  expenses of their counsel) incurred on or prior to the Effective Date and payable by the Debtors in

15  accordance with the Interim DIP Order, the Secured Credit Facility and the Final Cash Collateral

16  Order (in each case modified by the Extension Order) ("Future Costs") that have not been invoiced

17  and remain unpaid as of the Effective Date.

18          BofA, for and on behalf of the Secured Parties, shall be entitled, without the need for any

19  further notice to or approval of any Person, including without limitation, the Debtors or the

20  Bankruptcy Court, to apply the cash collateral described in the first paragraph of this subsection C to

21  pay any documented Future Costs that are not disputed in writing by the Liquidating Trustee within

22  ten (10) Business Days after submission by BofA to the Liquidating Trustee of applicable invoices,

23  statements, receipts or other documents supporting such Future Costs; provided that all such invoices,

24  statements, receipts or other documents evidencing such Future Costs must be submitted to the

25  Liquidating Trustee within sixty (60) days of the Effective Date.  To the extent any Future Costs are

26  disputed by the Liquidating Trustee in accordance with the preceding sentence, BofA, for and on

27  behalf of the Secured Parties, shall be entitled to apply the cash collateral described in the first

28  paragraph of this subsection C to pay such Future Costs only to the extent such Future Costs are

approved by a Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate court) or are no longer disputed by the Liquidating Trustee (as reflected in a written notice from the Liquidating Trustee).

Any cash collateral held pursuant to this subsection C sixty (60) days after the Effective Date that exceeds the amount of any Future Costs which remain unpaid and for which invoices, statements, receipts or other documents evidencing such Future Costs have been submitted to the Liquidating Trustee (including, without limitation, any Future Costs being disputed by the Liquidating Trustee in accordance with this subsection C) shall be released by BofA to the Liquidating Trustee within ten (10) Business Days.

D.    Cash in the amount equal to any Disputed Costs that have not been paid to BofA or any of the other Secured Parties as of the Effective Date to be held as collateral for such Disputed Costs.

BofA, for and on behalf of the Secured Parties, shall be entitled, without the need for any further notice to or approval of any Person, including without limitation, the Debtors, the Liquidating Trustee, or the Bankruptcy Court, to apply the cash collateral described in the first paragraph of this subsection D to pay such Disputed Costs that are either (i) not the subject of a motion, objection or other formal action commenced by the Liquidating Trustee in the Bankruptcy Court prior to one year after the Effective Date or (ii) approved by a Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate court) or (iii) are no longer disputed by the Liquidating Trustee (as reflected in a written notice from the Liquidating Trustee).

Notwithstanding anything to the contrary contained in the Plan, the Liquidating Trust reserves the right to seek an Order of the Bankruptcy Court (which Order shall be subject to any appeal rights of any party) as to the Secured Parties' entitlement to any costs, fees and/or expenses of the Secured Parties (including costs, fees and/or expense of their counsel) that were disputed by the Debtors or the Creditors' Committee prior to the Effective Date in accordance with the requirements of paragraph 13 of the Final Cash Collateral Order (or corresponding provisions of any previous cash collateral order or the Extension Order) (the "Disputed Costs"); provided, however, that unless the Liquidating Trustee has filed a motion or brought another formal action in the Bankruptcy Court seeking such an

1    Order within one year after the Effective Date, the Liquidating Trust and the Liquidating Trustee

2    shall be deemed to have irrevocably waived any right to seek such an Order, and the Disputed Costs

3    shall be deemed to be Allowed Claims for purpose of the Plan and shall not be subject to any further

4    objection, challenge, action or adversary proceeding by any Person whether in the Bankruptcy Court

5    or elsewhere.  In addition, notwithstanding anything contained in the Plan to the contrary, the

6    Creditors' Committee's Motion for Turnover of Property of the Estate Purchase to 11 U.S.C. § 542

7    [Docket No. 1476] (the "Turnover Motion") is preserved for the benefit of the Debtors or the

8    Liquidating Trust, as applicable, to the extent that it has not been denied as of the Effective Date by a

9    Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate

10    court).

11        Any cash collateral held pursuant to this subsection D after the resolution and payment of all

12    Disputed Costs pursuant to this subsection D shall be promptly released by BofA to the Liquidating

13    Trustee within five (5) business days after such payment.

14        E.    Cash in the amount of $2,500,000 to be held as collateral for any unliquidated,

15    contingent, or post-Effective Date claims of the Secured Parties, including, without limitation, any

16    claims for indemnification that any of them might have asserted or may assert and costs, fees and/or

17    expenses of the Secured Parties (including, without limitation, costs, fees and/or expenses of their

18    counsel) payable by the Debtors in accordance with the Interim DIP Order, the Secured Credit

19    Facility and the Final Cash Collateral Order (in each case modified by the Extension Order) that are

20    incurred after the Effective Date in connection with any such unliquidated, contingent and/or

21    indemnification claims (collectively, "BofA Indemnification Claims"); provided, however, if all of

22    the Secured Parties (including, without limitation, BofA) have not been dismissed with prejudice as

23    defendants in the First American Trust Adversary Action by Final Order of the Bankruptcy Court or

24    other court of competent jurisdiction (including any appellate court) as of the Effective Date, the

25    amount of cash collateral provided to BofA, for an on behalf of the Secured Parties, pursuant to this

26    subsection E shall be increased to $3,000,000 until such time as all of the Secured Parties (including,

27    without limitation, BofA) have been dismissed with prejudice as defendants in the First American

28    Trust Adversary Action by Final Order of the Bankruptcy Court or other court of competent

1  jurisdiction (including any appellate court), at which time BofA shall promptly return $500,000 of

2  cash collateral held pursuant to this subsection E to the Liquidating Trust within five (5) business

3  days thereafter.

4          BofA, for and on behalf of the Secured Parties, shall be entitled, without the need for any

5  further notice to or approval of any party, including without limitation the Debtors, the Liquidating

6  Trustee, or the Bankruptcy Court, to apply the cash collateral described in the preceding paragraph to

7  pay any documented BofA Indemnification Claims as and when such claims become liquidated and

8  non-contingent unless any such payment is disputed in writing by the Liquidating Trustee within ten

9  (10) Business Days after submission by BofA to the Liquidating Trustee of- applicable invoices,

10  statements, receipts or other documents, in which case, BofA, for and on behalf of the Secured

11  Parties, shall be entitled to apply the cash collateral described in the preceding paragraph to pay any

12  such disputed BofA Indemnification Claim only upon either entry of a Final Order of the Bankruptcy

13  Court or other court of competent jurisdiction (including any appellate court) authorizing such

14  payment or receipt by BofA of written notice from the Liquidating Trustee withdrawing its objection.

15          Except as otherwise agreed between the Liquidating Trustee and BofA, so long as at the time

16  of release of cash collateral pursuant to this subsection E (i) all of the Secured Parties (including,

17  without limitation, BofA) have been dismissed with prejudice as defendants in the First American

18  Trust Adversary Action by Final Order of the Bankruptcy Court or other court of competent

19  jurisdiction (including any appellate court), (ii) no other lawsuit, claim or other action has been

20  commenced or threatened against any of the Secured Parties (including, without limitation, BofA)

21  that could, in BofA's determination, result in or give rise to a BofA Indemnification Claim and (iii)

22  any dispute by the Liquidating Trustee of any BofA Indemnification Claims has been resolved in

23  accordance with the previous paragraph (and BofA, for and on behalf of the Secured Parties, has been

24  paid any BofA Indemnification Claims that it is entitled to be paid in accordance with such

25  resolution), BofA shall release to the Liquidating Trust cash collateral held pursuant to this

26  subsection E as follows: (A) $1 million shall be released on the first Business Day that is one year

27  after the Effective Date; (B) $500,0000 shall be released on the first Business Day that is eighteen

28  (18) months after the Effective Date; and (C) any remaining cash collateral held pursuant to this

subsection E shall be released on the first Business Day that is two years after the Effective Date.  In

the event that any of the events described in clauses (i) through (iii) of the preceding sentence has

occurred and is continuing as of the time a release of cash collateral would otherwise be required

pursuant to the preceding sentence, BofA shall not be required to make such release of cash collateral

to the Liquidating Trust until (x) such time as any such event has been fully and finally resolved

pursuant to a Final Order of the Bankruptcy Court or other court of competent jurisdiction (including

any appellate court) or has otherwise been resolved to the satisfaction of BofA, and (y) any BofA

Indemnification Claims arising from or relating to any such event shall have been paid pursuant to

the preceding paragraph.

