1   judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of

2   the Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other

3   agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the

4   ordinary course of business) whether liquidated or unliquidated, fixed or contingent, matured or

5   unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law,

6   equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other

7   occurrences taking place on or after the Petition Date through and including the Effective Date in

8   connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the negotiation and

9   filing of the Plan, the Disclosure Statement or any prior plans of reorganization, the filing of the

10  Chapter 11 Cases, the pursuit of confirmation of the Plan or any prior plans of reorganization, the

11  consummation of the Plan, the administration of the Plan, or the property to be liquidated and/or

12  distributed under the Plan, and that could have been asserted by or on behalf of the Debtors or their

13  Estates, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter

14  ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, in

15  any such case, against (i) the Released Parties, *except* Avoidance Actions or objections to Proofs of

16  Claims filed by any Released Parties ÷, and (ii) the Secured Parties, together with their respective

17  affiliates, agents, attorneys, officers, directors and employees (collectively with the Secured Parties,

18  the "Secured Parties Releasees"), except with respect to the Turnover Action or the Disputed Costs.

19                  (b)      Debtor Released Parties and Secured Parties Releasees

20          Pursuant to section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, the

21  Debtors, in their individual capacity and as debtors-in possession, for and on behalf of their Estates,

22  shall release and forever unconditionally release all the Debtors' present or former, officers, directors,

23  employees, attorneys, financial advisors, representatives or agents ("Debtor Released Parties") for

24  and from any and all Claims or rights contingent or existing as of the Effective Date in any manner

25  arising from, based on or relating to, in whole or in part, the Debtors, the subject matter of, or the

26  transactions or events giving rise to, any Claim or interest that is treated in the Plan, the business or

27  contractual arrangements between any Debtor and any Debtor Released Party or Secured Parties

28  Releasees, as applicable, the restructuring of Claims and interests prior to or in the Chapter 11 Cases,

or any act, omission, occurrence or event in any manner related to any such Claims, interest, or the Chapter 11 Case, *except* for (i) in the case of the Debtor Released Parties, Avoidance Actions or objections to Proof of Claims filed against any of the Debtor Released Parties and (ii) in the case of any Secured Party Releasees, with respect to the Turnover Action or the Disputed Costs.

No provision of the Plan or of the Confirmation Order, including without limitation, any release or exculpation provision, shall modify, release or otherwise limit the liability of any person not specifically released hereunder, including without limitation, any person that is a co-obligor or joint tortfeasor of a Debtor Released Party or that otherwise is liable under theories of vicarious or other derivative liability.

After the Effective Date, the Liquidating Trustee and the Liquidating Trust shall be bound, to the same extent the Debtor is bound, by all of the releases set forth above.

### 4. *Release By Holders of Claims and Equity Interests*

On the Effective Date (a) each Person that votes to accept the Plan, and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Equity Interests, in consideration for the obligations of the Liquidating Trust and the Liquidating Trustee under the Plan and the Cash and other consideration to be delivered in connection with the Plan and the Liquidating Trust, each entity (other than a Debtor) that has held, holds or may hold a Claim or Equity Interest, as applicable, (each, a "Release Obligor") shall have conclusively, absolutely, unconditionally, irrevocably and forever, released each Debtor Released Party and each Secured Parties Releasee from any Claim or Cause of Action (except Avoidance Actions) existing as of the Effective Date arising from, based on or relating to, in whole or in part, the subject matter of, or the transaction or event giving rise to, the Claim or Equity Interest of such Release Obligor, and any act, omission, occurrence or event in any manner related to such subject matter, transaction or obligation and any act, omission, occurrence, representation or failure to act that occurred prior to the Petition Date, including the decision to file and the preparation and filing the Chapter 11 cases and the timing of the commencement of the Chapter 11 Cases.

1          Notwithstanding the foregoing, however, this section shall not release (A) any Debtor

2    Released Party from any Claims or Causes of Action existing as of the Effective Date, based on (i)

3    the Internal Revenue Code or other domestic state, city or municipal tax code, (ii) the environmental

4    laws of the United States or any domestic state, city or municipality, (iii) any criminal laws of the

5    United States or any domestic state, city or municipality, (iv) Sections 1104-1109 and 1342(d) of the

6    Employee Retirement Income Security Act of 1974, as amended, (v) any Claim previously asserted

7    or hereinafter asserted that is covered by an existing policy of insurance, (vi) any Claim or Cause of

8    Action expressly reserved in the Plan, (vii) a Debtor Released Party's acts of gross negligence or

9    willful misconduct, or (viii) First American's claims and causes of action in the First American

10    Adversary Proceeding against the officer/director and bank defendants and its claims against TRC,

11    James Roberson and David Roberson, or (B) any Secured Party Releasee from any Claims or Causes

12    of Action existing as of the Effective Date, based on (i)  the First American Trust Adversary Action,

13    (ii) the Internal Revenue Code or other domestic state, city or municipal tax code, (iii) the

14    environmental laws of the United States or any domestic state, city or municipality, of (iv) any

15    criminal laws of the United States or any domestic state, city or municipality.

16          The releases of the Secured Parties Releasees contained in the Plan, including, without

17    limitation, the releases set forth in Sections XI.C and XI.D of the Plan, shall be in addition to, and not

18    in limitation of, the releases of the Secured Parties Releasees contained in section 19 of the Interim

19    DIP Order and any other releases of any of the Secured Parties Releasees contained in or approved by

20    the Interim DIP Order or the Final Cash Collateral Order, all of which releases are hereby

21    incorporated into the Plan by this reference and made a part hereof.

