# APPENDIX A

Richard M Pachulski (CA Bar No. 90073)
Hamid R. Rafatjoo (CA Bar No. 181564)
PACHULSKI STANG ZIEHL &
    JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100
Telephone:    (310) 277-6910
Facsimile:    (310) 201-0760
Email: rpachulski@pszjlaw.com
        hrafatjoo@pszjlaw.com

*Counsel for Official Committee of Creditors
Holding Unsecured Claims*

Craig H. Millet (CA Bar No. 106027)
Kenneth A. Glowacki, Jr. (CA Bar No. 217762)
Solmaz Kraus (CA Bar No. 223117)
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, California  92612-4412
Telephone:    (949) 451-3800
Facsimile:    (949) 451-4220
Email:        cmillet@gibsondunn.com
              kglowacki@gibsondunn.com

*Counsel for Debtors and Debtors in
Possession*

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>FLEETWOOD ENTERPRISES, INC., et al.,<br><br>Debtors. | Case No.: 6:09-bk-14254-MJ<br><br>Chapter 11<br><br>**FIRST AMENDED JOINT PLAN OF LIQUIDATION OF FLEETWOOD ENTERPRISES, INC. AND ITS AFFILIATED DEBTORS AND THE OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS DATED APRIL 12, 2010**<br><br>Judge:  Honorable Meredith A. Jury<br><br>Hearing Date:  TBD<br>Time:          TBD<br>Courtroom:     301 3420 Twelfth St.<br>               Riverside, CA 92501<br><br>Objection Deadline:  TBD |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................... 1
II. DEFINED TERMS AND RULES OF INTERPRETATION ...................................... 2
    A.    Rules of Construction ..................................................................................... 2
    B.    Definitions...................................................................................................... 3
    C.    Rules of Interpretation ................................................................................. 23
    D.    Computation of Time ................................................................................... 24
    E.    Governing Law ............................................................................................ 24
    F.    Exhibits ....................................................................................................... 24
III. CLASSIFICATION OF CLAIMS AND INTERESTS ............................................ 24
    A.    Introduction................................................................................................. 24
IV. TREATMENT OF CLAIMS AND INTERESTS ..................................................... 28
    A.    Unclassified Claims ..................................................................................... 28
    B.    Claims ......................................................................................................... 28
V. ACCEPTANCE OR REJECTION OF THE PLAN by claim holders......................... 28
    A.    Impaired Classes of Claims Entitled to Vote................................................ 28
    B.    Acceptance by an Impaired Class ................................................................. 28
    C.    Presumed Acceptances by Unimpaired Classes ........................................... 28
    D.    Classes Deemed to Reject Plan .................................................................... 28
    E.    Summary of Classes Voting on the Plan....................................................... 28
    F.    Confirmation Pursuant to Bankruptcy Code Section 1129(b) ....................... 28
VI. MEANS FOR IMPLEMENTATION OF THE PLAN .............................................. 28
    A.    Substantive Consolidation of Debtors' Estates............................................. 28
    B.    Corporate Action.......................................................................................... 28
    C.    Sources for Plan Distribution........................................................................ 28
    D.    Payment of Claims ....................................................................................... 28
    E.    KEIP Payments ........................................................................................... 28
    F.    Liquidating Trust ......................................................................................... 28
    G.    No Revesting of Assets ................................................................................ 28
    H.    Accounts ...................................................................................................... 28
    I.    Release of Liens ........................................................................................... 28
    J.    Exemption from Certain Transfer Taxes ...................................................... 28
    K.    Preservation of Causes of Action; Settlement of Causes of Action................ 28
    L.    Effectuating Documents; Further Transactions ............................................ 28
VII. PROVISIONS GOVERNING DISTRIBUTIONS ................................................... 28
    A.    Special Provision Regarding Unimpaired Claims ......................................... 28
    B.    Allowed Claims ........................................................................................... 28
    C.    Distributions for Claims Allowed as of the Effective Date ........................... 28
    D.    Liquidating Trustee as Disbursing Agent ..................................................... 28
    E.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ..... 28
    F.    Prepayment ................................................................................................. 28
    G.    Means of Cash Payment................................................................................ 28
    H.    Interest on Claims ........................................................................................ 28
    I.    Withholding and Reporting Requirements .................................................... 28
    J.    Setoffs ......................................................................................................... 28
    K.    Procedure for Treating and Resolving Disputed, Contingent and/or
        Unliquidated Claims .................................................................................... 28
    L.    Fractional Dollars......................................................................................... 28
    M.    Allocation of Plan Distributions Between Principal and Interest .................... 28
    N.    Distribution Record Date .............................................................................. 28
VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .... 28
    A.    Rejected Contracts and Leases...................................................................... 28
    B.    Bar to Rejection Damages ............................................................................ 28

i

C.      Assumed and Assigned Contracts and Leases ................................................. 28
IX. CONFIRMATION AND CONSUMMATION OF THE PLAN........................................... 28
        A.      Conditions to Confirmation ............................................................. 28
        B.      Conditions to Effective Date ............................................................ 28
        C.      Waiver of Conditions ....................................................................... 28
        D.      Consequences of Non-Occurrence of Effective Date ........................ 28
        E.      Substantial Consummation .............................................................. 28
X. ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS............. 28
        A.      Professional Fee Claims................................................................... 28
        B.      Substantial Contribution Compensation and Expenses Bar Date ...... 28
        C.      Other Administrative Claims ............................................................ 28
XI. EFFECT OF PLAN CONFIRMATION........................................................................ 28
        A.      Binding Effect.................................................................................. 28
        B.      Discharge of the Debtors ................................................................. 28
        C.      Discharge of DB under the 14% Indenture ....................................... 28
        D.      Releases by the Debtors ................................................................... 28
        E.      Release By Holders of Claims and Equity Interests ......................... 28
        F.      Injunction ........................................................................................ 28
        G.      Term of Bankruptcy Injunction or Stays .......................................... 28
        H.      Exculpation and Limitation of Liability .......................................... 28
        I.      Indemnification Obligations ............................................................ 28
        J.      Dissolution of the Creditors' Committee .......................................... 28
        K.      Browder Objection........................................................................... 28
XII. RETENTION OF JURISDICTION .............................................................................. 28
XIII. MISCELLANEOUS PROVISIONS ............................................................................ 28
        A.      Modifications and Amendments ....................................................... 28
        B.      Severability of Plan Provisions........................................................ 28
        C.      Successors and Assigns..................................................................... 28
        D.      Payment of Statutory Fees ............................................................... 28
        E.      Revocation, Withdrawal or Non-Consummation ............................. 28
        F.      Service of Documents ...................................................................... 28
        G.      Plan Supplement(s) .......................................................................... 28
        H.      Plan Exhibits ................................................................................... 28
        I.      Tax Reporting And Compliance ....................................................... 28
        J.      Filing Of Additional Documents ...................................................... 28

EXHIBITS

| EXHIBIT A | LISTING OF SUBSIDIARY DEBTORS |
|---|---|
| EXHIBIT B | LIQUIDATING TRUST AGREEMENT |
| EXHIBIT C | NON-EXCLUSIVE LIST OF EXECUTORY CONTRACTS TO BE ASSUMED |
| EXHIBIT D | NON-EXCLUSIVE LIST OF RETAINED CAUSES OF ACTION |
| EXHIBIT E | IT AGREEMENTS |

**Note:**  To the extent that the foregoing Exhibits are not annexed to this Plan, such Exhibits will be filed with the Bankruptcy Court in Plan Supplement(s) filed on or before the date(s) set for the filing of such documents and forms of documents.

# I.

## INTRODUCTION

Fleetwood Enterprises, Inc., its affiliated debtors and debtors in possession (the "Debtors"), and the Official Committee of Unsecured Creditors Holding Unsecured Claims (the "Creditors' Committee") propose the following chapter 11 plan of liquidation. The Debtors and the Creditors' Committee are the proponents of the Plan (the "Plan Proponents") within the meaning of Bankruptcy Code section 1129. This Plan contemplates the distribution of the proceeds of the liquidation of the Debtors' Assets and the resolution of the outstanding Claims against and Equity Interests in the Debtors. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of (i) the Debtors' history, business and operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan. All Holders of Claims who are eligible to vote on the Plan are encouraged to read the Plan and the accompanying Disclosure Statement (including all exhibits thereto) in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019, the Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

The Plan is a liquidating plan. Pursuant to prior orders of the Bankruptcy Court, the Debtors have sold or will sell substantially all of their Assets. The Plan provides for the distribution of certain proceeds from such sales and the creation of a Liquidating Trust that will administer and liquidate all remaining property of the Debtors, including Causes of Action, not sold, transferred or otherwise waived or released before the Effective Date of the Plan. The Plan further provides for the substantive consolidation of all of the Debtors, the termination of all Equity Interests in the Debtors, the dissolution and wind-up of the affairs of the Debtors, and the transfer of any remaining Estate Assets to the Liquidating Trust. The Plan also provides for Distributions to certain Holders of Administrative Claims and Priority Claims and to other Claimholders and the funding of the Liquidating Trust.

The Plan embodies a settlement in principle with the majority holders of 14% Notes and 6% Notes that, in the aggregate, asserted in excess of $233 million of claims against the Debtors. In December 2008, approximately $81 million of the 5% Notes issued by FEI were exchanged for 14% notes, which were guaranteed and secured by certain assets of the Debtors.   The Debtors instituted an avoidance action against the 14% Notes. The Creditors' Committee was then given standing to pursue the avoidance action and filed an amended complaint to avoid the issuance of the 14% Notes, the security interests and guarantees granted to the holders of the 14% Notes.  As explained in more detail in the Disclosure Statement, the Plan Proponents believe that the Noteholder Settlement, which resolves the litigation against the holders of the 14% Notes (the "DB Litigation"), avoids litigation over the relative rights of the 14% Notes, is in the best interests of the Estates and will provide a far greater recovery to general unsecured creditors than awaiting the uncertain results of expensive protracted litigation against the 14% Notes.

