Amounts in respect of undeliverable Distributions made by the Liquidating Trustee shall be returned to the Liquidating Trustee until such Distributions are claimed. The Liquidating Trustee shall, with respect to Cash, maintain in the Liquidating Trust Cash on account of undeliverable and unclaimed Distributions until such time as a Distribution becomes deliverable, is claimed or is forfeited.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an undeliverable or unclaimed Distribution within six (6) months after the last Periodic Distribution Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed Distribution against the Debtors and their Estates, the Liquidating Trustee, the Liquidating Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property. In such cases, any Cash otherwise reserved for undeliverable or unclaimed Distributions shall become the property of the Liquidating Trust free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan as Net Distributable Proceeds and the Liquidating Trust Agreement. Nothing contained in this Plan or the Liquidating Trust Agreement shall require the Debtors, or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim; provided, however, that in his sole discretion, the Liquidating Trustee may periodically publish notice of unclaimed Distributions.

**F.      Prepayment**

Except as otherwise provided in this Plan or the Confirmation Order, the Debtors or the Liquidating Trustee, as the case may be, shall have the right to prepay in their discretion, without penalty, all or any portion of an Allowed Administrative Claim, Allowed Priority Tax Claim, Allowed Miscellaneous Secured Claim, or Allowed Non-Tax Priority Claim, at any time.

**G.      Means of Cash Payment**

Cash payments made pursuant to this Plan shall be in U.S. dollars and shall be made, on and after the Effective Date, at the option and in the sole discretion of the Liquidating Trustee by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Liquidating Trustee.

In the case of foreign creditors, Cash payments may be made, at the option of the Liquidating Trustee, in such funds and by such means as are necessary or customary in a particular jurisdiction.

**H.    Interest on Claims**

Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Claimholder shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

**I.    Withholding and Reporting Requirements**

In connection with this Plan and all Distributions under this Plan, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding, payment, and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder. All persons holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes. For example, with respect to any employee-related withholding, if the Debtors are obligated by law to withhold amounts from Distributions to a present or former employee to satisfy such present or former employee's tax and other payroll obligations, the Liquidating Trustee may withhold a portion of the Distributions allocated to the Holder of an Allowed Claim that is a present or former employee, whether or not such Distributions are in the form of Cash, in such amount as is determined necessary to satisfy such Holder's tax and other payroll obligations with respect to the Distributions.

Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive

responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidating Trustee in connection with such Distribution.  Any property to be distributed pursuant to this Plan shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Article VII.E.2 of this Plan.

**J.** **Setoffs**

**1.** **By a Debtor**

Except as otherwise provided in the Plan, the Debtors, prior to the Effective Date, and the Liquidating Trustee, on and after the Effective Date, may, pursuant to Bankruptcy Code section 553 or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtors may have against the Holder of such Claim without seeking relief from the Bankruptcy Court; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Liquidating Trust or the Liquidating Trustee of any such Claim that the Debtors may have against such Holder.

**2.** **By Non-Debtors**

Unless otherwise stipulated in writing by the Debtors (before the Effective Date) or by the Liquidating Trustee (after the Effective Date), any party against whom a claim or counterclaim is asserted by the Estates (an "Estate Claim") must assert any setoff rights, right of subrogation, or recoupment of any kind against such Estate Claim at the time it answers such Estate Claim, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred; provided, however that nothing herein shall limit the assertion of such right of setoff, subrogation or recoupment via an amended or supplemental pleading to the extent required by Rule 15 of the Federal Rules of Civil Procedure and/or Rule 7015 of the Federal Rules of Bankruptcy Procedure.

K.      **Procedure for Treating and Resolving Disputed, Contingent and/or Unliquidated Claims**

1.      **Objection Deadline; Prosecution of Objections**

Except as set forth in the Plan with respect to Administrative Claims, all objections to Claims must be filed and served on the Holders of such Claims by the Claims Objection Deadline, as the same may be extended by the Bankruptcy Court.  If an objection has not been filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (i) was Scheduled by the Debtors but (ii) was not Scheduled as contingent, unliquidated, and/or disputed, by the Claims Objection Deadline, as the same may be extended by order of the Bankruptcy Court, the Claim to which the Proof of Claim or Scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier.  Notice of any motion for an order extending the Claims Objection Deadline shall be required to be given only to those persons or entities that have requested notice in the Chapter 11 Cases, or to such persons as the Bankruptcy Court shall order.

From the Confirmation Date through the Claims Objection Deadline, any party in interest, including the Liquidating Trustee, may file objections, settle, compromise, withdraw, or litigate to judgment objections to Claims.  Subject to the terms of the Liquidating Trust Agreement, from and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  Nothing contained herein, however, shall limit the right of the Liquidating Trustee to object to Claims, if any, filed or amended after the Effective Date.

2.      **No Distributions on Disputed Claims**

Notwithstanding any other provision of the Plan or the Liquidating Trust Agreement, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim are resolved.

3.      **Distributions on Allowed Claims**

Payments and Distributions from the Liquidating Trust to each respective Claimholder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of the Plan that govern Distributions to such Claimholders.  On the earlier of (a) the Distribution Date following the date when a Disputed Claim

becomes an Allowed Claim or (b) ninety (90) days after such Disputed Claim becomes an Allowed Claim, the Liquidating Trustee will distribute to the Claimholder any Cash that would have been distributed on the dates Distributions were previously made to Claimholders had such Allowed Claim been an Allowed Claim on such dates.

All Distributions made under this Article of the Plan on account of an Allowed Claim will be made together with any dividends, payments, or other Distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates Distributions were previously made to Holders of Allowed Claims included in the applicable Class.

**4.      De Minimis Distributions**

Except as otherwise provided in the Plan, the Liquidating Trustee shall not have any obligation to make a Distribution on account of an Allowed Claim if the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not constitute a final Distribution to such Holder and such Distribution has a value less than $10.00. The Liquidating Trustee shall have no obligation to make any Distribution on Claims Allowed in an amount less than $100.00.

**L.      Fractional Dollars**

Any other provision of this Plan notwithstanding, the Liquidating Trustee shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

**M.      Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**N.    Distribution Record Date**

The Liquidating Trustee will have no obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, as stated on the official claims register.

## VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.    Rejected Contracts and Leases**

Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document, the Confirmation Order shall constitute an order under Bankruptcy Code section 365 rejecting all prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, (d) is identified in Exhibit C to the Plan as an executory contract or unexpired lease of the Debtors to be assumed; provided, however, that the Plan Proponents may amend such Exhibit C at any time prior to the Confirmation Date; provided further however, that listing such an agreement on such Exhibit shall not constitute an admission by a Debtor that such agreement is an executory contract  or unexpired lease or that any Debtor has any liability thereunder, or (e) is identified in Exhibit E to the Plan as an IT agreement that will not be rejected by the Plan, but will continue for up to 200 days after the Effective Date, and if not assumed by the expiration thereof, will be deemed to be automatically rejected without a further order of the Court (with creditors having 30 days after notice of rejection to file rejection damage claims, if any).

**B.    Bar to Rejection Damages**

If the rejection of an executory contract or unexpired lease pursuant to Article VIII.A above gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be

forever barred and shall not be enforceable against the applicable Debtor or its Estate, the

Liquidating Trust, or their respective successors or properties unless a Proof of Claim is filed and

served on the Liquidating Trust and counsel for the Liquidating Trustee within thirty (30) days after

service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court.

**C.     Assumed and Assigned Contracts and Leases**

Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan

Document entered into after the Petition Date or in connection with the Plan, the Confirmation Order

shall constitute an order under Bankruptcy Code section 365 assuming, as of the Effective Date,

those insurance agreements listed on Exhibit C to this Plan; provided, however, that the Plan

Proponents may amend such Exhibit at any time prior to the Confirmation Date; provided further,

however, that listing an insurance agreement on such Exhibit shall not constitute an admission by a

Debtor that such agreement is an executory contract or that any Debtor has any liability thereunder.

## IX.

## CONFIRMATION AND CONSUMMATION OF THE PLAN

**A.     Conditions to Confirmation**

The following are conditions precedent to the occurrence of the Confirmation Date:

(a)     A Final Order finding that the Disclosure Statement contains adequate

information pursuant to Bankruptcy Code section 1125 shall have been entered by the Bankruptcy

Court;

(b)     A proposed Confirmation Order in form and substance, reasonably acceptable

to the Plan Proponents, BofA, and Whippoorwill with respect to provisions that impact their rights

under the Plan; and

(c)     Approval of all provisions, terms and conditions hereof in the Confirmation

Order.

**B.     Conditions to Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each

of which must be satisfied or waived in writing in accordance with Article IX.C:

(a)     The Confirmation Order shall have been entered and become a Final Order and shall provide that the Debtors, the Liquidating Trust, and the Liquidating Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan or effectuate, advance, or further the purposes thereof;

(b)     All Plan Exhibits shall be, in form and substance, reasonably acceptable to the Plan Proponents and Whippoorwill to the extent that any Plan Exhibits impact their rights, and shall have been executed and delivered by all parties' signatory thereto;

(c)     The Debtors shall be authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures, and the agreements or documents created in connection with, and expressly provided for under, the Plan;

(d)     All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed; and

(e)     The Debtors shall have sufficient Cash to satisfy in full, or adequately reserve for, the BofA Cash Collateral Amount, and all Allowed Administrative Claims, Priority Claims and Miscellaneous Secured Claims.

## C.     Waiver of Conditions

Subject to the reasonable approval of Whippoorwill with respect to provisions that impact its rights under the Plan, each of the conditions set forth in Articles IX.A and IX.B of the Plan may be waived in whole or in part by the Plan Proponents and, in the case of Article IX.A(b), by BofA and Whipporwill, as applicable. The failure to satisfy or waive any condition to the Effective Date may be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of a party to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

**D.      Consequences of Non-Occurrence of Effective Date**

In the event that the Effective Date does not timely occur, the Plan Proponents reserve all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated, that the Plan be null and void in all respects, and/or that any settlement of Claims provided for in the Plan be null and void.  In the event that the Bankruptcy Court shall enter an order vacating the Confirmation Order, the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

**E.      Substantial Consummation**

Substantial consummation of the Plan, as defined in Bankruptcy Code section 1101(2), shall not be deemed to have occurred unless and until all Allowed Administrative Claims, Priority Claims and Miscellaneous Secured Claims have been paid in full or funds sufficient to satisfy all Allowed Administrative Claims, Priority Claims and Miscellaneous Secured Claims have been placed in a segregated reserve.

**X.**

**ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS**

**A.      Professional Fee Claims**

**1.      Final Fee Applications**

The Final Fee Applications must be filed no later than forty-five (45) days after the Effective Date.  Objections, if any, to Final Fee Applications of such Professionals must be filed and served on the Liquidating Trustee and its respective counsel, the requesting Professional and the Office of the U.S. Trustee no later than ninety (90) days from the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

**2.      Employment of Professionals after the Effective Date**

Except as otherwise provided for in the Liquidating Trust Agreement, from and after the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 or any order previously entered by the Bankruptcy Court in seeking retention or compensation for services rendered or expenses incurred after such date shall terminate.

**B.    Substantial Contribution Compensation and Expenses Bar Date**

Any Person who wishes to make a Substantial Contribution Claim based on facts or circumstances arising after the Petition Date, must file an application with the clerk of the Court, on or before the Administrative Claims Bar Date, and serve such application on counsel for the Plan Proponents and as otherwise required by the Court and the Bankruptcy Code on or before the Administrative Claims Bar Date, or be forever barred from seeking such compensation or expense reimbursement.  Objections, if any, to the Substantial Contribution Claim must be filed no later than the Administrative Claims Objection Deadline, unless otherwise extended by Order of the Court.

**C.    Other Administrative Claims**

All other requests for payment of an Administrative Claim arising after the Petition Date up to and through the Effective Date, other than Professional Fee Claims, must be filed with the Court and served on counsel for the Plan Proponents no later than the Administrative Claims Bar Date.  Unless the Liquidating Trustee or any other party in interest objects to an Administrative Claim by the Administrative Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Liquidating Trustee or any other party in interest objects to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

## XI.

## EFFECT OF PLAN CONFIRMATION

**A.    Binding Effect**

This Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Liquidating Trust and the Liquidating Trustee.

**B.      Discharge of the Debtors**

Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation will not discharge Claims against the Debtors; provided, however, that no Claimholder or Equity Interest Holder may, on account of such Claim or Equity Interest, seek or receive any payment or other distribution from, or seek recourse against, any Debtor, the Liquidating Trust, the Liquidating Trustee, and/or their respective successors, assigns and/or property, except as expressly provided in this Plan. The discharge shall not prevent First American from prosecuting its claims in the adversary proceeding styled *First American Trust Company v. Fleetwood Enterprises, Inc., et. al.* [Case No. 6:09-ap-1415-MJ] (the "First American Trust Adversary Action").

**C.      Discharge of DB under the 14% Indenture**

Upon the satisfaction of all of DB's duties set forth in this Plan, DB (collectively with its successors and assigns) shall be discharged and relieved of all obligations under the 14% Indenture effective as of the Effective Date.