The aggregate of the amounts in paragraphs B, C, D and E above shall be known as the

"BofA Cash Collateral Amount".

On the Effective Date, the BofA Cash Collateral Amount shall be placed in a segregated

account at Bank of America in the name of the Liquidating Trustee (the "BofA Cash Collateral

Account").  The BofA Cash Collateral Amount and the BofA Cash Collateral Account shall be free

and clear of all existing and future Liens as to any Person other than the Secured Parties, which

parties shall have a fully perfected first priority lien on the BofA Cash Collateral Account and all

amounts in the BofA Cash Collateral Account.  Such lien shall secure the obligations of all of the

Debtors and the Liquidating Trustee to the Secured Parties with respect to any and all Outstanding

Letters of Credit, the Future Costs, the Disputed Costs (as defined below), and any BofA

Indemnification Claims.

The collateralization of the Future Costs, the Disputed Costs, or the BofA Indemnification

Claims shall not be deemed to be an admission by the Debtors or the Liquidating Trustee that any of

the Future Costs or BofA Indemnification Claims are valid and proper claims against the Debtors or

the Liquidating Trustee either in the amount collateralized or in any other amount.

Except for the liens provided herein (including, without limitation, the liens on the BofA Cash

Collateral Account and all funds in the BofA Cash Collateral Account), all liens held by the Secured

Parties under the Secured Credit Facility, Interim DIP Order, Final Cash Collateral Order and the

Extension Order (including Liens granted thereunder prior to the Effective Date) shall be terminated

upon the Effective Date.  The Secured Credit Facility, Interim DIP Order, Final Cash Collateral

Order and the Extension Order shall survive entry of an Order confirming the Plan for purposes of

Plan distribution only and to effect the treatment provided to BofA under the Plan.  In the event of

any conflict between the provisions of the Secured Credit Facility, Interim DIP Order, Final Cash

Collateral Order and the Extension Order and the Plan, the provisions of the Plan shall govern.

The foregoing treatment shall be in full and complete satisfaction of any and all Class 2

Claims, and recourse shall be limited as set forth above.

Class 2 is Impaired and is entitled to vote on the Plan.

(c)    Class 3: Allowed ISIS Claim

Unless ISIS and the Plan Proponents or Liquidating Trustee agree otherwise, the Holder of the

Allowed ISIS Claim will receive the following treatment as soon as reasonably practicable on or after

the Effective Date in full satisfaction of its Allowed ISIS Claim:

The Liquidating Trustee will:  (1) cure any default that occurred before or after the

commencement of the Chapter 11 Cases, other than a default of a kind specified in section 365(b)(2)

of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured, by

paying the amount of approximately $3.55 million to the Holder of the Allowed ISIS Claim (the

"ISIS Cure Amount"); (b) reinstate the maturity of such Allowed Claim or interest as such maturity

existed before such default, without recognizing any default interest rate or similar penalty or charge;

(3) compensate the Holder of the Allowed ISIS Claim for any actual damages incurred as a result of

any reasonable reliance by such Holder on such contractual provision or such applicable law; (4) if

such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a

default arising from failure to operate a nonresidential real property lease subject to section

365(b)(1)(A), compensate the Holder of the Allowed ISIS Claim for any actual pecuniary loss

incurred by such holder as a result of such failure; and (5) leave unaltered all of the Holder's other

legal, equitable, or contractual rights with respect to its Allowed ISIS Claim.

Class 3 is Unimpaired under the Plan and therefore not entitled to vote.

    (d)    Class 4: Miscellaneous Secured Claims

        On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date

immediately following the date a Miscellaneous Secured Claim becomes an Allowed Miscellaneous

Secured Claim or (b) the date that is ninety (90) days after the date on which such Miscellaneous

Secured Claim becomes an Allowed Miscellaneous Secured Claim, a Holder of an Allowed

Miscellaneous Secured Claim shall receive, in full and final satisfaction, settlement and release of

and in exchange for, such Allowed Miscellaneous Secured Claim, at the election of the Liquidating

Trustee, (i) Cash equal to the lesser of the unpaid portion of such Allowed Miscellaneous Secured

Claim and the value of the Holder's Collateral securing the Miscellaneous Secured Claim as required

pursuant to section 506(b) of the Bankruptcy Code, (ii) a return of the Holder's Collateral securing

the Miscellaneous Secured Claim, or (iii) such other treatment as to which such Holder and the

Debtors and/or the Liquidating Trustee shall have agreed upon in writing.  Any Holder of a

Miscellaneous Secured Claim shall retain its Lien in the Collateral or the proceeds of the Collateral

(to the extent that such Collateral is sold by the Debtors or the Liquidating Trustee free and clear of

such Lien) to the same extent and with the same priority as such Lien held as of the Petition Date

until such time as (a) the Holder of such Miscellaneous Secured Claim (i) has been paid Cash equal

to the value of its Allowed Miscellaneous Secured Claim, (ii) has received a return of the Collateral

securing the Miscellaneous Secured Claim or (iii) has been afforded such other treatment as to which

such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; or (b)

such purported Lien has been determined by an order of the Bankruptcy Court to be invalid or

otherwise avoidable.[23]

        Class 4 is conclusively presumed to have accepted the Plan and, therefore, Holders of Class 4

Claims are not entitled to vote to accept or reject the Plan.

---

[23] The Maricopa County Treasurer's ("Maricopa") Claim is a Class 4 Miscellaneous Secured Claim.
If Maricopa's Claim is Allowed and is found to be over secured under section 506(b) of the
Bankruptcy Code, interest may accrue at the state statutory rate of 16% per annum.

1

       (e)    Class 5: 14% Notes Claims

2

       On the Effective Date, the Liens of the 14% Notes held as of the Petition Date shall remain as

3

valid Liens for purposes of the Plan only and the 14% Notes Claims shall be Allowed as a Secured

4

Claim in the amount of $84,256,664.  In full and final satisfaction of their Secured Allowed Claim,

5

the 14% Notes Claims shall receive their Pro Rata share of 43.5% of the Net Distributable Proceeds,

6

less: (a) fees and expenses payable and paid to DB (both for its services and those of its agents) (the

7

"DB Fees"); (b) any amounts payable and paid to Whippoorwill for fees and expenses incurred by its

8

professionals (collectively, the "Whippoorwill Fees"), pursuant to a Substantial Contribution Claim;

9

and (c) any funds distributed to the Holders of the 5% Notes.  The Creditors' Committee will support

10

Whippoorwill's Substantial Contribution Claim, provided any recovery thereon is paid in accordance

11

with the previous sentence.  The 43.5% of Net Distributable Proceeds payable to the 14% Notes

12

Claims shall be paid (x) on the Effective Date with respect to the Initial Net Distributable Proceeds;

13

and (y) on each subsequent Distribution Date as reasonably practicable after the Liquidation Trust

14

acquires such Net Distributable Proceeds with respect to the balance.

15

       The 14% Notes Claims shall not be subject to avoidance, disallowance, recharacterization or

16

subordination (whether equitable or otherwise).  All amounts due to be paid to, and all amounts paid

17

to and received by, the Holders of the 14% Notes Claims shall not be subject to avoidance,

18

disallowance, disgorgement, recharacterization or subordination.

19

       Without recourse, representation, or warranty and solely for purposes of enforcing the

20

percentage allocation of Net Distributable Proceeds, on the Effective Date, the 14% Notes shall be

21

deemed to assign to the Liquidating Trustee that portion of their intercreditor rights necessary to

22

preclude the Holders of the 5% Notes from exercising a payover demand against distribution to the

23

Holders of 6% Notes.  On the Effective Date, provided that Class 5 votes to accept the Plan, the 14%

24

Notes shall be deemed to release any intercreditor rights or payover demands that they have against

25

the Holders of 6% Notes.  For the avoidance of doubt, any Liens granted to the 14% Notes prior to

26

the Effective Date will be extinguished on the Effective Date in exchange for the treatment afforded

27

to the 14% Notes Claims hereunder.

28

1   All of the DB Fees shall be paid concurrently with the final payment of Professional Fee

2   Claims, but if at the time of such distribution, there are insufficient funds to make a payment in full,

3   then DB shall be entitled to its Pro Rata portion of the DB Fees distributed at such time relative to the

4   total fees and expenses paid to all Professionals, which amount shall be deducted from the 43.5% Net

5   Distributable Proceeds allocated to the 14% Notes Claims.  Similarly, all of the Whippoorwill Fees

6   shall be paid concurrently with the final payment of Professional Fee Claims (but if at the time of

7   such Distribution, there are insufficient funds to make a payment in full, then Whippoorwill shall be

8   entitled to its Pro Rata portion relative to the total fees and expenses paid to all Professionals of the

9   Whippoorwill Fees distributed at such time), provided that such Whippoorwill Fees have been

10   approved by allowance of the Substantial Contribution Claim, and such amount shall be deducted

11   from the 43.5% Net Distributable Proceeds allocated to the 14% Notes Claims.