22        **5.**    *Injunction*

23          Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other

24    things, that **FROM AND AFTER THE EFFECTIVE DATE ALL PERSONS WHO HAVE**

25    **HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN THE**

26    **DEBTORS ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE**

27    **FOLLOWING ACTIONS AGAINST THE ESTATE(S), THE LIQUIDATING TRUST, THE**

28    **LIQUIDATING TRUSTEE, GIBRALTAR, OR ANY OF THEIR PROPERTY ON ACCOUNT**

OF ANY SUCH CLAIMS OR EQUITY INTERESTS: (A) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (D) ASSERTING A SETOFF, RIGHT OF SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY, OR OBLIGATION DUE TO THE DEBTORS; (E) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING (INCLUDING, WITHOUT LIMITATION, ANY "DIRECT ACTION" UNDER THE LAWS OF ANY STATE) TO OBTAIN OR CLAIM ENTITLEMENT TO THE PROCEEDS OF ANY POLICY OF INSURANCE ISSUED BY GIBRALTAR WHICH COVER CLAIMS AGAINST THE DEBTORS OR TO DETERMINE IF A CLAIM IS COVERED BY ONE OR MORE POLICIES OF INSURANCE ISSUED BY GIBRALTAR; AND (F) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN; PROVIDED, HOWEVER, THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH PERSONS FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN OR THE CONFIRMATION ORDER; AND PROVIDED FURTHER THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE ANY INSURANCE COMPANY THAT IS A COUNTERPARTY TO A REINSURANCE AGREEMENT WITH GIBRALTAR FROM EXERCISING ANY OF ITS RIGHTS AGAINST GIBRALTAR PROVIDED THAT ANY ENFORCEMENT ACTION MUST BE BROUGHT BEFORE THIS BANKRUPTCY COURT; AND PROVIDED FURTHER THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE FIRST AMERICAN FROM PROSECUTING THE FIRST AMERICAN ADVERSARY PROCEEDING AGAINST THE DEFENDANTS THEREIN AND EXISTING D&O POLICIES.

6.    *Term of Bankruptcy Injunction or Stays*

All injunctions or stays provided for in these Chapter 11 Cases under Bankruptcy Code section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Upon the Effective Date, the immediately foregoing injunction shall apply.

7.    *Exculpation and Limitation of Liability*

Except as otherwise specifically provided in the Plan, the Debtors, the Liquidating Trustee, the Liquidating Trust, DB, Whippoorwill, the Secured Parties Releasees, the 5% Indenture Trustee, the Creditors' Committee, the members of the Creditors' Committee, solely in their capacity as such, and any of the foregoing parties' respective present or former members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur any claim, action, proceeding, cause of action, Avoidance Action, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, right to payment, or Claim (as defined in Bankruptcy Code section 101(5)), whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively, in law, equity, or otherwise to one another or to any Claimholder or Equity Interest Holder, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the negotiation and filing of the Plan, the Disclosure Statement or any prior plans of reorganization, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan or any prior plans of reorganization, the consummation of the Plan, the administration of the Plan, or the property to be liquidated and/or distributed under the Plan except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that the foregoing shall not be deemed to

exculpate or release (i) any of the parties other than the Secured Parties Releasees from Avoidance Actions or objections to Proofs of Claims that the Debtors may hold against such parties or (ii) any Secured Party Releasee with respect to the Turnover Action or the Disputed Costs.

**8.** *Discharge of DB under the 14% Indenture*

Upon the satisfaction of all of DB's duties set forth in the Plan, DB (collectively with its successors and assigns) shall be discharged and relieved of all obligations under the 14% Indenture effective as of the Effective Date.

## VII.
## CERTAIN FACTORS TO BE CONSIDERED

The Holders of Claims against any of the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

**A.** **General Considerations**

The Plan sets forth the means for satisfying the Claims against each of the Debtors. Certain Claims and Equity Interests receive no Distributions pursuant to the Plan.

**B.** **Certain Bankruptcy Considerations**

Even if all Impaired Classes vote in favor of the Plan and, with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Bankruptcy Code section 1129 requires, among other things, a showing that the value of Distributions to dissenting Holders of Claims and Equity Interests may not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Plan Proponents believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. *See* Appendix C annexed hereto for a Liquidation Analysis of the Debtors.

The Plan provides for certain conditions that must be fulfilled prior to Confirmation of the Plan and the Effective Date. As of the date of this Disclosure Statement, there can be no assurance

that any or all of the conditions in the Plan will be met (or waived) or that the other conditions to Confirmation, if any, will be satisfied. If a chapter 7 liquidation were to occur, there is a substantial risk that the value of the Debtors' Estates would be substantially eroded to the detriment of all stakeholders.

## C.    Administrative and Priority Claims

As discussed elsewhere in this Disclosure Statement, the Plan provides that additional Distributions under the Plan (in excess of any Distributions made during these Chapter 11 Cases) to Holders of General Unsecured Claims are entirely dependent on whether there will be net Cash remaining after payment in full or reserving for the payments in full of all Allowed Administrative, Priority Tax, Secured, and Non-Tax Priority Claims, and all other costs and expenses of the wind-down of the Debtors' Estates ("Net Distributable Proceeds").

While the Plan Proponents currently estimate that there will be Net Distributable Proceeds, all Allowed Administrative, Priority Tax, Secured, and Non-Tax Priority Claims have not yet been resolved or fixed in amount, and all costs and expenses of completing the wind-down of the Estates cannot be estimated with certainty. As a result, the actual allowed amounts of all such Claims could turn out to be substantially higher than the estimate made by the Plan Proponents herein, and there can be no assurance that there will be any Net Distributable Proceeds.

Additionally, as the number and amount of Priority Tax Claims and Administrative Claims are presently unknown to the Debtors, it is possible that, if the actual number and amount of Priority Tax Claims and Administrative Claims exceeds the Debtors' estimates, the Debtors may not obtain enough Cash to satisfy all Priority Tax Claims and Administrative Claims in full. Accordingly, should Priority Tax Claims and Administrative Claims exceed the amount of Cash held by the Debtors and Holders of such Priority Tax Claims and Administrative Claims refuse to consent to less than payment in full, the Bankruptcy Court may deny Confirmation of the Plan. As set forth elsewhere in the Plan and the Disclosure Statement, the Debtors reserve their right to seek to dismiss or convert one or more of these Chapter 11 Cases.

# VIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtors, the Liquidating Trust and certain Holders that are entitled to vote to accept or reject the Plan. This discussion is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof, and all of which are subject to change, possibly with retroactive effect.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types of Holders subject to special treatment under the Tax Code (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and U.S. persons that have a functional currency other than the U.S. Dollar). This discussion assumes that Holders hold their Claims as capital assets for U.S. federal income tax purposes (generally, property held for investment). This discussion does not address any aspects of state, local or non-U.S. taxation or U.S. federal taxation other than income taxation. Furthermore, this discussion generally does not address the U.S. federal income tax consequences to Holders that are Unimpaired under the Plan or Holders that are not entitled to receive or retain any property under the Plan.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise

1    subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as

2    those that are excluded from this discussion as noted above; (iv) the manner in which the Holder

3    acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was

4    acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the

5    Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously

6    included accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of

7    the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes;

8    (xi) whether the Claim, and any instrument received in exchange therefor, is considered a "security"

9    for U.S. federal income tax purposes; and (xii) whether the "market discount" rules are applicable to

10    the Holder.  Therefore, each Holder should consult its tax advisor for information that may be

11    relevant to its particular situation and circumstances, and the particular tax consequences to such

12    Holder of the transactions contemplated by the Plan.

13        A substantial amount of time may elapse between the date of this Disclosure Statement and

14    the receipt of a final Distribution under the Plan.  Events occurring after the date of this Disclosure

15    Statement, such as additional tax legislation, court decisions or administrative changes, could affect

16    the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

17    There can be no assurance that the Internal Revenue Service ("IRS") will not take a contrary view

18    with respect to one or more of the issues discussed below.  No ruling has been or will be sought from

19    the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will

20    be obtained by the Debtors with respect thereto.  No representations are being made regarding the

21    particular tax consequences of the confirmation or implementation of the Plan as to any Holder.  This

22    discussion is not binding upon the IRS or other taxing authorities.  No assurance can be given that the

23    IRS or another authority would not assert, or that a court would not sustain, a different position from

24    any discussed herein.

25        TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230,

26    HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX

27    ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE

28    RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF

AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE TAX CODE;

(B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR

MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE

TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD

SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT

TAX ADVISOR.

**A.    Certain Tax Consequences of the Plan**

  **1.    *Treatment of Transfers to and Distributions by the Liquidating Trust***

    (a)    Treatment of Holders of Interests in the Liquidating Trust

For U.S. federal income tax purposes, all parties must treat the transfer of Assets to the

Liquidating Trust as (i) a transfer of the Assets to the beneficiaries of the Liquidating Trust followed

by (ii) a transfer of the Assets by such beneficiaries to the Liquidating Trust, with the beneficiaries

being treated as the grantors and owners of the Liquidating Trust. Each Holder that is a beneficiary

of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the

Effective Date in an amount equal to the difference between the amount realized in respect of its

Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should

generally equal the fair market value of the Assets deemed received for U.S. federal income tax

purposes under the Plan in respect of such Holder's Claim. A Holder that is deemed to receive

Assets under the Plan in respect of its Claim should generally have a tax basis in such Assets in an

amount equal to the fair market value of such Assets on the date of receipt.

As each Holder's share of the Assets may change depending upon the resolution of Disputed

Claims, Holders may be prevented from recognizing all of their loss in connection with the

consummation of the Plan until all Disputed Claims have been resolved for U.S. federal income tax

purposes.

The Liquidating Trustee and the beneficiaries of the Liquidating Trust are required to value

the Assets consistently and to use such valuations for all U.S. federal income tax purposes. The

Liquidating Trust Agreement will provide for (i) consistent valuation of the Assets by the Liquidating

Trustee and the beneficiaries of the Liquidating Trust, (ii) the Liquidating Trust to determine the fair

market value of the Assets, and (iii) the Liquidating Trust to send such determination to each

beneficiary of the Liquidating Trust.

(b)    Tax Treatment of Liquidating Trust

(i)    General

As described in Section VI.F.6 of the Plan, and except as otherwise described below, the

parties believe and intend to take the position that, for U.S. federal income tax purposes, the

Liquidating Trust is a grantor trust.

A grantor trust is treated as a pass-through entity for U.S. federal income tax purposes.

Accordingly, in general, no tax should be imposed on the deemed transfer of Assets by a Holder to

the Liquidating Trust. In addition, no tax should be imposed on the Liquidating Trust on the deemed

receipt of such Assets or on income earned or gain recognized by the Liquidating Trust with respect

to those Assets. Instead, the beneficiaries of the Liquidating Trust will be taxed on their respective

allocable shares of such net income or gain in each taxable year of the Liquidating Trust, and will be

responsible for paying the taxes associated with such income or gain whether or not they received

any Distributions from the Liquidating Trust in such taxable year.

There can be no assurance that the IRS will agree with the classification of the Liquidating

Trust or any reserves within the Liquidating Trust, as a grantor trust or part of a grantor trust,

respectively. A different classification could result in a different income tax treatment of the

Liquidating Trust or a reserve within the Liquidating Trust. Such treatment could include, but is not

limited to, the imposition of an entity-level tax on either the Liquidating Trust or a reserve within the

Liquidating Trust. Such a tax, if imposed, could result in a material reduction in the amount that

would otherwise be available for distribution to Holders.

(ii)    Reserves that may be Established by the Liquidating Trustee

A portion of the Assets transferred to the Liquidating Trust will be attributable to Disputed

Claims. The tax treatment of such transfers of Assets generally will be the same as the tax treatment

of transfers of Assets with respect to Allowed Claims. The Liquidating Trustee, however, may create

one or more reserve accounts for the Assets held on account of Disputed Claims. Under the Tax

Code, amounts earned by an escrow account, settlement fund or similar fund must be subject to

1   current tax. Although the U.S. Treasury Department has issued certain Treasury regulations

2   addressing the tax treatment of such funds, the U.S. Treasury Department has not issued Treasury

3   regulations to address the tax treatment of such funds in a bankruptcy context. Accordingly, the

4   proper tax treatment of such funds, and the extent to which a reserve established by the Liquidating

5   Trustee would be treated as such a fund, is uncertain. Depending on the facts and the relevant law,

6   such funds may be treated as grantor trusts to debtors, grantor trusts to claimholders, or as trusts

7   subject to an entity-level tax. Except as described below, the Debtors intend to treat the Assets held

8   in any reserve established by the Liquidating Trustee on account of Disputed Claims as having been

9   transferred to the Liquidating Trust by the Holders of such Disputed Claims, and the Holders of the

10  Disputed Claims as grantors and owners of the Liquidating Trust.

11          Under the Plan, the Liquidating Trust may be allowed, for federal income tax purposes, to

12  treat an account, trust, fund or reserve that holds assets to satisfy the Disputed Claims as a Disputed

13  Ownership Fund ("DOF") taxable under IRC section 468B and Treasury Income Tax Regulation

14  section 1.468B-9. If the Liquidating Trustee were to file an election to treat a reserve as a DOF, then

15  the DOF would be treated as a separate taxable entity for U.S. federal income tax purposes, and

16  would be required to file tax returns and pay any tax due on income earned or gain recognized that

17  was attributable to the Assets held in the reserve with respect to which the DOF election was made.