No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith, have been approved for use in soliciting acceptances and rejections of the Plan. Nothing in the Plan should be construed as constituting a solicitation of acceptances of the Plan unless and until the Disclosure Statement has been approved and distributed to all Holders of Claims and Equity Interests to the extent required by Bankruptcy Code section 1125.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ CAREFULLY THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS THERETO) AND THE PLAN, EACH IN ITS ENTIRETY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**II.**

**DEFINED TERMS AND RULES OF INTERPRETATION**

**A.      Rules of Construction**

For purposes of this Plan, except as expressly provided herein or unless the context otherwise requires, all capitalized terms not otherwise defined, including those capitalized terms used in the preceding Introduction, shall have the meanings ascribed to them in Article II of this Plan or any Exhibit hereto. Any term used in this Plan that is not defined herein, but is defined in the

Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. To the extent that there is an inconsistency between a definition in this Plan and a definition set forth in the Bankruptcy Code, the definition set forth herein shall control. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

**B.    Definitions**

     **1.**    **5% Notes** means those remaining 5% Convertible Senior Subordinated Debentures due 2023 issued in the original aggregate principal amount of $100 million by FEI in December 2003, which were not exchanged for 14% Notes or for the stock of FEI.

     **2.**    **6% Notes** means those certain 6% Convertible Subordinated Debentures due 2028, issued in the original aggregate principal amount of $296.4 million by FEI to Debtor Fleetwood Capital Trust, Bank of New York as indenture trustee, on account of which the aggregate Allowed Claim shall be $161.173 million.

     **3.**    **14% Notes** means the 14% Senior Secured Notes due 2011, issued by FEI on December 12, 2008 in the aggregate principal amount of approximately $81.4 million in exchange for the 5% Notes, on account of which the aggregate Allowed Claim shall be Allowed on a secured basis in the amount of $84,256,664.

     **4.**    **14% Notes Certificates** means the securities and certificates of authentication issued pursuant to the 14% Indenture to evidence ownership of the 14% Notes.

     **5.**    **14% Indenture** means the Indenture dated as of December 12, 2008 among FEI as Issuer, certain subsidiaries of FEI listed therein as Guarantors, and DB as Trustee and Collateral Agent, pursuant to which FEI issued the 14% Notes.

     **6.**    **503(b)(9) Claim** means a Claim to the extent asserted against one or more of the Debtors pursuant to Bankruptcy Code section 503(b)(9).

     **7.**    **503(b)(9) Claim Bar Date** means September 9, 2009 for all Debtors.

     **8.**    **Administrative Claim** means a Claim for costs and expenses of administration of the Chapter 11 Cases under Bankruptcy Code sections 503(b), 507(b), or 1114(e)(2), and entitled to

priority under Bankruptcy Code section 507(a)(2), including: (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims related to tax years commencing after the Petition Date, but excluding Claims relating to tax periods, or portions thereof, ending on or before the Petition Date); (b) 503(b)(9) Claims, and (c) all other claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court, including Professional Fee Claims.

9.    **Administrative Claims Bar Date** means the last date by which a request for payment of an Administrative Claim that arises after the Petition Date up to and through the Effective Date, may be filed, which date is thirty (30) days after the Effective Date, <u>provided however</u>, that Professional Fee Claims may be filed up to forty-five (45) days after the Effective Date.

10.    **Administrative Claims Objection Deadline** means the last day for filing an objection to any request for the payment of an Administrative Claim, which shall be the later of (a) one hundred eighty (180) days after the Effective Date or (b) such other date specified in this Plan or ordered by the Bankruptcy Court. The filing of a motion to extend the Administrative Claims Objection Deadline shall automatically extend the Administrative Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Administrative Claims Objection Deadline is denied by the Bankruptcy Court, the Administrative Claims Objection Deadline shall be the later of the current Administrative Claims Objection Deadline (as previously extended, if applicable) or thirty (30) days after the Bankruptcy Court's entry of an order denying the motion to extend the Administrative Claims Objection Deadline.

11.    **Allowed Claim** means a Claim or any portion thereof (a) that has been allowed by a Final Order of the Bankruptcy Court (or such court as the Liquidating Trustee and the Holders of any such Claim agree may adjudicate such Claim and any objections thereto), (b) that either (x) has been Scheduled as a liquidated, non-contingent, and undisputed Claim in an amount greater than zero on the Schedules, or (y) is the subject of a timely filed Proof of Claim as to which either (i) no

objection to its allowance has been filed (either by way of objection or amendment to the Schedules) within the periods of limitation fixed by the Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled, waived through payment, or withdrawn, or has been denied by a Final Order, or (c) that is expressly allowed in a liquidated amount in the Plan or by the Liquidating Trustee in its sole and absolute discretion. For purposes of determining the status (i.e., Allowed or Disputed) of a particular Claim prior to the expiration of the period fixed for filing objections to the allowance or disallowance of Claims, any such Claim which has not been previously allowed or disallowed by a Final Order of the Bankruptcy Court or the Plan shall be deemed a Disputed Claim unless such Claim is specifically identified by the Plan Proponents and/or the Liquidating Trustee as being an Allowed Claim.

12.     **"Allowed ... Claim"** means an Allowed Claim of the particular type or Class described.

13.     **Assets** means all tangible and intangible assets of every kind and nature of the Debtors and their Estates, and all proceeds thereof, existing as of the Effective Date.

14.     **Avoidance Actions** means Causes of Action arising under Bankruptcy Code sections 510, 541, 542, 544, 545, 547 through 551 and/or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action.

15.     **Ballot** means each of the ballot forms distributed to each Holder of a Claim or Equity Interest entitled to vote to accept or reject this Plan.

16.     **Bankruptcy Code** means title 11 of the United States Code, as now in effect or hereafter amended and as applicable to the Chapter 11 Cases.

17.     **Bankruptcy Court** means the United States Bankruptcy Court for the Central District of California (Riverside Division) or any other court with jurisdiction over the Chapter 11 Cases.

18.     **Bankruptcy Rules** means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended and as applicable to the Chapter 11 Cases on proceedings therein, as the case may be, and the Local

Rules, as now in effect or hereafter amended.

19.    **BofA Cash Collateral Account** has the meaning ascribed to it in Article IV.B.2 herein.

20.    **BofA Cash Collateral Amount** has the meaning ascribed to it in Article IV.B.2 herein.

21.    **BofA Indemnification Claims** has the meaning ascribed to it in Article IV.B.2 herein.

22.    **BofA Indemnification Reserve** has the meaning ascribed to it in Article IV.B.2 herein.

23.    **Business Day** means any day, other than a Saturday, Sunday or Legal Holiday (as defined in Bankruptcy Rule 9006(a)).

24.    **Case Interest Rate** means the federal judgment rate provided in 28 U.S.C. § 1961 in effect on the Petition Date.

25.    **Cash** means legal tender of the United States of America and equivalents thereof, which may be conveyed by check or wire transfer.

26.    **Causes of Action** means any and all claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights of action, rights to legal remedies, rights to equitable remedies, rights to payment and Claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, that any Debtor and/or Estate may hold against any Person but excluding those released, exculpated or waived pursuant to this Plan.

27.    **Chapter 11 Case(s)** means, (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

28.    **Charging Lien** means the lien that DB is entitled to exercise under the terms of the 14% Indenture against, or any other priority in payment to which DB is entitled under the terms of

the 14% Indenture with respect to, any distribution to be made under the 14% Indenture or on account of the 14% Notes Claims.

29.     **Claim** has the meaning set forth in Bankruptcy Code section 101(5).

30.     **Claimholder** means the Holder of a Claim.

31.     **Claims Agent** means Kurtzman Carson Consultants, LLC.

32.     **Claims Objection Deadline** means the last day for filing objections to Claims, including but not limited to 503(b)(9) Claims and Reclamation Claims, but excluding all other Administrative Claims and Professional Fee Claims, which day shall be the later of (a) one year after the Effective Date or (b) such other date as the Bankruptcy Court may order.  The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion.  In the event that such motion to extend the Claims Objection Deadline is denied, the Claims Objection Deadline shall be the later of the current Claims Objection Deadline (as previously extended, if applicable) or thirty (30) days after the Bankruptcy Court's entry of an order denying the motion to extend the Claims Objection Deadline.

33.     **Class** means a category of Holders of Claims or Equity Interests.

34.     **Class 1** consists of Non-Tax Priority Claims.

35.     **Class 2** consists of the Secured Credit Facility Claims.

36.     **Class 3** consists of the ISIS Claim.

37.     **Class 4** consists of the Miscellaneous Secured Claims.

38.     **Class 5** consists of the 14% Notes Claims.

39.     **Class 6** consists of the General Unsecured Claims against the Debtors that are not otherwise classified herein.

40.     **Class 7** consists of the 6% Notes Claims.

41.     **Class 8** consists of the 5% Notes Claims.

42.     **Class 9** consists of the Convenience Claims.

43.     **Class 10** consists of the Product Liability PI Claims.

44.     **Class 11** consists of the WARN Class Claims and Severance Class Claims.

45.     **Class 12A** consists of the Claim of Lumbermen's Underwriting Alliance.

**46.**    **Class 12B** consists of the Claim of Georgia Self Insurance Guaranty Trust Fund.

**47.**    **Class 13A** consists of the Claim of Westchester Fire Insurance Company and ACE INA Insurance.

**48.**    **Class 13B** consists of the Claim of Old Republic Insurance Co.

**49.**    **Class 13C** consists of the Claim of National Union Fire Insurance Company of Pittsburgh, PA, American Home Assurance Company, American International Specialty Lines Insurance Company of the State of Pennsylvania, Commerce and Industry Insurance Company, AIU Insurance Company, Birmingham Fire Insurance Company of the State of Pennsylvania, Illinois National Insurance Company, American International South Insurance Company, National Union Fire Insurance Company of Louisiana, American International Pacific Insurance Company, Granit State Insurance Company, New Hampshire Insurance Company, Lexington Insurance Company, Landmark Insurance Company, Starr Excess Liability Insurance Company Ltd.

**50.**    **Class 13D** consists of the Claim of Fidelity and Deposit Company of Maryland.

**51.**    **Class 13E** consists of the Claim of Lumbermen's Mutual Casualty Company, American Motorists Insurance Company, American Manufacturers Mutual Insurance Company American Protection Insurance Company and Kemper Insurance Co.

**52.**    **Class 14** consists of Intercompany Claims by and between the Debtors.

**53.**    **Class 15** consists of the Equity Interests.

**54.**    **Collateral** means any property or interest in property of a Debtor's Estate subject to a Lien to secure the payment or performance of a Claim.