**D.      Releases by the Debtors**

**1.      Professionals, Creditors' Committee and Secured Parties**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors (in their individual capacities and as debtors and debtors in possession) will be deemed to release forever, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of the Debtors to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences taking place on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the negotiation and filing of the Plan, the Disclosure Statement or any prior plans of reorganization, the filing of the Chapter 11 Cases,**

the pursuit of confirmation of the Plan or any prior plans of reorganization, the consummation of the Plan, the administration of the Plan, or the property to be liquidated and/or distributed under the Plan, and that could have been asserted by or on behalf of the Debtors or their Estates, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, in any such case, against (i) the Released Parties except Avoidance Actions or objections to Proofs of Claims filed by any Released Parties, and (ii) the Secured Parties, together with their respective affiliates, agents, attorneys, officers, directors and employees (collectively with the Secured Parties, the "Secured Parties Releasees"), except with respect to the Turnover Action or the Disputed Costs.

2.    **Debtor Released Parties and Secured Parties Releasees**

Pursuant to section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, the Debtors, in their individual capacity and as debtors-in possession, for and on behalf of their Estates, shall release and forever unconditionally release all the Debtors' present or former, officers, directors, employees, attorneys, financial advisors, representatives or agents ("Debtor Released Parties") for and from any and all Claims or Rights contingent or existing as of the Effective Date in any manner arising from, based on or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Debtor Released Party or Secured Parties Releasees, as applicable, the restructuring of Claims and interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence or event in any manner related to any such Claims, interest, or the Chapter 11 Case, except for (i) in the case of the Debtor Released Parties, Avoidance Actions or objections to Proof of Claims filed against any of the Debtor Released Parties and (ii) in the case of any Secured Party Releasees, with respect to the Turnover Action or the Disputed Costs.

No provision of this Plan or of the Confirmation Order, including without limitation, any release or exculpation provision, shall modify, release or otherwise limit the liability of any person not specifically released hereunder, including without limitation, any

person that is a co-obligor or joint tortfeasor of a Debtor Released Party or that otherwise is liable under theories of vicarious or other derivative liability.

　　　　After the Effective Date, the Liquidating Trustee and the Liquidating Trust shall be bound, to the same extent the Debtor is bound, by all of the releases set forth above.

E.　　Release By Holders of Claims and Equity Interests

　　　　On the Effective Date (a) each Person that votes to accept this Plan, and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Equity Interests, in consideration for the obligations of the Liquidating Trust and the Liquidating Trustee under the Plan and the Cash and other consideration to be delivered in connection with the Plan and the Liquidating Trust, each entity (other than a Debtor) that has held, holds or may hold a Claim or Equity Interest, as applicable, (each, a "Release Obligor") shall have conclusively, absolutely, unconditionally, irrevocably and forever, released each Debtor Released Party and each Secured Parties Releasee from any Claim or Cause of Action (except Avoidance Actions) existing as of the Effective Date arising from, based on or relating to, in whole or in part, the subject matter of, or the transaction or event giving rise to, the Claim or Equity Interest of such Release Obligor, and any act, omission, occurrence or event in any manner related to such subject matter, transaction or obligation and any act, omission, occurrence, representation or failure to act that occurred prior to the Petition Date, including the decision to file and the preparation and filing the Chapter 11 cases and the timing of the commencement of the Chapter 11 Cases.

　　　　Notwithstanding the foregoing, however, this Section shall not release (A) any Debtor Released Party from any Claims or Causes of Action existing as of the Effective Date, based on (i) the Internal Revenue Code or other domestic state, city or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city or municipality, (iii) any criminal laws of the United States or any domestic state, city or municipality, (iv) Sections 1104-1109 and 1342(d) of the Employee Retirement Income Security Act of 1974, as amended, (v) any Claim previously asserted or hereinafter asserted that is covered by an existing policy

of insurance, (vi) any Claim or Cause of Action expressly reserved in the Plan or (vii) a Debtor Released Party's acts of gross negligence or willful misconduct, or (viii) First American's claims and causes of action in the First American Trust Adversary Action against the officer/director and bank defendants and its claims against TRC, James Roberson and David Roberson, or (B) any Secured Party Releasee from any Claims or Causes of Action existing as of the Effective Date, based on (i) the First American Trust Adversary Action, (ii) the Internal Revenue Code or other domestic state, city or municipal tax code, (iii) the environmental laws of the United States or any domestic state, city or municipality, of (iv) any criminal laws of the United States or any domestic state, city or municipality.

The releases of the Secured Parties Releasees contained in this Plan, including, without limitation, the releases set forth in Sections XI.C and XI.D of this Plan, shall be in addition to, and not in limitation of, the releases of the Secured Parties Releasees contained in section 19 of the Interim DIP Order and any other releases of any of the Secured Parties Releasees contained in or approved by the Interim DIP Order or the Final Cash Collateral Order, all of which releases are hereby incorporated into this Plan by this reference and made a part hereof.

F.     **Injunction**

Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that **from and after the Effective Date all Persons who have held, hold or may hold Claims against or Equity Interests in the Debtors are permanently enjoined from taking any of the following actions against the Estate(s), the Liquidating Trust, the Liquidating Trustee, Gibraltar, or any of their property on account of any such Claims or Equity Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting, or enforcing any lien or encumbrance; (D) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors; (E) commencing or continuing, in any manner or in any place, any action or other proceeding (including, without limitation, any "direct action" under the laws of any state) to**

obtain or claim entitlement to the proceeds of any policy of insurance issued by Gibraltar

which cover Claims against the Debtors or to determine if a Claim is covered by one or more

policies of insurance issued by Gibraltar; and, (F) commencing or continuing, in any manner

or in any place, any action that does not comply with or is inconsistent with the provisions of

the Plan; provided, however, that nothing contained herein shall preclude such Persons from

exercising their rights pursuant to and consistent with the terms of this Plan or the

Confirmation Order; and provided further that nothing contained herein shall preclude any

insurance company that is a counterparty to a reinsurance agreement with Gibraltar from

exercising any of its rights against Gibraltar provided that any enforcement action must be

brought before this bankruptcy court; and provided further that nothing contained herein

shall preclude First American from prosecuting the First American Trust Adversary Action

against the defendants therein and existing D&O policies.

G.      **Term of Bankruptcy Injunction or Stays**

All injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code

section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full

force and effect until the Effective Date.  Upon the Effective Date, the injunction provided in Article

XI.E shall apply.

H.      **Exculpation and Limitation of Liability**

Except as otherwise specifically provided in this Plan, the Debtors, the

Liquidating Trustee, the Liquidating Trust, DB, Whippoorwill, the Secured Parties Releasees,

the 5% Indenture Trustee, the Creditors' Committee, the members of the Creditors'

Committee, solely in their capacity as such, and any of the foregoing parties' respective present

or former members, officers, directors, employees, advisors, attorneys, representatives,

financial advisors, investment bankers, or agents and any of such parties' successors and

assigns, shall not have or incur any claim, action, proceeding, cause of action, Avoidance

Action, suit, account, controversy, agreement, promise, right to legal remedies, right to

equitable remedies, right to payment, or Claim (as defined in Bankruptcy Code Section

101(5)), whether known, unknown, reduced to judgment, not reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively, in law, equity, or otherwise to one another or to any Claimholder or Equity Interest Holder, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the negotiation and filing of the Plan, the Disclosure Statement or any prior plans of reorganization, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan or any prior plans of reorganization, the consummation of the Plan, the administration of the Plan, or the property to be liquidated and/or distributed under the Plan except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided however, that the foregoing shall not be deemed to exculpate or release (i) any of the parties other than the Secured Parties Releasees from Avoidance Actions or objections to Proofs of Claims that the Debtors may hold against such parties or (ii) any Secured Party Releasee with respect to the Turnover Action or the Disputed Costs.

**I.    Indemnification Obligations**

Except as otherwise provided in this Plan, the Interim DIP Order, the Final Cash Collateral Order (in each case modified by the Extension Order), or any contract, instrument, release, or other agreement or document entered into in connection with this Plan, any and all indemnification obligations that the Debtors have pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document, or applicable law shall be rejected as of the Effective Date, to the extent executory.

**J.    Dissolution of the Creditors' Committee**

Effective on the Effective Date, the Creditors' Committee shall have no further powers or duties and shall be dissolved for all purposes; provided, however, that the Creditors'

Committee and the Professionals employed by the Creditors' Committee shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities relating to the preparation, filing, and prosecution of Final Fee Applications, upon the submission of invoices to the Liquidating Trust. Any time or expenses incurred in the preparation, filing, and prosecution of Final Fee Applications shall be disclosed by each Professional in its Final Fee Application and shall be subject to approval of the Bankruptcy Court. Payments of fees and expenses made to the Creditors' Committee and the Professionals employed by the Creditors' Committee shall be made concurrently with payments of fees and expenses to DB and Whippoorwill and other Professionals.

## K.    Browder Objection

The Plan Proponents and/or Fleetwood believe that the Claims asserted by Jesse Browder, Mary White, Otha Townsend, Vera and Robert Burns, Tamicca Stanley, and Mary Goodwin (collectively, the "Browder Plaintiffs") are not covered by any policy of insurance issued in favor of Fleetwood. The Browder Plaintiffs dispute this contention.  Notwithstanding the foregoing, the Plan does not release or discharge any claims that the Browder Plaintiffs may have against any policy of insurance issued in favor of Fleetwood, to the extent any such claim exists. Nothing in the Plan or in the Confirmation Order shall preclude Plaintiffs and the Plaintiff Class from pursuing their claims to the extent of available insurance coverage and proceeds. The Browder Claims of the Plaintiff Class asserted against the Debtors, solely to the extent of available insurance, are preserved and not discharged by the Plan. However, to the extent the Browder Plaintiffs assert that they are entitled to any recovery on account of any policy of insurance issued by Gibraltar, then any action to establish coverage, to assert a claim against Gibraltar or to obtain any other recovery from Gibraltar must be brought before the Bankruptcy Court.

If and when the Browder Claims of the Plaintiff Class members become Allowed Claims, and to the extent not covered by insurance, then such Allowed Claims shall be treated as General Unsecured Claims in Class 6. To the extent any portion of the Browder Claims is covered by the proceeds of insurance, any deficit will be treated as a General Unsecured Claim in Class 6.

1
2
3
4

        The Liquidating Trust shall not destroy, abandon or otherwise render documents

relating to the Browder Plaintiffs unavailable except upon entry of an Order by a court of competent

jurisdiction on notice to parties in interest, including the Browder Plaintiffs, and an opportunity to be

heard.

5
6

## XII.

## RETENTION OF JURISDICTION

7
8
9
10
11

        Under Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the

Confirmation Order, substantial consummation of the Plan and occurrence of the Effective Date, the

Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the

Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things,

jurisdiction to:

12
13
14
15
16
17
18
19

        (1)     Allow, disallow, determine, liquidate, classify, estimate or establish

                the priority or secured or unsecured status of any Claim or Equity Interest,

                including the resolution of any request for payment of any Administrative

                Claim, the resolution of any objections to the allowance or priority of Claims

                or Equity Interests and the determination of requests for the payment of claims

                entitled to priority under Bankruptcy Code section 507(a)(1), including

                compensation any reimbursement of expenses of parties entitled thereto;

20
21
22
23
24
25
26
27

        (2)     Hear and determine all applications for compensation and

                reimbursement of expenses of Professionals under the Plan or under

                Bankruptcy Code sections 330, 331, 503(b), 1103, and 1129(a)(4); provided,

                however, that from and after the Effective Date, the payment of the fees and

                expenses of the retained Professionals of the Liquidating Trust and/or the

                Liquidating Trustee shall be made in the ordinary course of business and shall

                not be subject to the approval of the Bankruptcy Court;

28

(3)     Hear and determine all matters with respect to the assumption or

rejection of any executory contract or unexpired lease to which a Debtor is a

party or with respect to which a Debtor may be liable, and to hear, determine

and, if necessary, liquidate any Claims arising therefrom;

(4)     Effectuate performance of and payments under the provisions of the

Plan;

(5)     Hear and determine any and all adversary proceedings, motions,

applications and contested or litigated matters arising out of, under or related

to the Chapter 11 Cases, the Plan or the Liquidating Trust Agreement;

(6)     Enter such orders as may be necessary or appropriate to execute,

implement or consummate the provisions of the Plan and all contracts,

instruments, releases and other agreements or documents created in

connection with the Plan, the Disclosure Statement or the Confirmation Order;

(7)     Hear and determine disputes arising in connection with the

interpretation, implementation, consummation or enforcement of the Plan,

including disputes arising under agreements, documents or instruments

executed in connection with the Plan;

(8)     Consider any modifications of the Plan, cure any defect or omission or

reconcile any inconsistency in any order of the Bankruptcy Court, including,

without limitation, the Confirmation Order;

(9)     Issue injunctions, enter and implement other orders or take such other

actions as may be necessary or appropriate to restrain interference by any

entity with implementation, consummation, or enforcement of the Plan or the

Confirmation Order;

(10)    Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified or vacated;

(11)    Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(12)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(13)    Except as otherwise limited herein, recover all Assets of the Debtors and property of the Estates, wherever located;

(14)    Hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

(15)    Hear and determine all matters related to the property of the Estates from and after the Confirmation Date;

(16)    Hear and determine the Causes of Action;

(17)    Hear and determine all disputes involving the existence, nature or scope of the injunctions, indemnification, exculpation and releases granted pursuant to this Plan;

(18)    Hear and determine all matters related to (i) the property of the Estates from and after the Confirmation Date, (ii) the winding up of the Debtors' affairs, and (iii) the activities of the Liquidating Trust and/or the Liquidating Trustee, including (A) challenges to or approvals of the Liquidating Trustee's activities, (B) resignation, incapacity or removal of the Liquidating Trustee and successor Liquidating Trustees, (C) reporting by, termination of and

accounting by the Liquidating Trustee, and (D) release of the Liquidating

Trustee from its duties;

(19)    Hear and determine disputes with respect to compensation of the

Liquidating Trustee and the Liquidating Trust Professionals;

(20)    Hear and determine all disputes involving the existence, nature and/or

scope of the injunctions and releases provided herein, including any dispute

relating to any liability arising out of any termination of employment or the

termination of any employee or retiree benefit provision, regardless of

whether such termination occurred prior to or after the Effective Date;

(21)    Hear and determine such other matters as may be provided in the

Confirmation Order or as may be authorized under, or not inconsistent with,

provisions of the Bankruptcy Code;

(22)    Hear and determine the WARN and Severance Class Settlement

Agreement and any disputes or issues relating thereto;

(23)    Enforce all orders previously entered by the Bankruptcy Court;

(24)    Dismiss any and/or all of the Chapter 11 Cases; and

(25)    Enter a final decree closing the Chapter 11 Cases.