12   Notwithstanding anything to the contrary contained herein, all distributions to Holders of 14%

13   Notes Claims shall be subject to, and the allocations made herein shall be reduced on a pro rata basis

14   by, the Charging Lien to the extent of any unpaid fees and expenses of DB, whether such fees and

15   expenses are incurred by DB prior to or after the Effective Date, it being understood that DB shall be

16   entitled to the recovery of all fees and expenses incurred under the 14% Indenture and in

17   administering distributions to the holders of 14% Notes Claims before any distributions are made to

18   the Holders of the 14% Notes Claims.

19   Upon the Effective Date, the DB Litigation shall be deemed dismissed with respect to all

20   parties, with prejudice, and confirmation of the Plan shall constitute a final and binding resolution of

21   all issues raised, or that could be raised, in connection with the DB Litigation.

22   Class 5 is Impaired and is entitled to vote on the Plan.

23   (f)   Class 6: General Unsecured Claims

24   Provided that all Allowed Administrative Claims, Priority Claims and Secured Claims have

25   been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and

26   Secured Claims have been placed in a segregated reserve, as set forth in the Plan and in the

27   Liquidating Trust Agreement, and subject to the occurrence of the Effective Date, on, or as soon as

28   reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a

1   General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date that is

2   ninety (90) days after the date on which such General Unsecured Claim becomes an Allowed General

3   Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and

4   final satisfaction, settlement and release of and in exchange for such Allowed General Unsecured

5   Claim, its Pro Rata share of the Initial Net Distributable Proceeds, if any, and, on each Periodic

6   Distribution Date, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata

7   share of the Periodic Net Distributable Proceeds, not to exceed in the aggregate 56.5% of the total

8   Net Distributable Proceeds.

9        Class 6 is Impaired and is entitled to vote on the Plan.

10       (g)    Class 7: 6% Notes Claims

11       Provided that all Allowed Administrative Claims, Priority Claims and Secured Claims have

12  been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and

13  Secured Claims have been placed in a segregated reserve, as set forth in the Plan and in the

14  Liquidating Trust Agreement, and subject to the occurrence of the Effective Date, and subject to

15  acceptance of the Plan by Class 7, Holders of 6% Notes Claims shall receive $2 million from the

16  56.5% Net Distributable Proceeds allocable to the General Unsecured Claims, which amount shall be

17  paid at the time Distributions are made to General Unsecured Creditors pursuant to the Plan or as the

18  Liquidating Trustee shall determine in its sole and absolute discretion.  Concurrently with the final

19  payment of Professional Fee Claims for the Debtors and the Creditors' Committee after the Effective

20  Date and provided that Class 7 has voted to accept the Plan, the Professional fees and expenses of the

21  indenture trustee of the 6% Notes and the trustee's professionals shall be paid to such applicable

22  indenture trustee or professional, subject to a review for reasonableness by the Creditors' Committee,

23  out of the 56.5% of the Net Distributable Proceeds allocable to the Allowed General Unsecured

24  Claims, but if at the time of such distribution, there are insufficient funds to make payment in full,

25  then such fees shall be paid Pro Rata with other professionals ~~time~~ proposed to be paid at such time

26  under the Plan (including the DB Fees and Whippoorwill Fees).  Any rights granted to the 6% Notes

27  prior to the Effective Date shall be extinguished on the Effective Date in exchange for the treatment

28  afforded to the 6% Notes herein.

1    Class 7 is Impaired and is entitled to vote on the Plan.

2            (h)    Class 8: 5% Notes Claims

3            Pursuant to the terms of the Noteholder Settlement among the Creditors' Committee and the

4    Holders of a majority of the 14% Notes, such parties agreed that the Holders of the 14% Notes

5    Claims would pay for the distribution to the Holders of the 5% Notes Claims, if any, out of the 43.5%

6    of the Net Distributable Proceeds allocable to the Allowed 14% Notes Claims. ~~Plan~~ Pursuant to

7    negotiations between the Holders of a majority of the 14% Notes and the 5% Indenture Trustee,

8    provided that Class 8 does not vote to reject the Plan and the 5% Indenture Trustee does not object to

9    the Plan or Disclosure Statement, Holders of the Allowed 14% Notes Claims will allocate to Holders

10   of Allowed 5% Notes Claims a total of $75,000 from the 43.5% of Net Distributable Proceeds

11   allocated to the Allowed 14% Notes Claims. The $75,000 Distribution to Holders of Allowed 5%

12   Notes Claims shall include all fess and expenses of the 5% Indenture Trustee and shall be subject to

13   the exercise by the 5% Indenture Trustee of any contractual right of priority or charging lien under

14   the 5% Notes Indenture for payment of its fees and expenses. Distribution to Holders of Class 8

15   Claims shall be made pro rata and contemporaneously with the first Distribution to the Holders of

16   Class 5 Claims, other than payments for fees and expenses of DB and Whippoorwill.

17           On the Effective Date, in consideration for the distribution provided for herein, Holders of the

18   5% Notes shall be deemed to release any intercreditor rights or payover demands they have, if any,

19   against the Holders of the 6% Notes and the 14% Notes.

20           Class 8 is Impaired and is entitled to vote on the Plan.

21           (i)    Class 9: Convenience Claims

22           On, or as soon as reasonably practicable after, the Initial Distribution Date, each Holder of an

23   Allowed Convenience Claim shall receive, in full and final satisfaction, settlement and release of and

24   in exchange for such Convenience Claim, 25% of its Allowed Claim as a final distribution. Holders

25   of Class 6 Claims in excess of $10,000 will be eligible to opt into this Class by reducing their claim

26   to $10,000 by checking the "Opt-In to Convenience Class" box on their ballot. Total distributions

27   under this Class shall be paid out of the 56.5% of the Net Distributable Proceeds allocable to the

28   Allowed General Unsecured Claims, and are anticipated to be limited to $1.25 million, subject to the

Liquidating Trustee's discretion to increase this amount at the time of the Initial Distribution Date. In the event that this class has greater demand than funds allocated to this Class, then the Liquidating Trustee shall have the absolute discretion to select and remove certain of the opt-in members of this class. In no instance shall the Liquidating Trustee remove a non-opt-in Allowed Convenience Claim from this Class.

Class 9 is Impaired and is entitled to vote on the Plan.

(j)    Class 10: Product Liability PI Claims

Unless their Product Liability PI Claim has previously become an Allowed Claim, all Holders of Claims in Class 10 shall be required to participate in the Product Liability PI Claim Mediation Process attached hereto as Appendix E. As provided in the Product Liability PI Claim Mediation Process, if and when Allowed, Holders of Class 10 Claims shall receive a Pro Rata distribution of available insurance proceeds from Gibraltar policies covering Product Liability PI Claims upon the year in which the Claim arose. Once all mediations as to Product Liability PI Claims in a given policy year have been liquidated, the Liquidating Trustee may, in its discretion, begin the distribution of Gibraltar policy proceeds for that year without regard to whether the Product Liability PI Claims in any other policy year have been liquidated or allowed, or he may wait until Product Liability PI Claims in other policy years, or all policy years have been liquidated, before making distributions of Gibraltar policy proceeds. To the extent the allowed amount of any Class 10 Claim is not paid in full with insurance proceeds, then the unpaid deficiency amount shall receive the treatment provided for under Class 6 for Allowed General Unsecured Claims, and any Distributions thereto shall be paid out of the 56.5% of the Net Distributable Proceeds allocable to the Allowed General Unsecured Claims.

Class 10 is Impaired and is entitled to vote on the Plan

(k)    Class 11: WARN Class Claims and Severance Class Claims

The WARN and Severance Class Settlement Agreement shall be presented to the Bankruptcy Court for approval pursuant to Rule 9019 of the Bankruptcy Rules and as a class settlement under Rule 23 of the Federal Rules of Civil Procedure and notice of the WARN and Severance Class Settlement Agreement shall be given to all WARN Class Members and/or Severance Class Members as required under Rule 23 and the Order of the Bankruptcy Court. If the WARN and Severance Class

Settlement Agreement is approved, any WARN Class Member or Severance Class Member may affirmatively elect not to accept the treatment ("Opt Out") afforded to the WARN Class Members and Severance Class Members in the WARN and Severance Class Settlement Agreement by following the procedures in the notice of the WARN and Severance Class Settlement Agreement.