18  Any tax liability of the DOF would reduce the distributions to certain Holders. For purposes of

19  determining the DOF's federal income tax liability, a DOF would not be required to report as income

20  transfers of assets to the DOF, but would be required to include in income all income received or

21  accrued from assets transferred to the DOF. The DOF would not be allowed a tax deduction for a

22  distribution of Assets or of the net after-tax income earned by the DOF to a Holder. The initial tax

23  basis of assets transferred to a DOF would be the fair market value of the assets determined on the

24  date of transfer to the DOF, and the DOF's holding period would begin on the date of the transfer.

25          No assurance can be given that the IRS would accept a DOF election made by the Liquidating

26  Trustee with respect to a reserve. If the IRS were to successfully reject a DOF election, the reserve

27  with respect to which the DOF election was made would be subject to the rules applicable to reserve

28  accounts described above.

1  (c)  Tax Treatment of the Debtors

2  (i)  Recognition of Gain or Loss

3  The Debtors will recognize gain or loss equal to the difference between the fair market value

4  of the Assets and the adjusted tax basis of such Assets at the time the Assets are transferred to the

5  Liquidating Trust.  The Debtors anticipate that any net gain resulting from the transfer of Assets may

6  be offset by the tax attributes available to the Debtors, such as net operating losses, capital loss carry-

7  forwards and other deductions from, or offsets to, income.  The Debtors may, however, have some

8  alternative minimum tax liability as a result of the transfer of the Assets.  Any such tax will be paid

9  by the Debtors or the Liquidating Trust to the IRS.

10  The foregoing conclusions are based on, among other things, the Debtors' assumptions

11  concerning the fair market value of the Assets and the nature and magnitude of their respective tax

12  attributes.  Although the Debtors believe such assumptions are correct and appropriate, the IRS may

13  challenge one or more of those assumptions, and if the IRS were to prevail in any such challenge, the

14  Debtors' Estates could be subject to a tax liability that might be allowed as an Administrative Claim.

15  Such an Allowed Administrative Claim would reduce the funds available to administrative and other

16  Creditors.

17  (ii)  Cancellation of Debt Income

18  Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of

19  any cancellation of indebtedness ("COD") income recognized during the taxable year.  COD income

20  generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of

21  (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other

22  property transferred by the debtor in satisfaction of such discharged indebtedness (including stock).

23  COD income also includes any interest that has been previously accrued and deducted but remains

24  unpaid at the time the indebtedness is discharged.

25  The Tax Code permits a debtor in bankruptcy to exclude its COD income from gross income

26  if the discharge occurs in a title 11 case.  Thus, although the Debtors will realize COD income as a

27  result of the satisfaction of Claims, the Debtors may not be required to recognize any of that COD

28  income.

(d)    Treatment of Holders of Equity Interests

In accordance with the Plan, Holders of Equity Interests will not receive any recovery under the Plan. A Holder of an Equity Interest will generally recognize a loss in an amount equal to such Holder's adjusted tax basis in the Equity Interest. Capital losses are subject to various limitations under the Tax Code.

**2.    *Allocation of Plan Distributions Between Principal and Interest***

Distributions under the Plan with respect to any Claim that is composed of indebtedness and accrued but unpaid interest on such indebtedness will, to the extent permitted by applicable law, be allocated for U.S. federal income tax purposes first to the principal amount of the Claim and second, to the extent the distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. A Holder will generally recognize a loss to the extent that any accrued interest, including original issue discount ("OID"), was previously included in income and is not paid in full. Current U.S. federal income tax law is unclear on this point, and no assurance can be given that the IRS will not challenge the Debtors' position. Holders of Claims are urged to consult their own tax advisors regarding the particular U.S. federal income tax consequences to them of the treatment of accrued but unpaid interest, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

If, contrary to the intended position, such a distribution were treated as allocated first to accrued but unpaid interest, a Holder would realize ordinary income with respect to such distribution in an amount equal to the accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder would otherwise realize a loss as a result of the Plan. A Holder should also recognize ordinary income (but not in excess of the amount of gain recognized, as described above) to the extent a distribution is received in exchange for market discount not previously taken into account under the Holder's method of accounting.

**3.    *Withholding, Backup Withholding, and Information Reporting***

In connection with the Plan and all Distributions under the Plan, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions

under the Plan shall be subject to any such withholding, payment, and reporting requirements.  The

Liquidating Trustee shall be authorized to take any and all actions that may be necessary or

appropriate to comply with such withholding, payment, and reporting requirements.  All amounts

properly withheld from Distributions to a Holder as required by applicable law and paid over to the

applicable taxing authority for the account of such Holder shall be treated as part of the Distributions

to such Holder.  All persons holding Claims shall be required to provide any information necessary to

effect information reporting and withholding of such taxes.  For example, with respect to any

employee-related withholding, if the Debtors are obligated by law to withhold amounts from

Distributions to a present or former employee to satisfy such present or former employee's tax and

other payroll obligations, the Liquidating Trustee may withhold a portion of the Distributions

allocated to the Holder of an Allowed Claim that is a present or former employee, whether or not

such Distributions are in the form of Cash, in such amount as is determined necessary to satisfy such

Holder's tax and other payroll obligations with respect to the Distributions.

Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is

to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the

satisfaction and payment of any tax obligations imposed by any governmental unit, including income,

withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall

be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made

arrangements satisfactory to the Liquidating Trustee for the payment and satisfaction of such

withholding tax obligations or such tax obligation that would be imposed upon the Liquidating

Trustee in connection with such Distribution.  Any property to be distributed pursuant to the Plan

shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution

pursuant to Section VII.E.2. of the Plan.