**55.**    **Confirmation** means entry by the Bankruptcy Court of the Confirmation Order.

**56.**    **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court docket in the jointly administered Chapter 11 Cases.

**57.**    **Confirmation Hearing** means the hearing held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**58.**    **Confirmation Order** means the order entered by the Bankruptcy Court confirming the Plan under Bankruptcy Code section 1129.

**59.** **Consummation or Consummate** means the occurrence of or to achieve the Effective Date.

**60.** **Contingent** means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

**61.** **Convenience Claim** means a Class 6 General Unsecured Claim Allowed in an amount of $10,000 or less or as to which a Holder of an Allowed Claim in excess of $10,000 elects to reduce its Allowed Claim to $10,000.

**62.** **Creditor** means any Person who holds a Claim against one or more of the Debtors.

**63.** **Creditors' Committee** means the Official Committee of Creditors Holding Unsecured Claims of Fleetwood Enterprises, Inc., et al., appointed by the United States Trustee in the Chapter 11 Cases pursuant to Bankruptcy Code section 1102.

**64.** **DB** means Deutsche Bank Trust Company Americas, a New York Banking corporation, as Trustee and as Collateral Agent for the 14% Notes under the terms of the 14% Indenture.

**65.** **DB Fees** has the meaning ascribed to such term as set forth in Article IV.B.5.

**66.** **DB Litigation** means that action entitled *Fleetwood Homes of Washington, Inc., et al. v. Deutsche Bank Trust Company Americas, a New York Banking corporation, as Trustee and as Collateral Agent of the Fleetwood Enterprises, Inc. Indenture*, dated as of December 12, 2008, et al., as amended, currently pending before the Bankruptcy Court as adversary case number 09-01258-MJ.

**67.** **Debtor** means any of Fleetwood Enterprises, Inc. or the Subsidiary Debtors in their individual capacity.

**68.** **Debtors** means, collectively, Fleetwood Enterprises, Inc. and all of the Subsidiary Debtors.

**69.** **Disallowed** means, with respect to a Claim, or any portion thereof, that such Claim (a) has been disallowed by a Final Order, (b) is Scheduled at zero or as contingent, disputed or unliquidated and as to which no Proof of Claim has been filed by the applicable Bar Date or deemed timely filed pursuant to either the Bankruptcy Code or any Final Order or under applicable law, or

(c) is not Scheduled, and as to which (i) no Proof of Claim has been filed by the applicable Bar Date or deemed timely filed pursuant to either the Bankruptcy Code or any Final Order or under applicable law, or (ii) no request for payment of an Administrative Claim has been filed by the Administrative Claims Bar Date, as appropriate, or deemed timely filed pursuant to either the Bankruptcy Code or any Final Order or under applicable law.

70.    **Disclosure Statement** means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, distributed contemporaneously herewith in accordance with Bankruptcy Code sections 1125 and 1126(b) and Bankruptcy Rule 3018.

72.    **Disputed Claim** means a Claim, or any portion thereof, that has not been Allowed and:

(a)    if no Claim has been filed, or deemed to have been filed, by the applicable Bar Date, which has been or hereafter is listed on the Schedules as unliquidated, contingent or disputed, and which has not been resolved by written agreement of the parties or an order of the Bankruptcy Court;

(b)    if a Claim has been filed, or deemed to have been filed, by the applicable Bar Date (i) a Claim for which a corresponding Claim has been listed on the Schedules as unliquidated, contingent or disputed; (ii) a Claim for which a corresponding Claim has been listed on the Schedules as other than unliquidated, contingent or disputed, but the amount or priority such Claim as asserted in the Claim varies from the amount or priority of such Claim as listed in the Schedules; or (iii) a Claim as to which any party in interest has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules and any orders of the Bankruptcy Court, or which is otherwise disputed by a Debtor and/or the Liquidating Trustee in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn, or determined by a Final Order;

(c)    if a request for payment of an Administrative Claim has been filed or deemed to have been filed by the Administrative Claims Bar Date, as appropriate, an Administrative Claim as to which any party in interest has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court,

or which is otherwise disputed by a Debtor or the Liquidating Trustee in accordance with applicable

law, which objection, request for estimation or dispute has not been withdrawn or determined by a

Final Order;

        (d)     for which a Claim was required to be filed by order of the Bankruptcy Court,

but as to which a Claim was not timely or properly filed; or

        (e)     that is disputed in accordance with the provisions of this Plan.

      **73.**     **Disputed ... Claim** means a Disputed Claim of the type described.

      **74.**     **Disputed Claim Amount** means (a) if a liquidated amount is set forth in the Proof of

Claim relating to a Disputed Claim, (i) the liquidated amount set forth in the Proof of Claim relating

to the Disputed Claim; (ii) an amount agreed to by a Debtor or the Liquidating Trustee and the

Holder of such Disputed Claim; or (iii) if a request for estimation is filed by any party, the amount at

which such Claim is estimated by the Bankruptcy Court; (b) if no liquidated amount is set forth in

the Proof of Claim relating to a Disputed Claim, (i) an amount agreed to by a Debtor or the

Liquidating Trustee and the Holder of such Disputed Claim or (ii) the amount estimated by the

Bankruptcy Court with respect to such Disputed Claim; or (c) if the Claim was listed on the

Schedules as unliquidated, contingent or disputed and no Proof of Claim was filed, or deemed to

have been filed, by the applicable Bar Date and the Claim has not been resolved by written

agreement of the parties or an order of the Bankruptcy Court, zero.

      **75.**     **Disputed Costs** has the meaning ascribed to it in Article IV.B.2 herein.

      **76.**     **Distribution** means any distribution pursuant to the Plan to the Holders of Allowed

Claims.

      **77.**     **Distribution Date** means either the Initial Distribution Date or a Periodic

Distribution Date.

      **78.**     **Distribution Record Date** means the record date for purposes of making

Distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation

Date or such other date designated in the Confirmation Order.

      **79.**     **DTC** means the Depository Trust Company.

      **80.**     **Effective Date** means the Business Day this Plan becomes effective as provided in

Article IX hereof.

81.    **Equity Interests** means the legal, equitable, contractual, and other rights of any Person with respect to any capital stock or other ownership interest in any Debtor, whether or not transferable, and all options, warrants, call rights, puts, awards, or rights or agreements to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor, including the Old Common Stock Interests and the Subsidiary Interests.  For the avoidance of doubt, Equity Interests does not include any interest that a Debtor may own in a non-Debtor affiliate, which interest is an Asset of the Debtors and is being transferred to the Liquidating Trust pursuant to the terms of this Plan.

82.    **Estate(s)** means, individually, the estate of Fleetwood Enterprises, Inc. or any of the Subsidiary Debtors and, collectively, the estates of all of the Debtors created under Bankruptcy Code section 541.

83.    **Estate Claim** has the meaning ascribed to such term in Article VII.J hereof.

84.    **Exhibit** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

85.    **Exhibit Filing Date** means the date on which Exhibits to the Plan or the Disclosure Statements shall be filed with the Bankruptcy Court, which date shall be at least five (5) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice to parties in interest.

86.    **Extension Order** means that Order entered by the Bankruptcy Court on February 10, 2010 at [Docket No. 1808] entitled "Order Extending the Debtors' Authorization to Use Cash Collateral to Earlier of April 30, 2010 and the Effective Date of a Plan of Liquidation."

87.    **Face Amount** means (a) when used in reference to a Disputed Claim, the Disputed Claim Amount and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

88.    **FEI** means Fleetwood Enterprises, Inc.

89.    **Final Cash Collateral Order** means the Final Order Extending the Debtors' Authorization to Use Cash Collateral to Earlier of January 31, 2010 and the Effective Date of a Plan

of Liquidation entered by the Bankruptcy Court on September 10, 2009 (Docket No. 1255), as

extended from time to time by further Orders of the Bankruptcy Court, including the Extension

Order.

90.    **Final Decree** means the decree contemplated under Bankruptcy Rule 3022.

91.    **Final Fee Applications** means the final requests for payment of Professional Fee

Claims.

92.    **Final Order** means an order or judgment of the Bankruptcy Court, or other court of

competent jurisdiction, as entered on the docket in any Chapter 11 Case, the operation or effect of

which has not been stayed, reversed, or amended and as to which order or judgment (or any revision,

modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and

as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

93.    **Final Trust Distribution Date** means the date of the last Distribution from the

Liquidating Trust under the Plan for and on account of an Allowed Claim.

94.    **First American Trust Adversary Action** has the meaning ascribed to it in Article

X.B.

95.    **Future Costs** has the meaning ascribed to it in Article IV.B.2 herein.

96.    **General Bar Date** means the bar date for filing Proofs of Claims for Claims arising

prior to the Petition Date against any and/or all of the Debtors in the Chapter 11 Cases, other than

those Claims expressly excluded from the General Bar Date pursuant to a Final Order of the

Bankruptcy Court, or (i) August 28, 2009 for the Primary Filers or (ii) January 4, 2010 for the

Secondary and Tertiary Filers.

97.    **General Unsecured Claim** means a Claim that is not otherwise separately classified

under the Plan.  For the avoidance of doubt, a General Unsecured Claim excludes Administrative

Claims, Priority Claims, Miscellaneous Secured Claims, Secured Credit Facility Claims, ISIS Claim,

14% Notes Claims, 5% Notes Claims, 6% Notes Claims, Convenience Claims, Intercompany

Claims, and Equity Interests.  A General Unsecured Claim does not include a Product Liability PI

Claim, except to the extent of any deficiency of such claim as set forth in more detail in Article

IV.B.10 herein or to the extent that a Non-Tax Priority Claim exceeds the amount of the statutory

cap under section 507 of the Bankruptcy Code as set forth in more detail in Article IV.B.1 herein.

**98.    Gibraltar** means Gibraltar Insurance Co. Ltd. a wholly owned subsidiary of FEI organized under the laws of Bermuda that issued policies of insurance covering product liability asserted against the Debtors and certain of the Debtors' workers' compensation liability.

**99.    Governmental Bar Date** means the bar date for Governmental Units to file Proofs of Claim for Claims arising prior to the Petition Date against any and/or all of the Debtors, which date was September 8, 2009 for the Primary Filers, January 25, 2010 for the Secondary, and February 8, 2010 for the Tertiary Filers.