## XIII.

## MISCELLANEOUS PROVISIONS

**A.    Modifications and Amendments**

The Plan Proponents together may alter, amend or modify the Plan or any Exhibits

thereto under Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date, subject

to the reasonable approval of Whippoorwill and BofA with respect to provisions that impact their

rights hereunder.  After the Confirmation Date and prior to substantial consummation of the Plan as

defined in Bankruptcy Code section 1101(2), the Plan Proponents may, under Bankruptcy Code

section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

**B.**    **Severability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, then the Bankruptcy Court, at the request of the Plan Proponents, shall have the power to alter and interpret such terms or provisions to make them valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provisions shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**C.**    **Successors and Assigns**

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Person.

**D.**    **Payment of Statutory Fees**

All fees then due and payable pursuant to 28 U.S.C. § 1930, as determined by the Court at the Confirmation Hearing, shall be paid on or before the Effective Date by the Debtors. All such fees that become due and payable thereafter by a Debtor shall be paid by the Liquidating Trustee. The Liquidating Trustee shall pay quarterly fees to the U.S. Trustee until the Chapter 11 Cases are closed or converted and/or the entry of final decrees. The Debtors, through the

Liquidating Trust, shall file post-confirmation quarterly reports or any pre-confirmation monthly operating reports not filed as of the Confirmation Hearing in conformance with the U.S. Trustee Guidelines.  The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which shall be paid by the Debtors and/or the Liquidating Trustee.

**E.      Revocation, Withdrawal or Non-Consummation**

The Plan Proponents reserve the right to collectively revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans.  If the Plan Proponents revoke or withdraw the Plan as to any or all of the Debtors, or if Confirmation or consummation of the Plan as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by such Debtors or any other Person.

**F.      Service of Documents**

Any notice, request or demand required or permitted to be made or provided to or upon a Debtor, the Creditors' Committee, and/or the Liquidating Trustee under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, and (d) addressed as follows:

***The Debtors:***

If by overnight or hand delivery:

28464-002\DOCS_LA:216782.5                              97

Fleetwood
c/o Chief Financial Officer
Fleetwood Enterprises, Inc.
3125 Myers Street
Riverside, CA 92503

with a copy to:

Craig H. Millet
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, California  92612-4412

**The Creditors' Committee:**

Hamid R. Rafatjoo
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100

**The Liquidating Trust/The Liquidating Trustee:**

SltnTrst LLC
9952 S. Santa Monica Blvd.
2nd Floor
Beverly Hills, CA 90212

**G.      Plan Supplement(s)**

Exhibits to the Plan not attached hereto shall be filed in one or more Plan

Supplements by the Exhibit Filing Date.  Any Plan Supplement (and amendments thereto) filed by

the Plan Proponents shall be deemed an integral part of the Plan and shall be incorporated by

reference as if fully set forth herein.  Substantially contemporaneously with their filing, the Plan

Supplements may be viewed at the office of the clerk of the Bankruptcy Court or its designee during

normal business hours, by visiting the Court's website at www.caeb.uscourts.gov (PACER account

required) or by visiting www.kccllc.net/fleetwood.  Holders of Claims and/or Equity Interests may

obtain a copy of any Plan Supplements upon reasonable written request to the Claims Agent.  The

documents contained in any Plan Supplements shall be approved by the Bankruptcy Court pursuant

to the Confirmation Order.

**H.      Plan Exhibits**

Any and all Plan Exhibits, or other lists or schedules not filed with the Plan shall be

filed with the Clerk of the Bankruptcy Court on or before the Exhibit Filing Date.  Upon such filing,

such documents may be inspected in the office of the Clerk of the Bankruptcy Court during normal

court hours.  Holders of Claims or Equity Interests may obtain a copy of any such document upon

written request to the Debtors in accordance with Article XIII of the Plan.

**I.    Tax Reporting And Compliance**

The Liquidating Trustee is hereby authorized, on behalf of each of the Debtors, to

request an expedited determination under Bankruptcy Code section 505(b) of the tax liability of the

Debtors for all taxable periods ending after the Petition Date through and including the Effective

Date.

**J.    Filing Of Additional Documents**

On or before substantial consummation of this Plan, the Debtors shall file such

agreements and other documents as may be necessary or appropriate to effectuate and further

evidence the terms and conditions of this Plan.

1    Dated: Riverside, California
        March 3, 2010

2

3                                      FLEETWOOD ENTERPRISES, INC., et al.
                                       (for itself and on behalf of the Debtors)

4

                                       By:        /s/ Andrew M. Griffiths
5                                             Name:    Andrew M. Griffiths
                                              Title:    Chief Financial Officer

6

7    Dated: March 3, 2010

8

9                                      OFFICIAL COMMITTEE OF CREDITORS HOLDING
                                       UNSECURED CLAIMS

10

                                       By:        /s/ Peter Kravitz
11                                            Name:    Peter Kravitz, Giant RV
                                              Title:    Co-Chair of the Official Committee of
12                                                     Creditors Holding Unsecured Claims

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit A**

**Schedule of Subsidiary Debtors**

## SCHEDULE OF SUBSIDIARY DEBTORS

1.   Fleetwood Holdings, Inc.;
2.   Fleetwood Retail Corp.;
3.   Fleetwood Homes Investment, Inc.;
4.   Fleetwood General Partner of Texas, Inc.;
5.   Fleetwood Homes of Texas, L.P.;
6.   Trendsetter Homes, Inc.;
7.   Fleetwood Homes of Pennsylvania, Inc.;
8.   Fleetwood Homes of Arizona, Inc.;
9.   Fleetwood Homes of Tennessee, Inc.;
10.  Fleetwood Homes of California, Inc.;
11.  Fleetwood Homes of Virginia, Inc.;
12.  Fleetwood Homes of Florida, Inc.;
13.  Fleetwood Homes of Washington, Inc.;
14.  Fleetwood Homes of Georgia, Inc.;
15.  Fleetwood Motor Homes of California, Inc.;
16.  Fleetwood Homes of Idaho, Inc.;
17.  Fleetwood Motor Homes of Indiana, Inc.;
18.  Fleetwood Homes of Indiana, Inc.;
19.  Fleetwood Motor Homes of Pennsylvania, Inc.;
20.  Fleetwood Homes of Kentucky, Inc.;
21.  Fleetwood Travel Trailers of California, Inc.;
22.  Fleetwood Homes of North Carolina, Inc.;
23.  Fleetwood Travel Trailers of Indiana, Inc.;
24.  Fleetwood Homes of Oregon, Inc.;
25.  Fleetwood Travel Trailers of Kentucky, Inc.;
26.  Fleetwood Travel Trailers of Maryland, Inc.;
27.  Fleetwood Travel Trailers of Ohio, Inc.;
28.  Fleetwood Travel Trailers of Oregon, Inc.;
29.  Fleetwood Travel Trailers of Texas, Inc.;
30.  Gold Shield, Inc.;
31.  Gold Shield of Indiana, Inc.;
32.  Hauser Lake Lumber Operations, Inc.;
33.  Fleetwood Home Centers of Nevada, Inc.;
34.  Fleetwood Home Centers of Texas, Inc.;
35.  Fleetwood Retail Corp. of Arizona;
36.  Fleetwood Retail Corp. of Arkansas;
37.  Fleetwood Retail Corp. of California;
38.  Fleetwood Retail Corp. of Florida;
39.  Fleetwood Retail Corp. of Georgia;
40.  Fleetwood Retail Corp. of Illinois;
41.  Fleetwood Retail Corp. of South Carolina;
42.  Fleetwood Retail Corp. of North Carolina;
43.  Fleetwood Retail Corp. of Tennessee;
44.  Fleetwood Retail Corp. of Virginia;
45.  Fleetwood Retail Corp. of West Virginia;
46.  Fleetwood Capital Trust;
47.  Fleetwood International Inc;
48.  Fleetwood Homes of Mississippi, Inc.;  and
49.  Continental Lumber Products, Inc.

**Exhibit B**

**Liquidating Trust Agreement**

**(To Be Filed On Or Before The Exhibit Filing Date)**

**Exhibit C**

**List of Executory Contracts to Be Assumed**

**(To Be Filed On Or Before The Exhibit Filing Date)**

**Exhibit D**

**Non-Exclusive List of Causes of Action**

**(To Be Filed On Or Before The Exhibit Filing Date)**

**Exhibit E**
**IT Agreements**


**(To Be Filed On Or Before The Exhibit Filing Date)**

# APPENDIX B

**APPENDIX B**

**ORGANIZATIONAL CHART AND DESCRIPTION OF DEBTORS AND**

**NON-DEBTORS**



The Debtors FHI and FRC are direct subsidiaries of FEI. Other Debtors who are direct

subsidiaries of FEI are as follows:

**Subsidiaries of FEI**

- Continental Lumber Products, Inc.

- Fleetwood Capital Trust

- Fleetwood Homes of Mississippi, Inc.

- Trendsetter Homes, Inc.

- Fleetwood International, Inc.

The Debtors who are subsidiaries of FHI and FRC are as follows:

## Subsidiaries of FHI

- Fleetwood General Partner of Texas, Inc.;
- Fleetwood Homes of Texas, L.P.[1]
- Fleetwood Homes Investment, Inc.
- Fleetwood Homes of Arizona, Inc.
- Fleetwood Homes of California, Inc.
- Fleetwood Homes of Florida, Inc.
- Fleetwood Homes of Georgia, Inc.
- Fleetwood Homes of Idaho, Inc.
- Fleetwood Homes of Indiana, Inc.
- Fleetwood Homes of Kentucky, Inc.
- Fleetwood Homes of North Carolina, Inc.
- Fleetwood Homes of Oregon, Inc.
- Fleetwood Homes of Pennsylvania, Inc.
- Fleetwood Homes of Tennessee, Inc.
- Fleetwood Homes of Virginia, Inc.
- Fleetwood Homes of Washington, Inc.
- Fleetwood Motor Homes of California, Inc.
- Fleetwood Motor Homes of Indiana, Inc.
- Fleetwood Motor Homes of Pennsylvania, Inc.
- Fleetwood Travel Trailers of California, Inc.

---

[1] Fleetwood Homes of Texas, L.P is affiliate of both Fleetwood General Partner of Texas, Inc. and Fleetwood Homes Investment, Inc., both of which are direct subsidiaries of FHI.

- Fleetwood Travel Trailers of Indiana, Inc.

- Fleetwood Travel Trailers of Kentucky, Inc.

- Fleetwood Travel Trailers of Maryland, Inc.

- Fleetwood Travel Trailers of Ohio, Inc.

- Fleetwood Travel Trailers of Oregon, Inc.

- Fleetwood Travel Trailers of Texas, Inc.

- Gold Shield, Inc.

- Gold Shield of Indiana, Inc.

- Hauser Lake Lumber Operations, Inc.

## Subsidiaries of FRC

- Fleetwood Home Centers of Nevada, Inc.

- Fleetwood Home Centers of Texas, Inc.

- Fleetwood Retail Corp. of Arizona*

- Fleetwood Retail Corp. of Arkansas*

- Fleetwood Retail Corp. of California

- Fleetwood Retail Corp. of Florida*

- Fleetwood Retail Corp. of Georgia*

- Fleetwood Retail Corp. of Illinois

---

* These entities filed their petitions for bankruptcy subsequent to the filings made by the other Debtors. Fleetwood Retail Corp. of Arizona filed it chapter 11 petition on July 29, 2009, in order to stay an attempt by its landlord to terminate a lease pursuant to which it had prepaid rent. The remaining entities, Fleetwood Retail Corp. of Arkansas, Fleetwood Retail Corp. of Florida, Fleetwood Retail Corp. of Georgia, and Fleetwood Retail Corp. of South Carolina, followed on August 11, 2009, in order to stay any similar attempts by the landlords under their leases to take such threatening actions against their prepaid leasehold interests. Pursuant to an order of this Court on August 19, 2009 [Docket No. 1118], the bankruptcy estates of these five additional Fleetwood entities are being jointly administered with the Estates of the other Debtors.