*If the WARN and Severance Class Settlement Agreement is approved by the Bankruptcy Court*:

A.    On the effective date of the WARN and Severance Class Settlement Agreement or the Effective Date of the Plan, whichever is later, any WARN Class Member or Severance Class Member who has *not* affirmatively elected to Opt Out shall receive, in full satisfaction of their Claims, the treatment provided in the WARN and Severance Class Settlement Agreement.

B.    As to any WARN Class Member or Severance Class Member who affirmatively elects to Opt Out, if and when their WARN Class Claim or Severance Class Claim becomes an Allowed Claim, then they shall be afforded the treatment of a Non-Tax Priority Claim in Class 1 subject to the limitations of section 507(a)(4) and (5) of the Bankruptcy Code with any amount of their WARN Class Claim or Severance Class Claim in excess of the limitations of section 507(a)(4) and (5) of the Bankruptcy Code treated as a General Unsecured Claim in Class 6 and any Distribution to Class 11 pursuant thereto shall be paid out of the 56.5% Net Distributable Proceeds allocable to the Allowed General Unsecured Claims.

C.    Any WARN Class Member or Severance Class Member who Opts Out of the treatment afforded in the WARN and Severance Class Settlement Agreement shall have the same rights and obligations as he or she would have had if the WARN Action and/or the Severance Action had never been filed and the WARN and Severance Class Settlement Agreement had never been executed.

*If the Settlement Agreement is not approved by the Bankruptcy Court:*

The WARN Class Claims and Severance Class Claims will continue to be litigated before the Bankruptcy Court. If and when the Claim of any WARN Class Member or any Severance Class Member becomes an Allowed Claim, the Claim of the WARN Class Member or Severance Class Member shall be afforded the treatment of a Non-Tax Priority Claim in Class 1 subject to the

limitations of section 507(a)(4) and (5) of the Bankruptcy Code with any amount in excess of the limitations of section 507(a)(4) and (5) of the Bankruptcy Code treated as a General Unsecured Claim in Class 6 with any Distribution to Class 11 pursuant thereto to be paid out of the 56.5% of Net Distributable Proceeds allocable to the Allowed General Unsecured Claims.

The Class 11 Claims of WARN Class Members and Severance Class Members are impaired and are entitled to vote on the Plan.

(l)    Class 12

Each Claimant in Class 12 is or was the beneficiary of an LC issued by the Debtors' Secured Parties pursuant to the Secured Credit Facility and which comprises the Allowed Secured Credit Facility Claims. Upon the Effective Date, each Claim in Classes 12A and 12B shall be deemed an Allowed Claim and each holder of an Allowed Claim in Class 12 shall receive the treatment described below in full and final satisfaction of its Claim and in exchange for waiver of any deficiency claims. Each Claim in Class 12A and Class 12B is Impaired and is entitled to vote on the Plan.

(i)    Class 12A: Lumbermen's Underwriting Alliance

LUA insured the workers' compensation liability of the Debtors in the states of Arizona, Idaho, Tennessee, Virginia, Texas, Florida, Maryland and Kentucky between November 1, 1981 and February 1, 1999. The Debtors' liability to LUA was secured by LC No. 3040443 in the amount of $100,000 which LUA drew on or about December 4, 2009. LUA was also holding Cash deposits of $86,774. On the Effective Date, in full and final satisfaction of LUA's Allowed Claim, LUA shall retain the approximately $186,000 in LC proceeds as well as other Cash on hand.

(ii)    Class 12B:  Georgia Self Insurance Guaranty Trust Fund

The Debtors' workers' compensation liability in the state of Georgia, was secured by LC No. 3040445 in the amount of $1,230,000. The Georgia Self Insurers Guaranty Trust Fund ("Georgia"), drew on LC No. 3140445 on July 23, 2009 and it now holds $1,230,000 in Cash. On the Effective Date, in full and final satisfaction of the Allowed Claim of the Georgia, Georgia shall retain the proceeds of LC No. 3040445 in the amount $1,230,000, as well as other Cash on hand.

1

      (m)   <u>Class 13</u>

2          Each Claimant in Class 13 is or was the beneficiary of an LC issued by the Debtors' Secured

3   Parties pursuant to the Secured Credit Facility and which comprises the Allowed Secured Credit

4   Facility Claims.  The Debtors assert that each Claimant in Class 13 holds Collateral consisting of (i)

5   its rights under an outstanding LC, (ii) the proceeds of a LC and/or (iii) Cash.  The Debtors also

6   assert that they are entitled to the return of the Collateral (or, if not drawn upon, the exoneration of a

7   LC) to the extent the amount of the Collateral exceeds the Allowed Claim of the Holder of a Class 13

8   Claim.  The Plan Proponents have undertaken a detailed analysis of the Collateral held by each

9   Holder of a Class 13 Claim and the likelihood of each such Holder's Class 13 Claim becoming under

10  secured.  Based on that analysis, the Plan Proponents believe that, if and when Allowed, each holder

11  of an Allowed Class 13 Claim will be significantly over secured and that each such Claimholder will

12  ultimately end up returning Collateral to the Estate.  However, in the event that the Plan Proponents

13  are mistaken and a Holder of a Class 13 Claim receives an Allowed Class 13 Claim in an amount that

14  exceeds the Collateral, the deficiency amount shall be treated as a Class 6 General Unsecured Claim.

15         Unless otherwise provided with respect to any subclass of Class 13, upon a Claim in Class 13

16  becoming an Allowed Claim, such Claim shall be treated as follows:

17      (i)    To the extent the Allowed Claim is less than the amount of the Collateral held by the

18  Class 13 Claimant, then the Class 13 Claimant shall retain the Collateral up to the amount of such

19  Allowed Claim and any excess shall be returned to the Liquidating Trustee;

20      (ii)   To the extent the Allowed Claim exceeds the aggregate amount of the Collateral held

21  by the Class 13 Claimant, then the Class 13 Claimant shall retain the Collateral and the amount by

22  which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General

23  Unsecured Claim in Class 6; or,

24      (iii)  As the Holder of a Claim in Class 13 and the Debtors and/or the Liquidating Trustee

25  shall agree upon in writing.

26         Each Holder of a Class 13 Claim shall continue to hold its Collateral to the same extent and

27  with the same priority held as of the Petition Date until such time as (a) the Claim of the Holder of

28  such Class 13 Claim becomes an Allowed Claim, (b) such purported Claim has been determined by a

1  Final Order of the Bankruptcy Court to be invalid, disallowed or otherwise avoidable, or (c) as the

2  Holder of a Class 13 Claim and the Debtors and/or the Liquidating Trustee shall agree upon in

3  writing.  A Class 13 Claim shall become an Allowed Claim as provided in the Plan and no Holder of

4  a Claim in Class 13 is obligated to take any action to seek the allowance of its Claim.

5      Each Holder of a Claim in Class 13 is conclusively presumed to have accepted the Plan and,

6  therefore, each Holder of a Class 13 Claim is unimpaired and not entitled to vote to accept or reject

7  the Plan.

8          (i)     Class 13A:  Westchester Fire Insurance Company and ACE INA

9                          Insurance

10     Westchester Fire Insurance Company and ACE issued construction bonds with respect to the

11  Debtors' military housing business and bonds supporting the Debtors' self insured workers'

12  compensation liability in Washington and Indiana all of which were secured by LC No. 3051853.  On

13  or about December 29, 2009, ACE drew on LC. No. 3051853 in its entirety.  As of January 31, 2010,

14  ACE held $13,897,702.50 in Cash as security for the Claims of ACE against the Debtors.

15     The Holder of the Class 13A Claim shall have an unliquidated Claim as reflected in Proofs of

16  Claim number 7661 through 7678, inclusive, filed by such Holder and the Agreements of Indemnity

17  referenced therein, subject to being liquidated or reduced, in whole or in part, as such Holder and the

18  Debtors (or the Liquidating Trustee) may mutually agree in writing after taking into account any

19  exposure or loss related to liabilities allegedly giving rise to the Class 13A Claim that has been fully

20  and indefeasibly released or otherwise extinguished in accordance with the provisions of Agreements

21  of Indemnity between such Holder and any of the Debtors governing draws under such Holder's LC,

22  or the holding, use, or return of any proceeds thereof.

23          (ii)    Class 13B:  Old Republic Insurance Co.