Moreover, under certain circumstances, Holders may be subject to "backup withholding" with

respect to payments made pursuant to the Plan, unless such Holder either (i) comes within certain

exempt categories (which generally include corporations) and, when required, demonstrates this fact,

or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury

1  that the Holder is a U.S. person, that its taxpayer identification number is correct and that it is not

2  subject to backup withholding because of a failure to report all dividend and interest income.

3  Backup withholding is not an additional tax. Amounts withheld under the backup

4  withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder

5  may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an

6  appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

7  In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal

8  income tax return of certain types of transactions in which the taxpayer participated, including,

9  among other types of transactions, certain transactions that result in the taxpayer claiming a loss in

10  excess of specified thresholds. Each Holder is strongly urged to consult its tax advisor regarding

11  these regulations and whether the transactions contemplated by the Plan would be subject to these

12  regulations and require disclosure on the Holders' tax returns.

13  **B.     Importance of Obtaining Professional Tax Assistance**

14  THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN

15  TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX

16  PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR

17  INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX

18  CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON

19  A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED

20  TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE AND LOCAL, AND

21  APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

22  **IX.**
**FEASIBILITY OF THE PLAN, BEST INTERESTS OF CREDITORS, AND**
23  **ANALYSIS OF RECOVERY TO CREDITORS**

24  **A.     Feasibility of the Plan**

25  The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy

26  Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the

27  liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or

28

1   reorganization is proposed in the Plan. *See* 11 U.S.C. § 1129(a)(11). The Plan provides for the

2   liquidation of the Debtors' Assets and the Distribution of the proceeds to Holders of Allowed Claims.

3   The Plan Proponents believe that the Cash on hand and the proceeds from the Assets will be

4   sufficient to pay all Administrative and Priority Claims that become Allowed, based upon the Plan

5   Proponents' estimates. Accordingly, the Plan Proponents believe that the Plan is feasible

## B.    Acceptance of the Plan

7       As a condition to confirmation of any plan, the Bankruptcy Code requires that each class of

8   impaired claims vote to accept that plan, unless the plan satisfies the best interests test, as set forth

9   below.

10      Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims

11  as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in

12  number of claims in that class, but for that purpose counts only those who actually vote to accept or

13  to reject a plan. Thus, Impaired Classes under the Plan will have voted to accept such Plan only if

14  two-thirds (2/3) in amount and a majority in number actually voting in each Class cast their Ballots in

15  favor of acceptance. Holders of Claims who fail to vote for the Plan are not counted as either

16  accepting or rejecting that Plan.

## C.    Best Interests Test

18      As noted above, even if a plan is accepted by the holders of each class of claims and interests,

19  the Bankruptcy Code requires a bankruptcy court to determine that such plan is in the best interests of

20  all holders of claims or interests that are impaired by that plan and that have not accepted that plan.

21  The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a bankruptcy

22  court to find either that all members of an impaired class of claims or interests have accepted the plan

23  or that the plan will provide a member who has not accepted the plan with a recovery of property of a

24  value, as of the effective date of the plan, that is not less than the amount that such holder would

25  recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

26      To calculate the probable distribution to holders of each impaired class of claims and interests

27  if the debtors were liquidated under chapter 7, a bankruptcy court must first determine the aggregate

28  dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to

1  chapter 7 cases under the Bankruptcy Code. Because, here, the Plan is a liquidating plan, the

2  "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best

3  interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation

4  contemplated by the Plan. However, the Plan Proponents believe that in a chapter 7 liquidation, there

5  would be *additional* costs and expenses that the Estates would incur. Such costs would include the

6  compensation of a trustee, as well as compensation of counsel and other professionals retained by the

7  trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in these Chapter 11

8  Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the

9  chapter 7 cases, litigation costs, and Claims arising from the operations of the Debtors during the

10  pendency of these Chapter 11 Cases. As such, there is no reason to believe that Creditors of the

11  Debtors would receive more in a chapter 7 liquidation than they would receive under the Plan.

12  **D.      Liquidation Analysis**

13          In order to determine the amount of hypothetical chapter 7 liquidation value available to

14  Creditors, the Plan Proponents have prepared a liquidation analysis, a copy of which is annexed

15  hereto as Appendix C (the "Liquidation Analysis"). The Liquidation Analysis describes the recovery

16  available to the Debtors' creditors resulting from the liquidation of Assets of the Estates. The Plan

17  Proponents believe that such Liquidation Analysis demonstrates that in a chapter 7 liquidation,

18  Holders of certain Claims against the Debtors, including General Unsecured Claimholders, would

19  receive less of a recovery as compared to the recovery under the Plan.

20          Notwithstanding the foregoing, the Plan Proponents believe that the Liquidation Analysis

21  with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors

22  necessarily contains estimates of the net proceeds that will be available after completion of a chapter

23  7 wind-down. Claims estimates are based solely upon the Plan Proponents' review of any Claims

24  filed (a review that is ongoing) and the Debtors' books and records. Timing changes to the

25  Liquidation Analysis alone should not have a significant impact on the net distributable value

26  available for unsecured creditors. No order or finding has been entered by the Bankruptcy Court

27  estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set

28  forth in the Liquidation Analysis.

The Plan Proponents reserve the right under the Plan to revoke or withdraw the Plan at any time prior to Confirmation. If the Plan is withdrawn, the Plan Proponents reserve the right to request that these Chapter 11 Case be converted to one under chapter 7, although as set forth above and in this section, the Plan Proponents believe that Creditors will receive a higher recovery through the Plan than through chapter 7.

E.    **Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Plan**

It is impossible for the Plan Proponents to determine with any specificity the value each Creditor will receive as a percentage of its Allowed Claim. This difficulty in estimating the value of recoveries is due to, among other things, the inherent uncertainty in estimating the amount of Administrative Claims, Priority Tax Claims, Miscellaneous Secured Claims, and Non-Tax Priority Claims that will ultimately become Allowed, as well as, to a lesser degree, the ultimate amount of Allowed Claims in any Impaired Class.