**100.    Governmental Unit** has the meaning set forth in Bankruptcy Code section 101(27).

**101.    Holdback Amount** means the amount equal to twenty percent (20%) of fees billed to the Debtors for a given month that were retained by the Debtors as a holdback on payment of Professional Fee Claims.

**102.    Holder** means an entity holding a Claim or Interest.

**103.    Impaired** means, when used in reference to a Claim, Interest or Class, a Claim, Interest or Class that is impaired within the meaning of Bankruptcy Code section 1124.

**104.    Indemnification Obligation** means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution to any present or former officer, director, or employee, or any present or former Professionals, advisors, or representatives of the Debtors, pursuant to by-laws, articles of incorporation, contract, or otherwise as may be in existence immediately prior to the Petition Date.

**105.    Initial Distribution Date** means a Business Day, as determined by the Liquidating Trustee, as soon as practicable after the Effective Date, that is at least thirty (30) Business Days after the funding of the Liquidating Trust or as soon thereafter as practicable.

**106.    Initial Net Distributable Proceeds** means the amount of Net Distributable Proceeds available for distribution to the Holders of Allowed General Unsecured Claims and the 14% Notes as of the Effective Date, if any.

**107.    Intercompany Claim** means any Claim held by a Debtor against another Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Debtor with

respect to another Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor.

**108.**   **Interim DIP Order** means the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (2) Authorizing the Use of Cash Collateral, (3) Granting Liens and Superpriority Claims, (4) Modifying the Automatic Stay, and (5) Setting Final Hearing* entered by the Bankruptcy Court on April 1, 2009 (Docket No. 183).

**109.**   **IRS** means the Internal Revenue Service.

**110.**   **ISIS Claim** means the Claim asserted by ISIS Lending, LLC for amounts owing to it under the prepetition ISIS Promissory Note.

**111.**   **ISIS Promissory Note** means the Promissory Note Secured By Deed of Trust, dated as of August 22, 2008, which evidences the loan made by ISIS to Fleetwood Motor Homes of California and Fleetwood Homes of California, Inc. in the principal amount of $27,250,000.

**112.**   **KEIP Employees** mean Andrew Griffiths, Leonard J. McGill, James Smith, and Michael Shearin.

**113.**   **KEIP Participants** means those individuals who are eligible to receive retention and/or incentive payments pursuant to the Fleetwood Enterprises, Inc. Key Employee Incentive and Retention Programs approved by the Bankruptcy Court on July 17, 2009 (Docket No. 956) or the Amended and Restated Key Employee Retention and Incentive Plan approved by the Bankruptcy Court on February 11, 2010 (Docket No. 1846).

**114.**   **KEIP Payment** means the discretionary incentive payment that is payable to the KEIP Employees pursuant to the *Order Approving the Debtors' Payment of Incentive Bonuses and Severance Payments to Key Employees* entered on July 17, 2009 (Docket No. 956) and the Modified and Amended KEIP Plan Order.

**115.**   **Lien** means any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage, or hypothecation to secure payment of a debt or performance of an obligation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

**116.    Liquidating Trust** means the trust established under this Plan with the power and authority set forth in this Plan and the Liquidating Trust Agreement.

**118.    Liquidating Trust Agreement** means the agreement to be executed as of the Effective Date establishing the Liquidating Trust pursuant to the Plan in substantially the form attached as Exhibit B hereto.

**119.    Liquidating Trust Assets** means all of the Debtors' Assets, property treated by the Plan, any minutes, and general corporate records of Debtors, and any books and records relating to the foregoing not otherwise treated by the Plan, which shall automatically vest in the Liquidating Trust on the Effective Date pursuant to the terms of this Plan.

**121.    Liquidating Trust Oversight Committee** means the committee comprised of the following three entities:  two members nominated by the Creditors' Committee and one by Whippoorwill.

**122.    Liquidating Trust Professionals** means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals of the Liquidation Trustee (in their capacities as such).

**123.    Liquidating Trustee** means SltnTrst LLC or such designee of which Peter Kravitz is the principal, or any successor in interest.

**124.    Local Rules** means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Central District of California.

**125.    Miscellaneous Secured Claim** means a Claim that is (a) secured by a valid and perfected Lien on property in which a Debtor's Estate has an interest or (b) subject to setoff under Bankruptcy Code section 553 and such right of setoff has been asserted by the holder of such right as required by Article VII.J hereof, to the extent of the value of the Claimholder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or, in the case of setoff, pursuant to Bankruptcy Code section 553.

**126.    Modified and Amended KEIP Plan Order** means the Order Approving Amended and Restated Key Employee Incentive Program entered by the Bankruptcy Court on February 12,

2010 [Docket No. 1846].

127.    **Net Distributable Proceeds** means the Net Proceeds derived from the liquidation or monetization of any and all of the Assets of the Debtors to be vested in the Liquidating Trust (including all Cash of the Debtors wherever located, including, but not limited to, Cash presently held in any segregated accounts for the benefit of the 14% Notes Claims but excluding the BofA Cash Collateral Amount), after payment of, or adequately reserving for payment of, all Allowed Administrative Claims, all Allowed Priority Claims, all Allowed Secured Credit Facility Claims, all Allowed Miscellaneous Secured Claims, Professional Fee Claims of the Debtors and Creditors' Committee, and all Liquidating Trust expenses.

128.    **Net Proceeds** means such amounts collected from the sale or liquidation of Assets after payment of all costs and expenses of such sale or liquidation, including, without limitation, attorney fees.

129.    **Non-Tax Priority Claim** means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to Bankruptcy Code section 507(a) and not otherwise separately classified herein.

130.    **Noteholder Settlement** means the settlement embodied in this Plan between the Creditors' Committee and the holders of a majority of the 14% Notes in principle.

131.    **Old Common Stock Interests** means, the shares of common stock of the Debtors issued and outstanding as of the Petition Date or otherwise held as of the applicable Distribution Record Date, including common stock acquired by holders of stock options and other rights to acquire stock who exercise their rights by the applicable Distribution Record Date.

132.    **Periodic Distribution Date** means a Distribution Date after the Initial Distribution Date which shall occur (i) after the first Business Day occurring ninety (90) days after the immediately preceding Distribution Date or (ii) on such other Business Day selected by the Liquidating Trustee, in its sole and absolute discretion.

133.    **Periodic Net Distributable Proceeds** means, with respect to each Periodic Distribution Date, the amount of Net Distributable Proceeds available to be distributed from the Liquidating Trust to the Holders of Allowed Claims pursuant to the terms hereunder.

**134.**    **Person** has the meaning set forth in Bankruptcy Code section 101(41).

**135.**    **Petition Date** means the date of filing of the applicable voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code, or March 19, 2009 for the Primary Filers, July 29, 2009 for the Secondary Filer, or August 11, 2009 for the Tertiary Filers.

**136.**    **Plan** means this chapter 11 plan, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, or modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**137.**    **Plan Document** means the Plan, together with any contract, instrument, release, or other agreement or document entered in connection with Plan.

**138.**    **Plan Proponents** means the Debtors and the Creditors' Committee.

**139.**    **Plan Supplement** means the compilation(s) of documents and forms of documents, specified in the Plan, that the Debtors will file with the Bankruptcy Court on or before the date that is (a) ten (10) days prior to the Voting Deadline or (b) set by the Bankruptcy Court for the filing of such documents and forms of documents.

**140.**    **Plant 47** means that certain real property against which ISIS asserts a first priority lien as evidenced by the Deed of Trust, assignment of Rents, Security Agreement and Fixture Filing recorded on August 25, 2008 as Instrument No. 2008-04678624 (Plant 47), but excluding that certain personal property (including inventory) located at Plant 47 against which ISIS asserted a second priority lien that was sold in connection with the RV Assets Sale Order.

**141.**    **Pre-Petition Secured Credit Facility** means the credit facility governed by that certain Third Amended Credit Agreement (as subsequently amended), dated as of January 5, 2007 among FEI, FHI and certain of FEI's and FHI's subsidiaries, as Borrowers, the Lenders referred to therein, and Bank of America, N.A., as Agent for the Lenders, and any of the documents and instruments relating thereto, as amended, supplemented or modified as of the date hereof.

**143.**    **Primary Filers** means all of the Debtors except the Secondary Filer and the Tertiary Filers.

**144.**    **Priority Claims** means, collectively, all Priority Tax Claims and Non-Tax Priority Claims.

**145.    Priority Tax Claim** means a Claim of a Governmental Unit of the kind specified in Bankruptcy Code sections 502(i) or 507(a)(8).

**146.    Product Liability PI Claims** means any Claim asserted for personal injury based on allegations of product liability against the Debtors that are covered by product liability insurance policies issued by Gibraltar.

**147.    Professional** means (a) any professional employed in these Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, or 1103 or otherwise, and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code section 503(b)(4).

**148.    Professional Fee Claim** means a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and prior to and including the Effective Date.

**149.    Proof of Claim** means a proof of claim filed on or before the General Bar Date or the Governmental Bar Date, as applicable, or such other date as ordered by the Bankruptcy Court.

**150.    Pro Rata** means, at any time, the proportion that the Face Amount of an Allowed Claim in a particular Class bears to the aggregate Face Amount of all Allowed Claims in such Class, unless the Plan provides otherwise.

**151.    Reclamation Claim** means each Claim to the extent asserted against one or more of the Debtors pursuant to Bankruptcy Code section 546(c).

**152.    Released Claims** means the claims or causes of actions described in Article XI hereof.

**153.    Released Parties** means (i) any Professional, (ii) the Creditors' Committee, (iii) any member of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee and not in any other capacity, (iv) Law Debenture Trust Company of New York, as indenture trustee of the 5% Notes indenture, and (v) any of the representatives, agents, officers, directors, employees, professionals, financial advisors, consultants, or attorneys of the foregoing.

**154.    RV Assets Sale Order** means the *Amended Order (I) Authorizing and Approving the Sale of RV Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing*

*and Approving Assumption and Assignment of Contracts and Leases; and (III) Granting Related Relief* entered on August 6, 2009 (Docket No. 1056).

155.    **Scheduled** means, with respect to any Claim, the status, priority and amount, if any, of such Claim as set forth in the Schedules.

156.    **Schedules** means the schedules of assets and liabilities, the list of Holders of Interests, and the statements of financial affairs filed by the Debtors pursuant to Bankruptcy Code section 521 and the Bankruptcy Rules, as such schedules have been or may be further modified, amended or supplemented in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

157.    **Secured Claims** means either the Miscellaneous Secured Claims or the Secured Credit Facility Claims.