- Fleetwood Retail Corp. of North Carolina
- Fleetwood Retail Corp. of South Carolina*
- Fleetwood Retail Corp. of Tennessee
- Fleetwood Retail Corp. of Virginia
- Fleetwood Retail Corp. of West Virginia

The direct subsidiaries of FHI, other than Hauser Lake Lumber, along with Continental Lumber Products, a subsidiary of FEI, are referred to as the ("Operating Subsidiaries") (the Operating Subsidiaries together with FEI, FHI and FRC and their subsidiaries are collectively referred to as the "Debtors").

**Non-Debtors**

The following direct and indirect subsidiaries and affiliates of FEI did *not* file chapter 11 petitions:

- Fleetwood Housing International, Inc.
- Fleetwood Travel Trailers of Virginia, Inc.
- Fleetwood Canada Ltd.
- Fleetwood De Mexico S.A. DE C.V.
- Fleetwood Retail Corp. of Alabama
- Fleetwood Retail Corp. of Colorado
- Fleetwood Retail Corp. of Idaho
- Fleetwood Retail Corp. of Kansas
- Fleetwood Retail Corp. of Kentucky
- Fleetwood Retail Corp. of Louisiana
- Fleetwood Retail Corp. of Mississippi
- Fleetwood Retail Corporation of Missouri
- Fleetwood Retail Corp. of New Mexico

- Fleetwood Retail Corp. of Ohio
- Fleetwood Retail Corp. of Oklahoma
- Fleetwood Retail Corp. of Oregon
- Fleetwood Retail Corp. of Washington
- Fleetwood Financial Services, Inc.
- Fleetwood Holidays, Inc.
- Fleetwood Homes of Oklahoma, Inc.
- Fleetwood Travel Trailers of Nebraska, Inc.
- Gibraltar Insurance Company, Ltd.
- GSF Installation Co.
- Fleetwood Retail Investment Corp.
- Expression Homes Corp.
- Fleetwood Vacation Club, Inc.
- FVC Management Co. Inc.
- HomeOne Credit Corp.
- Home Sentry Insurance Agency, Inc.
- National Home Shield Insurance Agency, Inc. of Alabama

The majority of the non-debtors, which include the subsidiaries of FRC, as well as Fleetwood Retail Investment Corp., Expression Homes Corp., HomeOne Credit Corp. and its subsidiaries, were formerly involved in Fleetwood's manufactured housing retail and financing business. Fleetwood sold the manufactured housing retail operations and its entire loan portfolio in 2005. In connection with that sale, Fleetwood assigned leases for numerous retail locations to the buyers, but remained liable for certain lease terms in the event of default by the assignees. The non-debtor subsidiaries of FRC were not involved in any litigation arising from the sale of the manufactured housing retail operations.

Gibraltar Insurance Company, Ltd., ("Gibraltar") is an entity established in 1977 under

the laws of Bermuda which provided, primarily, coverage for product liability claims involving

Fleetwood's products.  The remaining non-debtors, Fleetwood Housing International, Fleetwood

Financial Services, Fleetwood Vacation Club, Inc. (including its wholly owned subsidiary, FVC

Management Co., Inc.), Fleetwood Holidays, Inc., Fleetwood Homes of Oklahoma, Inc.,

Fleetwood Travel Trailers of Nebraska, Inc., and GSF Installation Co., are all inactive and have

no assets, employees or liabilities.

100706589_1.DOC

# APPENDIX C

Exhibit C

LIQUIDATION ANALYSIS

## Introduction

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often called the "Best Interests Test"), Holders of Allowed Claims must either (a) accept the Plan or (b) receive or retain under the Plan on account of such Claim property of a value, as of the Plan's assumed Effective Date, that is not less than the value such Holder would receive or retain if the Debtors' cases were converted to chapter 7 of the Bankruptcy Code ("Chapter 7") and liquidated by an appointed trustee.

In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from the hypothetical liquidation of the Debtors' assets under Chapter 7; the second step is to allocate such net dollar amount of proceeds to the various Holders of Allowed Claims based on the absolute priority rule. The Plan Proponents have prepared this hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the Disclosure Statement. The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation related costs that would be available to the Debtors' creditors if the Debtors were to be liquidated pursuant to a liquidation under Chapter 7 as an alternative to the liquidation of assets and allocation of value under the Plan. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The Liquidation Analysis is based upon certain assumptions discussed herein and in the Disclosure Statement

**UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE PLAN PROPONENTS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND OTHER UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE PLAN PROPONENTS AND THEIR ADVISORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS OR THOSE REFLECTED UNDER THE PLAN WILL BE REALIZED AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.**

## Significant Assumptions

Hypothetical recoveries to stakeholders of the Debtors in Chapter 7 were determined through multiple steps, as set forth below. The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of June 30, 2010 and assumes that the Debtors would commence a Chapter 7 liquidation on or about June 30, 2010 (the "Conversion Date") under the supervision of a court-appointed Chapter 7 trustee. The Liquidation Analysis assumes that certain assets sales and events would take place prior to the Conversion Date as more fully described in footnote (a) below. The Liquidation Analysis reflects the wind-down and liquidation of substantially all of the Debtors' remaining assets over a six-month period (the "Wind-Down Period), with an additional 12 month period necessary to reconcile claims, settle or prosecute remaining litigation and make distributions to holders of Allowed Claims.

1

The Plan Proponents believe that a Chapter 7 trustee, if appointed, would elect to substantively consolidate the Debtors for the reasons set forth in the Plan and Disclosure Statement. As such, the Liquidation Analysis assumes that all Debtors will be substantively consolidated. Finally, the Liquidation Analysis considers two potential outcomes for the resolution of the disputed liens granted in favor of the holders of the 14% Notes: one in which the Chapter 7 trustee would strike a similar settlement with the holders of the 14% Notes as that contemplated under the Plan (the "Chapter 7 Settlement" outcome) and one in which no such settlement is reached and all litigation and negotiation efforts by the Chapter 7 trustee to have the disputed liens extinguished are ultimately unsuccessful (the "Chapter 7 No Settlement" outcome). In the Chapter 7 Settlement outcome, the Liquidation Analysis assumes that the liens granted in favor of the holders of the 14% Notes are extinguished and that the holders of the 14% Notes will receive 43.5% of the proceeds of the liquidation by virtue of their claims and the enforcement of the subordination provisions of the indentures governing the 5% Notes and 6% Notes. While the Liquidation Analysis is prepared on this basis, the enforceability of the subordination provisions in each indenture is not acknowledged by the parties and therefore could be litigated and the outcome of such litigation could result in a different outcome than the assumptions incorporated herein. In the Chapter 7 No Settlement outcome, the Liquidation Analysis assumes that the liens granted in favor of the holders of the 14% Notes are upheld and all litigation and negotiation efforts by the Chapter 7 trustee to have them extinguished are ultimately unsuccessful. A failure by the Chapter 7 trustee to favorably resolve the disputed liens would result in a considerably lower recovery for unsecured claimants.

## Estimate of Proceeds from Chapter 11 Liquidation

Estimates were made of cash proceeds that might be received from the liquidation of the Debtors' assets after consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution, including (i) the costs and expenses of a liquidation under Chapter 7 arising from fees payable to the a trustee and advisors to such trustee; and, (ii) the potential erosion in value of assets in a Chapter 7 case in the context of a more expedited liquidation than that contemplated under the Plan.

The Liquidation Analysis assumes that the remaining real estate portfolio owned by the Debtors would be sold in bulk or individual transactions within the Wind-Down Period. The Plan Proponents believe that the longer marketing period contemplated under the Plan would allow for conditions in the market for commercial real estate to improve and result in a higher recovery than that achievable during the Wind-Down Period, as a result, the Liquidation Analysis reflects a significant discount necessary to sell the properties within the Wind-Down Period. Assumed liquidation values of real estate took into account a variety of factors including, without limitation, (i) recent appraisals; (ii) recent marketing activity and list price of each asset; (iii) discussions with the real estate brokers retained to market the properties; (iv) the ability to lease the assets the time necessary to find tenants for each property; and (v) financial returns necessary to attract financial buyers to the assets within the Wind-Down Period. The Liquidation Analysis presents a mid-point of a range of values and are presented net of sales commissions. Holding costs for each asset include real estate taxes, utilities, security and routine maintenance and are included in trust operating expenses.

2

The Liquidation Analysis assumes that a portion of the collateral held by bonding companies and that supports letters of credit that remain outstanding will be returned to the estate over time based on anticipated exposure run-off and reduction pursuant to agreement or Court order. Other assets include certain receivables, leasehold interests, miscellaneous intellectual property and equipment, notes receivable and deposits, proceeds from which have been estimated by the Plan Proponents based on the current status of efforts to collect, sell or otherwise monetize these assets. The Liquidation Analysis does not reflect any potential recoveries that might be realized by the Chapter 7 trustee's potential pursuit of any Avoidance Actions, as these recoveries could be highly speculative in light of, among other things, the various defenses that would likely be asserted.

### Estimate of Costs

Proceeds from a Chapter 7 liquidation would be reduced by administrative costs incurred during the Wind-Down Period for the disposition of assets and the reconciliation of claims. These costs include professional (including attorneys, appraisers and other advisors) and trustee fees, salaries, severance and retention costs, certain occupancy costs, the estimated holding costs for each asset over the relevant period to the extent such costs were not considered in the determination of proceeds, and the costs to pursue the DB Litigation which the Plan Proponents do not believe will be performed on contingency basis.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and the potential impact of the DB Litigation, the Plan Proponents have determined, as summarized in the following charts and the "Best Interest Test" section of the Disclosure Statement, that the Plan will provide creditors with a recovery that is greater than creditors would receive pursuant to a liquidation of the Debtors' assets under Chapter 7.

The following liquidation analysis should be reviewed with the accompanying notes.

3

Fleetwood Enterprises, Inc. et al.
Liquidation Analysis Exhibit
($ in millions)

| | | Plan of Reorganization | Chapter 7 Conversion Chapter 7 Settlement | Chapter 7 Conversion Chapter 7 No Settlement |
|---|---|---|---|---|
| | | Net Distributable Value | Net Liquidation Value | Net Liquidation Value |
| **Asset Values** | | | | |
| Cash & Cash Equivalents | (a) | $ 20.1 | $ 23.3 | $ 23.3 |
| Real Property | (b) | 34.3 | 5.5 | 5.5 |
| Releases of Cash Collateral | (c) | 13.1 | 13.1 | 13.1 |
| Other Assets | (d) | 12.7 | 12.7 | 12.7 |
| Gross Liquidation Proceeds | | 80.2 | 54.6 | 54.6 |
| **Secured Claims** | | | | |
| 14% Noteholders | (e) | - | - | (31.4) |
| ISIS | (f) | (19.9) | - | - |
| | | (19.9) | - | (31.4) |
| **Administrative and Priority Claims** | | | | |
| Professional Fees | (g) | (0.8) | (0.8) | (0.8) |
| Administrative Claims | (h) | (2.3) | (2.3) | (2.3) |
| Priority Claims | (i) | (8.2) | (8.2) | (8.2) |
| | | (11.3) | (11.3) | (11.3) |
| Liquidating Trust Expenses / Expenses of Chapter 7 Trustee | (j) | (8.1) | (8.7) | (9.7) |
| Net Distributable Value for Unsecured Creditors | | $ 40.9 | $ 34.5 | $ 2.1 |

| | | Estimated Unsecured Claims | Net Distributable Value | Estimated Unsecured Claims | Net Liquidation Value | Estimated Unsecured Claims | Net Liquidation Value |
|---|---|---|---|---|---|---|---|
| 14% Noteholders | (k) | $ 84.3 | $ 17.7 | $ 84.3 | $ 15.0 | $ 52.9 | $ 1.2 |
| 5% Noteholders | (k) | 1.1 | 0.1 | 1.1 | - | 1.1 | - |
| 6% Noteholders | (k) | 161.2 | 2.0 | 161.2 | - | 161.2 | - |
| Convenience Class Creditors | (l) | 4.9 | 1.1 | n/a | n/a | n/a | n/a |
| General Unsecured Creditors | (m) | 155.1 | 20.0 | 160.0 | 19.5 | 160.0 | 0.9 |
| | | $ 406.6 | $ 40.9 | $ 406.6 | $ 34.5 | $ 375.2 | $ 2.1 |
| **Percentage Recoveries on Unsecured Claims** | | | | | | | |
| 14% Noteholders | | | 21.0% | | 17.8% | | 2.3% |
| 5% Noteholders | (n) | | 6.8% | | 0.0% | | 0.0% |
| 6% Noteholders | | | 1.2% | | 0.0% | | 0.0% |
| Convenience Class Creditors | | | 22.4% | | n/a | | n/a |
| General Unsecured Creditors | | | 12.9% | | 12.2% | | 0.6% |