24     On behalf of Gibraltar, Old Republic Insurance Co. ("Old Republic") provided workers'

25  compensation coverage to the Debtors in Alabama and Georgia and the reimbursement obligations of

26  the Debtors and Gibraltar to Old Republic were secured by LC No. 3040444 in the amount of $1.08

27  million.  On November 27, 2009, Old Republic drew on LC No. 3040444 and it now holds $1.08

28  million in Cash.

1            (iii)     Class 13C:  National Union Fire Insurance Company of Pittsburgh, PA,

2          et al.

3       The Debtors' workers' compensation liability in the states of Arizona, Idaho, Tennessee,

4 Virginia, Florida, Maryland and Kentucky from April 1, 2003 to the present was covered by National

5 Union Fire Insurance Company of Pittsburgh, PA, American Home Assurance Company, American

6 International Specialty Lines Insurance Company of the State of Pennsylvania, Commerce and

7 Industry Insurance Company, AIU Insurance Company, Birmingham Fire Insurance Company of the

8 State of Pennsylvania, Illinois National Insurance Company, American International South Insurance

9 Company, National Union Fire Insurance Company of Louisiana, American International Pacific

10 Insurance Company, Granit State Insurance Company, New Hampshire Insurance Company,

11 Lexington Insurance Company, Landmark Insurance Company, Starr Excess Liability Insurance

12 Company Ltd. ("National Union").  The Debtors' reimbursement obligations to National Union are

13 secured by LC No. 3056166 in the amount of $4,302,210, which expires on March 31, 2010.

14            (iv)     Class 13D: Fidelity and Deposit Company of Maryland

15       Fidelity and Deposit Company of Maryland ("Fidelity") issued a surety bond with respect to

16 the Debtors' contract to supply manufactured housing to the U.S. Department of Defense for Fort

17 Sill.  The Surety Bond is secured by LC No. 3092431 in the amount of $3,017,440, which expires on

18 March 11, 2010.  Morgan Buildings and Spas, Inc. ("Morgan Spa") has made claims against the

19 Debtors, which the Debtors deny, and which are now being litigated in Texas along with the Debtors'

20 claims against Morgan Spa.  If Morgan Spa prevails, it will be entitled to payment under the surety

21 bond and Fidelity will then be entitled to indemnification from the proceeds of LC No. 3092431.

22            (v)     Class 13E:  Kemper Insurance Co., et al.

23       Lumbermen's Mutual Casualty Company, American Motorists Insurance Company,

24 American Manufacturers Mutual Insurance Company and American Protection Insurance Company

25 and Kemper Insurance Co. ("Kemper") insured the workers' compensation liability of the Debtors in

26 the states of Arizona, Idaho, Tennessee, Virginia, Texas, Florida, Maryland and Kentucky between

27 February 1, 1996 and April 1, 2003.  The Debtors' liability to Kemper is secured by LC No. 3040130

28

1  in the remaining amount of $1,070,000 plus Cash of approximately $1.428 million held by Kemper

2  from prior draws on letters of credit.

3      (n)  Class 14: Intercompany Claims

4     In connection with, to the extent of and as a result of, the substantive consolidation of the

5  Debtors' Estates in these Chapter 11 Cases, on the Confirmation Date or such other date as may be

6  set by an order of the Bankruptcy Court, but subject to the occurrence of the Effective Date, all

7  Intercompany Claims by and between the Debtors shall be deemed eliminated, cancelled and/or

8  extinguished and the Holders of Class 14 Claims shall not be entitled to, and shall not receive or

9  retain any property or interest in property on account of such Claims.

10      (o)  Class 15: Equity Interests

11     On the Effective Date, all Equity Interests in the Debtors shall be cancelled and each Holder

12  thereof shall not be entitled to, and shall not receive or retain any property or interest in property on

13  account of, such Equity Interests.  For the sake of clarity, the equity interests in *non*-Debtors that are

14  affiliated with one or more of the Debtors (*e.g.*, Gibraltar) will *not* be cancelled, but, to the extent

15  owned or controlled by the Debtors, shall be transferred to the Liquidating Trust as Estate property.

16     Class 15 is deemed to have rejected the Plan and, therefore, Holders of Equity Interests are

17  not entitled to vote to accept or reject the Plan.

18  **B.**  **Acceptance or Rejection of the Plan by Claim Holders**

19     **1.**  *Impaired Classes of Claims Entitled to Vote*

20     The votes of Holders of Claims and Equity Interests in Impaired Classes who receive or retain

21  property on account of their Claims or Equity Interests and who are entitled to vote under the

22  Solicitation Procedures Order will be solicited for acceptance or rejection of the Plan.

23     **2.**  *Acceptance by an Impaired Class*

24     In accordance with Bankruptcy Code section 1126(c) and except as provided in Bankruptcy

25  Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is

26  accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in

27  number of the Claims of such Class that are entitled to vote and have timely and properly voted to

28  accept or reject the Plan.

### 3. *Presumed Acceptances by Unimpaired Classes*

Classes 1, 3, 4 and 13 are Unimpaired by the Plan.  Under Bankruptcy Code section 1126(f), such Claimholders are conclusively presumed to accept the Plan, and the votes of such Claimholders will not be solicited.

### 4. *Classes Deemed to Reject Plan*

Claimholders in Class 14 and Equity Interest Holders in Class 15, are not entitled to receive or retain any property under the Plan.  Under Bankruptcy Code section 1126(g), Holders of Claims and Equity Interests in these Classes are deemed to reject the Plan, and the votes of such Claimholders or Equity Interest Holders will not be solicited.

### 5. *Summary of Classes Voting on the Plan*

The votes of Holders of Claims in Classes 2, 5, 6, 7, 8, 9, 10, 11 and 12 whose Claims are not the subject of an objection and whose Claims are not listed in the Debtors' Schedules as contingent, unliquidated, or disputed, will be temporarily allowed for voting purposes as set forth in the Solicitation Procedures Order and will be solicited with respect to the Plan.

### 6. *Confirmation Pursuant to Bankruptcy Code Section 1129(b)*

To the extent necessary, the Plan Proponents will seek confirmation of the Plan from the Bankruptcy Court by employing the "cramdown" procedures set forth in section 1129(b) of the Bankruptcy Code.  Subject to the reasonable approval of Whippoorwill with respect to provisions that impact its rights under the Plan, the Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Exhibit or schedule, including to amend or modify the Plan or such Exhibits or schedules to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

### C.    Substantive Consolidation of All of the Debtors' Estates

"Substantive consolidation" is the merging of the assets and liabilities of two or more related debtors into a single pool to pay creditors.  Substantive consolidation simplifies the process of how creditor claims are resolved by making available all of the assets of the consolidated debtors to each of the consolidated debtors' creditors.  The goal of substantive consolidation is to accomplish fairness to all creditors.  The common effects of substantive consolidation are:  (1) the combining of the assets of multiple debtors as if they belonged to one single, consolidated entity; (2) the treatment of multiple

1  claims against multiple debtors as one claim asserted against one common entity; (3) the satisfaction

2  of the liabilities of multiple debtors from one common asset pool; (4) the elimination of intercompany

3  claims by and among the substantively consolidated debtor entities; and (5) the combining of the

4  creditors of multiple debtors into a single class of creditors for voting and distribution purposes under

5  a plan of reorganization or liquidation.

6       The Ninth Circuit has determined that substantive consolidation is appropriate when *either*:

7          (i)     creditors dealt with the debtor entities as a single economic unit and did not

8                  rely on their separate identities in extending credit (the "Single Entity Test");

9                  or

10          (ii)    the affairs of the debtors are so entangled that consolidation will benefit all

11                  creditors (the "Hopeless Entanglement Test").

12  *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 766 (9th Cir. 2000).  Because the test is framed

13  in the disjunctive (*i.e.*, using "or" instead of "and"), substantive consolidation is appropriate under

14  this test if just one of the two requirements is satisfied.  Proponents of substantive consolidation bear

15  the burden of proof.

16       In connection with the Plan, the Plan Proponents seek a substantive consolidation of the assets

17  and liabilities of all of the Debtors.  Although only one of the two elements must be met to establish

18  substantive consolidation, the Plan Proponents believe that they can satisfy both the Hopeless

19  Entanglement Test and the Single Entity Test.

20       **2.**    ***The Plan Proponents Can Satisfy the Single Entity Test***

21       Creditors relied upon the combined creditworthiness of the Debtors in extending loans thereto

22  as well as the Debtors' various cross-guarantees and cross-collateralization of assets for security.  For

23  example, FHI and the Operating Subsidiaries are the combined Borrowers under the Secured Credit

24  Facility, which is secured by a pledge of the majority of the assets of each of FHI and the Operating

25  Subsidiaries, including real property owned thereby.  FEI guaranteed FHI's and the Operating

26  Subsidiaries' obligations under the Secured Credit Facility.  In return, FHI and the Operating

27  Subsidiaries guaranteed FEI's obligations under the 14% Notes for FEI.  The 14% Notes are also

28  secured by the assets of FHI and the Operating Subsidiaries.