Notwithstanding the difficulty in quantifying recoveries to Holders of Allowed Claims with precision, the Plan Proponents believe that the Liquidation Analysis and proposed recoveries to each Class of Impaired Claims under the Plan imply a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Plan Proponents believe that the "best interests" test of Bankruptcy Code section 1129 is satisfied.

F.    **Confirmation Without Acceptance of All Impaired Classes:  The "Cramdown" Alternative**

Under the Plan, Classes 14 and 15 are deemed to have rejected the Plan. In view of the deemed rejection by such Holders, the Plan Proponents will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Specifically, Bankruptcy Code section 1129(b) provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. A bankruptcy court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. 11 U.S.C. § 1129(b)(1).

1      A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a

2  dissenting class is treated equally with respect to other classes of equal rank. Moreover, a plan is fair

3  and equitable as to a class of unsecured claims which rejects a plan if the plan provides (a) for each

4  holder of a claim included in the rejecting class to receive or retain on account of that claim property

5  that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b)

6  that the holder of any claim or interest that is junior to the claims of such class will not receive or

7  retain on account of such junior claim or interest any property at all. 11 U.S.C. § 1129(b)(2)(B).

8      A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan

9  provides (a) that each holder of an interest included in the rejecting class receives or retains on

10  account of that interest property that has a value, as of the effective date of the plan, equal to the

11  greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled,

12  any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that

13  the holder of any interest that is junior to the interests of such class will not receive or retain any

14  property at all on account of such junior interest under the plan. 11 U.S.C. § 1129(b)(2)(C).

15      For example, if a class of unsecured claims rejects a plan under which a junior class (*e.g.*, a

16  class of interest holders) will receive or retain any property under the plan, the plan cannot be

17  confirmed (with certain possible exceptions not relevant to the plan) unless the plan provides that the

18  class of unsecured creditors receives value equal to the allowed amount of the claims in that class.

19  This is not the case under the Plan in these Chapter 11 Cases. Contrary to the foregoing example,

20  because neither Class 14 nor Class 15 will receive any Distribution under the Plan, and there is no

21  class that is junior to Class 15, the Plan Proponents submit that the Plan is fair and equitable as to

22  such Classes of Holders. Moreover, the Plan does not discriminate unfairly because the Plan treats

23  all Holders within these Classes equally with respect to other classes of equal rank.

24      As to a class of secured claims, a plan is fair and equitable if it provides: (i) that the holders of

25  such claims retain their liens securing such claims or are paid in cash in full the value of their claims

26  as of the effective date; (ii) that their liens attach to the proceeds of any sale of the underlying

27  collateral; or (iii) the holders receive the indubitable equivalence of their claims. *See* 11 U.S.C. §

28  1129(b)(2)(A).

1   For example, under the prior version of the Plan, ISIS would receive Plant 47 in full

2   satisfaction of its Class 3 claims.  If ISIS is eligible to vote and decides to vote to reject the Plan, the

3   Plan Proponents will seek to cram down the Plan on ISIS.  For the Plan Proponents to satisfy the "fair

4   and equitable" test as to ISIS, the Plan must provide ISIS with property of indubitable equivalent

5   value of ISIS's Claim (once Allowed) as of the Effective Date.  *See* 11 U.S.C. § 1129(b)(2)(A)(iii).

6   Accordingly, for Fleetwood to successfully cram down on ISIS (again under the prior version of the

7   Plan), the Bankruptcy Court would need to find that, as of the Effective Date, the value of Plant 47

8   equals or exceeds the amount of ISIS's Claim (once Allowed).  Because the Class 3 treatment in the

9   First Amended Plan abandons this "dirt for debt" treatment and instead seeks to cure and reinstate

10  ISIS's debt, cram down on ISIS will probably not be required.

11  **G.        Significant Changes to Financial Assets of the Debtors as of Conversion Date**

12  The Liquidation Analysis appended hereto as Appendix C analyzes the hypothetical

13  liquidation of the Estates if these Chapter 11 Cases are converted to chapter 7.  In the Liquidation

14  Analysis, this hypothetical "Conversion Date" is defined as June 30, 2010, which is approximately

15  the date the Debtors expect the Plan to go effective, also known as the Effective Date of the Plan.

16  ***Thus, any analysis of the Debtors' finances as of the Conversion Date is equally applicable to the***

17  ***Debtors' finances as of the Plan Effective Date.***

18  The Plan Proponents do not expect the balance sheet assets of the Debtors to materially

19  change through the Conversion Date, with some exceptions, including the following items:

20  As shown in the Liquidation Analysis, cash and restricted cash balances are estimated to be

21  $20.1M as of the Conversion Date after consideration of (i) the costs of administering the Chapter 11

22  Cases through the Conversion Date; (ii) sale of certain real properties that the Plan Proponents

23  believe fair value is being achieved today; (iii) the cash collateralization of remaining LCs in the

24  amount of 105% the face amount thereof; and, (iv) other ordinary course expenditures borne by the

25  Debtors prior to the Conversion Date.  Note that these amounts are estimates, which are subject to

26  change based on a variety of factors, including that certain cash flow activity expected to occur after

27  the Conversion Date in the Liquidation Analysis may occur or has occurred before the Conversion

28  Date and vice versa.

The receivable balance is estimated to decrease by approximately $1 million through the Conversion Date as a result of aged receivable collections. The receivable balance is subject to change due to the timing of collections expected to occur before and after the Conversion Date. The Liquidation Analysis assumes the majority of receivables are collected after the Conversion Date.

Performance bond receivables are estimated to decrease by the Conversion Date as a result of a release of cash Collateral supporting military and manufacturing bond exposure. Performance bond receivable balance is subject to change as additional releases may occur prior to the Conversion Date. The Liquidation Analysis assumes that all performance bond releases are recovered after the Conversion Date while some releases have occurred and will occur prior to the Conversion Date.

The net book value of property, plant and equipment is estimated to be reduced by $12.4M as of the Conversion Date as a result of the sale of certain real property and relief of related Assets. Real property anticipated to be sold prior to the Conversion Date includes former Housing Plants 75-1 & 75-2 (Alma, Georgia), Plant 70 (Auburndale, Florida ), Plant 35-1 (Broxton, Georgia), Plant 05-1 & 05-2 (Douglas, Georgia), Plant 21 (Glendale, Arizona), Plant 22-2 (Elizabethtown, Pennsylvania); former RV Supply Plant 58-1 (Riverside, California), and Plant 801 (Decatur, Indiana). The net book value of property, plant and equipment is subject to change due to the timing of sales expected to occur before and after the Conversion Date. The Liquidation Analysis assumes that the properties listed above are sold prior to the Conversion Date.