158.    **Secured Credit Facility** means the credit facility governed by the "Fourth Amended and Restated Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement dated as of March [26], 2009 among the Financial Institutions Named Herein, as the Lenders; Bank of America, N.A., as the Agent; Fleetwood Enterprises, Inc., as a Guarantor; and Fleetwood Holdings Inc., and certain of its Subsidiaries, as the Borrowers," the Interim DIP Order, and any of the documents and instruments relating thereto, as amended, supplemented or modified as of the date hereof.

159.    **Secured Credit Facility Claims** means the Claims of the Secured Parties arising under or from the Secured Credit Facility (including, without limitation, the Claims under the Pre-Petition Credit Facility (which were rolled up into the Secured Credit Facility)), the Interim DIP Order and/or the Final Cash Collateral Order, including without limitation the Postpetition Obligations (as defined in the Interim DIP Order).

160.    **Secured Parties** means the Prepetition Agent, the Prepetition Credit Facility Lenders, the Postpetition Agent and the DIP Lenders, as such terms are defined in the Interim DIP Order.

161.    **Secured Parties Releasees** has the meaning ascribed to it in Article XI.C.1. herein.

162.    **Securities Act** means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended.

163.    **Security** shall have the meaning ascribed to it in Bankruptcy Code section 101(49).

164.    **Secondary Filer** means Fleetwood Retail Corp. of Arizona.

165.    **Severance Action** means that adversary action entitled *Curtis Jay Howe v. Fleetwood Enterprises, Inc.*, Adversary No. 09-01421-MJ, alleging claims for breach of contract and violation of the Employee Retirement Income Security Act on the grounds that FEI had an obligation to pay severance to terminated employees, but failed to do so.

166.    **Severance Class** means all persons who were employed by one of the Debtors, were eligible to receive severance under the Debtors' severance policy and were terminated on or after March 6, 2009, without receiving severance, with the exception of the KEIP Participants.

167.    **Severance Class Claim** means any and all demands, claims, damages, and causes of action, present and future, which were asserted or could have been asserted in the Severance Action, including, but not limited to, any other claims against the Debtors for severance pay or benefits based on or arising out of any federal, state or local statute, ordinance or regulation.

168.    **Severance Class Members** means all individuals within the definition of the Severance Class.

169.    **Solicitation** means the solicitation by the Plan Proponents of acceptances of the Plan.

170.    **Solicitation Procedures Order** means the order entered by the Bankruptcy Court establishing procedures for Solicitation of votes for or against the Plan under Bankruptcy Code sections 105, 1125, 1126 and 1128 and Bankruptcy Rules 2002, 3017, 2018 and 3020.

171.    **Subsidiary Debtor(s)** means, individually or collectively, the debtors and debtors in possession identified on Exhibit A annexed hereto.

172.    **Substantial Contribution Claim** means a Claim under Bankruptcy Code subsections 503(b)(3), (b)(4), or (b)(5) for compensation or reimbursement of expenses incurred in making a substantial contribution in the Chapter 11 Cases.

173.    **Tax Claim** means all or that portion of a Claim held by a Governmental Unit for a tax assessed or assessable against the Debtors, including income and employment taxes and any related penalties or interest.

174.    **Tax Items** has the meaning ascribed to such term in Article VI.F.6 hereof.

175.    **Taxes** means any and all taxes, levies, imposts, assessments, or other charges of

whatever nature imposed at any time by a Governmental Unit or by any political subdivision or taxing authority thereof or therein and all interest, penalties, or similar liabilities with respect thereto.

176.  **Tertiary Filers** means Fleetwood Retail Corp. of Arkansas, Fleetwood Retail Corp. of Florida, Fleetwood Retail Corp. of Georgia, and Fleetwood Retail Corp. of South Carolina.

177.  **Turnover Motion** has the meaning ascribed to it in Article IV.B.2 herein.

178.  **Unclassified Claims** means Administrative Claims and Priority Tax Claims.

179.  **Unimpaired** means, when used in reference to a Claim, Equity Interest or Class, a Claim, Equity Interest or Class that is not impaired within the meaning of Bankruptcy Code section 1124.

180.  **U.S. Trustee** means the Office of the United States Trustee for the Central District of California.

181.  **Voting Deadline** means the date and time, as fixed by an order of the Bankruptcy Court by which all Ballots to accept or reject the Plan must be received in order to be counted.

182.  **WARN Action** means the Consolidated Complaint for Damages and Other Relief filed on September 22, 2009 by Sandra Justice, Alicia Rice, Ronald Doud, Jeremiah Hastings, Brian Tucker, and Robert Myers, purportedly acting on behalf of a putative class, alleging that Fleetwood Enterprises, Inc., Fleetwood Travel Trailers of Ohio, Inc., Fleetwood Motor Homes of California, Inc. and Fleetwood Travel Trailers of Oregon, Inc. violated the WARN Act and California WARN Act.

183.  **WARN and Severance Class Settlement Agreement** means the Compromise and Settlement Agreement entered into by and between the Debtors and the Creditors' Committee on the one hand, and Plaintiffs Sandra Justice, Alicia Rice, Ronald Doud, Jeremiah Hastings, Brian Tucker, Robert Myers and Curtis Jay Howe, on behalf of themselves and on behalf of each person who is a member of the WARN Class or the Severance Class and thus eligible to participate in the settlement on the other hand.

184.  **WARN Class** means all persons who were employed by one of the Debtors in a facility with greater than 50 employees and were terminated on or after March 9, 2009, without receiving a full 60 days' notice in advance of their termination by a Debtor who either (a) conducted

a mass layoff of more than 50 employees on or after March 9, 2009, or within 30 days thereafter, or (b) conducted a plant closing on or after March 9, 2009, with the exception of the KEIP Participants.

**185.    WARN Class Claim** means any and all demands, claims, damages, and causes of action, present and future, which (a) were asserted or could have been asserted in the WARN Action, including, but not limited to, any claims against the Debtors for back pay or benefits based on or arising out of any federal, state or local statute, ordinance or regulation.

**186.    WARN Class Member** means all individuals included within the definition of the WARN Class.

**187.    Whippoorwill** means Whippoorwill Associates Inc., as agent for its discretionary accounts, and Brigade Capital Management, LLC, on behalf of the accounts it represents, as the beneficial owners of approximately 55.4% of the entire issuance of the 14% Notes.

**188.    Whippoorwill Fees** has the meaning ascribed to such term as set forth in Article IV.B.5.

**C.    Rules of Interpretation**

For purposes of the Plan (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented, (c) unless otherwise specified, all references in the Plan to sections, articles, Schedules and Exhibits are references to sections, articles, Schedules and Exhibits of or to the Plan, (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) to the extent not modified herein, the rules of construction set forth in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply.

**D.     Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**E.     Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) and except as otherwise provided herein or therein, the laws of (i) the State of California shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (ii) the laws of the state of incorporation of each Debtor shall govern corporate governance matters with respect to such Debtor, in either case without giving effect to the principles of conflicts of law thereof.

**F.     Exhibits**

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date. After the Exhibit Filing Date, copies of Exhibits can be obtained upon written request to the Claims Agent to the Debtors, at Fleetwood Claims Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, or by downloading such Exhibits from the Bankruptcy Court's website at http://www.caeb.uscourts.gov (registration required) or the Claims Agent's website at www.kccllc.net/fleetwood. To the extent any Exhibit is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-Exhibit portion of the Plan shall control.

**III.**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

**A.     Introduction**

All Claims and Equity Interests, except Administrative Claims and Priority Tax Claims are placed in the Classes set forth below. In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to

the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Plan provides for substantive consolidation of the Debtors' assets and liabilities for voting and distribution purposes, as described in Article VI.A of this Plan. However, the Plan Proponents specifically reserve the right to seek confirmation of the Plan with respect to each Debtor separately. The Debtors have set forth the Classes below, which is a summary of the Claims treatment. Readers should refer to Article IV for the complete discussion of Claims treatment.