## Notes to Liquidation Analysis

a) Cash represents estimated cash balances available on the Conversion Date after consideration of (i) the costs of administering the Chapter 11 cases through the Conversion Date; (ii) the sale of certain real properties that the Plan Proponents believe fair value is being achieved today; (iii) the cash collateralization of remaining letters of credit in the amount of 105% the face amount of such letters of credit; and, (iv) other ordinary course expenditures borne by the Debtors prior to the Conversion Date.

b) The Liquidation Analysis assumes that the remaining real estate portfolio owned by the Debtors would be sold in bulk or individual transactions within the Wind-Down Period. The Plan Proponents believe that the longer marketing period contemplated under the Plan would allow for market conditions in the market for commercial real estate to improve and result in a higher recovery than that achievable during the Wind-Down Period, as a result, the Liquidation Analysis reflects a significant discount necessary to sell the properties within the Wind-Down Period. Assumed liquidation values of real estate took into account a variety of factors including, without limitation, (i) recent appraisals; (ii) recent marketing activity and list price of each asset; (iii) discussions with the real estate brokers retained to market the properties; (iv) the ability to lease the assets and the time necessary to find tenants for each property; and, (v) financial returns necessary to attract financial buyers to the assets within the Wind-Down Period. The Liquidation Analysis presents a mid-point of a range of values and are presented net of sales commissions. Holding costs for each asset include real estate taxes, utilities, security and routine maintenance and are included in trust operating expenses for the applicable time period. The real property assumed to be sold post-Effective Date includes former Travel Trailer Plants 42 (Crawfordsville, Indiana) and 29 (Edgerton, Ohio); former Motor Home Plants 71-1 (Elysburg, Pennsylvania), 71-2 (Paxinos, Pennsylvania), 47-1 (Riverside, California) and 47-2 (Riverside, California); former Housing Plants 25-3 (Lexington, Mississippi), 46 (Lumberton, North Carolina), 41-1&2 (Pembroke, North Carolina, 84 (Waco, Texas), and 31 (Woodland, Washington); and raw land at Plant 66 (Wichita Falls, Texas).

c) Amount represents the cash collateral currently supporting surety bond and letter of credit exposure that the Plan Proponents anticipate will be released to the Liquidating Trust over time.

d) Other Assets represents the amount estimated by the Plan Proponents to be collected on account of (i) remaining accounts receivable; (ii) notes receivable from Nichols/Encore and proceeds from related subleases; (iii) estimated proceeds released from escrow accounts related to the Debtors' sale of RV assets; (iv) proceeds from Split Dollar and Other Life Insurance Policies; and, (v) the sale of miscellaneous equipment and intellectual property.

e) Represents the value of real property and segregated cash upon which the holders of the 14% Notes have liens. Under the Chapter 7 Settlement outcome, the Liquidation Analysis assumes that these are extinguished as part of a broader settlement; in the Chapter 7 No Settlement outcome, the Liquidation Analysis assumes that all such liens are upheld.

f) The Plan Proponents are not aware of any material other secured claims except those of ISIS. Consistent with the treatment in the Plan of Reorganization, the Liquidation Analysis assumes that the ISIS Promissory Note will be re-instated with an estimated balance of $17.791 million at the Effective Date, net of the $3.55 million payment to ISIS at the Effective Date. Consistent with the terms of the ISIS Promissory Note, the ISIS secured claim shown in the Liquidation Analysis includes approximately 14 months' interest through the maturity date, though the actual interest paid may be lower to the extent that principal payments are made prior to the maturity date. The Committee views the extent of ISIS's lien on cash collateral as of the Effective Date to be $0.00. ISIS disagrees with the Committee's analysis. For purposes of this Liquidation Analysis, we assume that ISIS is entitled to recover the full value of its outstanding debt first from existing liens on real estate and then, if necessary from cash collateral. This Liquidation Analysis should not be viewed as an admission or concession by the Committee and the Committee reserves all rights to argue at confirmation that the amount of ISIS's lien on cash should be $0.00. Under the Chapter 7 Settlement and No Settlement outcomes, the Liquidation Analysis assumes that ISIS Promissory Note will not be re-instated, but rather that the ISIS claim will be satisfied from proceeds of the sale of Plant 47 and the remainder of its collateral on Plants 75-1 and 71-1.

g) Professional Fees represents the Plan Proponents estimate of accrued by unpaid professional fees under approved retention agreements as of the Conversion Date.

h) Administrative expenses include estimated allowed 503(b)(9) claims, post-petition accounts payable and payments due under key employee incentive programs.

i) Priority claims represents the Plan Proponents estimates of priority employee, WARN Act and tax claims as of the Conversion Date. In the Chapter 7 No Settlement outcome, there are insufficient funds to pay the priority claims in full.

j) Liquidating Trust expenses represents the Plan Proponent's budget for 16 months beginning on July 1, 2010. The Plan Proponents' Liquidating Trust budget has been adjusted to include (i) reduced real estate holding costs pursuant to the Wind-Down Period described above; and, (ii) substitutes the estimated expenses of a Chapter 7 trustee in lieu of the trustee compensation proposed under the Plan. The expenses of the Chapter 7 trustee have been estimated to be 3.0% of the gross proceeds (excluding cash on hand on the Conversion Date) of the liquidation, pursuant to section 326(a) of the Bankruptcy Code. In the Chapter 7 No Settlement outcome, it is assumed that the Chapter 7 trustee incurs an additional $1.0 million in litigation expenses related to efforts to extinguish the disputed liens held by the holders of the 14% Notes.

k) Represents the estimated allowed claim of each class of notes. The Liquidation Analysis assumes that the provisions of the indentures governing the 5% Notes and the 6% Notes that subordinate their payment rights to those of the 14% Notes are enforced. While the Liquidation Analysis is prepared on this basis, the enforceability of the subordination provisions in each indenture is not acknowledged by the parties and therefore could be litigated and the outcome of such litigation could result in a different outcome than the assumptions incorporated herein. Further, the unsecured claims of the

6

holders of the 14% Notes are assumed to be reduced by any recovery obtained on their retained liens in the Chapter 7 No Settlement outcome, as described above.

l)  Represents estimated Convenience Class Claims assuming that (i) each creditor with a claim less than or equal to $10,000 will receive a 25% distribution on the First Distribution Date in full satisfaction of its claim; and, (ii) that each creditor who would receive at least a 15% recovery on their Allowed Claim by opting into the Convenience Class would do so pursuant to the procedures described in the Plan.

m)  Represents the mid-point of the Plan Proponents' estimated range of general unsecured claims less estimated Convenience Class Claims in the Plan of Reorganization scenario. It is assumed that there would be no Convenience Class if the cases were converted to Chapter 7.

n)  Pursuant to the terms of the Noteholder Settlement among the Creditors' Committee and the Holders of a majority of the 14% Notes, the parties agreed that the Holders of the 14% Notes Claims would pay for the distribution to the Holders of the 5% Notes Claims, if any, out of the 43.5% of the Net Distributable Proceeds allocable to the Allowed 14% Notes Claims. Pursuant to negotiations between the Holders of a majority of the 14% Notes and Law Debenture Trust Company of New York, as indenture trustee for the 5% Notes, provided that Class 8 does not vote to reject the Plan, Holders of the Allowed 14% Notes Claims will allocate to Holders of Allowed 5% Notes Claims a total of $75,000 from the 43.5% of Net Distributable Proceeds allocated to the Allowed 14% Notes Claims.

APPENDIX D

# APPENDIX D

## Litigation Commenced During the Chapter 11 Cases

Since the Petition Date, the following nineteen (19) adversary actions have been filed that relate to the Debtors' Chapter 11 Cases:

- *Fleetwood Enterprises, Inc., et al.* v. *Deutsche Bank Trust Company Americas, et al.* (Case No. 6:09-ap-01258-MJ) – complaint filed on May 27, 2009, alleging causes of action for avoidance of preferential transfers, avoidance of fraudulent transfers, recovery of avoidable transfers, and disallowance of defendant's proofs of claim. An October 15, 2009 order authorized the substitution of the Committee for Fleetwood as plaintiff. On February 11, 2010, a status conference was held in this proceeding. Following the status conference, the Court stayed the proceeding for 180 days. The Committee has indicated it plans to file a motion for summary judgment within that period if the parties are unable to settle the matter. However, the parties have resolved their disputes and are in the process of seeking Court approval of the settlement.

- *Myers v. Fleetwood Enterprises Inc.* (Case No. 6:09-ap-01105-MJ) – class action filed on March 10, 2009, alleging violations under the Worker Adjustment and Retraining Notification ("WARN") Act and California Labor Code §§ 1400 et seq. On September 15, 2009, Judge Jury entered an order consolidating the *Myers, Justice* and *Doud* WARN Act cases into one proceeding (the *Doud* adversary proceeding- Case No. 6:09-ap-01114-MJ) wherein the plaintiffs were ordered to filed a consolidated complaint. On December 17, 2009, the Court dismissed the *Myers* proceeding without prejudice.

- *Justice, et al. v. Fleetwood Enterprises Inc.* (Case No. 6:09-ap-01108-MJ) – class action filed on March 10, 2009, alleging violations under the WARN Act and claims for allowance and payment of administrative expense claims. On September 15, 2009, Judge Jury entered an order consolidating the *Myers, Justice* and *Doud* WARN Act cases into one proceeding (the *Doud* adversary proceeding- Case No. 6:09-ap-01114-MJ) wherein the plaintiffs were ordered to filed a consolidated complaint. On December 17, the Court dismissed the *Justice* proceeding without prejudice.

- *Doud, et al. v. Fleetwood Enterprises Inc., et al.* (Case No. 6:09-ap-01114-MJ) – class action filed on March 12, 2009, alleging violations under the WARN Act and California Labor Code §§ 1400 et seq. On September 15, 2009, Judge Jury entered an order consolidating the *Myers, Justice* and *Doud* WARN Act cases into this adversary proceeding wherein the plaintiffs were ordered to file a consolidated complaint. On December 16, 2009, the parties filed a Joint Status Conference Statement advising the Court that the parties had reached a settlement of the consolidated WARN Act Cases. The parties anticipate that they will document the settlement and file the required motions for approval under Bankruptcy Rules 7023 and 9019 shortly. The next status conference in the consolidated action is scheduled for March 3, 2010.

- *Fleetwood Homes of Tennessee, Inc. v. Ferrell Mobile Homes, Inc. et al.* (Case No. 6:09-ap-01176-MJ) – complaint filed on April 17, 2009, alleging causes of action for

breach of contract, goods sold and delivered, unjust enrichment, turnover of property, and violation of the automatic stay, arising out of the defendants' failure to pay for certain mobile home units. The parties negotiated a settlement and the case was dismissed on May 27, 2009.

- *Fleetwood Travel Trailers of California, Inc. et al. v. Nations Trailer Convoy, Inc.* (Case No. 6:09-ap-01185-MJ) – complaint filed on April 23, 2009, alleging causes of action for turnover of property and violation of the automatic stay, arising out of the defendant's failure to release certain travel trailer units in its possession. The parties negotiated a settlement and the case was dismissed on June 25, 2009.

- *Fleetwood Enterprises, Inc. v. Andresen, et al.* (Case No. 6:09-ap-01250-MJ) – complaint filed on May 21, 2009, requesting an injunction extending the automatic stay to the parties in a pending case in Florida - the Andresen action. On June 25, 2009, the Court entered an order that enjoined the Andresen action for a period of 90 days. At a status conference held on September 16, 2009, the Court granted Fleetwood's oral motion to dismiss the Andresen action.

- *Barabino v. Gamel et al.* (Case No. 6:09-ap-01347-MJ) – case was initiated in the U.S. District Court for the Eastern District of California on November 3, 2004. Plaintiff alleged causes of action for fraud, negligent misrepresentation, and violations of the Magnuson-Moss Warranty Act, the Song-Beverly Warranty Act, the California Consumer Legal Remedies Act, the Federal Odometer Act, the Automobile Sales Finance Act, the Rosenthal Fair Debt Collection Practices Act, and California Business & Professions Code § 17200. The case was transferred to the bankruptcy court on July 14, 2009. On December 22, 2009, Fleetwood filed a motion for summary judgment claiming that because Mr. Barabino failed to file a proof of claim in the Debtors' bankruptcy cases, he is forever barred from receiving any distribution from the estate on his claims. A hearing on the summary judgment motion was held on January 28, 2010, and on February 5, 2010, the Court entered an order granting Fleetwood's summary judgment motion. The action will be dismissed with prejudice shortly.

- *Fleetwood Homes of Georgia, Inc. v. Trailmaster Manufacturing, Inc.* (Case No. 6:09-ap-01356-MJ) – complaint filed on July 27, 2009, alleging breach of a contract to sell assets relating to a manufactured housing facility located in Georgia. A default judgment in the amount of $45,000 was entered in favor of plaintiff on September 24, 2009. There is a tentative settlement between the parties for $30,000.