1        Additionally, two of the Operating Subsidiaries, Fleetwood Motor Homes of California, Inc.

2    and Fleetwood Homes of California, Inc., borrowed approximately $27.25 million from ISIS, which

3    was secured by each of their real property located in Riverside, CA.  FEI guaranteed FHI's and the

4    Operating Subsidiaries' obligations under the ISIS loan.  Because the foregoing shows a single

5    "operating" enterprise funded by loans secured by cross collateralization, the Plan Proponents submit

6    that creditors relied upon the creditworthiness of **all** the Debtors in making loans to the operating

7    enterprise.  As such, the Debtors' estates should be consolidated under the Single Entity Test.

8        **3.**    ***The Plan Proponents Can Satisfy the Hopeless Entanglement Test***

9        Disentangling the affairs of the Debtors would likely be burdensome and could adversely

10    affect creditor distributions.  The Debtors repeatedly engaged in intercompany lending, shared raw

11    materials, shared personnel, entered into cross-guaranties, and participated in cross-collateralization

12    with their assets.  Moreover, despite the fact that each of the Debtors are independent legal entities

13    with their own facilities, employees, and local management, the Debtors generally operated as a

14    single enterprise with a central payment system and central cash management system.

15        The Debtors' central payment system illustrates the extent of entanglement between the

16    Debtors.  The Debtors adopted a centralized vendor payment system whereby trade payable balances

17    owed by individual Operating Subsidiaries are paid directly by FHI on behalf of the Operating

18    Subsidiaries.  Rather than have each Operating Subsidiary remit multiple payments for amounts owed

19    to the same vendor, the Debtors' central payment system consolidated amounts owed across the

20    Operating Subs to the same vendor into a single payment made to that vendor from FHI.

21    Consolidating payments at FHI also provided greater centralized control over disbursements.

22        The Debtors' inability to disentangle its affairs without affecting creditor dispositions is also

23    evidenced by the Debtors' centralized cash management system.  On the operations level, the system

24    was designed to centralize cash flow from FEI's intake (*i.e.*, blocked) account to FHI's main account,

25    which directly funds the Operating Subsidiaries' activities through 40 individual disbursement

26    accounts.  FHI's main account is physically linked with both FEI's main account and the accounts of

27    the Operating Subsidiaries, and provides them with the funds needed to continue operations.

28

As further evidence of the Debtors' entanglement, FEI files consolidated financial statements with the SEC (*see* 10-K and 10-Q's) and lists its Debtor subsidiaries as "the RV Group" and "the Housing Group," which intimates that these "groups" are captive divisions of FEI, not independent entities. FEI and its subsidiaries also share overhead, management, accounting, and other related expenses. FEI owns (either directly or indirectly) all or a majority of the stock of each of the Debtors and the Debtors share common directors and officers. As demonstrated by the foregoing, the Debtors operated and were regarded as a consolidated enterprise. Indeed, disentangling their affairs is simply not possible and, even if it was, would cost more than the value of the Estates' remaining assets. Accordingly, the consolidation of the Debtors' Estates is proper under the Hopeless Entanglement Test.

### 4.    *The Effect of Substantive Consolidation Under the Plan*

The Plan contemplates and is predicated upon entry of an order substantially consolidating the Debtors' Estates. On the Effective Date, the Plan provides that (i) all Intercompany Claims by, between and among the Debtors shall be eliminated, (ii) all assets and liabilities of the Debtors shall be merged, (iii) any obligation of a Debtor and all guarantees thereof by one or more of the other Debtors shall be deemed to be one obligation, (iv) the Equity Interests in the Debtors shall be cancelled, and (v) each Claim filed or to be filed against any Debtor shall be deemed a single Claim against and a single obligation of the Debtors. Finally, on the Effective Date, in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment, or performance made by the Debtors as to the obligations of another Debtor shall be released and of no further force and effect.

### D.    Employee Related Provisions

### 1.    *Employees*

All of the Debtors' employees shall be terminated as of the Effective Date and converted to independent contractors upon execution by the employee of an independent contractor agreement with the Liquidating Trust.

### 2.    *KEIP Payments*

Depending upon the timing of the KEIP Payments, both the Debtors (pre-Effective Date) and the Liquidating Trustee (post-Effective Date) shall be permitted to pay to the KEIP Employees the KEIP Payments up to the maximum incentive payment set forth in the KEIP Order and Modified and Amended KEIP Plan Order.

### 3.    *Benefit Plans*

To the extent not terminated previously, all of the benefit plans for the benefit of the Debtors' employees shall be cancelled effective as of the Effective Date.

## E.    The Liquidating Trust

### 1.    *Establishment of Liquidating Trust*

The Liquidating Trust shall be established and shall become effective on the Effective Date. All Distributions to the Holders of Allowed Claims shall be from the Liquidating Trust. The Liquidating Trust shall hold and administer the Assets of the Debtors and their Estates, including but not limited to the Causes of Action for liquidation and distribution in accordance with the Plan unless otherwise settled or released by Order of the Bankruptcy Court prior to the Effective Date, and the Net Proceeds thereof (collectively, the "Liquidating Trust Assets").

### 2.    *Trust Distributions*

The Liquidating Trustee shall liquidate all Assets of the Debtors and the Estates (including, without limitation, all Causes of Action) and distribute the Net Proceeds of such liquidation from the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.

### 3.    *Duration of Trust*

The Liquidating Trust shall have an initial term of five (5) years; provided, however, that, if warranted by the facts and circumstances, and subject to the approval of the Bankruptcy Court with jurisdiction over the case, upon a finding that an extension of the term of the Liquidating Trust is necessary to accomplish the liquidating purpose of the Trust, the term of the Liquidating Trust may be extended for a finite term and/or terminated as more fully described in the Plan. As soon as practicable after the Final Trust Distribution Date, the Liquidating Trustee shall seek entry of a Final Order closing these Chapter 11 Cases pursuant to Bankruptcy Code section 350.

### 4. *Liquidation of Causes of Action*

Notwithstanding any other term or provision of the Plan, the Debtors shall have, prior to the Effective Date, and the Liquidating Trustee shall have, on and after the Effective Date, sole authority and responsibility for investigating, analyzing, commencing, prosecuting, litigating, compromising, collecting, and otherwise administering the Causes of Action pursuant to the terms of the Plan and Liquidating Trust Agreement. Further, the Liquidation Trust Oversight Committee shall set thresholds for approval with respect to the initiation of prosecution of any Avoidance Actions in its sole discretion.

### 5. *Liquidating Trustee*

#### (a)  Appointment

The appointment of the Liquidating Trustee shall be effective as of the Effective Date. Successor Liquidating Trustee(s) shall be appointed as set forth in the Liquidating Trust Agreement.

#### (b)  Term

Unless the Liquidating Trustee resigns or dies earlier, the Liquidating Trustee's term shall expire upon termination of the Liquidating Trust pursuant to the Plan and/or the Liquidating Trust Agreement.

#### (c)  Powers and Duties

The Liquidating Trustee shall have the rights and powers set forth in the Liquidating Trust Agreement including, but not limited to, the powers of a debtor-in-possession under Bankruptcy Code sections 1107 and 1108. The Liquidating Trustee shall be governed in all things by the terms of the Liquidating Trust Agreement and the Plan. The Liquidating Trustee shall administer the Liquidating Trust, and its assets, and make Distributions from the proceeds of the Liquidating Trust in accordance with the Plan. In addition, the Liquidating Trustee shall, in accordance with the terms of the Plan, take all actions necessary to wind down the affairs of the Debtors consistent with the Plan and applicable non-bankruptcy law.