## X.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

As discussed immediately above, the Plan Proponents believe that the Plan affords Holders of Claims the potential for a better realization on the Debtors' Assets than a chapter 7 liquidation, and, therefore, is in the best interests of such Holders.

If, however, the requisite acceptances of voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative plan or plans of liquidation, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## A.     Alternative Plan(s) of Liquidation

If the requisite acceptances are not received or if the Plan is not confirmed, the Plan Proponents or any other party in interest could attempt to formulate and propose a different plan or plans of liquidation.

With respect to an alternative liquidation plan, the Plan Proponents have explored various other alternatives in connection with the extensive negotiation process involved in the formulation and development of the Plan.  The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

## B.     Liquidation under Chapter 7

If no Plan is confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to complete the liquidation of the Debtors' assets for Distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Equity Interests in the Debtors.

The Plan Proponents believe that in a liquidation under chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a diminution in the value of the Debtors' Estates. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority.  In such a case, the proceeds of the liquidation would be distributed by the chapter 7 trustee in accordance with chapter 7.  The Plan Proponents believe that such a result would reduce Distributions to all Holders of General Unsecured Claims compared to those under the Plan, because of additional administrative expenses for the chapter 7 trustee and professionals retained by it.  *See* Appendix C.

## C.     Dismissal of the Chapter 11 Cases

If no Plan is confirmed, the Debtors or other parties in interest may seek dismissal of these Chapter 11 Cases pursuant to Bankruptcy Code section 1112.  Without limitation, dismissal of these

1   Chapter 11 Cases would terminate the automatic stay and might allow certain Creditors to foreclose

2   on their Liens on substantially all of the Debtors' remaining assets. Accordingly, the Debtors believe

3   that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' remaining assets,

4   would lower the return to Creditors and would reduce any return to Holders of Claims other than

5   Miscellaneous Secured Claims.

## XI.
## PLAN VOTING INSTRUCTIONS AND PROCEDURES

**A.**     **Notice to Holders of Claims and Equity Interests**

9        This Disclosure Statement will be made available to Holders of Claims that are entitled to

10   vote on the Plan. A discussion and listing of those Holders of Claims that are entitled to vote on the

11   Plan and those Holders of Claims that are not entitled to vote on the Plan is provided herein. The

12   primary purpose of this Disclosure Statement is to provide adequate information to enable such

13   Claimholders to make a reasonably informed decision with respect to the Plan prior to exercising

14   their right to vote to accept or reject the Plan.

15        The Bankruptcy Court has been asked to approve this Disclosure Statement as containing

16   information of a kind and in sufficient and adequate detail to enable such Claimholders to make an

17   informed judgment with respect to acceptance or rejection of the Plan. THE BANKRUPTCY

18   COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT (WHEN SUCH APPROVAL IS

19   OBTAINED) DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR

20   COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, OR AN ENDORSEMENT

21   OF THE PLAN BY THE BANKRUPTCY COURT.

22        WHEN AND IF CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL

23   BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS,

24   WHETHER OR NOT SUCH HOLDERS ARE ENTITLED TO VOTE OR DID VOTE ON THE

25   PLAN AND WHETHER OR NOT HOLDERS RECEIVE OR RETAIN ANY DISTRIBUTIONS

26   OR PROPERTY UNDER THE PLAN. THUS, YOU ARE ENCOURAGED TO READ THE PLAN

27   AND THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, ALL HOLDERS OF

28   IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS

DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR

ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. This Disclosure Statement

contains important information about the Plan, the Debtors' businesses and operations, considerations

pertinent to acceptance or rejection of the Plan and developments concerning these Chapter 11 Cases.

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN**

**CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO**

**SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS**

**DISCLOSURE STATEMENT, AND NO PERSON HAS BEEN AUTHORIZED TO**

**DISTRIBUTE ANY INFORMATION OR MAKE ANY STATEMENTS CONCERNING THE**

**DEBTORS OTHER THAN THE INFORMATION CONTAINED HEREIN.**

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT

IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES AND

ASSUMPTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE

RESULTS. Except as otherwise specifically and expressly stated herein, this Disclosure Statement

does not reflect any events that may occur subsequent to the date hereof and that may have a material

impact on the information contained in this Disclosure Statement. The Debtors do not anticipate that

any amendments or supplements to this Disclosure Statement will be distributed to reflect such

occurrences. Accordingly, the delivery of this Disclosure Statement shall not under any circumstance

imply that the information herein is correct or complete as of any time *subsequent* to the date hereof.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED

BY A CERTIFIED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN

ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**B.    Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity

interests in classes of claims or equity interests that are impaired *and* that are in a class that will

receive a distribution under a proposed chapter 11 plan are entitled to vote to accept or reject a

proposed chapter 11 plan. Classes of claims in which the holders of claims are unimpaired under a

chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject

1    the plan. Classes of claims or interests that receive no distribution on account of their claims or

2    interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

3         Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be

4    "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights

5    to which such claim or interest entitled the holder thereof, or (ii) notwithstanding any legal right to an

6    accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults

7    resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or

8    interest as it existed before the default.

9         In addition, a holder of an impaired claim or interest which is entitled to receive or retain

10   property under a plan may vote to accept or to reject a plan only if the claim or interest is "allowed"

11   for purposes of voting, which means generally that no party in interest has objected to such claim or

12   interest or, if no proof of claim was filed, that such claim or interest has not been scheduled by the

13   Debtor as contingent, unliquidated or disputed.

14        Accordingly, the Holder of a Claim against a Debtor that is Impaired under the Plan is entitled

15   to vote to accept or reject the Plan if (i) the Plan provides a Distribution in respect of such Claim, (ii)

16   (a) the Claim has been scheduled by the Debtors (and such claim is not scheduled at zero or as

17   disputed, contingent or unliquidated) or (b) the Claimholder has filed a Proof of Claim on or before

18   the bar date applicable to such Holder, pursuant to Bankruptcy Code sections 502(a) and 1126(a) and

19   Bankruptcy Rules 3003 and 3018, and (iii) (a) no objection to the Claim has been timely filed or any

20   timely objection been withdrawn, dismissed or denied by Final Order, or (b) pursuant to Bankruptcy

21   Rule 3018(a), upon application of the Holder of the Claim with respect to which there has been an

22   objection, the Bankruptcy Court temporarily allows the Claim in an amount that the Bankruptcy

23   Court deems proper for the purpose of accepting or rejecting the Plan, all as further set forth in the

24   motion for a Solicitation Procedures Order.