**CLAIMS TREATMENT**

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| N/A | Administrative Claims | $3.1 million | Full payment – one hundred cents on the dollar (100/100) upon the earlier of the Distribution Date immediately following the date the Claim becomes an Allowed Claim or the date that is ninety (90) days after the date on which such Claim becomes an Allowed Claim. |
| N/A | Priority Tax Claims | $1.0 million | Full payment – one hundred cents on the dollar (100/100) consistent with Bankruptcy Code section 1129(a)(9)(C). |
| 1 | Non-Tax Priority Claims | $7.2 million | Full payment – one hundred cents on the dollar (100/100). Cash equal to the unpaid portion of the Allowed Non-Priority Claim or such other treatment as agreed upon between the Claim holder and the Liquidating Trustee upon the earlier of the Distribution Date immediately following the date that the Claim becomes an Allowed Claim or 90 days after the date when such claim becomes an Allowed Claim.<br><br>Estimated Projected Payment: 100%<br>**Unimpaired; Deemed to Accept** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 2 | Secured Credit Facility Claim | $1.7 million | Cash equal to 105% of the face amount as of the Effective Date of Outstanding Letters of Credit (as defined in the Interim DIP Order) issued on behalf of any or all of the Debtors by Bank of America, which shall be placed in a segregated account, plus the other treatment as more fully set forth in Article IV.B.2 herein.<br><br>Estimated Projected Payment:  100%<br>**Impaired; Entitled to Vote** |
| 3 | ISIS Claim | $17.8 million | On or as soon as reasonably practicable after the Effective Date, the Allowed ISIS Claim shall be cured and reinstated within the meaning of section 1124 of the Bankruptcy Code.<br><br>Estimated Projected Payment: 100%<br>**Unimpaired; Not Entitled to Vote** |
| 4 | Miscellaneous Secured Claims | Unknown | At the election of the Liquidating Trustee, (i) Cash equal to the lesser of the unpaid portion of such Allowed Claim and the value of the Holder's Collateral securing the Miscellaneous Secured Claim as required pursuant to section 506(b) of the Bankruptcy Code; (ii) a return of the Holder's Collateral; or (iii) such other treatment as agreed to in writing upon the earlier of (a) the Distribution Date immediately following the date the Claim becomes an Allowed Claim or (b) the date that is ninety (90) days after the date on which such Claim becomes an Allowed Claim.<br><br>Estimated Projected Payment: 100%<br>**Unimpaired; Deemed to Accept** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 5 | 14% Notes Claims | $84.3 million | On the Effective Date, the Liens of the 14% Notes shall remain as valid Liens for Plan purposes only and the 14% Notes Claims shall be Allowed as a Secured Claim in the amount of $84,256,664. In full and final satisfaction of their Secured Allowed Claim, the 14% Notes Claims shall receive their Pro Rata share of 43.5% of the Net Distributable Proceeds, net of the fees and expenses payable to DB and Whippoorwill and the distribution to Class 8, the Initial Net Distributable Proceeds of which shall be payable on the Effective Date, and the balance of which shall be distributable on each subsequent Distribution Date, as reasonably practicable after the Liquidating Trust acquires such Net Distributable Proceeds. *See* Article IV.B.5 below for further treatment.<br><br>Estimated Projected Payment: 21%<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 6 | General Unsecured Claims | $115 million to $195 million | Provided that all Allowed Administrative Claims, Priority Claims and Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Secured Claims have been placed in a segregated reserve, as set forth in the Plan and in the Liquidating Trust Agreement, and subject to the occurrence of the Effective Date, on, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date that is ninety (90) days after the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed General Unsecured Claim, Pro Rata with the Holders of Allowed Class 6 and Class 10 Claims, its share of the Initial Net Distributable Proceeds and, on each Periodic Distribution Date, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Periodic Net Distributable Proceeds. In the aggregate, including any distributions herein to Classes 7, 10 (to the extent of any deficiency), 11 (to the extent of any deficiency), Allowed General Unsecured Claims shall receive 56.5% of the Net Distributable Proceeds available for distribution.<br><br>Estimated Projected Payment: 10.3% to 17.4%<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 7 | 6% Notes Claims | $161.173 million | Provided that all Allowed Administrative Claims, Priority Claims and Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Secured Claims have been placed in a segregated reserve, as set forth in the Plan and in the Liquidating Trust Agreement, and subject to the occurrence of the Effective Date, and subject to acceptance of the Plan by Class 7, Holders of 6% Notes Claims shall receive $2 million from the 56.5% Net Distributable Proceeds allocable to the General Unsecured Claims, which amount shall be paid at the time Distributions are made to General Unsecured Creditors pursuant to the Plan or as the Liquidating Trustee shall determine in its sole and absolute discretion.  Concurrently with the final payment of Professional Fee Claims for the Debtors and the Creditors' Committee after the Effective Date and provided that Class 7 has voted to accept the Plan, the professional fees and expenses of the indenture trustee of the 6% Notes and the trustee's professionals shall be paid to such applicable indenture trustee or professional, subject to a review for reasonableness by the Creditors' Committee, out of the 56.5% of the Net Distributable Proceeds allocable to the Allowed General Unsecured Claims, but if at the time of such distribution, there are insufficient funds to make payment in full, then such fees shall be paid Pro Rata with other professionals paid at such time. <br><br> Estimated Projected Payment:  1.2% <br> **Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 8 | 5% Notes Claims | $1.069 million | Pursuant to the terms of the Noteholder Settlement among the Creditors' Committee and the Holders of a majority of the 14% Notes, the parties agreed that the Holders of the 14% Notes Claims would pay for the distribution to the Holders of the 5% Notes Claims, if any, out of the 43.5% of the Net Distributable Proceeds allocable to the Allowed 14% Notes Claims.  Pursuant to negotiations between the Holders of a majority of the 14% Notes and Law Debenture Trust Company of New York, as indenture trustee for the 5% Notes (the "5% Indenture Trustee"), provided that Class 8 does not vote to reject the Plan and the 5% Indenture Trustee does not object to the Plan or Disclosure Statement, Holders of the Allowed 14% Notes Claims will allocate to Holders of Allowed 5% Notes Claims a total of $75,000 from the 43.5% of Net Distributable Proceeds allocated to the Allowed 14% Notes Claims.  The $75,000 distribution to Holders of Allowed 5% Notes Claims shall include all fees and expenses of the 5% Indenture Trustee and shall be subject to the exercise by such 5% Indenture Trustee of any contractual right of priority or charging lien under the 5% Notes indenture for payment of its fees and expenses.  Distributions to Holders of Class 8 Claims shall be made pro rata and contemporaneously with the first distribution to the Holders of Class 5 Claims, other than payments for fees and expenses of DB and Whippoorwill.  *See* Section IV.A.5 below for further treatment.<br><br>Estimated Projected Payment: 6.8%<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 9 | Convenience Claims | $5 million (approximate) | Holders of an Allowed Convenience Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Convenience Claim, 25% of their Allowed Claim as a final distribution.  Holders of Class 6 Claims in excess of $10,000 will be eligible to opt into this Class by reducing their claim to $10,000 by checking the "Opt-In to Convenience Class" box on their ballot.  Total distributions under this Class are anticipated to be limited to $1.25 million, subject to the Liquidating Trustee's discretion to increase this amount at the time of the Initial Distribution Date.  In the event that this Class has greater demand than funds allocated to this Class, then the Liquidating Trustee shall have the absolute discretion to select and remove certain of the opt-in members of this Class.  In no instance shall the Liquidating Trustee remove a non-opt-in Allowed Convenience Claim from this Class.<br><br>Estimated Projected Payment:  22.4%<br>**Impaired; Entitled to Vote** |
| 10 | Product Liability PI Claims | Unknown | Unless their Product Liability PI Claim has previously become an Allowed Claim, all Holders of Claims in Class 10 shall be required to participate in the Product Liability PI Claim Mediation Process attached to the Disclosure Statement as Appendix E.  As provided in the Product Liability PI Claim Mediation Process, if and when Allowed, Holders of Class 10 Claims shall receive a Pro Rata distribution of available insurance proceeds from Gibraltar policies covering Product Liability PI Claims upon the year in which the claim arose.  To the extent the allowed amount of any Class 10 Claim is not paid in full with insurance proceeds, then the unpaid deficiency amount shall receive the treatment provided for under Class 6 for Allowed General Unsecured Claims.<br><br>Estimated Projected Payment:  Unknown<br>**Impaired; Entitled to Vote** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 11 | WARN Class Claims and Severance Class Claims | Unknown | If the WARN and Severance Class Settlement Agreement is approved:<br>• Class Members who do not Opt Out will receive the treatment afforded in the WARN and Severance Class Settlement.<br>• Class Members who Opt Out, who have filed claims and whose Claims are Allowed Claims, shall receive full payment of their Claims up to the cap set by Bankruptcy Code section 507 with any excess treated as an unsecured claim to share Pro Rata with Claims in Class 6.<br>If the WARN and Severance Class Settlement Agreement is *not* approved:<br>• The WARN Class Claim and Severance Class claims shall continue to be litigated and class members whose Claims become Allowed Claims, shall receive full payment of their Claims up to the cap set by Bankruptcy Code section 507 with any excess treated as Claims in Class 6.<br><br>Estimated Projected Payment:  Unknown<br>**Impaired; Entitled to Vote.** |
| 12A | Lumbermen's Underwriting Alliance | Unknown | On the Effective Date, in full and final satisfaction of its Allowed Claim, the Holder of Allowed Claims in Class 12A shall be permitted to retain any proceeds of previously drawn letters of credit, as well as other Cash on hand, in exchange for waiver of any deficiency claim.<br><br>Estimated Projected Payment:  Unknown<br>**Impaired; Entitled to Vote.** |
| 12B | Georgia Self Insurance Guaranty Trust Fund | Unknown | On the Effective Date, in full and final satisfaction of its Allowed Claim, the Holder of Allowed Claims in Class 12B shall be permitted to retain any proceeds of previously drawn letters of credit, as well as other Cash on hand, in exchange for waiver of any deficiency claim.<br><br>Estimated Projected Payment:  Unknown<br>**Impaired; Entitled to Vote.** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 13A | Westchester Fire Insurance Company and ACE INA Insurance | Unknown | Upon a Claim in Class 13A becoming an Allowed Claim, the Holder of a Class 13A Claim shall be permitted to either: (i) to the extent the Allowed Claim is less than the amount of the Collateral held by Holder, retain the Collateral up to the amount of such Allowed Claim and any excess shall be returned to the Liquidating Trustee; (ii) to the extent the Allowed Claim exceeds the amount of the Collateral held by Holder, retain the Collateral and the amount by which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General Unsecured Claim in Class 6; or (iii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing. <br><br>The Holder of the Class 13A Claim shall have an Allowed Claim as further set forth herein. <br><br>Estimated Projected Payment:  Unknown<br>**Unimpaired; Deemed to Accept** |
| 13B | Old Republic Insurance Co. | Unknown | Upon a Claim in Class 13B becoming an Allowed Claim, the Holder of a Class 13B Claim shall be permitted to either:  (i) to the extent the Allowed Claim is less than the amount of the Collateral held by Holder, retain the Collateral up to the amount of such Allowed Claim and any excess shall be returned to the Liquidating Trustee; (ii) to the extent the Allowed Claim exceeds the amount of the Collateral held by Holder, retain the Collateral and the amount by which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General Unsecured Claim in Class 6; or (iii)  accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing. <br><br>Estimated Projected Payment:  Unknown<br>**Unimpaired; Deemed to Accept** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 13C | National Union Fire Insurance Company of Pittsburgh, PA, et al. | Unknown | Upon a Claim in Class 13C becoming an Allowed Claim, the Holder of a Class 13C Claim shall be permitted to either: (i) to the extent the Allowed Claim is less than the amount of the Collateral held by Holder, retain the Collateral up to the amount of such Allowed Claim and any excess shall be returned to the Liquidating Trustee; (ii) to the extent the Allowed Claim exceeds the amount of the Collateral held by Holder, retain the Collateral and the amount by which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General Unsecured Claim in Class 6; or (iii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment: Unknown<br>**Unimpaired; Deemed to Accept** |
| 13D | Fidelity and Deposit Company of Maryland | Unknown | Upon a Claim in Class 13D becoming an Allowed Claim, the Holder of a Class 13D Claim shall be permitted to either: (i) to the extent the Allowed Claim is less than the amount of the Collateral held by Holder, retain the Collateral up to the amount of such Allowed Claim and any excess shall be returned to the Liquidating Trustee; (ii) to the extent the Allowed Claim exceeds the amount of the Collateral held by Holder, retain the Collateral and the amount by which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General Unsecured Claim in Class 6; or (iii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment: Unknown<br>**Unimpaired; Deemed to Accept** |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS AS OF THE EFFECTIVE DATE (VALUES ON A CONSOLIDATED BASIS) | ESTIMATED PROJECTED PAYMENT/TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|---|
| 13E | Kemper Insurance Co., et al. | Unknown | Upon a Claim in Class 13E becoming an Allowed Claim, the Holder of a Class 13E Claim shall be permitted to either: (i) to the extent the Allowed Claim is less than the amount of the Collateral held by Holder, retain the Collateral up to the amount of such Allowed Claim and any excess shall be returned to the Liquidating Trustee; (ii) to the extent the Allowed Claim exceeds the amount of the Collateral held by Holder, retain the Collateral and the amount by which the Allowed Claim exceeds the amount of the Collateral shall be treated as a General Unsecured Claim in Class 6; or (iii) accept such other treatment as to which such Holder and the Debtors and/or Liquidating Trustee shall have agreed upon in writing.<br><br>Estimated Projected Payment: Unknown<br>**Unimpaired; Deemed to Accept** |
| 14 | Intercompany Claims By and Between Debtors | Unknown | On the Effective Date, all Intercompany Claims by and between the Debtors shall be cancelled.<br><br>Estimated Projected Payment: 0%<br>**Impaired; Deemed to Reject** |
| 15 | Equity Interests | Unknown | On the Effective Date, all Equity Interests shall be cancelled.<br><br>Estimated Projected Payment: 0%<br>**Impaired; Deemed to Reject** |