- *Fleetwood Enterprises, Inc. v. Gibraltar Insurance Company, Ltd., et al.* (Case No. 6:09-ap-01361-MJ) – complaint filed on July 30, 2009, requesting an injunction extending the automatic stay to the parties in a pending case in Louisiana - the Joseph action. FEI has filed a motion for preliminary injunction and the Court entered an order granting the Debtors' motion on August 28, 2009. On December 29, 2009, FEI filed a status conference report, informing the Court that the Debtors and claimants have reached a settlement to all of the claims proceeding in Louisiana. On January 14, 3010, the Court held a status conference in this proceeding. At the status conference, the Debtors indicated that they plan to file a motion with the Court to approve the settlement. Following the status conference, the court stayed the proceeding for 90

Gibson, Dunn & Crutcher LLP

days to allow for the filing of the motion. Should the motion be granted, the adversary action will then be dismissed.

- *Fleetwood Enterprises, Inc., et al. v. AL-KO Kober Corporation* (Case No. 6:09-ap-01379-MJ) – complaint filed on August 7, 2009, alleging causes of action for avoidance of preferential transfers, avoidance of fraudulent transfers, and recovery of avoidable transfers. On October 7, 2009, the Committee, the Debtors and Al-Ko Kober entered into a stipulation resolving certain of AL-Ko Kober's claims and staying the adversary proceeding until the effective date of a confirmed plan or conversion to chapter 7. The Court entered its order approving the stipulation on October 9, 2009. A status conference is set for March 10, 2010.

- *Fleetwood Enterprises, Inc., et al. v. Cast Products Corporation* (Case No. 6:09-ap-01380-MJ) – complaint filed on August 7, 2009, alleging causes of action for avoidance of preferential transfers, avoidance of fraudulent transfers, and recovery of avoidable transfers. On October 14, 2009, the parties filed a stipulation in the adversary proceeding agreeing to work to resolve Cast Product's claims and staying the adversary proceeding for approximately 2 weeks. On October 15, 2009, the Court entered an order approving the stipulation. A status conference is set for March 10, 2010.

- *Fleetwood Enterprises, Inc., et al. v. Tristar Distributing Inc.* (Case No. 6:09-ap-01381-MJ) – complaint filed on August 7, 2009, alleging causes of action for avoidance of preferential transfers, avoidance of fraudulent transfers, and recovery of avoidable transfers. On October 14, 2009, the parties filed a stipulation in the adversary proceeding agreeing to work to resolve Tristar's claims and staying the adversary proceeding for approximately 2 weeks. On October 15, 2009, the Court entered an order approving the stipulation. A status conference is set for March 10, 2010.

- *Fleetwood Enterprises, Inc v. Bluelinx Corporation*, (Case No. 6:09-ap-01397-MJ) – complaint filed on August 17, 2009, alleging causes of action for avoidance of preferential transfers, avoidance of fraudulent transfers, and recovery of avoidable transfers. On September 15, 2009, the Committee, the Debtors and Bluelinx entered into a stipulation resolving Bluelinx's claims and staying the adversary proceeding until the effective date of a confirmed plan or conversion to chapter 7. The Court entered its order approving the stipulation on September 17, 2009. A status conference is set on March 10, 2010.

- *Lazy Days RV Center, Inc. v. Fleetwood Enterprises, Inc.* (Case No. 6:09-ap-01404-MJ) – complaint filed August 20, 2009, alleging causes of action for injunctive relief seeking to extend the automatic stay to Lazy Days in a state court action originally brought by John H. and Kelly J. Schalmo, et al. against Lazy Days and FEI. On December 28, 2009, Lazy Days, the Schalmo plaintiffs, and the Debtors entered into a stipulation to dismiss the adversary proceeding. The Court entered its order approving the stipulation and dismissing the action on December 28, 2009.

- *First American Trust Company, as Trustee for the Century Trust v. Fleetwood Enterprises, Inc. et al.* (Case No. 6:09-ap-01415-MJ) – complaint filed August 26,

2009, alleging causes of action against FEI and several of its former and current officers and directors for breach of contract, breach of fiduciary duty, fraud, conversion, declaratory relief, and equitable subordination relating to the alleged failure of defendants to pay 2007 and 2008 premiums under the John C. Crean Split Dollar Insurance Policies. The defendants filed their Answer to the complaint on October 28, 2009. A status conference is currently set for March 25, 2010.

- *Curtis Jay Howe v. Fleetwood Enterprises, Inc.* (Case No. 6:09-ap-01421) – complaint filed August 28, 2009, alleging violations for breach of contract and violation of ERISA relating to FEI's alleged prepetition severance plan. On December 16, 2009, Howe and FEI filed a joint status report notifying the Court that the parties had reached a settlement and that the parties anticipate that they will document the settlement and file the required motions for approval within the next month. A status conference is set for March 3, 2010.

- *Fleetwood Enterprises, Inc. v. Carl M. Tasker* (Case No. 6:09-ap-01518) – complaint filed October 23, 2009, seeking declaratory and injunctive relief under the Bankruptcy Code against at least 7,521 individual formaldehyde claimants who have claimed bodily injury against the Debtors in connection with the manufactured homes they provided to FEMA. Defendants filed their answer on November 24, 2009. The Debtors have reached a global settlement regarding the formaldehyde claims (subject to Court approval), which should resolve this action. The next status conference is set for March 11, 2010.

- *People of the State of California v. Fleetwood Enterprises, Inc.* (Case No.: 6-09-ap-01539) – complaint filed November 5, 2009 removing a case originally filed by the People (via the Riverside District Attorney ("DA")) in the Riverside Superior Court (Case No. RIC 533412), asserting causes of action for negligent violations of hazardous waste disposal laws, illegal transportation of hazardous waste and violations of unfair competition law. On January 7, 2010, the Riverside DA and FEI entered into a Stipulation for Settlement, whereby FEI agreed that the Riverside DA would have an allowed unsecured non-priority claim against FEI in the amount of $31,234.14, without the need to file a proof of claim or take further action against FEI in its bankruptcy case. *See* Adversary No. 09-01539, Docket No. 6 (Jan. 7, 2010). In exchange, the Riverside DA agreed to waive all claims against FEI or the other Debtors on account of the hazardous waste incident. On January 13, 2010, FEI filed a motion under Federal Bankruptcy Rule 9019 seeking approval of the settlement [Docket No. 1741], which was approved by the Court on February 9, 2010 [Docket No. 1806].

100772234_1.DOC

Gibson, Dunn &
Crutcher LLP

# APPENDIX E

## APPENDIX E

**Mandatory Mediation Procedures for Liquidating Product Liability Personal Injury Claims Covered Under a Policy of Insurance Issued by Gibraltar Insurance Co., Ltd.**

**1.      Personal Injury Claimants with Claims Based on Products Liability Shall Participate in a Mandatory Mediation Process.**

Claims based on product liability theories where personal injuries are alleged ("PI Claims")[1] may be covered by policies of insurance issued by Gibraltar Insurance Co., Ltd., a wholly owned subsidiary of Debtor FEI ("Gibraltar") in favor of Fleetwood. The proceeds of policies issued by Gibraltar are property of the Debtors' bankruptcy Estates to be administered in a manner that ensures the fair distribution of proceeds to claimants with allowed PI Claims.

Any trial of a PI Claim must be conducted before the United States District Court, rather than before the Bankruptcy Court.[2] However, before proceeding to trial, the Bankruptcy Court may require parties to participate in alternate dispute resolution proceedings in an effort to efficiently liquidate disputed claims without the need of a trial before the District Court to maximize the benefits available from limited insurance proceeds. **The Plan requires that all Holders of PI Claims ("PI Claimants") must first complete the mandatory mediation process described below before seeking a trial before the District Court.** All PI Claims shall remain stayed until the completion of the mediation process.

*The Plan Proponents do not make any representation as to the financial condition of Gibraltar, the financial ability of Gibraltar to pay out the full remaining coverage attributable to any Policy Year or that sufficient coverage remains to pay allowed PI Claims in full.*

**2.      The Debtors' Insurance Coverage for Products Liability Claims.**

Since 1977, the primary layer of products liability insurance for the Debtors' recreational vehicle and manufactured housing businesses has been provided by Gibraltar. Gibraltar has been in existence since 1977, is organized under the laws of Bermuda and it is subject to the laws of Bermuda governing insurance companies. Gibraltar only provides coverage to the Debtors and related non-debtor affiliates of the Debtors. Gibraltar is *not* one of the Debtors in these bankruptcy cases, nor has it filed insolvency proceedings under Bermuda law or other laws.

---

[1]  Capitalized terms used but not defined herein shall have the definitions ascribed to them in the Disclosure Statement.

[2]  Any claimant asserting non-personal injury claims against the Debtors will proceed through the normal claims resolution process administered by this Court and will not participate in mandatory mediation.

Since Gibraltar's inception, Gibraltar had provided Fleetwood with a "Product/Completed Operations Liability" policy to insure Fleetwood as to product liability claims as a primary layer up to a maximum aggregate products liability exposure (the "Gibraltar Policies") by year.[3]  Each Gibraltar Policy is an "occurrence policy" and the coverage year in which a claim falls is based on when the claim occurred rather than when the claim is asserted. Coverage limits varied by year.  There are pending PI Claims in Policy Years 1993, 1996, 1998, and 2000 through 2008.  Between 2004 and 2008, where the majority of the remaining PI Claims fall, coverage under each policy year is limited to $5,000,000 per occurrence and $5,000,000 in the aggregate.

The Gibraltar Policies also cover investigation and defense costs relating to covered claims, which are also subject to the policy coverage limits.  The Gibraltar Policies are, therefore, known as "wasting policies," meaning Gibraltar's payment of investigation and defense costs reduces total available coverage dollar-for-dollar.  If Gibraltar is forced to pay investigation and defense costs associated with the continuing litigation of the PI Claims, then the policy proceeds available for distribution on account of allowed PI Claims will decline by the amount paid.  Therefore, if any PI Claimant chooses to pursue a larger liquidated claim through litigation in the District Court, the potential opportunity to achieve a larger liquidated claim through litigation will be offset by the smaller pro rata recovery available from the diminished policy proceeds.

The Debtors also obtained excess liability coverage as identified on Schedules 1, 2 and 3 attached hereto, which apply differently depending on the Policy Year.  For 2004-2008, the applicable excess policies only cover any single claim that exceeds $5 million and ***do not*** provide coverage on an aggregate basis.  Further, the excess coverage only covers that portion of any single allowed PI Claim that exceeds $5 million and do the excess coverage does not cover investigation and defense costs.  Fleetwood does not expect any single claim to exceed $5 million and it is unlikely that the excess liability coverage will cover any PI Claims falling in Policy Years 2004 through 2008.[4]  Nevertheless, carriers providing excess coverage will receive notice of the mediation conferences and will be required to participate in the mediation process.

---

[3]  The policies run from November 1 in one year until November 1 of the next year.  For example, the Debtors had a Gibraltar Policy from November 1, 2004 to November 1, 2005 that applied to claims occurring during that year.  For ease of reference, the Plan uses the terms "2004 Gibraltar Policy" and "Policy Year 2004" when referring to the Gibraltar Policy that was in place from November 1, 2004 to November 1, 2005, and follows the same convention for all subsequent years.

[4]  *See* **Schedule 2** attached hereto for a graphic depiction of the Debtors' total products liability insurance coverage for each Policy Year between 2004 and 2008.

3.    **Any Coverage Disputes Will Need to be Resolved Before the PI Claims can be Liquidated.**

Some claimants have asserted that their claims are covered under one or more Gibraltar Policies. The Debtors dispute the existence of any coverage for any non-product liability claim or any claim not involving personal injury. If a dispute as to coverage arises, it will impossible to know the number of PI Claimants with viable PI Claims in any given Policy Year until the coverage dispute is resolved. Thus, if a coverage dispute arises, the Liquidating Trustee will initiate a declaratory relief adversary action in the Bankruptcy Court seeking a determination as to whether coverage exists (the "Coverage Dispute"). The mediation process as to a particular Policy Year may be delayed until all Coverage Disputes are resolved.

4.    **The Treatment of PI Claims Utilizing a Mandatory Mediation Process.**

Gibraltar has established reserves for each Policy Year given its historical claim experience and in conformance with Bermuda law. Payouts in excess of reserves could threaten the solvency of Gibraltar. In the event of Gibraltar's insolvency, Gibraltar may be unable to provide coverage to the full extent of the Gibraltar Policies as to all PI Claims and the value of the Gibraltar entity itself may be lost which may prevent the eventual sale of Gibraltar for the general benefit of the Debtors' Estate.

Because of the numerous competing claims for scarce proceeds, in order to prevent an inequitable "race to the proceeds," to protect the solvency of Gibraltar and to try to avoid the depletion of the Policy proceeds by excessive litigation costs, the Plan requires that all Holders of PI Claims against the Debtors or Gibraltar that occurred in any Policy Year follow the mandatory mediation procedures set forth below.

*The Plan Proponents do not represent that following these mediation procedures will guarantee the solvency of Gibraltar, the financial ability of Gibraltar to pay out the full remaining coverage attributable to any Policy Year or that sufficient coverage remains to pay any allowed PI Claim in full.*

A.    **Overview of the Mandatory Mediation Procedures.**

The Plan imposes a mandatory mediation program, in which the PI Claimants and Liquidating Trustee shall meet directly with a mediator. The goal is to avoid the significant economic burdens and delay that would be involved in formal litigation and to arrive at an agreed upon, liquidated, Allowed Claim. The process is, therefore, designed to preserve Gibraltar's limited, remaining insurance resources for the benefit of the Estates and the PI Claimants. If after fully following these mediation procedures, the parties fail to reach agreement as to the amount of a liquidated Allowed PI Claim, then the PI Claimant shall be allowed to have its claim tried before the United States District Court pursuant to the rules of that court.