#### (d)  Fees and Expenses

Except as otherwise provided in the Plan, compensation of the Liquidating Trustee and the costs and expenses of the Liquidating Trustee and the Liquidating Trust (including, without

1   limitation, professional fees and expenses) shall be paid from the Liquidating Trust. The Liquidating

2   Trustee shall pay, without further order, notice, or application to the Bankruptcy Court, the

3   reasonable fees and expenses of the Liquidating Trust Professionals, as necessary to discharge the

4   Liquidating Trustee's duties under the Plan and the Liquidating Trust Agreement. Prior to the

5   Effective Date, the Liquidating Trustee shall be entitled to payment of reasonable fees and expenses

6   incurred in an amount to be agreed to by the Plan Proponents and approved by the Bankruptcy Court

7   in the Confirmation Order. After the Effective Date, the Liquidating Trustee shall be entitled to

8   payment at a rate of $25,000 for the first six months, $20,000 for the next twelve months, and

9   $10,000 per month thereafter.

10              (e)      Retention of Professionals and Compensation Procedure

11              On and after the Effective Date, subject to the terms of the Liquidating Trust Agreement, the

12  Liquidating Trustee may engage such professionals and experts, including a financial advisor (after

13  discussing with Whippoorwill), as may be deemed necessary and appropriate by the Liquidating

14  Trustee to assist the Liquidating Trustee in carrying out the provisions of the Plan and the Liquidating

15  Trust Agreement, including, but not limited to, professionals retained prior to the Effective Date by

16  either the Debtors or the Creditors' Committee.

17              (f)      Liquidating Trustee as Successor

18              Pursuant to Bankruptcy Code section 1123(b), the Liquidating Trustee shall be the successor

19  to the Debtors for all purposes.

20              (g)      Compromising Claims

21              Pursuant to the Plan and the Liquidating Trust Agreement, as of the Effective Date, the

22  Liquidating Trustee is authorized to approve compromises of the Causes of Action and all Claims,

23  Disputed Claims, and Liens and to execute necessary documents, including Lien releases and

24  stipulations of settlement or release, without notice to any party and without further order of the

25  Bankruptcy Court, except as otherwise provided in the Liquidating Trust Agreement and pursuant to

26  the threshold amounts for approval as may be set by the Liquidation Trust Oversight Committee.

27

28

(h)    Investment Powers

The powers of the Liquidating Trustee to invest any Cash that is held by the Liquidating

Trust, other than those powers reasonably necessary to maintain the value of the assets and to further

the Liquidating Trust's liquidating purposes, shall be limited to powers to invest in demand and time

deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other

temporary liquid investments, such as treasury bills.

(i)    Distributions

The Liquidating Trustee is required to distribute at least annually to beneficiary Claimholders

qualifying for Distributions from the Liquidating Trust under the Plan the Liquidating Trust's net

income and all Net Proceeds from the sale of assets by the Liquidating Trust, except that the

Liquidating Trust may retain an amount of Net Proceeds or net income reasonably necessary to

maintain the value of its assets or to meet Claims and contingent liabilities (including Disputed

Claims).  The Liquidating Trustee shall make continuing efforts to dispose of the Liquidating Trust's

Assets, make timely Distributions, and not unduly prolong the duration of the Liquidating Trust.

(j)    Vesting of Assets

On the Effective Date, all property treated by the Plan, any minutes, and general corporate

records of Debtors, and any books and records relating to the foregoing not otherwise treated by the

Plan, shall automatically vest in the Liquidating Trust free and clear of all Liens, Claims,

encumbrances, and other interests and shall thereafter be administered, liquidated by sale, collection,

recovery, or other disposition and distributed by the Liquidating Trust in accordance with the terms

of the Liquidating Trust Agreement and the Plan without further action of the Debtors.

**6.    *Federal Income Taxation of Liquidating Trust***

For federal income tax purposes, the Debtors, the Liquidating Trust, the Liquidating Trustee

and the beneficiary Claimholders shall treat the Liquidating Trust as a liquidating trust within the

meaning of Treasury Income Tax Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-

45, 1994-2 C.B. 124.  For federal income tax purposes, the transfer of assets to the Liquidating Trust

under the Plan is treated as a deemed transfer to the beneficiary Claimholders in satisfaction of their

Claims followed by a deemed transfer of the assets by the beneficiary Claimholders to the

1  Liquidating Trust. For federal income tax purposes, the beneficiary Claimholders will be deemed to

2  be the grantors and owners of the Liquidating Trust and its assets. For federal income tax purposes,

3  the Liquidating Trust will be taxed as a grantor trust within the meaning of IRC sections 671-677 (a

4  non-taxable pass-through tax entity) owned by the beneficiary Claimholders. The Liquidating Trust

5  will file federal income tax returns as a grantor trust under IRC section 671 and Treasury Income Tax

6  Regulation section 1.671-4 and report, but not pay tax on the Liquidating Trust's tax items of income,

7  gain, loss deductions and credits ("Tax Items"). The beneficiary Claimholders will report on their

8  federal income tax returns and pay any federal income tax liability attributable to such Liquidating

9  Trust's Tax Items. The Debtors, Liquidating Trust and the beneficiary Claimholders will use

10 consistent valuations of the assets transferred to the Liquidating Trust for all federal income tax

11 purposes, such valuations to be determined jointly by the Debtors and the Liquidating Trustee.

12 **F.      Release of Liens**

13        Except as otherwise provided in the Plan, the Confirmation Order, or in any document,

14 instrument, or other agreement created in connection with the Plan, on the Effective Date, all

15 mortgages, deeds of trust, liens, or other security interests against the property of the Estates shall be

16 released.

17 **G.      Exemption from Certain Transfer Taxes**

18        Pursuant to Bankruptcy Code section 1146(c), any transfers from any of the Debtors to the

19 Liquidating Trust or to any other Person pursuant to the Plan in the United States shall not be subject

20 to any stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local

21 governmental officials or agents to forgo the collection of any such tax or governmental assessment

22 and to accept for filing and recordation any of the foregoing instruments or other documents without

23 the payment of any such tax or governmental assessment.

24 **H.      Preservation of Causes of Action; Settlement of Causes of Action**

25        **1.      *Preservation of Causes of Action***

26        In accordance with section 1123(b)(3) of the Bankruptcy Code or any corresponding

27 provision of similar federal or state laws, on and after the Effective Date, (a) the Liquidating Trustee

28 shall be deemed to be a representative of the Debtors as the party in interest in these Chapter 11

88

Cases and any adversary proceeding in these Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal as to which any of the Debtors is a party and (b) the Liquidating Trustee shall retain all of the Causes of Action of the Debtors and their Estates, a nonexclusive list of which is set forth on Exhibit D annexed to the Plan, and other similar claims arising under applicable state laws, including, without limitation, Avoidance Actions, if any, and all other causes of action of a trustee and debtor in possession under the Bankruptcy Code.  The failure of the Plan Proponents to list a claim, right, cause of action, suit or proceeding on Exhibit D shall not constitute a waiver or release by the Debtors or their Estates of such claim, right of action, suit or proceeding.

### 2.    *Settlement of Causes of Action*

Subject to the terms of the Liquidating Trust Agreement, at any time after the Confirmation Date but before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors may settle some or all of the Causes of Action with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.  After the Effective Date, the Liquidating Trustee, in accordance with the terms of the Plan and the Liquidating Trust Agreement, will determine whether to bring, settle, release, compromise, enforce or abandon such rights (or decline to do any of the foregoing) in accordance with the Plan.

## I.    **Provisions Governing Distributions**

### 1.    *Special Provision Regarding Unimpaired Claims*

Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Bankruptcy Court, or any document or agreement enforceable pursuant to the terms of the Plan, nothing shall affect the rights and defenses, both legal and equitable, of the Debtors and the Liquidating Trustee with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

### 2.    *Allowed Claims*

Except as set forth in the Plan, the Liquidating Trustee shall only make Distributions to Holders of Allowed Claims.  No Holder of a Disputed Claim will receive any Distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim.

**3.**    *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Distribution Date by the Liquidating Trustee.  Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to the terms and conditions of the Plan.

**4.**    *Liquidating Trustee as Disbursing Agent*

The Liquidating Trustee shall make all Distributions required under the Plan, subject to the terms and provisions of the Plan and the Liquidating Trust Agreement.

**5.**    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

(a)    Delivery of Distributions in General

Distributions shall be made from the Liquidating Trust in accordance with the terms of the Plan and the Liquidating Trust Agreement.  In making Distributions under the Plan, the Liquidating Trustee may rely upon the accuracy of the claims register maintained by the Claims Agent in these Chapter 11 Cases, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

(b)    Undeliverable and Unclaimed Distributions

If the Distribution to any Holder of an Allowed Claim is returned to the Liquidating Trustee as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  Amounts in respect of undeliverable Distributions made by the Liquidating Trustee shall be returned to the Liquidating Trustee until such Distributions are claimed.  The Liquidating Trustee shall, with respect to Cash, maintain in the Liquidating Trust Cash on account of undeliverable and unclaimed Distributions until such time as a Distribution becomes deliverable, is claimed or is forfeited as set forth in Section VII.E of the Plan.