25        Under the Plan, Classes 1, 3, 4 and 13 are Unimpaired and are conclusively presumed under

26   Bankruptcy Code section 1126(f) to have accepted the Plan, and their votes to accept or to reject the

27   Plan will not be solicited. Classes 2, 5, 6, 7, 8, 9, 10, 11, and 12 are Impaired under the Plan and are

28   entitled to vote on the Plan, subject to the limitations set forth above. Classes 14 and 15 are Impaired

1  under the Plan and will not receive or retain any Distribution or property under the Plan on account of

2  their Claims or Equity Interests and, therefore, are deemed under Bankruptcy Code section 1126(g) to

3  have rejected the Plan and are not entitled to vote to accept or reject the Plan.  Pursuant to

4  Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims are not

5  classified and are not entitled to vote on the Plan.

6  **C.    Solicitation Package**

7      Unless ordered otherwise by the Bankruptcy Court, accompanying this Disclosure Statement

8  are copies of (1) the Plan; (2) the notice of the confirmation hearing and related matters, setting forth

9  (i) the time fixed for returning Ballots to accept or reject the Plan, (ii) the time fixed for filing

10  objections to confirmation of the Plan, (iii) the date and time of the hearing on confirmation, and (iv)

11  the website address where the Plan and this Disclosure Statement (among other Plan related

12  documents) can be downloaded for free (the "Confirmation Hearing Notice"); (3) if you are the

13  Holder of Claim(s) entitled to vote on the Plan, one or more Ballots to be used by you in voting to

14  accept or reject the Plan; (4) the order approving this Disclosure Statement (the "Disclosure

15  Statement Order"); and (5) a plan support letter authored by the Plan Proponents (the "Plan Support

16  Letter").

17      The Solicitation Package contains hard copies of the Confirmation Hearing Notice, Ballot and

18  Plan Support Letter, and CD-Rom copies of the Plan, Disclosure Statement, and Disclosure

19  Statement Order.

20      The Confirmation Hearing Notice sets forth in detail, among other things, procedures

21  governing voting deadlines and objection deadlines with respect to the Plan and confirmation of the

22  Plan.  The Confirmation Hearing Notice and the instructions attached to the Ballot should be read in

23  connection with this section of the Disclosure Statement.

24  **D.    Voting Procedures, Ballots and Voting Deadline**

25      If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of

26  voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in

27  more than one Class, you will receive separate Ballots that must be used for each separate Class of

28  Claims.  After carefully reviewing the Plan, this Disclosure Statement and the detailed instructions

1   accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor

2   of or against the Plan on the enclosed Ballot.  Each Ballot has been coded to reflect the Class of

3   Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded

4   Ballot or Ballots sent to you.  You must complete and sign your original Ballot (copies will not be

5   accepted) and return it to either Grant Thornton, LLP (the "Voting Agent") or Kurtzman, Carson

6   Consultants (the "Securities Voting Agent") as instructed on your Ballot so that it is received no later

7   than by **May 19, 2010 AT 5:00 P.M. (PACIFIC TIME)** (the "Voting Deadline").

8   　　　　DO NOT RETURN ANY STOCK CERTIFICATES OR DEBT INSTRUMENTS WITH

9   YOUR BALLOT.

10   　　　　If you have any questions about (i) the procedure for voting your Claim or with respect to the

11   materials that you have received or (ii) the amount of your Claim, please contact the Voting Agent at

12   the address listed on your Ballot.

13   　　　　*Alternatively, if you wish to obtain a copy of the Plan, this Disclosure Statement or any*

14   *appendices or exhibits to such documents, please visit: http://www.kccllc.net/fleetwood to*

15   *download free copies.*

16   **E.　　Confirmation Hearing and Deadline for Objections to Confirmation**

17   　　　　Pursuant to Bankruptcy Code section 1128 and Bankruptcy Rule 3017(c), the Confirmation

18   Hearing date and the date by which objections to Confirmation must be filed are set forth in the

19   Confirmation Hearing Notice.  The Confirmation Hearing will be held before the Honorable

20   Meredith A. Jury, United States Bankruptcy Judge for the Central District of California, in the

21   Bankruptcy Court, 3420 Twelfth Street, Courtroom 301, Riverside, CA 92501-3819.  The

22   Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further

23   notice except for the announcement of the adjournment date made at the Confirmation Hearing or at

24   any subsequent adjourned Confirmation Hearing.

25   **F.　　Internet Access to Bankruptcy Court Documents**

26   　　　　Bankruptcy Court documents filed in these Chapter 11 Cases as well as the Bankruptcy

27   Court's calendar and other administrative matters may be found, downloaded and printed from the

28   Bankruptcy Court's website found at http://www.caeb.uscourts.gov through an account obtained from

Pacer Service Center by dialing 1-800-676-6856 (from the United States) or (210) 301-6440 (from outside the United States). Free copies can be found, downloaded and printed from http://www.kccllc.net/fleetwood.

## XII.
## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Plan Proponents believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Plan Proponents urge all Holders of Claims in Impaired Classes to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be RECEIVED by either the Voting Agent or Securities Voting Agent (as applicable) on or before 5:00 p.m. (Pacific Time) on May 19, 2010.

DATED: April 12, 2010                      Respectfully submitted,

**FLEETWOOD ENTERPRISES, INC. AND ITS
AFFILIATED DEBTORS AND DEBTORS IN
POSSESSION IN THE CHAPTER 11 CASES**


By:    */s/ Andrew M. Griffiths*
Name:  Andrew M. Griffiths
Title:  Senior Vice President/Chief Financial Officer

125