# IV.

## TREATMENT OF CLAIMS AND INTERESTS

### A.    Unclassified Claims

In accordance with Bankruptcy Code section 1123(a)(1) of the Bankruptcy Code, certain Claims have not been classified, and the respective treatment of such Unclassified Claims is set forth immediately below.

### 1.    Administrative Claims

Except as otherwise provided herein, and subject to the requirements of this Plan, on, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date an Administrative Claim becomes an Allowed Administrative Claim or (b) the date that is ninety (90) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim against the Debtors shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto (i) prior to the Effective Date, by the Debtors and (ii) subsequent to the Effective Date, by the Liquidating Trustee.  Administrative Claimholders will be paid in full on account of their Claims and are not entitled to vote on the Plan.

     2.     **Priority Tax Claims**

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Distribution Date, a Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (i) regular installment Cash payments, occurring not less frequently than quarterly over a period not exceeding five (5) years after the Petition Date, in an aggregate principal amount equal to the unpaid portion of such Allowed Priority Tax Claim, plus interest on the unpaid portion thereof at the Case Interest Rate from the Effective Date through the date of payment thereof or (ii) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; provided, however, that the Liquidating Trustee shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance of any Allowed Priority Tax Claim, in full at any time on or after the Effective Date without premium or penalty.  Priority Tax Claimholders will be paid in full on account of their Claims and are not entitled to vote on the Plan.

**B.    Claims**

    **1.    Class 1:  Non-Tax Priority Claims**

        On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim or (b) the date that is ninety (90) days after the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, a Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Non-Tax Priority Claim, (i) Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim or (ii) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing.  Any deficiency claim over and above the limits set forth under section 507 of the Bankruptcy Code for priority claims shall be treated as a Class 6 General Unsecured Claim.

        Class 1 is conclusively presumed to have accepted the Plan and, therefore, Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

    **2.    Class 2:  Allowed Secured Credit Facility Claims**

        The Secured Credit Facility Claims shall be Allowed Claims, except for amounts at issue in the Turnover Motion (which shall become Allowed Claims to the extent the Turnover Motion is denied pursuant to a Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate court)), the Disputed Costs, any disputed Future Costs, any disputed post-Effective Date costs and any BofA Indemnification Claims (as defined below) that are contingent, unliquidated or disputed as of the Effective Date.  On the Effective Date, Holders of Secured Credit Facility Claims shall receive the following treatment:

        A.    Payment in full of all Postpetition Obligations (as defined in the Interim DIP Order) then outstanding (including, without limitation, all costs, fees and/or expenses of the Secured Parties (including, without limitation, costs, fees, and/or expenses of their counsel) other than the Disputed Costs, the Future Costs and any BofA Indemnification Claims that are contingent, unliquidated or disputed as of the Effective Date) and that are payable by the Debtors in accordance with the Interim DIP Order, the Secured Credit Facility and the Final Cash Collateral Order (in each

case modified by the Extension Order); provided that the payment of any amount pursuant to this subsection A shall not constitute a waiver or release of any claim, defense, right or remedy that any Person might have or assert in connection with the Turnover Motion.

B.    Cash equal to 105% of the face amount as of the Effective Date of Outstanding Letters of Credit (as defined in the Interim DIP Order) to be held as collateral for Outstanding Letters of Credit.   After the Effective Date, BofA, for and on behalf of the Secured Parties, shall be entitled to one (1) Business Days' notice to the Liquidating Trustee, and without the need for any further notice to or approval of any Person, including without limitation the Debtors, the Liquidating Trustee or the Bankruptcy Court, to apply the cash collateral described in the preceding sentence to reimburse the Secured Parties for any Outstanding Letters of Credit that are drawn.

In addition, BofA, for and on behalf of the Secured Parties, shall be entitled, without the need for any further notice to or approval of any Person, including without limitation, the Debtors, the Liquidating Trustee, or the Bankruptcy Court, except as set forth in clause (iv) of this sentence, to apply the cash collateral described in the first paragraph of this subsection B to pay any documented costs, fees and/or expenses (including, without limitation, the costs, fees and/or expenses of their counsel) related to, incurred in connection with or arising from the Outstanding Letters of Credit that are (i) incurred on or after the Effective Date, (ii) are or would be payable by the Debtors in accordance with the Interim DIP Order, the Secured Credit Facility and the Final Cash Collateral Order (in each case modified by the Extension Order), (iii) are not BofA Indemnification Claims (as defined below) and (iv) are not disputed in writing by the Liquidating Trustee within ten (10) Business Days after submission by BofA of applicable invoices, statements, receipts or other documents supporting such costs, fees and/or expenses, or, to the extent disputed by the Liquidating Trustee within such ten (10) Business Day period, are either approved by a Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate court) or are no longer disputed by the Liquidating Trustee (as reflected in a written notice from the Liquidating Trustee).

The amount of cash collateral held pursuant to this subsection B shall be reduced and released from time to time by BofA to the Liquidating Trust to the extent that it exceeds 105% of the face amount of Outstanding Letters of Credit that remain outstanding at such time plus the amount of any fees, costs and/or expenses that are being disputed by the Liquidating Trustee pursuant to the preceding sentence.

C.    Cash in the amount of $100,000 to be held as collateral for any further costs, fees and/or expenses of the Secured Parties (including, without limitation, costs, fees, and/or expenses of their counsel) incurred on or prior to the Effective Date and payable by the Debtors in accordance with the Interim DIP Order, the Secured Credit Facility and the Final Cash Collateral Order (in each case modified by the Extension Order) ("Future Costs") that have not been invoiced and remain unpaid as of the Effective Date.

BofA, for and on behalf of the Secured Parties, shall be entitled, without the need for any further notice to or approval of any Person, including without limitation, the Debtors or the Bankruptcy Court, to apply the cash collateral described in the first paragraph of this subsection C to pay any documented Future Costs that are not disputed in writing by the Liquidating Trustee within ten (10) Business Days after submission by BofA to the Liquidating Trustee of applicable invoices, statements, receipts or other documents supporting such Future Costs; provided that all such invoices, statements, receipts or other documents evidencing such Future Costs must be submitted to the Liquidating Trustee within sixty (60) days of the Effective Date.  To the extent any Future Costs are disputed by the Liquidating Trustee in accordance with the preceding sentence, BofA, for and on behalf of the Secured Parties, shall be entitled to apply the cash collateral described in the first paragraph of this subsection C to pay such Future Costs only to the extent such Future Costs are approved by a Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate court) or are no longer disputed by the Liquidating Trustee (as reflected in a written notice from the Liquidating Trustee).

Any cash collateral held pursuant to this subsection C sixty (60) days after the Effective Date that exceeds the amount of any Future Costs which remain unpaid and for which invoices, statements, receipts or other documents evidencing such Future Costs have been submitted

to the Liquidating Trustee (including, without limitation, any Future Costs being disputed by the

Liquidating Trustee in accordance with this subsection C) shall be released by BofA to the

Liquidating Trust to the Liquidating Trustee within ten (10) Business Days.

D.    Cash in the amount equal to any Disputed Costs that have not been paid to

BofA or any of the other Secured Parties as of the Effective Date to be held as collateral for such

Disputed Costs.

BofA, for and on behalf of the Secured Parties, shall be entitled, without the need for

any further notice to or approval of any Person, including without limitation, the Debtors, the

Liquidating Trustee, or the Bankruptcy Court, to apply the cash collateral described in the first

paragraph of this subsection D to pay such Disputed Costs that are either (i) not the subject of a

motion, objection or other formal action commenced by the Liquidating Trustee in the Bankruptcy

Court prior to one year after the Effective Date or (ii) approved by a Final Order of the Bankruptcy

Court or other court of competent jurisdiction (including any appellate court) or (iii) are no longer

disputed by the Liquidating Trustee (as reflected in a written notice from the Liquidating Trustee).

Notwithstanding anything to the contrary contained in the Plan, the Liquidating Trust

reserves the right to seek an Order of the Bankruptcy Court (which Order shall be subject to any

appeal rights of any party) as to the Secured Parties' entitlement to any costs, fees and/or expenses of

the Secured Parties (including costs, fees and/or expense of their counsel) that were disputed by the

Debtors or the Creditors' Committee prior to the Effective Date in accordance with the requirements

of paragraph 13 of the Final Cash Collateral Order (or corresponding provisions of any previous

cash collateral order or the Extension Order) (the "Disputed Costs"); provided, however, that unless

the Liquidating Trustee has filed a motion or brought another formal action in the Bankruptcy Court

seeking such an Order within one year after the Effective Date, the Liquidating Trust and the

Liquidating Trustee shall be deemed to have irrevocably waived any right to seek such an Order, and

the Disputed Costs shall be deemed to be Allowed Claims for purpose of this Plan and shall not be

subject to any further objection, challenge, action or adversary proceeding by any Person whether in

the Bankruptcy Court or elsewhere.  In addition, notwithstanding anything contained in the Plan to

the contrary, the Creditors' Committee's Motion for Turnover of Property of the Estate Purchase to

11 U.S.C. § 542 [Docket No. 1476] (the "Turnover Motion") is preserved for the benefit of the Debtors or the Liquidating Trust, as applicable, to the extent that it has not been denied as of the Effective Date by a Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate court).