While mediation under the procedures set forth below will be far less expensive than traditional litigation, there are nevertheless associated costs. These costs, including mediators' fees and expenses, attorney's fees for counsel to the Liquidating Trust, costs attendant to the Mediation Conferences, such as phone and/or video-teleconferencing costs, reasonable travel and

lodging costs of the mediator and counsel for the Liquidating Trustee incurred in attending a Mediation Conference, will be charged to the coverage provided under the applicable Gibraltar Policy and paid from the available Gibraltar Policy proceeds for the Policy Year in question.  For example, all such costs associated with the mediations for Policy Year 2004 will be paid in full from the 2004 Gibraltar Policy proceeds.

### B.    PI Claims Will be Classified and Mediated According to Policy Year.

All PI Claimants in a given Policy Year will be channeled through a mediation process with separate Mediation Conferences for each PI Claimant in that year.  There will be a different mediation session for each Policy Year, though the mediation procedures will generally be the same for all Policy Years.

Once the mediations for a given Policy Year are completed and, assuming the claims as to all PI Claimants in that Policy Year have been liquidated, the Liquidating Trustee may, in his discretion, begin the distribution of Gibraltar Policy proceeds to Claimants with allowed PI Claims in that year alone without regard to whether the PI Claims in any other Policy Year have been liquidated or allowed.  Alternately, the Liquidating Trustee may wait until PI Claims in other Policy Years, or PI Claims in all Policy Years have been liquidated, before making distributions of Gibraltar Policy proceeds

### C.    Selection of Mediator and Alternate Mediator.

The Liquidating Trustee will select a Mediator and an Alternate Mediator for each Policy Year from the panel maintained by the United States Bankruptcy Court for the Central District of California of qualified professionals who have volunteered and been chosen to serve as mediators in bankruptcy cases, adversary proceedings and other disputes.  The Mediator will mediate each PI Claim in the Policy Year for which he/she has been assigned.

### D.    Notice of Mediation.

Once a Final Order has been entered resolving any Coverage Dispute, the Liquidating Trustee shall cause a Notice of Mediation in Fleetwood Bankruptcy Case to be served by first class mail on counsel of record for each PI Claimant if available, or in the absence of information about counsel, on the last known address for the PI Claimant, and also any provider of excess insurance.  The notice shall include the following:

1. The name and contact information of the Mediator designated to conduct the mediation concerning the PI Claimant's claim.

2. The date, time and place of the Mediation Conference.

3. The procedures that will be followed during the Mediation Conference.

4. Who shall attend the Mediation Conference on behalf of each party.

5.  The materials or exhibits that should be provided to the Mediator before the Mediation Conference and any issues or matters that it would be helpful to have the parties address in their written mediation statements.

The Mediator may, in his/her discretion, also set a Pre-Mediation Tele-Conference to discuss the above matters.

Unless, in the discretion of the Mediator, attendance by telephone or videoconference is permitted, counsel for the Liquidating Trustee, the PI Claimant and authorized representatives of any carrier providing excess coverage shall each personally attend the Mediation Conference and any subsequent session(s) of that conference, unless excused by the Mediator.

The Mediation Conference shall proceed informally.  No discovery shall be taken or permitted in connection with the Mediation Conference without the Mediator's express approval. The rules of evidence shall not apply.  There shall be no formal examination or cross-examination of witnesses.  The Mediator shall have the broadest possible discretion to conduct the Mediation Conference in the manner and style of the Mediator's choosing, with the goal of reaching an agreement as to the liquidated amount of the PI Claim.

**5.      Claims Resolved Through the Mediation Process.**

If the parties reach agreement as to the liquidated amount of a PI Claim, the Liquidating Trustee shall prepare a written stipulation to be executed by the parties and the Mediator that reflects the liquidated amount of the PI Claim and any other terms of the parties' agreement, including waiver of the PI Claimants' right to a deficiency Claim against the Estate, if that is part of the agreement.

The Liquidating Trustee and the PI Claimant may also resolve PI Claims outside of, or prior to, this mediation process.  The agreement reflecting the parties' compromise may be submitted to the Court for approval along with PI Claims resolved by the mediation process or separately.

Upon the completion of a the Mediation Conferences as to a particular Policy Year, the Liquidating Trustee shall file a motion with the Court seeking approval of the agreement(s) of the parties and reporting whether all PI Claims within that Policy Year have been resolved or whether further proceedings are required to resolve any disputed PI Claim.

**6.      Disposition of Claims Not Resolved Through Mediation.**

If after completing these procedures, a PI Claimant and the Liquidating Trustee fail to reach agreement as to the amount of an allowed liquidated PI Claim, and then the Liquidating Trustee shall take the appropriate actions to cause the transfer of the claim dispute to the District Court as directed by the Bankruptcy Court.  The resolution of the PI Claim shall then be tried before the United States District Court pursuant to the rules of that Court.

7.    **Payment of Resolved PI Claims and the Treatment of Deficiency Claims.**

After all PI Claims are liquidated, and after all costs associated with the mediation have been paid in full from the Gibraltar Policy applicable to that Policy Year, the Liquidating Trustee shall submit the liquidated PI Claims to Gibraltar for payment up to the limits of the remaining proceeds attributable to each Policy Year.

- The full remaining proceeds in any Policy Year are *not* being tendered to pay PI Claims in that year.  The liquidated amount of any PI Claim will be based on the merits of the PI Claim itself.  *There is no assurance or representation that the full amount of the remaining proceeds in a given Policy Year will be used to pay liquidated PI Claims that occurred within that Policy Year.*

- *The aggregate amount of allowed PI Claims within a particular Policy Year may exceed proceeds available.*  If after all PI Claims within a particular Policy Year are liquidated and allowed, the aggregate amount of all PI Claims within that Policy Year exceeds remaining policy proceeds, then the PI Claims in that Policy Year shall receive a pro rata distribution of available proceeds in that Policy Year.

- *The Plan and these Mediation Procedures do not represent or assure that Gibraltar will remain solvent as determined under Bermuda law or otherwise have the financial ability to pay out the full remaining coverage attributable to any Policy.*  Gibraltar may become insolvent as a result of a number of reasons, including, but not limited to, demands on other polices issued by Gibraltar as to the Debtors' workers' compensation liability or the amount of allowed PI Claims in several policy years exceeding historical amounts and the reserves established.

- If Gibraltar is unable to pay the full amount the allowed PI Claims within a Policy Year due to the overall financial condition Gibraltar or otherwise, then all allowed PI Claims overall shall receive a distribution of proceeds and/or other assets of Gibraltar on a pro rata basis based on the assets of Gibraltar and in compliance with Bermuda law.

**The timing of the distributions of Gibraltar Policy proceeds is within the discretion of the Liquidating Trustee.**  Once all mediations as to PI Claims in a given Policy Year are completed and PI Claims have been liquidated, the Liquidating Trustee may, in its discretion, begin the distribution of Gibraltar Policy proceeds for that year without regard to whether the PI Claims in any other Policy Year have been liquidated or allowed, or he may wait until PI Claims in other Policy Years, or all Policy Years have been liquidated, before making distributions of Gibraltar Policy proceeds.

To the extent the allowed and liquidated amount of any PI Claim is not paid in full from the remaining proceeds of a Gibraltar Policy and/or excess insurance if coverage is available as to the allowed PI Claim within a given Policy Year, and if a PI Claimant has not agreed to waive any deficiency claim against the Estate, **then the amount of the Allowed PI Claim that is not paid from Gibraltar proceeds or excess insurance coverage shall be an Allowed General Unsecured Claim in Class 8 which shall be treated as provided in the Plan.**

8.      **Any Dispute Concerning these Procedures Shall be Resolved by the Bankruptcy Court.**

Any dispute as to these Mediation Procedures or the action of the Mediator or any matter related thereto shall be resolved by the United States Bankruptcy Court pursuant to the Plan, the United States Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

**Schedule 1.**
**Products Liability Insurance Layers – Primary (with reinsurance) and**
**Excess – 2000-03**

| | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|



EXCESS

Gerling $50.0 million

Gerling $50.0 million

Zurich $25.0 million / Gerling $25 million

Zurich $42.5 million

Lexington (AIG) $35 million

Lexington (AIG) $35 million

Swiss Re $35 million

National Union $50 million

Swiss RE $7.5 million

Swiss RE $7.5 million

National Union $7.5 million

PRIMARY

New Hampshire $2.5 million
Swiss RE $2 million
Gibraltar $3 million

New Hampshire $2.5 million

Gibraltar $5 million

Gibraltar $7.5 million

Gibraltar $7.5 million

| Available Proceeds Remaining in Primary Layer | **Gibraltar Exhausted** | **Gibraltar Exhausted?? $2,635,860** | **Gibraltar Exhausted?? $3,908,920** | **Gibraltar Exhausted?? $4,756,838** |
|---|---|---|---|---|

**Notes:**
- Gibraltar provided the $7.5 million primary layer of insurance in these Policy Years.
- For Policy Years 2000 and 2001, Gibraltar purchased third party reinsurance policies from Swiss Re International Business Insurance Company Limited and New Hampshire Insurance Company Per AIG Europe (UK) Limited. Therefore, Gibraltar's net exposure was less than the $7.5 million aggregate within the primary layer as shown above.
- The Debtor purchased excess coverage in 2000-2003 from Lexington Insurance Company, Gerling, Swiss Re, Zurich and National Union Fire Insurance Company of Pittsburgh, as depicted. In 2000-2003 the excess layer of insurance provided "first dollar coverage once the primary layer was exhausted.

**Schedule 2.**
**Products Liability Insurance Layers – Primary and Excess – 2004-08**



**Notes:**  For each of these Policy Years, the Debtors purchased excess coverage from Zurich, Starr Excess (AIG), AIG CAT, and American International Specialty Lines Insurance Company (ASLIC), in the amounts and for the Policy Years depicted above.  The excess layer only covers the amount by which any single claim exceeds $5.0 million.  The excess layer does not provide coverage in the aggregate, nor does it cover defense costs

**Schedule 3**
**Products Liability Insurance Layers—Primary and Excess—for Years with Open Claims**
**Occurring Prior to 2000**



|  | 1993 | 1996 | 1998 |
|---|---|---|---|

1993: $40m / 50% Zurich / 50% Lexington — Swiss RE $4.2m (Reinsurance of GIB) — Gibraltar $5.8m

1996: Lexington $35m — Swiss RE $7.5m — Gibraltar $7.5m

1998: Lexington $35m — Swiss RE $7.5m — New Hamp $2.5m — Swiss RE $2m — Gibraltar $3m

**Notes:**  In each of these policy years, Gibraltar insures up to $5 million in aggregate and $500,000 per occurrence. However Fleetwood also obtained a primary (supplemental) policy with Lexington, such that any claim (including defense costs) in excess of $500,000 is covered (up to an aggregate of $4.5 million).

100711907_1.DOC

10

**APPENDIX F**

Fleetwood Enterprises, Inc., et al, including Gibraltar Insurance Company, Ltd.
**Condensed Consolidated Balance Sheet**
**(Accrual Basis Only)**

| $ in Thousands | March 9, 2009 | | January 24, 2010 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and cash equivalents | $ | 23,986 | $ | 11,839 |
| Restricted Cash | | 650 | | 29,229 |
| Market investments | | 17,563 | | 20,705 |
| Receivables | | 33,994 | | 5,722 |
| Inventories | | 90,983 | | 86 |
| Deferred taxes | | - | | - |
| Assets of discontinued operations | | - | | - |
| Performance bond deposits | | - | | 14,871 |
| Other current assets | | 13,561 | | 3,218 |
| Total Current Assets | | 180,737 | | 85,670 |
| | | | | |
| Property, plant and equipment, net | | 130,044 | | 55,764 |
| Cash value of company-owned life insurance | | 4,016 | | - |
| Goodwill | | - | | - |
| Investment in subsidiary (CTPS) | | - | | 8,892 |
| CSV of life insurance policies (Split Dollar) | | - | | 6,153 |
| Other Assets | | 31,716 | | 3,142 |
| **TOTAL ASSETS** | $ | 346,513 | $ | 159,621 |
| | | | | |
| **POST PETITION LIABILITIES** | | | | |
| Accounts payable | $ | - | $ | 213 |
| Employee compensation and benefits | | - | | (2,418) |
| Product warranty reserve | | - | | - |
| Insurance reserves | | - | | (3,807) |
| Accrued Interest | | - | | 12,024 |
| Liabilities of discontinued operations | | - | | - |
| Short-term borrowings | | - | | 3,151 |
| Other current liabilities | | - | | (1,720) |
| Deferred compensation and retirement benefits | | - | | (62) |
| 5% convertible senior subordinated debentures | | - | | - |
| 6% convertible subordinated debentures | | - | | - |
| 14% Senior Note | | - | | 12,671 |
| Other long-term borrowings | | - | | (6) |
| Other non-current liabilities | | - | | - |
| **TOTAL POST PRETITION LIABILITIES** | $ | - | $ | 20,046 |
| | | | | |
| **PRE PETITION LIABILITIES** | | | | |
| Accounts payable | $ | 10,036 | $ | 10,201 |
| Employee compensation and benefits | | 20,207 | | 7,108 |
| Product warranty reserve | | 35,473 | | 4,757 |
| Insurance reserves | | 39,837 | | 22,015 |
| Accrued Interest | | 13,745 | | 13,745 |
| Liabilities of discontinued operations | | - | | - |
| Short-term borrowings | | 311 | | 311 |
| Other current liabilities | | 25,584 | | 18,649 |
| Deferred compensation and retirement benefits | | 9,076 | | 9,015 |
| 5% convertible senior subordinated debentures | | 1,069 | | 1,069 |
| 6% convertible subordinated debentures | | 160,142 | | 160,142 |
| 14% Senior Note | | 61,848 | | 61,848 |
| Other long-term borrowings | | 27,731 | | 23,731 |
| Other non-current liabilities | | 12,894 | | - |
| **TOTAL PRE PRETITION LIABILITIES** | $ | 417,953 | $ | 332,591 |
| | | | | |
| **TOTAL LIABILITIES** | $ | 417,953 | $ | 352,637 |
| | | | | |
| COMMITMENTS AND CONTINGENCIES | | | | |
| Shareholders equity: | | | | |
| Preferred stock, $1 par value, authorized 10,000,000 shares, non outstanding | | - | | - |
| Common stock, $.01 par value, authorized 300,000,000 shares, outstanding | | | | |
| 209,320,000 at January 25, 2009 and 64,257,000 at April 27, 2008 | | 2,092 | | 2,080 |
| Additional paid-in capital | | 623,279 | | 623,634 |
| Accumulated deficit | | (695,389) | | (817,468) |
| Accumulated other comprehensive loss | | (1,422) | | (1,262) |
| | | (71,440) | | (193,016) |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ | 346,513 | $ | 159,621 |