### 6.    *Prepayment*

Except as otherwise provided in the Plan or the Confirmation Order, the Debtors or the Liquidating Trustee, as the case may be, shall have the right to prepay in their discretion, without penalty, all or any portion of an Allowed Administrative Claim, Allowed Priority Tax Claim, Allowed Miscellaneous Secured Claim or Allowed Non-Tax Priority Claim, at any time.

### 7.    *Means of Cash Payment*

Cash payments made pursuant to the Plan shall be in U.S. Dollars and shall be made, on and after the Effective Date, at the option and in the sole discretion of the Liquidating Trustee by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Liquidating Trustee.  In the case of foreign creditors, Cash payments may be made, at the option of the Liquidating Trustee, in such funds and by such means as are necessary or customary in a particular jurisdiction.

### 8.    *Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Claimholder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

### 9.    *Withholding and Reporting Requirements*

In connection with the Plan and all Distributions under the Plan, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding, payment, and reporting requirements.  The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution.

### 10.    *Setoffs*

#### (a)    By a Debtor

Except as otherwise provided in the Plan, the Debtors, prior to the Effective Date, and the Liquidating Trustee, on and after the Effective Date, may, pursuant to Bankruptcy Code section 553 or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtors may have against the Holder of such Claim without seeking relief from the Bankruptcy Court; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Liquidating Trust or the Liquidating Trustee of any such Claim that the Debtors may have against such Holder.

#### (b)    By Non-Debtors

Unless otherwise stipulated in writing by the Debtors (before the Effective Date) or by the Liquidating Trustee (after the Effective Date), any party against whom a claim or counterclaim is asserted by the Estates (an "Estate Claim") must assert any setoff rights, right of subrogation, or recoupment of any kind against such Estate Claim at the time it answers such Estate Claim, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred; provided, however that nothing herein shall limit the assertion of such right of setoff, subrogation or recoupment via an amended or supplemental pleading to the extent required by Rule 15 of the Federal Rules of Civil Procedure and/or Rule 7015 of the Federal Rules of Bankruptcy Procedure.

### 11.    *Procedure for Treating and Resolving Disputed, Contingent and/or Unliquidated Claims*

The procedures for treating and resolving disputed, contingent and/or unliquidated claims are enumerated in Section VII.K. of the Plan.

### 12.   *Distribution Record Date*

The Liquidating Trustee will have no obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all Plan purposes to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, as stated on the official claims register.

## J.   **Treatment Of Executory Contracts And Unexpired Leases**

### 1.   *Rejected Contracts And Leases.*

Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document, the Confirmation Order shall constitute an order under Bankruptcy Code section 365 rejecting all prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, (d) is identified in Exhibit C to the Plan as an executory contract or unexpired lease of the Debtors to be assumed; provided, however, that the Plan Proponents may amend such Exhibit C at any time prior to the Confirmation Date; provided further however, that listing such an agreement on such Exhibit shall not constitute an admission by a Debtor that such agreement is an executory contract  or unexpired lease or that any Debtor has any liability thereunder, or (e) is identified in Exhibit E to the Plan as an IT agreement that will *not* be rejected by the Plan, but will continue for up to 200 days after the Effective Date, and if not assumed by the expiration thereof, will be deemed to be automatically rejected without a further order of the Court (with creditors having 30 days after notice of rejection to file rejection damage claims, if any).

### 2.   *Bar to Rejection Damages*

If the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the Liquidating Trust, or their

1    respective successors or properties unless a Proof of Claim is filed and served on the Liquidating

2    Trust and counsel for the Liquidating Trustee within thirty (30) days after service of a notice of the

3    Effective Date or such other date as is prescribed by the Bankruptcy Court.

4         **3.**    *Assumed and Assigned Contracts and Leases*

5         Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan

6    Document entered into after the Petition Date or in connection with the Plan, the Confirmation Order

7    shall constitute an order under Bankruptcy Code section 365 assuming, as of the Effective Date, those

8    agreements listed on Exhibit C to the Plan; provided, however, that the Plan Proponents may amend

9    such Exhibit at any time prior to the Confirmation Date; provided further, however, that listing an

10   agreement on such Exhibit shall not constitute an admission by a Debtor that such agreement is an

11   executory contract or unexpired lease or that any Debtor has any liability thereunder.

12   **K.**    **Confirmation And Consummation Of The Plan**

13        **1.**    *Conditions Precedent to Confirmation and Effective Date*

14        The conditions precedent to the occurrence of Confirmation and the Effective Date that must

15   either be satisfied or waived in writing are enumerated in Section IX.A and IX.B of the Plan.

16        **2.**    *Waiver of Conditions*

17        Subject to the reasonable approval of Whippoorwill with respect to provisions that impact its

18   rights under the Plan, each of the conditions set forth in Section IX.A and IX.B of the Plan may be

19   waived in whole or in part by the Plan Proponents and, in the case of Article IX.A(b), by BofA and

20   Whippoorwill, as applicable.  The failure to satisfy or waive any condition to the Effective Date may

21   be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such

22   condition to be satisfied.

23        **3.**    *Consequences of Non-Occurrence of Effective Date*

24        In the event that the Effective Date does not timely occur, the Plan Proponents reserve all

25   rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated,

26   that the Plan be null and void in all respects, and/or that any settlement of Claims provided for in the

27   Plan be null and void.

28

### 4.   *Substantial Consummation*

Substantial consummation of the Plan, as defined in Bankruptcy Code section 1101(2), shall not be deemed to have occurred unless and until all Allowed Administrative Claims, Priority Claims and Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Miscellaneous Secured Claims have been placed in a segregated reserve.

### L.   **Allowance And Payment Of Certain Administrative Claims**

#### 1.   *Professional Fee Claims*

##### (a)   Final Fee Applications

The Final Fee Applications must be filed no later than forty-five (45) days after the Effective Date.  Objections, if any, to Final Fee Applications of such Professionals must be filed and served on the Liquidating Trustee and its respective counsel, the requesting Professional and the Office of the U.S. Trustee no later than ninety (90) days from the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

##### (b)   Employment of Professionals after the Effective Date

Except as otherwise provided for in the Liquidating Trust Agreement, from and after the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 or any order previously entered by the Bankruptcy Court in seeking retention or compensation for services rendered or expenses incurred after such date shall terminate.

#### 2.   *Substantial Contribution Compensation and Expenses Bar Date*

Any Person who wishes to make a Substantial Contribution Claim based on facts or circumstances arising after the Petition Date, must file an application with the clerk of the Court, on or before the Administrative Claims Bar Date, and serve such application on counsel for the Plan Proponents and as otherwise required by the Court and the Bankruptcy Code on or before the Administrative Claims Bar Date, or be forever barred from seeking such compensation or expense reimbursement.  Objections, if any, to the Substantial Contribution Claim must be filed no later than the Administrative Claims Objection Deadline, unless otherwise extended by Order of the Court.

### 3. *Other Administrative Claims*

All other requests for payment of an Administrative Claim arising after the Petition Date up to and through the Effective Date, other than Professional Fee Claims, must be filed with the Court and served on counsel for the Plan Proponents no later than the Administrative Claims Bar Date. Unless the Liquidating Trustee or any other party in interest objects to an Administrative Claim by the Administrative Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Liquidating Trustee or any other party in interest objects to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

## M. Effect Of Plan Confirmation

### 1. *Binding Effect*

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Equity Interests, and their respective successors and assigns, including, but not limited to, the Liquidating Trust and the Liquidating Trustee.

### 2. *Discharge of the Debtors*

Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation will not discharge Claims against the Debtors; provided, however, that no Claimholder or Equity Interest Holder may, on account of such Claim or Equity Interest, seek or receive any payment or other Distribution from, or seek recourse against, any Debtor, the Liquidating Trust, the Liquidating Trustee, and/or their respective successors, assigns and/or property, except as expressly provided in the Plan. The discharge shall not prevent First American from prosecuting its claims in the adversary proceeding styled *First American Trust Company v. Fleetwood Enterprises, Inc., et. al*. [Case No. 6:09-ap-1415-MJ] (the "First American Adversary Proceeding").

### 3. *Releases by the Debtors*

(a)  Professionals, Creditors' Committee and Secured Parties

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors (in their individual capacities and as debtors and debtors in possession) will be deemed to release forever, waive, and discharge all claims, obligations, suits,