Any cash collateral held pursuant to this subsection D after the resolution and payment of all Disputed Costs pursuant to this subsection D shall be promptly released by BofA to the Liquidating Trustee within five (5) business days after such payment.

E.      Cash in the amount of $2,500,000 to be held as collateral for any unliquidated, contingent, or post-Effective Date claims of the Secured Parties, including, without limitation, any claims for indemnification that any of them might have asserted or may assert and costs, fees and/or expenses of the Secured Parties (including, without limitation, costs, fees and/or expenses of their counsel) payable by the Debtors in accordance with the Interim DIP Order, the Secured Credit Facility and the Final Cash Collateral Order (in each case modified by the Extension Order) that are incurred after the Effective Date in connection with any such unliquidated, contingent and/or indemnification claims (collectively, "BofA Indemnification Claims"); provided, however, if all of the Secured Parties (including, without limitation, BofA) have not been dismissed with prejudice as defendants in the First American Trust Adversary Action by Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate court) as of the Effective Date, the amount of cash collateral provided to BofA, for an on behalf of the Secured Parties, pursuant to this subsection E shall be increased to $3,000,000 until such time as all of the Secured Parties (including, without limitation, BofA) have been dismissed with prejudice as defendants in the First American Trust Adversary Action by Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate court), at which time BofA shall promptly return $500,000 of cash collateral held pursuant to this subsection E to the Liquidating Trust within five (5) business days thereafter.

BofA, for and on behalf of the Secured Parties, shall be entitled, without the need for any further notice to or approval of any party, including without limitation the Debtors, the Liquidating Trustee, or the Bankruptcy Court, to apply the cash collateral described in the preceding

paragraph to pay any documented BofA Indemnification Claims as and when such claims become liquidated and non-contingent unless any such payment is disputed in writing by the Liquidating Trustee within ten (10) Business Days after submission by BofA to the Liquidating Trustee of applicable invoices, statements, receipts or other documents, in which case, BofA, for and on behalf of the Secured Parties, shall be entitled to apply the cash collateral described in the preceding paragraph to pay any such disputed BofA Indemnification Claim only upon either entry of a Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate court) authorizing such payment or receipt by BofA of written notice from the Liquidating Trustee withdrawing its objection.

Except as otherwise agreed between the Liquidating Trustee and BofA, so long as at the time of release of cash collateral pursuant to this subsection E (i) all of the Secured Parties (including, without limitation, BofA) have been dismissed with prejudice as defendants in the First American Trust Adversary Action by Final Order of the Bankruptcy Court or other court of competent jurisdiction (including any appellate court), (ii) no other lawsuit, claim or other action has been commenced or threatened against any of the Secured Parties (including, without limitation, BofA) that could, in BofA's determination, result in or give rise to a BofA Indemnification Claim and (iii) any dispute by the Liquidating Trustee of any BofA Indemnification Claims has been resolved in accordance with the previous paragraph (and BofA, for and on behalf of the Secured Parties, has been paid any BofA Indemnification Claims that it is entitled to be paid in accordance with such resolution), BofA shall release to the Liquidating Trust cash collateral held pursuant to this subsection E as follows: (A) $1 million shall be released on the first Business Day that is one year after the Effective Date; (B) $500,0000 shall be released on the first Business Day that is eighteen (18) months after the Effective Date; and (C) any remaining cash collateral held pursuant to this subsection E shall be released on the first Business Day that is two years after the Effective Date. In the event that any of the events described in clauses (i) through (iii) of the preceding sentence has occurred and is continuing as of the time a release of cash collateral would otherwise be required pursuant to the preceding sentence, BofA shall not be required to make such release of cash collateral to the Liquidating Trust until (x) such time as any such event has been fully and finally

1    resolved pursuant to a Final Order of the Bankruptcy Court or other court of competent jurisdiction

2    (including any appellate court) or has otherwise been resolved to the satisfaction of BofA, and (y)

3    any BofA Indemnification Claims arising from or relating to any such event shall have been paid

4    pursuant to the preceding paragraph.

5    　　　　The aggregate of the amounts in paragraphs B, C, D and E above shall be known as

6    the "BofA Cash Collateral Amount".

7    　　　　On the Effective Date, the BofA Cash Collateral Amount shall be placed in a

8    segregated account at Bank of America in the name of the Liquidating Trustee (the "BofA Cash

9    Collateral Account"). The BofA Cash Collateral Amount and the BofA Cash Collateral Account

10   shall be free and clear of all existing and future Liens as to any Person other than the Secured

11   Parties, which parties shall have a fully perfected first priority lien on the BofA Cash Collateral

12   Account and all amounts in the BofA Cash Collateral Account. Such lien shall secure the

13   obligations of all of the Debtors and the Liquidating Trustee to the Secured Parties with respect to

14   any and all Outstanding Letters of Credit, the Future Costs, the Disputed Costs (as defined below),

15   and any BofA Indemnification Claims.

16   　　　　The collateralization of the Future Costs, the Disputed Costs, or the BofA

17   Indemnification Claims shall not be deemed to be an admission by the Debtors or the Liquidating

18   Trustee that any of the Future Costs or BofA Indemnification Claims are valid and proper claims

19   against the Debtors or the Liquidating Trustee either in the amount collateralized or in any other

20   amount.

21   　　　　Except for the liens provided herein (including, without limitation, the liens on the

22   BofA Cash Collateral Account and all funds in the BofA Cash Collateral Account), all liens held by

23   the Secured Parties under the Secured Credit Facility, Interim DIP Order, Final Cash Collateral

24   Order and the Extension Order (including Liens granted thereunder prior to the Effective Date) shall

25   be terminated upon the Effective Date. The Secured Credit Facility, Interim DIP Order, Final Cash

26   Collateral Order and the Extension Order shall survive entry of an Order confirming the Plan for

27   purposes of Plan distribution only and to effect the treatment provided to BofA under this Plan. In

28   the event of any conflict between the provisions of the Secured Credit Facility, Interim DIP Order,

Final Cash Collateral Order and the Extension Order and the Plan, the provisions of this Plan shall govern.

The foregoing treatment shall be in full and complete satisfaction of any and all Class 2 Claims, and recourse shall be limited as set forth above.

Class 2 is Impaired and is entitled to vote on the Plan.

**3.    Class 3:  Allowed ISIS Claim**

Unless ISIS and the Plan Proponents or Liquidating Trustee agree otherwise, the Holder of the Allowed ISIS Claim will receive the following treatment as soon as reasonably practicable on or after the Effective Date in full satisfaction of its Allowed ISIS Claim:

The Liquidating Trustee will:  (1) cure any default that occurred before or after the commencement of the Chapter 11 Cases, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured, by paying the amount of $3.55 million to the Holder of the Allowed ISIS Claim (the "ISIS Cure Amount"); (b) reinstate the maturity of such Allowed Claim or interest as such maturity existed before such default, without recognizing any default interest rate or similar penalty or charge; (3) compensate the Holder of the Allowed ISIS Claim for any actual damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (4) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensate the Holder of the Allowed ISIS Claim for any actual pecuniary loss incurred by such holder as a result of such failure; and (5) leave unaltered all of the Holder's other legal, equitable, or contractual rights with respect to its Allowed ISIS Claim.

Class 3 is Unimpaired under the Plan and therefore not entitled to vote.

**4.    Class 4:  Miscellaneous Secured Claims**

On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim or (b) the date that is ninety (90) days after the date on which such Miscellaneous

Secured Claim becomes an Allowed Miscellaneous Secured Claim, a Holder of an Allowed

Miscellaneous Secured Claim shall receive, in full and final satisfaction, settlement and release of

and in exchange for, such Allowed Miscellaneous Secured Claim, at the election of the Liquidating

Trustee, (i) Cash equal to the lesser of the unpaid portion of such Allowed Miscellaneous Secured

Claim and the value of the Holder's Collateral securing the Miscellaneous Secured Claim as required

pursuant to section 506(b) of the Bankruptcy Code, (ii) a return of the Holder's Collateral securing

the Miscellaneous Secured Claim or (iii) such other treatment as to which such Holder and the

Debtors and/or the Liquidating Trustee shall have agreed upon in writing.  Any Holder of a

Miscellaneous Secured Claim shall retain its Lien in the Collateral or the proceeds of the Collateral

(to the extent that such Collateral is sold by the Debtors or the Liquidating Trustee free and clear of

such Lien) to the same extent and with the same priority as such Lien held as of the Petition Date

until such time as (a) the Holder of such Miscellaneous Secured Claim (i) has been paid Cash equal

to the value of its Allowed Miscellaneous Secured Claim, (ii) has received a return of the Collateral

securing the Miscellaneous Secured Claim or (iii) has been afforded such other treatment as to which

such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; or (b)

such purported Lien has been determined by an order of the Bankruptcy Court to be invalid or

otherwise avoidable.

Class 4 is conclusively presumed to have accepted the Plan and, therefore, Holders of

Class 4 Claims are not entitled to vote to accept or reject the Plan.

5.    **Class 5:  14% Notes Claims**

On the Effective Date, the Liens of the 14% Notes held as of the Petition Date shall

remain as valid Liens for purposes of the Plan only and the 14% Notes Claims shall be Allowed as a

Secured Claim in the amount of $84,256,664.  In full and final satisfaction of their Secured Allowed

Claim, the 14% Notes Claims shall receive their Pro Rata share of 43.5% of the Net Distributable

Proceeds, less:  (a) fees and expenses payable and paid to DB (both for its services and those of its

agents) (the "DB Fees"); (b) any amounts payable and paid to Whippoorwill for fees and expenses

incurred by its professionals (collectively, the "Whippoorwill Fees"), pursuant to a Substantial

Contribution Claim; and (c) any funds distributed to the Holders of the 5% Notes.  The Creditors