Note 1: This consolidated balance sheet includes non-debtors. The most significant is Gibraltar, the captive insurance company,
with assets of $24.5 million and liabilities of $21.0 million.
Note 2: Restricted cash includes amounts that are held as collateral for undrawn lines of credit or are restricted under the terms
of an applicable order of the bankruptcy court.
Note 3: Not reflected on the balance sheet are $16.6 million of letters of credit mainly to support the workers' compensation
self-insured exposure.

Note 4: Post-petition liabilities include activity from reserve adjustments that were set pre-petition. These adjustments will be
reclassified to offset pre-petition liabilites with no net impact to total liabilities reported on the balance sheet.

**APPENDIX G**

Fleetwood Enterprises, Inc., et al, including Gibraltar Insurance Company, Ltd.
Consolidated Income Statement
(Accrual Basis Only)

| | Actual FY09 | | | | Actual FY10 | | | | | | | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | March | April | May | June | July | August | September | October | November | December | January | Mar-09 to Jan-10 |
| **SALES** | | | | | | | | | | | | |
| Gross sales | $17,997,973 | $48,638,909 | $27,345,021 | $18,038,898 | $18,015,296 | $6,626,267 | $99,677 | - | - | - | - | $136,762,040 |
| Intercompany sales | | | | | | | | | | | | - |
| Sales discounts and allowances | (1,542,617) | (3,137,682) | (3,208,147) | (1,599,352) | (1,156,210) | (412,867) | 631,163 | | | | | (10,425,712) |
| Miscellaneous sales | | | (1) | | | | 3,046 | 585 | 404 | 369 | 376 | 4,778 |
| Other Taxes | | | | | | | | | | | | |
| NET SALES | 16,455,356 | 45,501,227 | 24,136,873 | 16,439,546 | 16,859,086 | 6,213,399 | 733,886 | 585 | 404 | 369 | 376 | 126,341,106 |
| **COST OF GOODS SOLD** | | | | | | | | | | | | |
| Beginning Inventory at cost | 54,893,879 | 54,737,018 | 48,729,429 | 46,480,861 | 42,130,003 | 9,396,576 | 234,504 | 120,342 | 119,656 | - | - | 256,842,269 |
| Purchases | 9,888,047 | 23,834,809 | 12,851,836 | 5,155,657 | (21,576,262) | (4,369,046) | (136,667) | 213,773 | 96,146 | - | - | 25,958,293 |
| Material Adjustments / Sold Inventories | | | (4) | | | | | | | (201,542) | (51,889) | (253,435) |
| Less: Ending Inventory at cost | 54,737,018 | 48,729,426 | 46,480,861 | 42,130,003 | 9,396,576 | 234,504 | 120,342 | 119,656 | 83,090 | - | - | 202,031,476 |
| TOTAL MATERIALS COST | 10,044,908 | 29,842,401 | 15,100,400 | 9,506,515 | 11,157,165 | 4,793,026 | (22,504) | 214,458 | 132,712 | (201,542) | (51,889) | 80,515,651 |
| **OPERATING EXPENSES** | | | | | | | | | | | | |
| Payroll - Insiders | - | 364,642 | 134,279 | 208,558 | 234,683 | 193,624 | 125,308 | 125,308 | 125,308 | 125,308 | 125,308 | 1,812,326 |
| Payroll - Other Employees | 3,480,894 | 11,207,605 | 5,584,386 | 5,698,840 | 5,533,342 | 3,544,573 | (3,830,243) | 312,553 | 232,817 | 154,638 | 267,389 | 32,186,793 |
| Payroll Taxes | 485,756 | 1,267,128 | 476,561 | 501,361 | 466,468 | 274,894 | 70,458 | 17,733 | 285,580 | 34,792 | 29,399 | 3,910,130 |
| Benefits | 808 | 808 | 422 | (1,212) | 133 | (2,034) | (1,870) | 83 | 5,886 | - | - | 2,234 |
| Depreciation and Amortization | 604,107 | 1,606,152 | 948,575 | 988,136 | 926,442 | 74,412 | 167,478 | 10,123 | 84,110 | 7,500 | 7,500 | 5,085,612 |
| Rent Expense - Real Property | 202,147 | 188,879 | 129,438 | 104,947 | 105,725 | 105,236 | 4,487 | 41,163 | 3,202 | 1,230 | 3,378 | 974,424 |
| Lease Expense - Personal Property | 59,437 | 60,025 | 87,844 | 53,471 | 74,412 | | | | | | | 525,197 |
| Insurance | 1,033,501 | 1,659,455 | 1,493,893 | 1,909,207 | 1,731,360 | 697,096 | (2,850,721) | 1,525,326 | 1,518,894 | 2,316,648 | (118,222) | 10,916,376 |
| Real Property Taxes | 124,622 | 303,965 | 235,458 | 189,426 | 193,623 | 175,169 | 198,264 | 106,035 | 17,033 | 81,868 | (80,097) | 1,544,966 |
| Telephone and Utilities | 375,113 | 524,900 | 396,778 | 352,067 | 310,719 | 350,743 | 66,674 | 118,098 | 115,628 | 77,152 | 49,496 | 2,737,369 |
| Repairs and Maintenance | 251,609 | 283,888 | 319,215 | 301,507 | 240,700 | 160,401 | 50,656 | 132,455 | 76,317 | 36,043 | 163,427 | 2,016,219 |
| Travel and Entertainment | 151,516 | 163,425 | 80,695 | 123,547 | 46,806 | 46,806 | 5,288 | 8,215 | 2,230 | 4,933 | 1,183 | 698,538 |
| Miscellaneous Operating Expenses | 8,083,887 | 13,667,825 | 4,135,871 | 8,391,220 | 8,383,819 | 7,583,819 | 2,891,301 | 2,490,686 | 2,997,858 | 1,702,255 | (942,781) | 80,037,183 |
| TOTAL OPERATING EXPENSES | 15,472,705 | 31,278,066 | 14,023,415 | 18,863,277 | 28,435,242 | 13,148,138 | 2,891,301 | 2,490,686 | 2,997,858 | 4,542,369 | (514,421) | 142,425,466 |
| INCOME/(LOSS) FROM OPERATIONS | (9,062,258) | (15,619,871) | (4,986,942) | (11,930,246) | (32,659,626) | (11,727,764) | 3,859,310 | (5,101,652) | (5,597,189) | (4,340,458) | 566,686 | (96,600,010) |
| **NON-OPERATING INCOME** | | | | | | | | | | | | |
| Interest Income | 1,066 | (7,741) | 1,022 | - | - | - | 941 | 40,920 | - | - | 742 | 36,951 |
| Interest Income - Intercompany | 23,817 | 65,100 | 44,459 | 44,459 | 44,459 | 44,459 | 44,459 | 44,459 | 44,459 | 44,459 | 44,459 | 489,047 |
| Interest Income - Common Securities | 5,532 | 15,676 | 16,894 | 37,177 | 57,185 | 144 | 62,019 | 113 | 66,640 | 63,728 | 10,610 | 335,717 |
| Interest Income - Taxable | | 166,147 | 15,058 | 26,418 | 30,711 | 10,819 | 21,714 | 27,401 | (132,121) | 161,296 | 24,049 | 351,492 |
| Investment Income - Management Fees | | | | | | | | | | | | |
| TOTAL NON-OPERATING INCOME | 30,415 | 239,182 | 77,433 | 108,053 | 132,355 | 55,422 | 129,132 | 112,893 | (21,022) | 269,483 | 79,860 | 1,213,206 |
| **NON-OPERATING EXPENSES** | | | | | | | | | | | | |
| Long Term Interest Expense - Senior Note | (809,564) | (212,809) | (1,548,185) | (1,548,185) | (1,548,185) | (1,586,100) | (1,586,100) | (1,586,100) | (1,586,100) | (1,586,100) | (1,586,100) | (17,118,528) |
| Long Term Interest Expense - Intercompany | (223,400) | (211,799) | (249,319) | (256,689) | (249,117) | (510,663) | (218,742) | (248,838) | (1,310,224) | (425,966) | (255,969) | (4,120,720) |
| Long Term Interest Expense - B of A | (242,175) | (351,637) | (1,016,602) | (558,971) | (601,710) | (506,231) | (509,621) | (81,433) | (156,982) | (147,232) | (127,057) | (4,299,453) |
| Long Term Interest Expense - CTPS | (454,153) | (1,241,352) | (847,752) | (847,752) | (847,752) | (847,752) | (10,430,371) | (835,687) | (835,687) | (835,687) | (835,687) | (18,859,632) |
| Long Term Interest Expense - Miscellaneous | 11,012 | 25,848 | 22,169 | 18,936 | 18,936 | 18,956 | (4,644) | - | - | - | - | 111,193 |
| TOTAL NON-OPERATING EXPENSES | (1,718,280) | (3,951,745) | (3,659,489) | (3,192,661) | (3,227,827) | (3,431,810) | (12,749,477) | (2,752,059) | (3,888,993) | (2,994,986) | (2,804,813) | (44,352,140) |
| OTHER | 2,744 | (442,309) | (26,882) | 1,817 | 341,177 | (1,413) | 30,778 | - | - | - | - | 343,660 |
| TAXES | 5,335 | (2,247) | 1,826 | 8,627 | (3,185,483) | (1,973,060) | | | | | | (5,594,465) |
| DISCONTINUED OPERATIONS | | | (2,687) | 23,432 | | | | | | | | 32,460 |
| NET INCOME (LOSS) | $(10,258,202) | $(18,887,877) | $(8,575,019) | $(15,025,298) | $(32,251,870) | $(13,132,505) | $(8,730,257) | $(7,740,819) | $(9,507,204) | $(7,065,961) | $(2,158,267) | $(133,833,278) |

# APPENDIX H

Fleetwood Enterprises, Inc.
Liquidating Trustee Budget
Estimated Post Confirmation Wind Down Costs
7/1/2010 - 10/31/2011

Note:
The estimates included in the Liquidation Trust Budget that support this analysis were created in February of 2010.  This information is subject to continuing review and revision, and the Plan Proponents reserve the right to update the liquidation analysis prior to Plan solicitation.

| ($ in thousands) | Liquidating Trust Budget Total | Footnotes: |
|---|---|---|
| Operations of Liquidation Trust | | |
| Payroll and Benefits | $ (706) | \<A\> |
| IT Outsourcer Payments | (250) | \<B\> |
| Property Taxes | (404) | \<C\> |
| Insurance | (250) | \<D\> |
| General and Administrative | (738) | \<E\> |
| U.S. Trustee Fees | (625) | \<F\> |
| Professional Fees | (4,870) | \<G\> |
| Plant Holding Costs | (270) | \<H\> |
| Total Operations of Liquidation Trust | $ (8,114) | \<I\> |

Footnotes:
\<A\> - Payroll assumes remaining employees are retained as independent contractors to wind down operations.
\<B\> - Remaining Transition Service Agreement costs for IT services from En Pointe.
\<C\> - Estimated property taxes for remaining idle real estate.
\<D\> - Estimated Director and Officer's insurance tail payment.
\<E\> - Other G&A costs such as repairs and maintenance, lease, storage costs, etc.
\<F\> - Anticipated quarterly fees to the US Trustee.
\<G\> - Professional fee estimate for post-confirmation fees only.
\<H\> - Plant holding costs for utilities and security for idle plants.
\<I\> - Excludes interest expense and professional fees incurred pre-confirmation.